Trials@uspto.gov                                                                Paper 32
571-272-7822                                                      Entered: June 13, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BMW OF NORTH AMERICA, LLC,
Petitioner,

v.

STRAGENT, LLC,
Patent Owner.

_____

Case IPR2017-00677
Patent 8,566,843 B2

_____

Before LYNNE E. PETTIGREW, PATRICK M. BOUCHER, and
CARL L. SILVERMAN, *Administrative Patent Judges*.

BOUCHER, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2017-00677
Patent 8,566,843 B2

In response to a Petition (Paper 2, "Pet.") filed by BMW of North America, LLC ("Petitioner"), we instituted an *inter partes* review of claims 51–59 of U.S. Patent No. 8,566,843 B2 ("the '843 patent"). Paper 8 ("Dec."). During the trial, Stragent, LLC ("Patent Owner") filed a Response (Paper 11, "PO Resp.") to which Petitioner filed a Reply (Paper 18, "Reply"). During the trial, Petitioner filed a Motion to Exclude portions of the testimony of Patent Owner's expert, which Patent Owner opposed, and to which Petitioner replied. Papers 20, 24, 26. An oral hearing was held on March 14, 2018, and a copy of the transcript was entered into the record. Paper 29 ("Tr.").[1]

We have jurisdiction under 35 U.S.C. § 6. This Decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of the claims on which we instituted trial. Based on the record before us, Petitioner has shown, by a preponderance of the evidence, that claims 51–59 are unpatentable.

## I. BACKGROUND

### A. The '843 Patent

The '843 patent describes systems and methods "for sharing information in a distributed system." Ex. 1001, col. 1, ll. 29–30. Such systems and methods are illustrated for system architectures such as "may be

---

[1] The hearing was a consolidated hearing for IPR2017-00676 and IPR2017-00677.

IPR2017-00677
Patent 8,566,843 B2

situated in automotive electronics or industrial control and monitoring systems." *Id.* at col. 3, ll. 11–13. An example is provided in Figure 1 of the '843 patent, which is reproduced below.



Figure 1 generally depicts elements of a distributed embedded communication and computing system. *Id.* at col. 3, ll. 9–11.

In an automotive environment, various electronic control units ("ECUs") control such applications as engine control, brake control, or diagnostics through connections to various sensors and actuators organized into separate subnetworks. *Id.* at col. 3, ll. 13–18. Such applications are themselves grouped into backbone system functions, such as "body control, power train, and chassis." *Id.* at col. 3, ll. 19–21. With a hierarchical

IPR2017-00677
Patent 8,566,843 B2

organization that includes gateways 101, 103, 104, 105, messages are relayed up and down through the system layers. *Id.* at col. 3, ll. 24–26. Each layer may contain multiple ECUs connected through wired serial multiplexing bus systems, with the '843 patent noting several examples that include Controller Area Network ("CAN"), Local Interconnect Network ("LIN"), and Flexray. *Id.* at col. 3, ll. 26–33.

At the highest level in the hierarchy, "the system level," system gateway 101 is connected via various busses to other system-level ECUs, to subsequent gateways 103, and to external components 120. *Id.* at col. 3, ll. 60–67. In addition, system gateway 101 may be connected to external gateway 131 to link the system to remote device 132. *Id.* at col. 4, ll. 1–6. "Subsequent to the system level may be several layers of groups and subgroups that are link[ed] to the higher levels via gateways (101, 103, 104, 105)." *Id.* at col. 4, ll. 7–9.

In operation, ECU 102 receives "real-time" input variables from local sensors 108 or from networked sensors 106, respectively via signal lines 113 or multiplexing bus system 112. *Id.* at col. 3, ll. 39–42. "[R]eal-time may include any response time that may be measured in milli- or microseconds, and/or is less than 1 second." *Id.* at col. 3, ll. 36–38. ECU 102 processes the input variables and generates output variables that may be shared with other ECUs 102. *Id.* at col. 3, ll. 46–51. Two relevant modes of sharing are described.

IPR2017-00677
Patent 8,566,843 B2

First, ECUs 102 "typically share information with devices that are connected on the same physical multiplexing system. This method of information sharing is called horizontal information sharing in a hierarchical system." *Id.* at col. 3, ll. 51–55.

Second, a bulletin board may be used so that "the information is shared, in real-time, among a plurality of heterogeneous processes." *Id.* at col. 1, ll. 31–33. According to the '843 patent, "heterogeneous networks may refer to any different communication networks with at least one aspect that is different." *Id.* at col. 7, ll. 27–29. Figure 7 of the '843 patent, reproduced below, illustrates a logical architecture between three heterogeneous network controllers using such a bulletin board.



IPR2017-00677
Patent 8,566,843 B2

Figure 7 illustrates a system architecture in which a bulletin board acts as a shared memory interacting with multiple communication busses, with data received from one communication bus stored on the bulletin board and shared as a new message with other network types. *Id.* at col. 7, ll. 4–37.

The illustrated architecture includes four principal components: (1) network controllers 702, 703, and 704 (first column) for each of multiple heterogeneous networks; (2) associated operating system interfaces 705 for each of the heterogeneous networks (second column); (3) remote message communication processes 706 for stripping out network-specific information (third column); and (4) the bulletin board, which may contain events 607, real-time variables 608, configuration parameters, and firmware. *Id.* at col. 5, ll. 63–67, col. 6, ll. 33–37. In operation, external event 701, such as a flag indicating that data from a sensor are available, is transmitted on a network to a communication bus controller, such as network controller 703 in the drawing. *Id.* at col. 7, ll. 4–9. This causes an operating system interface (such as communication interface 709) to notify a remote message communication process (such as remote message conversion method 710) that data are available, with notification provided in turn to application process 606. *Id.* at col. 7, ll. 4–17.

## B.  Prosecution History

The application that matured into '843 patent is a continuation of the application that matured into U.S. Patent No. 8,209,705 ("the '705 patent"),

6

IPR2017-00677
Patent 8,566,843 B2

filed July 30, 2008. Ex. 1001 at [63]. The '705 patent is a continuation of

U.S. Patent No. 7,802,263 ("the '263 patent"), filed December 15, 2003. *Id.*

The '843 patent also claims the benefit of the filing date of U.S. Provisional

Application No. 60/434,018 ("the '018 provisional application"), filed

December 17, 2002. *Id.* at [60].

At the time of filing the application that matured into the '263 patent,

independent claim 1 recited the following:

> 1. A method for sharing information in a distributed system,
> comprising:
>> receiving information;
>> storing the information on a bulletin board; and
>> sharing, in real-time, the information among a plurality
> of heterogeneous processes.

Ex. 1011, 649. Although certain amendments were made to the claim during

prosecution, allowance was secured only after an interview with the

Examiner in which the applicants authorized the addition of several

limitations that Petitioner characterizes as "memory-related":

(1) "requesting a bulletin board resource of one or more bulletin boards"; (2)

"determining whether the bulletin board resource is available"; (3) "in the

event the bulletin board resource is not available, re-requesting the bulletin

board resource until a threshold has been reached"; and (4) storing the

information on the bulletin board resource "in the event the bulletin board

resource is available." *Id.* at 250–252; *see* Pet. 4–5.

Independent claim 1 was filed in the same original form at the time of

filing the application that matured into the '705 patent. Ex. 1002, 255.

IPR2017-00677
Patent 8,566,843 B2

During prosecution, the applicants amended the claims to add what
Petitioner characterizes as "memory-related limitations similar to those in
the claims of the '263 patent":

> in the event the storage resource is not available,
> <u>determining whether a timeout has been reached and</u> causing a
> re-request in connection with the storage resource <u>if the timeout
> has not been reached</u>; [and]
>> <u>in the event the timeout has been reached, causing an error
>> notification to be sent</u>.

*Id.* at 84–85 (underscoring in original to identify material added by
amendment). These added limitations were among those identified by the
Examiner in allowing the application as not "disclose[d] or suggest[ed]"
"when taken in the context of [the] claims as a whole." *Id.* at 98–99.

Similarly, independent claim 1 was again filed in the same original
form at the time of filing the application that matured into the '843 patent.
Ex. 1018, 220. The originally filed claims were subsequently canceled
during prosecution and applicants "submitted fifty-nine new claims with the
memory related limitations similar to the allowed '705 patent claims."
Pet. 7; Ex. 1018, 116–32. The amended claims were subsequently allowed
without express Reasons for Allowance by the Examiner. Ex. 1018, 63–94.

## C. Illustrative Claim

Challenged claim 51, which is illustrative of the challenged claims, is
reproduced below with numbers added to identify specific elements of the
claim in accordance with the scheme used by Petitioner. *See* Pet. 10–11.

8

IPR2017-00677
Patent 8,566,843 B2

51.  [0] An apparatus, comprising:

[1] a control unit configured for:

[2] identifying information associated with a message received utilizing a first network protocol associated with a first network;

[3] issuing a storage resource request in connection with a storage resource and determining whether the storage resource is available;

[4] determining whether a threshold has been reached in association with the storage resource request;

[5] in the event the storage resource is not available and the threshold associated with the storage resource request has not been reached, issuing another storage resource request in connection with the storage resource;

[6] in the event the storage resource is not available and the threshold associated with the storage resource request has been reached, sending a notification; and

[7] in the event the storage resource is available, storing the information utilizing the storage resource;

[8] wherein the apparatus is operable such that the information is capable of being shared in real-time utilizing a second network protocol associated with a second network, and the control unit includes:

[9] a first interface for interfacing with the first network, the first interface including a first interface-related first component for receiving first data units and a first interface-related second component, the control unit being operable such that the first data units are processed after which processed first data units are provided, where the first network is at least one of a Controller Area Network type, a Flexray type, or a Local Interconnect Network type; and

[10] a second interface for interfacing with the second network, the second interface including a second interface-related first component for receiving second data units and a second interface-related second component, the control

IPR2017-00677
Patent 8,566,843 B2

unit being operable such that the second data units are processed after which processed second data units are provided, where the second network is at least one of the Controller Area Network type, the Flexray network type, or the Local Interconnect Network type.

