Trials@uspto.gov                                               Paper 32
Tel: 571-272-7822                                   Entered: December 6, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

BMW OF NORTH AMERICA, LLC,
Petitioner,

v.

STRAGENT, LLC,
Patent Owner.
_____

Case IPR2017-01519
Patent 8,566,843 B2
_____

Before LYNNE E. PETTIGREW, PATRICK M. BOUCHER, and
CHRISTA P. ZADO, *Administrative Patent Judges*.

Opinion for the Board filed by BOUCHER, *Administrative Patent Judge*.

Opinion Dissenting filed by ZADO, *Administrative Patent Judge*.

BOUCHER, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

Case IPR2017-01519
Patent 8,566,843 B2

In response to a Petition (Paper 2, "Pet.") filed by BMW of North America, LLC ("Petitioner"), we instituted an *inter partes* review of claims 1–50 of U.S. Patent No. 8,566,843 B2 ("the '843 patent"). Paper 7 ("Dec."); Paper 19. During the trial, Stragent, LLC ("Patent Owner") filed a Response (Paper 10, "PO Resp.") to which Petitioner filed a Reply (Paper 25, "Reply"). An oral hearing was held with the parties, and a copy of the transcript was entered into the record. Paper 31 ("Tr.").[1]

We have jurisdiction under 35 U.S.C. § 6. This Decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of the claims on which we instituted trial. Based on the record before us, Petitioner has shown, by a preponderance of the evidence, that claims 1–50 are unpatentable.

## I. BACKGROUND

### A. *The '843 Patent*

The '843 patent describes systems and methods "for sharing information in a distributed system." Ex. 1001, 1:29–30. Such systems and methods are illustrated for system architectures such as "may be situated in automotive electronics or industrial control and monitoring systems." *Id.* at 3:11–13. An example is provided in Figure 1 of the '843 patent, which is reproduced below.

---

[1] The hearing was a consolidated hearing for IPR2017-01519, IPR2017-01520, IPR2017-01521, and IPR2017-01522.

Case IPR2017-01519
Patent 8,566,843 B2



Figure 1 generally depicts elements of a distributed embedded communication and computing system. *Id.* at 3:9–11.

In an automotive environment, various electronic control units ("ECUs") control such applications as engine control, brake control, or diagnostics through connections to various sensors and actuators organized into separate subnetworks. *Id.* at 3:13–18. Such applications are themselves grouped into backbone system functions, such as "body control, power train, and chassis." *Id.* at 3:19–21. With a hierarchical organization that includes gateways 101, 103, 104, 105, messages are relayed up and down through the system layers. *Id.* at 3:24–26. Each layer may contain multiple ECUs connected through wired serial multiplexing bus systems, with the '843 patent noting several examples that include Controller Area Network ("CAN"), Local Interconnect Network ("LIN"), and Flexray. *Id.* at 3:26–33.

Case IPR2017-01519
Patent 8,566,843 B2

At the highest level in the hierarchy, "the system level," system gateway 101 is connected via various busses to other system-level ECUs, to subsequent gateways 103, and to external components 120. *Id.* at 3:60–67. In addition, system gateway 101 may be connected to external gateway 131 to link the system to remote device 132. *Id.* at 4:1–6. "Subsequent to the system level may be several layers of groups and subgroups that are link[ed] to the higher levels via gateways (101, 103, 104, 105)." *Id.* at 4:7–9.

In operation, ECU 102 receives "real-time" input variables from local sensors 108 or from networked sensors 106, respectively via signal lines 113 or multiplexing bus system 112. *Id.* at 3:39–42. "[R]eal-time may include any response time that may be measured in milli- or microseconds, and/or is less than 1 second." *Id.* at 3:36–38. ECU 102 processes the input variables and generates output variables that may be shared with other ECUs 102. *Id.* at 3:46–51. Two relevant modes of sharing are described.

First, ECUs 102 "typically share information with devices that are connected on the same physical multiplexing system. This method of information sharing is called horizontal information sharing in a hierarchical system." *Id.* at 3:51–55.

Second, a bulletin board may be used so that "the information is shared, in real-time, among a plurality of heterogeneous processes." *Id.* at 1:31–33. According to the '843 patent, "heterogeneous networks may refer to any different communication networks with at least one aspect that is different." *Id.* at 7:27–29. Figure 7 of the '843 patent, reproduced below, illustrates a logical architecture between three heterogeneous network controllers using such a bulletin board.

4

Case IPR2017-01519
Patent 8,566,843 B2



Figure 7 illustrates a system architecture in which a bulletin board acts as a shared memory interacting with multiple communication busses, with data received from one communication bus stored on the bulletin board and shared as a new message with other network types. *Id.* at 7:4–37.

The illustrated architecture includes four principal components: (1) network controllers 702, 703, and 704 (first column) for each of multiple heterogeneous networks; (2) associated operating system interfaces 705 for each of the heterogeneous networks (second column); (3) remote message communication processes 706 for stripping out network-specific information (third column); and (4) the bulletin board, which may contain events 607, real-time variables 608, configuration parameters, and firmware. *Id.* at 5:63–67, 6:33–37. In operation, external event 701, such as a flag indicating that data from a sensor are available, is transmitted on a network to a communication bus controller, such as network controller 703 in the

Case IPR2017-01519
Patent 8,566,843 B2

drawing.  *Id.* at 7:4–9.  This causes an operating system interface (such as communication interface 709) to notify a remote message communication process (such as remote message conversion method 710) that data are available, with notification provided in turn to application process 606.  *Id.* at 7:4–17.

## B.  Prosecution History

The application that matured into the '843 patent is a continuation of the application that matured into U.S. Patent No. 8,209,705 ("the '705 patent"), filed July 30, 2008.  Ex. 1001 at [63].  The '705 patent is a continuation of U.S. Patent No. 7,802,263 ("the '263 patent"), filed December 15, 2003.  *Id.*  The '843 patent also claims the benefit of the filing date of U.S. Provisional Application No. 60/434,018 ("the '018 provisional application"), filed December 17, 2002.  *Id.* at [60].

At the time of filing the application that matured into the '263 patent, independent claim 1 recited the following:

> 1.  A method for sharing information in a distributed system, comprising:
>     receiving information;
>     storing the information on a bulletin board; and
>     sharing, in real-time, the information among a plurality
> of heterogeneous processes.

Ex. 1011, 649.  Although certain amendments were made to the claim during prosecution, allowance was secured only after an interview with the Examiner in which the applicants authorized the addition of several limitations:  (1) "requesting a bulletin board resource of one or more bulletin boards"; (2) "determining whether the bulletin board resource is available";

Case IPR2017-01519
Patent 8,566,843 B2

(3) "in the event the bulletin board resource is not available, re-requesting

the bulletin board resource until a threshold has been reached"; and

(4) storing the information on the bulletin board resource "in the event the

bulletin board resource is available."  *Id.* at 250–252.

Independent claim 1 was filed in the same original form at the time of

filing the application that matured into the '705 patent.  Ex. 1002, 255.

During prosecution, the applicants amended the claims to add limitations

similar to those that secured allowance of the claims of the '263 patent:

> in the event the storage resource is not available,
> <u>determining whether a timeout has been reached and</u> causing a
> re-request in connection with the storage resource <u>if the timeout
> has not been reached</u>; [and]
> > <u>in the event the timeout has been reached, causing an error
> > notification to be sent</u>.

*Id.* at 84–85 (underscoring in original to identify material added by

amendment).  These added limitations were among those identified by the

Examiner in allowing the application as not "disclose[d] or suggest[ed]"

"when taken in the context of [the] claims as a whole."  *Id.* at 98–99.

Independent claim 1 was again filed in the same original form at the

time of filing the application that matured into the '843 patent.  Ex. 1018,

220.  The originally filed claims were subsequently canceled during

prosecution and applicants submitted new claims that included limitations

similar to those that secured allowance in the prior applications.  Ex. 1018,

116–32.  The amended claims were subsequently allowed without express

Reasons for Allowance by the Examiner.  Ex. 1018, 63–94.

Case IPR2017-01519
Patent 8,566,843 B2

*C.  Illustrative Claim*

Challenged claim 1, which is illustrative of the challenged claims, is reproduced below with numbers added to identify specific elements of the claim in accordance with the scheme used by Petitioner.  *See Pet. 16–31.*

1.    [0] A non-transitory computer-readable medium storing a computer program product for sharing information, the computer program product, comprising:

[1] code for allowing receipt of information associated with a message received utilizing a first network protocol associated with a first network;

[2] code for causing a determination as to whether a storage resource is available;

[3] code for determining whether a threshold has been reached and causing a request in connection with the storage resource if the threshold has not been reached;

[4] code for, in the event the threshold has been reached, causing an error notification to be sent;

[5] code for, in the event the storage resource is available, causing storage of the information utilizing the storage resource; and

[6] code for causing the information to be shared by:

[7] in real-time, sharing the information utilizing at least one message format corresponding to a second network protocol associated with a second network;

[8] wherein the computer program product is associated with an electronic control unit with a plurality of interface portions including:

[9] a first interface portion for interfacing with the first network, the first interface portion including a first interface-related first layer part for receiving first interface-related first layer messages and a first interface-related second layer part, the computer program product being operable such that the first interface-related first layer messages are processed after which first interface-related second layer messages are provided, where the first network is at least one of a Controller Area Network

Case IPR2017-01519
Patent 8,566,843 B2

> type, a Flexray network type, or a Local Interconnect Network
> type; and
>
> [10] a second interface portion for interfacing with
> the second network, the second interface portion including a
> second interface-related first layer part for receiving second
> interface-related first layer messages and a second interface-
> related second layer part, the computer program product being
> operable such that the second interface-related first layer
> messages are processed after which second interface-related
> second layer messages are provided, where the second network
> is at least one of the Controller Area Network type, the Flexray
> network type, or the Local Interconnect Network type.

Ex. 1001, 12:15–62.

### D. Evidence

Petitioner relies on the following references.  Pet. 12–16.

| Staiger | US 2002/0073243 A1 | June 13, 2002 | Ex. 1004 |
| Millsap | US 6,484,082 B1 | Nov. 19, 2002 | Ex. 1015 |

William Wong, *Software And Hardware Standards Help, But In-Vehicle Network Growth Will Be Conservative:  CAN networks and OSEK/VDX-compatible operating systems will drive tomorrow's vehicles*, 49 Elec. Design 62 (Jan. 8, 2001) ("Wong") (Ex. 1012).

In addition, Petitioner provides Declarations by Vijay K. Madisetti and R. Benjamin Cassady, which we have also considered.  Exs. 1003, 1014. No cross-examination testimony of these witnesses was filed in the proceeding.

Patent Owner provides a Declaration by Jeffrey A. Miller, Ph.D.  Ex. 2001.  Dr. Miller was cross-examined by Petitioner, and a transcript of his deposition was entered into the record.  Ex. 1031.

Case IPR2017-01519
Patent 8,566,843 B2

### E.  Asserted Grounds of Unpatentability

Petitioner challenges claims 1–50 over the following combinations of references.  Pet. 12.

| Reference(s) | Ground(s) | Claims |
|---|---|---|
| Staiger | § 102(a), (b), (e) | 1–21, 24–27, 49, 50 |
| Staiger | § 103(a) | 1–21, 24–27, 49, 50 |
| Staiger, Millsap, and Wong | § 103(a) | 1–50 |

We instituted this proceeding on the obviousness challenge over Staiger, Millsap, and Wong.  Dec. 27.  Subsequent to instituting the proceeding, the Supreme Court held that a final written decision under 35 U.S.C. § 318(a) must decide the patentability of all claims challenged in a petition for *inter partes* review.  *SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348 (2018).  Accordingly, we notified the parties that "[w]e modify our institution decision to institute on all of the challenged claims and all of the grounds presented in the Petition."  Paper 19, 2.  Neither party requested further briefing in light of that notification.

### F.  Real Parties in Interest

Petitioner identifies BMW of North America, LLC, BMW Manufacturing Co., LLC, and Bayerische Motoren Werke, AG as real parties in interest in this proceeding.  Pet. 93.

Patent Owner identifies only itself as a real party in interest.  Paper 4, 1.

Case IPR2017-01519
Patent 8,566,843 B2

*G.  Related Proceedings*

The parties identify the following district-court proceedings as involving the '843 patent:  (1) *Stragent, LLC v. BMW of North America, LLC*, No. 6:16-cv-00446 (E.D. Tex.); (2) *Stragent, LLC v. Mercedes-Benz USA, LLC*, No. 6:16-cv-00447 (E.D. Tex.); and (3) *Stragent, LLC v. Volvo Cars of North America, LLC*, No. 6:16-cv-00448 (E.D. Tex.).  Pet. 93; Paper 4, 1–2.

The following *inter partes* review proceedings also involve the '843 patent:  IPR2017-00457, IPR2017-00677, IPR2017-01503, IPR2017-01504, and IPR2017-01520.  The following *inter partes* review proceedings involve the related '705 patent: IPR2017-00458, IPR2017-00676, IPR2017-01502, IPR2017-01521, and IPR2017-01522.

II.  ANALYSIS

*A.  Claim Construction*

In an *inter partes* review proceeding based on a petition filed prior to November 13, 2018, the Board interprets claims of an unexpired patent using the broadest reasonable construction in light of the specification of the patent in which they appear.  *See* 37 C.F.R. § 42.100(b) (2016); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016) (upholding the

Case IPR2017-01519
Patent 8,566,843 B2

use of the broadest reasonable interpretation standard).[2]  An inventor may

provide a meaning for a term that is different from its ordinary meaning by

defining the term in the specification with reasonable clarity, deliberateness,

and precision.  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

### 1.  *"real-time"*

Independent claim 1 recites "in real-time, sharing the information."

Ex. 1001, 12:33.  Independent claims 47–50 include similar recitations

directed to sharing information in "real-time."  *Id.* at 16:31, 17:8, 17:40–41,

18:11–12.  Petitioner argues that the Specification of the '843 patent

expressly defines "real-time":  "In the context of the present description,

real-time may include any response time that may be measured in milli- or

microseconds, and/or is less than 1 second."  Pet. 9; Ex. 1001, 3:35–38.

Accordingly, Petitioner proposes that "'real-time' should be construed as

responses that occur in less than one second."  Pet. 9 (citing Ex. 1003 ¶ 58).

Patent Owner contends that the definition from the Specification should be

adopted.  PO Resp. 14.

---

[2] The Office recently promulgated changes to the claim-construction
standard applied in *inter partes* review proceedings.  *Changes to the Claim
Construction Standard for Interpreting Claims in Trial Proceedings Before
the Patent Trial and Appeal Board*, 83 Fed. Reg. 51,340 (Oct. 11, 2018).
Because the Petition was filed before November 13, 2018, effective date of
the rule change, however, those changes do not apply to this proceeding.  *Id.*
at 51,345 ("The Office will continue to apply the BRI standard for
construing unexpired patent claims . . . in AIA proceedings where a petition
was filed before the effective date of the rule.").

Case IPR2017-01519
Patent 8,566,843 B2

We construe "real-time" as Petitioner proposes, i.e., as including responses that occur in less than one second.  The first part of the quote cited above provided in the Specification ("may be measured in milli- or microseconds") is not limiting because *any* response time, no matter how large or small, may be *measured* in milli- or microseconds.

