**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **STRAGENT, LLC,** | |
| **Plaintiff,** | |
| **v.** | **C.A. No. 20-510-LPS** |
| **BMW OF NORTH AMERICA, LLC** *et al*, | |
| **Defendants** | |
| **STRAGENT, LLC,** | |
| **Plaintiff,** | |
| **v.** | **C.A. No. 20-511-LPS** |
| **MERCEDES-BENZ USA, LLC** *et al*, | |
| **Defendants** | |
| **STRAGENT, LLC,** | |
| **Plaintiff,** | |
| **v.** | **C.A. No. 20-512-LPS** |
| **VOLVO CAR NORTH AMERICA, LLC,** | |
| **Defendant** | |

**PLAINTIFF'S OPENING**
**CLAIM CONSTRUCTION BRIEF**

George Pazuniak (DE Bar No. 478)
O'Kelly & O'Rourke, LLC
824 North Market Street, Suite 1001A
Wilmington, DE 19801
Direct: (207) 359-8576
gp@del-iplaw.com

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

I.  BACKGROUND AND STATEMENT OF FACTS .......................................................- 1 -

   A.  INTRODUCTION ........................................................................................- 1 -

   B.  THE STRAGENT PATENTS ........................................................................- 1 -

   C.  PROSECUTION HISTORY OF THE STRAGENT PATENTS ....................................- 6 -

II.  LEGAL STANDARD........................................................................................- 6 -

III.  CLAIM CONSTRUCTIONS...............................................................................- 7 -

   A.  "DEBUGGING MODE" ..............................................................................- 7 -

   B.  "ISSUE A STORAGE RESOURCE REQUEST IN CONNECTION WITH A STORAGE RESOURCE OF THE AUTOMOTIVE ELECTRONIC CONTROL UNIT" ...........................................................................- 9 -

   C.  "DETERMINING WHETHER A STORAGE RESOURCE IS AVAILABLE" ..................................- 13 -

   D.  "RE-TRYING AN ACCESS IN CONNECTION WITH THE STORAGE RESOURCE" ....................- 14 -

   E.  "SHARING THE INFORMATION" ................................................................- 15 -

   F.  "CONFIGURE THE DATA STRUCTURE OF THE NON-VOLATILE MEMORY"........................- 18 -

# TABLE OF AUTHORITIES

<u>CASES</u>

*Duncan Parking Techs., Inc. v. IPS Grp., Inc.*,

    914 F.3d 1347 (Fed. Cir. 2019) -------------------------------------------------------------- - 12 -

*Eko Brands, LLC v. Adrian Rivera Maynez Enterprises, Inc*.,

    946 F.3d 1367 (Fed. Cir. 2020) -------------------------------------------------------------- - 12 -

*Evolusion Concepts, Inc. v. HOC Events, Inc.*,

    2022 WL 128577, ___ F.4th ___ (Fed. Cir. 2022) ----------------------------------------- - 6 -, - 8 -

*Immunex Corp. v. Sanofi-Aventis U.S. LLC*,

    977 F.3d 1212 (Fed. Cir. 2020) -------------------------------------------------------------- - 11 -

*Nobel Biocare Servs. AG v. Instradent USA, Inc.*,

    903 F.3d 1365 (Fed. Cir. 2018) -------------------------------------------------------------- - 11 -

*Phillips v. AWH Corp.*,

    415 F.3d 1303 (Fed. Cir. 2005) (en banc) -------------------------------------------------- passim

*SynQor, Inc. v. Artesyn Techs., Inc.*,

    709 F.3d 1365 (Fed. Cir. 2013) -------------------------------------------------------------- - 12 -

*Unwired Planet, LLC v. Apple, Inc.*,

    829 F.3d 1353 (Fed. Cir. 2016) --------------------------------------------------------------- - 9 -

## I.   BACKGROUND AND STATEMENT OF FACTS

### a.   Introduction

Plaintiff Stragent, LLC ("Stragent") filed the above three captioned cases for infringement of four patents against Defendants BMW of North America, LLC and BMW Manufacturing Co., LLC (C.A. No. 20-510-LPS); Mercedes-Benz USA, LLC, Mercedes-Benz Vans, LLC, Daimler Trucks North America, LLC, and Daimler North America Corp. (C.A. No. 20-511-LPS); and Volvo Car North America, LLC (C.A. No. 20-512-LPS) (collectively, "Defendants").

