IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| STRAGENT, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 20-510 (LPS) |
| | ) | |
| BMW OF NORTH AMERICA, LLC and | ) | |
| BMW MANUFACTURING CO., LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| STRAGENT, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 20-511 (LPS) |
| | ) | |
| MERCEDES-BENZ USA, LLC, | ) | |
| MERCEDES-BENZ VANS, LLC, | ) | |
| DAIMLER TRUCKS NORTH AMERICA LLC and | ) | |
| DAIMLER NORTH AMERICA CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| STRAGENT, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 20-512 (LPS) |
| | ) | |
| VOLVO CAR NORTH AMERICA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANTS' INITIAL CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ............................................................................................. 1

II.   CLAIM CONSTRUCTION ARGUMENTS ................................................... 2

      A.    "debugging mode" ('477 patent, claims 27 and 28) .............................. 2

      B.    "issue a storage resource request in connection with a storage resource of the
            automotive electronic control unit" ('036 patent, claims 1 and 102; '790 patent,
            claims 1 and 15; '477 patent, claim 23) ................................................................. 4

      C.    "determining whether a storage resource is available" ('765 patent, claims 12 and
            24) ......................................................................................................... 8

      D.    "re-trying an access in connection with the storage resource" ('765 patent, claims
            12 and 24) ............................................................................................. 9

      E.    "sharing the information" ('765 patent, claims 12, 24, 28, and 31; '790 patent,
            claims 1, 2, 5, 8, 9, 15, 16, 20, and 22-24; '036 patent, claims 1 and 102-103)... 12

      F.    "configure the data structure of the nonvolatile memory" ('477 patent, claim 23)
            ............................................................................................................. 16

III.  CONCLUSION.............................................................................................. 17

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott Labs. v. Sandoz Inc.*,
 544 F.3d 1341 (Fed. Cir. 2008) ................................................................ 10

*Cronos Techs., LLC v. Expedia, Inc.*,
 No. 13-1538-LPS, 2016 WL 3982309 (D. Del. July 22, 2016) ............................. 13

*Genuine Enabling Tech., LLC v. Sony Corp.*,
 No. CV 17-135, 2020 WL 1140910 (D. Del. Mar. 9, 2020) .................................. 15

*Jonsson v. Stanley Works*,
 903 F.2d 812 (Fed. Cir. 1990) ................................................................. 13

*MTD Prods. Inc. v. Iancu*,
 933 F.3d 1336 (Fed. Cir. 2019) ................................................................ 16

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
 133 F.3d 1473 (Fed. Cir. 1998) ................................................................ 10

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
 521 F.3d 1351 (Fed. Cir. 2008) ................................................................. 7

*Omega Eng'g, Inc. v. Raytek Corp.*,
 334 F.3d 1314 (Fed. Cir. 2003) ................................................................ 14

*Phillips v. AWH Corp.*,
 415 F.3d 1303 (Fed. Cir. 2005) ......................................................... 5, 13, 16

*Power-One, Inc. v. Artesyn Techs., Inc.*,
 599 F.3d 1343 (Fed. Cir. 2010) ................................................................ 12

*Sulzer Textil A.G. v. Picanol N.V.*,
 358 F.3d 1356 (Fed. Cir. 2004) ................................................................ 12

## I.     INTRODUCTION

Plaintiff Stragent, LLC is asserting four patents against each of Defendants BMW of North America, LLC and BMW Manufacturing Co., LLC ("BMW"); Mercedes-Benz USA, LLC, Mercedes-Benz Vans, LLC, Daimler  Trucks North America, LLC, and Daimler North America Corp. ("Daimler-Mercedes"); and Volvo Car North America, LLC ("VCNA") (collectively, "Defendants")—U.S. Patent Nos. 9,705,765 (the "'765 patent"), 10,002,036 (the "'036 patent"), 10,031,790 (the "'790 patent"), and 10,248,477 (the "'477 patent")[1] (collectively, the "patents-in-suit").