Ex. 1001, col. 18, l. 29–col. 19, l. 5.

### D. Evidence

Petitioner relies on the following references. Pet. 15–25.

| Staiger | US 2002/0073243 A1 | June 13, 2002 | Ex. 1004 |
| Millsap | US 6,484,082 B1 | Nov. 19, 2002 | Ex. 1015 |

OSEK/VDX Binding Specification, Version 1.3 (Sept. 17, 2001) ("OSEK Binding) (Ex. 1007)

OSEK/VDX Communication Specification, Version 2.2.2 (Dec. 18, 2000) ("OSEK COM") (Ex. 1008)

OSEK/VDX Network Management Concept and Application Programming Interface, Version 2.51 (May 31, 2000) ("OSEK NM") (Ex. 1009)

OSEK/VDX Fault-Tolerant Communication, Version 1.0 (July 24, 2001) ("OSEK FTCom") (Ex. 1010)[2]

In addition, Petitioner provides Declarations by Vijay K. Madisetti, Ph.D., Christopher Butler, and R. Benjamin Cassady, which we have also

---

[2] Petitioner refers to OSEK Binding, OSEK COM, OSEK NM, and OSEK FTCom collectively as "OSEK/VDX." We sometimes use the same terminology herein.

IPR2017-00677
Patent 8,566,843 B2

considered.  Exs. 1003, 1013, 1014, 1026.  No cross-examination testimony of these witnesses was filed in the proceeding, and Patent Owner explicitly confirmed that it did not cross-examine Dr. Madisetti.  Tr. 41:14–16.

Patent Owner provides a Declaration by Jeffrey A. Miller, Ph.D.  Ex. 2001.  Dr. Miller was cross-examined by Petitioner, and a transcript of his deposition was entered into the record.  Ex. 1025.  Dr. Miller's Declaration is also the subject of a Motion to Exclude filed by Petitioner, to which Patent Owner responded and Petitioner replied.  Papers 20, 24, 26.

## E.  Asserted Grounds of Unpatentability

Petitioner challenges claims 51–59 over the following combinations of references.  Pet. 15.

| References | Basis |
| --- | --- |
| Staiger and Millsap | § 103(a) |
| OSEK/VDX | § 102(b) |
| OSEK/VDX | § 103(a) |
| OSEK/VDX and Millsap | § 103(a) |

We instituted this proceeding on all of the above-identified challenges, except the anticipation ground over OSEK/VDX.  Dec. 33.  Subsequent to instituting the proceeding, on April 24, 2018, the Supreme Court held that a final written decision under 35 U.S.C. § 318(a) must decide the patentability of all claims challenged in a petition for *inter partes* review.  *SAS Institute, Inc. v. Iancu*, 138 S.Ct. 1348 (2018).  Accordingly, we notified the parties that "[w]e modify our institution decision to institute on all of the challenged

11

IPR2017-00677
Patent 8,566,843 B2

claims and all of the grounds presented in the Petition."  Paper 31, 2.
Specifically, we informed the parties that, notwithstanding the original
institution on a subset of the grounds, "the Board intends to address the
anticipation grounds over OSEK/VDX in its . . . final written decision[]."
*Id.*  Neither party has requested further briefing in light of that notification.

### F.  Real Parties in Interest

Petitioner identifies BMW of North America, LLC, BMW
Manufacturing Co., LLC, and Bayerische Motoren Werke, AG as real
parties in interest in this proceeding.  Pet. 83.

Patent Owner identifies only itself as a real party in interest.  Paper 5,
1.

### G.  Related Proceedings

The parties identify the following district-court proceedings as
involving the '843 patent:  (1) *Stragent, LLC v. BMW of North America,
LLC*, No. 6:15-cv-00446 (E.D. Tex.); (2) *Stragent, LLC v. Mercedes-Benz
USA, LLC*, No. 6:15-cv-00447 (E.D. Tex.); and (3) *Stragent, LLC v. Volvo
Cars of North America, LLC*, No. 6:15-cv-00448 (E.D. Tex.).  Pet. 83;
Paper 5, 1–2.

The parties also identify several *inter partes* review proceedings
involving the '843 patent:  IPR2017-00457, IPR2017-01503, IPR2017-
01504, IPR2017-01519, and IPR2017-01520.  Paper 10, 1–2; Paper 13, 2.

IPR2017-00677
Patent 8,566,843 B2

Patent Owner further identifies several *inter partes* review proceedings involving the '705 patent: IPR2017-00458, IPR2017-00676, IPR2017-01502, IPR2017-01521, and IPR2017-01522. Paper 13, 2.

## II. ANALYSIS

### A. *Motion to Exclude*

Petitioner moves to exclude "at least paragraphs 16-21 and 30-104" of Dr. Miller's Declaration (Ex. 2001). Paper 20, 1. Petitioner contends that the identified paragraphs "are not the product of reliable principles and methods," contrary to Fed. R. Evid. 702, "because both Dr. Miller's declaration (Ex. 2001) and his deposition (Ex. 1025) show that Dr. Miller applied a wrong claim construction standard, and misunderstood a key legal concept that impacts his opinions on obviousness." *Id.* at 2. Specifically, Petitioner observes that Dr. Miller's Declaration "is completely silent regarding the claim construction standard applied," and argues that Dr. Miller's deposition testimony "exposed that he did not apply the proper standard, or at least did not apply it correctly." *Id.* at 3. Petitioner speculates that "Dr. Miller was likely not informed of and did not follow the process outlined for construing claims in an IPR." *Id.* at 4.

We have reviewed the relevant deposition testimony, in which Dr. Miller was asked to identify the standard he used when construing claim terms in his Declaration. Ex. 1025, 27:1–34:14. We agree with Petitioner that Dr. Miller did not provide responses sufficient to conclude that he was

IPR2017-00677
Patent 8,566,843 B2

aware of and/or applied the correct claim-construction standard.  *See id.* at
27:5–6 ("I used what is generally accepted in the field."), 27:9–11 ("So to –
for construing the claim terms is providing a definition of what the term is.
So I provided a general definition for the terms."), 30:3–6 ("Well, that's the
standard that I used for construing the claim terms in this Declaration.  I
don't know if that's the legal qualification for construing claim terms."),
32:18–23 ("broadest reasonable interpretation" would mean "when you're
defining a term that you would define it in a way that is, first of all,
reasonable, that it makes sense and that it's broad, meaning general and that
it's interpreting the phrase or the term").

     Nevertheless, we are not persuaded that the appropriate remedy is
exclusion of Dr. Miller's testimony.  As Patent Owner asserts, "[t]he role of
the expert witness under the Federal Rules of Evidence is to 'help the trier of
fact to understand the *evidence* or to determine a *fact* in issue.'"  Paper 24,
2–3 (quoting Fed. R. Evid. 702) (emphasis by Patent Owner).  As Patent
Owner further asserts, Petitioner does not "impugn[]" Dr. Miller's credibility
as an expert in the subject matter at issue.  *Id.* at 3–4.  We agree with Patent
Owner that "Petitioner's attack on the sufficiency of the evidence is
improper in a motion to exclude."  *Id.* at 4 (citing *Microsoft Corp. v.
Surfcast, Inc.*, Case IPR2013-00292 at 52–53 (Paper 93) (PTAB Oct. 14,
2014)).  We accordingly deny Petitioner's Motion to Exclude.

     Petitioner alternatively argues in its Reply that "Because Dr. Miller
did not apply the correct claim construction standard, his opinions on claim

IPR2017-00677
Patent 8,566,843 B2

construction (Ex. 2001, §§16-21) should be afforded no weight."  Reply 2.
Although we agree that the weight to be accorded to Dr. Miller's testimony
on claim construction is impacted by the uncertainty of the analytical
procedure he followed, we are not persuaded that his testimony should be
discounted wholesale.  Dr. Miller provides relevant opinions on a number of
issues, particularly including how a person of ordinary skill in the art would
understand certain terms in light of the Specification, that are helpful to us as
the trier of fact.  "There is no more certain test for determining when experts
may be used than the common sense inquiry whether the untrained layman
would be qualified to determine intelligently and to the best possible degree
the particular issue without enlightenment from those having a specialized
understanding of the subject involved in the dispute."  Ladd, Expert
Testimony, 5 Vand. L. Rev. 414, 418 (1952).

*B.  Claim Construction*

The Board interprets claims of an unexpired patent using the broadest
reasonable construction in light of the specification of the patent in which
they appear.  *See* 37 C.F.R. § 42.100(b); *Cuozzo Speed Techs., LLC v. Lee*,
136 S.Ct. 2131, 2144–46 (2016) (upholding the use of the broadest
reasonable interpretation standard).  An inventor may provide a meaning for
a term that is different from its ordinary meaning by defining the term in the
specification with reasonable clarity, deliberateness, and precision.  *In re
Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

15

IPR2017-00677
Patent 8,566,843 B2

### 1.  "real-time"

Independent claim 51 recites that information is capable of being shared "in real time utilizing a second network protocol . . . ," and dependent claim 59 recites that information is processed "to create, in real-time, messages in at least two other message formats . . . ."  Petitioner argues that the Specification of the '843 patent expressly defines "real-time":  "In the context of the present description, real-time may include any response time that may be measured in milli- or microseconds, and/or is less than 1 second."  Ex. 1001, col. 3, ll. 35–38.  Accordingly, Petitioner proposes that "'real-time' should be construed as responses that occur in less than one second."  Pet. 13.  Patent Owner contends that the definition from the Specification should be adopted.  PO Resp. 15.

We construe "real-time" as Petitioner proposes, i.e., as including responses that occur in less than one second.  The first part of the quote cited above provided in the Specification ("may be measured in milli- or microseconds") is not limiting because *any* response time, no matter how large or small, may be *measured* in milli- or microseconds.