## 2.  *"threshold"*

Independent claims 1 and 47 recite "determining whether a threshold has been reached and causing a request in connection with the storage resource if the threshold has not been reached."  Ex. 1001, 12:24–26, 16:23–25.  Independent claims 48–50 include similar recitations.  *Id.* at 16:60–67, 17:32–34, 17:66–18:4.  Petitioner proposes that "threshold" be construed consistent with a dictionary definition it provides, as a "level, point, or value above which something is true or will take place and below which it is not or will not."  Pet. 9 (citing Ex. 1016, 5).  Observing that the Specification of the '843 patent uses "threshold" in the context of an elapsed time, Petitioner further proposes that this construction "include the maximum value (i.e., time-out) of a timer."  *Id.* (citing Ex. 1001, 8:21–25, 8:47–51).  Patent Owner does not address construction of the term in its Response.  We agree with Petitioner's reasoning in light of the Specification, and accordingly construe "threshold" as Petitioner proposes.

## 3.  *"heterogeneous networks"*

Dependent claims 26 and 32 recite that "the first network and the second network are heterogeneous networks."  Ex. 1001, 14:40–41, 15:10–11.  The Specification of the '843 patent defines "heterogeneous networks":

Case IPR2017-01519
Patent 8,566,843 B2

"In the context of the present description, heterogeneous networks may refer to any different communication networks with at least one aspect that is different." Ex. 1001, 7:26–29.  In light of this explicit definition, we construe "heterogeneous networks" as Petitioner proposes, i.e., as "networks having at least one aspect that is different."  Pet. 10 (citing Ex. 1003 ¶ 60). Patent Owner does not address construction of the term.

### 4. "isolated from temporal characteristics"

Dependent claim 32 recites that "each of a plurality of different processes process the information in a manner that is isolated from temporal characteristics associated with the heterogeneous networks."  Ex. 1001, 15:11–14.  Petitioner proposes that "isolated from temporal characteristics" be construed as "unaffected by the temporal behavior," and supports its proposed construction with examples provided in the Specification and with testimony by Dr. Madisetti.  Pet. 10–11 (citing Ex. 1001, 8:47–51, 8:64–9:2, 11:10–13; Ex. 1003 ¶ 61).  Patent Owner does not address construction of the term.  Petitioner's proposed construction is reasonable, and we adopt it.

### 5. "network layer translation"

Dependent claim 35 recites that "the storage resource is operable so as not to require a network layer translation of messages."  Ex. 1001, 15:27–28. According to Petitioner, "[t]he only place where 'translation' is mentioned in the specification, other [than] in claim 35 itself," occurs in identifying "enhancements" that address "shortcomings of traditional computer networks," namely, "[t]he concept of a direct-access bulletin board that does not require a network layer translation of messages on each node of the

Case IPR2017-01519
Patent 8,566,843 B2

network." Pet. 11; Ex. 1001, 11:19–20, 11:30–35. Petitioner asserts, supported by the testimony of Dr. Madisetti, that a person of ordinary skill in the art "would have understood the term to mean removing network information, such as network addresses and communication network problems," and therefore proposes construing "network layer translation" as "removing network information." Pet. 11 (citing Ex. 1003 ¶ 62). Patent Owner does not address construction of the phrase. Petitioner's proposed construction is reasonable, and we adopt it.

### 6. Information Sharing

Patent Owner identifies recitations in each of the independent claims that relate to real-time sharing of information. PO Resp. 12. Patent Owner's argument regarding the construction of such recitations can be illustrated with independent claim 1, which recites "code for causing the information to be shared by: in real-time, sharing the information utilizing at least one message format corresponding to a second network protocol associated with a second network." Ex. 1001, 12:32–35. According to Patent Owner, "the words '*the* information' clearly refer to information previously identified in the claims." PO Resp. 12. In claim 1, Patent Owner contends that "it is the 'information associated with a message received utilizing a first network protocol associated with a first network' (limitation 1.1) which was caused to be stored utilizing the storage resource (limitation 1.6[3]) – i.e., it is information whose storage was completed to the bulletin board or the storage resource." *Id.* at 13.

---

[3] Patent Owner appears to intend to refer to limitation 1.5.

Case IPR2017-01519
Patent 8,566,843 B2

Patent Owner thus contends that information sharing, as recited in the independent claims, requires completion of storage to the recited bulletin board or storage resource.  Patent Owner also cites a general-dictionary definition of "share" as "to partake of, use, experience, occupy, or enjoy with others; to have in common."  *Id.* at 14 (citing Ex. 2003).

We are not persuaded by Patent Owner's contention.  Outside of the preamble, claim 1 first recites "information" as part of the requirement of "code for allowing receipt of information associated with a message received utilizing a first network protocol associated with a first network." Ex. 1001, 12:19–21.  The claim includes recitations for various code that contemplate potentially different actions depending on the satisfaction of different conditions.  For example, code causes a "determination as to whether a storage resource is available," and, "in the event the storage resource is available," code "caus[es] storage of the information utilizing the storage resource."  *Id.* at 12:22–23, 12:29–31.  But additional code causes "a request in connection with the storage resource if [a] threshold has not been reached" and causes an error notification to be sent if "the threshold has been reached."  *Id.* at 12:22–28.  The plain language of the claim does not require that "the information" be stored using the "storage resource" under all conditions.

The plain language of the claim *does*, though, always require the presence of "code for causing the information to be shared," specifically by "in real-time, sharing the information utilizing at least one message format corresponding to a second network protocol associated with a second network."  *Id.* at 12: 32–35.  Nothing in the plain language of this element requires that "the information" have been stored with the storage resource.

Case IPR2017-01519
Patent 8,566,843 B2

Indeed, Petitioner identifies "embodiments of the specification that share information not using a shared storage."  Reply 8.  In particular, the Specification of the '843 patent describes "horizontal information sharing in a hierarchical system" where output variables generated by an ECU are output to local actuators, which are connected via discrete signal lines or networked actuators connected via a multiplexing bus.  *See* Ex. 1001, 8:51–59, 7:38–49 ("In an alternate embodiment of the remote message communication process . . . [t]o communicate between two heterogeneous networks, this process may then be repeated in reverse by adding back the header information for the various layers of the second network, and eventually putting the message onto the second network's physical link."); *see* Tr. 10:19–12:7 (Petitioner, at oral hearing, discussing embodiment that shares information without using a shared storage).  Furthermore, the description of "information" as "capable of being stored *or* shared" in the '843 patent Specification is consistent with storage and sharing being distinct concepts.  *See* Ex. 1001, 3:56–59 (emphasis added).

At the oral hearing, Patent Owner argued that "the information" recited in element 1.7 ("in real time, sharing *the information* utilizing at least one message format corresponding to a second network protocol associated with a second network") (emphasis added) necessarily refers to "the information" recited in element 1.5 (code for, in the event the storage resource is available, causing storage of *the information* utilizing the storage resource") (emphasis added):

> Our position is that the information then appears in Element 1.5, which says the information is stored utilizing a storage resource. Therefore, the next time the word the information is used, it's

17

Case IPR2017-01519
Patent 8,566,843 B2

> now referring to the last antecedent basis, which is no longer
> Element 1.1.  The last antecedent is Element 1.5.

Tr. 48:10–14. But Patent Owner is unable to identify sufficient legal basis
for its "last antecedent" theory.  *See id.* at 40:8–15 ("I have not found the
concept in patent claim construction.").

   In addition to these considerations, we note that Patent Owner has
submitted a definition of "share" drawn from a technical dictionary into the
record of this proceeding.  Ex. 2004.[4]  We find the technical dictionary
provided by Patent Owner to be more probative than the general-purpose
dictionary Patent Owner quotes.

   The language of the general-purpose dictionary definition of "share"
that states "to partake of, use, experience, occupy, or enjoy with others; to
have in common," does not appear to contemplate the sharing of
"information," which the '843 patent Specification describes as "includ[ing]
data, a signal, and/or anything else capable of being stored and shared."  *See*
Ex. 2003 (general definition of "share"); Ex. 1001, 3:56–59.  Instead, the
technical definition of "[t]o make files, directories, or folders accessible to
other users over a network" is more relevant because it expressly
contemplates the same context as the '843 patent, i.e., sharing over a
network.  Ex. 2004 (technical definition of "share").

---

[4] We note that, even if Patent Owner had not entered Exhibit 2004 into this
proceeding, judges are free to rely on extrinsic dictionary definitions when
construing claim terms, so long as the dictionary definition does not
contradict any definition found in or ascertained by a reading of the patent
documents.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 n.6
(Fed. Cir. 1996) *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1322–23 (Fed.
Cir. 2005) (en banc).

Case IPR2017-01519
Patent 8,566,843 B2

Thus, the plain language of the claim, intrinsic evidence in the form of the Specification, and extrinsic evidence in the form of a technical-dictionary definition all support a construction of information sharing that requires making the information accessible, without requiring storage of the information. We accordingly construe the various recitations of information sharing in the claims in accordance with such requirements.

### 7. Other Terms

We do not find it necessary, for purposes of this Decision, to construe any other terms explicitly. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc*., 200 F.3d 795, 803 (Fed. Cir. 1999)) (only terms in controversy need to be construed, and only to the extent necessary to resolve the controversy).

### B. Effective Filing Date

Petitioner contends that the challenged claims are entitled to claim the benefit of only the December 15, 2003, filing date of the '263 patent, and, in particular, that they are not entitled to the December 17, 2002, filing date of the '018 provisional application. Pet. 6–8. Petitioner argues that "the '263 patent is the first instance that even arguably discloses the memory-related limitations," and that the '018 provisional application does not disclose

> at least the following memory-related limitations of claim 1: "code for determining whether a threshold has been reached and causing a request in connection with the storage resource if the threshold has not been reached"; "code for, in the event the storage resource is available, causing storage of the information

Case IPR2017-01519
Patent 8,566,843 B2

> utilizing the storage resource[,]" . . . [and] at least the following
> limitation of claims 48 and  50:  "when the storage resource is
> not  available  and  the  threshold  associated  with  the
> [determination whether the storage resource is available] has not
> been  reached,  issuing  another  storage  resource  request  in
> connection with the storage resource."

*Id.* at 7–8.  Petitioner further contends that "the ['018] provisional
application simply states that 'the bulletin board manager provides
mechanisms for access control,'" and that "[t]his broad statement . . . in now
way discloses the limitations above." *Id.* at 8 (citing Ex. 1005, 8).  Patent
Owner does not present any evidence or argument that the '843 patent is
entitled to claim the benefit of the '018 provisional application filing date.

For a claim of a patent to claim priority from the filing date of its
provisional application, the provisional application must contain a written
description of the claim in the manner set forth under 35. U.S.C. § 112.  35
U.S.C. § 119(e)(1).  Although a petitioner bears the ultimate burden of
persuasion to show a claim is unpatentable, a second and distinct burden—
the burden of production—is a shifting burden.  *Dynamic Drinkware, LLC v.
National Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).  In cases
such as here, where Petitioner has presented sufficient evidence and
argument of unpatentability based on references that pre-date the filing date
of the '263 patent, Petitioner has met its initial burden of production.  *Id.* at
1379.  The burden then shifted to Patent Owner to show that the '018
provisional application provides written description support for the
challenged claims of the '843 patent.  *Id.* at 1380.  As we discussed above,
Patent Owner does not provide any evidence or argument in this regard, and
therefore has not met its burden of production to show the challenged claims

Case IPR2017-01519
Patent 8,566,843 B2

are entitled to the benefit of the '018 provisional application filing date.
Therefore, based on the record, we accord the challenged claims the
December 15, 2003 filing date of the '263 patent.

We note that, although the burden of production has not shifted back
to Petitioner with regard to entitlement to the '018 provisional filing date,
the Petition identifies specific claim limitations Petitioner contends are
unsupported by the '018 provisional application and identifies specific
disclosure in the '018 provisional application that it contends is insufficient.
Pet. 6–8.

## C. Legal Principles

To establish anticipation, each and every element in a claim, arranged
as recited in the claim, must be found in a single prior art reference.  *Net
MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008);
*Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir.
2001).  While the elements must be arranged in the same way as is recited in
the claim, "the reference need not satisfy an *ipsissimis verbis* test."  *In re
Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009); *In re Bond*, 910 F.2d 831,
832–33 (Fed. Cir. 1990).  Identity of terminology between the anticipatory
prior art reference and the claim is not required.  Prior art references must be
"'considered together with the knowledge of one of ordinary skill in the
pertinent art.'"  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

Also, "it is proper to take into account not only specific teachings of
the reference but also the inferences which one skilled in the art would
reasonably be expected to draw therefrom."  *In re Preda*, 401 F.2d 825, 826
(CCPA 1968).  As the Court of Appeals for the Federal Circuit recently

Case IPR2017-01519
Patent 8,566,843 B2

explained, the dispositive question for anticipation is whether one skilled in the art would reasonably understand or infer from a prior art reference that every claim element is disclosed in that reference. *Eli Lilly v. Los Angeles Biomedical Research Inst.*, 849 F.3d 1073, 1074–1075 (Fed. Cir. 2017).

A claim is unpatentable for obviousness under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when in evidence, objective indicia of non-obviousness, i.e., secondary considerations.[5] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

Additionally, the obviousness inquiry typically requires an analysis of "whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) (requiring "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness")); *see In re Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1333 (Fed. Cir. 2016) (citing *DyStar Textilfarben GmbH & Co. Deutschland KG v. C. H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006)).

---

[5] The parties do not address secondary considerations, which accordingly do not form part of our analysis.

Case IPR2017-01519
Patent 8,566,843 B2

To prevail on its challenges, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.* 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden never shifts to Patent Owner. *See Dynamic Drinkware*, 800 F.3d at 1378 (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review). Furthermore, Petitioner does not satisfy its burden of proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

## D.  Level of Skill in the Art

The parties advocate for the adoption of similar levels of ordinary skill in the art. Petitioner contends that a person of ordinary skill "would have a bachelor's degree in science in electrical engineering, computer engineering, or a related engineering discipline and at least two years of industry experience in the field of distributed computing or automotive engineering, or equivalent experience, education, or both." Pet. 8. In addition, Petitioner contends that such a person "would also have knowledge or familiarity with in-vehicle computing." *Id.* (citing Ex. 1003 ¶¶ 65–66). Dr. Madisetti's testimony supports Petitioner's proposal. Ex. 1003 ¶¶ 65–66.

Case IPR2017-01519
Patent 8,566,843 B2

> Patent Owner similarly contends that a person of ordinary skill
>
> would have had at least the qualifications of or equivalent to
> either a master's degree in electrical engineering, computer
> science, or computer engineering with course work or research
> in embedded networking technologies or an undergraduate
> degree in electrical engineering, computer science, or computer
> engineering with at least two years of relevant work experience
> in industry.

PO Resp. 15.  Dr. Miller's testimony supports Patent Owner's proposal.
Ex. 2001 ¶ 17.  The principal difference between the levels proposed by the
parties is Petitioner's requirement that the person have knowledge or
familiarity with "in-vehicle computing."  Although the Specification
illustrates its systems and methods for sharing information in a distributed
system in the context of vehicle applications, the claims are not so limited.
We are not persuaded that familiarity with in-vehicle computing would be a
characteristic of a person of ordinary skill in the relevant art.  We therefore
adopt Patent Owner's expression of the level of skill in the art, noting that it
instead requires some level of familiarity with embedded networking
technologies.

### E.  Testimony of Dr. Miller

Petitioner argues that the testimony of Patent Owner's expert,
Dr. Miller "deserves little weight because he misapplies the law and
provides contradictory testimony."  Reply 2.  Specifically, Petitioner
contends that Dr. Miller (1) does not understand or apply the principles of
broadest reasonable interpretation in his claim constructions; (2) imports
limitations from the Specification into the claims; (3) does not understand

Case IPR2017-01519
Patent 8,566,843 B2

what defines an invention; and (4) cannot identify an antecedent basis. *Id.* at
2–3.