Pursuant to the Scheduling Order entered in the above litigations, this is Plaintiff Stragent's opening brief with respect to construction of claims.

### b.   The Stragent Patents

Stragent accuses Defendants of infringing the following claims of the following patents:

   9,705,765 claims 12, 24, 26, 27, 28, 31

   10,002,036 claims 1, 9, 18, 19, 34, 38, 72, 79, 82, 98, 102-14, 117, 121, 122

   10,031,790 claims 1, 2, 4-6, 8, 9, 15, 16, 18-20, 22-24

   10,248,477 claims 23, 26, 27, 28

All four patents share a common specification, and the parties have agreed that to avoid confusion and assist comprehension the parties will reference the specification of Patent 10,248,477 ("'477 Patent") regardless of which patent claim is being addressed (with the understanding that the different claims are not identical and, thus, claim differing inventions).

The '477 Patent discloses automobile electronic control units ("ECUs") that have the capability of sharing information amongst multiple networks, including at least all three of the

FlexRay, CAN and LIN, all three being different networks utilizing different protocols and used for different functions in automobiles.

The sharing of information is a function of multiple components that are recited in the claims. One aspect is the storage resource of the ECU. Information or data is included in a data structure, sometimes in the form of a bulletin board, and any device on any network has access to the ECU and the data. The system can fetch that data from the storage resource and send it to another device. The device and the corresponding storage resource do not know, and do not care where that data came from.

The benefits of the Stragent Patent inventions include that more information may be made available for different automobile systems, and that ECUs can now be multi-purposed for use with different networks which means fewer ECUs are required to be developed and inventoried compared to ECUs which can accommodate only one network, or even two networks. The Stragent Patent inventions provide these benefits by a novel combination of elements, some of which may individually be in the prior art, but which are re-purposed to provide the functionality of providing sharing of data between the FlexRay, CAN and LIN networks.

Figure 7 of the Stragent Patents illustrates the process interaction with multiple external communication buses which is one aspect of the invention:



The original filing of an application leading to the present claims was a Provisional application, which is incorporated by reference into the Stragent Patent specifications, and it states in the context of specific embodiments more about the benefits of the inventions compared to the prior art.  It notes that gateways were known in the prior art, but a conventional gateway is just a translator to translate messages from one network and then send the message to every other network to which the gateway was attached, and to do so whether any devices on the other networks care about that information or not.

The invention of the Stragent Patents, on the other hand, lies in that information from one network using one protocol which is stored and made available to different processes operating on different networks using distinct and different protocols and are utilized only when required. This is very different from a gateway simply sending one network's information to any other network to which it is connected.

Further, the Stragent Patent inventions allow three or more networks to exchange

information even where all the networks are different, and all three or more networks utilize

different protocols.

The Stragent Patent note one deficiency of the standard gateways and the benefit of the

invention as follows:

> The approach uses a common, or shared storage system that is connected to all of
> the system networks through network interfaces.  A critically important feature of
> the bulletin board approach is that the complexity of the bulletin board grows
> linearly with the number of networks (as opposed to as N(N-1) for the gateway
> approach), and in one-to-many situations the number of message transformations
> is half that of the standard networking approach.

(7:1-8).

The deficiencies are explained in more detail in the Provisional, as follows:

> To implement this inter-network communication, the industry has defined several
> types of gateways or bridges.  This approach involves translation of the various
> network protocol layers from one form to another, see figure 2.  Following the
> classical approach of digital communications, in each step towards abstraction
> from the physical transportation layer, the protocol stack adds an additional
> header to the message sent through the network. While it is effective to abstract
> the application from the network complexity, this approach has several distinct
> disadvantages:

> First, the gateway must perform a variety of computations and
> transformations on every message. As a result, the number of transformations
> becomes large as the number of interconnected networks grows. For N different
> networks, the number of transformations processed by the gateway increases as
> N*(N-1 ).