The patents-in-suit are each part of the same family and share a common specification. They all claim priority to ultimate parent U.S. Patent No. 7,802,263.  The priority chain of the patents-in-suit further includes U.S. Patent Nos. 8,209,705 and 8,566,843, which Plaintiff previously asserted against certain Defendants in the United States District Court for the Eastern District of Texas.  *See* D.I.[2] 9 at 8-9.  The Patent Trial and Appeal Board ("PTAB") invalidated the claims of the '705 and '843 patents during *inter partes* review proceedings ("IPR").  *Id.*  During these proceedings, the PTAB addressed the proper construction of certain claim terms and/or phrases which are also found in the claims of the patents-in-suit.

The patents-in-suit are generally directed to using automotive electronic control unit ("ECU") gateway middleware having associated "bulletin board" memory that allows for "real-time" sharing of information across different in-vehicle networks—*e.g.*, sharing information between two or more of a Controller  Area Network ("CAN"), Local Interconnect Network

---

[1]     The '765 patent is attached as Exhibit A; the '036 patent is attached as Exhibit B; the '790 patent is attached as Exhibit C; and the '477 patent is attached as Exhibit D.

[2]     All D.I. numbers refer to documents filed in C.A. No. 20-510-LPS unless otherwise noted.

("LIN"), and FlexRay Network in "vehicle communication and control systems, real-time monitoring systems, industrial automation and control systems, as well as any other desired system." Ex. D ('477 patent) at 1:32-35, 2:60-3:2. The patents-in-suit state that multiple automotive ECUs "control complex applications such as engine control, brake control, or diagnostics" while connected by multiplexing bus-systems corresponding to different networks. *Id.* at 2:48-3:2. Such ECUs have software for interfacing with the ECU's input/output mechanisms and storing information within the ECU. *Id.* at 4:13-30. These ECUs share arbitrated access to a "common, or shared storage system that is connected to all of the system networks through network interfaces." *Id.* at 7:1-3, 7:52-8:3.

## II. CLAIM CONSTRUCTION ARGUMENTS

### A. "debugging mode" ('477 patent, claims 27 and 28)

| Defendants' Proposed Construction | Stragent's Proposed Construction |
| --- | --- |
| "a mode, distinct from normal operation, that allows the network to run in a fail-safe reduced operation mode or in a diagnostic mode that allows inspection of the system, while it is running" | "a program or module to detect, locate and fix errors in the system while it is running" |

The parties dispute regarding the term "debugging mode" primarily concerns two issues: (1) whether "debugging mode" is a mode, as opposed to a program or module (it is) and (2) whether "debugging mode" describes a mode distinct from normal operation that allows the network to run in a fail-safe operation mode (it does). Because the intrinsic record supports both of these interpretations, the Court should adopt Defendants' proposed construction.

Regarding the first issue, the plain language of claims 27 and 28 of the '477 patent requires "code to additionally run in a debugging mode." '477 patent, 16:58-59, 16:64. In this context, the term "code" appears to be what Plaintiff refers to in its proposed construction as a "program or

2

module." But the plain claim language distinguishes the term "code" from the phrase "debugging mode." And a program or module set up to perform debugging tasks is clearly distinct from the separate mode of operation described in the specification. Thus, "debugging mode" should be construed as something other than a "program or module."

Notably, the parties agree that the term "diagnostic mode" should be construed as "*a mode, distinct from normal operation, that allows inspection of the system while it is running.*" D.I. 44 (emphasis added). Adopting Plaintiff's proposed construction, however, would lead to one "mode" term being construed as "a mode" and another as a "program or module." Not only will this difference confuse the jury, neither the claim language nor the intrinsic record supports such a distinction. The term "mode" should be construed consistently for both terms, even if the modifiers "diagnostic" and "debugging" specify different functions for these distinct modes.