### 2.  "threshold"

Independent claim 51 recites "determining whether a threshold has been reached in association with the storage request."  Petitioner proposes that "threshold" be construed consistent with a dictionary definition it

16

IPR2017-00677
Patent 8,566,843 B2

provides, as a "value above which something is true or will take place and below which it is not or will not." Pet. 13–14 (citing Ex. 1016, 5). Observing that the Specification of the '843 patent uses "threshold" in the context of an elapsed time, Petitioner further proposes that this construction "include the maximum value (i.e., time-out) of a timer." *Id*. (citing Ex. 1001, col. 8, ll. 21–25, col. 8, ll. 47–51). We agree, and accordingly construe "threshold" as Petitioner proposes.[3]

### 3. *"heterogeneous networks"*

Dependent claim 55 recites that the "apparatus is operable such that the first network and the second network are heterogeneous networks." The Specification of the '843 patent defines "heterogeneous networks": "In the context of the present description, heterogeneous networks may refer to any different communication networks with at least one aspect that is different." Ex. 1001, col. 7, ll. 26–29. In light of this explicit definition, for purposes of this Decision, we construe "heterogeneous networks" as Petitioner proposes, i.e., as "networks having at least one aspect that is different." Pet. 14 (citing

---

[3] Patent Owner advocates for the same construction advanced by Petitioner, but omits inclusion of the maximum value of a timer. PO Resp. 15. Although Patent Owner asserts that the construction is otherwise "the definition provided by the '843 Patent," it does not cite to the '843 patent to support its assertion, and we are unable to identify such a definition in the patent. Nevertheless, we agree with Petitioner that any distinction between the constructions is not material to any grounds. *See* Reply 6.

17

IPR2017-00677
Patent 8,566,843 B2

Ex. 1003 ¶ 60).  Patent Owner proposes the same construction.  PO Resp.
16.

### 4. *"the information is capable of being shared"*

Independent claim 51 recites that "the apparatus is operable such that
the information is capable of being shared in real-time utilizing a second
network protocol associated with a second network." Ex. 1001, col. 18, ll.
49–52.  In its Response, Patent Owner proposes the following construction:

> [T]he term "shared in real-time utilizing a second network
> protocol associated with a second network" can only mean that
> the first data units have been delivered to storage, where they are
> partaken of, used, experienced or occupied (that is "shared") by
> the second network, and that the entire process is conducted "in
> milli- or microseconds, and/or is less than 1 second."

PO Resp. 16–17.  Patent Owner bases its proposal on a general-dictionary
definition of "share" and its proposed construction of "real-time." *Id.* at 16
(citing Ex. 2003).  At the oral hearing, Patent Owner also appeared to rely on
the interaction of the limitation with other limitations recited in claim 51,
particularly, "in the event the storage resource is available, storing the
information utilizing the storage resource." Tr. 22:11–25:7.  In addition,
Patent Owner cites to several quotations drawn from the Specification of the
'843 patent that relate to sharing information by its storage on a bulletin
board.  PO Resp. 17–19 (citing Ex. 1001, col. 1, ll. 30–33, col. 3, ll. 51–59,
col. 6, ll. 27–31, col. 10, l. 67–col. 11, l. 9, col. 11, ll. 20–58).

IPR2017-00677
Patent 8,566,843 B2

Petitioner disputes Patent Owner's proposed construction, noting that the limitation does not recite any "storage" or "deliver[ing]" first data units to storage. Reply 6–7. In addition, Petitioner contends that Patent Owner's proposed construction "contradicts the '843 specification," in part because of the disclosure of "horizontal information sharing," which does not require bulletin-board storage. *Id.* at 8.

We find it unnecessary to construe the entire (unparsed) limitation set forth above, which includes elements such as "real-time," for which Patent Owner has proposed an independent construction. Rather, it is sufficient to construe "the information is capable of being shared," with the full limitation further limiting the format used. In construing "the information is capable of being shared," we note that Patent Owner has submitted a definition of "share" drawn from a technical dictionary into the record of this proceeding, although Patent Owner does not cite the technical dictionary in addressing construction of the phrase. Ex. 2004.[4] We find the technical dictionary provided by Patent Owner to be more probative than the general-purpose dictionary Patent Owner cites.

_____

[4] We note that, even if Patent Owner had not entered Exhibit 2004 into this proceeding, judges are free to rely on extrinsic dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 n.6 (Fed. Cir. 1996) *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1322–23 (Fed. Cir. 2005) (en banc).

19

IPR2017-00677
Patent 8,566,843 B2

The language of the general-purpose dictionary that refers to "to partake of, use, experience, occupy, or enjoy with others; to have in common," does not appear to contemplate the sharing of "information," which the '843 patent Specification describes as "includ[ing] data, a signal, and/or anything else capable of being stored and shared." *See* Ex. 2003 (general definition of "share"); Ex. 1001, col. 3, ll. 56–59. Instead, the technical definition of "[t]o make files, directories, or folders accessible to other users over a network" is more relevant because it expressly contemplates the same context as the '843 patent, i.e., sharing over a network. Ex. 2004 (technical definition of "share").

We also agree with Petitioner that construction of "the information is capable of being shared" does not encompass delivery of the information to storage, which is addressed in other limitations of claim 51, and need not be read into the limitation at issue. *See* Tr. 9:18–21. Furthermore, the description of "information" as "capable of being stored *or* shared" in the '843 patent Specification is consistent with storage and sharing being distinct concepts. *See* Ex. 1001, col. 3, ll. 56–59 (emphasis added). In addition, the inclusion of an embodiment in that Specification that does not appear to require storage of the shared information reinforces our conclusion. Ex. 1001, col. 3, ll. 51–55; *see* Tr. 8:7–12, 12:1–14.

In light of these considerations, we construe "the information is capable of being shared" in parallel with the technical-dictionary definition

20

IPR2017-00677
Patent 8,566,843 B2

provided by Patent Owner, i.e., as capable of being made accessible, but not requiring storage of the information.

## C.  Effective Filing Date

Petitioner contends that the challenged claims are "entitled only" to the December 15, 2003, filing date of the '263 patent as their effective filing date, and that they are not entitled to the December 17, 2002, filing date of the '018 provisional application.  Pet. 8–10.  Petitioner argues that "the '263 patent is the first instance where Patent Owner even arguably disclosed the memory-related claim limitations," and that the '018 provisional application does not disclose

> at least the following limitations of claim 51:  "determining whether a threshold has been reached in association with the storage request"; "in the event the storage resource is not available and the threshold associated with the storage resource request has not been reached, issuing another storage resource request in connection with the storage resource"; and "in the event the storage resource is not available and the threshold associated with the storage resource request has been reached, sending a notification."  Ex. 1001, claim 51; *see generally* Ex. 1005.

*Id.* at 9–10.  Petitioner further contends that "the ['018] provisional application simply and generally states that 'the bulletin board manager provides mechanisms for access control,'" and that "[t]his broad statement in no way discloses the claim limitations as described above."  *Id.* (citing Ex. 1005, 9).

21

IPR2017-00677
Patent 8,566,843 B2

In the Institution Decision, we determined that Petitioner had, through these contentions, satisfied its initial burden of production with respect to the issue of the challenged claims' effective filing date. Dec. 10–11. As we noted, "Petitioner adequately identifies specific claim limitations that it contends are unsupported by the '018 provisional application and identifies specific disclosure in the '018 provisional application that it contends is insufficient." *Id.* at 12 (citing *Dynamic Drinkware, LLC v. National Graphics, Inc.*, 800 F.3d 1375, 1380 (Fed. Cir. 2015)). Patent Owner does not contest in its Response that the challenged claims are entitled only to an effective filing date of December 15, 2003. Based on the record, we accord that effective filing date to the challenged claims.

### D. Legal Principles

To establish anticipation, each and every element in a claim, arranged as recited in the claim, must be found in a single prior art reference. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008); *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001). While the elements must be arranged in the same way as is recited in the claim, "the reference need not satisfy an *ipsissimis verbis* test." *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009); *In re Bond*, 910 F.2d 831, 832–33 (Fed. Cir. 1990). Identity of terminology between the anticipatory prior art reference and the claim is not required. Prior art references must be "'considered together with the knowledge of one of ordinary skill in the

22

IPR2017-00677
Patent 8,566,843 B2

pertinent art.'" *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

Also, "it is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom." *In re Preda*, 401 F.2d 825, 826 (CCPA 1968). As the Court of Appeals for the Federal Circuit recently explained, the dispositive question for anticipation is whether one skilled in the art would reasonably understand or infer from a prior art reference that every claim element is disclosed in that reference. *Eli Lilly v. Los Angeles Biomedical Research Inst.*, 849 F.3d 1073, 1074–1075 (Fed. Cir. 2017).

A claim is unpatentable for obviousness under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when in evidence, objective indicia of non-obviousness, i.e., secondary considerations.[5] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

---

[5] The parties do not address secondary considerations, which accordingly do not form part of our analysis.

Additionally, the obviousness inquiry typically requires an analysis of "whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) (requiring "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness")); *see In re Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1333 (Fed. Cir. 2016) (citing *DyStar Textilfarben GmbH & Co. Deutschland KG v. C. H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006)).

To prevail on its challenges, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.* 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review). Furthermore, Petitioner does not satisfy its burden of proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

IPR2017-00677
Patent 8,566,843 B2

### E. Level of Skill in the Art

The parties advocate for the adoption of similar levels of ordinary skill in the art.  Petitioner contends that a person of ordinary skill "would have a bachelor's degree in electrical engineering, computer engineering, or a related engineering discipline and at least two years of industry experience in the field of distributed computing or automotive engineering, or equivalent experience, education, or both."  Pet. 10.  In addition, Petitioner contends that such a person "would also have knowledge or familiarity with in-vehicle computing."  *Id.* (citing Ex. 1003 ¶¶ 63–64).  Dr. Madisetti's testimony supports Petitioner's proposal.  Ex. 1003 ¶¶ 63–64.