As Petitioner recognizes, in a related *inter partes* review proceeding,
we "agree[d] with Petitioner that Dr. Miller did not provide responses
sufficient to conclude that he was aware of and/or applied the correct claim-
construction standard." *BMW of N. Am., LLC v. Stragent, LLC*, Case
IPR2017-00677, slip op. at 13–14 (PTAB June 16, 2018) (Paper 32). But
deficiencies in Dr. Miller's testimony in that earlier proceeding have largely
been cured in the instant proceeding. *See, e.g.*, Ex. 2001 ¶ 27 ("I have been
advised, and it is my understanding, that patent claims in IPR proceedings
such as this are given their broadest reasonable construction in view of the
patent claims, specification, file history, and the understanding of one having
ordinary skill in the relevant art at the time of the invention.").

We have reviewed the deposition testimony to which Petitioner draws
our attention, and disagree that Dr. Miller's imprecisions regarding patent
law are sufficient to discount or limit the weight accorded to his opinions.
*See* Reply 3–7. Technical experts are not expected to be legal authorities,
and Dr. Miller's opinions are helpful to us as the trier of fact. *See* Fed. R.
Evid. 702 (stating conditions under which an expert witness may testify in
the form of an opinion). We are also not persuaded by Petitioner's argument
that Dr. Miller's opinions should be given reduced weight because "he is a
pay for opinion expert, whose opinions reflect counsel instructions rather
than his views." Reply 5. Despite Petitioner's allusions, we see nothing
irregular or improper with Dr. Miller's acknowledgment that Patent Owner's
"attorneys did provide some clarifications and help in preparing the
declaration." *See id.*; Ex. 1031, 30:21–24. Dr. Miller swears to the

25

Case IPR2017-01519
Patent 8,566,843 B2

statements in his Declaration under penalty of perjury, and we see no compelling reason not to accord those states due weight.  Ex. 2001, 62.

### F.  Obviousness over Staiger, Millsap, and Wong

#### 1.  Staiger

Staiger, which "relates to a method and a circuit arrangement for communication within and across networks," was filed on December 4, 2001, and published on June 13, 2002.  Ex. 1004 ¶ 1, [22], [43].  Consistent with the effective filing date we accord the challenged claims herein, Staiger is prior art under 35 U.S.C. §§ 102(a), 102(b), and 102(e).

Staiger, like the specification of the '843 patent, describes network communications in automobiles.  *Id.* ¶ 2.  Staiger discloses that "[t]hrough the networks the computer systems are able to collect information from different mostly remote systems" and that "[t]he information might contain parameters describing the state of operation of the remote systems which are meant to be controlled or monitored by the computer system receiving the information."  *Id.*  In particular, Staiger discloses an Electronic Control Unit ("ECU") "connected to a plurality of real-time networks, e.g., several individual CAN (Controller Area Network) busses or other multiple purpose networks, like multimedia-networks, such as MOST (Media Oriented Systems Transport), i.e., an optical bus system used in automobiles, or IEEE1394 (Firewire)."  *Id.* ¶ 3.  The ECU executes an application program for controlling remote systems while concurrently performing gateway functions between the different networks.  *Id.* ¶¶ 4–5.

Figure 2 of Staiger is reproduced below.

26

Case IPR2017-01519
Patent 8,566,843 B2



FIG. 2

Figure 2 depicts a high-level block diagram of intercommunication processor 200, connected to switchboard 201, "which is designed to connect four individual CAN-busses 202 to 205 and in addition a first and a second independent CPU 207 and 208." *Id.* ¶ 36 (emphasis omitted).  Each of CAN busses 202–205 is connected to a respective bus adapter 214–217, which may be formed by standardized CAN controllers providing connections to the respective CAN busses 202–205. *Id.* ¶ 38.  First and second CPUs 207 and 208 provide connections to first and second additional bus systems 210 and 211, respectively. *Id.* ¶ 36.  Can-busses 202 to 205 may be compatible with one of the CAN-B network protocol or the CAN-C network protocol. *See id.* ¶ 38.  "Connecting up to four CAN busses and one or two CPUs together represents a typical network requirement used in modern automobiles.  However, . . . the present invention is neither limited to this

27

Case IPR2017-01519
Patent 8,566,843 B2

particular bus system[], the specific number of busses nor to the number of
CPUs connected to it." *Id.* ¶ 37. Figure 2 also depicts execution tag registry
238, which Staiger describes as being "connected to a first, a second and a
third execution unit 240 to 244 which can access a register pool 246 for
storing data and for exchanging data among the execution units 240 to 244."
*Id.* ¶ 41.

### 2. *Millsap*

Millsap, which relates to "[a] network management approach for use
in a vehicle to control activation of electronic control units (ECUs)
networked together throughout the vehicle," was filed on May 24, 2000, and
issued on November 19, 2002. Ex. 1015 at [22], [45], [57]. Consistent with
the effective filing date we accord the challenged claims herein, Millsap is
prior art under 35 U.S.C. §§ 102(a) and 102(e).

Millsap, like Staiger and the specification of the '843 patent, describes
network communications in automobiles. *Id.* at [57]. Millsap describes "an
on-board vehicle network which utilizes a network management strategy that
permits distributed ECUs on the network." *Id.* at 2:27–33.

Figure 9 of Millsap is reproduced below.



*Fig. 9*

28

Case IPR2017-01519
Patent 8,566,843 B2

Figure 9 depicts Gateway G1 comprising two interfaces, Comm. Kernel 140 ("communication kernel") and Comm. Kernel 142, connected to two different networks, SubNet A and SubNet B. *Id.* SubNet A is connected via high-speed bus 110, and SubNet B is connected via low-speed bus 112. *Id.* at 12:27–30. Each communication kernel includes a data link layer ("DLL") and a physical layer that provides conversion of digital data symbols (i.e., 1's and 0's) generated by the data link layer into electrical signals transmitted on the bus. *Id.* at 12:42–51.

### 3. *Wong*

Wong, which relates to automotive networks, was purportedly published on January 8, 2001. Ex. 1012; Ex. 1014 ¶ 4. Consistent with the effective filing date we accord the challenged claims herein, Wong is prior art under 35 U.S.C. § 102(b).

Wong, like Staiger and the specification of the '843 patent, describes network communications in automobiles. Ex. 1012, 62. Wong discloses that "[v]ehicles will be home for some of the most diverse network and multiprocessing technology over the next five years," and that "[s]tandards will help improve acceptance and reduce costs." *Id.* "Leading the standardization charge for networks in automotive environments is the Controller Area Network (CAN) . . . providing a standard for real-time operating systems for the many embedded processors found in automotive networks." *Id.* Wong discloses further that CAN is not the only kind of network used in automobiles. "At the low end, the Local Interconnect Network (LIN) is being employed," and "[a] variety of multimedia networks

29

Case IPR2017-01519
Patent 8,566,843 B2

are undergoing evaluation too, including a modified version of IEEE-1394 standard to allow operation in a more hostile environment." *Id.* (emphasis omitted). Wong provides a table listing various automobile networking standards, including, for example, CAN, CAN-A, CAN-B, CAN-C, LIN, and FlexRay. *Id.* at 66. According to Wong, "[t]he vehicle of the future will contain a variety of networks tied together primarily for management and diagnostic support. . . . One or more gateways will link various network segments." *Id.* at 64 (Fig. 1).

### 4. Independent Claim 1
#### a. Preamble

With respect to the preamble of claim 1, which recites "[a] non-transitory computer-readable medium storing a computer program product for sharing information," Petitioner relies on Staiger's disclosure of "a method and a circuit arrangement for communication within and across networks." Ex. 1001, 12:16–18; Pet. 16–17, 62. Petitioner argues that Staiger discloses a computer program product as recited because Staiger discloses that the method and circuit may be implemented using software. Pet. 17–18 (citing Ex. 1004 ¶ 83). Petitioner further argues that Staiger discloses code for performing the features recited in limitations 1.1 to 1.6 by virtue of disclosing a software implementation. *Id.* Patent Owner does not dispute Petitioner's contention.

We find, on the basis of the evidence and explanation provided by Petitioner, that Petitioner has shown sufficiently that Staiger discloses the preamble of claim 1.

Case IPR2017-01519
Patent 8,566,843 B2

### b. Element 1.1

Petitioner contends that Staiger discloses "code for allowing receipt of information associated with a message received utilizing a first network protocol associated with a first network," as recited in claim 1. Ex. 1001, 12:19–21; Pet. 18, 62. According to Petitioner, Staiger discloses receiving information associated with a message by virtue of its disclosure of an initializing process that analyzes information encoded in an incoming message received through any one of the CAN busses. Pet. 18 (citing Ex. 1004 ¶¶ 32, 36). Petitioner argues that Staiger discloses using a "first network protocol associated with a first network" by virtue of its disclosure of receiving information from remote units using a particular type of bus, such as CAN, FireWire, or MOST. *Id.* According to Petitioner, each bus type is associated with a specific network protocol. *Id.* Patent Owner does not dispute Petitioner's contention.

We find, on the basis of the evidence and explanation provided by Petitioner, that Petitioner has shown sufficiently that Staiger discloses this limitation.

### c. Element 1.2

Petitioner contends that Staiger discloses "code for causing a determination as to whether a storage resource is available," as recited in claim 1. Ex. 1001, 12:22–23; Pet. 18–19, 62. Petitioner relies on Staiger's determination of whether an execution tag registry is available. Pet. 18–19. Petitioner argues that Staiger's tag registry is a "storage resource" because it stores data. *Id.* (citing Ex. 1004 ¶ 41). Petitioner argues a determination of availability is made because Staiger discloses "a determination of block 520

31

Case IPR2017-01519
Patent 8,566,843 B2

of whether or not an execution tag registry . . . is available." *Id.* at 18–19
(quoting Ex. 1004 ¶ 62) (ellipses in original).  Patent Owner does not dispute
Petitioner's contention.

We find, on the basis of the evidence and explanation provided by
Petitioner, that Petitioner has shown sufficiently that Staiger discloses this
limitation.

### d.  Element 1.3

Petitioner contends that Staiger discloses "code for determining
whether a threshold has been reached and causing a request in connection
with the storage resource if the threshold has not been reached," as recited in
claim 1.  Ex. 1001, 12:24–26; Pet. 19–21, 62.  Petitioner relies on Staiger's
disclosure of a time-out event.  Pet. 19–21 (citing Ex. 1004, Fig. 5).  Staiger
discloses that if a tag registry is unavailable, the system re-requests
allocation of the registry so long as no time-out has occurred.  *Id.* at 19–20
(citing Ex. 1004 ¶ 62).  Petitioner equates determination of a time-out event
with determining whether a threshold has been reached.  *Id.*  Petitioner's
argument is based on the construction of "threshold" that we adopted above,
namely, "a level, point, or value above which something is true or will take
place and below which it is not or will not." *Id.* at 20.  Petitioner argues that
the threshold in Staiger is the amount of time it takes for a time-out event to
occur.  *Id.*  If a time-out event has not occurred, i.e., the threshold has not
been reached, Petitioner argues Staiger discloses causing the claimed request
in connection with a storage resource because Staiger discloses re-requesting
allocation of a tag registry if the tag registry was previously unavailable.  *Id.*
Patent Owner does not dispute Petitioner's contention.

Case IPR2017-01519
Patent 8,566,843 B2

We find, on the basis of the evidence and explanation provided by Petitioner, that Petitioner has shown sufficiently that Staiger discloses this limitation.

### e. Element 1.4

Petitioner contends that Staiger discloses "code for, in the event the threshold has been reached, causing an error notification to be sent," as recited in claim 1. Ex. 1001, 12:27–28; Pet. 21–22, 62. Petitioner relies on Staiger's disclosure that when a time-out event has occurred (i.e., the threshold has been reached) and the tag registry is unavailable, Staiger causes an "interrupt request" to be sent. Pet. 21–22 (citing Ex. 1004 ¶ 62, Fig. 5). Petitioner argues that the "interrupt request" is the claimed error notification because it provides notification of an error with the tag registry. *Id.* (citing Ex. 1003 ¶ 104). In particular, the "interrupt request" indicates situations in which the intercommunication pre-processor ("IPP") is unavailable or busy. *Id.* (citing Ex. 1004, Fig. 5). Patent Owner does not dispute Petitioner's contention.

We find, on the basis of the evidence and explanation provided by Petitioner, that Petitioner has shown sufficiently that Staiger discloses this limitation.

### f. Element 1.5

Petitioner contends that Staiger discloses "code for, in the event the storage resource is available, causing storage of the information utilizing the storage resource," as recited in claim 1. Ex. 1001, 12:29–31; Pet. 22–25, 62. Petitioner argues that Staiger teaches that if the tag registry is available and

33

Case IPR2017-01519
Patent 8,566,843 B2

no time-out has occurred, the tag registry is initiated and the message is retrieved and stored.  Pet. 22–25 (citing Ex. 1004 ¶¶ 64, 66, Figs. 5, 6; Ex. 1003 ¶ 6).  Patent Owner does not dispute Petitioner's contention.

We find, on the basis of the evidence and explanation provided by Petitioner, that Petitioner has shown sufficiently that Staiger discloses this limitation.

### g.  Elements 1.6 and 1.7

Claim 1 recites "code for causing the information to be shared by:  in real-time, sharing the information utilizing at least one message format corresponding to a second network protocol associated with a second network."  Ex. 1001, 12:32–35.  Petitioner contends that Staiger discloses these limitations.  Pet. 25–27, 62.

In addressing these limitations, Petitioner argues that Staiger discloses sharing messages with a plurality of different destinations.  *Id.* at 25–26 (citing Ex. 1004 ¶¶ 35–36, 48, Fig. 1).  Of particular relevance is the following disclosure, explaining aspects of Figure 2 of Staiger, reproduced above:

> The switchboard 201 is a multiplexing scheme controlled either by one of the CPUs 207 and 208 or the intercommunication preprocessor 200.  This allows the CPUs 207 and 208 to use the functionality of the intercommunication preprocessor 200.  *For example, a message generated by one of the CPUs 207 and 208 has to be broadcasted to several CAN busses 202 to 205 identically.*  In this case, the message is multiplexed by the switchboard 201 to the intercommunication preprocessor 200, then, the intercommunication preprocessor 200 processes the message and initiates immediate distribution.  This procedure significantly   saves   time,   since   the   intercommunication

34

Case IPR2017-01519
Patent 8,566,843 B2

> preprocessor 200, specialized to operate this tasks [*sic*], will
> require only a fraction of processing time in comparison to a
> master CPU formed by one of the CPUs 207 and 208.
> Furthermore, the master CPU only has to execute one single
> message operation, in case the message needs to be computed
> before forwarding, which saves processing time as well.

Ex. 1004 ¶ 51 (emphasis added).

In making its argument, Petitioner observes that CPUs 207 and 208 are connected to bus systems such as FireWire or MOST, corresponding to a "first network protocol," as recited in element 1.1, and that CPUs 202–205 are connected to CAN busses, which are different and correspond to a "second network protocol." Pet. 26. In addition, Petitioner observes that the resulting information sharing occurs in "real-time" because Staiger discloses that CAN, FireWire, and MOST busses are real-time busses with a response time in "milliseconds or microseconds," consistent with our construction. *Id.* at 27 (citing Ex. 1004 ¶¶ 7, 51; Ex. 1003 ¶ 111). We find this identification sufficient.