> Second, with each layer of abstraction the message length grows and
> therefore decreases the throughput of the system or adds latency to real-time
> control loops.

> Third, in many situations there is a one-to-many relationship between
> devices that generate data values and devices that use those values. In a system
> with multiple such user devices operating on multiple heterogeneous networks,
> the gateway must transform the messages containing the same basic data multiple
> times between each of the networks being served.

- 4 -

Fourth, in real-time embedded systems, the messages between distant nodes in the network need to comply with requirements for latency and jitter. Although one can define time-slots for each value on a specific communication bus, with the standard networking scheme it is impossible to forward the time sensitive information to a different physical communication link without introducing additional unpredictable latency and jitter through the required protocol transformations.

Fifth, current networking concepts can only cash information in pipes that are associated with the protocol stack. Without storage concept in a gateway that allows random access from multiple communication networks, it is impossible to exchange information between different predictable timeslots in each connected network.

(Stragent Exhibit 1)

Thus the '477 Patent, including the incorporated Provisional, points out that the conventional gateway approach is very inefficient because for N networks the number of messages processed by the network is N(N-1).  Thus, assume you have N networks attached to the gateway, and, for simplicity, assume that each network has only one message.  This means that there are N messages entering the gateway (one from each network).  Now, each message from each network must be translated to every other network.  That means there are (N-1) translations for each message (one for every network other than the one that originated the message), so the overall processing complexity is N(N-1), which grows very quickly as N increases.  So, a conventional gateway is fine in a case where you only have, say, two networks, since the complexity is 2(2-1)=2. However, if you have, say, 5 networks (LS-CAN, HS-CAN, FlexRay, LIN, and MOST), then the gateway complexity is 5(5-1)=20, so this device is 20 times as complex as compared to a single network (or 10 times as complex as the case with two networks).  If you had multiple instances of CAN networks, say 10 total networks, then the complexity would be 90 times higher than a single network. More generally, as the number of

- 5 -

networks N increases, the complexity increases by a factor of $N^2$, which is a polynomial increase.

Using the patented approach, the '477 Patent extracts the information or data from each network message and posts it in memory, which is then made available through the claimed interface to other networks that utilize different protocols.

Not only is this more efficient, but the invention also reduces the network message traffic, since only those messages that are needed traverse an ECU from one network to another. In the example above with five networks connected by a conventional gateway, each network would end up with 5 times the message traffic, which could bog down the network with a tremendous amount of traffic and make the network unusable.

### c. <u>Prosecution History of the Stragent Patents</u>

Stragent does not believe that the prosecution histories are pertinent to the claim construction issues before the Court.  The prosecution histories of the four patents consist of rejections based on non-statutory obviousness-type double patent rejections which were remediated by applicants' filing of terminal disclaimers, and which were followed by notices of allowance, and, in some cases, clarifications of claim language.

## II.   <u>LEGAL STANDARD</u>

The Federal Circuit recently restated the general principle of claim construction:

> "[T]he words of a claim 'are generally given their ordinary and customary meaning,' " as understood by a relevant artisan at the time of the invention.  A relevant artisan is not deemed to read a term in a vacuum, but instead "is deemed to read the claim term ... in the context of the particular claim in which the disputed term appears," and "in the context of the entire patent, including the specification." Id. at 1313.

*Evolusion Concepts, Inc. v. HOC Events, Inc*., 2022 WL 128577 at *3, ___ F.4[th] ___ (Fed. Cir. 2022) (quoting *Phillips v. AWH Corp*., 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc)).

## III.    CLAIM CONSTRUCTIONS

### a.   "Debugging mode"

**Pat. 10,248,477 claims 27, 28**

| Stragent's Construction | Defendants' Construction |
|---|---|
| "a program or module to detect, locate and fix errors in the system while it is running." | "a mode, distinct from normal operation, that allows the network to run in a fail-safe reduced operation mode or in a diagnostic mode that allows inspection of the system, while it is running" |

"Debugging" is a term well recognized in the art.  It means "to detect, locate and fix errors" of a program or a system.  (Stragent Exhibit 2).  It is distinct from a diagnostic mode because diagnostics relates to checking the health of a system, while debugging involves fixing errors that have already occurred.  (Compare Ex. 2 pp.102 and 108).