Rather, the specification wholly supports Defendants' interpretation. For example, the specification discusses a "debug mode" twice. In both instances, the specification describes it as a mode that the claimed system enters distinct from normal operation, and not a program or module that executes as part of normal operation:

> When the distributed computing and communication system wakes up from the sleep mode (1701), it can enter … an emergency or debug mode (1704). Ex. D ('477 patent) at 9:62-65.

> But any processing node may enter a debug/emergency mode (1704) if a failure or other qualifying event occurs. *Id.* at 10:29-31.

Not only does the specification expressly describe "debugging mode" as a mode, but it also describes "debug mode" in virtually the same terms as Defendants' proposed construction:

> The emergency or debug mode lets the network run in a fail-safe reduced operation mode or in a diagnostic mode that allows inspection of the system, while it is running.

Ex. D ('477 patent) at 11:36-39.   Defendants' proposed construction encompasses the full description of "debugging mode" and should be adopted.

   **B.     "issue a storage resource request in connection with a storage resource of the automotive electronic control unit" ('036 patent, claims 1 and 102; '790 patent, claims 1 and 15; '477 patent, claim 23)**

| Defendants' Proposed Construction | Stragent's Proposed Construction |
|---|---|
| "issue a request for storing a message in conjunction with the message being received at the automotive electronic control unit/hardware processor" | No construction is required. <br><br> If construction is required, "make a request in connection with the storage resource of the automotive electronic control unit" |

   Each of the above-identified claims is directed to a system/apparatus that includes an ECU coupled to a first network and a second network.   The claims recite that the ECU includes a memory storing instructions that cause the ECU to perform a number of operations, including receiving a message from the first network and sharing information relating to the message via the second network.  *See* Ex. A ('036 patent), claims 1 and 102; Ex. C ('790 patent), claims 1 and 15; Ex. D ('477 patent), claim 23.  The claims further recite that, after the ECU receives the message from the first network, it "issue[s] a storage resource request in connection with a storage resource" of the ECU.

   Defendants' proposed construction clarifies that this "storage resource request" is made in conjunction with a received message.   The claims themselves and the patents' specification confirms that Defendants' proposal is correct—the "storage resource request" is a request made "in conjunction with the message being received at the automotive electronic control unit/hardware processor."  It is unclear from Plaintiff's proposed construction (or assertion that no construction is required) whether Plaintiff disagrees that an issued storage request is associated with the receipt

of the message from the first network, but Defendants' construction confirms the operational flow of the claim to avoid jury confusion.

First, the context of the claims confirms that Defendants' proposed construction of these terms is correct. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) ("[T]he context in which a term is used in the asserted claim can be highly instructive" during the claim construction process.). For example, claims 1 and 15 of the '790 patent recite that the ECU memory includes instructions to "identify information associated with a message received" over a Flexray network or CAN and, "***in response to the identification of the information***, issue a storage resource request in connection with a storage resource of the automotive electronic control unit." Ex. C ('790 patent), claims 1 and 15 (emphasis added). Similarly, claim 23 of the '477 patent recites instructions to "receive information in the form of a packet data unit including a datum carried by a received message" from a first network and, "***in response to the receipt of the information***, issue a storage resource request in connection with a storage resource." Ex. D ('477 patent), claim 23 (emphasis added). Thus, in each claim, the "storage resource request" is made "in response to" the identification of information associated with a message received by the ECU. In other words, the '790 and '477 patent claims explicitly require that the storage resource request be made "in response to" (and therefore, in conjunction with) the message being received at the ECU from the first network, as Defendants propose.

The same is the case for the '036 patent claims, which recite instructions to "identify information associated with a message" received over a Flexray or a CAN network and "issue a storage resource request in connection with a storage resource of the automotive electronic control unit and determine whether the storage resource is available ***for storing the information***." Ex. B ('036 patent), claim 1 (emphasis added). Thus, the "storage resource request" is made to determine

whether the storage resource is available for storing the "information associated with a message" received by the ECU. As a result, the '036 patent claims also require that the "storage resource request" be made in conjunction with the message being received by the ECU, as Defendants propose.