> Patent Owner similarly contends that a person of ordinary skill
>
> would have had at least the qualifications of or equivalent to either a master's degree in electrical engineering, computer science, or computer engineering with course work or research in embedded networking technologies or an undergraduate degree in electrical engineering, computer science, or computer engineering with at least two years of relevant work experience in industry.

PO Resp. 19.  Dr. Miller's testimony supports Patent Owner's proposal.  Ex. 2001 ¶ 12.  The principal difference between the levels proposed by the parties is Petitioner's requirement that the person have knowledge or familiarity with "in-vehicle computing."  Although the Specification illustrates its systems and methods for sharing information in a distributed system in the context of vehicle applications, the claims are not so limited.  We are not persuaded that familiarity with in-vehicle computing would be a

25

IPR2017-00677
Patent 8,566,843 B2

characteristic of a person of ordinary skill.  We therefore adopt Patent Owner's expression of the level of skill in the art, noting that it instead requires some level of familiarity with embedded networking technologies.

### F.  Obviousness over Staiger and Millsap
### 1.  Independent Claim 51

Staiger, which "relates to a method and a circuit arrangement for communication within and across networks," was filed on December 4, 2001, and published on June 13, 2002.  Ex. 1004 ¶ 1, [22], [43].  Consistent with the effective filing date we accord the challenged claims, Staiger is thus prior art to the '843 patent.

Like the '843 patent, Staiger presents its description of communicating across networks in the context of an automotive environment, describing an ECU as follows:

> An Electronic Control Unit (ECU) in a modern automobile is an example of such a[ circuit] arrangement.  The ECU may be connected to a plurality of real-time networks, e.g., several individual CAN (Controller Area Network) busses or other multiple purpose networks, like multimedia-networks, such as MOST (Media Oriented Systems Transport), i.e., an optical bus system used in automobiles, or IEEE1394 (Firewire).

Id. ¶ 3.  Staiger explains that, during operation, the ECU executes an application for controlling remote systems while also monitoring various busses and networks to select and retrieve parameters required for the application programs in progress.  Id. ¶ 4.  Staiger describes methods and

IPR2017-00677
Patent 8,566,843 B2

systems for processing messages to communicate with remote units over at
least one data network and with at least one dedicated CPU. *Id.* ¶ 15.

Figure 2 of Staiger is reproduced below.



FIG. 2

Figure 2 depicts a high-level block diagram of interconnection preprocessor
200, which may be used in the message-processing methods. *Id.* ¶ 36.
Preprocessor 200 is connected to switchboard 201, "which is designed to
connect four individual CAN-busses 202 to 205 in addition to a first and
second independent CPU 207 and 208." *Id.* First and second CPUs 207 and
208 provide connections to first and second additional bus systems 210 and
211, respectively. *Id.* Each of CAN busses 202–205 is connected to a
respective bus adapter 214–217, which may be formed by standardized CAN

27

IPR2017-00677
Patent 8,566,843 B2

controllers providing connections to the respective CAN busses 202–205. *Id.* ¶ 38.

In addition to relying on Figure 2 as illustrating an apparatus with a control unit, as recited in the preamble and limitation 51.1 of claim 51, Petitioner relies on the related description of an initializing process as disclosing identifying information associated with a message and utilizing a first network protocol associated with a first network, as recited in limitation 51.2. Pet. 26–28. We agree with this identification.

### a. Limitations 51.8–51.10

Petitioner also relies on such disclosure for limitations 51.8–51.10, observing that Staiger "shares messages with a plurality of different destinations (e.g., CAN busses, FireWire busses, MOST busses, CPUs), and teaches that each message may be transmitted to more than one destination." *Id.* at 34. In addressing the "real-time" sharing requirement of limitation 51.8, Petitioner refers to Staiger's disclosure of a response time that is "typically milliseconds or microseconds," consistent with the construction adopted herein. *Id.* at 35 (citing Ex. 1004 ¶¶ 7, 51).

In addressing the types of networks recited in limitations 51.9 and 51.10, Petitioner relies on Staiger's disclosure of the bus adapters interfacing with CAN, and notes that "[e]ach CAN adapter may utilize either CAN-B or CAN-C physical layers, which are different protocols and physical

28

IPR2017-00677
Patent 8,566,843 B2

implementations from each other." *Id.* at 42–43 (citing Ex. 1004 ¶ 38; Ex. 1003 ¶ 127). This identification is sufficient.[6]

For the specific interfaces recited in limitations 51.9 and 51.10, Petitioner (1) ties Staiger's disclosure of an electronic control unit that performs "routing, gateway, bus bridge and filtering functions" to a plurality of real-time networks (Ex. 1004 ¶¶ 3–5) with specific components shown in Figure 2; and (2) alternatively contends that "[t]o the extent that *Staiger* does not teach the [limitations], *Millsap* does." Pet. 37; *see id.* at 35–44. We agree with both of Petitioner's positions.

### *i. Staiger*

With respect to Petitioner's first position, Petitioner provides annotated versions of Figure 2 of Staiger that make specific correspondences between the "first network" and CAN bus 202, and between the "second network" and CAN bus 204, as well as correspondences between the "first interface" and bus adapter 214, and between the "second interface" and bus adapter 216. *Id.* at 43. With these correspondences, Petitioner further identifies the first and second "interface-related components" with the

---

[6] Although Petitioner takes the position that CAN-B and CAN-C "have 'at least one aspect that is different,' and are therefore different networks," we note that challenged independent claim 51 does not explicitly recite that the first and second networks are different types of networks. *See* Pet. 43. Challenged dependent claims 56–59 include explicit recitations requiring different network protocols. We address Petitioner's challenge to those claims below.

IPR2017-00677
Patent 8,566,843 B2

drawing's indications of information transfer between the CAN busses and
their respective bus adapters, and between the bus adapters and the
switchboard.  Petitioner's annotated Figure 2 is reproduced below.



Annotated Figure 2 identifies those portions of Staiger that Petitioner
maps to the "first interface," including the "first interface-related first
component" and the "first interface-related second component."  Pet. 37.
That is, Petitioner contends that bus adapter 214 is a "first interface for
interfacing with the first network," that the corresponding physical CAN
layer is a "first interface-related first component for receiving first data
units," and that multiplexer 222, which forms part of switchboard 201,
corresponds to the "first interface-related second component."  *Id.* at 35–36.

Similarly, the annotated drawing also identifies those portions of
Staiger that Petitioner maps to the "second interface," including the "second

IPR2017-00677
Patent 8,566,843 B2

interface-related first component" and the "second interface-related second component." *Id*. at 42–43. That is, Petitioner contends that bus adapter 216 is a "second interface for interfacing with the second network," that the corresponding physical CAN layer is a "second interface-related second component for receiving second data units," and that multiplexer 222, which forms part of switchboard 201, corresponds to the "second interface-related second component." *Id*. Patent Owner does not contest this aspect of Petitioner's analysis.

Rather, Patent Owner contends that Staiger does not disclose limitation 51.8, which requires that the apparatus be "operable such that the information is capable of being shared in real-time utilizing a second network protocol associated with a second network." PO Resp. 25–29. While acknowledging that Staiger distributes information, Patent Owner argues that it "does not convert the message to a format that can be recognized and used by different ECUs using different protocols." *Id.* at 23. Without such format conversion, "Staiger does not disclose the heart of the claimed invention, which is to receive data or other information from one network, and then process that message so that it can be shared with a second network utilizing a second network protocol associated with the second network." *Id.* According to Patent Owner, Staiger's disclosure is limited to "the concept that the central device can receive CAN messages via CAN-C or CAN-B busses and physical layers, process and distribute them to a final destination." *Id.* But Staiger is deficient, according to Patent Owner,

31

IPR2017-00677
Patent 8,566,843 B2

because "information received via a CAN-B bus, using a CAN-B protocol in Staiger cannot be made available to a destination via a CAN-C protocol." *Id.*

The factual disagreement over Staiger's disclosure hinges on the following:

> The switchboard 201 is a multiplexing scheme controlled either by one of the CPUs 207 and 208 or the intercommunication preprocessor 200. This allows the CPUs 207 and 208 to use the functionality of the intercommunication preprocessor 200. *For example, a message generated by one of the CPUs 207 and 208 has to be broadcasted to several CAN busses 202 to 205 identically.* In this case, the message is multiplexed by the switchboard 201 to the intercommunication preprocessor 200, then, the intercommunication preprocessor 200 processes the message and initiates immediate distribution. This procedure significantly saves time, since the intercommunication preprocessor 200, specialized to operate this tasks [*sic*], will require only a fraction of processing time in comparison to a master CPU formed by one of the CPUs 207 and 208. Furthermore, the master CPU only has to execute one single message operation, in case the message needs to be computed before forwarding, which saves processing time as well.

Ex. 1004 ¶ 51 (emphasis added). As Patent Owner emphasized at the oral hearing, "[t]he key phrase is identically." Tr. 28:17. According to Patent Owner, "[i]dentically means that all buses get the same information, the same message. There [are] no different protocols. There are no different formats. . . . Staiger doesn't even hint or suggest that there is any conversion

IPR2017-00677
Patent 8,566,843 B2

of any message or any data . . . from one protocol or one format to another."
*Id.* at 28:18–23.

Ultimately, the word "identically" cannot bear the weight Patent Owner places upon it to conclude that Staiger does not teach or suggest that "the apparatus is operable such that the information is capable of being shared . . . utilizing a second network protocol associated with a second network," as the claim requires. On cross-examination, Patent Owner's expert, Dr. Miller, conceded several relevant points that support Petitioner's inference regarding the teachings of Staiger. And, "in considering the disclosure of a reference, it is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom." *In re Preda*, 401 F.2d at 826.