We recognize that Petitioner elides in its initial presentation of its argument by asserting that "*Staiger* discloses *receiving messages* from 'one of the CPUs 207 and 208'" when Staiger instead refers to "a message *generated* by one of the CPUs 207 and 208." Pet. 26 (emphasis added); Ex. 1004 ¶ 51 (emphasis added). This is a point also made by the dissent. *See post*, at 7–10 (Zado, APJ, dissenting). But "it is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom." *In re Preda*, 401 F.2d 825, 826 (CCPA 1968). In doing so, we note that Patent Owner concedes that Staiger "discloses that messages from the various

35

Case IPR2017-01519
Patent 8,566,843 B2

busses are received and distributed" (although Patent Owner draws other distinctions addressed below). PO Resp. 24 (citing Ex. 1004 ¶ 36). And Patent Owner's expert, Dr. Miller, testified on cross-examination that "the message coming through CPU 207 and 208 has to be broadcasted to the CAN busses 202 to 205 identically." Ex. 1031, 112:2–4. We thus understand Staiger to teach the broadcast of messages received from CPUs 207 and 208 to CAN busses 202–205, as Petitioner asserts.

Furthermore, Staiger's disclosure is necessarily evaluated in the context of the reference as a whole, which describes a method that "focuses on message processing in a system for communicating with remote units over at least one data network and with at least one dedicated CPU." Ex. 1004 ¶ 15. After "a message to be processed is received and it is determined the kind of treatment to be performed with the received message," Staiger performs such processing and, "[f]inally, the result of the message processing is presented to be forwarded to a destination unit." *Id.* Intercommunication among the various busses shown in Figure 2, reproduced above, may occur with switchboard 201, which "is a multiplexing scheme controlled either by one of the CPUs 207 and 208 or the intercommunication preprocessor 200." *Id.* ¶ 51.

Petitioner addresses this multiplexing aspect in its Reply, an argument we find properly responsive to Patent Owner's contentions that "Staiger only describes a type of multiplexing" and that "the Patent does not suggest that multiplexing is a form of sharing." PO Resp. 26. In particular, Petitioner directs our attention to Figure 8 of the '843 patent and related description that suggests multiplexing is a form of "sharing." Reply 17 (citing Ex. 1001, 3:46–59, Fig. 8, 7:53–58). In addition, Petitioner highlights cross-

Case IPR2017-01519
Patent 8,566,843 B2

examination testimony of Patent Owner's expert, Dr. Miller, that "I would
say if you transmit data from one device to another device, that the data has
been shared with the second device. . . .  Yes, you can use multiplexing for
doing that." *Id.* (quoting Ex. 1031, 24:2–13).

Patent Owner also disputes Petitioner's analysis for these limitations
on the basis that the plain language of elements 1.6 and 1.7[6] requires that
"the information" that is shared must be the same information that is
received in element 1.1, "utilizing a first network protocol associated with a
first network," and which is stored in the storage resource in element 1.5.
PO Resp. 23–24.  According to Patent Owner, elements 1.6 and 1.7 require
"that the information associated with a first network protocol associated with
a first network, which was stored in the storage resource, be shared 'utilizing
a second network protocol associated with a second network.'"  *Id.* at 24.
Patent Owner argues that Staiger neither discloses nor enables a skilled
artisan to execute these limitations because "whatever their function, busses
210 and 211 are never connected to any information stored in the storage
resource, because CPUs 207 and 208 interrupt any communication between
them and any storage."  *Id.* at 26–27.

Part of this is essentially the same argument that we address in detail
above as a matter of claim construction.  As we explain there, the plain
language of the claim, intrinsic evidence in the form of the Specification,
and extrinsic evidence in the form of a technical-dictionary definition
supports a construction of information sharing that does not require storage

---

[6] Patent Owner erroneously refers to limitations 1.7 and 1.8.  *See, e.g.*, PO
Resp. 23.

Case IPR2017-01519
Patent 8,566,843 B2

of the information.  In advancing this argument with respect to elements 1.6
and 1.7, Patent Owner improperly seeks to import certain specific
embodiments described in the Specification into the claims.  But "[i]t is a
'bedrock principle' of patent law that 'the claims of a patent define the
invention to which the patentee is entitled the right to exclude." *Phillips*,
415 F.3d at 1323 (citing *Innova/Pure Water, Inc. v. Safari Water Filtration
Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  The claims are "the sole
measure of the grant."  *Innova/Pure Water, Inc.*, 381 F.3d at 1115 (citing
*Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 339
(1961)).

In addition, Patent Owner highlights the word "identically" in
Staiger's disclosure of broadcasting messages from CPUs 207 and 208 to
CAN busses 202–205:  "The 'identically' means that all busses 202 – 205
must be the same protocol – either CAN-B or CAN-C, but not both at the
same time."  PO Resp. 26 (citing Ex. 2001 ¶¶ 65–66).  According to Patent
Owner, "Staiger does not contemplate converting of data so as to be
available for two protocols, because Staiger does not disclose any form of
conversion of data from one protocol to another." *Id.* at 27.  This argument
is unpersuasive because Petitioner is relying on the undisputed fact that
CPUs 207 and 208 use FireWire or MOST, a different protocol than the
CAN protocol used by busses 202–205.

The dissent emphasizes the other aspect of Patent Owner's argument,
namely that "the information" recited in element 1.7 "must be the same
*information* recited in limitation 1.1 that is associated with a received
message." *See post*, at 15–16 (Zado, APJ, dissenting).  As the dissent
observes, "Staiger discloses its system receiving a message, and *processing*

38

Case IPR2017-01519
Patent 8,566,843 B2

the message." *Id.* at 15 (citing Ex. 1004 ¶¶ 32–33, 35).  We do not disagree that "the message would be processed, and a *new, different* message resulting from the processing would be sent to CAN buses 202 to 205."  *Id.* at 17.  But in concluding that "*the information* that is shared would not necessarily be the same *information* that is received, as required by limitations 1.1 and 1.7," the dissent conflates "the information" and "the message."  *See id.*

Such conflation is contrary both to the claim language and the disclosure of Staiger.  That is, the claim explicitly distinguishes the *information* and the *message* by reciting, in element 1.1, "allowing receipt of information associated with a message." Ex. 1001, 12:18.  Staiger similarly explains, in describing its Figure 1, that "an incoming message" is received, and that "information [is] encoded in the incoming data." Ex. 1004 ¶ 32. Although various processing is performed on the *message* in Staiger, including an "initializing process," a "dynamic process," and a "presentation process," none of these processes is described as changing the "information encoded in the incoming data."  In particular, the "initializing process" "analyses an incoming message . . . and determines further processing based on configuration data . . . and information encoded in the incoming data." *Id.* ¶ 32.  The "dynamic process" allows "differentiation to known state of the art processor topologies."  *Id.* ¶ 33.  And the "presentation process" allows "output[ting] a message as a result of the computation of the incoming message."  *Id.* ¶ 35.

Although such overhead processing may prepare the received information for distribution with Staiger's multiplexing techniques, there is no indication that the informational content of the message is changed.

39

Case IPR2017-01519
Patent 8,566,843 B2

Indeed, Staiger's summary description of this processing appears to take steps to preserve the informational content through storage in a set of registers:

> First, a message to be processed is received and it is determined the kind of treatment to be performed with the received message. Then message specific information specifying contents of the received message and the determined treatment of a received message are stored into a first set of registers. . . . Then the determined treatment gets performed. Meanwhile, the first set of registers are monitored in order to start presenting the result of the message processing once the processing of the message is complete. Finally, the result of the message processing is presented to be forwarded to a destination unit.

Ex. 1004 ¶ 15.

Accordingly, we find, on the basis of the evidence and explanation provided by Petitioner, and having considered Patent Owner's arguments, that Petitioner has shown sufficiently that Staiger discloses elements 1.6 and 1.7.

### h. Element 1.8

Petitioner contends that the combination of Staiger and Millsap teaches or suggests that "the computer program product is associated with an electronic control unit with a plurality of interface portions," as recited in claim 1. Ex. 1001, 12:36–38; Pet. 63–66. Petitioner relies on Millsap's disclosure of electronic control units, or ECUs, in vehicle control system networks. Pet. 63–64 (citing Ex. 1015, abst.). According to Petitioner, the ECUs disclosed in Millsap include a plurality of interface portions because the ECUs are connected to one or more networks. *Id.* (citing Ex. 1015, 1:6–

40

Case IPR2017-01519
Patent 8,566,843 B2

10, 2:41–46, 12:20–36, 12:42–44, Fig. 8; Ex. 1003 ¶ 193).  In particular,
Millsap discloses a gateway ECU comprising two communication kernels,
Comm. Kernel 140 and Comm. Kernel 142, wherein each communication
kernel connects to a different network, Sub-Net A and Sub-Net B,
respectively.  *Id.* at 64 (citing Ex. 1015, Fig. 9).  Petitioner takes the position
that the communication kernels disclose interface portions because they
connect to networks via busses 110 and 112, respectively, and include
physical layers.  *Id.*  Petitioner makes a sufficient showing with these
identifications.

Petitioner also articulates sufficient reasoning for combining these
teachings with Staiger because both references (1) are from the same field of
endeavor, i.e., are related to real-time distributed communication and control
of automotive ECUs; (2) aim to solve similar problems of improving data
processing between automotive ECUs; and (3) use similar techniques to
solve the problems, such as using gateway ECUs to bridge different
networks to allow for communication between the networks.  *Id.* at 65.
Petitioner supports this reasoning with testimony by Dr. Madisetti.  Ex. 1003
¶ 195.  In addition, Petitioner persuasively argues that the combination
would have been predictable and yielded no unexpected results:  "The
communication kernel described in *Millsap* was one of many well-known
and well-understood interface designs for providing data from a bus to a
computing resource that a POSITA would have known could be used with
the adapters of *Staiger*."  Pet. 66 (citing Ex. 1015, 12:42–13:14; Ex. 1003
¶ 197).

Patent Owner disputes whether a person of skill in the art would
combine the teachings of Staiger and Millsap, but this is done more broadly

Case IPR2017-01519
Patent 8,566,843 B2

in also discussing the further combination with Wong.  Because that is most relevant to elements 1.9 and 1.10, we address that argument below.

We find, on the basis of the evidence and explanation provided by Petitioner, that Petitioner has shown sufficiently that the combination of Staiger and Millsap discloses element 1.8.

### i.  Elements 1.9 and 1.10

With respect to elements 1.9 and 1.10, which recite first and second interface portions for interfacing with first and second networks, respectively, Petitioner identifies Millsap's communication kernel 140 as a "first interface portion" and communication kernel 142 as a "second interface portion," noting that kernel 140 and kernel 142 connect to different networks, i.e., a first network and a second network.  Pet. 66–68.  For the recitation that each interface portion has a first layer part and a second layer part, Petitioner argues that the physical layer in Millsap's communication kernel reads on the claimed "first layer part," and the communication kernel's DLL reads on the "second layer part."  *Id.* at 68–69.  Petitioner argues that the networks in the combined system of Staiger and Millsap can be CAN, FireWire, or MOST, because Staiger expressly discloses these networks.  *Id.* at 69.  Petitioner further argues that a skilled artisan would have understood other networks, such as LIN and FlexRay, were in use in automotive systems at the time, and could have been used in the combined system of Staiger and Millsap.  *Id.* (citing Ex. 1003 ¶ 202).  Petitioner relies on Wong to support its argument regarding the understanding of a skilled artisan.  *Id.* (citing Ex. 1012, 68, Figs. 1–2).

Case IPR2017-01519
Patent 8,566,843 B2

Petitioner provides a rationale for combining Wong with Staiger and
Millsap.  *Id.* at 70.  In pertinent part, Staiger and Millsap relate to bridging
different networks in automobiles, and Wong provides a description of
various well known networks used in automobiles at the time.  *Id.*  Petitioner
argues the combination would have yielded predictable results, namely, a
gateway ECU that bridges between not only various types of CAN networks
described in Staiger, but also bridges with other well-known networks used
in automobiles, as disclosed in Wong.  *Id.* at 71–72.

We are persuaded by Petitioner's arguments regarding the
combination of Staiger, Millsap, and Wong.  Patent Owner responds that
"Petitioner has also not shown that Millsap is at all related to the invention
claimed in the ['843] Patent."  PO Resp. 47.  In particular, Patent Owner
asserts that "Millsap does not disclose, for example, any CAN, Flexray or
LIN network."  *Id.* (citing Ex. 2001 ¶ 127).  In addition, although Patent
Owner agrees that Wong discusses the potential use of CAN, LIN, and
Flexray with automotive ECUs, "that is only one small part of the
limitations."  *Id.* at 48 (citing Ex. 2001 ¶¶ 129–130).

Although limitations 1.9 and 1.10 are expressed in a lengthy manner,
the concepts they recite are relatively straightforward, requiring interfaces
that process first messages to produce second messages.  Petitioner provides
sufficient reasoning and evidence to support its position that one of skill in
the art would combine the teachings of Staiger and Millsap in the manner it
proposes in part because they are from the same field of endeavor and
because they are reasonably pertinent to the particular problem with which
the inventor of the '843 patent was concerned.  *See In re Bigio*, 381 F.3d
1320, 1325 (Fed. Cir. 2004).

Case IPR2017-01519
Patent 8,566,843 B2

We find, on the basis of the evidence and explanation provided by Petitioner, that Petitioner has shown sufficiently that the combination of Staiger, Millsap, and Wong discloses elements 1.9 and 1.10.

### j. Summary

Based on the foregoing, we conclude that Petitioner shows, by a preponderance of the evidence, that independent claim 1 is unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### 5. Claim 2

Claim 2 depends from claim 1 and recites that "the computer program product is operable such that the determination as to whether the storage resource is available is made utilizing an initial request in connection with the storage resource." Ex. 1001, 12:64–67. For this limitation, drawing an equivalence between the recited "storage resource" and Staiger's tag registry, Petitioner observes that Figure 5 of Staiger illustrates performing a "determination . . . of whether or not an execution tag registry . . . is available." Pet. 31–32 (quoting Ex. 1004 ¶ 62). With this identification, Petitioner makes a sufficient showing, which is not contested by Patent Owner outside of its arguments directed at underlying claim 1.

We conclude that Petitioner shows, by a preponderance of the evidence, that claim 2 is unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

Case IPR2017-01519
Patent 8,566,843 B2

### 6. *Claims 3–8*

Claim 3 depends from claim 1 and recites that "the computer program product is operable such that the storage resource includes a bulletin board resource." Ex. 1001, 13:2–4. According to the Specification of the '843 patent, "the bulletin board may refer to any database that enables users to send and/or read electronic messages, files, and/or other data that are of general interest and/or addressed to no particular person/process." *Id.* at 5:9–13.

For the limitation of claim 3, Petitioner identifies execution tag registry 238, shown in Figure 2 of Staiger, reproduced above, with the recited "bulletin board resource." As Petitioner observes, "[d]ata stored by execution tag registry 238 are shared by execution units 240-244 for processing different processes, and thus are not addressed to any particular process." Pet. 33 (citing Ex. 1003 ¶ 124). In light of the Specification's explanation of a "bulletin board," we agree with Petitioner that Staiger's "ETRs [execution tag registries] are the claimed 'bulletin boards.'" *Id.* (citing Ex. 1003 ¶ 124).

Claims 4–6 each depend from claim 1 and respectively recite similar features, namely that the computer program product is operable such that the storage resource "includes a shared memory," "stores messages that are addressed to no particular process," and "stores messages available by any number of processes." Ex. 1001, 13:5–17. That is, we agree with Petitioner that these features are aspects of execution tag registry 238, as well as of register pool 246, also illustrated in Figure 2 of Staiger.

Claims 7 and 8 each depend from claim 1 and respectively recite that the computer program product is operable such that the storage resource "is

Case IPR2017-01519
Patent 8,566,843 B2

a section of a storage" and "involves a database." Ex. 1001, 13:14–24.
Petitioner contends that these limitations are met by Staiger because
execution tag registry is "included in a DP (dynamic process) execution unit
239 and store[s] data needed for the computation of the received messages."
Pet. 36; Ex. 1004 ¶ 41.  We agree, as well as with Petitioner's related
contention involving register pool 246, which is "for storing data and
exchanging data among the execution units 240-241."  Pet. 36; Ex. 1004
¶ 41.