The distinction between debugging and diagnostics is noted in the Stragent Patent specifications.  Thus, although the Stragent Patents include the diagnostic mode as part of the "emergency or debug" module, the specifications also clearly differentiated the diagnostic mode as a separate element:

> The emergency or debug mode lets the network run in a fail-safe reduced operation mode or in a diagnostic mode that allows inspection of the system, while it is running.

(11:36-39).

Most critically, however, '477 Patent claims 4-5, 15-16, 26-27 and 28 separately refer to both a "diagnostic mode" and a "debugging mode."  Claim differentiation mandates in this case that the two terms be distinguished with each being afforded its ordinary meaning.

"Debugging mode" is correctly construed as "a program or module to detect, locate and

fix errors in the system while it is running."  The specification and the claims' structure require that the debugging be of the ECU or the system.  Thus, the specification states that the "emergency or debug mode lets the network run in a fail-safe reduced operation mode or in a diagnostic mode that allows inspection of the system**,** while it is running." (11:36-39).  The "**,**" before the phrase "while it is running" ordinarily means that the phrase is directed to all the preceding modes.  The "debugging mode" claims 5, 11, 16, 22, 27 and 28 all require that the debugging mode be run by code in the ECU which further supports construing "debugging mode" as something run while the system is running.  .

Defendants' proposed construction is erroneous for several reasons.  First, it introduces a new technical unexplained expression -- "fail-safe reduced operation mode" – which can only cause confusion.  Second, it converts a "debugging mode" into being part of the "diagnostic mode," which is an error, because the debugging and diagnostic modes are separately claimed as two different modes.  The parties have stipulated that the term "diagnostic mode" is properly construed as "a mode, distinct from normal operation, that allows inspection of the system while it is running." (D.I. 63).  While the "diagnostic" and "debugging" modes can be conducted at the same time, the technical dictionaries, and the claims/specifications confirm that the two modes are recognized to perform different functions.

The Federal Circuit recently reaffirmed that it is error to effectively convert a disclosure of a specification into what is effectively a disclaimer.  Thus, in *Evolusion Concepts, supra*, the issue was whether a magazine catch bar could be either have been factory installed as part of an OEM device or had to be part of a separate modification.  The district court relied first on the

fact that the specification's "disclosed embodiments do not illustrate OEM magazine catch bars."

But the Federal Circuit held that this:

> cannot make a difference in this case. We have repeatedly held that "it is not enough that the only embodiments, or all of the embodiments, contain a particular limitation to limit claims beyond their plain meaning. Here, nothing in the specification suggests that factory (or OEM) provenance of a bar disqualifies it from being part of the invention if, as a structural matter, it is a magazine catch bar under the ordinary meaning. And nothing in the specification suggests that factory (or OEM) installation precludes the possession of the structural features required by the invention.

*Id*. (quoting *Unwired Planet, LLC v. Apple, Inc*., 829 F.3d 1353, 1359 (Fed. Cir. 2016)).  The

Court continued:

> The district court further relied on a sentence of the specification to conclude that the specification excludes a factory-installed magazine catch bar: "The invention is a permanent fixture added to a semi-automatic firearm by removing the standard OEM magazine catch assembly and installing the invention."  But … the specification sentence does not preclude the installation of a factory-installed magazine catch bar.

*Id.* (citations omitted).

### b.  "issue a storage resource request in connection with a storage resource of the automotive electronic control unit"

**Pats. 10,002,036 claims 1 and 102; 10,031,790 claim 1 and 15; 10,248,477 claim 23**

| Stragent's Construction | Defendants' Construction |
|---|---|
| No construction is required.<br><br>If construction is required, "make a request in connection with the storage resource of the automotive electronic control unit" | "issue a request for storing a message in conjunction with the message being received at the automotive electronic control unit/hardware processor" |

The words of this limitation require no construction as the words are plain English and

mean what they say. *Phillips v. AWH Corp*., 415 F.3d 1303, 1314 (Fed.Cir.2005) (*en banc*) ("In

some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words"). This limitations comprises plain English words.  Nothing in the intrinsic record demonstrates that the inventor defined the words in derogation to their ordinary English usage, and there is no disclaimer.