Defendants' proposed construction is also confirmed by the specification, which describes the claimed "storage resource request" in relation to a "bulletin board" memory (or "database") contained in an ECU. One described use for this "bulletin board" memory, which is illustrated in Figure 6 of the patents, is to store information extracted from messages received from other network devices via a "remote message communication interface." *See, e.g.,* Ex. D ('477 patent) at 5:12-46. The specification describes that information is extracted from received messages by a "remote message process (706)," which uses "sub-process 804," described as a "bulletin board store procedure" to store variables in the "bulletin board." *Id.* at 6:28-41, 7:34-35, 7:52-53, Figs. 7-8.

The "bulletin board store procedure" includes a "request [for] the access right to the common resource, a section of the non-volatile or volatile memory, from the operating system." *Id.* at 7:52-57. This procedure, which the specification terms "explicit resource management," must take place "before data can be stored in the bulletin board." *Id.* The "bulletin board store procedure" is illustrated in Figure 10 of the specification:



FIGURE 10

As described in the patent and illustrated in Figures 8 and 10, before information extracted from received messages can be stored in the "bulletin board" memory there must be a "request" for the "BB [i.e., bulletin board] Resource," which corresponds to the "storage resource request" of the asserted claims. Thus, the specification is consistent with the patent claims in describing a "storage resource request" that is made in conjunction with the message being received by the ECU, as Defendants propose.

Stragent's proposed constructions should be rejected. First, Stragent's assertion that "no construction is required" fails to acknowledge that there is a genuine dispute between the parties regarding the scope of the claim language, especially since Stragent has not agreed that Defendants' description of the requirement of the claims is correct. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it.").

Second, Stragent's alternative proposal of "make a request in connection with a storage resource" improperly broadens the claim language, or is otherwise vague, because that language is inconsistent with the claims' express recital of a particular request—namely, a "storage resource request." Stragent's proposal is also inconsistent with the above-described disclosures in the specification, which make clear that the "request" is one for a "BB [bulletin board memory] Resource."

C.   **"determining whether a storage resource is available" ('765 patent, claims 12 and 24)**

| Defendants' Proposed Construction | Stragent's Proposed Construction |
|---|---|
| "determine the availability of a storage resource for a message in the automotive electronic control unit in conjunction with the message being received by the automotive electronic control unit" | No construction is required.<br><br>If construction is required, "ascertain or decide the availability of a storage resource" |

This term presents a dispute that is substantially the same as for the previous term, relating to whether the claims' recitation of "determining whether a storage resource is available" is made in conjunction with message being received by the ECU, as Defendants propose. The '765 patent claims and specification again confirm that Defendants' proposal is correct—the claimed "determining" step is performed "in conjunction with the message being received by the automotive electronic control unit."

Claims 12 and 24 of the '765 patent (Ex. A) are both directed to an automotive ECU that includes instructions for "receiving information associated with a message received" from a CAN or a Flexray network, "determining whether a storage resource is available," and "if the storage resource is available, storing the information utilizing the storage resource." Thus, the ECU performs the step of "determining whether a storage resource is available" so that it can decide whether to store the "information associated with a message" received by the ECU—i.e., the

"determining" step is performed in conjunction with the message being received by the ECU, as Defendants propose.

Defendants' proposed construction is also confirmed by the specification for the same reasons described in relation to the "issue a storage resource request" term. Specifically, the '765 patent describes the claimed "determining whether a storage resource is available" functionality in relation to the same "bulletin board" memory disclosure. When information is extracted from a received message by the "remote message process (706)" (Ex. D ('477 patent) at 5:12-46, 6:28-41, 7:24-38), the ECU performs a "bulletin board store procedure" that includes a request for access to a common resource (i.e., memory), and "[i]f the resource is available, the process gets the resource." *Id*. at 7:34-35, 7:52-58, Fig. 10. Information extracted from received messages is stored in the "bulletin board" memory if the ECU determines that the storage resource is available. *Id.* Thus, the specification is consistent with the patent claims in describing that the claimed "determining" step is made in conjunction with the message being received by the ECU, as Defendants propose.