On cross-examination, Dr. Miller agreed that Staiger discloses that CAN busses 202–205 connect to different network protocols from those protocols busses 210 and 211 connect to, and that these network protocols use different message formats. Ex. 1025, 66:21–68:13. Dr. Miller also agreed that the Staiger busses 202–205, 210, and 211 can receive and send messages. *Id.* at 69:19–21. And Dr. Miller agreed that Staiger discloses that messages received from busses 210–211 can be shared with CAN busses 202–205 through bus adaptors 214–217. *Id.* at 74:3–10. In light of these concessions by Patent Owner's expert, the most natural understanding of the single word "identically" in Staiger is that the identical *content* of the

IPR2017-00677
Patent 8,566,843 B2

message is broadcast over the different CAN busses, not that Staiger fails to accommodate its own recognition that the *formats* used are different.

### ii. Millsap

Petitioner's alternative position for limitations 51.9 and 51.10 relies on teachings from Millsap, which "relates to networks used in vehicles to provide distributed control of various vehicle functions and, more particularly, to such networks which utilize different groupings of electronic control units (ECUs) to carry out different control tasks." Ex. 1015, col. 1, ll. 6–10.  Petitioner supports this reasoning with testimony by Dr. Madisetti. Ex. 1003 ¶¶ 121–123.

Figure 9 of Millsap is reproduced below.



*Fig. 9*

Figure 9 shows that "each gateway node is connected to at least 2 [busses] and will interact with each network according to its message strategy and transmission models." Ex. 1015, col. 13, ll. 22–25.  That is, Petitioner identifies communication kernels 140, 142 as the recited interfaces.  Pet. 38 (annotated drawing).  Petitioner further identifies the first and second

IPR2017-00677
Patent 8,566,843 B2

components of each interface as disclosed in Figure 8 of Millsap, which is reproduced below.



*Fig. 8*

Figure 8 depicts a conceptual layout of communication kernel 120 that can be used by each of multiple ECUs in communicating with its respective bus, providing a standardized interface between the bus and application process 122 being executed by the ECU. *Id.* at col. 12, ll. 42–46.

Petitioner reasons that a person of skill in the art would have known to combine these teachings with those of Staiger because both references (1) are from the same field of endeavor, i.e., are related to real-time distributed communication and control of automotive ECUs; (2) aim to solve similar problems of improving data processing between automotive ECUs; and (3) use similar techniques to solve the problems, such as using gateway ECUs to bridge different networks to allow for communication between the networks. Pet. 41. Petitioner supports this reasoning with testimony by Dr.

35

IPR2017-00677
Patent 8,566,843 B2

Madisetti.  Ex. 1003 ¶¶ 121–123.  Petitioner articulates sufficient reasoning with rational underpinning to support the combination it proposes.

Patent Owner contends that "Millsap is entirely unrelated to the invention claimed in the '843 Patent" because "Millsap does not disclose any CAN, Flexray or LIN network, and, does not disclose any concept of networks operating under different protocols."  PO Resp. 33 (citing Ex. 2001 ¶ 49).  This contention does not provide a sufficient basis to discount Petitioner's articulated reasoning for combining the teachings of the references.  Although limitations 51.9 and 51.10 are expressed in a lengthy manner, the concepts they recite are relatively straightforward, requiring interfaces that process first messages to produce second messages. Petitioner provides sufficient reasoning and evidence to support its position that one of skill in the art would combine the teachings of Staiger and Millsap in the manner it proposes in part because they are from the same field of endeavor and because they are reasonably pertinent to the particular problem with which the inventor of the '843 patent was concerned.  *See In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004).

In addressing the specific limitations for the "first interface" and "second interface" recited in limitations 51.9 and 51.10, Petitioner identifies layer 124 of Millsap's Figure 8 as corresponding to the "first component" and layer 126 as corresponding to the "second component," for each of communication kernels 140, 142, i.e., as "first interface-related" and "second interface-related," respectively.  Pet. 40 (annotated drawing).

IPR2017-00677
Patent 8,566,843 B2

To support its argument that Millsap teaches the requirement of limitation 51.9 that "the control unit be[] operable such that the first data units are processed after which processed first data units are provided," Petitioner cites a portion of the following disclosure regarding Figure 8:

> FIG. 8 depicts a conceptual layout of a communication kernel 120 that can be used by each of the ECUs in communicating with its respective bus. This communication kernel provides a standardized interface between the bus and the application process 122 being executed by the ECU. It includes both software and physical layers. More specifically, the communication kernel 120 includes a physical layer 124 that *provides a conversion of the digital data symbols (1's and 0's) generated by the data link layer 126 into electrical signals* transmitted on the bus.

Ex. 1015, col. 12, ll. 42–51 (emphasis added); *see* Pet. 39. That is, Petitioner relies on the disclosure of digital-to-analog conversion as satisfying the claim's requirement that second layer messages be provided after processing first layer messages. Petitioner reiterates the argument with respect to limitation 51.10. Pet. 42–44. Given the breadth of the claim language, which recites that "processed [first/second] data units" be provided after processing "[first/second] data units," such digital-to-analog conversion meets the claim recitations.

IPR2017-00677
Patent 8,566,843 B2

### b. Limitations 51.3–51.7

Petitioner addresses the "memory-related" limitations 51.3–51.7 by reference to Figure 5 of Staiger, which is reproduced below, and related disclosures.



FIG. 5

Figure 5 depicts a flowchart illustration of message processing in an initializing process. Ex. 1004 ¶ 26. In explaining the relevance of this process to the claim limitations, Petitioner highlights Staiger's disclosure of

IPR2017-00677
Patent 8,566,843 B2

determining whether a tag registry, which it correlates to the "storage resource" recited in claim 51, is available before a "time-out" event occurs. Pet. 28–29 (citing Ex. 1004 ¶ 62 ("Block 518 receives the time-out event from the delay timer of block 510 and a negative event of a determination of block 520 of whether or not an execution tag registry . . . is available.")). Petitioner thus draws a correspondence between this disclosure and limitations 51.3 and 51.4 by separately focusing on Staiger's determination of the availability of the tag registry ("issuing a storage resource request in connection with a storage resource and determining whether the storage resource is available," recited as limitation 51.3) and on Staiger's determination of whether the time-out event has occurred ("determining whether a threshold has been reached in association with the storage resource request," recited as limitation 51.4). *Id.* at 28–31. In doing so, Petitioner draws a correlation between the delay until a time-out event and the "threshold," consistent with our construction of "threshold" as including the maximum value of a timer. *Id.* at 31.

    As Petitioner observes, Figure 5 of Staiger addresses circumstances both when the tag registry is available and when it is not available. *Id.* at 31–34. If the tag registry is not available, as determined at block 520, block 516 determines whether the delay time has timed out. Ex. 1004 ¶ 62. If no time-out has occurred, another determination is made whether the tag registry is available, i.e., "issuing another storage resource request in connection with the storage resource," recited as part of limitation 51.5. *Id.*;

IPR2017-00677
Patent 8,566,843 B2

Pet. 31. If a time-out has instead occurred, "the process passes to block 522," which issues an interrupt request that Petitioner reasonably identifies as the "notification" recited in limitation 51.6. Ex. 1004 ¶ 62; Pet. 32–33. If the tag registry is available, as determined at block 520, the registry is initiated, and the message is retrieved and stored, corresponding to limitation 51.7. Ex. 1004 ¶¶ 64, 66; Pet. 33–34.

These steps, as identified by Petitioner from the disclosures of Staiger, track the steps recited in limitations 51.3–51.7 of claim 51 under the various circumstances when the storage resource is available or not available, and when the threshold has been reached or not reached. Patent Owner does not respond separately to Petitioner's contentions regarding limitations 51.3–51.7.

### c. Summary

Based on the foregoing, we conclude that Petitioner shows, by a preponderance of the evidence, that independent claim 51 is unpatentable under 35 U.S.C. § 103(a) over Staiger and Millsap.

### 2. Dependent Claims 52 and 53

Claim 52 and 53 depend from claim 51, respectively reciting that the processed first data units and the second data units "have a same format" or "are the same data units." Ex. 1001, col. 19, ll. 6–11. Petitioner addresses these claims by identifying special circumstances of Staiger's more general

40

IPR2017-00677
Patent 8,566,843 B2

structure.  For claim 52, Petitioner contends that when "[b]oth busses [are] CAN-B or CAN-C busses . . . , each message would have the same format." Pet. 44 (citing Ex. 1004 ¶¶ 38, 51; Ex. 1003 ¶ 131).  For claim 53, Petitioner contends that "when the same message is present on the first and second networks and the first and second networks are the same type (i.e., the message has the same format and content) . . . each message (i.e., 'data units') would have the same format and content on each bus." *Id.* at 44–45 (citing Ex. 1004 ¶¶ 38, 51; Ex. 1003 ¶ 133).  Patent Owner relies on its arguments for claim 51 and does not respond separately to these contentions, which we find persuasive.  *See* PO Resp. 29.

We conclude that Petitioner shows, by a preponderance of the evidence, that claims 52 and 53 are unpatentable under 35 U.S.C. § 103(a) over Staiger and Millsap.

### 3.  *Dependent Claim 54*

Claim 54 depends from claim 51 and recites that "the apparatus is operable such that the processing involves headers." Ex. 1001, col. 19, ll. 13–15.  Petitioner adequately identifies disclosure in Millsap of messages transmitted as a frame with a header.  Pet. 45 (citing Ex. 1015, col. 8, ll. 52–62, col. 17, ll. 59–64; Ex. 1003 ¶ 135).  Patent Owner does not respond separately to this contention, outside its arguments for claim 51.  *See* PO Resp. 29.

IPR2017-00677
Patent 8,566,843 B2

We conclude that Petitioner shows, by a preponderance of the evidence, that claim 54 is unpatentable under 35 U.S.C. § 103(a) over Staiger and Millsap.