Patent Owner does not contest these aspects of Petitioner's analysis
with respect to any of claims 3–8.  We conclude that Petitioner shows, by a
preponderance of the evidence, that claims 3–8 are unpatentable under 35
U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### 7.  Claims 9, 10, 12, and 13

Claims 9, 10, 12, and 13 each depend from claim 1 and respectively
recite that the computer program product is operable such that the request is
"a re-request," "a storage resource request," "another storage resource
request," and "for access to the storage resource."  Ex. 1001, 13:25–30,
13:36–44.  For these limitations, Petitioner relies on Staiger's disclosure of
allocating an execution tag registry during the initial process of message
processing.  Pet. 36–37 (citing Ex. 1004 ¶ 63, Fig. 5).  Figure 5 of Staiger is
reproduced below.

Case IPR2017-01519
Patent 8,566,843 B2



FIG. 5

Figure 5 is a flowchart illustration of message processing in an initializing process.  Ex. 1004 ¶26.

At block 520 of Figure 5, a determination is made whether an execution tag registry is available; if it is, "the process continues to block 526 [for] initiating and preparing the execution tag registry" for access.  Ex. 1004 ¶ 64.  Petitioner accordingly reasons from this disclosure, and we agree, that "the request is a storage resource request," as recited in claim 10, and that "the request is for access to the storage resource," as recited in claim 13.  Pet. 36–37 (citing Ex. 1003 ¶ 130).

47

Case IPR2017-01519
Patent 8,566,843 B2

In addition, Staiger discloses monitoring delay timer 510, which
issues a "time-out event." Ex. 1004 ¶ 63. If the requested execution tag
registry is not available and "[i]f the time-out event has not yet happened,"
the process makes a negative determination in time-out block 516, and
returns to block 524 to again request access to the execution tag registry at
block 520. *Id.* Petitioner accordingly reasons, and we agree, that "the
request is a re-request," as recited in claim 9, and that such a re-request is
"another storage resource request," as recited in claim 12. Pet. 37 (citing Ex.
1003 ¶ 131).

Patent Owner does not contest these aspects of Petitioner's analysis.
We conclude that Petitioner shows, by a preponderance of the evidence, that
claims 9, 10, 12, and 13 are unpatentable under 35 U.S.C. § 103(a) over
Staiger, Millsap, and Wong.

### 8. *Claim 11*

Claim 11 depends from claim 1 and recites that "the computer
program product is operable such that the request is repeated until the
storage resource is available unless a certain time beyond the threshold has
elapsed." Ex. 1001, 13:32–35. For this limitation, Petitioner relies on
Staiger's disclosure of increasing an internal counter that counts the number
of interrupt requests. Pet. 38 (citing Ex. 1004 ¶ 61). Because Staiger
discloses repeatedly re-requesting access to the execution tag registry if the
registry is not available until a time-out event occurs (as in block 516 of
Figure 5 of Staiger), Petitioner reasons that the limitation is met. *Id.* at 38–
39 (citing Ex. 1004 ¶ 62–63; Ex. 1003 ¶ 133). We agree with this reasoning,
which is not separately disputed by Patent Owner.

48

Case IPR2017-01519
Patent 8,566,843 B2

We conclude that Petitioner shows, by a preponderance of the evidence, that claim 11 is unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### 9.  Claims 14 and 15

Claims 14 and 15 each depend from independent claim 1 and recite that the computer program product is operable such that the determining, causing, and threshold are each associated with "a same layer of processing" and "a middleware layer that sits under an application layer."  Ex. 1001, 13:45–53.  For these limitations, Petitioner observes that the determination of whether a time-out event has occurred and the causing of the request in connection with the execution tag registry (blocks 510, 514, 516, and 520 of Figure 5) are all part of an "initializing process."  Pet. 40 (citing Ex. 1004 ¶¶ 60–64).  As Petitioner asserts, "the initializing process is performed by IP execution unit 226, which is part of the middleware layer," and "IP execution unit 226 sits under a DP execution unit 239 (i.e., the 'application layer')."  *Id.* (citing Ex. 1004 ¶ 39, Fig. 2).  We agree with these identifications.

Petitioner does not contest this aspect of Petitioner's analysis, and we conclude that Petitioner shows, by a preponderance of the evidence, that claims 14 and 15 are unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### 10.  Claim 16

Claim 16 depends from claim 1 and recites that the computer program product is operable such that "the sharing includes providing the information

Case IPR2017-01519
Patent 8,566,843 B2

to a plurality of software or hardware operations that share the storage resource." Ex. 1001, 13:55–59. For this limitation, Petitioner refers again to Staiger's example of broadcasting messages from CPUs 207 and 208 to several CAN busses 202–205. Pet. 40 (citing Ex. 1004 ¶ 51). Petitioner reasons that the limitation is met because the messages are received and stored in register pool 238, shown in Figure 2 above, and can thereby be accessed by execution units 240–244 and different processes shown in Figure 3. *Id.* at 40–41 (citing Ex. 1004 ¶ 41, Figs. 2, 3; Ex. 1003 ¶ 137). We agree with this reasoning, which Patent Owner does not dispute separately from its arguments directed at claim 1.

We conclude that Petitioner shows, by a preponderance of the evidence, that claim 16 is unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### *11. Claim 17*

Claim 17 depends from claim 1 and recites that the computer program product is operable such that "the electronic control unit is equipped with at least one gateway function." Ex. 1001, 13:61–63. For this limitation, Petitioner refers to Staiger's express disclosure of connecting an ECU that performs "routing, gateway, bus bridge and filtering functions" to real-time networks. Pet. 41 (citing Ex. 1004 ¶¶ 3–5). Patent Owner does not separately dispute this showing, which we find sufficient.

We conclude that Petitioner shows, by a preponderance of the evidence, that claim 17 is unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

Case IPR2017-01519
Patent 8,566,843 B2

### 12.  Claims 18–20

Claims 18–20 each depend from claim 1 and respectively recite that the computer program product is operable such that the real-time involves a response time that "is measured in milliseconds," "is measured in microseconds," and "is less than 1 second."  Ex. 1001, 13:65–67, 14:2–4, 14:6–8.  Petitioner addresses these limitations with Staiger's express disclosure of "real-time capability of the bus system, i.e., the capability of a system to respond to stimuli within some small upper limit of response time, typically milliseconds or microseconds."  Pet. 41–42; Ex. 1004 ¶ 7.  Because this disclosure meets the claim limitations, which Patent Owner does not separately dispute, Petitioner makes a sufficient showing.

We conclude that Petitioner shows, by a preponderance of the evidence, that claims 18–20 are unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### 13.  Claims 21–23

Claims 21–23 depends from claim 1 and respectively recite that the computer program product is operable such that the first network or the second network is "of the Controller Area Network type," is "of the Flexray network type," and is "of the Local Interconnect Network type."  Ex. 1001, 14:11–21.  Petitioner addresses the CAN limitation of claim 21 with Staiger's express disclosure that bus adapters 214–217 interface to CAN busses 202–205.  Pet. 42 (citing Ex. 1004 ¶ 38; Ex. 1003 ¶ 143).  For the Flexray and LIN limitations of claims 22 and 23, Petitioner relies on the express disclosure of such networks in Wong.  Pet. 72–73 (citing Ex. 2012, 68).  Because the identified disclosures meet the respective claim

Case IPR2017-01519
Patent 8,566,843 B2

limitations, which Patent Owner does not separately dispute, Petitioner makes a sufficient showing.

We conclude that Petitioner shows, by a preponderance of the evidence, that claims 21–23 are unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

*14.  Claim 24*

Claim 24 depends from claim 1 and recites specific structure for each of the interface-related layer parts.  Specifically, the claim requires that "the first interface-related first layer part or the second interface-related first layer part include[] at least one of a controller, a communication interface, or an operating system interface"; and the claim requires that "the first interface-related second layer part or the second interface-related second layer part include[] at least one of a remote conversion layer, a communication interface, or an operating system interface."  Ex. 1001, 14:22–31.  Petitioner focuses on the "communication interface" recited within each of the two limitations, and the correspondences discussed above in connection with limitations 1.9 and 1.10 of independent claim 1.  Because those identified parts receive or transmit messages, Petitioner contends that each of them is at least a "communication interface."  Pet. 42–44.  We agree, and Patent Owner does not dispute this aspect of Petitioner's analysis.

We conclude that Petitioner shows, by a preponderance of the evidence, that claim 24 is unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

Case IPR2017-01519
Patent 8,566,843 B2

### 15. *Claim 25*

Claim 25 depends from claim 1 and recites that the computer program product is operable such that "the first interface portion and the second interface portion are each separate portions of a same apparatus." Ex. 1001, 14:34–37. We agree with Petitioner that Figure 2 of Staiger, reproduced above, shows the two interface portions, i.e., bus adapter 214 and bus adapter 216 are separate portions of the same apparatus, i.e., intercommunication preprocessor 200. Pet. 44 (citing Ex. 1004, Fig. 2; Ex. 1003 ¶ 149).

### 16. *Claims 26–30*

Claims 26–30 each depend from claim 1 and recite that the computer program product is operable such that "the first network and the second network are heterogeneous networks," and certain variations requiring that the second network protocol (and a third network protocol in the case of claim 30) be different than the first network protocol. Ex. 1001, 14:38–15:3. Petitioner addresses these limitations by observing that bus adapters 214–217 interfacing with a CAN have different protocols than CPUs 207 and 208 interfacing with FireWire or MOST. Pet. 45. By drawing a correspondence between the former and the "first network protocol," and between the latter and the "second network protocol," Petitioner reasons that they are heterogeneous networks because they have at least one aspect that is different, in accordance with the claim construction we adopt. *Id.* In particular, Petitioner asserts that "[t]hese different buses transmit and receive data at different rates and use message formats not compatible with each

53

Case IPR2017-01519
Patent 8,566,843 B2

other," supporting that assertion with testimony of Dr. Madisetti. *Id.* (citing Ex. 1012, 64; Ex. 1003 ¶ 152).

Alternatively, Petitioner observes that the bus adapters may interface with CAN-B or CAN-C, "which are different network protocols and physical implementations from each other." *Id.* at 46 (citing Ex. 1004 ¶ 38). Also supported by testimony of Dr. Madisetti, Petitioner asserts that "[t]hese different implementations of CAN transmit and receive data at different rates and are therefore not compatible with each other." *Id.* (citing Ex. 1012, 64; Ex. 1003 ¶ 153). The use of both CAN-B and CAN-C also forms the basis for Petitioner's argument regarding claim 30, which requires a third network protocol. *Id.* at 47. Specifically, Petitioner reasons that CAN-B corresponds to the "first network protocol," CAN-C corresponds to the "second network protocol," and FireWire or MOST corresponds to the "third network protocol." *Id.* In such a circumstance, "[t]he first network protocol is different than either of the second and third network protocols," as claim 30 requires. *Id.* (citing Ex. 1003 ¶ 155).

Patent Owner disputes this analysis with an argument that generally parallels its argument for independent claim 1. That is, Patent Owner contends, similar to its argument directed at element 1.7 of claim 1, that Petitioner's assertions "do not alter the underlying issue that Staiger does not disclose the sharing of information received via a message utilizing a first network protocol with a second network using a different protocol, regardless of whether the rates are different." PO Resp. 32. For reasons discussed in depth above in connection with claim 1, Patent Owner's arguments are not persuasive.

Case IPR2017-01519
Patent 8,566,843 B2

In addressing claim 30, Patent Owner makes the further argument that "[w]hile it is correct that Staiger shows that Staiger's central unit receives information from as many as three different networks, Staiger does not even contemplate operating two different CAN protocols side-by-side." *Id.* at 34. Specifically, Patent Owner contends that "it is clear that Staiger intended the system to have identical CAN busses," whether they be CAN-B or CAN-C. *Id.* (citing Ex. 2001 ¶ 91). Patent Owner appears to ground this contention in Staiger's assertion that "[t]he additional first and second bus systems 210 and 211 might be different from each other." *See id.* But neither Patent Owner nor its expert explains why having bus systems 210 and 211 be different from each other limits whether CAN busses 202–205 need to use the same protocol. Patent Owner stresses that, in Staiger's statement that CAN busses 202–205 may use CAN-C or CAN-B, "[t]he 'or' is of key importance – it is not 'and/or'." *Id.* (citing Ex. 2001 ¶¶ 89–91). But as Petitioner argues in reply, "'or' is true when CAN-C, CAN-B, or CAN-C and CAN-B are present." Reply 22 (citing Ex. 1031, 13:24–14:17). Accordingly, Patent Owner's argument is unpersuasive.

We conclude that Petitioner shows, by a preponderance of the evidence, that claims 26–30 are unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### 17. *Claims 31–34*

Claim 31 depends from claim 1 and recites that the computer program product is operable such that the storage resource "is protected utilizing semaphores." Ex. 1001, 15:6–7. Claims 32–34 depend from claim 31 and

Case IPR2017-01519
Patent 8,566,843 B2

respectively recite heterogeneous networks, information storage in response to interrupts, and updating of information at different rates. *Id.* at 15:8–24.

For the limitation of claim 31, Petitioner contends that a person of ordinary skill in the art would recognize that, to protect the execution tag registry, Staiger "necessarily would have to implement techniques that lock access." Pet. 48. Petitioner further contends that "[u]sing semaphores to lock access was a standard technique . . . , well known to people skilled in the art at the time before '843's priority date," and cites two documentary references, as well as testimony of Dr. Madisetti in support of that contention. *Id.* (citing Exs. 1019, 1020; Ex. 1003 ¶ 158). Patent Owner does not dispute this aspect of Petitioner's analysis, which we find sufficient for this limitation.

For the limitation of claim 32, Petitioner relies on the disclosure of heterogeneous networks discussed above for claims 26–30. Pet. 48–49. According to Petitioner, Staiger "discloses various examples of the execution tag registry task, none of which depends on the underlying network." *Id.* at 49. That is, "[p]rocessing of the execution tag registry task described by *Staiger* is not any different for different networks, be[] it CAN-B, CAN-C, Flexray, LIN, or other." *Id.* Patent Owner does not dispute this characterization of Staiger, with which we agree. Petitioner's reasoning that Staiger thereby discloses that "each of a plurality of different processes process the information in a manner that is isolated from temporal characteristics associated with the heterogeneous networks" is also consistent with our adopted construction of "isolated from temporal characteristics." *See id.*

56

Case IPR2017-01519
Patent 8,566,843 B2

For the limitation of claim 33, Petitioner refers to Figure 4 of Staiger, which illustrates that some interrupts are associated with the initializing process, and other interrupts (such as explicitly shown interrupt request lines, i.e., "IRQs") are associated with presentation processes.  Pet. 50–51.  With this identification, Petitioner makes a sufficient showing, which is not disputed by Patent Owner.

For the limitation of claim 34, Petitioner relies on the fact that different CAN busses may be low-speed or high-speed, thereby transmitting and receiving data at different rates.  *Id.* at 51–52.  Petitioner reasons that "the different processes are therefore updated with the information at a first rate that differs from a second rate with which the different processes send the information to the storage resource," as required by the claim.  *Id.*  This reasoning is not separately disputed by Patent Owner, and is a sufficient showing.

We conclude that Petitioner shows, by a preponderance of the evidence, that claims 31–34 are unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

## 18.  *Claim 35*

Claim 35 depends from claim 1 and recites that the computer program product is operable such that "the storage resource is operable so as not to require a network layer translation of messages."  Ex. 1001, 15:27–28.  For this limitation, Petitioner observes that Staiger discloses "receiving messages from the network layer (e.g., the various buses), processing the message in an initializing process before storing the messages in ETR 238."  Pet. 52 (citing Ex. 1004 ¶¶ 60–62).  According to Petitioner, because "[d]uring the

57

Case IPR2017-01519
Patent 8,566,843 B2

initializing process, no network information needs to be removed from the messages," there is no need for network layer translation. *Id.* We agree with this reasoning, which is not separately disputed by Patent Owner.