The ordinary meaning of the word "request" is (a) "the act or an instance of asking for something"; or (b) "the act of politely or formally asking for something." (https://www.merriam-webster.com/dictionary/request).

The specification uses the term "request" consistently with the ordinary meaning of the term:

> FIG. 10 describes the bulletin board store procedure (804) in more detail.  Before new data can be stored in the bulletin board, the procedure has to request the access right to the common resource, a section of the non-volatile or volatile memory, from the operating system (1001).  This is called explicit resource management.

(7:52-57).

> FIG. 11 describes the bulletin board retrieve procedure (1101) in more detail. Before data can be retrieved from the bulletin board, the procedure has to request the access right to the common resource, a section of the non-volatile or volatile memory, from the operating system (1102).

(8:12-16).

The word "request" does not have any technical meaning that is different from the ordinary meaning of the word.  Thus, no construction is required.  However, to the extent that the Court requires a construction, the phrase "issue a storage resource request" should be construed

- 10 -

as "make a request in connection with the storage resource of the automotive electronic control unit."

Defendant's proposed construction erroneously rewrites the claim to add the requirement "issue a request for *storing a message*" and that the storage request occur "in conjunction with *the message* being received." Defendants' construction is plainly erroneous because they contradict the express claim language. The claims do not provide for storing any "messages." The claims refer to storing "information [or datum] associated with a message" ('477 Patent claim 23; '790 Patent claim 1; '036 Patent claim 1; '765 Patent claim 12). The specification plainly identifies the difference between datum or information on the one hand and a message on the other hand. Particularly, "messages" carry "data" or "information." (1:40-43: "sharing information in an automobile vehicle comprising: receiving information in the form of a packet data unit representing datum information carried by an overall message"); (6:19-21: "Once all layers are processed the remaining packet data unit (PDU) represents the datum or core information carried by the overall message"). A "message" may include "data" or "information" but a "message" is more than either.

Indeed, by requiring the storing of a "message," Defendants' construction excludes all the embodiments in the Stragent Patents, as they all reflect storage of data or information and not messages. It is well-established law that "there is a strong presumption against a claim construction that excludes a disclosed embodiment." *Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977 F.3d 1212, 1220 (Fed. Cir. 2020) (citations omitted). *See* also *Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1381 (Fed. Cir. 2018) ("we 'ha[ve] cautioned against interpreting a claim term in a way that excludes disclosed embodiments, when that term has

- 11 -

multiple ordinary meanings consistent with the intrinsic record'") (internal citations omitted); *Eko Brands, LLC v. Adrian Rivera Maynez Enterprises, Inc*., 946 F.3d 1367, 1373 (Fed. Cir. 2020) ("claim construction that excludes the preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support") (quoting *SynQor, Inc. v. Artesyn Techs., Inc*., 709 F.3d 1365, 1378–79 (Fed. Cir. 2013)); *Duncan Parking Techs., Inc. v. IPS Grp., Inc*., 914 F.3d 1347, 1364 (Fed. Cir. 2019) ("a claim construction that excludes the preferred embodiment is highly disfavored").

More broadly, Defendants' construction errs because the instant limitation says only "issue a storage resource request in connection with a storage resource" without limiting the nature or subject of the storage request. While other limitations of individual claims may further specify or limit the "storage request," nothing in the claims requires a construction defining the "request" to be for "storing," let alone defining what may be stored.

Finally, Defendants' construction further errs because Defendants substitute "in conjunction" for "in connection." "Conjunction" has a narrower meaning than "connection." (*Cf.*, https://www.merriam-webster.com/dictionary/conjunction with https://www.merriam-webster.com/dictionary/connection). That narrower construction becomes especially difficult when read in the context of the subsequent imported/un-supported phrase: "the message being received…." The intrinsic record consistently uses the word "connection," and the word "conjunction" is nowhere found (literally nor conceptually). (See, for example, Abstract and 1:46-53).