### D. "re-trying an access in connection with the storage resource" ('765 patent, claims 12 and 24)

| Defendants' Proposed Construction | Stragent's Proposed Construction |
|---|---|
| "again determining whether a storage resource is available after a first determination that a storage resource is not available, for example by issuing another storage resource request in connection with the storage resource" | No construction is required.<br><br>If construction is required, "making another attempt to ascertain or decide the availability of a storage resource" |

Claim construction "aid[s] the decision-maker, by restating the claims in non-technical terms." *Abbott Labs. V. Sandoz Inc.*, 544 F.3d 1341, 1360 (Fed. Cir. 2008) (citing *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998)). Here, the language of the

claim term lacks the clarity needed for a jury to understand what "re-trying an access in connection with the storage resource" means.

Based on proposed constructions before the Court, the parties appear to agree that that "re-trying" means an attempted action must be done again ("another" or "again"), and that "trying an access" in connection with a storage resource requires determining whether the storage resource is available (i.e., to "ascertain or decide the availability of a storage resource" or "determining whether a storage resource is available"). And the parties also appear to agree because, even though the terms "trying" or "re-trying an access" do not appear in the specification, the specification describes a procedure for "determining whether the storage resource is available." *See, e.g.*, Ex. D ('477 patent) at Abstract (stating that the "system, method and computer program product . . . provided" involve "determining whether the storage resource is available for storing the information"). Indeed, the specification describes the procedure for accessing a storage resource as (1) "request[ing] the access right to a common resource," and (2) "[i]f the resource is not available, [the procedure] may try it again after a waiting period . . . until the resource is available." *See, id.*, 7:52–60; 8:12–19. Necessary to the process of "re-trying" access to a storage resource is a determination of whether the resource is available—otherwise, the process would only try once. This is confirmed by Figure 10 (below), which illustrates the process of storing a variable as requiring including the step of determining whether the resource is available—i.e., Operation 1002 for "BB Resource Available?" In fact, in reference to Figure 10, the specification clarifies that, if the procedure has exclusive access to the storage resources, the procedure "does not need" Operation 1002—*i.e.*, determining whether the resource is available. *Id.* at 8:4-8.



FIGURE 10

The patents refer to this as an explicit resource management. *See* Ex. D ('477 patent) at 7:52-57. By its construction, Stragent does not dispute that such explicit resource management is required by the claims.

However, the mutually agreed and specification-confirmed requirement that "re-trying an access in connection with the storage resource" includes the step of determining whether a storage resources is available is not apparent from the claim language itself. Accordingly, "re-trying an access in connection with the storage resource" must be construed to clarify the meaning of this phrase for a jury, and Stragent's non-construction must be rejected. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) ("The terms, as construed by the court, must 'ensure that the jury fully understands the court's claim construction rulings and what the patentee covered by the claims.'") (quoting *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004)). Accordingly, Defendants respectfully request that the term "re-trying an access in connection with the storage resource" be construed so that it is clear for the jury, and it should be construed as "again determining whether a storage resource is available after a first determination that a storage resource is not available, for example by issuing another storage resource request in connection with the storage resource."