### 4. Dependent Claim 55

Claim 55 depends from claim 51 and recites that "the apparatus is operable such that the first network and the second network are heterogeneous networks." Ex. 1001, col. 19, ll. 16–18.  Because Staiger discloses that busses 202–205 may be either CAN-C or CAN-B, and busses 210–211 may be FireWire or MOST, Petitioner contends that the "networks utilize different protocols, and are thus 'heterogeneous.'" Pet. 45–46 (citing Ex. 1004 ¶¶ 38–48; Ex. 1003 ¶ 137).  This position is consistent with our adopted construction of "heterogeneous networks" as "networks having at least one aspect that is different," and Patent Owner does not respond separately to the contention outside its arguments directed at claim 51.  *See* PO Resp. 29.

We conclude that Petitioner shows, by a preponderance of the evidence, that claim 55 is unpatentable under 35 U.S.C. § 103(a) over Staiger and Millsap.

### 5. Dependent Claims 56–59

Claims 56–59 each depend from claim 51 and recite that "the apparatus is operable such that the second network protocol is different than

42

IPR2017-00677
Patent 8,566,843 B2

the first network protocol." Ex. 1001, col. 19, l. 19–col. 20, l. 20. Petitioner
relies on the same reasoning as presented for claim 55 for this limitation.
Pet. 46.

In addition, claims 57–59 recite further variations, including different
rates, different message formats, and a third network protocol different from
both the first and second network protocols. *Id.* at col. 20, ll. 1–20.
Petitioner addresses these additional limitations by observing that "CAN-C
and CAN-B had different transmission bit rates," that CAN-C and CAN-B
used different message formats, and that Staiger may use CAN-C, CAN-B,
FireWire, and MOST networks. Pet. 46–47.

Although Patent Owner does not dispute Petitioner's reasoning as
applied to claim 55, it contends that Petitioner "fail[s] to demonstrate how or
where Staiger teaches the concept of information utilizing a first network
protocol being shared utilizing a second network protocol, where the second
network protocol is different than the first network protocol." PO Resp. 30–
31 (citing Ex. 2001 ¶ 44). In advancing this contention, Patent Owner
interweaves, in its response addressing each of claims 56–59, a discussion of
limitation 51.8, which requires real-time sharing of information "utilizing a
second network protocol associated with a second network." *Id.* at 30–41.

We address Patent Owner's argument with respect to limitation 51.8
*supra*, finding it unpersuasive, and we similarly find the argument as applied
to claims 56–59 equally unpersuasive. Rather, we agree with Petitioner that
Staiger discloses the concept of information sharing between different

43

IPR2017-00677
Patent 8,566,843 B2

network protocols, as evidenced by Staiger's use of CAN-B or CAN-C busses. *See* Reply 13. We also agree with Petitioner that Dr. Miller's cross-examination testimony supports the assertion that "Staiger discloses messages received from busses 210-211 can be shared with CAN busses 202-205 through bus adaptors 214-217, where CAN busses 202-205 are connected to different network protocols and use different message formats from those protocols busses 210 and 211 are connected to." *Id.* (citing Ex. 1025, 66:21–68:13, 69:19–21, 73:3–10; Ex. 1026 ¶ 25).

Patent Owner also argues that the limitation requiring different network protocols is not disclosed by Millsap, but Petitioner does not rely on Millsap for the limitation. *See* PO Resp. 32–35.

We conclude that Petitioner shows, by a preponderance of the evidence, that claims 56–59 are unpatentable under 35 U.S.C. § 103(a) over Staiger and Millsap.

### 6. *Summary*

For the foregoing reasons, we conclude that Petitioner shows, by a preponderance of the evidence, that claims 51–59 are unpatentable under 35 U.S.C. § 103(a) over Staiger and Millsap.

### G. *Anticipation by OSEK/VDX*

Petitioner describes OSEK/VDX as "a joint project by sixty-two automotive companies creating an open-ended architecture standard for

44

IPR2017-00677
Patent 8,566,843 B2

distributed ECUs in vehicles." Pet. 18 (citing Ex. 1007, 2). Petitioner's
expert, Dr. Madisetti, further explains that "OSEK/VDX is a standard for
interfacing distributed ECUs with real-time operating systems found in
automotive networks," including "seven specifications that together describe
'interfaces and protocols for the transfer of data . . . between and within
network stations (ECUs).'" Ex. 1003 ¶ 81 (quoting Ex. 1007, 6) (alteration
by Dr. Madisetti).

Petitioner's anticipation challenge based on OSEK/VDX relies on a
combination of four references (OSEK Binding, OSEK COM, OSEK
FTCom, and OSEK NM) that describe different aspects of various versions
of the OSEK/VDX standard. *See* Pet. 15. Petitioner focuses its attention on
version "SB3," which OSEK Binding discloses as encompassing the specific
documents relied on, i.e., including version 1.3 of the Binding specification,
version 2.2.2 of the communication ("COM") specification, version 2.5.1 of
the network-management ("NM") specification, and version 1.0 of the
OSEKtime COM ("FTCom") specification. Ex. 1007, 9.

Petitioner contends that these individual specifications "were
originally available at http://osek-vdx.org" and were archived by The
Wayback Machine on September 26, 2001, more than a year before both the
effective filing date we accord the claims and more than a year before the
filing date of the '018 provisional application. Pet. 20. To support its
contention that the individual documents were publicly accessible on
September 26, 2001, Petitioner provides a Declaration of Christopher Butler,

45

IPR2017-00677
Patent 8,566,843 B2

Office Manager at the Internet Archive, which manages The Wayback
Machine, attesting to its practices regarding archival of files on the Internet.
Ex. 1013. Petitioner additionally provides a Declaration of R. Benjamin
Cassady, attesting to his retrieval of certain documents, including Ex. 1006,
which Petitioner contends "confirms that OSEK FTCom was known to a
[person of ordinary skill in the art] by at least December 10, 2002." Ex.
1014; Pet. 22. Petitioner provides sufficient evidence that each of OSEK
Binding, OSEK COM, OSEK FTCom, and OSEK NM is a printed
publication.

Nevertheless, we are not persuaded that the four documents are
properly considered to constitute a single prior-art reference. "A claim is
anticipated only if each and every element as set forth in the claim is found,
either expressly or inherently described, *in a single prior art reference*."
*Verdegaal Bros., Inc. v. Union Oil Co. of California*, 814 F.2d 628, 631
(Fed. Cir. 1987) (emphasis added).

Petitioner contends that "OSEK/VDX is a 'single prior art reference'
and thus qualifies as prior art under § 102(a) and/or (b) because the standard
comprises only seven specifications, all authored by the same group, and
would be considered together, evidenced by their linking and cross-
referencing." Pet. 22–23 (citing *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 424
F.3d 1276, 1285 (Fed. Cir. 2005)). Although Petitioner correctly observes
that "[t]he specifications that make up OSEK/VDX version SB3 are indexed
within OSEK Binding," Petitioner's overall focus on what it contends is

common authorship insufficiently accounts for the different dates of creation of the individual documents. Pet. 23; *see Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1351–1352 (Fed. Cir. 2008) ("the GSM standard is actually several prior art references with separate dates of creation, rather than a single prior art reference") ("the GSM standard is simply not a coherent whole document that can be assigned a single prior art date of creation").

First, each of the individual documents bears a different date on its face, belying any conclusion that they are properly considered as a single reference. Ex. 1007, 1 (Binding Specification dated September 17, 2001); Ex. 1008, 1 (Communication specification dated December 18, 2000); Ex. 1009, 1 (Network Management specification dated May 31, 2000); Ex. 1010, 1 (Fault-Tolerant Communication specification dated July 24, 2001). The SB3 version of the OSEK/VDX standard evidently arises from selective reference to different versions of the individual specifications as they have evolved over time. *See* Ex. 1007, 3 ("As the standardisation of requirements that are applicable to different OSEK/VDX specifications should not be replicated within the different specifications, this document is therefore set-up to collate all requirements that are owned by the different specifications.") (italicization omitted).

Second, Petitioner's argument that the individual documents are commonly authored is tenuous at best. Petitioner too sweepingly treats two groups responsible for creation of the documents (the "OSEK group" and the

IPR2017-00677
Patent 8,566,843 B2

"OSEK/VDX steering committee") as defining a single authorship, without addressing the composition of those groups and potential changes in that composition over the time period in which the individual specifications were created. *See* Pet. 24. This deficiency is particularly notable in light of the large number of entities (sixty-two automotive companies) that "attended and contributed to the OSEK/VDX Technical Committee." *See* Ex. 1007, 2. Accordingly, we find that OSEK Binding, OSEK COM, OSEK FTCom, and OSEK NM are not collectively a "single prior art reference," and therefore conclude that Petitioner has not demonstrated a reasonable likelihood of prevailing on its anticipation challenge of claims 51–59 over OSEK/VDX.

### H.  Obviousness over OSEK Binding, OSEK COM, OSEK FTCom, and OSEK NM

As an alternative to its anticipation challenge, Petitioner contends that claims 51–59 would have been obvious over OSEK/VDX "to the extent that the combined specifications comprising OSEK/VDX are not found to be a single prior art publication." Pet. 77. Petitioner reasons that a person of ordinary skill in the art "would naturally consider the OSEK/VDX specifications together in order to gain a complete understanding of the standard and the capabilities of ECU nodes," supporting that reasoning with testimony by Dr. Madisetti. *Id.* at 78 (citing Ex. 1003 ¶ 189; *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrice Co.*, 464 F.3d 1356, 1367 (Fed. Cir. 2006)). Particularly in light of OSEK Binding's

IPR2017-00677
Patent 8,566,843 B2

specific reference to each of the specifications in defining version SB3 (Ex. 1007, 9), we agree with that contention and conclude that Petitioner articulates sufficient reasoning to combine the teachings of the four documents.  Patent Owner does not contest Petitioner's rationale for combining the teachings of the four documents.