We conclude that Petitioner shows, by a preponderance of the evidence, that claim 35 is unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.


### 19.   *Claims 36 and 37*

Claims 36 and 37 each depend from claim 1 and respectively recite that the computer program product is operable such that "the threshold includes a timeout" and "the threshold includes a time-related threshold." Ex. 1001, 15:29–35.  For these limitations, similar to element 1.4 of independent claim 1, discussed above, Petitioner relies on Staiger's disclosure of re-requesting access to an execution tag registry if the registry is not available and "a time-out event has not yet happened."  Pet. 52–53 (citing Ex. 1004 ¶¶ 62–63, Fig. 5).  We are persuaded by Petitioner's argument that these aspects of the prior art meet the claim limitations, and Patent Owner does not separately dispute Petitioner's reasoning.

We conclude that claims 36 and 37 are unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.


### 20.   *Claims 38 and 41*

Claims 38 and 41 each depend from claim 1 and recite that messages include protocol data units.  Ex. 1001, 15:36–42, 15:56–59.  Petitioner reasons that the recited "first layer messages" and "second layer messages" in Staiger are received or associated with messages received from multiple

Case IPR2017-01519
Patent 8,566,843 B2

networks, "so they all include data packets communicated across network protocols, which were also known as 'protocol data units (PDUs).'"  Pet. 54. Petitioner cites uncontroverted testimony of Dr. Madisetti that supports the assertion, and Patent Owner does not separately dispute this aspect of Petitioner's analysis.  *See* Ex. 1003 ¶ 170.

We conclude that Petitioner shows, by a preponderance of the evidence, that claims 38 and 41 are unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### 21.  *Claims 39 and 42*

Claims 39 and 42 each depend from claim 1 and recite that messages include headers.  Ex. 1001, 15:43–47, 15:60–62.  Petitioner observes that Staiger's messages include protocol data units, "which by definition, have headers." Pet. 55 (citing Ex. 1003 ¶ 172).  In addition, Petitioner addresses the requirement of claim 39 that "the first interface-related first layer messages and the first interface-related second layer messages are different in terms of at least one aspect of headers thereof" by observing that, with the correspondence drawn in its analysis of claim 1, the "first interface-related first layer messages have network application headers, and the "first interface-related second layer messages" have filter headers.  *Id.* (citing Ex. 1004, Fig. 9; Ex. 1003 ¶ 172).  These identifications are sufficient, and Patent Owner does not separately dispute this aspect of Petitioner's analysis.

We conclude that Petitioner shows, by a preponderance of the evidence, that claims 39 and 42 are unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

Case IPR2017-01519
Patent 8,566,843 B2

*22. Claim 40*

Claim 40 depends from claim 1 and recites that "the processing includes conversion" and that "the first interface-related second layer part carries out the processing of the first interface-related first layer messages." Ex. 1001, 15:48–55.  Petitioner contends that such processing is disclosed by Staiger because "the bus messages from the physical layer network are received and sent through multiplexer 222 to control engine 224 of the [intercommunication preprocessor] for processing."  Pet. 56 (citing Ex. 1004 ¶¶ 38–39; Ex. 1003 ¶ 174).  This contention is consistent with the claim limitation, and is not separately disputed by Patent Owner.

We conclude that Petitioner shows, by a preponderance of the evidence, that claim 40 is unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

*23. Claim 43*

Claim 43 depends from claim 1 and recites that the computer program product is operable such that "the first interface-related first layer part is associated with a layer that is below another layer associated [with] the first interface-related second layer part." Ex. 1001, 15:65–67.  Petitioner addresses this limitation by referring to the interfacing of Staiger's bus adapters 214–217 with multiplexer 222, which forms part of switchboard 201. Pet. 57–58 (citing Ex. 1004 ¶¶ 38, 50).  Petitioner reasons that "the CAN physical layers are associated with the 'first interface-related first layer part' and located below switchboard 201 that is associated with the 'first interface-related second layer part.'"  *Id.* at 58 (citing Ex. 1003 ¶ 176).  This aspect of Petitioner's analysis is not separately disputed by Patent Owner.

60

Case IPR2017-01519
Patent 8,566,843 B2

We conclude that Petitioner shows, by a preponderance of the evidence, that claim 43 is unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### 23. *Claims 44 and 45*

Claims 44 and 45 depend from claim 1 and respectively recite that the computer program product is operable such that the first interface-related second layer messages and the second interface-related first layer messages "have a same format" and "are a same messages." Ex. 1001, 16:1–10. As previously noted, Staiger discloses that busses 202–205 may use CAN-B or CAN-C. Ex. 1004 ¶ 38. In light of this, Petitioner reasons that

> messages received by bus adapter 214 (i.e., "first interface-related first layer messages") from the CAN-C must be converted to messages (i.e., "first interface-related second layer messages") in the format associated with the CAN-B so that they match with messages received by bus adapter 216 from CAN-B (i.e., "second interface-related first layer messages").

Pet. 58. Petitioner provides the example of messages received by bus adapters 214–217 from the CAN being converted to messages in the format associated with the other network protocol so that they match with messages received by CPUs 207 and 208. *Id.* at 58–59. Accordingly, "*Staiger* therefore discloses that the messages have a same format, as in claim 44, and are the same messages, as in claim 45." *Id.* at 59. Patent Owner does not separately dispute this aspect of Petitioner's analysis, which we find sufficient.

Case IPR2017-01519
Patent 8,566,843 B2

We conclude that Petitioner shows, by a preponderance of the evidence, that claims 44 and 45 are unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### 24.  Claim 46

Claim 46 depends from claim 1 and recites that the computer program product is operable such that "a waiting period is implemented between re-requests for the storage resource." Ex. 1001, 16:11–14.  Relying again on the delay timer discussed above in connection with claims 9, 10, 12, and 13, Petitioner contends that the timer "inherently has a waiting period or interval between consecutive time increments, [and] there is a waiting period between the re-requests." Pet. 59–60.  Petitioner supports this inherency argument with testimony of Dr. Madisetti, and the argument is not separately disputed by Patent Owner.  *See* Ex. 1003 ¶ 180.

We find this argument sufficient on this record, and conclude that Petitioner shows, by a preponderance of the evidence, that claim 46 is unpatentable over Staiger, Millsap, and Wong.

### 25.  Claim 47

Independent claim 47 is a method claim that substantially parallels computer-readable medium claim 1.  Ex. 1001, 16:15–50.  Petitioner contends that claim 47 is therefore unpatentable "[f]or the same reasons" as claim 1, and Patent Owner similarly relies only on arguments directed at claim 1 and addressed above.  Pet. 60; PO Resp. 35.  Because we find that Petitioner makes a sufficient showing with respect to claim 1, we also find that Petitioner makes a sufficient showing with respect to claim 47.

Case IPR2017-01519
Patent 8,566,843 B2

We conclude that Petitioner shows, by a preponderance of the
evidence, that claim 47 is unpatentable under 35 U.S.C. § 103(a) over
Staiger, Millsap, and Wong.

### 26. *Claim 48*

Independent claim 48 includes many limitations that have evident
counterparts in independent claim 1. We have reviewed Petitioner's analysis
of claim 48, and find it sufficient. *See* Pet. 74–92. We note that that
analysis applies Millsap for elements 48.7–47.9 in a manner similar to
elements 1.8–1.10, discussed in detail above. Patent Owner's arguments are
also similar to those it makes in connection with claim 1, and we therefore
address them briefly. *See* PO Resp. 35–46.

First, Patent Owner disputes Petitioner's showing with respect to
element 48.7, which recites that the computer program product be operable
"such that the information is capable of being shared in real-time utilizing a
control unit that includes a plurality of interfaces." *Id.* at 37–43. In
addressing Petitioner's analysis of this element, Patent Owner reiterates its
argument that sharing information requires storage: "Petitioner . . . never
explain[s] how Staiger allegedly discloses a sharing of a message that was
received in limitation 48.1 and was then stored as per limitation 48.6." *Id.* at
39 (citing Ex. 2001 ¶ 101). Because we disagree that this is a requirement of
the claim, for the reasons discussed above, Patent Owner's argument is not
persuasive.

In addition, the dissent agrees with Patent Owner that "Petitioner has
not shown that the information associated with the received message is the
same as the information associated with the outgoing message that Petitioner

Case IPR2017-01519
Patent 8,566,843 B2

asserts is capable of being shared in real-time." *See post* at 19 (Zado, APJ, dissenting). For the reasons we set forth in our discussion of limitations 1.7 (*see supra*, Section II.F.4.g), we disagree with the dissent's reading of Staiger on this point.

Second, Patent Owner disputes Petitioner's showing with respect to element 48.9, which recites "a second interface, the second interface including a second interface-related component for receiving second data units, the computer program product being operable such that the second data units are processed after which processed second data units are provided." *Id.* at 43–46. In particular, Patent Owner contends that Staiger's "discussion of Figure 2 shows clearly that information is broadcast through the CAN buses, but there is nothing [in] Staiger that reflects messages being received from the CAN buses." *Id.* at 45 (citing Ex. 2001 ¶ 119). This argument is similar in respects to Patent Owner's argument regarding element 1.7 of claim 1, addressed above, in that the argument does not account for the reasonable inferences that may be drawn from Staiger as a whole. As Petitioner points out, Staiger discloses that the intercommunication preprocessor provides storage for "messages received from either one of the bus adapters 214 to 217 or one of the CPUs 207 and 208." Ex. 1004 ¶ 40; *see* Reply 24. One of skill in the art would reasonably understand that Staiger implicitly contemplates the receipt of messages from the CAN busses.

Accordingly, we conclude that Petitioner shows, by a preponderance of the evidence, that independent claim 48 is unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

Case IPR2017-01519
Patent 8,566,843 B2

*27.  Claims 49 and 50*

Independent claims 49 and 50 respectively recite "[a] non-transitory computer-readable medium storing a computer program product for sharing information" and "[a]n apparatus," with limitations that Petitioner characterizes as "substantially identical to or even broader than elements" of independent claim 1.  Pet. 93.  We agree with this characterization, and Patent Owner advances no arguments different from those made in connection with claim 1.  *See* PO Resp. 46.

We accordingly conclude that Petitioner shows, by a preponderance of the evidence, that claims 49 and 50 are unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

*G.  Anticipation by and Obviousness over Staiger*

As noted above, grounds involving anticipation of claims 1–21, 24–27, 49, and 50 by Staiger, and obviousness of those claims over Staiger, were added to this proceeding in response to the Supreme Court's decision in *SAS Institute*.  In Patent Owner's Response and in Petitioner's Reply, these additional grounds are not separately addressed outside the arguments presented for the obviousness combination over Staiger, Millsap, and Wong. Accordingly, and because the grounds involving Staiger alone are moot in light of our conclusions regarding Staiger, Millsap, and Wong, we do not further address the grounds involving Staiger alone.

*H.  Constitutionality of Inter Partes Review Proceedings*

Patent Owner contends that "this IPR should be terminated and the petition dismissed because the IPR system is unconstitutional."  PO Resp.

Case IPR2017-01519
Patent 8,566,843 B2

55–56.  This argument is foreclosed by the Supreme Court's determination

otherwise.  *Oil States Energy Services, LLC v. Greene's Energy Group,*

*LLC*, 138 S. Ct. 1365, 1370 (2018) ("In this case, we address whether inter

partes review violates Article III or the Seventh Amendment of the

Constitution.  We hold that it violates neither.").


## I. Estoppel

Petitioner argues that under 37 C.F.R. § 42.73(d)(3)(i) Patent Owner

is estopped from arguing any claim not patentably distinct from those held

unpatentable.  Reply 2.  Rule 42.73(d)(3) states "[a] patent applicant or

owner is precluded from taking action inconsistent with the adverse

judgment, including obtaining in any patent: (i) [a] claim that is not

patentably distinct from a finally refused or canceled claim."  Because we

conclude that Petitioner has made a sufficient showing with respect to all

challenged claims, even considering Patent Owner's arguments, we do not

reach this issue.


## III. ORDER

It is

ORDERED that, based on a preponderance of the evidence, claims 1–

50 of U.S. Patent No. 8,566,843 B2 are held to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision,

parties to this proceeding seeking judicial review of our decision must

comply with the notice and service requirements of 37 C.F.R. § 90.2.

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

BMW OF NORTH AMERICA, LLC,
Petitioner,

v.

STRAGENT, LLC,
Patent Owner.

————————————

Case IPR2017-01519
Patent 8,566,843 B2

————————————

Before LYNNE E. PETTIGREW, PATRICK M. BOUCHER, and
CHRISTA P. ZADO, *Administrative Patent Judges*.

ZADO, *Administrative Patent Judge*, dissenting.

I respectfully dissent from my colleagues' determination that
Petitioner has shown the challenged claims of the '843 patent are
unpatentable.  In my view, the majority decision finds incorrectly that
Petitioner has established, by a preponderance of the evidence, that the
challenged claims are unpatentable.

## I.      INTRODUCTION

Of the claims challenged by Petitioner, claims 1, 47, 48, 49, and 50
are independent, and claims 2–46 depend from claim 1.  Petitioner asserts,
under all three grounds, that Staiger discloses limitation 1.7 of claim 1.
Pet. 26–27 (arguing with regard to its first two grounds, i.e., anticipation by

Case IPR2017-01519
Patent 8,566,843 B2

Staiger and obviousness over Staiger, that Staiger discloses limitation 1.7);
*id.* at 62–73 (arguing with regard to its third ground, i.e., obviousness over
the combination of Staiger, Millsap, and Wong, limitations 1.8–1.10, but not
including any additional arguments for limitation 1.7).  For reasons stated
below, it is my view that Petitioner has not shown sufficiently that Staiger
discloses limitation 1.7, and therefore, has not established unpatentability of
claim 1 by a preponderance of the evidence.

Claims 2–21 and 24–46 depend either directly or indirectly from
claim 1, and therefore include all the limitations of claim 1.  Petitioner does
not set forth additional evidence or arguments for these dependent claims
that addresses the shortcomings of the arguments for limitation 1.7.  *Id.* at
31–60, 72.  Therefore, it is my view that Petitioner also had not established
unpatentability of claims 2–21 and 24–46 by a preponderance of the
evidence.

As to independent claims 47, 49, and 50, Petitioner asserts these
claims "are substantially identical to or even broader than elements 1.0–
1.10." *Id.* at 60, 93.  Petitioner does not provide any additional evidence or
arguments for these independent claims that addresses the shortcomings of
the arguments for limitation 1.7.  *Id.*  Because Petitioner does not make a
sufficient showing for claim 1, and Petitioner asserts claims 47 and 49 and
50 are substantially identical to or even broader than limitations 1.0 to 1.10
of claim 1, and does not provide any additional arguments or evidence for
these claims, it is my view that Petitioner has not established unpatentability
of claims 2–47, 49, and 50 by a preponderance of the evidence.

To the extent there are any differences between claim 1 and claims 47,
49 and 50 that would require additional or different evidence and argument,

Case IPR2017-01519
Patent 8,566,843 B2

Petitioner does not identify any or provide additional evidence and argument to address them.  37 C.F.R. § 42.104(b)(4); *id.* § 42.22(a)(2); *id.* § 42.104(b)(5).  As the Federal Circuit has explained, "[i]n an IPR, the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable."  *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016).