Thus, the limitation does not require any construction as nothing in the intrinsic record modifies the ordinary meaning of the words of the claim term.  Defendants' proposed construction rewrites the claim limitation and excludes all the Patent embodiments.

### c.   "determining whether a storage resource is available"

### Pat. 9,705,765, claims 12 and 24

| Stragent's Construction | Defendants' Construction |
|---|---|
| No construction is required.<br><br>If construction is required, "ascertain or decide the availability of a storage resource" | "determine the availability of a storage resource for a message in the automotive electronic control unit in conjunction with the message being received by the automotive electronic control unit" |

Again, the words of this limitation require no construction as the words are plain English and mean what they say.  *Phillips v. AWH Corp*., *supra*.

Defendants' proposed construction seems intent on introducing requirements found in the patents' embodiments.  Indeed, Defendants begin their construction by simply repeating the plain claim language -- "determine the availability of a storage resource" – and then add various other requirements "for a message in the automotive electronic control unit in conjunction with the message being received by the automotive electronic control unit."

Further, as argued in the previous section, Defendants err because they again introduce the term "message" into the construction and add the novel "in conjunction" requirement, neither of which is supported by the intrinsic record.

- 13 -

### d. "re-trying an access in connection with the storage resource"

### Pat. 9,705,765 claims 12 and 24

| Stragent's Construction | Defendants' Construction |
|---|---|
| No construction is required.<br><br>If construction is required, "making another attempt to ascertain or decide the availability of a storage resource" | "again determining whether a storage resource is available after a first determination that a storage resource is not available, for example by issuing another storage resource request in connection with the storage resource" |

As in the case of the prior terms, the words of this limitation require no construction as the words are plain English and mean what they say.  *Phillips v. AWH Corp., supra.*

Defendants propose to confuse the construction and rewrite the term by changing "re-trying an access in connection with the storage resource" to mean something more limited and different than the plain claim language.  The claim is confusing because the construction begins with "again" without explaining what the "again" refers to.

If the Defendants mean to equate "again" with "retrying," the Defendants' proposed construction is still incorrect, because the plain language of the claim does not say – try again to "determine[e] whether a storage resource is available."

Additionally, Defendants' proposed construction errs in adding "*for example* by issuing another storage resource request in connection with the storage resource."  Construing claims by examples is fraught with potential risk that juries will come to view the claim language as requiring something equivalent to the proffered example in the Court's construction.   To the best of Stragent's research no reported Federal Circuit  decision has allowed a claim construction that included a "for example."

e. **"sharing the information"**

**Pats. 9,705,765 claims 12, 24, 28 and 31; 10,031,790 claims 1–2, 5, 8–9, 15–16, 20, and 22–24; 10,002,036, claims 1 and 102–103**

| Stragent's Construction | Defendants' Construction |
|---|---|
| "permitting the information stored in a storage resource to be used by another process" | "transmitting the information, without requiring storage of the information prior to transmitting" |

The ordinary technical meaning of "sharing" is "to make files, directories or folders accessible to other users over a network." (Microsoft Computer Dictionary, Exhibit 3). Thus, "data sharing" has been defined as "the use of a single file by more than one person or computer." (Exhibit 3). These technical definitions implement the word's ordinary meaning which is "to partake of, use, experience, occupy, or enjoy with others" and to "have in common." https://www.merriam-webster.com/dictionary/share. Nothing in the intrinsic record changes the ordinary meaning of the word "share" or its derivatives.

Further, the plain claim language requires that the information must be stored prior to sharing. The article "the" in "the information" means that the information was previously identified. The only antecedent in the claims is information that was stored, and, hence, "the information" has to mean "stored information." Thus, the two independent claims in issue from the '790 Patent recite:

> "issue a storage resource request in connection with a storage resource of the automotive electronic control unit and determine whether the storage resource is available for storing the information, where the storage resource is configured to store the information that is received utilizing the Flexray network for the purpose of sharing the information utilizing a Controller Area Network that is another physical network"

('790 Patent 12:49-57; 15:8-15).