**E.**   **"sharing the information" ('765 patent, claims 12, 24, 28, and 31; '790 patent, claims 1, 2, 5, 8, 9, 15, 16, 20, and 22-24; '036 patent, claims 1 and 102-103)**

| Defendants' Proposed Construction | Stragent's Proposed Construction |
|---|---|
| "making the information accessible, without requiring storage of the information" | "permitting the information stored in a storage resource to be used by another process" |

Independent asserted claims 12 and 24 of the '765 patent (Ex. A); claims 1 and 15 of the '790 patent (Ex. C); and claims 1 and 102 of the '036 patent (Ex. B) generally claim separate instructions for "sharing…information" and "storing…information" if certain conditions are met. Nothing in the plain language of the claims requires the information being "shar[ed]" to have first been "stor[ed];" in other words, nowhere does the plain language of the claims condition the "sharing" of information on a determination that a storage resource was available for storing that information. Ex. A ('765 patent) at 14:18–19, 16:43–44; Ex. C ('790 patent) at 13:1–2, 15:26–27; Ex. B ('036 patent) at 12:60–61, 18:66–67. Nowhere do the claims require "sharing the information" to necessarily include "storing the information." These are always recited as separate claim elements such that "sharing" information does not subsume the separately claimed "storing" of information. *See Cronos Techs., LLC v. Expedia, Inc.*, No. 13-1538-LPS, 2016 WL 3982309, at *6 (D. Del. July 22, 2016) ("The Court generally avoids constructions that render a claim limitation superfluous." (citation omitted)). As shown in the chart above, Defendants' construction accounts for the difference between "sharing the information" and "storing the information," as recited in the claims, while Stragent's does not.

The instrinsic evidence is consistent with the clear distinction between "sharing" and "storing" information. For example, the specification describes an ECU receiving input variables (e.g., information) that the ECU then shares with other ECUs either through multiplexing or through a gateway. Ex. D ('477 patent) at 3:8–14. Nowhere, though, does the specification describe

"storing" input variables or information as a prerequisite to "sharing" such variables or information. *See, e.g.*, Ex. D ('477 patent) at 3:15–28 (describing a process for information sharing without mentioning any storage requirement). Instead, the specification explicitly discusses storing and sharing information as separate processes. *Id.* at 3:25–28 ("In the context of the present description, such information may include data, a signal, and/or anything else **capable of** being stored and shared." (emphasis added)).

The PTAB likewise confirmed that "storing" and "sharing" are separate and distinct claim elements in finding every claim of the parent patents unpatentable in the IPR proceedings. *See Cronos*, 2016 WL 3982309, at *2 ("The prosecution history, which is 'intrinsic evidence, 'consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent.'") (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005)); *Jonsson v. Stanley Works*, 903 F.2d 812, 818 (Fed. Cir. 1990) ("[T]he prosecution history of the [parent] patent and the construction of the term 'diffuse light' contained in that patent, is relevant to an understanding of 'diffuse light' as that term is used in the [CIP] patent."); *cf. Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1333 (Fed. Cir. 2003)("[A]n interpretation asserted in the prosecution of a parent application can also affect continuation applications, . . . continuation-in-part applications, . . . and even related continuation-in-part applications arising from the same patent . . . ." (citations omitted)). For example, the PTAB found that "construction of 'sharing the information' does not require that the information be stored," and that "the description of 'information' as 'capable of being stored and shared' in the [] patent Specification is consistent with storage and sharing being **distinct concepts**."[3] IPR2017-00676, Paper No. 33 (Final Written Decision), attached as Exhibit E, at 18–19 (emphasis added)

---

[3]    IPR2017-00676 involved U.S. Pat. No. 8,209,705, which is a predecessor of those asserted here and shares an identical specification.

(further noting that "the inclusion of an embodiment in that Specification that does not appear to require storage of the shared information reinforces our conclusion."); *see also* IPR2017-00677, Paper No. 32 (Final Written Decision), attached as Exhibit F, at 20 (same, and further agreeing that "'the information is capable of being shared' does not encompass delivery of the information to storage, which is addressed in other limitations of [the claim], and need not be read into the limitation at issue."). Thus, consistent with the specification, the prosecution history supports a finding that "sharing" information, as claimed in the asserted patents, does not require "storing" information.