### 1.  Independent Claim 51

Figure 1-2 of OSEK Binding is reproduced below.



Figure 1-2    Layer model of OSEK/VDX with OSEKtime OS

IPR2017-00677
Patent 8,566,843 B2

Figure 1-2 illustrates a layer model of OSEK/VDX that shows interfaces to multiple networks for sending messages in "distributed fault-tolerant highly dependable real-time applications." Ex. 1007, 7. As shown in the drawing, each interface has multiple layers for receiving and processing messages.

In analyzing the specific limitations of claim 51, the Petition focuses primarily on OSEK NM, supplementing its analysis with specific reference to portions of OSEK COM, in addressing limitations dealing with the treatment of the availability of a storage resource and real-time sharing of information, as well as in addressing the interfaces recited in limitations 51.9 and 51.10. Pet. 48–70. Petitioner observes that "OSEK NM describes a '[g]ateway support' capable of 'monitoring . . . nodes across several networks' and 'negotiat[ing] operating modes across several networks.'" *Id.* at 49 (quoting Ex. 1009, 134) (alterations by Petitioner). Because the standard allows for "[i]nterleaving of network layer messages," which "enables gateway operation that needs to handle different network layer message transmissions concurrently across distinct sub-networks," Ex. 1008, 111–12, Petitioner reasons that OSEK NM thus teaches an ECU configured to implement the described software, and correlates this ECU with the "control unit" recited in limitation 51.1. Pet. 49–50.

Figure 2 of OSEK NM is reproduced below.

IPR2017-00677
Patent 8,566,843 B2



Figure 2    Infrastructure of the NM (logical ring), example with two busses

Figure 2 shows an infrastructure of a logical ring that includes an electronic communication unit and in which, for example, node A receives messages from node C.  Ex. 1009, 9.  In addition to identifying the "Electronic Communication Unit" in the top center of the drawing as the recited control unit, Petitioner observes that the protocol includes transmission and receipt of information in the form of a message between ECUs with a particular type of network, such as CAN, VAN, J1850, K-BUS, and D2B, which it correlates with the "first network protocol associated with a first network," recited in limitation 51.2.  Pet. 51–52 (citing Ex. 1009, 7, 9).

### a. Limitations 51.3–51.7

In addressing claim 51's treatment of a storage resource, Petitioner contends that OSEK NM discloses determining whether nodes in a network are present and able to transfer information because each node in the network has a "data buffer" and because each node is actively monitored by every other node in the network to determine whether another node is

IPR2017-00677
Patent 8,566,843 B2

available. *Id.* at 52–53 (citing Ex. 1009, 8–10, 11, Fig. 4). Petitioner thus draws a correlation between such a "data buffer" and the "storage resource" recited in the claim. *Id.* at 52–53. In addition, Petitioner points to OSEK NM's disclosure of a set of timers, i.e., $T_{Typ}$, $T_{Max}$, and $T_{Error}$, that determine when to send requests and error notifications to other network nodes. *Id.* at 54–55 (citing Ex. 1009, 24–25). A node is determined to be unavailable when a message is not received from that node within a specified timeframe based on such timers. Ex. 1009, 9–10. Consistent with our construction of "threshold" as including the time-out of a timer, Petitioner thus contends that this procedure corresponds to limitations 51.3 and 51.4 by determining whether a "storage resource" is available and by determining whether a threshold has been reached in association with a storage resource request. Pet. 52–54. We agree with these identifications.

Patent Owner disputes Petitioner's analysis with respect to limitation 51.3, "issuing a storage request in connection with a storage resource and determining whether the storage resource is available." PO Resp. 43–45. Patent Owner's contention appears to be based on a reading of the claim language as imputing a requirement for direct interrogation as to the availability status of the recited storage resource:

> The OSEK NM logical ring permits each node on a network to monitor the status of other nodes on the same network by receiving status messages, as Petitioner states. Petition at p. 53. However, transmission of a status message is a signal that the transmitting node – not the node receiving the status message – is "alive" on the network. Nodes in the logical ring therefore

52

IPR2017-00677
Patent 8,566,843 B2

> determine the status of other network nodes based on messages
> received from them, not transmitted to them.  Unless there are
> only two nodes on a given network, in normal operation a
> "monitoring" node will never receive a response to a network
> message *directly back* from a node to which it transmits, because
> there will be at least one more node present in the ring sequence,
> interposed in the return path.

*Id.* at 44 (citing Ex. 2001 ¶ 70; Pet. 52) (emphasis added).  This argument,
which refers to a response "directly back" from a node to which a
monitoring node transmits, is not persuasive because it is not commensurate
with the scope of the claim limitation.  Rather, we agree with Petitioner that
the limitation "does not state where the request and determination are made,
or how the request and determination are made," and that "requesting a node
to make a determination of the availability of another node based on
messages received from that node falls within the scope" of the limitation.
Reply 17.

For limitation 51.5, which is performed "in the event the storage
resource is not available and the threshold . . . has not been reached,"
Petitioner observes that OSEK NM describes a recovery state for an
unavailable node that starts the $T_{Error}$ timer, which acts to determine whether
a timeout has been reached.  *Id.* at 55–57.  Petitioner draws a
correspondence between OSEK NM's teachings related to receiving another
message from the unavailable node and "issuing another storage request in
connection with the storage resource," with the normal mode being re-
established when the message is received.  *Id.* (citing Ex. 1009, 25, 26, 45,

IPR2017-00677
Patent 8,566,843 B2

47, 52).  Conversely, if the $T_{Error}$ times out, a "LimpHome" message is
transmitted, which Petitioner reasonably identifies with the "notification"
recited in limitation 51.6.  *Id.* at 57–58 (citing Ex. 1009, 25).  Petitioner
supports its analysis with testimony by Dr. Madisetti.  Ex. 1003 ¶¶ 154–155.
In the event that the node is available, the data are stored in the buffer, which
Petitioner contends corresponds to limitation 51.7 requiring "storing the
information utilizing the storage resource."  Pet. 58–59 (citing Ex. 1009, 11,
20).

Patent Owner disputes that OSEK/VDX discloses limitation 51.5, i.e.,
"issuing another storage resource request in connection with the storage
resource" under circumstances when the storage resource is not available
and the threshold has not been reached.  PO Resp. 45–46.  Patent Owner's
argument is similar to the argument it makes in connection with limitation
51.3, i.e., that "Petitioner points directly to *receipt* of a message as evidence
for disclosure of '*issuing* another storage request,'" and that "[r]eceiving is
the opposite of sending."  *Id.* at 46.  This argument is unpersuasive for
similar reasons, namely the claim's silence regarding how the "[]other
storage resource request" is issued.  As Petitioner asserts, "[t]he 'another
storage resource request' issued in element [51.5] is just another storage
resource request of element [51.3]."  Reply 18 (citing Ex. 1026 ¶ 46).

With Petitioner's identifications and reasoning, it makes a sufficient
showing for limitations 51.3–51.7.

IPR2017-00677
Patent 8,566,843 B2

### b. Limitation 51.8

For the real-time sharing limitation 51.8, Petitioner relies on OSEK NM's disclosure of sharing message data that a node receives from a logical predecessor with a logical successor. *Id.* at 59–60 (citing Ex. 1009, 11, Fig. 4). Petitioner addresses the requirement of utilizing a second network protocol associated with a second network by observing that OSEK NM "describes that the several busses may be low-speed CAN and/or high-speed CAN," supporting its argument with testimony by Dr. Madisetti. Pet. 62 (citing Ex. 1003 ¶ 162). Further, the Petition identifies an example in OSEK NM in which $T_{Typ}$, the time within which the sharing occurs, is described as "70*ms*," consistent with the construction of "real-time" we adopt herein. *Id.* at 60.

Patent Owner disputes Petitioner's argument with respect to this limitation. PO Resp. 46–48. Patent Owner contends that Petitioner's argument is deficient because "the structures Petitioner has identified share information wholly within the confines of one network." *Id.* at 48. But Figure 2, reproduced above, provides an illustration of a *logical* ring with two communication media that correspond to different physical networks. *See* Reply 19–20; Ex. 1009, 8; Ex. 1026 ¶ 5.

Patent Owner also contends that Petitioner's argument is deficient because "the data allegedly 'shared' is being automatically 'pushed' from [a] node, rather than 'pulled.'" PO Resp. 48. This argument implicitly applies a construction of "the information is capable of being shared" that we do not

IPR2017-00677
Patent 8,566,843 B2

adopt. That is, Patent Owner appears to be requiring that information be shared from a shared storage, and thus "pulled" on the basis of a request. But no such requirement is recited in the claim limitation, and does not form part of our applied construction.

With Petitioner's identifications and reasoning, it makes a sufficient showing with respect to limitation 51.8.

### c. Limitations 51.9 and 51.10

In its analysis of the remaining limitations, Petitioner points to Figure 1 of OSEK NM, reproduced below, and related disclosure that describes a data link layer for interfacing with the underlying network.



Figure 1    interface and algorithms responsibility

56

IPR2017-00677
Patent 8,566,843 B2

Figure 1 illustrates "interface and algorithms responsibility" of an ECU microcontroller with multiple interfaces shown in the "Data Link Layer" in the lower left of the drawing.  Ex. 1009, 7.  To address the specific structure for the interfaces recited in limitations 51.9 and 51.10, Petitioner provides an annotated drawing that makes correspondences between the "first interface" and communication to "Network 1," and similarly between the "second interface" and communication to "Network k."  Pet. 68.  The respective "first component" and "second component" for each interface are further identified by Petitioner as corresponding to the "Interface Circuit" and "Protocol Circuit" for each network.  *Id.*  In making these correspondences, Petitioner again relies on low-speed CAN and high-speed CAN, supporting its argument with testimony by Dr. Madisetti.  *Id.* (citing Ex. 1003 ¶ 170).  Patent Owner does not dispute these identifications, which we find persuasive.