Petitioner challenges claim 48 under only its third ground, i.e., obviousness over the combination of Staiger, Millsap, and Wong.  Pet. 12. For reasons stated below, it is my view that Petitioner has not shown sufficiently that Staiger discloses limitation 48.1 of claim 48, and therefore, has not established unpatentability of claim 48 by a preponderance of the evidence.

II.   ANALYSIS

A.   *Principles of Law*

To prevail on its challenges, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable.  35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).  "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable."  *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d at 1363.  It is incumbent upon Petitioner to identify, in the Petition, "in writing and with particularity each claim challenged, the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge to each claim."  35 U.S.C. § 312(a)(3); *see also Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (2016) ("It is of the utmost importance that petitioners in the IPR proceedings

Case IPR2017-01519
Patent 8,566,843 B2

adhere to the requirement that the initial petition identify 'with particularity' the 'evidence that supports the grounds for the challenge to each claim.' 35 U.S.C. § 312(a)(3).").  Although the burden of production may shift, the burden of persuasion on the issue of patentability remains with Petitioner always and never shifts to Patent Owner.  *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

Petitioner asserts unpatentability under both §§ 102 and 103.  Pet. 12. To establish anticipation, each and every element in a claim, arranged as recited in the claim, must be found in a single prior art reference.  *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008); *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001).  Prior art references must be "'considered together with the knowledge of one of ordinary skill in the pertinent art.'"  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).  Also, "it is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom."  *In re Preda*, 401 F.2d 825, 826 (CCPA 1968).  As the Court of Appeals for the Federal Circuit recently explained, the dispositive question for anticipation is whether one skilled in the art would reasonably understand or infer from a prior art reference that every claim element is disclosed in that reference. *Eli Lilly v. Los Angeles Biomedical Research Inst.*, 849 F.3d 1073, 1074– 1075 (Fed. Cir. 2017).

A claim is unpatentable for obviousness under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which

Case IPR2017-01519
Patent 8,566,843 B2

said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations, including:  (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when in evidence, objective indicia of non-obviousness, i.e., secondary considerations.  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).  Furthermore, Petitioner does not satisfy its burden of proving obviousness by employing "mere conclusory statements."  *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

B.    *Claim 1*

(1) "[1.6] *code for causing the information to be shared by:*"

(2) "[1.7] *in real-time, sharing the information utilizing at least one message format corresponding to a second network protocol associated with a second network*"

Limitations 1.6 and 1.7 recite "code for causing *the information* to be shared by: in real-time, sharing the information utilizing at least one message format corresponding to a second network protocol associated with a second network."  Ex. 1001, 12:32–35 (emphasis added).  The parties do not dispute, and the majority does not state otherwise, that "*the* information" as recited in limitations 1.6 and 1.7 refers to the same information recited in limitation 1.1.[7]  Limitation 1.1 recites "code for allowing receipt of

_____

[7] As discussed in the majority decision, the parties dispute whether "the information" must also be stored, as recited in limitation 1.5.  Majority Dec.

Case IPR2017-01519
Patent 8,566,843 B2

*information* associated with a message received utilizing a first network
protocol associated with a first network." *Id.* at 12:19–21 (emphasis added).
In light of this antecedent, limitations 1.6 and 1.7 require code that causes
sharing of *the same information* that is received in a message formatted
using a first format, and sharing that *information* in a different, second
format.

### 1. Petitioner's Argument

#### (3) "sharing the information utilizing at least one message format corresponding to a second network protocol associated with a second network"

For reasons discussed below, contrary to Petitioner's assertion, I
would find that Staiger does not disclose limitation 1.7.

Petitioner relies on Staiger alone for disclosure of "sharing the
information utilizing at least one message format corresponding to a second
network protocol associated with a second network," as recited in
limitation 1.7.  Pet. 26.  Petitioner's argument is that Staiger satisfies this
limitation vis-à-vis disclosure that one of CPUs 207 and 208 receives a
message from one of buses 210 or 211 and broadcasts the message to several
of CAN buses 202 to 205 identically.  *Id.*  Petitioner's theory is that a
message using a first network protocol (e.g., FireWire or MOST), as
required by limitation 1.1, is received by one of CPUs 207 and 208 from one
of buses 210 and 211.  *Id.*  Furthermore, the received message is converted
by one of CPUs 207 and 208 into a message that uses a second network
protocol (e.g., CAN), and then is shared via broadcasting to several of CAN

---

15–19, 37–38.  I agree with my colleagues that the claim does not require
the information to be stored.

Case IPR2017-01519
Patent 8,566,843 B2

buses 202 to 205.  *Id.*  Petitioner does not present any alternative theory as to how Staiger discloses limitation 1.7.  *Id.*

Contrary to the argument and theory upon which Petitioner relies, Staiger does not expressly disclose CPUs 207 and 208 broadcasting a message *received from* buses 210 and 211 to CAN buses 202 to 205. Petitioner's argument in the Petition on this issue, in its entirety, is reproduced below:

> *Staiger* discloses receiving messages from "one of the CPUs 207 and 208" and broadcasting the message "to several CAN busses 202–205 identically."  Ex. 1004, ¶ 51.  CPUs 207–208 are connected to bus systems such as FireWire or MOST (i.e., a "first network protocol"), which are different than CAN busses 202–205 (i.e., a "second network protocol").  *Id.*, ¶36.

Pet. 26.  Here, Petitioner identifies disclosure in Staiger of a scenario in which one of CPUs 207 and 208 broadcasts a message to CAN buses 202 to 205 identically.  Ex. 1004 ¶ 51.  However, Staiger does not say that this message is received from buses 210 or 211.  *Id.*  On the contrary, Staiger says that this message is *generated by one of CPUs 207 and 208*.  *Id.* Nowhere does Staiger disclose that this message comes from any source other than one of CPUs 207 and 208.

The only disclosure regarding buses 210 and 211 includes the statement that they are connected to CPUs 207 and 208, and identification of the network protocols the buses may use.  Ex. 1004, ¶ 36.  Aside from the depiction in Figure 2 showing a connection between buses 210 and 211 and CPUs 207 and 208, the entire disclosure regarding these buses is reproduced below:

7

Case IPR2017-01519
Patent 8,566,843 B2

> The first and the second CPU 207 and 208 are
> providing connections to first and second additional
> bus systems 210 and 211, respectively.  The
> additional first and second bus systems 210 and 211
> might be different from each other and formed by,
> e.g., a FireWire system, i.e., a high performance
> serial bus specified according to IEEE 1394, or any
> other kind of multimedia bus, such as, e.g., MOST
> (Media Oriented Systems Transport).

*Id.* As is readily seen from this disclosure, Staiger never explains the purpose of buses 210 and 211, nor describes what they are connected to (aside from CPUs 207 and 208).  Nor does Staiger disclose the types of messages CPUs 207 and 208 receive from buses 210 and 211, and in particular, whether these messages contain information to be shared with CAN buses 202 to 205.

Based on the foregoing, there is no question that Staiger does not expressly disclose that the message broadcast from one of CPUs 207 and 208 to CAN buses 202 to 205 is received from one of buses 210 to 211.

In the absence of any express disclosure, it is proper to take into account the inferences which one of skill in the art would be reasonably expected to draw from Staiger.  *In re Preda*, 401 F.2d at 826; *Eli Lilly v. Los Angeles Biomedical Research Inst.*, 849 F.3d at 1074–1075.  With regard to the inferences a skilled artisan would reasonably have drawn, Petitioner bears the burden of demonstrating that a person of ordinary skill in the art would have inferred that Staiger discloses that the message broadcast from one of CPUs 207 and 208 comes in through one of buses 210 and 211. However, on this point, the Petition is utterly silent.  Pet. 26.  As discussed above, the Petition provides only two sentences of argument, neither of

8

Case IPR2017-01519
Patent 8,566,843 B2

which addresses the inferences a skilled artisan would have drawn. *Id.*
Indeed, the Petition does not even assert that a skilled artisan would have
inferred that messages broadcasted by CPUs 207 to 208 to CAN buses 202
to 205 are received from buses 210 and 211 and converted from one protocol
to another by the CPUs, as required by limitation 1.7. *Id.* Rather, the
Petition merely points out that buses 210 and 211 are connected to
CPUs 207 and 208, without stating what inferences would have been drawn,
and why. *Id.* (stating that "CPUs 207–208 are connected to bus systems
such as FireWire or MOST (i.e., a 'first network protocol'), which are
different than CAN busses 202–205 (i.e., a second network protocol').").
However, given that Staiger says the message to be broadcasted is *generated
by one of CPUs 207 and 208*, Petitioner needs to explain why a skilled
artisan would have drawn the inference that the message, rather than being
generated by one of the CPUs as stated in Staiger, instead comes from
another source. Furthermore, in view of Staiger's lack of description
regarding buses 210 and 211, Petitioner needs to explain why a skilled
artisan would have inferred that the other source for the message is one of
buses 210 and 211. Regardless of whether Petitioner could have presented
sufficient argument and evidence regarding the inferences a skilled artisan
would have drawn, Petitioner clearly has not done so here.

In addition to the argument in the Petition, Petitioner argues in the
Reply that Dr. Miller provides testimony that supports its position.
Reply 18–19. However, his testimony does not support Petitioner's
position. In particular, Petitioner relies on Dr. Miller's testimony to support
the statements in the Petition that Staiger discloses: 1) CPUs 207 and 208
are connected to buses 210 and 211; 2) buses 210 and 211 use the protocols

9

Case IPR2017-01519
Patent 8,566,843 B2

FireWire or MOST, whereas CAN buses 202 to 205 use the CAN protocol; and 3) CPUs 207 and 208 broadcast messages to CAN buses 202 to 205 identically. *Id.* However, like the Petition, Petitioner does not explain why a skilled artisan would have drawn the inference that the broadcasted messages, rather than being generated by the CPUs as disclosed in Staiger, instead come from one of buses 210 and 211. Petitioner's explanation amounts to little more than observing that there is a connection between buses 210 and 211. However, as discussed above, absent any description in Staiger of the purpose of these buses, the devices connected to them, and they types of messages received by them, mere observation that there is a connection, in my view, is insufficient to satisfy Petitioner's burden. The majority decision discusses Petitioner's argument in the Reply, namely Petitioner's reliance on Dr. Miller's testimony, which is discussed more fully below, *infra* Section II.B.3.

In my view, absent sufficient explanation from Petitioner, as well as underlying evidence, Petitioner has not satisfied its burden. For the foregoing reasons, it is my view that Petitioner has failed to show that Staiger discloses one of CPUs 207 and 208 broadcasting to CAN buses 202 to 205 a message *received from one of buses 210 and 211*. Because this is the only theory upon which Petitioner relies to show disclosure of limitation 1.7, Petitioner has failed to show that Staiger discloses this limitation.

2. *Evidence Discussed in the Majority Decision*

Although the majority finds Petitioner has shown with sufficiency that Staiger discloses this limitation, the majority relies not on express disclosure—which, for reasons expressed above, Staiger lacks—but, rather

10

Case IPR2017-01519
Patent 8,566,843 B2

on what a person of ordinary skill in the art would have inferred Staiger
discloses. Majority Dec. 35–36. However, as discussed above and below, it
is my view that the record lacks sufficient argument and evidence to draw
the inferences necessary for Petitioner to prevail.

### 3. Dr. Miller's Testimony

To support its decision, the majority relies on an admission by Patent
Owner's expert, Dr. Miller, that "the message *coming through* CPU 207 and
208 has to be broadcasted to the CAN busses 202 to 205 identically."
Majority Dec. 35–36 (citing Ex. 1031, 112:2–4). Based on this testimony,
the majority "understand[s] Staiger to teach the broadcast of messages
*received by* CPUs 207 and 208 to CAN busses 202–205, as Petitioner
asserts." *Id.* at 36 (emphasis added). I respectfully disagree that Staiger
discloses the broadcast of messages *received by* CPUs 207 and 208 to CAN
buses 202–205. As discussed above, the disclosure upon which the majority
relies states that the broadcasted messages are *generated by* one of
CPUs 207 and 208. Ex. 1004, ¶ 51. Moreover, even if it were true that
Staiger discloses that the messages broadcasted by CPUs 207 and 208 are
*received by*, rather than *generated by*, the CPUs, there is no explanation as to
how Dr. Miller's testimony, and the majority's understanding, leads to any
inference that the received message is from one of *buses 210 and 211*, as
required under Petitioner's theory. The majority does not, in citing Dr.
Miller's testimony, concede that Staiger expressly discloses that the
broadcasted message comes from buses 210 and 211. Majority Dec. 35–36
(the majority stating that it "understand[s] Staiger to teach the broadcast of
messages received from CPUs 207 and 208 to CAN busses 202–205," but
omitting discussion of the message coming from buses 210 and 211).

11

Case IPR2017-01519
Patent 8,566,843 B2

Petitioner attempts, in its Reply, to rely on this testimony by Dr. Miller to support the argument that "Staiger's system does share information . . . for example, from busses 210 and 211 to busses 202 to 205," and "Staiger discloses that 'the messages' on busses 210 and 211 is 'coming through CPU 207 and 208 to be broadcasted to the CAN busses 202 to 205 identically.'"  Reply 18 (citing Ex. 1031, 111:19–112:4).  However, as discussed below, Dr. Miller's testimony does not support these assertions.

Petitioner takes out of context Dr. Miller's testimony that "the message coming through CPU 207 and 208 has to be broadcasted to the CAN busses 202 and 205 identically," arguing that this testimony supports Petitioner's interpretation of Staiger as disclosing that messages on buses 210 and 211 come through CPU 207 and 208 and have to be broadcasted to CAN buses 202 to 205 identically.  *Id.*  First, Dr. Miller never testifies that messages coming through CPUs 207 and 208 are received from buses 210 and 211.  Rather, Dr. Miller reads verbatim a sentence in Staiger that neither party disputes, namely that Staiger discloses an exemplary scenario in which a message *generated by one of CPUs 207 and 208* has to be broadcasted to several CAN buses 202 to 205 identically, and confirms what he had read.

> Q      My question was: Does Staiger disclose that CPU 207 and 208 communicate through bus adapters 214, 215, 216, and 217?
>
> THE WITNESS: I don't see that it specifically says that. The sentence that I see here, which I read earlier in paragraph 51 says, "A message generated by one of the CPUs 207 and 208 has to be broadcasted to several CAN busses 202 to 205 identically."

12

Case IPR2017-01519
Patent 8,566,843 B2

> Q    BY MR. DAMON [Petitioner's counsel]: And from
> Figure 2, how would CPUs 207 and 208 communicate
> with busses 202 through 205?  For simplicity, you can
> pick any one from 202 to 205.  You don't have to explain
> all four of them.
>
> THE WITNESS: Well, somehow it has to make it on
> to—what is that?—bus 222.  I'm looking at the
> specification, the multiplexer 222.
>
> Q    BY MR. DAMON: And in Figure 2, do you see any other
> lines between 207 and 208 that CAN busses 202
> through 205 also communicate through that is not the
> multiplexer 222?
>
> A    No, I don't.
>
> BY MR.DAMON [Petitioner's counsel]: But you agree that
> CPUs 207 and 208 can communicate with CAN
> busses 202 to 205?
>
> THE WITNESS: Again, the sentence says in
> paragraph 51, "CPUs 207 and 208 has to be broadcasted
> to several CAN busses 202 to 205 identically."
>
> Q    BY MR. DAMON: Is that a yes or no?
>
> A    So the message coming through CPU 207 and 208 has to
> be broadcasted to the CAN busses 202 to 205 identically.