- 15 -

The independent claims of Patents 9,705,765 and 10,002,036 are similar and clearly state that the shared information must be first stored.  Thus, the two independent claims of the '765 Patent here in suit, Claim 12 and 24 both recite the same language (except for reciting different networks):

> if the storage resource is available, <u>storing the information</u> utilizing the storage resource; and
>
> <u>sharing the information</u> utilizing a [Flexray] [Controller Area Network] network protocol associated with a [Flexray] [Controller Area Network] network;
>
> wherein the receiving, the determining, <u>the storing, and the sharing</u> all occur in less than one second ….

('765 Patent 12:17-22; 16:44-49).

The relevant claim language in independent claims 1 and 102 of the '036 Patent is:

> in the event the storage resource is available, <u>store the information</u> utilizing the storage resource; and
>
> <u>share the information</u> in less than one millisecond utilizing a [Controller Area Network] [Flexray] protocol associated with a [Controller Area Network] [Flexray]  Network….

('036 Patent 12:60-67; 18:66-19:3).

The requirement of the claims that only stored information is shared is supported by, for example, Figure 7, which is here annotated:



The "information" that is received from a first network is "stored" prior to being "share[d]" via a second network.  As is illustrated by the red annotated arrows above, all paths from the first network to the second network must pass through bulletin board 608 to be "store[d]."

Defendants' proposed construction is legally erroneous.  First, Defendants rewrite "sharing" to mean "transmitting."  While "transmitting" may be a type of "sharing," nothing in technical or ordinary dictionaries equate "sharing" with "transmitting," and the intrinsic record does not support such a narrowing limitation.

Defendants further err in saying that "sharing" can occur "without requiring storage."  But if the shared information is not the stored information, what does the article "the" mean in "*the* information."  By construing the claim term to not require storing before sharing requires the Court to contradict the express limitations of the claims that mandate storing when the article "the" is presented before the word "information."

Defendants' "storage not required" provision presumably derives from certain constructions by the PTAB in prior IPR decisions involving the claims of Patents 8,566,843 and 8,209,705.  The prior PTAB decisions are irrelevant here because the present claims are different from the claims considered in the IPRs, and the prior PTAB proceedings were conducted under the now-superseded Broadest Reasonable Construction claim construction standard, rather than the currently-governing *Phillips* standard.  Finally, the PTAB decisions are not governing.

### f.  "configure the data structure of the non-volatile memory"

Pat. 10,248,477 claim 23

| Stragent's Construction | Defendants' Construction |
|---|---|
| "Allocate memory, and/or implement the relationships between the data elements and/or the allowable functions" | "make a change to the data structure of the non-volatile memory" |

"Data structure" has been defined in the Microsoft Computer dictionary as "An organizational scheme, such as a record or array, that can be applied to data to facilitate interpreting the data or performing operations on it."  (Exhibit 3)

The ordinary definition of "configure" is "to set up for operation especially in a particular way."  (https://www.merriam-webster.com/dictionary/configure).

The specification provides

The bulletin board manager (501) contains an upgrade and configuration manager (507)….  The upgrade and configuration manager (507) is necessary to configure the data structure of the bulletin board and to make executable code available to individual processing nodes.

(4:39-45).  The configuration manager (507) is also shown in Figure 5 of the Stragent Patents.

- 18 -

Stragent's proposed construction follows the above-described definitions of "data structure" and "configure," except to make the meaning more understandable to a jury.

Stragent disputes Defendants' substantive construction of the term because Defendants have simply substitute "make a change" to configure, and have failed to explain "the data structure." As reflected in the standard dictionaries, "configure" is not limited to "making changes." Configuration, or a set-up, can clearly occur without changing the data structure. Thus, Defendants are adding a limitation that is not required by the ordinary meaning of the words and is not supported by the intrinsic record.

Respectfully Submitted,

*/s/ George Pazuniak*
George Pazuniak (DE Bar No. 478)
O'Kelly & O'Rourke, LLC
824 North Market Street, Suite 1001A
Wilmington, DE 19801
Direct: (207) 359-8676
gp@del-iplaw.com

*Attorney for Plaintiff*

- 19 -