In view of these findings, the PTAB construed the "sharing the information" phrase, as recited in the claims of parent patents having the same specification as the patents-in-suit here, as "making the information accessible, but not requiring storage of the information." Ex. E (IPR2017-00676, Paper No. 33) at 19; *see also* Ex. F (IPR2017-00677, Paper 32) at 21. Indeed, the PTAB specifically rejected Stragent's attempt to limit "sharing" to information that has been stored because "the inclusion of an embodiment in that Specification that does not appear to require storage of the shared information." Ex. F (IPR2017-00677, Paper 32) at 20; *see also* IPR2017-01502, Paper No. 24, attached as Exhibit G, at 12; IPR2017-01519, Paper No. 32, attached as Exhibit H, at 17 ("Indeed, Petitioner identifies 'embodiments of the specification that share information not using a shared storage.' In particular, the Specification of the '843 patent describes 'horizontal information sharing in a hierarchical system' where output variables generated by an ECU are output to local actuators, which are connected via discrete signal lines or networked actuators connected via a multiplexing bus." (citations omitted)); *see Genuine Enabling Tech., LLC v. Sony Corp.*, No. CV 17-135, 2020 WL 1140910, at *7 (D. Del. Mar. 9, 2020) (considering PTAB's claim constructions).

The PTAB already rejected Stragent's proposed construction because it disregards the intrinsic evidence and improperly imports limitations from the specification into the claims. And even though Stragent may identify a reference in the specification to a "share storage system" (*see* Ex. D ('477 patent) at 7:1–8), this single description of a single embodiment is insufficient to mandate a conclusion that the claimed "sharing…information" requires that the information to be shared must first be successfully "stor[ed]." *Id.* at 6:62–64 ("One embodiment provides a new mechanism for creating an information interconnection between two or more heterogeneous communication networks."). Stragent's other apparent intrinsic support fairs no better, at best describing examples when information may be stored, but never dictating that "sharing" information, as claimed, requires first "storing" information. *See id.*, at 4:13-21; 5:59-6:2; 10:9-16. Regardless, there is no basis for importing these individual embodiments from the specification into the claims. *See MTD Prods. Inc. v. Iancu*, 933 F.3d 1336, 1342 (Fed. Cir. 2019) (quoting *Phillips*, 415 F.3d at 1323). Indeed, Stragent's proposed claim construction is simply an attempt to have the Court do what the PTAB refused to do: "read [the 'stored'] limitation into the claims" of its patents. D.I. 38 at 11 n.8. Stragent's attempts to inject a "storing" requirement into the separately claimed "sharing" element that does not refer back to, or otherwise require, the "information" to first be successfully stored, renders the separate "storing" element superfluous, and should be rejected. *See* Ex. E (IPR2017-00676, Paper No. 33 (Final Written Decision)) at 18–19; *see also* Ex. F (IPR2017-00677, Paper No. 32 (Final Written Decision)) at 20.

Thus, the term "sharing the information" should be construed as "making the information accessible, without requiring storage of the information."

### F. "configure the data structure of the nonvolatile memory" ('477 patent, claim 23)

| Defendants' Proposed Construction | Stragent's Proposed Construction |
|---|---|
| "make a change to the data structure of the non-volatile memory" | "allocate memory, and/or implement the relationships between the data elements and/or the allowable functions" |

The parties dispute what it means to "configure" the structure of the non-volatile memory in the context of the '477 patent. The Court should adopt Defendants' proposed construction because it is consistent with the meaning found in the intrinsic record.

The specification of the '477 patent discloses remotely updating an ECU's non-volatile memory. In doing so, the system may reconfigure its computing infrastructure based on newly stored parameters:

> Continuing with FIG. 17, in the configuration mode (1702), the system software and the information-sharing configuration can be updated via a secure communication link with encrypted commands [sic] Each processing node (ECU or gateway) may have security mechanisms such as a certificate that allows it to identify and authorize another entity (remote gateway, remote ECU, or development tool) to make changes to its bulletin board parameters.