Petitioner makes a sufficient showing with respect to limitations 51.9 and 51.10.

### d. Summary

We conclude that Petitioner shows, by a preponderance of the evidence, that independent claim 51 is unpatentable under 35 U.S.C. § 103(a) over OSEK Binding, OSEK COM, OSEK FTCom, and OSEK NM.

IPR2017-00677
Patent 8,566,843 B2

### 2. Dependent Claims 52 and 53

In addressing claim 52's requirement that "the processed first data units and the second data units have a same format," the Petition provides only cursory analysis. Pet. 70–71. This consists of reproducing Figure 10 of OSEK NM, and asserting that the drawing shows "a received message and a transmitted message having the same format." We agree with Patent Owner that that assertion insufficiently addresses the claim distinction between the *processed* first data units and the *unprocessed* second data units, which are required to have the same format. PO Resp. 49–51. The mere identification of Figure 10 of OSEK NM showing received and transmitted messages that use a common format is insufficient to address the full limitation recited.

Petitioner provides more analysis in its Reply. Reply 21–24. We have reviewed that argument and conclude that it is new argument that is not entitled to consideration because Patent Owner has not had an adequate opportunity to respond. "A reply may only respond to arguments raised in the corresponding opposition or patent owner response." 37 C.F.R. § 42.23(b). Petitioner's more detailed reply argument, as well as the supporting testimony of Dr. Madisetti, Ex. 1026 ¶ 55, are not merely responsive to Patent Owner's argument, but articulate a theory regarding the claim limitation that is not discernible from the Petition. Accordingly, we do not consider Petitioner's reply arguments.

IPR2017-00677
Patent 8,566,843 B2

Petitioner's analysis of Claim 53 is deficient for the same reasons. *See* Pet. 71–72; PO Resp. 51–52 (alleging that "Petitioner's arguments have again misread the language of the claim"); Reply 23–24.

We conclude that Petitioner does not show, by a preponderance of the evidence, that claims 52 and 53 are unpatentable under 35 U.S.C. § 103(a) over OSEK Binding, OSEK COM, OSEK FTCom, and OSEK NM.

### 3.  Dependent Claims 54–57

To support its contention that "the processing involves headers," as recited in claim 54, Petitioner points to description in OSEK NM of encoding communication messages such that they have a header and data. Pet. 72 (citing Ex. 1009, 18, Fig. 7).  To support its contention that the first and second network are "heterogeneous networks," as recited in claim 56, and to support its contention that the networks use different protocols, as recited in claim 57, Petitioner refers to its earlier analysis in the context of limitation 51.10 that communications may be high-speed CAN or low-speed CAN, which use different network protocols. *Id.* at 72–73.  To support its further contention that the network protocols are "such that rates thereof are different," as recited in claim 57, Petitioner refers to its evidence that high-speed CAN and low-speed CAN have different transmission bit rates. *Id.* at 73 (citing Ex. 1012, 5; Ex. 1003 ¶ 184).  Patent Owner does not dispute any of these contentions, arguing only that claims 54–57 are not unpatentable by virtue of their dependence from claim 51. *See* PO Resp. 52.

IPR2017-00677
Patent 8,566,843 B2

Petitioner's contentions are persuasive and supported by evidence.
We conclude that Petitioner shows, by a preponderance of the evidence, that
claims 54–57 are unpatentable under 35 U.S.C. § 103(a) over OSEK
Binding, OSEK COM, OSEK FTCom, and OSEK NM.

### 4. Dependent Claims 58 and 59

For dependent claims 58 and 59, which also require different first and
second network protocols, as well as (for claim 58) conversion of different
message formats, and (for claim 59) a third different network protocol with a
different message format, Petitioner relies on its previous identification of
OSEK/VDX using high-speed or low-speed CAN. Pet. 74, 75. In
addressing message "formats" recited in the claims, the Petition assumes,
without explanation, that high-speed and low-speed CAN use different
"formats." *Id.* at 74–77. We agree with Patent Owner that the Petition
insufficiently supports this assumption. *See* PO Resp. 55 ("Petitioner
incorrectly assumes that the message formats for CAN-B and CAN-C are
different.").

The Petition provides no proposed construction for "format," and does
not explain what features characterize a "format" that would allow us to
assess the persuasiveness of Petitioner's position. The expert testimony on
this point is also contrary, with Dr. Miller unequivocally testifying that
"CAN-B and CAN-C use the same message format, because all CAN
implementations transmit messages in the form of CAN frames, which have

IPR2017-00677
Patent 8,566,843 B2

the same format." Ex. 2001 ¶ 92. Dr. Madisetti's initial testimony is unhelpful because it merely repeats Petitioner's argument under the assumption that the formats differ, without providing reasons for such an implicit conclusion. Ex. 1003 ¶ 186.

With its Reply, Petitioner includes a further Declaration by Dr. Madisetti that provides greater explanation for his position, and this is mirrored by the Reply's argument. Ex. 1026 ¶ 62; Reply 24–27. To further support its position, Petitioner provides new documentary evidence with its Reply in the form of U.S. Patent No. 5,379,405. Ex. 1024. The additional evidence and argument go beyond the proper scope of a Reply. 37 C.F.R. § 42.23(b). Patent Owner has had insufficient opportunity to respond to this additional evidence and argument for us to consider it. There is insufficient basis for us to discount the testimony of Dr. Miller and to give decisive weight to the late-offered testimony of Dr. Madisetti.

We conclude that Petitioner does not show, by a preponderance of the evidence, that claims 58 and 59 are unpatentable under 35 U.S.C. § 103(a) over OSEK Binding, OSEK COM, OSEK FTCom, and OSEK NM.

### 4. Summary

For the foregoing reasons, we conclude that Petitioner shows, by a preponderance of the evidence, that claims 51 and 54–57 are unpatentable under 35 U.S.C. § 103(a) over OSEK Binding, OSEK COM, OSEK FTCom, and OSEK NM. Petitioner does not show, by a preponderance of the

IPR2017-00677
Patent 8,566,843 B2

evidence, that claims 52, 53, 58, and 59 are unpatentable under 35 U.S.C.

§ 103(a) over OSEK Binding, OSEK COM, OSEK FTCom, and OSEK NM.

## I. Obviousness over OSEK Binding, OSEK COM, OSEK FTCom, OSEK NM, and Millsap

Petitioner alternatively challenges claims 51–59 as unpatentable under

35 U.S.C. § 103(a) over OSEK Binding, OSEK COM, OSEK FTCom,

OSEK NM, and Millsap. Pet. 78–83. Similar to its analysis challenging

those claims over Staiger and Millsap, Petitioner applies further disclosure

of Millsap "to the extent that OSEK/VDX alone does not disclose limitations

51.9-51.10," but otherwise relies on its previous analysis. *Id.* at 78. Similar

to the reasons we express above, Petitioner identifies sufficient disclosure in

Millsap to support its position with respect to claims 51 and 54–57;

Petitioner's analysis with respect to claims 52, 53, 58, and 59 remains

deficient because it does not rely on Millsap to correct the deficiencies with

respect to those claims. Petitioner also provides sufficient reasons to

combine the teachings of Millsap with those of OSEK Binding, OSEK

COM, OSEK FTCom, and OSEK NM that generally parallel its reasoning

for combining Millsap with Staiger. *Id.* at 81–83.

For reasons similar to those expressed above in our analysis of the

challenged claims over Staiger and Millsap, Petitioner thus makes a

sufficient showing with respect to claims 51 and 54–57. Although Patent

Owner contends that Petitioner "approaches the matter [in] a very generic

IPR2017-00677
Patent 8,566,843 B2

way, and does not apply Millsap to any specific limitations," it is clear that Petitioner relies on Millsap as an alternative to its theory that OSEK/VDX discloses limitations 51.9 and 51.10. PO Resp. 58; *see* Pet. 78–79. Indeed, Patent Owner "incorporate[s]" its "prior analyis" with respect to Millsap. *Id.* at 59. For the reasons expressed above, we find Petitioner's analysis persuasive, even after consideration of Patent Owner's responsive analysis.

We conclude that Petitioner shows, by a preponderance of the evidence, that claims 51 and 54–57 are unpatentable under 35 U.S.C. § 103(a) over OSEK Binding, OSEK COM, OSEK FTCom, OSEK NM, and Millsap. Petitioner does not show, by a preponderance of the evidence, that claims 52, 53, 58, and 59 are unpatentable under 35 U.S.C. § 103(a) over OSEK Binding, OSEK COM, OSEK FTCom, OSEK NM, and Millsap.

## *J. Constitutionality of Inter Partes Review Proceedings*

Patent Owner contends that "this IPR should be terminated and the petition dismissed because the IPR system is unconstitutional." PO Resp. 60–61. This argument is foreclosed by the Supreme Court's determination otherwise. *Oil States Energy Services, LLC v. Greene's Energy Group, LLC*, 138 S.Ct. 1365 (2018) ("In this case, we address whether inter partes review violates Article III or the Seventh Amendment of the Constitution. We hold that it violates neither.").

IPR2017-00677
Patent 8,566,843 B2

## III.  ORDER

It is

ORDERED that Petitioner's Motion to Exclude (Paper 20) is *denied*;

FURTHER ORDERED that, based on a preponderance of the evidence, claims 51–59 of U.S. Patent No. 8,566,843 B2 are held to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2017-00677
Patent 8,566,843 B2


PETITIONER:

Lionel M. Lavenue
John Moulder
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
lionel.lavenue@finnegan.com
christopher.moulder@finnegan.com


PATENT OWNER:

Thomas H. Kramer
O'KELLY ERNST & JOYCE, LLC
tkramer@oelegal.com

Thomas F. Meagher
MEAGHER EMANUEL LAKS GOLDBERG & LIAO, LLP
tmeagher@meagheremanuel.com