Ex. 1031, 110:15–112:9 (counsel objections omitted).  Although this
testimony confirms that Staiger discloses one of CPUs 207 and 208
broadcasting a message to CAN buses 202 to 205 identically, there is
nothing in this testimony about the message being received *from buses 210
or 211*.  Moreover, whatever may have been meant by the particular
phrasing used by Dr. Miller, namely "[s]o the message *coming through*
CPU 207 and 208," it does not override the disclosure of Staiger, which says

Case IPR2017-01519
Patent 8,566,843 B2

nothing about the messages being broadcasted as *coming through* CPUs 207 and 208, but rather states that CPU 207 or 208 *generates* the message. Ex. 1004, ¶ 51.

Rather than concede that the message to be broadcasted comes through buses 210 and 211, in the very next line, omitted by Petitioner and not discussed in the majority decision, Dr. Miller states that the message is *generated* by CPUs 207 and 208.  *Id.* at 112:7–8.  Later in this line of questioning, Dr. Miller clarifies several times that he does not admit that Staiger discloses any conversion between protocols, e.g., that a message coming in from bus 210 or 211 in FireWire or MOST format is converted by CPU 207 or 208 for broadcast to CAN buses 202 to 205.  *Id.* at 119:7–8 ("I'm not admitting anything about conversions coming in with Staiger and Figure 2); *id.* at 119:16–18 ("I'm not admitting that there's any conversion going on between the protocols going out on any of the wires"); *id.* at 109:23–110:3 ("But I want to clarify something here because I don't want my answers to be taken out of context and misrepresented.  Nowhere does Staiger disclose that a message of a certain format is coming in, being converted, and going back out on a different line as a different protocol.").  For the foregoing reasons, contrary to Petitioner's assertion, Dr. Miller's testimony does not support an inference that in Staiger's system CPUs 207 and 208 broadcast a message *from buses 210 and 211* to buses 202 to 205.  Therefore, it is my view that Dr. Miller's testimony, when taken in context, does not support Petitioner's overall assertion that Staiger discloses limitation 1.7.

Case IPR2017-01519
Patent 8,566,843 B2

4.      *Staiger's Disclosure of Processing Messages and Forwarding the*
        *Result to a Destination Unit Using Multiplexing*

It is not clear that the majority relies on any additional evidence, other
than Dr. Miller's single statement about messages coming through
CPUs 207 and 208—which Petitioner takes out of context—to arrive at its
finding as to the inferences a skilled artisan would have made, namely that
Staiger discloses broadcasting messages received from buses 210 and 211.
The majority states Staiger's disclosure necessarily is evaluated in the
context of the reference as a whole, and references disclosure about
processing messages that are multiplexed, but this appears to go toward an
issue raised by Patent Owner as to whether multiplexing can be considered a
form of "sharing information," rather than to whether Staiger discloses
broadcasting messages received from buses 210 and 211.  Majority Dec. 36
("Petitioner addresses this multiplexing aspect in its Reply, an argument we
find properly responsive to Patent Owner's contentions that 'Staiger only
describes a type of multiplexing,' and that 'the Patent does not suggest that
multiplexing is a form of sharing.'").  In any event, this discussion does not
mention buses 210 and 211.  It states that Staiger describes message
processing, noting that after a message to be processed is received, it is
determined the kind of treatment to be performed with the received message,
and that the result of the message processing is forwarded to a destination
unit.  *Id.*  However, even though Staiger discloses processing received
messages and sending out the results, Staiger still lacks disclosure that the
received messages to be processed come in from buses 210 and 211.  In
view of this lack of disclosure, it is my view that to satisfy its burden
*Petitioner* needs to provide at least some explanation as to why a skilled

15

artisan would have inferred that the messages processed by Staiger's system come in through buses 210 and 211.

Moreover, Staiger's disclosure of message processing highlights an additional, significant failure of Petitioner's arguments. As discussed above, limitation 1.7 refers to code for causing sharing of *the information*, which must be the same *information* recited in limitation 1.1 that is associated with a received message. However, the message output by Staiger's system, e.g., the message it shares, is not the same message it receives. Staiger discloses its system receiving a message, and *processing* the message. Ex. 1004, ¶¶ 32–33, 35. The processing includes performing computations on data in the message, and "assembl[ing] a *new* message" from the data that results from processing the message that was received, and outputting the new message. *Id.* ¶ 44; *id.* ¶ 33 (after analyzing an incoming message, "the message is subject of the second process that is called 'dynamic process'"); *id.* ¶ 35 ("output[ing] a message 112 as a result of the computation of the incoming message 102"). Processing of messages, and outputting a *new* message is not merely an embodiment of Staiger. It is described as the invention. *Id.* ¶ 15 (in the Summary of Invention, "[t]he method focuses on message processing . . . [f]irst, a message to be processed is received and it is determined the kind of treatment to be performed with the received message" and "once a process execution unit is available for processing", then "the determined treatment gets performed . . . [f]inally the result of the message processing is presented to be forwarded to the destination unit."); *id.* at [57] ("The message processing device according to the present invention includes a first execution unit for receiving a message to be processed and determining the kind of treatment to be performed with the

Case IPR2017-01519
Patent 8,566,843 B2

received message, a second execution unit for performing the determined treatment, and a third execution unit for presenting the result of the message processing to be forwarded to a destination unit.").

Therefore, even if a message received by one of CPUs 207 and 208 "came through" from one of buses 210 and 211, as argued by Petitioner, Staiger's teachings taken as a whole indicate that the message would not be broadcasted to CAN buses 202 to 205. Rather, the message would be processed, and a *new*, *different* message resulting from the processing would be sent to CAN buses 202 to 205. Accordingly, *the information* that is shared would not necessarily be the same *information* that is associated with the received message, as required by limitations 1.1 and 1.7. It is Petitioner's burden to show the information is the same. Petitioner does not identify what it contends to be *the information* associated with the received message, nor explain how Staiger discloses that this information is in the output message. Pet. 26. Petitioner does not discuss Staiger's disclosure that the ouput message is new, and not the same as the received message, nor explain why a skilled artisan would have inferred, nonetheless, that the information in the new output message is the same as the information in the received message. *Id.* For this additional reason, I would find that Petitioner has not satisfied its burden to show unpatentability.

5.    *Multiplexing as Sharing; Shared Information; Identically*

The remainder of the discussion by the majority regarding limitation 1.7 does not relate to whether the message broadcast by one of CPUs 207 and 208 is received from one of buses 210 and 211. The majority addresses arguments raised by Patent Owner as to whether multiplexing is a form of sharing, whether *the information* in limitation 1.7 must be stored as

Case IPR2017-01519
Patent 8,566,843 B2

recited in limitation 1.5, and whether broadcasting a message "identically" to CAN buses 202 to 205 means that Staiger's system is incapable of converting data so as to be available in two protocols. Majority Dec. 36–38. This discussion by the majority does not appear to include any additional evidence or considerations leading to the majority's finding that Staiger discloses that the message broadcast by one of CPUs 207 and 207 is received from one of buses 210 and 211.

### 6.   Summary

For the foregoing reasons, I would find that Petitioner has not set forth sufficient evidence and argument that Staiger discloses limitation 1.7 of claim 1. In particular, Staiger does not expressly disclose this limitation, and Petitioner has not set forth argument and evidence sufficient to show that a skilled artisan would have inferred that Staiger discloses it. Therefore, it is my view that Petitioner has not established, by a preponderance of the evidence, that claim 1 is unpatentable. Also, for similar reasons, as discussed *supra* Section II.B., it is my view that Petitioner has not established, by a preponderance of the evidence, that claims 2–47, 49, and 50 are unpatentable.

### C.   Claim 48

For reasons that follow, I would find that Petitioner has not shown that "Staiger and/or Millsap" discloses limitation 48.7 of claim 48, as Petitioner asserts. Pet. 84–86. As a result, it is my view that Petitioner has not established, by a preponderance of the evidence, that claim 48 is unpatentable as obvious over the combination of Staiger, Millsap, and Wong.

Case IPR2017-01519
Patent 8,566,843 B2

*1.    Discussion*

"[48.1] code for receiving information associated with a message received utilizing a first network protocol associated with a first network"

[48.7] wherein the computer program product is operable such that the information is capable of being shared in real-time utilizing a control unit that includes a plurality of interfaces including:"

Petitioner contends Staiger and/or Millsap discloses limitation 48.7. Pet. 84–86.  The recitation "the information" in this limitation refers to the "information" recited in limitation 48.1.  In its argument for limitation 48.1 Petitioner relies only on Staiger, arguing that "Staiger discloses receiving messages."  Pet. 76 (citing Ex. 1004[8] ¶¶ 15, 32, 35).  I agree that Staiger discloses receiving messages.  The Summary of Invention states "[f]irst, a message to be processed is received and it is determined the kind of treatment to be performed with the received message."  Ex. 1003 ¶ 15.  Also, in connection with Figure 1, which illustrates three-steps for processing received messages, Staiger describes a first process called an "initializing process" in which an incoming message is analyzed.  *Id.* ¶ 32.  Staiger discloses that in the third process, the "presentation process," presentation process ("PP") execution unit 110 outputs a message that results from computations performed on the incoming message.  *Id.* ¶ 35.  However, although Petitioner argues that Staiger discloses receiving a message, Petitioner does not specify what it contends is *the information* associated with the message, as recited in limitation 48.1.  Pet. 76.

---

[8] Petitioner erroneously cites to Exhibit 1003, the declaration of Dr. Madisetti, rather than to Ex. 1004, Staiger.

Case IPR2017-01519
Patent 8,566,843 B2

Patent Owner argues, and I agree, that Petitioner has not shown that information associated with Staiger's received message is the same as the information in Staiger's outgoing message.  PO Resp. 39.  As I discussed above, the message Petitioner identifies as the received message to satisfy limitation 48.1 is Staiger's incoming message.   Pet. 76 (citing Ex. 1004 ¶¶ 15, 32, 35).  This message, after it is received, for example by block 102 in Figure 1, is processed by Dynamic Process ("DP"), which includes three execution units that can run sequentially or in parallel.  Ex. 1004, ¶¶ 15, 33, 56.  Staiger explains that the DP execution units perform tasks and computations on the information in the incoming message, and a *new* message is generated that includes the *results* of the computations.  *Id.* ¶¶ 35, 47, 56.  Therefore, the new, output message in Staiger that Petitioner relies on for disclosure of sharing "the information" is not the same message, *and has not been shown to include the same information*, as the input message that Petitioner relies on for disclosure of limitation 48.1's recitation of "information."  Petitioner does not explain why or how information in Staiger's new, output message, which results from computations performed on information in the received input message, is the same information associated with the input message.

In particular, Petitioner does not identify what it contends to be *the information* associated with the received message, nor explain how Staiger discloses that this information is in the output message.  The majority decision presents a theory regarding how Staiger discloses sharing *the information*, Majority Dec. 38–40, but this theory is not presented in the Petition.  In particular, the majority finds that the processing performed in Staiger "may prepare the received information for distribution with Staiger's

Case IPR2017-01519
Patent 8,566,843 B2

multiplexing technique," and finds that "there is no indication that the informational content of the message is changed." *Id.* at 39–40. However, it is my view that the majority has not applied the burdens correctly.

As discussed above, the majority finds that there is no indication that the informational content of the received message is changed in the new message. Majority Dec., 39. However, in assessing whether Petitioner has satisfied its burden, the relevant inquiry is not whether Staiger indicates or specifies with particularity which information in the new message is changed. Rather, in light of Staiger's disclosure that a "*new*" message is assembled based on the results of processing a received message, Ex. 1004, ¶¶ 15, 33, 35, 47, Petitioner bears the burden of identifying information in the received message that it contends is not changed, which Petitioner does not do, and of showing that this information is in the new message, which Petitioner does not even argue.

Also, I do not find the evidence upon which the majority relies to be persuasive. To support its finding that Staiger does not indicate that the informational content of a received message is changed in the new message, the majority relies on Staiger's disclosure of a set of registers for storing "message specific information specifying the contents of the received message." Majority Dec., 40 (quoting Ex. 1004, ¶ 15). The majority finds that this description indicates that Staiger "appears to take steps to preserve the informational content through storage in a set of registers." *Id.* at 39–40. However, another interpretation is that the set of registers is not for preserving informational content, but rather is for providing storage that is convenient for the DP execution units to access so that they may execute computations on the information. First, Staiger does not expressly say that

21

Case IPR2017-01519
Patent 8,566,843 B2

the registers store informational content from received messages in order to preserve it for later insertion into the *new* message. Second, rather than store information for later insertion into a *new* message, Staiger describes using the registers to store data needed by the dynamic process "for the computation of received messages." Ex. 1004, ¶ 41. Staiger discloses

> control engine 224 is connected to the interrupt bus 220 and further possesses a connection to execution tag registry 238 which is included in a DP (dynamic process) execution unit 239 and store data needed for the computation of the received messages. The execution tag registry 238 itself is connected to a first, a second, and a third execution unit 240 and 244 which can access a register pool for storing data and exchanging data among the execution units 240 to 244.

*Id.* Accordingly, I interpret Staiger's disclosure to indicate that the registers are for storing information that is to be changed, i.e., to be computed on, by dynamic processes. Regardless of whose interpretation is correct, Petitioner bears the ultimate burden of persuasion. Petitioner does not present any evidence or argument on the issue of how the registers in Staiger are used.

For the foregoing reasons, I would find that Petitioner has not shown sufficiently that Staiger discloses limitation 48.7.

Petitioner also contends that to the extent Staiger does not teach this limitation, Millsap does. Pet. 86. However, Petitioner does not specify with particularity how Millsap teaches or suggests this limitation. Petitioner asserts that this limitation is taught by Millsap "for similar reasons discussed above for element 1.8," without providing any additional explanation. *Id.* at 86 (citing Pet., Section VI.B.1.a). But limitation 1.8 is substantially

Case IPR2017-01519
Patent 8,566,843 B2

different from limitation 48.7.  Limitation 1.8 recites "wherein the computer program product is associated with an electronic control unit with a plurality of interface portions including."  In particular, this limitation does not describe sharing the information.  Petitioner, therefore, places the burden on the Board to sift through the Petition's discussion of limitation 1.8 in order to ascertain Petitioner's assertions as to limitation 48.7—a task which is not the Board's burden to undertake.  Our rules require that a petition specify with particularity where each element of a claim is found in the prior art, and include a detailed explanation of the relevance of the prior art to the claim. 37 C.F.R. § 42.104(b)(4); *id.* § 42.22(a)(2); *id.* § 42.104(b)(5).  As the Federal Circuit has explained, "[i]n an IPR, the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d at 1363. Petitioner's reference to its discussion of a dissimilar claim limitation fails to specify with particularity how Millsap discloses limitation 48.7.

2.    *Summary*

For the foregoing reasons, I would find that Petitioner has not set forth sufficient evidence and argument that either Staiger or Millsap discloses limitation 48.7 of claim 48, as asserted by Petitioner.  Therefore, it is my view that Petitioner has not established, by a preponderance of the evidence, that claim 48 is unpatentable.

III.    CONCLUSION

The majority decision reaches the incorrect conclusion that Petitioner has established, by a preponderance of the evidence, that claims 1–50 are unpatentable.  From the majority's contrary decision, I respectfully dissent.

Case IPR2017-01519
Patent 8,566,843 B2


PETITIONER:

James M. Glass
Brett N. Watkins
Richard A. Lowry
QUINN EMANUEL URQUHART & SULLIVAN, LLP
jimglass@quinnemanuel.com
brettwatkins@quinnemanuel.com
richardlowry@quinnemanuel.com


PATENT OWNER:

Thomas H. Kramer
O'KELLY ERNST & JOYCE, LLC
tkramer@oeblegal.com

Thomas Meagher
Alan C. Pattillo
MEAGHER EMANUEL LAKS GOLDBERG & LIAO, LLP
tmeagher@meagheremanuel.com
cpattillo@meagheremanuel.com