> The remote entity may also download a new firmware to the bulletin board. The ECU or gateway can store this new firmware in its non-volatile memory while it backs up the original image on the bulletin board for the case that the new software is not functional. In the update mode, the distributed system can also reconfigure the communication and computing infrastructure based on a new set of parameters that need to be stored in the individual bulletin boards.

Ex. D ('477 patent) at 10:9-24. One of the purported enhancements of the '477 patent is that it changes the configuration of the system in a configuration or upgrade mode distinct from the system's normal operating mode, which allows for the predictable operation of the system:

> The concept that an embedded communication and computing network can run in multiple modes in order to provide for a guaranteed deterministic behavior of the system. This property can be achieved by only allowing change to the configuration and/or the functions (SW code) in a secured configuration and upgrade mode.

*Id.* at 11:28-33. Thus, Defendants submit that "configure" in this context should be construed to mean changing the data structure of non-volatile memory.

Plaintiff, on the other hand, contends that "configure" should be construed to mean "allocate memory" and/or "implement the relationship between the data elements and/or the allowable functions." The '477 patent, however, does not disclose these concepts. The '477 patent never uses the term "allocate memory." Although the '477 patent discloses creating relation links between variables in databases, it does not disclose doing so in the context of configuring the non-volatile memory. Accordingly, Plaintiff's proposed construction of this term introduces concepts not supported by the intrinsic record and should be rejected.

## III.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that their proposed constructions be adopted.

SHAW KELLER LLP

*/s/ Andrew E. Russell*

OF COUNSEL:

Lionel M. Lavenue
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER LLP
1875 Explorer Street, Suite 800
Reston, VA  20190
(571) 203-2700

R. Benjamin Cassady
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER LLP
901 New York Avenue, NW
Washington, DC   20001-4413
(202) 408-4000

Karen E. Keller (#4489)
Andrew E. Russell (#5382)
Nathan R. Hoeschen (#6232)
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com

*Attorneys for Defendants BMW of North America, LLC and BMW Manufacturing Co., LLC*

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*
_____

Jack B. Blumenfeld (#1014)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
cclark@morrisnichols.com

*Attorneys for Defendants Mercedes-Benz USA,*
*LLC, Mercedes-Benz Vans, LLC, Daimler*
*Trucks North America, LLC and Daimler*
*North America Corp.*

OF COUNSEL:

Edward J. DeFranco
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Jeffrey S. Gerchick
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, DC 20005
(202)-538-8000

Brett N. Watkins
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
711 Louisiana Street, Suite 500
Houston, TX 77002
(713) 221-7030


STAMOULIS & WEINBLATT, LLC

*/s/ Stamatios Stamoulis*
_____

Stamatios Stamoulis (#4606)
800 North West Street, Third Floor
Wilmington, DE 19801
(302) 999-1540
stamoulis@swdelaw.com

*Attorneys for Defendant*
*Volvo Car North America, LLC*

OF COUNSEL:

Lewis E. Hudnell, III
HUDNELL LAW GROUP P.C.
800 West El Comino Real, Suite 180
Mountain View, CA 94040
(650)564-7720

January 18, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on January 18, 2022, upon the following in the manner indicated:

Sean T. O'Kelly, Esquire                         *VIA ELECTRONIC MAIL*
George Pazuniak, Esquire
Thomas H. Kramer, Esquire
O'KELLY & ERNST, LLC
824 North Market Street, Suite 1001A
Wilmington, DE 19801
*Attorneys for Plaintiff*

Thomas F. Meagher, Esquire                       *VIA ELECTRONIC MAIL*
Alan Christopher Pattillo., Esquire
MEAGHER EMANUEL LAKS GOLDBERG
   & LIAO, LLP
One Palmer Square, Suite 325
Princeton, NJ 08542
*Attorneys for Plaintiff*

*/s/ Jack B. Blumenfeld*

_____

Jack B. Blumenfeld (#1014)