# EXHIBIT A

US009705765B2

(12) **United States Patent**
Fuchs et al.

(10) Patent No.: **US 9,705,765 B2**
(45) Date of Patent: **\*Jul. 11, 2017**

(54) **SYSTEM, METHOD AND COMPUTER PROGRAM PRODUCT FOR SHARING INFORMATION IN A DISTRIBUTED FRAMEWORK**

(71) Applicant: **Stragent, LLC**, Longview, TX (US)

(72) Inventors: **Axel Fuchs**, San Jose, CA (US); **Scott Sturges Andrews**, Petaluma, CA (US)

(73) Assignee: **Stragent, LLC**, Longview, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/405,088**

(22) Filed: **Jan. 12, 2017**

(65) **Prior Publication Data**

US 2017/0126524 A1    May 4, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 14/011,705, filed on Aug. 27, 2013, now Pat. No. 9,575,817, which is a continuation of application No. 13/531,319, filed on Jun. 22, 2012, now Pat. No. 8,566,843, which is a continuation of application No. 12/182,570, filed on Jul. 30, 2008, now Pat. No. 8,209,705, which is a continuation of application No. 10/737,690, filed on Dec. 15, 2003, now Pat. No. 7,802,263.

(60) Provisional application No. 60/434,018, filed on Dec. 17, 2002.

(51) **Int. Cl.**
*H04L 12/26* (2006.01)
*H04L 29/08* (2006.01)
*H04L 29/06* (2006.01)

(52) **U.S. Cl.**
CPC .............. *H04L 43/08* (2013.01); *H04L 43/04* (2013.01); *H04L 43/06* (2013.01); *H04L 67/02* (2013.01); *H04L 67/12* (2013.01); *H04L 65/102* (2013.01)

(58) **Field of Classification Search**
CPC ......... H04L 43/04; H04L 43/06; H04L 43/08; H04L 67/02; H04L 65/102
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,230,051 A | 7/1993 | Quan |
| 5,265,250 A | 11/1993 | Andrade et al. |
| 5,388,189 A | 2/1995 | Kung |
| 5,513,324 A | 4/1996 | Dolin, Jr. et al. |
| 5,588,002 A | 12/1996 | Kawanishi et al. .......... 370/462 |
| 5,666,485 A | 9/1997 | Suresh et al. |

(Continued)

OTHER PUBLICATIONS

Reinhard Maier, "Event-Triggered Communication on Top of Time-Triggered Architecture," Proceedings of the 21st Digital Avionics Systems Conference, vol. 2, 13.C.5-1-13.C.5-9 (Oct. 27-31, 2002).

(Continued)

*Primary Examiner* — Charles E Anya

(57) **ABSTRACT**

A system, method and computer program product are provided for receiving information associated with a message, issuing a storage resource request in connection with a storage resource and determining whether the storage resource is available. In use, the information is capable of being shared in less than one second, utilizing an automotive electronic control unit which includes a plurality of interfaces.

**31 Claims, 17 Drawing Sheets**



# US 9,705,765 B2
Page 2

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,737,529 | A | 4/1998 | Dolin, Jr. et al. |
| 5,923,846 | A | 7/1999 | Gage et al. |
| 5,941,947 | A | 8/1999 | Brown et al. |
| 5,956,489 | A | 9/1999 | San Andres et al. ......... 709/221 |
| 6,034,970 | A | 3/2000 | Levac et al. ................. 370/464 |
| 6,128,315 | A | 10/2000 | Takeuchi |
| 6,141,710 | A | 10/2000 | Miesterfeld ................. 710/100 |
| 6,185,466 | B1 | 2/2001 | Nicewonger |
| 6,289,390 | B1 | 9/2001 | Kavner ...................... 719/310 |
| 6,363,427 | B1 | 3/2002 | Teibel et al. |
| 6,378,001 | B1 | 4/2002 | Aditham et al. ............ 719/313 |
| 6,430,607 | B1 | 8/2002 | Kavner |
| 6,438,632 | B1 | 8/2002 | Kikugawa |
| 6,484,082 | B1 | 11/2002 | Millsap et al. |
| 6,725,348 | B1 | 4/2004 | Marier et al. |
| 6,801,942 | B1 | 10/2004 | Dietrich et al. ............ 709/225 |
| 6,941,510 | B1 | 9/2005 | Ozzie et al. |
| 7,103,045 | B2 | 9/2006 | Lavigne et al. ............ 370/392 |
| 7,103,646 | B1 | 9/2006 | Suzuki ...................... 709/220 |
| 7,103,656 | B2 | 9/2006 | Lewis et al. ............... 709/223 |
| 7,552,440 | B1 | 6/2009 | Stewart et al. ............. 719/312 |
| 7,950,017 | B1 | 5/2011 | Cain et al. |
| 2001/0018685 | A1 | 8/2001 | Saito et al. |
| 2002/0002586 | A1 | 1/2002 | Rafal et al. |
| 2002/0032856 | A1 | 3/2002 | Noguchi et al. |
| 2002/0047868 | A1 | 4/2002 | Miyazawa |
| 2002/0073243 | A1 | 6/2002 | Staiger ..................... 719/313 |
| 2002/0159460 | A1 | 10/2002 | Carrafiello et al. |
| 2002/0188691 | A1 | 12/2002 | Ignatius et al. |
| 2002/0191543 | A1 | 12/2002 | Buskirk et al. |
| 2002/0198943 | A1 | 12/2002 | Zhuang et al. |
| 2003/0061388 | A1 | 3/2003 | Cleghorn et al. |
| 2003/0074474 | A1 | 4/2003 | Roach et al. |
| 2003/0088568 | A1 | 5/2003 | Matsunaga et al. |
| 2003/0154116 | A1 | 8/2003 | Lofton |
| 2003/0236894 | A1 | 12/2003 | Herley |
| 2004/0003087 | A1 | 1/2004 | Chambliss |
| 2006/0155867 | A1 | 7/2006 | Kilian et al. |
| 2006/0155907 | A1* | 7/2006 | Yoshida ................. G06F 13/24 710/260 |
| 2007/0101206 | A1* | 5/2007 | Brabant .............. G06F 11/0757 714/25 |
| 2010/0333096 | A1 | 12/2010 | Dice et al. |
| 2011/0047218 | A1 | 2/2011 | Nojima et al. |
| 2011/0047310 | A1 | 2/2011 | Bonola |
| 2012/0029898 | A1 | 2/2012 | Carroll et al. |
| 2013/0111299 | A1 | 5/2013 | Hashimoto et al. |

OTHER PUBLICATIONS

William Wong, "Software and Hardware Standards Help, But In-Vehicle Network Growth Will Be Conservative: CAN networks and OSEK/VDX compatible operating systems will drive tomorrow's vehicles," Electronic Design, vol. 49, issue 1, 62 (Jan. 8, 2001).

OSEK/VDX Network Management Concept and Application Programming Interface, Version 2.51 (May 31, 2000).

Brad Johanson, Armando Fox, Pat Hanrahan, Terry Winograd, "The Event Heap: An Enabling Infrastructure for Interactive Workspaces," White Paper, Stanford University, Stanford, CA 1999.

Berwanger et al "FlexRay—The Communication System for Advanced Automotive Control Systems" 2001-01-0676, SAE 2001 World Congress, Mar. 5-8, 2001.

Bosch, "CAN Specification Version 2.0" Sep. 1991.

Clarke et al "Formal Verification of Autonomous Systems NASA Intelligent Systems Program" Carnegie Mellon University, Sep. 25, 2001.

Courtois et al "Concurrent Control with 'Readers' and 'Writers'" Communications of the ACM, vol. 14, No. 10, Oct. 1971.

Fredriksson, Lars-Berno "Controller Area Networks and the Protocol can for Machine Control Systems" Mechatronics vol. 4, No. 2, pp. 159-172, 1994.

Hernandez et al "Algorithms and architectures for real-time control 2000," Proceedings volume from the 6th IFAC Workshop, Palma de Mallorca, Spain, May 15-17, 2000.

Kirrmann et al. "The IEC/IEEE Train Communication Network," IEEE Micro, Mar.-Apr. 2001.

Koopman, Philip "Control Area Network (CAN)" 18-540 Distributed Embedded Systems, Presentation Slides, Oct. 4, 2000.

Leen et al, "Digital networks in the automotive vehicle," Computing and Control Engineering 10(6):257-266, Jan. 2000.

IEEE "The Authoritative Dictionary of IEEE Standards Terms" 7th Ed., IEEE Press, 2000.

IEEE "IEEE Standard for Information Technology—Portable Operating System Interface (POSIX®)—Part 1: System Application Program Interface (API)—Amendment d: Additional Realtime Extensions," IEEE Std 1003.1d-1999 (Amendment to IEEE Std 1003.1-1990), Jun. 16, 2000.

Mellor-Crummey et al. "Algorithms for Scalable Synchronization on Shared-Memory Multiprocessors," ACM Transactions on Computer Systems, vol. 9, No. 1, Feb. 1991, pp. 21-65.

Jagannathan et al. "Blackboard Architectures and Applications," vol. 3, Academic Press Inc., 1989, 524 pages.

SAE International, "Surface Vehicle Standard—SAE J1850" Rev May 2001.

Intelligent Transportation Systems Standards, United States Department of Transportation "SAE J2366—Family of ITS Data Bus (IDB) Protocol Standards," (online fact sheet written Jul. 12, 2006), available at https://www.standards.its.dot.gov/Factsheets/PrintFactsheet/56.

SAE International, "Surface Vehicle Recommended Practice—SAE J2366-1" Nov. 2001.

SAE International, "Surface Vehicle Recommended Practice—SAE J2366-2" Nov. 2001.

Schill, John "An Overview of the CAN Protocol," Embedded Systems Programming, Sep. 1997, pp. 46-62.

Stewart et al., "Integration of Real-Time Software Modules for Reconfigurable Sensor-Based Control Systems," Proceedings of the 1992 IEEE/RSJ International Conference on Intelligent Robots and Systems, Jul. 7-10, 1992.

Tanenbaum, Andrew S. "Computer Networks," 3rd Ed., Prentice Hall, Inc, 1996, pp. 1-76 (Introduction).

Tanenbaum, Andrew S. "Modern Operating Systems," 2nd Ed., Prentice Hall, Inc., 2001, excerpts from Chapters 2, 7, 8, and 10.

Upender et al., "Embedded Communication Protocol Options," Proceedings of the Fifth Annual Embedded Systems Conference, vol. 2, Miller Freeman, Inc., 1993.

Wargui et al. "Application of Controller Area Network to Mobile Robots," IEEE, Electrotechnical Conference, May 16, 1996, p. 205-207.

Wense et al. "Building Automotive LIN Applications," pp. 279-292, found as part of Krueger et al., "Advanced Microsystems for Automotive Applications 2001," Springer, 2001.

"An Embedded Software Primer," David E. Simon, 1999.

"Application of In-Vehicle Data Buses for Collision Avoidance Systems," William D. Horne, et al., 1998.

"The Foundation.TM Fieldbus Primer," Fieldbus Inc., Jun. 24, 2001.

"GSA Guide to Specifying Interoperable Building Automation and Control Systems Using ANSI/ASHRAE Standard 135-1995," Steven T. Bushby et al., Nov. 1999.

"Programming in the OSEK/VDX Environment," Joseph Lemieux, 2001.

"OSEK/VDX Binding Specification Version 1.3," OSEK Group, Sep. 17, 2001.

"OSEK/VDX Binding Specification Version 1.4," OSEK Group, Sep. 6, 2002.

"OSEK/VDX Binding Specification Version 1.4.1," OSEK Group, Jan. 21, 2003.

"OSEK/VDX Communication Specification Version 2.2.2," OSEK Group, Dec. 18, 2000.

"OSEK/VDX Communication Specification Version 3.0," OSEK Group, Jul. 26, 2002.

"OSEK/VDX Communication Specification Version 3.0.1," OSEK Group, Jan. 29, 2003.

# US 9,705,765 B2

Page 3

(56)                **References Cited**

OTHER PUBLICATIONS

"OSEK/VDX Communication Specification Version 3.0.2," OSEK Group, Dec. 9, 2003.

"OSEK/VDX Fault-Tolerant Communication Specification Version 1.0," OSEK Group, Jul. 24, 2001.

"OSEK/VDX Network Management Concept and Application Programming Interface Version 2.5.0," OSEK Group, May 31, 1998.

"OSEK/VDX Network Management Concept and Application Programming Interface Version 2.5.1," OSEK Group, May 31, 2000.

"OSEK/VDX Network Management Concept and Application Programming Interface Version 2.5.2," OSEK Group, Jan. 16, 2003.

"OSEK/VDX OSEK Implementation Language Specification Version 2.3," OSEK Group, Sep. 10, 2001.

"OSEK/VDX OSEK Implementation Language Specification Version 2.4," OSEK Group, Dec. 2, 2002.

"OSEK/VDX OSEK Implementation Language Specification Version 2.4.1," OSEK Group, Jan. 23, 2003.

"Goals and Motivation: What is OSEK/VDX," OSEK VDX Portal, 2012.

"OSEK/VDX OSEK Run Time Interface Part A: Language Specification Version 2.1," OSEK Group, Jul. 16, 2001.

"OSEK/VDX OSEK Operating System Specification Version 2.0 revision 1," OSEK Group, Oct. 15, 1997.

"OSEK/VDX OSEK Operating System Specification Version 2.1 revision 1," OSEK Group, Nov. 13, 2000.

"OSEK/VDX OSEK Operating System Specification Version 2.2," OSEK Group, Sep. 10, 2001.

"OSEK/VDX OSEK Operating System Specification Version 2.2.1," OSEK Group, Jan. 16, 2003.

"OSEK/VDX Time-Triggered Operating System Specification Version 1.0," OSEK Group, Jul. 24, 2001.

* cited by examiner



FIGURE 1



FIGURE 2



FIGURE 3



FIGURE 4



FIGURE 5



FIGURE 6



FIGURE 7



FIGURE 8



FIGURE 9



FIGURE 10



FIGURE 11



FIGURE 12



FIGURE 13



FIGURE 14



FIGURE 15



FIGURE 16



FIGURE 17

US 9,705,765 B2

**1**

# SYSTEM, METHOD AND COMPUTER PROGRAM PRODUCT FOR SHARING INFORMATION IN A DISTRIBUTED FRAMEWORK

## RELATED APPLICATION(S)

This application is a continuation of U.S. patent application Ser. No. 14/011,705 filed Aug. 27, 2013, which is a continuation of U.S. patent application Ser. No. 13/531,319 filed Jun. 22, 2012, now U.S. Pat. No. 8,566,843, which is a continuation of U.S. patent application Ser. No. 12/182,570 filed Jul. 30, 2008, now U.S. Pat. No. 8,209,705, which is a continuation of U.S. patent application Ser. No. 10/737,690 filed Dec. 15, 2003, now U.S. Pat. No. 7,802,263, which, in turn, claims priority under 35 U.S.C. §119 based on U.S. Provisional Application No. 60/434,018 filed Dec. 17, 2002, all of which are incorporated herein by reference.

## FIELD AND BACKGROUND OF THE INVENTION

The present invention relates to the field of distributed control and monitoring systems that may include certain temporal behavior.

Such technology may optionally apply to electronic vehicle communication and control systems, real-time monitoring systems, industrial automation and control systems, as well as any other desired system.

## SUMMARY OF THE INVENTION

A system, method and computer program product are provided for sharing information in a distributed system. After information is received, it is stored on a bulletin board. In use, the information is shared, in real-time, among a plurality of heterogeneous processes.

In one embodiment, both past and present instances of the information may be stored on the bulletin board. As an option, the information may be replicated among a plurality of the bulletin boards. Optionally, first information may be processed utilizing a first bulletin board and stored utilizing a second bulletin board. Still yet, the bulletin boards may be hierarchical.

In another embodiment, the processes may access multiple sections of the bulletin board. Further, the bulletin board may send notifications to the processes based on a state of the information on the bulletin board.

Optionally, the information may include variables. For example, the information may include input variables, output variables, etc. Moreover, the processes may include local processes, remote processes, etc. Still yet, the processes may include event triggered processes and/or time triggered processes. In use, each of the processes may process the information in a manner that is isolated from temporal characteristics associated with the network.

In still another embodiment, the information may be extracted from a message received by a bulletin board manager. Moreover, the information may be converted from a signal received by a bulletin board manager. Even still, the information may be shared in a single task, may be shared according to a schedule, and/or may be shared with an operating system. Optionally, dynamic preemptive scheduling may be provided. Also, the information may be shared across the communication network with only a portion of a

**2**

message header that is needed for a specific communication link while other communication links may use a different message header.

As a further option, resources in the network may be protected. Specifically, the resources in the network may be protected utilizing a schedule that allows information sharing utilizing the bulletin board. In another embodiment, the resources in the network may be protected utilizing semaphores.

In even still another embodiment, the information may be shared according to an internal clock, an external clock, etc. During operation, objects may be generated based on a change of state of the information stored in the bulletin board. Such objects may include, but are not limited to flags, events, signals, interrupts, etc. Still yet, the information may be stored in response to interrupts associated with the processes.

In use, the bulletin board may update the processes with information at a first rate that differs from a second rate with which the processes send the information to the bulletin board. Optionally, the bulletin board may be accessed with guaranteed access times, jitter, and bandwidth.

In addition, the bulletin board may be updated irregularly and triggered by internal or external objects including, but not limited to flags, events, signals, interrupts, etc. Event triggers may be provided independent of a link connection between nodes where the processes are carried out. Moreover, failure redundancy may be provided through multiple independent links across diverse physical connections.

As yet another option, the information may have a user-configured constraint associated therewith. Such constraint may include a memory constraint, a real-time constraint, etc. As a further option, the constraint may be configured utilizing a tool.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram of an embodiment of a system of one embodiment;

FIG. **2** is a block diagram generally depicting an embodiment of an ECU as part of the system illustrated in FIG. **1**;

FIG. **3** is a block diagram generally depicting an embodiment of a Gateway device as part of the system illustrated in FIG. **1**;

FIG. **4** is a block diagram of an embodiment of the software architecture assumed for one embodiment.

FIG. **5** is a block diagram of an embodiment of the middleware that contains the methods of one embodiment.

FIG. **6** is a block diagram of an embodiment of the bulletin board that describes the process interaction of one embodiment.

FIG. **7** is a block diagram of an embodiment of the bulletin board that describes the process interaction with multiple external communication buses as part of one embodiment.

FIG. **8** is a flow chart diagram of an embodiment of the variable store from remote I/O method of one embodiment.

FIG. **9** is a flow chart diagram of an embodiment of the variable store from local I/O method of one embodiment.

FIG. **10** is a flow chart diagram of an embodiment of the variable method of one embodiment.

FIG. **11** is a flow chart diagram of an embodiment of the variable retrieve method of one embodiment.

FIG. **12** is a flow chart diagram of an embodiment of the application process using the method of one embodiment

US 9,705,765 B2

3

FIG. **13** is a flow chart diagram of an embodiment of the local I/O update from bulletin board method of one embodiment.

FIG. **14** is a flow chart diagram of an embodiment of the variable replication method of one embodiment.

FIG. **15** is a flow chart diagram of an embodiment of the message store from remote gateway method of one embodiment.

FIG. **16** is a flow chart diagram of an embodiment of the message forward to remote ECU or Gateway method of one embodiment.

FIG. **17** is a state transition diagram of an embodiment of the mode switching method of one embodiment.

DETAILED DESCRIPTION

FIG. **1** is a block diagram generally depicting elements of an embodiment of the present distributed embedded communication and computing system. The system architecture may be situated in automotive electronics or industrial control and monitoring systems. In an automotive environment, the various Electronic Control Units (ECUs, **102**) control complex applications such as engine control, brake control, or diagnostics. They are either connected to sensors and actuators via discrete links or simple standard functions such as sensors and actuators are organized into separate sub networks.

These complex functions such as braking, engine-control, etc. are then grouped into the backbone system functions for the car, such as body control, power train and chassis. The backbone also includes the vehicle's high level functions such as diagnostics, telematics and entertainment systems.

Therefore the system is typically hierarchically organized and includes a variety of gateways (**101,104,105**), which relay messages up and down through the system layers. Each layer may contain multiple electronic control units (ECU, **102**) that are connected through wired serial multiplexing bus-systems such as Controller Area Network (CAN or ISO11898), Flexray, LIN, J1850, J1708, MOST, IEEE1394, and other similar serial multiplexing buses or through wireless multiplexing systems such as IEEE802.11, IEEE802.15, Bluetooth, Zigbee, or similar other wireless links.

Typically, functions provided by an ECU (**102**) are bound to hard real-time temporal behavior. In the context of the present description, real-time may include any response time that may be measured in milli- or microseconds, and/or is less than 1 second.

The ECU may receive a set of real-time input variables from local sensors (**108**), which are connected via discrete signal lines (**113**), or from networked sensors (**106**), which are connected through a multiplexing bus-system (**112**). The ECU may also share variables with other ECUs (**102**) that are either connected on the same physical multiplexing bus or that it can reach through a gateway (**101,103,104**).

Then the ECU (**102**) processes the input variables and generates a set of output variables that are either shared with other ECUs (**102**) as described above, or which are output to local actuators (**109**), which are connected via discrete signal lines (**113**), or to networked actuators, which are connected through a multiplexing bus (**112**). ECUs (**102**) typically share information with devices that are connected on the same physical multiplexing system. This method of information sharing is called horizontal information sharing in a hierarchical system. Gateways (**101,103,104**) link multiple physical multiplexing systems together. In the context of the

4

present description, such information may include data, a signal, and/or anything else capable of being stored and shared.

The highest level in the hierarchical system is the system level. The system level gateway (**101**) may be connected to ECUs on the system level multiplexing bus (**117**), to subsequent gateways (**103**) that also link to subsequent communication buses (**110**), and to external components (**120**) that may contain diagnostics devices (**121**), development tools (**122**), other add-on devices (**123**) or other instances of distributed embedded communication and computing systems (**100**). In addition, the system gateway (**101**) may also be connected to an external gateway (**131**) that may link the system to a remote device (**132**) through wireless or wired wide-area-networks such as the Internet, using standard protocols such as UDP/IP, TCP/IP, RTP, HTTP, SOAP, JAVA, etc. or nonstandard proprietary protocols.

Subsequent to the system level may be several layers of groups and subgroups that are link to the higher levels via gateways (**101,103,104,105**).

During the design-time of the system, not all ECUs may exist. Therefore, the development tool (**122**) may provide a plug-in component or virtual ECU/GW (**115**) that directly links into the wired multiplexing bus or wireless network (**110**) and also allows for separate control functions via a tool-link (**116**).

The block diagram in FIG. **2** depicts the detailed elements within a generic ECU (**200**) that is one embodiment of ECU (**102**). The ECU (**200**) typically contains a micro-processor (**201**), volatile memory (**204**) such as RAM, S-RAM or similar, non-volatile memory (**203**) such as EEPROM, FLASH, etc., a real time clock for internal timing of processes (**205**), a watchdog (**206**) to maintain the health of the system, one or more communication bus controllers (**207**) with associated drivers (**208**), digital I/O (**209**) with line drivers (**210**), and analog I/O (**211**) with associated analog signal conditioning (**212**).

In an alternate embodiment, the ECU (**200**) may also contain a wireless communication controller (**311**) and a RF-Front-end (**312**) as outlined in FIG. **3**. The software (**202**) can either be stored in local non-volatile memory (**203**) or partially downloaded via the communication link (**207,208**) and stored in the volatile memory. The software is then executed in the microprocessor (**201**).

The block diagram FIG. **3** depicts the detailed elements within a generic gateway (**300**) that is one embodiment of Gateway (**101,103,104,105**) in FIG. **1**.

FIG. **4** outlines one embodiment of the software architecture in an embedded system. The hardware abstraction layer (**405**) allows the system developer to adapt a standard operating system to a specific hardware as used in an ECU (**200**) or gateway (**300**). The hardware abstraction layer (**405**) adapts the real-time operating system (**403**) and the device drivers (**404**) to a specific hardware implementation.

One embodiment includes the middleware (**402**) that has direct access to the real-time operating system (**403**), the device drivers (**404**) and the hardware abstraction layer (**405**). The middleware isolates the application from input/output functions and allows multiple applications to share common variables locally. In addition, the middleware lets applications share variables with remote applications/processes. In the context of the present description, a process may refer to any hardware and/or software operation, etc.

In one embodiment, the middleware can directly interface with the input/output mechanisms of the hardware without utilizing an operating system (**403**) or hardware abstraction layer (**405**).

US 9,705,765 B2

5

Another embodiment of the middleware utilizes a pre-emptive multitasking operating system with explicit control of resources. In an alternate embodiment, the middleware can be built with a static multitasking scheme with implicit resource management or be part of a single task system.

Referring now to FIG. 5, the middleware (402) contains the bulletin board manager (501), a local signal communication interface (503), a remote message communication interface (504), and an application programming interface (502). The application interface (502) provides methods and data interfaces to a plurality of applications. In one embodiment, the application interface is an object library that can be linked to an application at design time.

The bulletin board manager (501) contains an upgrade and configuration manager (507), an event manager (505), a data access manager (508), and a data integrity watchdog (506). The upgrade and configuration manager (507) is necessary to configure the data structure of the bulletin board and to make executable code available to individual processing nodes. In the context of the present description, the bulletin board may refer to any database that enables users to send and/or read electronic messages, files, and/or other data that are of general interest and/or addressed to no particular person/process.

The access manager provides access control mechanisms for the code update and configuration mode. It also may control access rights for individual applications at execution time in the run mode.

The event manager (505) captures input-output events as variables and generates new events, flags, or signals based on operations on state variables in the bulletin board. Such operations may include test of maximum values, the occurrence of logically combined events, the result of an integrity check, or events and signals that are created based on any other logical or arithmetic computation on the state variables that are stored in the bulletin board. The actual processing of data and manipulation of data may be done in the application that uses the middleware (402). The data integrity watchdog analyses the stored state variables for its integrity and generates events or flags if any problem occurs.

The local signal communication interface (503) interfaces with the local discrete input/output hardware to update the bulletin board with new variables and to update the input/output interfaces with the state variables from the bulletin board. It also converts state variables to input/output signals and input/output signals to state variables that can be stored in the bulletin board. The conversion process may contain scaling of signals as well as offset compensation. Typically this processing helps to convert I/O signals that are measured in Volt to a physical entity and vice versa. The communication with the local discrete input output system can be triggered by events or signals can be sampled time-triggered based on a cyclic global or local time base.

The remote message communication interface (504) interfaces to serial multiplexing interfaces (buses) that are connected to the specific processing node (ECU or Gateway). It extracts variables from a plurality of messaging protocols and stores them in the database. It also replicates local bulletin-board state variables to the associated processing nodes by composing the appropriate messages for each communication link. The message transfer can be initiated triggered by a bus event, by a local event, or by a time-triggered mechanism that uses a cyclic local or global time base.

FIG. 6 shows the concept of an extended bulletin board or an embedded real-time database (601). In this embodiment the ECU (102) or the Gateway (101) hosts one or multiple

6

bulletin boards with relational links between the variables in the bulletin boards. The relations are defined by data processing functions that the gateway can operate on bulletin boards to obtain new information that can be stored in yet another bulletin board.

The bulletin board (601) may contain but is not limited to events (607), real-time variables (608), diagnostics data (609), configuration parameters (610), and firmware (611) to upgrade individual components of the executable code or the entire software of a processing node. Each type of information may include one or more sections so that individual processes are not blocked if they access separate sections of data.

The memory of the bulletin board is subdivided into areas that nodes on each external network can read from and write into and other areas that an external network may only read from. The data contained in the bulletin board may be stored in volatile or non-volatile memory. Each data entry may consist of one value or an array of values that also may represent a time series.

In one embodiment, each application process (603), local signal communication process (605), remote message communication process, and the bulletin manager (602) can individually access the bulletin board using operating system functions for resource management that may include semaphores, events, signals, call-back routines, flags, etc. in an alternate embodiment of the system the bulletin-board manager controls all interaction with the bulletin-board and all applications have to pass data to the bulletin-board manager. This approach simplifies the interaction with the bulletin board, but adds delay time and jitter to the state variables.

At design time, various hierarchies of memory management can be applied. In practice it is more efficient to allow each sub network and subsystem to place system variable data into local bulletin boards. This is because many system variables are primarily used only within their subsystem or sub network. By placing local information in a shared memory (local bulletin board), it can be used by multiple processes on this processor node. A group bulletin board allows devices on a sub-network to share information with a minimum of network traffic. A system bulletin board allows access to system-wide variables and information.

FIG. 7 illustrates the logical architecture of the interconnection between three heterogeneous network controllers (702, 703, 704), the associate Operating System interfaces (705), the remote message communication process (706), the bulletin board (608), and the application process (606). The connection to each communication controller is fundamentally implemented at the physical interface (the wire, fiber or electromagnetic wireless interface). Each of the higher level layers (data link, network, etc) in the communication interface (705) deals with specific features of the individual communication process. In practice these layers are typically represented in a message by "header" bits that contain information about that layer of the network being used to send the message.

Using this model, each communicated message may be processed at each layer to remove (and use) the associated header information for that level. Once all layers are processed the remaining packet data unit (PDU) represents the datum or core information carried by the overall message. In one embodiment, each communication controller has an associated communication interface and an associated remote message conversion mechanism. For instance com-

US 9,705,765 B2

7

munication bus controller **2** (**703**) has an associated communication interface **2** (**709**), and an associated remote message conversion **2** (**710**).

This arrangement allows the remote message process (**706**) to directly access information at the data link layer and interface it with the bulletin board. A network layer is not necessary. The remote message communication process (**706**) has a multi-network access interface (essentially a processing capability that can interpret and apply the header information for a variety of networks) and the bulletin board read/write memory access. Now, the individual processing nodes do not need to know about the existence of multiple networks. Each variable can be accessed from all connected physical networks in their proprietary format. Thus the normalization of the information has only to be handled at the gateway through replication of stored data to multiple attached networks.

Continuing with FIG. **7**, the communication procedure is described. In the given example, an external event (**701**) on communication controller **2** (**703**) triggers the operating system to notify the remote message communication process (**706**) that data is available. The notification may be a flag, a call-back routine, an event, or any other operating signal. The associated remote message conversion method **2** (**710**) extracts the data (e.g. real time variables) from the message PDU and stores the data in the bulletin board (**608**). It may also store the associated event as variable in the bulletin board and signal the bulletin-board event manager that new data is available.

The bulletin event manager then notifies the application process (**606**) with the appropriate mechanism. In addition, the event manager may trigger the sampling of local signals using the local signal communication process (**605**) described in FIG. **6**. Finally the bulletin event manager may trigger the bulletin board manager (**707**) to perform integrity checks or generate additional events based on the change of the state variables.

One embodiment provides a new mechanism for creating an information interconnection between two or more heterogeneous communication networks. In the context of the present description, heterogeneous networks may refer to any different communication networks with at least one aspect that is different.

The approach uses a common, or shared storage system that is connected to all of the system networks through network interfaces. A critically important feature of the bulletin board approach is that the complexity of the bulletin board grows linearly with the number of networks (as opposed to as N(N−1) for the gateway approach), and in one-to-many situations the number of message transformations is half that of the standard networking approach.

In an alternate embodiment of the remote message communication process (**706**) any remote process can access data via a single network interface. This approach requires a network layer in each processing node and therefore adds overhead to communications. To communicate between two heterogeneous networks, this process may then be repeated in reverse by adding back the header information for the various layers of the second network, and eventually putting the message onto the second network's physical link. The remote message communication manager (**706**) then can be simplified to only one message assembly and disassembly mechanism.

FIGS. **8-17** illustrate the method of operation of one embodiment of the present system, and also refer to aspects and elements one embodiment shown in FIGS. **1** through **7**.

8

FIG. **8** details the remote messaging process (**706**) described in FIG. **7**. Referring now to FIG. **8**, the core process of storing data from remote processes that are communicated through multiplexed communication links, into the bulletin board is described. An external notification or task activation starts the process. Then a message (**802**) is received from the operating system layer.

In an alternate embodiment, the message is directly copied form the input register of the communication controller. Then the process extracts variables from the message. Additional signal adaptation may be necessary. The sub-process **804** stores the variables in the bulletin board. If the process only updates one section of the bulletin board it waits for the next message notification (**806**). If variables in multiple sections need to be updated, the process repeats (**804**).

FIG. **9** shows the data update from local input/output peripherals. The process starts with an internal or external notification or task activation. Typically this process is repeated cyclic triggered by an internal or external real-time clock. When the process is activated, it samples or polls the local input ports that may include analog and digital signals (**902**). Then it converts these signals to real-time variables by using the conversion parameters stored in the bulletin board. The signal conditioning parameters van either be defined at design time or adaptively updated by the application process. Then the process stored the new state variables in the bulletin board using the sub-process (**804**) described above.

FIG. **10** describes the bulletin board store procedure (**804**) in more detail. Before new data can be stored in the bulletin board, the procedure has to request the access right to the common resource, a section of the non-volatile or volatile memory, from the operating system (**1001**). This is called explicit resource management.

If the resource is available, the process gets the resource. If the resource is not available, it may try it again after a waiting period (**1011**) until the resource is available. After a certain time has elapsed (**1009**) beyond a configurable threshold, the temporal behavior of the state variable can't be captured any longer and the middle-ware may send an error notification to the associated process.

After reserving the resource (**1003**), the bulletin board store mechanism (**804**) timestamps the state variable for future temporal reference (**1004**). Then, the bulletin board store procedure (**804**) copies the variables or parameters from its private memory (**1006**) to the shared bulletin-board memory (**601**). Then it releases the bulletin board resource.

In an alternate embodiment, the bulletin board store procedure (**804**) has exclusive access to the bulletin board (**601**) and does not need operations **1002**, **1003**, **1007**, **1009**, **1010**, and **1011** because the resource access is realized through implicit resource management. This can be achieved with either static task scheduling or by allowing only the bulletin board store procedure (**804**) to access the bulletin board (**601**).

FIG. **11** describes the bulletin board retrieve procedure (**1101**) in more detail. Before data can be retrieved from the bulletin board, the procedure has to request the access right to the common resource, a section of the non-volatile or volatile memory, from the operating system (**1102**).

If the resource is available, the process gets the resource. If the resource is not available, it may try it again after a waiting period (**1109**) until the resource is available. After a certain time has elapsed (**1109**) beyond a configurable threshold, the temporal behavior of the state variable can't be captured any longer and the middle-ware may send an error notification to the associated process (**1110**).

US 9,705,765 B2

9          10

After reserving the resource (**1104**), the bulletin board retrieve mechanism (**1101**) copies the variables or parameters from the shared bulletin-board memory (**601**) to its private memory (**1006**). Then, it releases the bulletin board resource.

In an alternate embodiment the bulletin board retrieve procedure (**1101**) has exclusive access to the bulletin board (**601**) and does not need operations **1103**, **1104**, **1106**, **1108**, **1109**, and **1110**. Because the resource access is realized through implicit resource management, this can be achieved with either static task scheduling or by allowing only the bulletin board retrieve procedure (**1101**) to access the bulletin board (**601**).

Referring to FIG. **12**, the application process (**1200**) utilizes the bulletin board retrieve mechanism (**1101**) to access all parameters, events, and real-time variables from the bulletin board. Thus the application process is decoupled from the temporal behavior of the input/output variables and can be triggered by a plurality of events (**1201**).

The application process may retrieve one or multiple sets of variables stored in a plurality of memory sections. Then the application process processes the variables (**1203**) with its method. Because the method is not tied to the location of the input/output variables, the application process can be moved or replicated to a plurality of processing nodes (ECUs or Gateways). After processing the input variables and generating a set of output variables, the application process uses the bulletin board store method (**801**) to update one or a plurality of memory sections in the bulletin board. If the application process is a cyclic procedure, it waits until the next activation occurs (**1205**).

Continuing with FIG. **13**, the update local I/O from bulletin board process (**1300**) utilizes the bulletin board retrieve mechanism (**1101**) to access real-time variables from the bulletin board and convert them to output signals (**1302**) that can be written to the output port (**1303**). The I/O update process may retrieve one or multiple sets of variables stored in a plurality of memory sections. If the I/O update process is a cyclic procedure, it waits until the next activation occurs (**1305**).

FIG. **14** describes the data replication process (**1400**). This process can be triggered by a plurality of notification mechanisms, such as events, alarm signals, internal and external timers, and flags set in the bulletin board. It then selects a subset of variables to be replicated and a communication port (**1402**). Next it retrieves the variables from the bulletin board with mechanism (**1401**) and assembles the messages for the specific communication link (**1403**). The message may include an address or identification number for all bulletin boards and associated processing nodes (ECUs and Gateways).

Finally, it writes the messages to the communication port (**1404**). In an alternate embodiment, it handles the messages to the associated interface procedure of the operating system. Then it repeats the procedure, until all variables are updated on all communication ports. If the data replication process is a cyclic procedure, it waits until the next activation occurs (**1405**).

Referring now to FIG. **15**, the store message from remote processing node (gateway or ECU) process (**1500**) describes how replicated data is stored in the bulletin board. This process can be triggered by a plurality of notification mechanisms, such as internal or remote events, alarm signals, internal and external timers, and flags set in the bulletin board. The communication bus may also issue these notifications. The process (**1500**) then reads a message from the communication port (**1502**), selects a subset of variables to be replicated (**1503**), and stores the variables in the bulletin board with procedure (**801**). In an alternate embodiment, this procedure may also be used to store a packet data unit (PDU) in the bulletin board for later replication on the same or a different communication link.

This store and forward networking mechanism can be implemented without the need for complex networking protocols and is therefore well suited for limited processing power and memory environments. It also works in soft-real time environments when no strict temporal behavior is required. The data store operation (**801**) may be repeated for a plurality of bulletin board sections. If the data replication process is a cyclic procedure, it waits until the next activation occurs (**1505**).

Continuing now with FIG. **16**, the store and forward updating mechanism (**1600**) replicates messages from remote processing nodes to other processing nodes from stored packet data units in the bulletin board. This process can be triggered by a plurality of notification mechanisms (**1601**), such as internal or remote events, alarm signals, internal and external timers, and flags set in the bulletin board. The communication bus may also issue these notifications.

The process (**1600**) then selects a message to be forwarded (**1602**) and the appropriate communication link and retrieves the PDU with the bulletin board retrieve mechanism (**1101**). It then adds the appropriate messages header for the communication link (**1603**) and may add routing information (**1604**). Finally the update process (**1600**) writes the messages to the communication port (**1605**). If the updating process is a cyclic procedure, it waits until the next activation occurs (**1607**).

FIG. **17** describes the various modes that the distributed communications and computing system (**100**) can be operated in. In one embodiment, the system operates in various distinct modes in order to preserve the integrity of the system and still allow for changing the architecture and behavior of the network or the roles of the individual nodes. When the distributed computing and communication system wakes up from the sleep mode (**1701**), it can enter a configuration and upgrade mode (**1702**), an emergency or debug mode (**1704**), or the normal real-time run mode (**1703**). The root node or system gateway in a distributed communication and computing system defines the mode based on the existence of external events, such as an external control command, internal events, a system failure, or failed integrity check.

Referring now to FIG. **1**, the external commands may be generated from a development tool (**122**) or a remote device (**132**) that is connected via a remote gateway (**131**). In an alternate embodiment, each ECU (**102**) or virtual ECU (**115**) can trigger the system to enter a different operating mode.

Continuing with FIG. **17**, in the configuration mode (**1702**), the system software and the information-sharing configuration can be updated via a secure communication link with encrypted commands Each processing node (ECU or gateway) may have security mechanisms such as a certificate that allows it to identify and authorize another entity (remote gateway, remote ECU, or development tool) to make changes to its bulletin board parameters.

The remote entity may also download a new firmware to the bulletin board. The ECU or gateway can store this new firmware in its non-volatile memory while it backs up the original image on the bulletin board for the case that the new software is not functional. In the update mode, the distributed system can also reconfigure the communication and

US 9,705,765 B2

11

computing infrastructure based on a new set of parameters that need to be stored in the individual bulletin boards.

In the normal run mode (1703), the system operates in the real-time information sharing mode and network configuration and certain parameters can't be changed. That protection allows defining deterministic temporal behavior on all communication links. But any processing node may enter a debug/emergency mode (1704) if a failure or other qualifying event occurs.

In the emergency mode, a processor executes an alternate procedure that maintains the temporal behavior on the communication links but may reduce or increase the amount of information shared with other processors. It also lets other processing nodes check on the integrity of sensors and actuators. In the maintenance and upgrade mode, an external system can upgrade executable code images and the bulletin-board configuration via secure communication links.

A system and method are thus provided for sharing information within a distributed embedded communications and computing system and with components outside the embedded system. The information sharing mechanism relies on a bulletin board that may include a small database operating under hard real-time conditions with minimal delays, communication latency, and jitter. The embedded database or bulletin board isolates a real-time application in a Electronic Control Unit (ECU) from various other real time applications and from input output signals in the same module (local information sharing), from event-triggered communications with applications in other modules, and from time-triggered communications with applications in other modules.

One design criteria of the database is that the temporal behavior of communications does not impact the real-time computing task and provides enough information access performance at peak time demand Typically, distributed embedded systems consist of a static structure that can be analyzed at design time. In addition to the real-time operation, the proposed method for information sharing also provides access to the parameters of the embedded system and allows for software upgrades of certain modules.

The present embodiment addresses the shortcomings of traditional computer networks with following enhancements:

1) The concept of multi-mode storage that links two or more communication networks via a bulletin board. The bulletin board is a multi-mode storage that can be thought of an extension to shared memory that can be accessed by local and remote processes at attached networks. There may be multiple hierarchical layers of bulletin boards depending on the topology of the communication system. The bulletin board increases the network efficiency by reducing the number of transactions needed to access remote variables.

2) The concept of a direct-access bulletin board that does not require a network layer translation of messages on each node of the network. Even though this approach restricts the reach of each node to only adjacent nodes and the next gateway, this still allows cross-network variable sharing though vertical real-time replication of data.

3) The concept of hierarchical bulletin board management that allows restriction of information access to certain levels in a network, but still allows the replication of information to other nodes in the network. This paradigm follows the path of reducing the information amount from the leaves of the network to central control and diagnosis hubs.

4) The concept that a gateway can host an assembly of bulletin boards or embedded database that allows operations on bulletin boards to generate events for associated pro-

12

cesses. This extension allows definition of a set of data processing operations that would be done once in a network and would be instantly available for connected nodes. Examples for operations are sensor data state observers, diagnostics, integrity checks, fail-safe mechanisms, etc.

5) The concept that an embedded communication and computing network can run in multiple modes in order to provide for a guaranteed deterministic behavior of the system. This property can be achieved by only allowing change to the configuration and/or the functions (SW code) in a secured configuration and upgrade mode. If the network is booted in the normal operating mode, all processors execute the existing code and only allow data sharing through the bulletin boards. The emergency or debug mode lets the network run in a fail-safe reduced operation mode or in a diagnostic mode that allows inspection of the system, while it is running. For each operating mode, the gateway can store a processing image on the bulletin board. The advantage of this procedure is that only the communication hubs need to deal with secure data transfer and encryption while the peripheral nodes in the network can be relative simple in design.

6) The concept of designing the topology of a distributed computing and communication system independent of the definition of the individual functions that the network performs. Each processing task is only associated with a bulletin board, but isolated from I/O processing.

Of course, these are all optional embodiments/enhancements.

While various embodiments have been described above, it should be understood that they have been presented by the way of example only, and not limitation. Thus, the breadth and scope of a preferred embodiment should be not limited by any of the above described exemplary embodiments, but should be defined only in accordance with the following claims and their equivalents.

What is claimed is:

1. An apparatus, comprising:

an automotive electronic control unit comprising a hardware and instructions for:

identifying information associated with a message received utilizing a Controller Area Network protocol associated with a Controller Area Network;

issuing a storage resource request in connection with a storage resource of the automotive electronic control unit and determining whether the storage resource is available for storing the information;

determining whether a threshold has been reached in association with the storage resource request;

in the event the storage resource is not available and the threshold associated with the storage resource request has not been reached, issuing another storage resource request in connection with the storage resource;

in the event the storage resource is not available and the threshold associated with the storage resource request has been reached, sending a notification;

in the event the storage resource is available, storing the information utilizing the storage resource; and

sharing the information in less than one second utilizing a Flexray network protocol associated with a Flexray network, wherein the automotive electronic control unit remains in hardwired communication with the Controller Area Network and the Flexray network and includes:

a first interface for interfacing with the Controller Area Network, the first interface including a first interface-related data link layer component for using

US 9,705,765 B2

13

Controller Area Network-related data link layer header bits and a first interface-related network layer component for using Controller Area Network-related network layer header bits; and

a second interface for interfacing with the Flexray network, the second interface including a second interface-related data link layer component for using Flexray network-related data link layer header bits and a second interface-related network layer component for using Flexray network-related network layer header bits.

**2**. The apparatus as recited in claim **1**, wherein the information is also shared in less than the one second utilizing, in addition to the Flexray network protocol, a Local Interconnect Network protocol associated with a Local Interconnect Network, and the automotive electronic control unit remains in hardwired communication with the Local Interconnect Network via a third interface for interfacing with the Local Interconnect Network, the third interface including a third interface-related data link layer component for using Local Interconnect Network-related data link layer header bits.

**3**. The apparatus as recited in claim **1**, wherein the identifying, the issuing of the another storage resource request, and the sending of the notification collectively occur in less than the one second.

**4**. The apparatus as recited in claim **1**, wherein the identifying, the issuing of the storage resource request, the storing the information, and the sharing collectively occur in less than the one second.

**5**. The apparatus as recited in claim **4**, wherein the second interface-related network layer component uses the Flexray network-related network layer header bits by adding the Flexray network-related network layer header bits to a data unit including the information, and then the second interface-related data link layer component uses the Flexray network-related data link layer header bits by adding the Flexray network-related data link layer header bits to the data unit, before communicating the data unit on a physical link of the Flexray network.

**6**. The apparatus as recited in claim **5**, wherein the first interface-related data link layer component uses the Controller Area Network-related data link layer header bits by removing the Controller Area Network-related data link layer header bits from another data unit, and the first interface-related network layer component uses the Controller Area Network-related network layer header bits by removing the Controller Area Network-related network layer header bits from the another data unit, where the information is extracted from the another data unit before the sharing.

**7**. The apparatus as recited in claim **1**, wherein a duration between the information being sent to the automotive electronic control unit and the sharing being completed is less than a second.

**8**. The apparatus as recited in claim **1**, wherein a duration between the information being received and the sharing is less than a millisecond.

**9**. The apparatus as recited in claim **1**, wherein the first interface-related data link layer component and the second interface-related data link layer component are drivers.

**10**. The apparatus as recited in claim **1**, wherein the first interface-related data link layer component and the second interface-related data link layer component are part of a hardware abstraction layer.

14

**11**. The apparatus as recited in claim **1**, wherein the hardware and the instructions are for releasing the storage resource after the storing.

**12**. An apparatus, comprising:

an automotive electronic control unit comprising a hardware and instructions for:

receiving information associated with a message received utilizing a Controller Area Network protocol associated with a Controller Area Network;

determining whether a storage resource is available;

if the storage resource is not available, ascertaining whether a threshold has been reached and re-trying an access in connection with the storage resource if the threshold has not been reached;

if the threshold has been reached, sending an error notification;

if the storage resource is available, storing the information utilizing the storage resource; and

sharing the information utilizing a Flexray network protocol associated with a Flexray network;

wherein the receiving, the determining, the storing, and the sharing all occur in less than one second; the automotive electronic control unit remains in hardwired communication with the Controller Area Network and the Flexray network; and the automotive electronic control unit includes:

a first interface for interfacing with the Controller Area Network, the first interface including a first interface-related data link layer component for using Controller Area Network-related data link layer header bits and a first interface-related network layer component for using Controller Area Network-related network layer header bits; and

a second interface for interfacing with the Flexray network, the second interface including a second interface-related data link layer component for using Flexray network-related data link layer header bits and a second interface-related network layer component for using Flexray network-related network layer header bits;

wherein the second interface-related network layer component uses the Flexray network-related network layer header bits by adding the Flexray network-related network layer header bits to a data unit including the information, and then the second interface-related data link layer component uses the Flexray network-related data link layer header bits by adding the Flexray network-related data link layer header bits to the data unit, before communicating the data unit on a physical link of the Flexray network;

wherein the first interface-related data link layer component uses the Controller Area Network-related data link layer header bits by removing the Controller Area Network-related data link layer header bits from another data unit, and the first interface-related network layer component uses the Controller Area Network-related network layer header bits by removing the Controller Area Network-related network layer header bits from the another data unit, where the information is extracted from the another data unit before the sharing.

**13**. An apparatus, comprising:

an automotive electronic control unit comprising a hardware and instructions for:

US 9,705,765 B2

15

identifying information associated with a message received utilizing a Flexray network protocol associated with a Flexray network;

issuing a storage resource request in connection with a storage resource of the automotive electronic control unit and determining whether the storage resource is available for storing the information;

determining whether a threshold has been reached in association with the storage resource request;

in the event the storage resource is not available and the threshold associated with the storage resource request has not been reached, issuing another storage resource request in connection with the storage resource;

in the event the storage resource is not available and the threshold associated with the storage resource request has been reached, sending a notification;

in the event the storage resource is available, storing the information utilizing the storage resource; and

sharing the information in less than one second utilizing a Controller Area Network protocol associated with a Controller Area Network, the automotive electronic control unit remaining in hardwired communication with the Flexray network and the Controller Area Network, and including:

a first interface for interfacing with the Flexray network, the first interface including a first interface-related data link layer component for using Flexray network-related data link layer header bits and a first interface-related network layer component for using Flexray network-related network layer header bits; and

a second interface for interfacing with the Controller Area Network, the second interface including a second interface-related data link layer component for using Controller Area Network-related data link layer header bits and a second interface-related network layer component for using Controller Area Network-related network layer header bits.

14. The apparatus as recited in claim 13, wherein the information is also shared in less than the one second utilizing, in addition to the Controller Area Network protocol, a Local Interconnect Network protocol associated with a Local Interconnect Network, and the automotive electronic control unit remains in hardwired communication with the Local Interconnect Network via a third interface for interfacing with the Local Interconnect Network, the third interface including a third interface-related data link layer component for using Local Interconnect Network-related data link layer header bits.

15. The apparatus as recited in claim 13, wherein the identifying, the issuing of the another storage resource request, and the sending of the notification collectively occur in less than the one second.

16. The apparatus as recited in claim 13, wherein the identifying, the issuing of the storage resource request, the storing the information, and the sharing collectively occur in less than the one second.

17. The apparatus as recited in claim 16, wherein the second interface-related network layer component uses the Controller Area Network-related network layer header bits by adding the Controller Area Network-related network layer header bits to a data unit including the information, and then the second interface-related data link layer component uses the Controller Area Network-related data link layer header bits by adding the Controller Area Network-related

16

data link layer header bits to the data unit, before communicating the data unit on a physical link of the Controller Area Network.

18. The apparatus as recited in claim 17, wherein the first interface-related data link layer component uses the Flexray network-related data link layer header bits by removing the Flexray network-related data link layer header bits from another data unit, and the first interface-related network layer component uses the Flexray network-related network layer header bits by removing the Flexray network-related network layer header bits from the another data unit, where the information is extracted from the another data unit before the sharing.

19. The apparatus as recited in claim 13, wherein a duration between the information being sent to the automotive electronic control unit and the sharing being completed is less than a second.

20. The apparatus as recited in claim 13, wherein a duration between the information being received and the sharing is less than a millisecond.

21. The apparatus as recited in claim 13, wherein the storage request and the issuing of the another storage resource request each includes a request for an access.

22. The apparatus as recited in claim 13, wherein the notification is sent by middleware.

23. The apparatus as recited in claim 13, wherein the hardware and the instructions are for releasing the storage resource after the storing.

24. An apparatus, comprising:

an automotive electronic control unit comprising a hardware and instructions for:

receiving information associated with a message received utilizing a Flexray network protocol associated with a Flexray network;

determining whether a storage resource is available;

if the storage resource is not available, ascertaining whether a threshold has been reached and re-trying an access in connection with the storage resource if the threshold has not been reached;

if the threshold has been reached, sending a notification;

if the storage resource is available, storing the information utilizing the storage resource;

sharing the information utilizing a Controller Area Network protocol associated with a Controller Area Network;

wherein the receiving, the determining, the storing, and the sharing collectively occur in less than one second; the automotive electronic control unit remains in hardwired communication with the Flexray network and the Controller Area Network; and the automotive electronic control unit includes:

a first interface for interfacing with the Flexray network, the first interface including a first interface-related data link layer component for using Flexray network-related data link layer header bits and a first interface-related network layer component for using Flexray network-related network layer header bits; and

a second interface for interfacing with the Controller Area Network, the second interface including a second interface-related data link layer component for using Controller Area Network-related data link layer header bits and a second interface-related network layer component for using Controller Area Network-related network layer header bits;

US 9,705,765 B2

17

wherein the second interface-related network layer component uses the Controller Area Network-related network layer header bits by adding the Controller Area Network-related network layer header bits to a data unit including the information, and the second interface-related data link layer component uses the Controller Area Network-related data link layer header bits by adding the Controller Area Network-related data link layer header bits to the data unit, before communicating the data unit on a physical link of the Controller Area Network;

wherein the first interface-related data link layer component uses the Flexray network-related data link layer header bits by removing the Flexray network-related data link layer header bits from another data unit, and the first interface-related network layer component uses the Flexray network-related network layer header bits by removing the Flexray network-related network layer header bits from the another data unit, where the information is extracted from the another data unit before the sharing.

**25**. The apparatus as recited in claim **24**, wherein the threshold is time-related.

**26**. The apparatus as recited in claim **24**, wherein the receiving, the determining, the ascertaining, the storing, and the sharing collectively occur in less than one millisecond.

18

**27**. The apparatus as recited in claim **24**, wherein the information is sent from a sensor origin on the Flexray Network and reaches an actuator destination on the Controller Area Network in less than one second.

**28**. The apparatus as recited in claim **24**, wherein the information is sent from an origin on the Flexray Network, is shared, and reaches a destination on the Controller Area Network in less than one millisecond.

**29**. The apparatus as recited in claim **24**, wherein the first interface-related data link layer component and the second interface-related data link layer component are part of a hardware abstraction layer.

**30**. The apparatus as recited in claim **24**, wherein the first interface-related data link layer component and the second interface-related data link layer component are drivers.

**31**. The apparatus as recited in claim **24**, wherein the information is also shared in less than the one second utilizing, in addition to the Controller Area Network protocol, a Local Interconnect Network protocol associated with a Local Interconnect Network, and the automotive electronic control unit remains in hardwired communication with the Local Interconnect Network via a third interface for interfacing with the Local Interconnect Network, the third interface including a third interface-related data link layer component for using Local Interconnect Network-related data link layer header bits.

* * * * *

EXHIBIT B



US010002036B2

(12) **United States Patent**
Fuchs et al.

(10) **Patent No.:** **US 10,002,036 B2**
(45) **Date of Patent:** *Jun. 19, 2018

(54) **SYSTEM, METHOD AND COMPUTER PROGRAM PRODUCT FOR SHARING INFORMATION IN A DISTRIBUTED FRAMEWORK**

(71) Applicant: **Stragent, LLC**, Longview, TX (US)

(72) Inventors: **Axel Fuchs**, San Jose, CA (US); **Scott Sturges Andrews**, Petaluma, CA (US)

(73) Assignee: **Stragent, LLC**, Longview, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 66 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/405,110**

(22) Filed: **Jan. 12, 2017**

(65) **Prior Publication Data**

US 2017/0123869 A1 May 4, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 14/011,705, filed on Aug. 27, 2013, now Pat. No. 9,575,817, which is a (Continued)

(51) **Int. Cl.**
*G06F 9/54* (2006.01)
*H04L 12/26* (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .......... *G06F 9/546* (2013.01); *B60R 16/0231* (2013.01); *G06F 9/542* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .......... G06F 9/542; G06F 9/545; G06F 9/546; H04L 43/10; H04L 67/10; B60R 16/0231
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,230,051 A   7/1993   Quan
5,265,250 A   11/1993   Andrade et al.
(Continued)

OTHER PUBLICATIONS

Reinhard Maier, "Event-Triggered Communication on Top of Time-Triggered Architecture," Proceedings of the 21st Digital Avionics Systems Conference, vol. 2, 13.C.5-1-13.C.5-9 (Oct. 27-31, 2002).
(Continued)

*Primary Examiner* — Charles E Anya

(57) **ABSTRACT**

A system, method and computer program product are provided for receiving information associated with a message, utilizing a first network protocol associated with a first network and causing a determination as to whether a storage resource is available. In use, in the event the storage resource is available, causing storage of the information utilizing the storage resource and sharing the information in less than one second, utilizing at least one message format corresponding to a second network protocol associated with a second network which is different from the first network protocol wherein the system, method and computer program product are associated with an automotive electronic control unit with at least one gateway function that remains in hardwired communication with the first network and the second network, the automotive electronic control unit having a plurality of interfaces.

**127 Claims, 17 Drawing Sheets**



# US 10,002,036 B2
Page 2

## Related U.S. Application Data

continuation of application No. 13/531,319, filed on Jun. 22, 2012, now Pat. No. 8,566,843, which is a continuation of application No. 12/182,570, filed on Jul. 30, 2008, now Pat. No. 8,209,705, which is a continuation of application No. 10/737,690, filed on Dec. 15, 2003, now Pat. No. 7,802,263.

(60) Provisional application No. 60/434,018, filed on Dec. 17, 2002.

(51) **Int. Cl.**
**H04L 29/08**         (2006.01)
**B60R 16/023**        (2006.01)

(52) **U.S. Cl.**
CPC .............. **G06F 9/545** (2013.01); **H04L 43/10** (2013.01); **H04L 67/10** (2013.01); *G06F 2209/547* (2013.01)

(56)                    **References Cited**

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,388,189 A | 2/1995 | Kung | |
| 5,513,324 A | 4/1996 | Dolin, Jr. et al. | |
| 5,588,002 A | 12/1996 | Kawanishi et al. | 370/462 |
| 5,666,485 A | 9/1997 | Suresh et al. | |
| 5,737,529 A | 4/1998 | Dolin, Jr. et al. | |
| 5,854,454 A | 12/1998 | Upender et al. | |
| 5,923,846 A | 7/1999 | Gage et al. | |
| 5,941,947 A | 8/1999 | Brown et al. | |
| 5,956,489 A | 9/1999 | San Andres et al. | 709/221 |
| 6,034,970 A | 3/2000 | Levac et al. | 370/466 |
| 6,128,315 A | 10/2000 | Takeuchi | |
| 6,141,710 A | 10/2000 | Miesterfeld | 710/110 |
| 6,185,466 B1 | 2/2001 | Nicewonger | |
| 6,289,390 B1 | 9/2001 | Kavner | 719/310 |
| 6,363,427 B1 | 3/2002 | Teibel et al. | |
| 6,378,001 B1 | 4/2002 | Aditham et al. | 719/313 |
| 6,430,607 B1 | 8/2002 | Kavner | |
| 6,438,632 B1 | 8/2002 | Kikugawa | |
| 6,484,082 B1 | 11/2002 | Millsap et al. | |
| 6,725,348 B1 | 4/2004 | Marier et al. | |
| 6,801,942 B1 | 10/2004 | Dietrich et al. | 709/225 |
| 6,941,510 B1 | 9/2005 | Ozzie et al. | |
| 7,103,045 B2 | 9/2006 | Lavigne et al. | 370/392 |
| 7,103,646 B1 | 9/2006 | Suzuki | 709/220 |
| 7,103,656 B2 | 9/2006 | Lewis et al. | 709/223 |
| 7,552,440 B1 | 6/2009 | Stewart et al. | 719/312 |
| 7,950,017 B1 | 5/2011 | Cain et al. | |
| 2001/0018685 A1 | 8/2001 | Saito et al. | |
| 2002/0002586 A1 | 1/2002 | Rafal et al. | |
| 2002/0032856 A1 | 3/2002 | Noguchi et al. | |
| 2002/0047868 A1 | 4/2002 | Miyazawa | |
| 2002/0073243 A1 | 6/2002 | Staiger | 719/313 |
| 2002/0124007 A1 | 9/2002 | Zhao | |
| 2002/0159460 A1 | 10/2002 | Carrafiello et al. | |
| 2002/0188691 A1 | 12/2002 | Ignatius et al. | |
| 2002/0191543 A1 | 12/2002 | Buskirk et al. | |
| 2002/0198943 A1 | 12/2002 | Zhuang et al. | |
| 2003/0061388 A1 | 3/2003 | Cleghorn et al. | |
| 2003/0074474 A1 | 4/2003 | Roach et al. | |
| 2003/0088568 A1 | 5/2003 | Matsunaga et al. | |
| 2003/0154116 A1 | 8/2003 | Lofton | |
| 2003/0236894 A1 | 12/2003 | Herley | |
| 2004/0003087 A1 | 1/2004 | Chambliss | |
| 2006/0155867 A1 | 7/2006 | Kilian et al. | |
| 2006/0155907 A1 | 7/2006 | Yoshimasa et al. | |
| 2007/0101206 A1 | 5/2007 | Brabant | |
| 2010/0333096 A1 | 12/2010 | Dice et al. | |
| 2011/0047218 A1 | 2/2011 | Nojima et al. | |
| 2011/0047310 A1 | 2/2011 | Bonola | |
| 2012/0029898 A1 | 2/2012 | Carroll et al. | |
| 2013/0111299 A1 | 5/2013 | Hashimoto et al. | |

## OTHER PUBLICATIONS

William Wong, "Software and Hardware Standards Help, But In-Vehicle Network Growth Will Be Conservative: CAN networks and OSEK/VDX compatible operating systems will drive tomorrow's vehicles," Electronic Design, vol. 49, issue 1, 62 (Jan. 8, 2001).
OSEK/VDX Network Management Concept and Application Programming Interface, Version 2.51 (May 31, 2000).
"An Embedded Software Primer," David E. Simon, 1999.
"Application of In-Vehicle Data Buses for Collision Avoidance Systems," William D. Horne, et al., 1998.
"The Foundation.TM Fieldbus Primer," Fieldbus Inc., Jun. 24, 2001.
"GSA Guide to Specifying Interoperable Building Automation and Control Systems Using ANSI/ASHRAE Standard 135-1995," Steven T. Bushby et al., Nov. 1999.
"Programming in the OSEK/VDX Environment," Joseph Lemieux, 2001.
"OSEK/VDX Binding Specification Version 1.3," OSEK Group, Sep. 17, 2001.
"OSEK/VDX Binding Specification Version 1.4," OSEK Group, Sep. 6, 2002.
"OSEK/VDX Binding Specification Version 1.4.1," OSEK Group, Jan. 21, 2003.
"OSEK/VDX Communication Specification Version 2.2.2," OSEK Group, Dec. 18, 2000.
"OSEK/VDX Communication Specification Version 3.0," OSEK Group, Jul. 26, 2002.
"OSEK/VDX Communication Specification Version 3.0.1," OSEK Group, Jan. 29, 2003.
"OSEK/VDX Communication Specification Version 3.0.2," OSEK Group, Dec. 9, 2003.
"OSEK/VDX Fault-Tolerant Communication Specification Version 1.0," OSEK Group, Jul. 24, 2001.
"OSEK/VDX Network Management Concept and Application Programming Interface Version 2.5.0," OSEK Group, May 31, 1998.
"OSEK/VDX Network Management Concept and Application Programming Interface Version 2.5.1," OSEK Group, May 31, 2000.
"OSEK/VDX Network Management Concept and Application Programming Interface Version 2.5.2," OSEK Group, Jan. 16, 2003.
"OSEK/VDX OSEK Implementation Language Specification Version 2.3," OSEK Group, Sep. 10, 2001.
"OSEK/VDX OSEK Implementation Language Specification Version 2.4," OSEK Group, Dec. 2, 2002.
"OSEK/VDX OSEK Implementation Language Specification Version 2.4.1," OSEK Group, Jan. 23, 2003.
"Goals and Motivation: What is OSEK/VDX," OSEK VDX Portal, 2012.
"OSEK/VDX OSEK Run Time Interface Part A: Language Specification Version 2.1," OSEK Group, Jul. 16, 2001.
"OSEK/VDX OSEK Operating System Specification Version 2.0 revision 1," OSEK Group, Oct. 15, 1997.
"OSEK/VDX OSEK Operating System Specification Version 2.1 revision 1," OSEK Group, Nov. 13, 2000.
"OSEK/VDX OSEK Operating System Specification Version 2.2," OSEK Group, Sep. 10, 2001.
"OSEK/VDX OSEK Operating System Specification Version 2.2.1," OSEK Group, Jan. 16, 2003.
"OSEK/VDX Time-Triggered Operating System Specification Version 1.0," OSEK Group, Jul. 24, 2001.
Berwanger et al "FlexRay—The Communication System for Advanced Automotive Control Systems" 2001-01-0676, SAE 2001 World Congress, Mar. 5-8, 2001.
Bosch, "CAN Specification Version 2.0" Sep. 1991.
Clarke et al "Formal Verification of Autonomous Systems NASA Intelligent Systems Program" Carnegie Mellon University, Sep. 25, 2001.
Courtois et al "Concurrent Control with "Readers" and "Writers"" Communications of the ACM, vol. 14, No. 10, Oct. 1971.

US 10,002,036 B2
Page 3

(56)               **References Cited**

OTHER PUBLICATIONS

Fredriksson, Lars-Berno "Controller Area Networks and the Protocol can for Machine Control Systems" Mechatronics vol. 4, No. 2, pp. 159-172, 1994.
Hernandez et al "Algorithms and architectures for real-time control 2000," Proceedings volume from the 6th IFAC Workshop, Palma de Mallorca, Spain, May 15-17, 2000.
Kirrmann et al. "The IEC/IEEE Train Communication Network," IEEE Micro, Mar.-Apr. 2001
Koopman, Philip "Control Area Network (CAN)" 18-540 Distributed Embedded Systems, Presentation Slides, Oct. 4, 2000.
Leen et al, "Digital networks in the automotive vehicle," Computing and Control Engineering 10(6):257-266, Jan. 2000.
IEEE "The Authoritative Dictionary of IEEE Standards Terms" 7th Ed., IEEE Press, 2000.
IEEE "IEEE Standard for Information Technology—Portable Operating System Interface (POSIX®)—Part 1: System Application Program Interface (API)—Amendment d: Additional Realtime Extensions," IEEE Std 1003.1d-1999 (Amendment to IEEE Std 1003.1-1990), Jun. 16, 2000.
Mellor-Crummey et al. "Algorithms for Scalable Synchronization on Shared-Memory Multiprocessors," ACM Transactions on Computer Systems, vol. 9, No. 1, Feb. 1991, pp. 21-65.
Jagannathan et al. "Blackboard Architectures and Applications," vol. 3, Academic Press Inc., 1989, 524 pages.
SAE International, "Surface Vehicle Standard—SAE J1850" Rev May 2001.
Intelligent Transportation Systems Standards, United States Department of Transportation "SAE J2366—Family of Its Data Bus (IDB) Protocol Standards," (online fact sheet written Jul. 12, 2006), available at https://www.standards.its.dot.gov/Factsheets/PrintFactsheet/56.
SAE International, "Surface Vehicle Recommended Practice—SAE J2366-1" Nov. 2001.
SAE International, "Surface Vehicle Recommended Practice—SAE J2366-2" Nov. 2001.
Schill, John "An Overview of the CAN Protocol," Embedded Systems Programming, Sep. 1997, pp. 46-62.
Stewart et al., "Integration of Real-Time Software Modules for Reconfigurable Sensor-Based Control Systems," Proceedings of the 1992 IEEE/RSJ International Conference on Intelligent Robots and Systems, Jul. 7-10, 1992.
Tanenbaum, Andrew S. "Computer Networks," 3rd Ed., Prentice Hall, Inc, 1996, pp. 1-76 (Introduction).
Tanenbaum, Andrew S. "Modern Operating Systems," 2nd Ed., Prentice Hall, Inc., 2001, excerpts from Chapters 2, 7, 8, and 10.
Upender et al., "Embedded Communication Protocol Options," Proceedings of the Fifth Annual Embedded Systems Conference, vol. 2, Miller Freeman, Inc., 1993.
Wargui et al. "Application of Controller Area Network to Mobile Robots," IEEE, Electrotechnical Conference, May 16, 1996, p. 205-207.
Wense et al. "Building Automotive LIN Applications," pp. 279-292, found as part of Krueger et al., "Advanced Microsystems for Automotive Applications 2001," Springer, 2001.
Giusto et al., "Automotive Virtual Integration Platforms: Why's, What's, and How's" Sep. 2002, Proceedings of the 2002 IEEE International Conference on Computer Design: VLSI in Computers and Processors (ICCD'02).
Juan Luis Posadas, et al., "Communications Structure for Sensor Fusion in Distributed Real Time Systems," May 2000, Algorithms and Architectures for Real-Time Control 2000: A Proceedings volume from the 6th IFAC Workshop.
Leen et al. "Expanding Automotive Electronic Systems" Jan. 2002, Computer 35(1).
Posadas et al. "Communications Structure for Sensory Data in Mobile Robots" 2002 , Engineering Applications of Artificial Intelligence, 15:341-350.
SAE, "ITS Data Bus—IDB-C Physical Layer" Nov. 2001, Surface Vehicle Recommended Practice, J2366-1.
Stewart et al. "The Chimera II Real-Time Operating System for Advanced Sensor-Based Control Applications" 1992, IEEE Transactions on Systems, Man, and Cybernetics, vol. 22, No. 6.
U.S. Appl. No. 15/919,201, filed Mar. 12, 2018.
Brad Johanson, Armando Fox, Pat Hanrahan, Terry Winograd, "The Event Heap: An Enabling Infrastructure for Interactive Workspaces," White Paper, Stanford University, Stanford, CA 1999.



100 Distributed Embedded Communication and Computing System
101
System Gateway
102
ECU
103
Group Gateway
ECU
ECU
104
SubGroup Gateway
105
ECU & Gateway
106
Network Sensor
107
Network Actuator
108
Local Sensor
109
Local Actuator
ECU
ECU
110
111
112
112
113
114
115
Virtual ECU/GW
116
120 External Components
121
Diagnosis Device
122
Develop-ment Tool
123
Add-On Device
130 Remote System
131
Gateway
132
Remote Device

FIGURE 1



200 ECU
201 Micro Processor
202 Software
Application
Application
Middleware
Real-Time Operating System
Device Drivers
Hardware Abstraction Layer
Non-Volatile Memory
203
Volatile Memory
204
Real Time Clock
205
Watchdog
206
Com-Bus Controller
207
Com-Bus Driver
208
Digital I/O
209
Line Driver
210
Analog I/O (DAC/ADC)
211
Analog Signal Conditioning
212

FIGURE 2



FIGURE 3

Case 1:20-cv-00510-JDW   Document 67-1   Filed 01/18/22   Page 38 of 430 PageID #: 6687



FIGURE 4



402 Middleware
Application Programming Interface
502
Bulletin Board Manager
501
Event Manager
505
Data Integrity Watchdog
506
Upgrade and Configuration Manager
507
Access Manager
508
Remote Message Com. Interface
Message - Variable Conversion
504
510
Local Signal Com. Interface
Signal - Variable Conversion
503
509

FIGURE 5



FIGURE 6



Application Process
606
BB Manager Process Integrity Check
707
Bulletin Board Real-Time Variables
608
Bulletin Board Events
607
712
711
BB Manager Process Event Manager Resource Manager
708
714
706
Remote Message Conversion 1
Remote Message Conversion 2
710
Remote Message Conversion 3
Remote Mess Proc
705
Com I/F 1
Com I/F 2
709
Com I/F 3
OS
Com. Bus Controller 1
713
Com. Bus Controller 2
Com. Bus Controller 3
702
701 External Event
703
704

FIGURE 7

Case 1:20-cv-00510-JDW   Document 67-1   Filed 01/18/22   Page 42 of 430 PageID #: 6691





FIGURE 9



FIGURE 10



FIGURE 11



FIGURE 12



FIGURE 13



FIGURE 14

1400
Update remote
ECUs or GWs
from Bulletin Boar
(data replication)

1401
External or
internal
Notification/
activation

1402
Select variables and
Com Port (bus) for replication

1101
Retrieve
Variables in
Bulletin Board

1403
Convert variables
to messages

1404
Write messages
to com port

1405
Variables from
other BB section?

no

yes

1406
Task inactive -
Wait for notification



FIGURE 15



FIGURE 16



FIGURE 17

US 10,002,036 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

**SYSTEM, METHOD AND COMPUTER PROGRAM PRODUCT FOR SHARING INFORMATION IN A DISTRIBUTED FRAMEWORK**

RELATED APPLICATION(S)

This application is a continuation of U.S. patent application Ser. No. 14/011,705 filed Aug. 27, 2013, which is a continuation of U.S. patent application Ser. No. 13/531,319 filed Jun. 22, 2012, now U.S. Pat. No. 8,566,843, which is a continuation of U.S. patent application Ser. No. 12/182,570 filed Jul. 30, 2008, now U.S. Pat. No. 8,209,705, which is a continuation of U.S. patent application Ser. No. 10/737,690 filed Dec. 15, 2003, now U.S. Pat. No. 7,802,263, which, in turn, claims priority under 35 U.S.C. § 119 based on U.S. Provisional Application No. 60/434,018 filed Dec. 17, 2002, all of which are incorporated herein by reference.

FIELD AND BACKGROUND OF THE INVENTION

The present invention relates to the field of distributed control and monitoring systems that may include certain temporal behavior.

Such technology may optionally apply to electronic vehicle communication and control systems, real-time monitoring systems, industrial automation and control systems, as well as any other desired system.

SUMMARY OF THE INVENTION

A system, method and computer program product are provided for sharing information in a distributed system. After information is received, it is stored on a bulletin board. In use, the information is shared, in real-time, among a plurality of heterogeneous processes.

In one embodiment, both past and present instances of the information may be stored on the bulletin board. As an option, the information may be replicated among a plurality of the bulletin boards. Optionally, first information may be processed utilizing a first bulletin board and stored utilizing a second bulletin board. Still yet, the bulletin boards may be hierarchical.

In another embodiment, the processes may access multiple sections of the bulletin board. Further, the bulletin board may send notifications to the processes based on a state of the information on the bulletin board.

Optionally, the information may include variables. For example, the information may include input variables, output variables, etc. Moreover, the processes may include local processes, remote processes, etc. Still yet, the processes may include event triggered processes and/or time triggered processes. In use, each of the processes may process the information in a manner that is isolated from temporal characteristics associated with the network.

In still another embodiment, the information may be extracted from a message received by a bulletin board manager. Moreover, the information may be converted from a signal received by a bulletin board manager. Even still, the information may be shared in a single task, may be shared according to a schedule, and/or may be shared with an operating system. Optionally, dynamic preemptive scheduling may be provided. Also, the information may be shared across the communication network with only a portion of a

message header that is needed for a specific communication link while other communication links may use a different message header.

As a further option, resources in the network may be protected. Specifically, the resources in the network may be protected utilizing a schedule that allows information sharing utilizing the bulletin board. In another embodiment, the resources in the network may be protected utilizing semaphores.

In even still another embodiment, the information may be shared according to an internal clock, an external clock, etc. During operation, objects may be generated based on a change of state of the information stored in the bulletin board. Such objects may include, but are not limited to flags, events, signals, interrupts, etc. Still yet, the information may be stored in response to interrupts associated with the processes.

In use, the bulletin board may update the processes with information at a first rate that differs from a second rate with which the processes send the information to the bulletin board. Optionally, the bulletin board may be accessed with guaranteed access times, jitter, and bandwidth.

In addition, the bulletin board may be updated irregularly and triggered by internal or external objects including, but not limited to flags, events, signals, interrupts, etc. Event triggers may be provided independent of a link connection between nodes where the processes are carried out. Moreover, failure redundancy may be provided through multiple independent links across diverse physical connections.

As yet another option, the information may have a user-configured constraint associated therewith. Such constraint may include a memory constraint, a real-time constraint, etc. As a further option, the constraint may be configured utilizing a tool.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram of an embodiment of a system of one embodiment;

FIG. **2** is a block diagram generally depicting an embodiment of an ECU as part of the system illustrated in FIG. **1**;

FIG. **3** is a block diagram generally depicting an embodiment of a Gateway device as part of the system illustrated in FIG. **1**;

FIG. **4** is a block diagram of an embodiment of the software architecture assumed for one embodiment.

FIG. **5** is a block diagram of an embodiment of the middleware that contains the methods of one embodiment.

FIG. **6** is a block diagram of an embodiment of the bulletin board that describes the process interaction of one embodiment.

FIG. **7** is a block diagram of an embodiment of the bulletin board that describes the process interaction with multiple external communication buses as part of one embodiment.

FIG. **8** is a flow chart diagram of an embodiment of the variable store from remote I/O method of one embodiment.

FIG. **9** is a flow chart diagram of an embodiment of the variable store from local I/O method of one embodiment.

FIG. **10** is a flow chart diagram of an embodiment of the variable method of one embodiment.

FIG. **11** is a flow chart diagram of an embodiment of the variable retrieve method of one embodiment.

FIG. **12** is a flow chart diagram of an embodiment of the application process using the method of one embodiment

3

FIG. 13 is a flow chart diagram of an embodiment of the local I/O update from bulletin board method of one embodiment.

FIG. 14 is a flow chart diagram of an embodiment of the variable replication method of one embodiment.

FIG. 15 is a flow chart diagram of an embodiment of the message store from remote gateway method of one embodiment.

FIG. 16 is a flow chart diagram of an embodiment of the message forward to remote ECU or Gateway method of one embodiment.

FIG. 17 is a state transition diagram of an embodiment of the mode switching method of one embodiment.

DETAILED DESCRIPTION

FIG. 1 is a block diagram generally depicting elements of an embodiment of the present distributed embedded communication and computing system. The system architecture may be situated in automotive electronics or industrial control and monitoring systems. In an automotive environment, the various Electronic Control Units (ECUs, 102) control complex applications such as engine control, brake control, or diagnostics. They are either connected to sensors and actuators via discrete links or simple standard functions such as sensors and actuators are organized into separate sub networks.

These complex functions such as braking, engine-control, etc. are then grouped into the backbone system functions for the car, such as body control, power train and chassis. The backbone also includes the vehicle's high level functions such as diagnostics, telematics and entertainment systems.

Therefore the system is typically hierarchically organized and includes a variety of gateways (101,104,105), which relay messages up and down through the system layers. Each layer may contain multiple electronic control units (ECU, 102) that are connected through wired serial multiplexing bus-systems such as Controller Area Network (CAN or ISO11898), Flexray, LIN, J1850, J1708, MOST, IEEE1394, and other similar serial multiplexing buses or through wireless multiplexing systems such as IEEE802.11, IEEE802.15, Bluetooth, Zigbee, or similar other wireless links.

Typically, functions provided by an ECU (102) are bound to hard real-time temporal behavior. In the context of the present description, real-time may include any response time that may be measured in milli- or microseconds, and/or is less than 1 second.

The ECU may receive a set of real-time input variables from local sensors (108), which are connected via discrete signal lines (113), or from networked sensors (106), which are connected through a multiplexing bus-system (112). The ECU may also share variables with other ECUs (102) that are either connected on the same physical multiplexing bus or that it can reach through a gateway (101,103,104).

Then the ECU (102) processes the input variables and generates a set of output variables that are either shared with other ECUs (102) as described above, or which are output to local actuators (109), which are connected via discrete signal lines (113), or to networked actuators, which are connected through a multiplexing bus (112). ECUs (102) typically share information with devices that are connected on the same physical multiplexing system. This method of information sharing is called horizontal information sharing in a hierarchical system. Gateways (101,103,104) link multiple physical multiplexing systems together. In the context of the

4

present description, such information may include data, a signal, and/or anything else capable of being stored and shared.

The highest level in the hierarchical system is the system level. The system level gateway (101) may be connected to ECUs on the system level multiplexing bus (117), to subsequent gateways (103) that also link to subsequent communication buses (110), and to external components (120) that may contain diagnostics devices (121), development tools (122), other add-on devices (123) or other instances of distributed embedded communication and computing systems (100). In addition, the system gateway (101) may also be connected to an external gateway (131) that may link the system to a remote device (132) through wireless or wired wide-area-networks such as the Internet, using standard protocols such as UDP/IP, TCP/IP, RTP, HTTP, SOAP, JAVA, etc. or nonstandard proprietary protocols.

Subsequent to the system level may be several layers of groups and subgroups that are link to the higher levels via gateways (101,103,104,105).

During the design-time of the system, not all ECUs may exist. Therefore, the development tool (122) may provide a plug-in component or virtual ECU/GW (115) that directly links into the wired multiplexing bus or wireless network (110) and also allows for separate control functions via a tool-link (116).

The block diagram in FIG. 2 depicts the detailed elements within a generic ECU (200) that is one embodiment of ECU (102). The ECU (200) typically contains a micro-processor (201), volatile memory (204) such as RAM, S-RAM or similar, non-volatile memory (203) such as EEPROM, FLASH, etc., a real time clock for internal timing of processes (205), a watchdog (206) to maintain the health of the system, one or more communication bus controllers (207) with associated drivers (208), digital I/O (209) with line drivers (210), and analog I/O (211) with associated analog signal conditioning (212).

In an alternate embodiment, the ECU (200) may also contain a wireless communication controller (311) and a RF-Front-end (312) as outlined in FIG. 3. The software (202) can either be stored in local non-volatile memory (203) or partially downloaded via the communication link (207,208) and stored in the volatile memory. The software is then executed in the microprocessor (201).

The block diagram FIG. 3 depicts the detailed elements within a generic gateway (300) that is one embodiment of Gateway (101,103,104,105) in FIG. 1.

FIG. 4 outlines one embodiment of the software architecture in an embedded system. The hardware abstraction layer (405) allows the system developer to adapt a standard operating system to a specific hardware as used in an ECU (200) or gateway (300). The hardware abstraction layer (405) adapts the real-time operating system (403) and the device drivers (404) to a specific hardware implementation.

One embodiment includes the middleware (402) that has direct access to the real-time operating system (403), the device drivers (404) and the hardware abstraction layer (405). The middleware isolates the application from input/output functions and allows multiple applications to share common variables locally. In addition, the middleware lets applications share variables with remote applications/processes. In the context of the present description, a process may refer to any hardware and/or software operation, etc.

In one embodiment, the middleware can directly interface with the input/output mechanisms of the hardware without utilizing an operating system (403) or hardware abstraction layer (405).

US 10,002,036 B2

5                                                                6

Another embodiment of the middleware utilizes a pre-emptive multitasking operating system with explicit control of resources. In an alternate embodiment, the middleware can be built with a static multitasking scheme with implicit resource management or be part of a single task system.

Referring now to FIG. 5, the middleware (402) contains the bulletin board manager (501), a local signal communication interface (503), a remote message communication interface (504), and an application programming interface (502). The application interface (502) provides methods and data interfaces to a plurality of applications. In one embodiment, the application interface is an object library that can be linked to an application at design time.

The bulletin board manager (501) contains an upgrade and configuration manager (507), an event manager (505), a data access manager (508), and a data integrity watchdog (506). The upgrade and configuration manager (507) is necessary to configure the data structure of the bulletin board and to make executable code available to individual processing nodes. In the context of the present description, the bulletin board may refer to any database that enables users to send and/or read electronic messages, files, and/or other data that are of general interest and/or addressed to no particular person/process.

The access manager provides access control mechanisms for the code update and configuration mode. It also may control access rights for individual applications at execution time in the run mode.

The event manager (505) captures input-output events as variables and generates new events, flags, or signals based on operations on state variables in the bulletin board. Such operations may include test of maximum values, the occurrence of logically combined events, the result of an integrity check, or events and signals that are created based on any other logical or arithmetic computation on the state variables that are stored in the bulletin board. The actual processing of data and manipulation of data may be done in the application that uses the middleware (402). The data integrity watchdog analyses the stored state variables for its integrity and generates events or flags if any problem occurs.

The local signal communication interface (503) interfaces with the local discrete input/output hardware to update the bulletin board with new variables and to update the input/output interfaces with the state variables from the bulletin board. It also converts state variables to input/output signals and input/output signals to state variables that can be stored in the bulletin board. The conversion process may contain scaling of signals as well as offset compensation. Typically this processing helps to convert I/O signals that are measured in Volt to a physical entity and vice versa. The communication with the local discrete input output system can be triggered by events or signals can be sampled time-triggered based on a cyclic global or local time base.

The remote message communication interface (504) interfaces to serial multiplexing interfaces (buses) that are connected to the specific processing node (ECU or Gateway). It extracts variables from a plurality of messaging protocols and stores them in the database. It also replicates local bulletin-board state variables to the associated processing nodes by composing the appropriate messages for each communication link. The message transfer can be initiated triggered by a bus event, by a local event, or by a time-triggered mechanism that uses a cyclic local or global time base.

FIG. 6 shows the concept of an extended bulletin board or an embedded real-time database (601). In this embodiment the ECU (102) or the Gateway (101) hosts one or multiple bulletin boards with relational links between the variables in the bulletin boards. The relations are defined by data processing functions that the gateway can operate on bulletin boards to obtain new information that can be stored in yet another bulletin node.

The bulletin board (601) may contain but is not limited to events (607), real-time variables (608), diagnostics data (609), configuration parameters (610), and firmware (611) to upgrade individual components of the executable code or the entire software of a processing node. Each type of information may include one or more sections so that individual processes are not blocked if they access separate sections of data.

The memory of the bulletin board is subdivided into areas that nodes on each external network can read from and write into and other areas that an external network may only read from. The data contained in the bulletin board may be stored in volatile or non-volatile memory. Each data entry may consist of one value or an array of values that also may represent a time series.

In one embodiment, each application process (603), local signal communication process (605), remote message communication process, and the bulletin manager (602) can individually access the bulletin board using operating system functions for resource management that may include semaphores, events, signals, call-back routines, flags, etc. in an alternate embodiment of the system the bulletin-board manager controls all interaction with the bulletin-board and all applications have to pass data to the bulletin-board manager. This approach simplifies the interaction with the bulletin board, but adds delay time and jitter to the state variables.

At design time, various hierarchies of memory management can be applied. In practice it is more efficient to allow each sub network and subsystem to place system variable data into local bulletin boards. This is because many system variables are primarily used only within their subsystem or sub network. By placing local information in a shared memory (local bulletin board), it can be used by multiple processes on this processor node. A group bulletin board allows devices on a sub-network to share information with a minimum of network traffic. A system bulletin board allows access to system-wide variables and information.

FIG. 7 illustrates the logical architecture of the interconnection between three heterogeneous network controllers (702, 703, 704), the associate Operating System interfaces (705), the remote message communication process (706), the bulletin board (608), and the application process (606). The connection to each communication controller is fundamentally implemented at the physical interface (the wire, fiber or electromagnetic wireless interface). Each of the higher level layers (data link, network, etc) in the communication interface (705) deals with specific features of the individual communication process. In practice these layers are typically represented in a message by "header" bits that contain information about that layer of the network being used to send the message.

Using this model, each communicated message may be processed at each layer to remove (and use) the associated header information for that level. Once all layers are processed the remaining packet data unit (PDU) represents the datum or core information carried by the overall message. In one embodiment, each communication controller has an associated communication interface and an associated remote message conversion mechanism. For instance com-

US 10,002,036 B2

7

munication bus controller **2** (**703**) has an associated communication interface **2** (**709**), and an associated remote message conversion **2** (**710**).

This arrangement allows the remote message process (**706**) to directly access information at the data link layer and interface it with the bulletin board. A network layer is not necessary. The remote message communication process (**706**) has a multi-network access interface (essentially a processing capability that can interpret and apply the header information for a variety of networks) and the bulletin board read/write memory access. Now, the individual processing nodes do not need to know about the existence of multiple networks. Each variable can be accessed from all connected physical networks in their proprietary format. Thus the normalization of the information has only to be handled at the gateway through replication of stored data to multiple attached networks.

Continuing with FIG. **7**, the communication procedure is described. In the given example, an external event (**701**) on communication controller **2** (**703**) triggers the operating system to notify the remote message communication process (**706**) that data is available. The notification may be a flag, a call-back routine, an event, or any other operating signal. The associated remote message conversion method **2** (**710**) extracts the data (e.g. real time variables) from the message PDU and stores the data in the bulletin board (**608**). It may also store the associated event as variable in the bulletin board and signal the bulletin-board event manager that new data is available.

The bulletin event manager then notifies the application process (**606**) with the appropriate mechanism. In addition, the event manager may trigger the sampling of local signals using the local signal communication process (**605**) described in FIG. **6**. Finally the bulletin event manager may trigger the bulletin board manager (**707**) to perform integrity checks or generate additional events based on the change of the state variables.

One embodiment provides a new mechanism for creating an information interconnection between two or more heterogeneous communication networks. In the context of the present description, heterogeneous networks may refer to any different communication networks with at least one aspect that is different.

The approach uses a common, or shared storage system that is connected to all of the system networks through network interfaces. A critically important feature of the bulletin board approach is that the complexity of the bulletin board grows linearly with the number of networks (as opposed to as N(N−1) for the gateway approach), and in one-to-many situations the number of message transformations is half that of the standard networking approach.

In an alternate embodiment of the remote message communication process (**706**) any remote process can access data via a single network interface. This approach requires a network layer in each processing node and therefore adds overhead to communications. To communicate between two heterogeneous networks, this process may then be repeated in reverse by adding back the header information for the various layers of the second network, and eventually putting the message onto the second network's physical link. The remote message communication manager (**706**) then can be simplified to only one message assembly and disassembly mechanism.

FIGS. **8-17** illustrate the method of operation of one embodiment of the present system, and also refer to aspects and elements one embodiment shown in FIGS. **1** through **7**.

8

FIG. **8** details the remote messaging process (**706**) described in FIG. **7**. Referring now to FIG. **8**, the core process of storing data from remote processes that are communicated through multiplexed communication links, into the bulletin board is described. An external notification or task activation starts the process. Then a message (**802**) is received from the operating system layer.

In an alternate embodiment, the message is directly copied form the input register of the communication controller. Then the process extracts variables from the message. Additional signal adaptation may be necessary. The sub-process **804** stores the variables in the bulletin board. If the process only updates one section of the bulletin board it waits for the next message notification (**806**). If variables in multiple sections need to be updated, the process repeats (**804**).

FIG. **9** shows the data update from local input/output peripherals. The process starts with an internal or external notification or task activation. Typically this process is repeated cyclic triggered by an internal or external real-time clock. When the process is activated, it samples or polls the local input ports that may include analog and digital signals (**902**). Then it converts these signals to real-time variables by using the conversion parameters stored in the bulletin board. The signal conditioning parameters van either be defined at design time or adaptively updated by the application process. Then the process stored the new state variables in the bulletin board using the sub-process (**804**) described above.

FIG. **10** describes the bulletin board store procedure (**804**) in more detail. Before new data can be stored in the bulletin board, the procedure has to request the access right to the common resource, a section of the non-volatile or volatile memory, from the operating system (**1001**). This is called explicit resource management.

If the resource is available, the process gets the resource. If the resource is not available, it may try it again after a waiting period (**1011**) until the resource is available. After a certain time has elapsed (**1009**) beyond a configurable threshold, the temporal behavior of the state variable can't be captured any longer and the middle-ware may send an error notification to the associated process.

After reserving the resource (**1003**), the bulletin board store mechanism (**804**) timestamps the state variable for future temporal reference (**1004**). Then, the bulletin board store procedure (**804**) copies the variables or parameters from its private memory (**1006**) to the shared bulletin-board memory (**601**). Then it releases the bulletin board resource.

In an alternate embodiment, the bulletin board store procedure (**804**) has exclusive access to the bulletin board (**601**) and does not need operations **1002**, **1003**, **1007**, **1009**, **1010**, and **1011** because the resource access is realized through implicit resource management. This can be achieved with either static task scheduling or by allowing only the bulletin board store procedure (**804**) to access the bulletin board (**601**).

FIG. **11** describes the bulletin board retrieve procedure (**1101**) in more detail. Before data can be retrieved from the bulletin board, the procedure has to request the access right to the common resource, a section of the non-volatile or volatile memory, from the operating system (**1102**).

If the resource is available, the process gets the resource. If the resource is not available, it may try it again after a waiting period (**1109**) until the resource is available. After a certain time has elapsed (**1109**) beyond a configurable threshold, the temporal behavior of the state variable can't be captured any longer and the middle-ware may send an error notification to the associated process (**1110**).

US 10,002,036 B2

9

After reserving the resource (1104), the bulletin board retrieve mechanism (1101) copies the variables or parameters from the shared bulletin-board memory (601) to its private memory (1006). Then, it releases the bulletin board resource. In an alternate embodiment the bulletin board retrieve procedure (1101) has exclusive access to the bulletin board (601) and does not need operations 1103, 1104, 1106, 1108, 1109, and 1110. Because the resource access is realized through implicit resource management, this can be achieved with either static task scheduling or by allowing only the bulletin board retrieve procedure (1101) to access the bulletin board (601).

Referring to FIG. 12, the application process (1200) utilizes the bulletin board retrieve mechanism (1101) to access all parameters, events, and real-time variables from the bulletin board. Thus the application process is decoupled from the temporal behavior of the input/output variables and can be triggered by a plurality of events (1201).

The application process may retrieve one or multiple sets of variables stored in a plurality of memory sections. Then the application process processes the variables (1203) with its method. Because the method is not tied to the location of the input/output variables, the application process can be moved or replicated to a plurality of processing nodes (ECUs or Gateways). After processing the input variables and generating a set of output variables, the application process uses the bulletin board store method (801) to update one or a plurality of memory sections in the bulletin board. If the application process is a cyclic procedure, it waits until the next activation occurs (1205).

Continuing with FIG. 13, the update local I/O from bulletin board process (1300) utilizes the bulletin board retrieve mechanism (1101) to access real-time variables from the bulletin board and convert them to output signals (1302) that can be written to the output port (1303). The I/O update process may retrieve one or multiple sets of variables stored in a plurality of memory sections. If the I/O update process is a cyclic procedure, it waits until the next activation occurs (1305).

FIG. 14 describes the data replication process (1400). This process can be triggered by a plurality of notification mechanisms, such as events, alarm signals, internal and external timers, and flags set in the bulletin board. It then selects a subset of variables to be replicated and a communication port (1402). Next it retrieves the variables from the bulletin board with mechanism (1401) and assembles the messages for the specific communication link (1403). The message may include an address or identification number for all bulletin boards and associated processing nodes (ECUs and Gateways).

Finally, it writes the messages to the communication port (1404). In an alternate embodiment, it handles the messages to the associated interface procedure of the operating system. Then it repeats the procedure, until all variables are updated on all communication ports. If the data replication process is a cyclic procedure, it waits until the next activation occurs (1405).

Referring now to FIG. 15, the store message from remote processing node (gateway or ECU) process (1500) describes how replicated data is stored in the bulletin board. This process can be triggered by a plurality of notification mechanisms, such as internal or remote events, alarm signals, internal and external timers, and flags set in the bulletin board. The communication bus may also issue these notifications. The process (1500) then reads a message from the communication port (1502), selects a subset of variables to be replicated (1503), and stores the variables in the bulletin

10

board with procedure (801). In an alternate embodiment, this procedure may also be used to store a packet data unit (PDU) in the bulletin board for later replication on the same or a different communication link.

This store and forward networking mechanism can be implemented without the need for complex networking protocols and is therefore well suited for limited processing power and memory environments. It also works in soft-real time environments when no strict temporal behavior is required. The data store operation (801) may be repeated for a plurality of bulletin board sections. If the data replication process is a cyclic procedure, it waits until the next activation occurs (1505).

Continuing now with FIG. 16, the store and forward updating mechanism (1600) replicates messages from remote processing nodes to other processing nodes from stored packet data units in the bulletin board. This process can be triggered by a plurality of notification mechanisms (1601), such as internal or remote events, alarm signals, internal and external timers, and flags set in the bulletin board. The communication bus may also issue these notifications.

The process (1600) then selects a message to be forwarded (1602) and the appropriate communication link and retrieves the PDU with the bulletin board retrieve mechanism (1101). It then adds the appropriate messages header for the communication link (1603) and may add routing information (1604). Finally the update process (1600) writes the messages to the communication port (1605). If the updating process is a cyclic procedure, it waits until the next activation occurs (1607).

FIG. 17 describes the various modes that the distributed communications and computing system (100) can be operated in. In one embodiment, the system operates in various distinct modes in order to preserve the integrity of the system and still allow for changing the architecture and behavior of the network or the roles of the individual nodes. When the distributed computing and communication system wakes up from the sleep mode (1701), it can enter a configuration and upgrade mode (1702), an emergency or debug mode (1704), or the normal real-time run mode (1703). The root node or system gateway in a distributed communication and computing system defines the mode based on the existence of external events, such as an external control command, internal events, a system failure, or failed integrity check.

Referring now to FIG. 1, the external commands may be generated from a development tool (122) or a remote device (132) that is connected via a remote gateway (131). In an alternate embodiment, each ECU (102) or virtual ECU (115) can trigger the system to enter a different operating mode.

Continuing with FIG. 17, in the configuration mode (1702), the system software and the information-sharing configuration can be updated via a secure communication link with encrypted commands Each processing node (ECU or gateway) may have security mechanisms such as a certificate that allows it to identify and authorize another entity (remote gateway, remote ECU, or development tool) to make changes to its bulletin board parameters.

The remote entity may also download a new firmware to the bulletin board. The ECU or gateway can store this new firmware in its non-volatile memory while it backs up the original image on the bulletin board for the case that the new software is not functional. In the update mode, the distributed system can also reconfigure the communication and computing infrastructure based on a new set of parameters that need to be stored in the individual bulletin boards.

US 10,002,036 B2

11

In the normal run mode (**1703**), the system operates in the real-time information sharing mode and network configuration and certain parameters can't be changed. That protection allows defining deterministic temporal behavior on all communication links. But any processing node may enter a debug/emergency mode (**1704**) if a failure or other qualifying event occurs.

In the emergency mode, a processor executes an alternate procedure that maintains the temporal behavior on the communication links but may reduce or increase the amount of information shared with other processors. It also lets other processing nodes check on the integrity of sensors and actuators. In the maintenance and upgrade mode, an external system can upgrade executable code images and the bulletin-board configuration via secure communication links.

A system and method are thus provided for sharing information within a distributed embedded communications and computing system and with components outside the embedded system. The information sharing mechanism relies on a bulletin board that may include a small database operating under hard real-time conditions with minimal delays, communication latency, and jitter. The embedded database or bulletin board isolates a real-time application in a Electronic Control Unit (ECU) from various other real time applications and from input output signals in the same module (local information sharing), from event-triggered communications with applications in other modules, and from time-triggered communications with applications in other modules.

One design criteria of the database is that the temporal behavior of communications does not impact the real-time computing task and provides enough information access performance at peak time demand Typically, distributed embedded systems consist of a static structure that can be analyzed at design time. In addition to the real-time operation, the proposed method for information sharing also provides access to the parameters of the embedded system and allows for software upgrades of certain modules.

The present embodiment addresses the shortcomings of traditional computer networks with following enhancements:

1) The concept of multi-mode storage that links two or more communication networks via a bulletin board. The bulletin board is a multi-mode storage that can be thought of an extension to shared memory that can be accessed by local and remote processes at attached networks. There may be multiple hierarchical layers of bulletin boards depending on the topology of the communication system. The bulletin board increases the network efficiency by reducing the number of transactions needed to access remote variables.

2) The concept of a direct-access bulletin board that does not require a network layer translation of messages on each node of the network. Even though this approach restricts the reach of each node to only adjacent nodes and the next gateway, this still allows cross-network variable sharing though vertical real-time replication of data.

3) The concept of hierarchical bulletin board management that allows restriction of information access to certain levels in a network, but still allows the replication of information to other nodes in the network. This paradigm follows the path of reducing the information amount from the leaves of the network to central control and diagnosis hubs.

4) The concept that a gateway can host an assembly of bulletin boards or embedded database that allows operations on bulletin boards to generate events for associated processes. This extension allows definition of a set of data processing operations that would be done once in a network

12

and would be instantly available for connected nodes. Examples for operations are sensor data state observers, diagnostics, integrity checks, fail-safe mechanisms, etc.

5) The concept that an embedded communication and computing network can run in multiple modes in order to provide for a guaranteed deterministic behavior of the system. This property can be achieved by only allowing change to the configuration and/or the functions (SW code) in a secured configuration and upgrade mode. If the network is booted in the normal operating mode, all processors execute the existing code and only allow data sharing through the bulletin boards. The emergency or debug mode lets the network run in a fail-safe reduced operation mode or in a diagnostic mode that allows inspection of the system, while it is running. For each operating mode, the gateway can store a processing image on the bulletin board. The advantage of this procedure is that only the communication hubs need to deal with secure data transfer and encryption while the peripheral nodes in the network can be relative simple in design.

6) The concept of designing the topology of a distributed computing and communication system independent of the definition of the individual functions that the network performs. Each processing task is only associated with a bulletin board, but isolated from I/O processing.

Of course, these are all optional embodiments/enhancements.

While various embodiments have been described above, it should be understood that they have been presented by the way of example only, and not limitation. Thus, the breadth and scope of a preferred embodiment should be not limited by any of the above described exemplary embodiments, but should be defined only in accordance with the following claims and their equivalents.

What is claimed is:

1. An apparatus, comprising:

an automotive electronic control unit including a non-transitory memory storage comprising instructions, and at least one hardware processor in hardwired communication with the memory storage, wherein the at least one hardware processor executes the instructions to:

identify information associated with a message received utilizing a Flexray network protocol associated with a Flexray network;

issue a storage resource request in connection with a storage resource of the automotive electronic control unit and determine whether the storage resource is available for storing the information;

determine whether a threshold has been reached in association with the storage resource request;

in the event the storage resource is not available and the threshold associated with the storage resource request has not been reached, issue another storage resource request in connection with the storage resource;

in the event the storage resource is not available and the threshold associated with the storage resource request has been reached, send a notification;

in the event the storage resource is available, store the information utilizing the storage resource; and

share the information in less than one millisecond utilizing a Controller Area Network protocol associated with a Controller Area Network, the automotive electronic control unit remaining in hardwired communication with the Flexray network and the Controller Area Network, and including:

US 10,002,036 B2

13

a first interface for interfacing with the Flexray network, the first interface including a first interface-related data link layer component that uses Flexray network-related data link layer header bits and a first interface-related network layer component that uses Flexray network-related network layer header bits; and

a second interface for interfacing with the Controller Area Network, the second interface including a second interface-related data link layer component that uses Controller Area Network-related data link layer header bits and a second interface-related network layer component that uses Controller Area Network-related network layer header bits.

**2**. The apparatus as recited in claim **1**, wherein the information is also shared in less than the one millisecond utilizing, in addition to the Controller Area Network protocol, a Local Interconnect Network protocol associated with a Local Interconnect Network, and the automotive electronic control unit remains in hardwired communication with the Local Interconnect Network via a third interface for interfacing with the Local Interconnect Network, the third interface including a third interface-related data link layer component that uses Local Interconnect Network-related data link layer header bits.

**3**. The apparatus as recited in claim **1**, wherein the identifying, the issuing the another storage resource request, and the sending the notification collectively occur in less than one microsecond.

**4**. The apparatus as recited in claim **1**, wherein the identifying, the issuing of the storage resource request, the storing the information, and an initiation of the sharing collectively occur in less than one microsecond.

**5**. The apparatus as recited in claim **4**, wherein the second interface-related network layer component uses the Controller Area Network-related network layer header bits by adding the Controller Area Network-related network layer header bits to a data unit including the information, and then the second interface-related data link layer component uses the Controller Area Network-related data link layer header bits by adding the Controller Area Network-related data link layer header bits to the data unit, before communicating the data unit on a physical link of the Controller Area Network.

**6**. The apparatus as recited in claim **5**, wherein the first interface-related data link layer component uses the Flexray network-related data link layer header bits by removing the Flexray network-related data link layer header bits from another data unit, and the first interface-related network layer component uses the Flexray network-related network layer header bits by removing the Flexray network-related network layer header bits from the another data unit, where the information is extracted from the another data unit before the sharing.

**7**. The apparatus as recited in claim **1**, wherein a duration between the information being sent to the automotive electronic control unit and the sharing being completed by the information arriving at a destination, is less than the one millisecond.

**8**. The apparatus as recited in claim **1**, wherein a duration between the information being received at the automotive electronic control unit, and the sharing being completed by arriving at a destination, is less than the one millisecond.

**9**. The apparatus as recited in claim **1**, wherein the storage resource request and the another storage resource request each includes a request for an access.

14

**10**. The apparatus as recited in claim **1**, wherein the storage resource is configured to store the information that is received utilizing the Flexray network that is a physical network, for the purpose of sharing the information utilizing the Controller Area Network that is another physical network.

**11**. The apparatus as recited in claim **1**, wherein the hardware processor and the instructions are for releasing the storage resource after the storing.

**12**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the information is replicated among a plurality of the storage resources.

**13**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that both past and present instances of the information are stored on the storage resource.

**14**. The apparatus as recited in claim **1**, wherein a plurality of the storage resources are included which are organized in a hierarchical manner.

**15**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that different processes are capable of accessing multiple sections of the storage resource.

**16**. The apparatus as recited in claim **15**, wherein the different processes include local processes.

**17**. The apparatus as recited in claim **15**, wherein the different processes include remote processes.

**18**. The apparatus as recited in claim **15**, wherein the different processes include both event triggered processes and time triggered processes.

**19**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that a storage resource manager sends notifications to different processes based on a state of the information stored utilizing the storage resource.

**20**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the information is shared without multiplexing.

**21**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that at least one of a plurality of different processes process the information in a manner that is isolated from temporal characteristics associated with at least one of the Controller Area Network or the Flexray Network.

**22**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the information is shared in a single task.

**23**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the information is shared according to a schedule.

**24**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the information is shared with an operating system.

**25**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that dynamic preemptive scheduling is provided.

**26**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the storage resource is protected utilizing a schedule that allows information sharing utilizing the storage resource.

**27**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the storage resource is protected utilizing semaphores.

**28**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the information is shared according to an internal clock.

US 10,002,036 B2

15

**29**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the information is shared according to an external clock.

**30**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that objects are generated based on a change of state of the information stored utilizing the storage resource.

**31**. The apparatus as recited in claim **30**, wherein the objects include at least one of flags, events, signals, or interrupts.

**32**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the information is stored in response to interrupts associated with different processes.

**33**. The apparatus as recited in claim **1**, wherein the storage resource is replicated through a distributed system.

**34**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the information is shared by the automotive electronic control unit with only a portion of a network communication protocol header.

**35**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the storage resource updates at least one process with the information at a first rate that differs from a second rate with which at least one other process sends the information to the storage resource.

**36**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that event triggers are provided independent of a link connection between nodes where different processes are performed.

**37**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that failure redundancy is provided across multiple independent links across diverse physical connections.

**38**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the storage resource is accessed with guaranteed access times.

**39**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the storage resource is accessed with guaranteed jitter.

**40**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the storage resource is accessed with guaranteed bandwidth.

**41**. The apparatus as recited in claim **1**, wherein the information has a user-configured constraint associated therewith.

**42**. The apparatus as recited in claim **41**, wherein the constraint includes a memory constraint.

**43**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the information is processed utilizing a first storage resource and stored utilizing a second storage resource.

**44**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that instances of the information are time-stamped when stored utilizing the storage resource for temporal reference.

**45**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that the storage resource updates different processes based on an event.

**46**. The apparatus as recited in claim **1**, wherein the apparatus is part of an embedded system.

**47**. The apparatus as recited in claim **1**, wherein the instructions include code.

**48**. The apparatus as recited in claim **1**, wherein the apparatus includes middleware.

**49**. The apparatus as recited in claim **1**, wherein the automotive electronic control unit includes a gateway for multicasting the information to the Flexray Network in addition to at least one other different network.

16

**50**. The apparatus as recited in claim **1**, wherein the automotive electronic control unit includes a gateway for concurrently sending the information to the Flexray Network in addition to at least one other network.

**51**. The apparatus as recited in claim **1**, wherein the storage resource includes a multi-mode storage.

**52**. The apparatus as recited in claim **1**, wherein the storage resource includes a section of the memory storage.

**53**. The apparatus as recited in claim **1**, wherein the storage resource is a component of firmware.

**54**. The apparatus as recited in claim **1**, wherein the automotive electronic control unit includes a gateway.

**55**. The apparatus as recited in claim **1**, wherein the automotive electronic control unit includes a gateway for sending the information to the Flexray Network in addition to at least one other network.

**56**. The apparatus as recited in claim **1**, wherein the automotive electronic control unit includes a gateway for sending the information to multiple Flexray Networks.

**57**. The apparatus as recited in claim **1**, wherein the storage resource includes non-volatile memory and volatile memory.

**58**. The apparatus as recited in claim **1**, wherein the storage resource stores a data entry.

**59**. The apparatus as recited in claim **58**, wherein the data entry includes an array of values.

**60**. The apparatus as recited in claim **58**, wherein the data entry includes an array of values that represents a time series.

**61**. The apparatus as recited in claim **1**, wherein at least one of the determinations is carried out as part of explicit resource management.

**62**. The apparatus as recited in claim **1**, wherein at least one of the determinations is carried out as part of implicit resource management.

**63**. The apparatus as recited in claim **1**, wherein the storage resource includes at least two different types of memory.

**64**. The apparatus as recited in claim **1**, wherein at least one aspect of the storage resource grows linearly with a number of heterogeneous networks to which the apparatus is coupled.

**65**. The apparatus as recited in claim **1**, wherein the information is associated with at least one of engine control or brake control.

**66**. The apparatus as recited in claim **1**, wherein the information is associated with diagnostics.

**67**. The apparatus as recited in claim **1**, wherein the apparatus is part of a system including a plurality of the automotive electronic control units which are each capable of interfacing at least one of an actuator or a sensor.

**68**. The apparatus as recited in claim **67**, wherein the apparatus further includes at least one gateway capable of interfacing the plurality of electronic control units.

**69**. The apparatus as recited in claim **68**, wherein the gateway includes a group gateway.

**70**. The apparatus as recited in claim **68**, wherein the gateway includes a subgroup gateway.

**71**. The apparatus as recited in claim **1**, wherein the automotive electronic control unit is a virtual automotive electronic control unit.

**72**. The apparatus as recited in claim **1**, wherein the apparatus is part of a system that is capable of interfacing a diagnostic tool and a design tool.

**73**. The apparatus as recited in claim **1**, wherein the apparatus is part of a system including a plurality of layers

US 10,002,036 B2

17

including an application layer, a middleware layer, a real-time operating system layer, a device driver layer, and a hardware abstraction layer.

**74**. The apparatus as recited in claim **1**, wherein the apparatus is part of a system including a plurality of layers including at least two of an application layer, a middleware layer, a real-time operating apparatus layer, a device driver layer, and a hardware abstraction layer.

**75**. The apparatus as recited in claim **1**, wherein the apparatus is part of a system including a plurality of layers including at least three of an application layer, a middleware layer, a real-time operating system layer, a device driver layer, and a hardware abstraction layer.

**76**. The apparatus as recited in claim **1**, wherein the apparatus is part of a system including a plurality of layers including at least four of an application layer, a middleware layer, a real-time operating system layer, a device driver layer, and a hardware abstraction layer.

**77**. The apparatus as recited in claim **1**, wherein the storage resource is configured such that temporal behavior of communications does not impact a real-time computing task.

**78**. The apparatus as recited in claim **1**, wherein the storage resource is configured for providing software upgrades for each of a plurality of modules.

**79**. The apparatus as recited in claim **78**, wherein the apparatus is configured such that the software upgrades are downloaded via a communication link.

**80**. The apparatus as recited in claim **1**, wherein the storage resource is configured such that network efficiency is increased by reducing a number of transactions needed to access remote variables.

**81**. The apparatus as recited in claim **1**, wherein the storage resource is a direct-access storage resource.

**82**. The apparatus as recited in claim **1**, wherein the apparatus is configured so as to avoid a network layer translation of the message.

**83**. The apparatus as recited in claim **1**, wherein the storage resource is configured so as to allow cross-network variable sharing though vertical real-time replication of data.

**84**. The apparatus as recited in claim **1**, wherein the storage resource is configured to restrict information access to certain levels in a particular network.

**85**. The apparatus as recited in claim **1**, wherein the storage resource is configured to restrict information access to certain network levels, while allowing replication of the information to nodes.

**86**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that multiple modes of operation are enabled in order to provide for a guaranteed deterministic behavior.

**87**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that multiple modes of operation are enabled, wherein at least one of the modes includes a secured configuration or upgrade mode that allows changes to configuration and/or functions.

**88**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that multiple modes of operation are enabled, wherein at least one of the modes includes a diagnostic mode.

**89**. The apparatus as recited in claim **1**, wherein the apparatus is configured such that a topology of a distributed computing and communication system is capable of being designed independent of a definition of individual functions that a particular network performs.

**90**. The apparatus as recited in claim **1**, and further comprising: a hardware abstraction layer that allows a

18

system developer to adapt a real-time operating system and a plurality of device drivers to a specific hardware implementation of the automotive electronic control unit.

**91**. The apparatus as recited in claim **90**, and further comprising: middleware that has access to the real-time operating system, the device drivers, and the hardware abstraction layer.

**92**. The apparatus as recited in claim **91**, wherein the middleware isolates multiple application from input or output functions.

**93**. The apparatus as recited in claim **92**, wherein the middleware allows the multiple applications to share common variables locally.

**94**. The apparatus as recited in claim **91**, wherein the middleware interfaces with input or output mechanisms without utilizing the real-time operating system nor the hardware abstraction layer.

**95**. The apparatus as recited in claim **91**, wherein the middleware is adapted for implementing different types of control of the storage resource.

**96**. The apparatus as recited in claim **95**, wherein the different types of control of the storage resource include implicit control and explicit control.

**97**. The apparatus as recited in claim **95**, wherein the different types of control of the storage resource include a control associated with the identifying, the issuing of the storage resource request, the storing of the information, and the sharing.

**98**. The apparatus as recited in claim **1**, and further comprising: a data integrity watchdog that analyses stored state variables for integrity and generates events or flags if a problem occurs.

**99**. The apparatus as recited in claim **1**, wherein the information includes state variables that are converted before storage utilizing the storage resource.

**100**. The apparatus as recited in claim **99**, wherein the state variables are converted for offset compensation in connection with the state variables.

**101**. The apparatus as recited in claim **1**, wherein the storage resource takes a form of storage other than a buffer.

**102**. An apparatus, comprising:

an automotive electronic control unit including a non-transitory memory storage comprising instructions, and at least one hardware processor in hardwired communication with the memory storage, wherein the at least one hardware processor executes the instructions to:

identify information associated with a message received utilizing a Controller Area Network protocol associated with a Controller Area Network;

issue a storage resource request in connection with a storage resource of the automotive electronic control unit and determine whether the storage resource is available for storing the information;

determine whether a threshold has been reached in association with the storage resource request;

in the event the storage resource is not available and the threshold associated with the storage resource request has not been reached, issue another storage resource request in connection with the storage resource;

in the event the storage resource is not available and the threshold associated with the storage resource request has been reached, send a notification;

in the event the storage resource is available, store the information utilizing the storage resource; and

US 10,002,036 B2

19
20

share the information in less than one millisecond utilizing a Flexray network protocol associated with a Flexray network;

wherein the automotive electronic control unit is in hardwired communication with the Controller Area Network and the Flexray network and includes:

a first interface in hardwired communication with the Controller Area Network, the first interface including a first interface-related data link layer component that uses Controller Area Network-related data link layer header bits and a first interface-related network layer component that uses Controller Area Network-related network layer header bits; and

a second interface in hardwired communication with the Flexray network, the second interface including a second interface-related data link layer component that uses Flexray network-related data link layer header bits and a second interface-related network layer component that uses Flexray network-related network layer header bits.

103. The apparatus as recited in claim 102, wherein the information is also shared in less than the one millisecond utilizing, in addition to the Flexray network protocol, a Local Interconnect Network protocol associated with a Local Interconnect Network, and the automotive electronic control unit remains in hardwired communication with the Local Interconnect Network via a third interface for interfacing with the Local Interconnect Network, the third interface including a third interface-related data link layer component that uses Local Interconnect Network-related data link layer header bits.

104. The apparatus as recited in claim 102, wherein the identifying, the issuing the another storage resource request, and the sending the notification collectively occur in less than one microsecond.

105. The apparatus as recited in claim 102, wherein the identifying, the issuing of the storage resource request, the storing the information, and an initiation of the sharing collectively occur in less than one microsecond.

106. The apparatus as recited in claim 102, wherein the second interface-related network layer component uses the Flexray network-related network layer header bits by adding the Flexray network-related network layer header bits to a data unit including the information, and then the second interface-related data link layer component uses the Flexray network-related data link layer header bits by adding the Flexray network-related data link layer header bits to the data unit, before communicating the data unit on a physical link of the Flexray network.

107. The apparatus as recited in claim 106, wherein the first interface-related data link layer component uses the Controller Area Network-related data link layer header bits by removing the Controller Area Network-related data link layer header bits from another data unit, and the first interface-related network layer component uses the Controller Area Network-related network layer header bits by removing the Controller Area Network-related network layer header bits from the another data unit, where the information is extracted from the another data unit before the sharing.

108. The apparatus as recited in claim 107, wherein a duration between the information being sent to the automotive electronic control unit and the sharing being completed by the information arriving at a destination, is less than the one millisecond.

109. The apparatus as recited in claim 108, and further comprising: a hardware abstraction layer that allows a system developer to adapt a real-time operating system and a plurality of device drivers to a specific hardware implementation of the automotive electronic control unit.

110. The apparatus as recited in claim 109, and further comprising: middleware that has access to the real-time operating system, the device drivers, and the hardware abstraction layer.

111. The apparatus as recited in claim 110, wherein the middleware isolates multiple application from input or output functions.

112. The apparatus as recited in claim 111, wherein the middleware allows the multiple applications to share common variables locally.

113. The apparatus as recited in claim 110, wherein the middleware interfaces with input or output mechanisms without utilizing the real-time operating system nor the hardware abstraction layer.

114. The apparatus as recited in claim 110, wherein the middleware is adapted for implementing different types of control of the storage resource.

115. The apparatus as recited in claim 114, wherein the different types of control of the storage resource include implicit control and explicit control.

116. The apparatus as recited in claim 114, wherein the different types of control of the storage resource include a control associated with the identifying, the issuing of the storage resource request, the storing the information, and the sharing.

117. The apparatus as recited in claim 108, and further comprising: a data integrity watchdog that analyses stored state variables for integrity and generates events or flags if a problem occurs.

118. The apparatus as recited in claim 108, wherein the information includes state variables that are converted before storage utilizing the storage resource.

119. The apparatus as recited in claim 118, wherein the state variables are converted for scaling the state variables.

120. The apparatus as recited in claim 118, wherein the state variables are converted for offset compensation in connection with the state variables.

121. The apparatus as recited in claim 107, wherein a duration between the information being received at the automotive electronic control unit, and the sharing being completed by arriving at a destination, is less than the one millisecond.

122. The apparatus as recited in claim 121, wherein the first interface-related data link layer component and the second interface-related data link layer component are drivers.

123. The apparatus as recited in claim 122, wherein the first interface-related data link layer component and the second interface-related data link layer component are part of a hardware abstraction layer.

124. The apparatus as recited in claim 123, wherein the hardware processor and the instructions are for releasing the storage resource after the storing.

125. The apparatus as recited in claim 121, wherein the apparatus is configured such that the information is shared without multiplexing.

126. The apparatus as recited in claim 102, where the storage resource is configured to store the information that is received utilizing the Controller Area Network protocol associated with the Controller Area Network that is a first physical network, for the purpose of sharing the information

US 10,002,036 B2

21

22

utilizing the Flexray network protocol associated with the Flexray network that is another physical network.

**127**. The apparatus as recited in claim **102**, wherein the storage resource takes a form of storage other than a buffer.

\* \* \* \* \*

EXHIBIT C



US010031790B1

(12) **United States Patent**
Fuchs et al.

(10) Patent No.: **US 10,031,790 B1**
(45) Date of Patent: *Jul. 24, 2018

(54) **SYSTEM, METHOD AND COMPUTER PROGRAM PRODUCT FOR SHARING INFORMATION IN A DISTRIBUTED FRAMEWORK**

(71) Applicant: **Stragent, LLC**, Longview, TX (US)

(72) Inventors: **Axel Fuchs**, San Jose, CA (US); **Scott Sturges Andrews**, Petaluma, CA (US)

(73) Assignee: **Stragent, LLC**, Longview, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/919,201**

(22) Filed: **Mar. 12, 2018**

**Related U.S. Application Data**

(63) Continuation of application No. 15/405,110, filed on Jan. 12, 2017, now Pat. No. 10,002,036, which is a continuation of application No. 14/011,705, filed on Aug. 27, 2013, now Pat. No. 9,575,817, which is a continuation of application No. 13/531,319, filed on Jun. 22, 2012, now Pat. No. 8,566,843, which is a continuation of application No. 12/182,570, filed on Jul. 30, 2008, now Pat. No. 8,209,705, which is a continuation of application No. 10/737,690, filed on Dec. 15, 2003, now Pat. No. 7,802,263.

(60) Provisional application No. 60/434,018, filed on Dec. 17, 2002.

(51) **Int. Cl.**
    *G06F 9/54* (2006.01)
    *B60R 16/023* (2006.01)
    *H04L 29/08* (2006.01)
    *H04L 12/26* (2006.01)

(52) **U.S. Cl.**
    CPC .......... *G06F 9/546* (2013.01); *B60R 16/0231* (2013.01); *G06F 9/542* (2013.01); *G06F 9/545* (2013.01); *H04L 43/10* (2013.01); *H04L 67/10* (2013.01); *G06F 2209/547* (2013.01)

(58) **Field of Classification Search**
    CPC .......... G06F 9/542; G06F 9/545; G06F 9/546; H04L 43/10; H04L 67/10; B60R 16/0231
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,956,489 A * 9/1999 San Andres ........ G06F 11/1662
                                                     709/221

OTHER PUBLICATIONS

Office Action Summary from U.S. Appl. No. 15/405,110 dated May 17, 2018.

* cited by examiner

*Primary Examiner* — Charles E Anya

(57) **ABSTRACT**

A system, method and computer program product are provided for receiving information associated with a message, issuing a storage resource request in connection with a storage resource and determining whether the storage resource is available. In use, the information is capable of being shared in less than one second, utilizing an automotive electronic control unit which includes a plurality of interfaces.

**30 Claims, 17 Drawing Sheets**





100 Distributed Embedded Communication and Computing System
120 External Components
130 Remote System
Diagnosis Device
Develop-ment Tool
Add-On Device
Gateway
Remote Device
ECU
System Gateway
Group Gateway
Virtual ECU/GW
SubGroup Gateway
ECU & Gateway
Network Sensor
Network Actuator
Local Sensor
Local Actuator
101
102
103
104
105
106
107
108
109
110
111
112
113
114
115
116
121
122
123
131
132

FIGURE 1



FIGURE 2



FIGURE 3



FIGURE 4



FIGURE 5





Case 1:20-cv-00510-JDW Document 67-1 Filed 01/18/22 Page 71 of 430 PageID #: 6720

FIGURE 7



FIGURE 8



FIGURE 9



FIGURE 10



FIGURE 11



FIGURE 12



FIGURE 13



FIGURE 14



FIGURE 15



FIGURE 16



FIGURE 17

US 10,031,790 B1

1

## SYSTEM, METHOD AND COMPUTER PROGRAM PRODUCT FOR SHARING INFORMATION IN A DISTRIBUTED FRAMEWORK

### RELATED APPLICATION(S)

This application is a continuation of U.S. patent application Ser. No. 15/405,110 filed Jan. 12, 2017, which is continuation of U.S. patent application Ser. No. 14/011,705 filed Aug. 27, 2013, which is a continuation of U.S. patent application Ser. No. 13/531,319 filed Jun. 22, 2012, now U.S. Pat. No. 8,566,843, which is a continuation of U.S. patent application Ser. No. 12/182,570 filed Jul. 30, 2008, now U.S. Pat. No. 8,209,705, which is a continuation of U.S. patent application Ser. No. 10/737,690 filed Dec. 15, 2003, now U.S. Pat. No. 7,802,263, which, in turn, claims priority under 35 U.S.C. § 119 based on U.S. Provisional Application No. 60/434,018 filed Dec. 17, 2002, all of which are incorporated herein by reference.

### FIELD AND BACKGROUND OF THE INVENTION

The present invention relates to the field of distributed control and monitoring systems that may include certain temporal behavior.

Such technology may optionally apply to electronic vehicle communication and control systems, real-time monitoring systems, industrial automation and control systems, as well as any other desired system.

### SUMMARY OF THE INVENTION

A system, method and computer program product are provided for sharing information in a distributed system. After information is received, it is stored on a bulletin board. In use, the information is shared, in real-time, among a plurality of heterogeneous processes.

In one embodiment, both past and present instances of the information may be stored on the bulletin board. As an option, the information may be replicated among a plurality of the bulletin boards. Optionally, first information may be processed utilizing a first bulletin board and stored utilizing a second bulletin board. Still yet, the bulletin boards may be hierarchical.

In another embodiment, the processes may access multiple sections of the bulletin board. Further, the bulletin board may send notifications to the processes based on a state of the information on the bulletin board.

Optionally, the information may include variables. For example, the information may include input variables, output variables, etc. Moreover, the processes may include local processes, remote processes, etc. Still yet, the processes may include event triggered processes and/or time triggered processes. In use, each of the processes may process the information in a manner that is isolated from temporal characteristics associated with the network.

In still another embodiment, the information may be extracted from a message received by a bulletin board manager. Moreover, the information may be converted from a signal received by a bulletin board manager. Even still, the information may be shared in a single task, may be shared according to a schedule, and/or may be shared with an operating system. Optionally, dynamic preemptive scheduling may be provided. Also, the information may be shared across the communication network with only a portion of a

2

message header that is needed for a specific communication link while other communication links may use a different message header.

As a further option, resources in the network may be protected. Specifically, the resources in the network may be protected utilizing a schedule that allows information sharing utilizing the bulletin board. In another embodiment, the resources in the network may be protected utilizing semaphores.

In even still another embodiment, the information may be shared according to an internal clock, an external clock, etc. During operation, objects may be generated based on a change of state of the information stored in the bulletin board. Such objects may include, but are not limited to flags, events, signals, interrupts, etc. Still yet, the information may be stored in response to interrupts associated with the processes.

In use, the bulletin board may update the processes with information at a first rate that differs from a second rate with which the processes send the information to the bulletin board. Optionally, the bulletin board may be accessed with guaranteed access times, jitter, and bandwidth.

In addition, the bulletin board may be updated irregularly and triggered by internal or external objects including, but not limited to flags, events, signals, interrupts, etc. Event triggers may be provided independent of a link connection between nodes where the processes are carried out. Moreover, failure redundancy may be provided through multiple independent links across diverse physical connections.

As yet another option, the information may have a user-configured constraint associated therewith. Such constraint may include a memory constraint, a real-time constraint, etc. As a further option, the constraint may be configured utilizing a tool.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of an embodiment of a system of one embodiment;

FIG. 2 is a block diagram generally depicting an embodiment of an ECU as part of the system illustrated in FIG. 1;

FIG. 3 is a block diagram generally depicting an embodiment of a Gateway device as part of the system illustrated in FIG. 1;

FIG. 4 is a block diagram of an embodiment of the software architecture assumed for one embodiment.

FIG. 5 is a block diagram of an embodiment of the middleware that contains the methods of one embodiment.

FIG. 6 is a block diagram of an embodiment of the bulletin board that describes the process interaction of one embodiment.

FIG. 7 is a block diagram of an embodiment of the bulletin board that describes the process interaction with multiple external communication buses as part of one embodiment.

FIG. 8 is a flow chart diagram of an embodiment of the variable store from remote I/O method of one embodiment.

FIG. 9 is a flow chart diagram of an embodiment of the variable store from local I/O method of one embodiment.

FIG. 10 is a flow chart diagram of an embodiment of the variable method of one embodiment.

FIG. 11 is a flow chart diagram of an embodiment of the variable retrieve method of one embodiment.

FIG. 12 is a flow chart diagram of an embodiment of the application process using the method of one embodiment.

US 10,031,790 B1

3

FIG. **13** is a flow chart diagram of an embodiment of the local I/O update from bulletin board method of one embodiment.

FIG. **14** is a flow chart diagram of an embodiment of the variable replication method of one embodiment.

FIG. **15** is a flow chart diagram of an embodiment of the message store from remote gateway method of one embodiment.

FIG. **16** is a flow chart diagram of an embodiment of the message forward to remote ECU or Gateway method of one embodiment.

FIG. **17** is a state transition diagram of an embodiment of the mode switching method of one embodiment.

DETAILED DESCRIPTION

FIG. **1** is a block diagram generally depicting elements of an embodiment of the present distributed embedded communication and computing system. The system architecture may be situated in automotive electronics or industrial control and monitoring systems. In an automotive environment, the various Electronic Control Units (ECUs, **102**) control complex applications such as engine control, brake control, or diagnostics. They are either connected to sensors and actuators via discrete links or simple standard functions such as sensors and actuators are organized into separate sub networks.

These complex functions such as braking, engine-control, etc. are then grouped into the backbone system functions for the car, such as body control, power train and chassis. The backbone also includes the vehicle's high level functions such as diagnostics, telematics and entertainment systems.

Therefore the system is typically hierarchically organized and includes a variety of gateways (**101,104,105**), which relay messages up and down through the system layers. Each layer may contain multiple electronic control units (ECU, **102**) that are connected through wired serial multiplexing bus-systems such as Controller Area Network (CAN or ISO11898), Flexray, LIN, J1850, J1708, MOST, IEEE1394, and other similar serial multiplexing buses or through wireless multiplexing systems such as IEEE802.11, IEEE802.15, Bluetooth, Zigbee, or similar other wireless links.

Typically, functions provided by an ECU (**102**) are bound to hard real-time temporal behavior. In the context of the present description, real-time may include any response time that may be measured in milli- or microseconds, and/or is less than 1 second.

The ECU may receive a set of real-time input variables from local sensors (**108**), which are connected via discrete signal lines (**113**), or from networked sensors (**106**), which are connected through a multiplexing bus-system (**112**). The ECU may also share variables with other ECUs (**102**) that are either connected on the same physical multiplexing bus or that it can reach through a gateway (**101,103,104**).

Then the ECU (**102**) processes the input variables and generates a set of output variables that are either shared with other ECUs (**102**) as described above, or which are output to local actuators (**109**), which are connected via discrete signal lines (**113**), or to networked actuators, which are connected through a multiplexing bus (**112**). ECUs (**102**) typically share information with devices that are connected on the same physical multiplexing system. This method of information sharing is called horizontal information sharing in a hierarchical system. Gateways (**101,103,104**) link multiple physical multiplexing systems together. In the context of the

4

present description, such information may include data, a signal, and/or anything else capable of being stored and shared.

The highest level in the hierarchical system is the system level. The system level gateway (**101**) may be connected to ECUs on the system level multiplexing bus (**117**), to subsequent gateways (**103**) that also link to subsequent communication buses (**110**), and to external components (**120**) that may contain diagnostics devices (**121**), development tools (**122**), other add-on devices (**123**) or other instances of distributed embedded communication and computing systems (**100**). In addition, the system gateway (**101**) may also be connected to an external gateway (**131**) that may link the system to a remote device (**132**) through wireless or wired wide-area-networks such as the Internet, using standard protocols such as UDP/IP, TCP/IP, RTP, HTTP, SOAP, JAVA, etc. or nonstandard proprietary protocols.

Subsequent to the system level may be several layers of groups and subgroups that are link to the higher levels via gateways (**101,103,104,105**).

During the design-time of the system, not all ECUs may exist. Therefore, the development tool (**122**) may provide a plug-in component or virtual ECU/GW (**115**) that directly links into the wired multiplexing bus or wireless network (**110**) and also allows for separate control functions via a tool-link (**116**).

The block diagram in FIG. **2** depicts the detailed elements within a generic ECU (**200**) that is one embodiment of ECU (**102**). The ECU (**200**) typically contains a micro-processor (**201**), volatile memory (**204**) such as RAM, S-RAM or similar, non-volatile memory (**203**) such as EEPROM, FLASH, etc., a real time clock for internal timing of processes (**205**), a watchdog (**206**) to maintain the health of the system, one or more communication bus controllers (**207**) with associated drivers (**208**), digital I/O (**209**) with line drivers (**210**), and analog I/O (**211**) with associated analog signal conditioning (**212**).

In an alternate embodiment, the ECU (**200**) may also contain a wireless communication controller (**311**) and a RF-Front-end (**312**) as outlined in FIG. **3**. The software (**202**) can either be stored in local non-volatile memory (**203**) or partially downloaded via the communication link (**207,208**) and stored in the volatile memory. The software is then executed in the microprocessor (**201**).

The block diagram FIG. **3** depicts the detailed elements within a generic gateway (**300**) that is one embodiment of Gateway (**101,103,104,105**) in FIG. **1**.

FIG. **4** outlines one embodiment of the software architecture in an embedded system. The hardware abstraction layer (**405**) allows the system developer to adapt a standard operating system to a specific hardware as used in an ECU (**200**) or gateway (**300**). The hardware abstraction layer (**405**) adapts the real-time operating system (**403**) and the device drivers (**404**) to a specific hardware implementation.

One embodiment includes the middleware (**402**) that has direct access to the real-time operating system (**403**), the device drivers (**404**) and the hardware abstraction layer (**405**). The middleware isolates the application from input/output functions and allows multiple applications to share common variables locally. In addition, the middleware lets applications share variables with remote applications/processes. In the context of the present description, a process may refer to any hardware and/or software operation, etc.

In one embodiment, the middleware can directly interface with the input/output mechanisms of the hardware without utilizing an operating system (**403**) or hardware abstraction layer (**405**).

US 10,031,790 B1

5

Another embodiment of the middleware utilizes a pre-emptive multitasking operating system with explicit control of resources. In an alternate embodiment, the middleware can be built with a static multitasking scheme with implicit resource management or be part of a single task system.

Referring now to FIG. 5, the middleware (402) contains the bulletin board manager (501), a local signal communication interface (503), a remote message communication interface (504), and an application programming interface (502). The application interface (502) provides methods and data interfaces to a plurality of applications. In one embodiment, the application interface is an object library that can be linked to an application at design time.

The bulletin board manager (501) contains an upgrade and configuration manager (507), an event manager (505), a data access manager (508), and a data integrity watchdog (506). The upgrade and configuration manager (507) is necessary to configure the data structure of the bulletin board and to make executable code available to individual processing nodes. In the context of the present description, the bulletin board may refer to any database that enables users to send and/or read electronic messages, files, and/or other data that are of general interest and/or addressed to no particular person/process.

The access manager provides access control mechanisms for the code update and configuration mode. It also may control access rights for individual applications at execution time in the run mode.

The event manager (505) captures input-output events as variables and generates new events, flags, or signals based on operations on state variables in the bulletin board. Such operations may include test of maximum values, the occurrence of logically combined events, the result of an integrity check, or events and signals that are created based on any other logical or arithmetic computation on the state variables that are stored in the bulletin board. The actual processing of data and manipulation of data may be done in the application that uses the middleware (402). The data integrity watchdog analyses the stored state variables for its integrity and generates events or flags if any problem occurs.

The local signal communication interface (503) interfaces with the local discrete input/output hardware to update the bulletin board with new variables and to update the input/output interfaces with the state variables from the bulletin board. It also converts state variables to input/output signals and input/output signals to state variables that can be stored in the bulletin board. The conversion process may contain scaling of signals as well as offset compensation. Typically this processing helps to convert I/O signals that are measured in Volt to a physical entity and vice versa. The communication with the local discrete input output system can be triggered by events or signals can be sampled time-triggered based on a cyclic global or local time base.

The remote message communication interface (504) interfaces to serial multiplexing interfaces (buses) that are connected to the specific processing node (ECU or Gateway). It extracts variables from a plurality of messaging protocols and stores them in the database. It also replicates local bulletin-board state variables to the associated processing nodes by composing the appropriate messages for each communication link. The message transfer can be initiated triggered by a bus event, by a local event, or by a time-triggered mechanism that uses a cyclic local or global time base.

FIG. 6 shows the concept of an extended bulletin board or an embedded real-time database (601). In this embodiment the ECU (102) or the Gateway (101) hosts one or multiple

6

bulletin boards with relational links between the variables in the bulletin boards. The relations are defined by data processing functions that the gateway can operate on bulletin boards to obtain new information that can be stored in yet another bulletin board.

The bulletin board (601) may contain but is not limited to events (607), real-time variables (608), diagnostics data (609), configuration parameters (610), and firmware (611) to upgrade individual components of the executable code or the entire software of a processing node. Each type of information may include one or more sections so that individual processes are not blocked if they access separate sections of data.

The memory of the bulletin board is subdivided into areas that nodes on each external network can read from and write into and other areas that an external network may only read from. The data contained in the bulletin board may be stored in volatile or non-volatile memory. Each data entry may consist of one value or an array of values that also may represent a time series.

In one embodiment, each application process (603), local signal communication process (605), remote message communication process, and the bulletin manager (602) can individually access the bulletin board using operating system functions for resource management that may include semaphores, events, signals, call-back routines, flags, etc. in an alternate embodiment of the system the bulletin-board manager controls all interaction with the bulletin-board and all applications have to pass data to the bulletin-board manager. This approach simplifies the interaction with the bulletin board, but adds delay time and jitter to the state variables.

At design time, various hierarchies of memory management can be applied. In practice it is more efficient to allow each sub network and subsystem to place system variable data into local bulletin boards. This is because many system variables are primarily used only within their subsystem or sub network. By placing local information in a shared memory (local bulletin board), it can be used by multiple processes on this processor node. A group bulletin board allows devices on a sub-network to share information with a minimum of network traffic. A system bulletin board allows access to system-wide variables and information.

FIG. 7 illustrates the logical architecture of the interconnection between three heterogeneous network controllers (702, 703, 704), the associate Operating System interfaces (705), the remote message communication process (706), the bulletin board (608), and the application process (606). The connection to each communication controller is fundamentally implemented at the physical interface (the wire, fiber or electromagnetic wireless interface). Each of the higher level layers (data link, network, etc) in the communication interface (705) deals with specific features of the individual communication process. In practice these layers are typically represented in a message by "header" bits that contain information about that layer of the network being used to send the message.

Using this model, each communicated message may be processed at each layer to remove (and use) the associated header information for that level. Once all layers are processed the remaining packet data unit (PDU) represents the datum or core information carried by the overall message. In one embodiment, each communication controller has an associated communication interface and an associated remote message conversion mechanism. For instance com-

7

munication bus controller **2** (**703**) has an associated communication interface **2** (**709**), and an associated remote message conversion **2** (**710**).

This arrangement allows the remote message process (**706**) to directly access information at the data link layer and interface it with the bulletin board. A network layer is not necessary. The remote message communication process (**706**) has a multi-network access interface (essentially a processing capability that can interpret and apply the header information for a variety of networks) and the bulletin board read/write memory access. Now, the individual processing nodes do not need to know about the existence of multiple networks. Each variable can be accessed from all connected physical networks in their proprietary format. Thus the normalization of the information has only to be handled at the gateway through replication of stored data to multiple attached networks.

Continuing with FIG. **7**, the communication procedure is described. In the given example, an external event (**701**) on communication controller **2** (**703**) triggers the operating system to notify the remote message communication process (**706**) that data is available. The notification may be a flag, a call-back routine, an event, or any other operating signal. The associated remote message conversion method **2** (**710**) extracts the data (e.g. real time variables) from the message PDU and stores the data in the bulletin board (**608**). It may also store the associated event as variable in the bulletin board and signal the bulletin-board event manager that new data is available.

The bulletin event manager then notifies the application process (**606**) with the appropriate mechanism. In addition, the event manager may trigger the sampling of local signals using the local signal communication process (**605**) described in FIG. **6**. Finally the bulletin event manager may trigger the bulletin board manager (**707**) to perform integrity checks or generate additional events based on the change of the state variables.

One embodiment provides a new mechanism for creating an information interconnection between two or more heterogeneous communication networks. In the context of the present description, heterogeneous networks may refer to any different communication networks with at least one aspect that is different.

The approach uses a common, or shared storage system that is connected to all of the system networks through network interfaces. A critically important feature of the bulletin board approach is that the complexity of the bulletin board grows linearly with the number of networks (as opposed to as N(N−1) for the gateway approach), and in one-to-many situations the number of message transformations is half that of the standard networking approach.

In an alternate embodiment of the remote message communication process (**706**) any remote process can access data via a single network interface. This approach requires a network layer in each processing node and therefore adds overhead to communications. To communicate between two heterogeneous networks, this process may then be repeated in reverse by adding back the header information for the various layers of the second network, and eventually putting the message onto the second network's physical link. The remote message communication manager (**706**) then can be simplified to only one message assembly and disassembly mechanism.

FIGS. **8-17** illustrate the method of operation of one embodiment of the present system, and also refer to aspects and elements one embodiment shown in FIGS. **1** through **7**.

8

FIG. **8** details the remote messaging process (**706**) described in FIG. **7**. Referring now to FIG. **8**, the core process of storing data from remote processes that are communicated through multiplexed communication links, into the bulletin board is described. An external notification or task activation starts the process. Then a message (**802**) is received from the operating system layer.

In an alternate embodiment, the message is directly copied form the input register of the communication controller. Then the process extracts variables from the message. Additional signal adaptation may be necessary. The sub-process **804** stores the variables in the bulletin board. If the process only updates one section of the bulletin board it waits for the next message notification (**806**). If variables in multiple sections need to be updated, the process repeats (**804**).

FIG. **9** shows the data update from local input/output peripherals. The process starts with an internal or external notification or task activation. Typically this process is repeated cyclic triggered by an internal or external real-time clock. When the process is activated, it samples or polls the local input ports that may include analog and digital signals (**902**). Then it converts these signals to real-time variables by using the conversion parameters stored in the bulletin board. The signal conditioning parameters van either be defined at design time or adaptively updated by the application process. Then the process stored the new state variables in the bulletin board using the sub-process (**804**) described above.

FIG. **10** describes the bulletin board store procedure (**804**) in more detail. Before new data can be stored in the bulletin board, the procedure has to request the access right to the common resource, a section of the non-volatile or volatile memory, from the operating system (**1001**). This is called explicit resource management.

If the resource is available, the process gets the resource. If the resource is not available, it may try it again after a waiting period (**1011**) until the resource is available. After a certain time has elapsed (**1009**) beyond a configurable threshold, the temporal behavior of the state variable can't be captured any longer and the middle-ware may send an error notification to the associated process.

After reserving the resource (**1003**), the bulletin board store mechanism (**804**) timestamps the state variable for future temporal reference (**1004**). Then, the bulletin board store procedure (**804**) copies the variables or parameters from its private memory (**1006**) to the shared bulletin-board memory (**601**). Then it releases the bulletin board resource.

In an alternate embodiment, the bulletin board store procedure (**804**) has exclusive access to the bulletin board (**601**) and does not need operations **1002**, **1003**, **1007**, **1009**, **1010**, and **1011** because the resource access is realized through implicit resource management. This can be achieved with either static task scheduling or by allowing only the bulletin board store procedure (**804**) to access the bulletin board (**601**).

FIG. **11** describes the bulletin board retrieve procedure (**1101**) in more detail. Before data can be retrieved from the bulletin board, the procedure has to request the access right to the common resource, a section of the non-volatile or volatile memory, from the operating system (**1102**).

If the resource is available, the process gets the resource. If the resource is not available, it may try it again after a waiting period (**1109**) until the resource is available. After a certain time has elapsed (**1109**) beyond a configurable threshold, the temporal behavior of the state variable can't be captured any longer and the middle-ware may send an error notification to the associated process (**1110**).

US 10,031,790 B1

9

After reserving the resource (**1104**), the bulletin board retrieve mechanism (**1101**) copies the variables or parameters from the shared bulletin-board memory (**601**) to its private memory (**1006**). Then, it releases the bulletin board resource.

In an alternate embodiment the bulletin board retrieve procedure (**1101**) has exclusive access to the bulletin board (**601**) and does not need operations **1103**, **1104**, **1106**, **1108**, **1109**, and **1110**. Because the resource access is realized with either static task scheduling or by allowing only the bulletin board retrieve procedure (**1101**) to access the bulletin board (**601**).

Referring to FIG. **12**, the application process (**1200**) utilizes the bulletin board retrieve mechanism (**1101**) to access all parameters, events, and real-time variables from the bulletin board. Thus the application process is decoupled from the temporal behavior of the input/output variables and can be triggered by a plurality of events (**1201**).

The application process may retrieve one or multiple sets of variables stored in a plurality of memory sections. Then the application process processes the variables (**1203**) with its method. Because the method is not tied to the location of the input/output variables, the application process can be moved or replicated to a plurality of processing nodes (ECUs or Gateways). After processing the input variables and generating a set of output variables, the application process uses the bulletin board store method (**801**) to update one or a plurality of memory sections in the bulletin board. If the application process is a cyclic procedure, it waits until the next activation occurs (**1205**).

Continuing with FIG. **13**, the update local I/O from bulletin board process (**1300**) utilizes the bulletin board retrieve mechanism (**1101**) to access real-time variables from the bulletin board and convert them to output signals (**1302**) that can be written to the output port (**1303**). The I/O update process may retrieve one or multiple sets of variables stored in a plurality of memory sections. If the I/O update process is a cyclic procedure, it waits until the next activation occurs (**1305**).

FIG. **14** describes the data replication process (**1400**). This process can be triggered by a plurality of notification mechanisms, such as events, alarm signals, internal and external timers, and flags set in the bulletin board. It then selects a subset of variables to be replicated and a communication port (**1402**). Next it retrieves the variables from the bulletin board with mechanism (**1401**) and assembles the messages for the specific communication link (**1403**). The message may include an address or identification number for all bulletin boards and associated processing nodes (ECUs and Gateways).

Finally, it writes the messages to the communication port (**1404**). In an alternate embodiment, it handles the messages to the associated interface procedure of the operating system. Then it repeats the procedure, until all variables are updated on all communication ports. If the data replication process is a cyclic procedure, it waits until the next activation occurs (**1405**).

Referring now to FIG. **15**, the store message from remote processing node (gateway or ECU) process (**1500**) describes how replicated data is stored in the bulletin board. This process can be triggered by a plurality of notification mechanisms, such as internal or remote events, alarm signals, internal and external timers, and flags set in the bulletin board. The communication bus may also issue these notifications. The process (**1500**) then reads a message from the communication port (**1502**), selects a subset of variables to

10

be replicated (**1503**), and stores the variables in the bulletin board with procedure (**801**). In an alternate embodiment, this procedure may also be used to store a packet data unit (PDU) in the bulletin board for later replication on the same or a different communication link.

This store and forward networking mechanism can be implemented without the need for complex networking protocols and is therefore well suited for limited processing power and memory environments. It also works in soft-real time environments when no strict temporal behavior is required. The data store operation (**801**) may be repeated for a plurality of bulletin board sections. If the data replication process is a cyclic procedure, it waits until the next activation occurs (**1505**).

Continuing now with FIG. **16**, the store and forward updating mechanism (**1600**) replicates messages from remote processing nodes to other processing nodes from stored packet data units in the bulletin board. This process can be triggered by a plurality of notification mechanisms (**1601**), such as internal or remote events, alarm signals, internal and external timers, and flags set in the bulletin board. The communication bus may also issue these notifications.

The process (**1600**) then selects a message to be forwarded (**1602**) and the appropriate communication link and retrieves the PDU with the bulletin board retrieve mechanism (**1101**). It then adds the appropriate messages header for the communication link (**1603**) and may add routing information (**1604**). Finally the update process (**1600**) writes the messages to the communication port (**1605**). If the updating process is a cyclic procedure, it waits until the next activation occurs (**1607**).

FIG. **17** describes the various modes that the distributed communications and computing system (**100**) can be operated in. In one embodiment, the system operates in various distinct modes in order to preserve the integrity of the system and still allow for changing the architecture and behavior of the network or the roles of the individual nodes. When the distributed computing and communication system wakes up from the sleep mode (**1701**), it can enter a configuration and upgrade mode (**1702**), an emergency or debug mode (**1704**), or the normal real-time run mode (**1703**). The root node or system gateway in a distributed communication and computing system defines the mode based on the existence of external events, such as an external control command, internal events, a system failure, or failed integrity check.

Referring now to FIG. **1**, the external commands may be generated from a development tool (**122**) or a remote device (**132**) that is connected via a remote gateway (**131**). In an alternate embodiment, each ECU (**102**) or virtual ECU (**115**) can trigger the system to enter a different operating mode.

Continuing with FIG. **17**, in the configuration mode (**1702**), the system software and the information-sharing configuration can be updated via a secure communication link with encrypted commands. Each processing node (ECU or gateway) may have security mechanisms such as a certificate that allows it to identify and authorize another entity (remote gateway, remote ECU, or development tool) to make changes to its bulletin board parameters.

The remote entity may also download a new firmware to the bulletin board. The ECU or gateway can store this new firmware in its non-volatile memory while it backs up the original image on the bulletin board for the case that the new software is not functional. In the update mode, the distributed system can also reconfigure the communication and

US 10,031,790 B1

11

computing infrastructure based on a new set of parameters that need to be stored in the individual bulletin boards.

In the normal run mode (**1703**), the system operates in the real-time information sharing mode and network configuration and certain parameters can't be changed. That protection allows defining deterministic temporal behavior on all communication links. But any processing node may enter a debug/emergency mode (**1704**) if a failure or other qualifying event occurs.

In the emergency mode, a processor executes an alternate procedure that maintains the temporal behavior on the communication links but may reduce or increase the amount of information shared with other processors. It also lets other processing nodes check on the integrity of sensors and actuators. In the maintenance and upgrade mode, an external system can upgrade executable code images and the bulletin-board configuration via secure communication links.

A system and method are thus provided for sharing information within a distributed embedded communications and computing system and with components outside the embedded system. The information sharing mechanism relies on a bulletin board that may include a small database operating under hard real-time conditions with minimal delays, communication latency, and jitter. The embedded database or bulletin board isolates a real-time application in a Electronic Control Unit (ECU) from various other real time applications and from input output signals in the same module (local information sharing), from event-triggered communications with applications in other modules, and from time-triggered communications with applications in other modules.

One design criteria of the database is that the temporal behavior of communications does not impact the real-time computing task and provides enough information access performance at peak time demand. Typically, distributed embedded systems consist of a static structure that can be analyzed at design time. In addition to the real-time operation, the proposed method for information sharing also provides access to the parameters of the embedded system and allows for software upgrades of certain modules.

The present embodiment addresses the shortcomings of traditional computer networks with following enhancements:

1) The concept of multi-mode storage that links two or more communication networks via a bulletin board. The bulletin board is a multi-mode storage that can be thought of an extension to shared memory that can be accessed by local and remote processes at attached networks. There may be multiple hierarchical layers of bulletin boards depending on the topology of the communication system. The bulletin board increases the network efficiency by reducing the number of transactions needed to access remote variables.

2) The concept of a direct-access bulletin board that does not require a network layer translation of messages on each node of the network. Even though this approach restricts the reach of each node to only adjacent nodes and the next gateway, this still allows cross-network variable sharing though vertical real-time replication of data.

3) The concept of hierarchical bulletin board management that allows restriction of information access to certain levels in a network, but still allows the replication of information to other nodes in the network. This paradigm follows the path of reducing the information amount from the leaves of the network to central control and diagnosis hubs.

4) The concept that a gateway can host an assembly of bulletin boards or embedded database that allows operations on bulletin boards to generate events for associated pro-

12

cesses. This extension allows definition of a set of data processing operations that would be done once in a network and would be instantly available for connected nodes. Examples for operations are sensor data state observers, diagnostics, integrity checks, fail-safe mechanisms, etc.

5) The concept that an embedded communication and computing network can run in multiple modes in order to provide for a guaranteed deterministic behavior of the system. This property can be achieved by only allowing change to the configuration and/or the functions (SW code) in a secured configuration and upgrade mode. If the network is booted in the normal operating mode, all processors execute the existing code and only allow data sharing through the bulletin boards. The emergency or debug mode lets the network run in a fail-safe reduced operation mode or in a diagnostic mode that allows inspection of the system, while it is running. For each operating mode, the gateway can store a processing image on the bulletin board. The advantage of this procedure is that only the communication hubs need to deal with secure data transfer and encryption while the peripheral nodes in the network can be relative simple in design.

6) The concept of designing the topology of a distributed computing and communication system independent of the definition of the individual functions that the network performs. Each processing task is only associated with a bulletin board, but isolated from I/O processing.

Of course, these are all optional embodiments/enhancements.

While various embodiments have been described above, it should be understood that they have been presented by the way of example only, and not limitation. Thus, the breadth and scope of a preferred embodiment should be not limited by any of the above described exemplary embodiments, but should be defined only in accordance with the following claims and their equivalents.

What is claimed is:

1. An apparatus, comprising:

an automotive electronic control unit including a non-transitory memory storage comprising instructions, and at least one hardware processor in hardwired communication with the memory storage, wherein the at least one hardware processor executes the instructions to:

identify information associated with a message received utilizing a Flexray network protocol associated with a Flexray network that is a physical network;

in response to the identification of the information, issue a storage resource request in connection with a storage resource of the automotive electronic control unit and determine whether the storage resource is available for storing the information, where the storage resource is configured to store the information that is received utilizing the Flexray network for the purpose of sharing the information utilizing a Controller Area Network that is another physical network;

determine whether a threshold has been reached in association with the storage resource request;

in the event the storage resource is not available and the threshold associated with the storage resource request has not been reached, issue another storage resource request in connection with the storage resource;

in the event the storage resource is not available and the threshold associated with the storage resource request has been reached, send a notification;

US 10,031,790 B1

13

in the event the storage resource is available, store the information utilizing the storage resource; and

share the information utilizing a Controller Area Network protocol associated with the Controller Area Network, the automotive electronic control unit remaining in hardwired communication with the Flexray network and the Controller Area Network, and including:

a first interface for interfacing with the Flexray network, the first interface including a first interface-related data link layer component that uses Flexray network-related data link layer header bits and a first interface-related network layer component that uses Flexray network-related network layer header bits; and

a second interface for interfacing with the Controller Area Network, the second interface including a second interface-related data link layer component that uses Controller Area Network-related data link layer header bits and a second interface-related network layer component that uses Controller Area Network-related network layer header bits;

wherein the automotive electronic control unit is configured such that:

the second interface-related network layer component uses the Controller Area Network-related network layer header bits by adding the Controller Area Network-related network layer header bits to a data unit including the information, and then the second interface-related data link layer component uses the Controller Area Network-related data link layer header bits by adding the Controller Area Network-related data link layer header bits to the data unit, before communicating the data unit on a physical link of the Controller Area Network;

the first interface-related data link layer component uses the Flexray network-related data link layer header bits by removing the Flexray network-related data link layer header bits from another data unit, and the first interface-related network layer component uses the Flexray network-related network layer header bits by removing the Flexray network-related network layer header bits from the another data unit, where the information is extracted from the another data unit before the sharing; and

a duration between the information being received at the automotive electronic control unit, and the sharing being completed by arriving at a destination, is less than one millisecond.

**2**. The apparatus as recited in claim **1**, wherein the automotive electronic control unit is configured such that the information is also shared in less than the one millisecond utilizing, in addition to the Controller Area Network protocol, a Local Interconnect Network protocol associated with a Local Interconnect Network, and the automotive electronic control unit remains in hardwired communication with the Local Interconnect Network via a third interface for interfacing with the Local Interconnect Network, the third interface including a third interface-related data link layer component that uses Local Interconnect Network-related data link layer header bits.

**3**. The apparatus as recited in claim **1**, wherein the automotive electronic control unit is configured such that the duration between the information being sent to the automotive electronic control unit and the sharing being completed by the information arriving at a destination, is less than one microsecond.

**4**. The apparatus as recited in claim **1**, wherein the automotive electronic control unit is configured such that the identifying, the issuing the another storage resource request, and the sending the notification collectively occur in less than one microsecond.

**5**. The apparatus as recited in claim **1**, wherein the automotive electronic control unit is configured such that the identifying, the issuing of the storage resource request, the storing the information, and an initiation of the sharing collectively occur in less than one microsecond.

**6**. The apparatus as recited in claim **1**, wherein the automotive electronic control unit includes a gateway for concurrently sending the information to the Controller Area Network in addition to at least one other network.

**7**. The apparatus as recited in claim **1**, wherein the automotive electronic control unit is configured such that the information is shared without multiplexing.

**8**. The apparatus as recited in claim **1**, wherein the automotive electronic control unit is configured such that the information is shared by the automotive electronic control unit from a first node on the Flexray network directly to a second node on the Controller Area Network.

**9**. The apparatus as recited in claim **1**, wherein the automotive electronic control unit is configured such that the information is shared by the automotive electronic control unit from a first node on the Flexray network to a second node on the Controller Area Network without involving any other nodes.

**10**. The apparatus as recited in claim **1**, wherein the automotive electronic control unit is configured such that the storage resource is not a buffer.

**11**. The apparatus as recited in claim **1**, wherein the automotive electronic control unit includes a gateway for concurrently sending the information to the Controller Area Network in addition to a Local Interconnect Network; the information is shared without multiplexing; and the storage resource is not a buffer.

**12**. The apparatus as recited in claim **11**, wherein the automotive electronic control unit is configured such that the information is shared by the automotive electronic control unit from a first node on the Flexray network to a second node on the Controller Area Network without involving any other nodes.

**13**. The apparatus as recited in claim **11**, wherein the automotive electronic control unit is configured such that other information is shared utilizing a Local Interconnect Network protocol associated with the Local Interconnect Network, and the automotive electronic control unit remains in hardwired communication with the Local Interconnect Network via a third interface for interfacing with the Local Interconnect Network, the third interface including a third interface-related data link layer component that uses Local Interconnect Network-related data link layer header bits.

**14**. The apparatus as recited in claim **13**, wherein the automotive electronic control unit is configured such that a duration between the other information being received at the automotive electronic control unit, and the sharing of the other information being completed by arriving at another destination, is less than one millisecond.

**15**. An apparatus, comprising:

an automotive electronic control unit including a non-transitory memory storage comprising instructions, and at least one hardware processor in hardwired commu-

15

nication with the memory storage, wherein the at least one hardware processor executes the instructions to:

identify information associated with a message received utilizing a Controller Area Network protocol associated with a Controller Area Network that is a physical network;

in response to the identification of the information, issue a storage resource request in connection with a storage resource of the automotive electronic control unit and determine whether the storage resource is available for storing the information, where the storage resource is configured to store the information that is received utilizing the Controller Area Network for the purpose of sharing the information utilizing a Flexray network that is another physical network;

determine whether a threshold has been reached in association with the storage resource request;

in the event the storage resource is not available and the threshold associated with the storage resource request has not been reached, issue another storage resource request in connection with the storage resource;

in the event the storage resource is not available and the threshold associated with the storage resource request has been reached, send a notification;

in the event the storage resource is available, store the information utilizing the storage resource; and

share the information utilizing a Flexray network protocol associated with the Flexray network;

wherein the automotive electronic control unit is in hardwired communication with the Controller Area Network and the Flexray network and includes:

a first interface in hardwired communication with the Controller Area Network, the first interface including a first interface-related data link layer component that uses Controller Area Network-related data link layer header bits and a first interface-related network layer component that uses Controller Area Network-related network layer header bits; and

a second interface in hardwired communication with the Flexray network, the second interface including a second interface-related data link layer component that uses Flexray network-related data link layer header bits and a second interface-related network layer component that uses Flexray network-related network layer header bits;

wherein the automotive electronic control unit is configured such that:

the second interface-related network layer component uses the Flexray network-related network layer header bits by adding the Flexray network-related network layer header bits to a data unit including the information, and then the second interface-related data link layer component uses the Flexray network-related data link layer header bits by adding the Flexray network-related data link layer header bits to the data unit, before communicating the data unit on a physical link of the Flexray network;

the first interface-related data link layer component uses the Controller Area Network-related data link layer header bits by removing the Controller Area Network-related data link layer header bits from another data unit, and the first interface-related network layer component uses the Controller Area Network-related network layer header bits by removing the Controller Area Network-related network layer header bits from the

16

another data unit, where the information is extracted from the another data unit before the sharing; and

a duration between the information being received at the automotive electronic control unit, and the sharing being initiated at the automotive electronic control unit, is less than one microsecond.

16. The apparatus as recited in claim 15, wherein the automotive electronic control unit is configured such that the information is shared by the automotive electronic control unit from a first node on the Controller Area Network directly to a second node on the Flexray network.

17. The apparatus as recited in claim 15, wherein the automotive electronic control unit is configured such that the information is shared by the automotive electronic control unit from a first node on the Controller Area Network to a second node on the Flexray network without involving any other nodes.

18. The apparatus as recited in claim 15, wherein the automotive electronic control unit includes a gateway for multicasting the information to the Flexray Network in addition to at least one other different network.

19. The apparatus as recited in claim 15, wherein the automotive electronic control unit includes a gateway that is configured for multicasting the information to the Flexray Network in addition to at least one other different network including a Local Interconnect Network.

20. The apparatus as recited in claim 15, wherein the automotive electronic control unit is configured such that other information is shared utilizing a Local Interconnect Network protocol associated with a Local Interconnect Network, and the automotive electronic control unit remains in hardwired communication with the Local Interconnect Network via a third interface for interfacing with the Local Interconnect Network, the third interface including a third interface-related data link layer component that uses Local Interconnect Network-related data link layer header bits, where a duration between the other information being received at the automotive electronic control unit and the sharing being initiated at the automotive electronic control unit utilizing the Local Interconnect Network protocol is less than one microsecond.

21. The apparatus as recited in claim 15, wherein the automotive electronic control unit is configured such that the storage resource takes a form of storage other than a buffer and the information is shared without only multiplexing.

22. The apparatus as recited in claim 15, wherein the automotive electronic control unit is configured such that a duration between the information being received at the automotive electronic control unit, and the sharing being completed by arriving at a destination, is less than one microsecond.

23. The apparatus as recited in claim 15, wherein the automotive electronic control unit is configured such that other information is capable of being shared utilizing a Local Interconnect Network protocol associated with a Local Interconnect Network, and the automotive electronic control unit remains in hardwired communication with the Local Interconnect Network via a third interface for interfacing with the Local Interconnect Network, the third interface including a third interface-related data link layer component that uses Local Interconnect Network-related data link layer header bits.

24. The apparatus as recited in claim 23, wherein the automotive electronic control unit is configured such that another duration between the other information being received at the automotive electronic control unit, and the

US 10,031,790 B1

17

sharing of the other information being completed by arriving at a destination, is less than one millisecond.

**25**. The apparatus as recited in claim **24**, wherein the automotive electronic control unit includes a gateway for concurrently sending the information to the Controller Area Network in addition to at least one other network; the information is shared without multiplexing; and the storage resource is not a buffer.

**26**. A system, comprising:

a vehicle; and

an automotive electronic control unit installed in the vehicle, the automotive electronic control unit including a non-transitory memory storage comprising instructions, and at least one hardware processor in hardwired communication with the memory storage, wherein the at least one hardware processor executes the instructions to:

identify information associated with a message received utilizing a Flexray network protocol associated with a Flexray network that is a physical network;

in response to the identification of the information, issue a storage resource request in connection with a storage resource of the automotive electronic control unit and determine whether the storage resource is available for storing the information, where the storage resource is configured to store the information that is received utilizing the Flexray network for the purpose of sharing the information utilizing a Controller Area Network that is another physical network;

determine whether a threshold has been reached in association with the storage resource request;

in the event the storage resource is not available and the threshold associated with the storage resource request has not been reached, issue another storage resource request in connection with the storage resource;

in the event the storage resource is not available and the threshold associated with the storage resource request has been reached, send a notification;

in the event the storage resource is available, store the information utilizing the storage resource; and

share the information utilizing a Controller Area Network protocol associated with the Controller Area Network, the automotive electronic control unit remaining in hardwired communication with the Flexray network and the Controller Area Network, and including:

a first interface for interfacing with the Flexray network, the first interface including a first interface-related data link layer component that uses Flexray network-related data link layer header bits and a first interface-related network layer component that uses Flexray network-related network layer header bits; and

a second interface for interfacing with the Controller Area Network, the second interface including a second interface-related data link layer component that uses Controller Area Network-related data link layer header bits and a second interface-related network layer component that uses Controller Area Network-related network layer header bits;

wherein the automotive electronic control unit is configured such that:

18

the second interface-related network layer component uses the Controller Area Network-related network layer header bits by adding the Controller Area Network-related network layer header bits to a data unit including the information, and then the second interface-related data link layer component uses the Controller Area Network-related data link layer header bits by adding the Controller Area Network-related data link layer header bits to the data unit, before communicating the data unit on a physical link of the Controller Area Network;

the first interface-related data link layer component uses the Flexray network-related data link layer header bits by removing the Flexray network-related data link layer header bits from another data unit, and the first interface-related network layer component uses the Flexray network-related network layer header bits by removing the Flexray network-related network layer header bits from the another data unit, where the information is extracted from the another data unit before the sharing;

the storage resource is not a buffer and the information is shared without multiplexing;

a duration between the information being received at the automotive electronic control unit, and the sharing being initiated at the automotive electronic control unit, is less than one millisecond; and

other information is shared utilizing a Local Interconnect Network protocol associated with a Local Interconnect Network, and the automotive electronic control unit remains in hardwired communication with the Local Interconnect Network via a third interface for interfacing with the Local Interconnect Network, the third interface including a third interface-related data link layer component that uses Local Interconnect Network-related data link layer header bits; where a duration between the other information being received at the automotive electronic control unit, and the sharing being initiated at the automotive electronic control unit utilizing the Local Interconnect Network protocol associated with the Local Interconnect Network, is less than one millisecond.

**27**. The system as recited in claim **26**, wherein the automotive electronic control unit is configured such that a duration between the information being sent to the automotive electronic control unit and the sharing being completed by the information arriving at a destination, is less than one microsecond.

**28**. The system as recited in claim **27**, wherein the automotive electronic control unit is configured such that a duration between the other information being sent to the automotive electronic control unit and the sharing being completed by the other information arriving at another destination, is less than one microsecond.

**29**. A system, comprising:

a vehicle; and

an automotive electronic control unit installed in the vehicle, the automotive electronic control unit including a non-transitory memory storage comprising instructions, and at least one hardware processor in hardwired communication with the memory storage, wherein the at least one hardware processor executes the instructions to:

identify information associated with a message received utilizing a Controller Area Network protocol associated with a Controller Area Network that is a physical network;

US 10,031,790 B1

19

in response to the identification of the information, issue a storage resource request in connection with a storage resource of the automotive electronic control unit and determine whether the storage resource is available for storing the information, where the storage resource is configured to store the information that is received utilizing the Controller Area Network for the purpose of sharing the information utilizing a Flexray network that is another physical network;

determine whether a threshold has been reached in association with the storage resource request;

in the event the storage resource is not available and the threshold associated with the storage resource request has not been reached, issue another storage resource request in connection with the storage resource;

in the event the storage resource is not available and the threshold associated with the storage resource request has been reached, send a notification;

in the event the storage resource is available, store the information utilizing the storage resource; and

share the information utilizing a Flexray network protocol associated with the Flexray network;

wherein the automotive electronic control unit is in hardwired communication with the Controller Area Network and the Flexray network and includes:

a first interface in hardwired communication with the Controller Area Network, the first interface including a first interface-related data link layer component that uses Controller Area Network-related data link layer header bits and a first interface-related network layer component that uses Controller Area Network-related network layer header bits; and

a second interface in hardwired communication with the Flexray network, the second interface including a second interface-related data link layer component that uses Flexray network-related data link layer header bits and a second interface-related network layer component that uses Flexray network-related network layer header bits;

wherein the automotive electronic control unit is configured such that:

the second interface-related network layer component uses the Flexray network-related network layer header bits by adding the Flexray network-related network layer header bits to a data unit including the informa-

20

tion, and then the second interface-related data link layer component uses the Flexray network-related data link layer header bits by adding the Flexray network-related data link layer header bits to the data unit, before communicating the data unit on a physical link of the Flexray network;

the first interface-related data link layer component uses the Controller Area Network-related data link layer header bits by removing the Controller Area Network-related data link layer header bits from another data unit, and the first interface-related network layer component uses the Controller Area Network-related network layer header bits by removing the Controller Area Network-related network layer header bits from the another data unit, where the information is extracted from the another data unit before the sharing;

a duration between the information being received at the automotive electronic control unit, and the sharing being initiated at the automotive electronic control unit, is less than one microsecond; and

the storage resource takes a form of storage other than a buffer and the information is shared using a technique other than multiplexing;

other information is shared utilizing a Local Interconnect Network protocol associated with a Local Interconnect Network, and the automotive electronic control unit remains in hardwired communication with the Local Interconnect Network via a third interface for interfacing with the Local Interconnect Network, the third interface including a third interface-related data link layer component that uses Local Interconnect Network-related data link layer header bits; where a duration between the other information being received at the automotive electronic control unit, and the sharing being initiated at the automotive electronic control unit utilizing the Local Interconnect Network protocol associated with the Local Interconnect Network, is less than one microsecond.

30. The system as recited in claim 29, wherein the automotive electronic control unit is configured such that the information is capable of being shared by the automotive electronic control unit from a first node on the Controller Area Network directly to a second node on the Flexray network without involving another automotive electronic control unit therebetween.

* * * * *

EXHIBIT D



US010248477B2

(12) **United States Patent**
Fuchs et al.

(10) Patent No.: **US 10,248,477 B2**
(45) Date of Patent: **\*Apr. 2, 2019**

(54) **SYSTEM, METHOD AND COMPUTER PROGRAM PRODUCT FOR SHARING INFORMATION IN A DISTRIBUTED FRAMEWORK**

(71) Applicant: **Stragent, LLC**, Longview, TX (US)

(72) Inventors: **Axel Fuchs**, San Jose, CA (US); **Scott Sturges Andrews**, Petaluma, CA (US)

(73) Assignee: **Stragent, LLC**, Longview, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/148,949**

(22) Filed: **Oct. 1, 2018**

(65) **Prior Publication Data**
US 2019/0034250 A1      Jan. 31, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 16/042,159, filed on Jul. 23, 2018, and a continuation of application No.
(Continued)

(51) **Int. Cl.**
*G06F 9/54*          (2006.01)
*H04L 12/26*        (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .......... *G06F 9/546* (2013.01); *B60R 16/0231* (2013.01); *G06F 9/54* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .......... G06F 9/542; G06F 9/545; G06F 9/546; H04L 43/10; H04L 67/10; B60R 16/0231
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,956,489 A * 9/1999 San Andres ........ G06F 11/1662
709/221

OTHER PUBLICATIONS

Notice of Allowance dated Jun. 27, 2018 for U.S. Appl. No. 15/919,201.

* cited by examiner

*Primary Examiner* — Charles E Anya

(57) **ABSTRACT**

A system, method and computer program product are provided for sharing information in an automobile vehicle comprising: receiving information in the form of a packet data unit representing datum information carried by an overall message from a first physical network selected from the group consisting of FlexRay, Controller Area Network, Local Interconnect Network and Media Oriented Systems Transport; in response to the receipt of the information, issuing a storage resource request in connection with a storage resource; determining whether the storage resource is available for storing the information; determining whether a threshold has been reached in association with the storage resource request; in the event the storage resource is not available and the threshold associated with the storage resource request has not been reached, issuing another storage resource request in connection with the storage resource; in the event the storage resource is available, storing the information in the storage resource; and sharing the stored information with at least one of a plurality of heterogeneous processes including at least one process associated with a second physical network selected from the group consisting of FlexRay, Controller Area Network, Local Interconnect Network and Media Oriented Systems Transport, utilizing a network protocol different from a protocol of the first physical network.

**30 Claims, 17 Drawing Sheets**



**US 10,248,477 B2**

Page 2

---

**Related U.S. Application Data**

15/919,201, filed on Mar. 12, 2018, now Pat. No. 10,031,790, which is a continuation of application No. 15/405,110, filed on Jan. 12, 2017, now Pat. No. 10,002,036, which is a continuation of application No. 14/011,705, filed on Aug. 27, 2013, now Pat. No. 9,575,817, which is a continuation of application 13/531,319, filed on Jun. 22, 2012, now Pat. No. 8,566,843, which is a continuation of application No. 12/182,570, filed on Jul. 30, 2008, now Pat. No. 8,209,705, which is a continuation of application No. 10/737,690, filed on Dec. 15, 2003, now Pat. No. 7,802,263.

(60)  Provisional application No. 60/434,018, filed on Dec. 17, 2002.

(51)  **Int. Cl.**
      **H04L 29/06**          (2006.01)
      **H04L 29/08**          (2006.01)
      **B60R 16/023**         (2006.01)

(52)  **U.S. Cl.**
      CPC .............. **G06F 9/542** (2013.01); **G06F 9/545** (2013.01); **H04L 43/04** (2013.01); **H04L 43/06** (2013.01); **H04L 43/08** (2013.01); **H04L 43/10** (2013.01); **H04L 67/02** (2013.01); **H04L 67/10** (2013.01); **H04L 67/12** (2013.01); *G06F 2209/547* (2013.01); *H04L 65/102* (2013.01)



FIGURE 1



FIGURE 2



FIGURE 3



FIGURE 4



FIGURE 5



FIGURE 6



FIGURE 7



FIGURE 8



FIGURE 9



FIGURE 10



FIGURE 11



FIGURE 12



FIGURE 13



FIGURE 14



FIGURE 15



FIGURE 16



FIGURE 17

US 10,248,477 B2

1

# SYSTEM, METHOD AND COMPUTER PROGRAM PRODUCT FOR SHARING INFORMATION IN A DISTRIBUTED FRAMEWORK

## RELATED APPLICATION(S)

This application is a continuation of U.S. patent application Ser. No. 16/042,159 filed Jul. 23, 2018, which is a continuation of U.S. patent application Ser. No. 15/919,201 filed Mar. 12, 2018, now U.S. Pat. No. 10,031,790, which is a continuation of U.S. patent application Ser. No. 15/405, 110 filed Jan. 12, 2017, now U.S. Pat. No. 10,002,036, which is continuation of U.S. patent application Ser. No. 14/011,705 filed Aug. 27, 2013, now U.S. Pat. No. 9,575, 817, which is a continuation of U.S. patent application Ser. No. 13/531,319 filed Jun. 22, 2012, now U.S. Pat. No. 8,566,843, which is a continuation of U.S. patent application Ser. No. 12/182,570 filed Jul. 30, 2008, now U.S. Pat. No. 8,209,705, which is a continuation of U.S. patent application Ser. No. 10/737,690 filed Dec. 15, 2003, now U.S. Pat. No. 7,802,263, which, in turn, claims priority under 35 U.S.C. § 119 based on U.S. Provisional Application No. 60/434,018 filed Dec. 17, 2002, all of which are incorporated herein by reference.

## FIELD AND BACKGROUND OF THE INVENTION

The present invention relates to the field of distributed control and monitoring systems that may include certain temporal behavior.

Such technology may optionally apply to electronic vehicle communication and control systems, real-time monitoring systems, industrial automation and control systems, as well as any other desired system.

## SUMMARY OF THE INVENTION

A system, method and computer program product are provided for sharing information in an automobile vehicle comprising: receiving information in the form of a packet data unit representing datum information carried by an overall message from a first physical network selected from the group consisting of FlexRay, Controller Area Network, Local Interconnect Network and Media Oriented Systems Transport; in response to the receipt of the information, issuing a storage resource request in connection with a storage resource; determining whether the storage resource is available for storing the information; determining whether a threshold has been reached in association with the storage resource request; in the event the storage resource is not available and the threshold associated with the storage resource request has not been reached, issuing another storage resource request in connection with the storage resource; in the event the storage resource is available, storing the information in the storage resource; and sharing the stored information with at least one of a plurality of heterogeneous processes including at least one process associated with a second physical network selected from the group consisting of FlexRay, Controller Area Network, Local Interconnect Network and Media Oriented Systems Transport, utilizing a network protocol different from a protocol of the first physical network.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram of an embodiment of a system of one embodiment;

2

FIG. **2** is a block diagram generally depicting an embodiment of an ECU as part of the system illustrated in FIG. 1;

FIG. **3** is a block diagram generally depicting an embodiment of a Gateway device as part of the system illustrated in FIG. 1;

FIG. **4** is a block diagram of an embodiment of the software architecture assumed for one embodiment.

FIG. **5** is a block diagram of an embodiment of the middleware that contains the methods of one embodiment.

FIG. **6** is a block diagram of an embodiment of the bulletin board that describes the process interaction of one embodiment.

FIG. **7** is a block diagram of an embodiment of the bulletin board that describes the process interaction with multiple external communication buses as part of one embodiment.

FIG. **8** is a flow chart diagram of an embodiment of the variable store from remote I/O method of one embodiment.

FIG. **9** is a flow chart diagram of an embodiment of the variable store from local I/O method of one embodiment.

FIG. **10** is a flow chart diagram of an embodiment of the variable method of one embodiment.

FIG. **11** is a flow chart diagram of an embodiment of the variable retrieve method of one embodiment.

FIG. **12** is a flow chart diagram of an embodiment of the application process using the method of one embodiment.

FIG. **13** is a flow chart diagram of an embodiment of the local I/O update from bulletin board method of one embodiment.

FIG. **14** is a flow chart diagram of an embodiment of the variable replication method of one embodiment.

FIG. **15** is a flow chart diagram of an embodiment of the message store from remote gateway method of one embodiment.

FIG. **16** is a flow chart diagram of an embodiment of the message forward to remote ECU or Gateway method of one embodiment.

FIG. **17** is a state transition diagram of an embodiment of the mode switching method of one embodiment.

## DETAILED DESCRIPTION

FIG. **1** is a block diagram generally depicting elements of an embodiment of the present distributed embedded communication and computing system. The system architecture may be situated in automotive electronics or industrial control and monitoring systems. In an automotive environment, the various Electronic Control Units (ECUs, **102**) control complex applications such as engine control, brake control, or diagnostics. They are either connected to sensors and actuators via discrete links or simple standard links such as sensors and actuators are organized into separate sub networks.

These complex functions such as braking, engine-control, etc. are then grouped into the backbone system functions for the car, such as body control, power train and chassis. The backbone also includes the vehicle's high level functions such as diagnostics, telematics and entertainment systems.

Therefore the system is typically hierarchically organized and includes a variety of gateways (**101,104,105**), which relay messages up and down through the system layers. Each layer may contain multiple electronic control units (ECU, **102**) that are connected through wired serial multiplexing bus-systems such as Controller Area Network (CAN or ISO11898), Flexray, LIN, J1850, J1708, MOST, IEEE1394, and other similar serial multiplexing buses or through wire-

US 10,248,477 B2

3

less multiplexing systems such as IEEE802.11, IEEE802.15, Bluetooth, Zigbee, or similar other wireless links.

Typically, functions provided by an ECU (102) are bound to hard real-time temporal behavior. In the context of the present description, real-time may include any response time that may be measured in milli- or microseconds, and/or is less than 1 second.

The ECU may receive a set of real-time input variables from local sensors (108), which are connected via discrete signal lines (113), or from networked sensors (106), which are connected through a multiplexing bus-system (112). The ECU may also share variables with other ECUs (102) that are either connected on the same physical multiplexing bus or that it can reach through a gateway (101,103,104).

Then the ECU (102) processes the input variables and generates a set of output variables that are either shared with other ECUs (102) as described above, or which are output to local actuators (109), which are connected via discrete signal lines (113), or to networked actuators, which are connected through a multiplexing bus (112). ECUs (102) typically share information with devices that are connected on the same physical multiplexing system. This method of information sharing is called horizontal information sharing in a hierarchical system. Gateways (101,103,104) link multiple physical multiplexing systems together. In the context of the present description, such information may include data, a signal, and/or anything else capable of being stored and shared.

The highest level in the hierarchical system is the system level. The system level gateway (101) may be connected to ECUs on the system level multiplexing bus (117), to subsequent gateways (103) that also link to subsequent communication buses (110), and to external components (120) that may contain diagnostics devices (121), development tools (122), other add-on devices (123) or other instances of distributed embedded communication and computing systems (100). In addition, the system gateway (101) may also be connected to an external gateway (131) that may link the system to a remote device (132) through wireless or wired wide-area-networks such as the Internet, using standard protocols such as UDP/IP, TCP/IP,RTP,HTTP, SOAP, JAVA, etc. or nonstandard proprietary protocols.

Subsequent to the system level may be several layers of groups and subgroups that are link to the higher levels via gateways (101,103,104,105).

During the design-time of the system, not all ECUs may exist. Therefore, the development tool (122) may provide a plug-in component or virtual ECU/GW (115) that directly links into the wired multiplexing bus or wireless network (110) and also allows for separate control functions via a tool-link (116).

The block diagram in FIG. 2 depicts the detailed elements within a generic ECU (200) that is one embodiment of ECU (102). The ECU (200) typically contains a micro-processor (201), volatile memory (204) such as RAM, S-RAM or similar, non-volatile memory (203) such as EEPROM, FLASH, etc., a real time clock for internal timing of processes (205), a watchdog (206) to maintain the health of the system, one or more communication bus controllers (207) with associated drivers (208), digital I/O (209) with line drivers (210), and analog I/O (211) with associated analog signal conditioning (212).

In an alternate embodiment, the ECU (200) may also contain a wireless communication controller (311) and a RF-Front-end (312) as outlined in FIG. 3. The software (202) can either be stored in local non-volatile memory (203) or partially downloaded via the communication link

4

(207,208) and stored in the volatile memory. The software is then executed in the microprocessor (201).

The block diagram FIG. 3 depicts the detailed elements within a generic gateway (300) that is one embodiment of Gateway (101,103,104,105) in FIG. 1.

FIG. 4 outlines one embodiment of the software architecture in an embedded system. The hardware abstraction layer (405) allows the system developer to adapt a standard operating system to a specific hardware as used in an ECU (200) or gateway (300). The hardware abstraction layer (405) adapts the real-time operating system (403) and the device drivers (404) to a specific hardware implementation.

One embodiment includes the middleware (402) that has direct access to the real-time operating system (403), the device drivers (404) and the hardware abstraction layer (405). The middleware isolates the application from input/output functions and allows multiple applications to share common variables locally. In addition, the middleware lets applications share variables with remote applications/processes. In the context of the present description, a process may refer to any hardware and/or software operation, etc.

In one embodiment, the middleware can directly interface with the input/output mechanisms of the hardware without utilizing an operating system (403) or hardware abstraction layer (405).

Another embodiment of the middleware utilizes a preemptive multitasking operating system with explicit control of resources. In an alternate embodiment, the middleware can be built with a static multitasking scheme with implicit resource management or be part of a single task system.

Referring now to FIG. 5, the middleware (402) contains the bulletin board manager (501), a local signal communication interface (503), a remote message communication interface (504), and an application programming interface (502). The application interface (502) provides methods and data interfaces to a plurality of applications. In one embodiment, the application interface is an object library that can be linked to an application at design time.

The bulletin board manager (501) contains an upgrade and configuration manager (507), an event manager (505), a data access manager (508), and a data integrity watchdog (506). The upgrade and configuration manager (507) is necessary to configure the data structure of the bulletin board and to make executable code available to individual processing nodes. In the context of the present description, the bulletin board may refer to any database that enables users to send and/or read electronic messages, files, and/or other data that are of general interest and/or addressed to no particular person/process.

The access manager provides access control mechanisms for the code update and configuration mode. It also may control access rights for individual applications at execution time in the run mode.

The event manager (505) captures input-output events as variables and generates new events, flags, or signals based on operations on state variables in the bulletin board. Such operations may include test of maximum values, the occurrence of logically combined events, the result of an integrity check, or events and signals that are created based on any other logical or arithmetic computation on the state variables that are stored in the bulletin board. The actual processing of data and manipulation of data may be done in the application that uses the middleware (402). The data integrity watchdog analyses the stored state variables for its integrity and generates events or flags if any problem occurs.

The local signal communication interface (503) interfaces with the local discrete input/output hardware to update the

US 10,248,477 B2

5

bulletin board with new variables and to update the input/output interfaces with the state variables from the bulletin board. It also converts state variables to input/output signals and input/output signals to state variables that can be stored in the bulletin board. The conversion process may contain scaling of signals as well as offset compensation. Typically this processing helps to convert I/O signals that are measured in Volt to a physical entity and vice versa. The communication with the local discrete input output system can be triggered by events or signals can be sampled time-triggered based on a cyclic global or local time base.

The remote message communication interface (504) interfaces to serial multiplexing interfaces (buses) that are connected to the specific processing node (ECU or Gateway). It extracts variables from a plurality of messaging protocols and stores them in the database. It also replicates local bulletin-board state variables to the associated processing nodes by composing the appropriate messages for each communication link. The message transfer can be initiated triggered by a bus event, by a local event, or by a time-triggered mechanism that uses a cyclic local or global time base.

FIG. 6 shows the concept of an extended bulletin board or an embedded real-time database (601). In this embodiment the ECU (102) or the Gateway (101) hosts one or multiple bulletin boards with relational links between the variables in the bulletin boards. The relations are defined by data processing functions that the gateway can operate on bulletin boards to obtain new information that can be stored in yet another bulletin board.

The bulletin board (601) may contain but is not limited to events (607), real-time variables (608), diagnostics data (609), configuration parameters (610), and firmware (611) to upgrade individual components of the executable code or the entire software of a processing node. Each type of information may include one or more sections so that individual processes are not blocked if they access separate sections of data.

The memory of the bulletin board is subdivided into areas that nodes on each external network can read from and write into and other areas that an external network may only read from. The data contained in the bulletin board may be stored in volatile or non-volatile memory. Each data entry may consist of one value or an array of values that also may represent a time series.

In one embodiment, each application process (603), local signal communication process (605), remote message communication process, and the bulletin manager (602) can individually access the bulletin board using operating system functions for resource management that may include semaphores, events, signals, call-back routines, flags, etc. in an alternate embodiment of the system the bulletin-board manager controls all interaction with the bulletin-board and all applications have to pass data to the bulletin-board manager. This approach simplifies the interaction with the bulletin board, but adds delay time and jitter to the state variables.

At design time, various hierarchies of memory management can be applied. In practice it is more efficient to allow each sub network and subsystem to place system variable data into local bulletin boards. This is because many system variables are primarily used only within their subsystem or sub network. By placing local information in a shared memory (local bulletin board), it can be used by multiple processes on this processor node. A group bulletin board allows devices on a sub-network to share information with

6

a minimum of network traffic. A system bulletin board allows access to system-wide variables and information.

FIG. 7 illustrates the logical architecture of the interconnection between three heterogeneous network controllers (702, 703, 704), the associate Operating System interfaces (705), the remote message communication process (706), the bulletin board (608), and the application process (606). The connection to each communication controller is fundamentally implemented at the physical interface (the wire, fiber or electromagnetic wireless interface). Each of the higher level layers (data link, network, etc) in the communication interface (705) deals with specific features of the individual communication process. In practice these layers are typically represented in a message by "header" bits that contain information about that layer of the network being used to send the message.

Using this model, each communicated message may be processed at each layer to remove (and use) the associated header information for that level. Once all layers are processed the remaining packet data unit (PDU) represents the datum or core information carried by the overall message. In one embodiment, each communication controller has an associated communication interface and an associated remote message conversion mechanism. For instance communication bus controller 2 (703) has an associated communication interface 2 (709), and an associated remote message conversion 2 (710).

This arrangement allows the remote message process (706) to directly access information at the data link layer and interface it with the bulletin board. A network layer is not necessary. The remote message communication process (706) has a multi-network access interface (essentially a processing capability that can interpret and apply the header information for a variety of networks) and the bulletin board read/write memory access. Now, the individual processing nodes do not need to know about the existence of multiple networks. Each variable can be accessed from all connected physical networks in their proprietary format. Thus the normalization of the information has only to be handled at the gateway through replication of stored data to multiple attached networks.

Continuing with FIG. 7, the communication procedure is described. In the given example, an external event (701) on communication controller 2 (703) triggers the operating system to notify the remote message communication process (706) that data is available. The notification may be a flag, a call-back routine, an event, or any other operating signal. The associated remote message conversion method 2 (710) extracts the data (e.g. real time variables) from the message PDU and stores the data in the bulletin board (608). It may also store the associated event as variable in the bulletin board and signal the bulletin-board event manager that new data is available.

The bulletin event manager then notifies the application process (606) with the appropriate mechanism. In addition, the event manager may trigger the sampling of local signals using the local signal communication process (605) described in FIG. 6. Finally the bulletin event manager may trigger the bulletin board manager (707) to perform integrity checks or generate additional events based on the change of the state variables.

One embodiment provides a new mechanism for creating an information interconnection between two or more heterogeneous communication networks. In the context of the present description, heterogeneous networks may refer to any different communication networks with at least one aspect that is different.

US 10,248,477 B2

7

The approach uses a common, or shared storage system that is connected to all of the system networks through network interfaces. A critically important feature of the bulletin board approach is that the complexity of the bulletin board grows linearly with the number of networks (as opposed to as N(N−1) for the gateway approach), and in one-to-many situations the number of message transformations is half that of the standard networking approach.

In an alternate embodiment of the remote message communication process (706) any remote process can access data via a single network interface. This approach requires a network layer in each processing node and therefore adds overhead to communications. To communicate between two heterogeneous networks, this process may then be repeated in reverse by adding back the header information for the various layers of the second network, and eventually putting the message onto the second network's physical link. The remote message communication manager (706) then can be simplified to only one message assembly and disassembly mechanism.

FIGS. 8-17 illustrate the method of operation of one embodiment of the present system, and also refer to aspects and elements one embodiment shown in FIGS. 1 through 7.

FIG. 8 details the remote messaging process (706) described in FIG. 7. Referring now to FIG. 8, the core process of storing data from remote processes that are communicated through multiplexed communication links, into the bulletin board is described. An external notification or task activation starts the process. Then a message (802) is received from the operating system layer.

In an alternate embodiment, the message is directly copied form the input register of the communication controller. Then the process extracts variables from the message. Additional signal adaptation may be necessary. The sub-process 804 stores the variables in the bulletin board. If the process only updates one section of the bulletin board it waits for the next message notification (806). If variables in multiple sections need to be updated, the process repeats (804).

FIG. 9 shows the data update from local input/output peripherals. The process starts with an internal or external notification or task activation. Typically this process is repeated cyclic triggered by an internal or external real-time clock. When the process is activated, it samples or polls the local input ports that may include analog and digital signals (902). Then it converts these signals to real-time variables by using the conversion parameters stored in the bulletin board. The signal conditioning parameters van either be defined at design time or adaptively updated by the application process. Then the process stored the new state variables in the bulletin board using the sub-process (804) described above.

FIG. 10 describes the bulletin board store procedure (804) in more detail. Before new data can be stored in the bulletin board, the procedure has to request the access right to the common resource, a section of the non-volatile or volatile memory, from the operating system (1001). This is called explicit resource management.

If the resource is available, the process gets the resource. If the resource is not available, it may try it again after a waiting period (1011) until the resource is available. After a certain time has elapsed (1009) beyond a configurable threshold, the temporal behavior of the state variable can't be captured any longer and the middle-ware may send an error notification to the associated process.

After reserving the resource (1003), the bulletin board store mechanism (804) timestamps the state variable for future temporal reference (1004). Then, the bulletin board

8

store procedure (804) copies the variables or parameters from its private memory (1006) to the shared bulletin-board memory (601). Then it releases the bulletin board resource.

In an alternate embodiment, the bulletin board store procedure (804) has exclusive access to the bulletin board (601) and does not need operations 1002, 1003, 1007, 1009, 1010, and 1011 because the resource access is realized through implicit resource management. This can be achieved with either static task scheduling or by allowing only the bulletin board store procedure (804) to access the bulletin board (601).

FIG. 11 describes the bulletin board retrieve procedure (1101) in more detail. Before data can be retrieved from the bulletin board, the procedure has to request the access right to the common resource, a section of the non-volatile or volatile memory, from the operating system (1102).

If the resource is available, the process gets the resource. If the resource is not available, it may try it again after a waiting period (1108) until the resource is available. After a certain time has elapsed (1109) beyond a configurable threshold, the temporal behavior of the state variable can't be captured any longer and the middle-ware may send an error notification to the associated process (1110).

After reserving the resource (1104), the bulletin board retrieve mechanism (1101) copies the variables or parameters from the shared bulletin-board memory (601) to its private memory (1006). Then, it releases the bulletin board resource. In an alternate embodiment the bulletin board retrieve procedure (1101) has exclusive access to the bulletin board (601) and does not need operations 1103, 1104, 1106, 1108, 1109, and 1110. Because the resource access is realized through implicit resource management, this can be achieved with either static task scheduling or by allowing only the bulletin board retrieve procedure (1101) to access the bulletin board (601).

Referring to FIG. 12, the application process (1200) utilizes the bulletin board retrieve mechanism (1101) to access all parameters, events, and real-time variables from the bulletin board. Thus the application process is decoupled from the temporal behavior of the input/output variables and can be triggered by a plurality of events (1201).

The application process may retrieve one or multiple sets of variables stored in a plurality of memory sections. Then the application process processes the variables (1203) with its method. Because the method is not tied to the location of the input/output variables, the application process can be moved or replicated to a plurality of processing nodes (ECUs or Gateways). After processing the input variables and generating a set of output variables, the application process uses the bulletin board store method (801) to update one or a plurality of memory sections in the bulletin board. If the application process is a cyclic procedure, it waits until the next activation occurs (1205).

Continuing with FIG. 13, the update local I/O from bulletin board process (1300) utilizes the bulletin board retrieve mechanism (1101) to access real-time variables from the bulletin board and convert them to output signals (1302) that can be written to the output port (1303). The I/O update process may retrieve one or multiple sets of variables stored in a plurality of memory sections. If the I/O update process is a cyclic procedure, it waits until the next activation occurs (1305).

FIG. 14 describes the data replication process (1400). This process can be triggered by a plurality of notification mechanisms, such as events, alarm signals, internal and external timers, and flags set in the bulletin board. It then selects a subset of variables to be replicated and a commu-

US 10,248,477 B2

9                                                                10

nication port (**1402**). Next it retrieves the variables from the bulletin board with mechanism (**1401**) and assembles the messages for the specific communication link (**1403**). The message may include an address or identification number for all bulletin boards and associated processing nodes (ECUs and Gateways).

Finally, it writes the messages to the communication port (**1404**). In an alternate embodiment, it handles the messages to the associated interface procedure of the operating system. Then it repeats the procedure, until all variables are updated on all communication ports. If the data replication process is a cyclic procedure, it waits until the next activation occurs (**1405**).

Referring now to FIG. **15**, the store message from remote processing node (gateway or ECU) process (**1500**) describes how replicated data is stored in the bulletin board. This process can be triggered by a plurality of notification mechanisms, such as internal or remote events, alarm signals, internal and external timers, and flags set in the bulletin board. The communication bus may also issue these notifications. The process (**1500**) then reads a message from the communication port (**1502**), selects a subset of variables to be replicated (**1503**), and stores the variables in the bulletin board with procedure (**801**). In an alternate embodiment, this procedure may also be used to store a packet data unit (PDU) in the bulletin board for later replication on the same or a different communication link.

This store and forward networking mechanism can be implemented without the need for complex networking protocols and is therefore well suited for limited processing power and memory environments. It also works in soft-real time environments when no strict temporal behavior is required. The data store operation (**801**) may be repeated for a plurality of bulletin board sections. If the data replication process is a cyclic procedure, it waits until the next activation occurs (**1505**).

Continuing now with FIG. **16**, the store and forward updating mechanism (**1600**) replicates messages from remote processing nodes to other processing nodes from stored packet data units in the bulletin board. This process can be triggered by a plurality of notification mechanisms (**1601**), such as internal or remote events, alarm signals, internal and external timers, and flags set in the bulletin board. The communication bus may also issue these notifications.

The process (**1600**) then selects a message to be forwarded (**1602**) and the appropriate communication link and retrieves the PDU with the bulletin board retrieve mechanism (**1101**). It then adds the appropriate messages header for the communication link (**1603**) and may add routing information (**1604**). Finally the update process (**1600**) writes the messages to the communication port (**1605**). If the updating process is a cyclic procedure, it waits until the next activation occurs (**1607**).

FIG. **17** describes the various modes that the distributed communications and computing system (**100**) can be operated in. In one embodiment, the system operates in various distinct modes in order to preserve the integrity of the system and still allow for changing the architecture and behavior of the network or the roles of the individual nodes. When the distributed computing and communication system wakes up from the sleep mode (**1701**), it can enter a configuration and upgrade mode (**1702**), an emergency or debug mode (**1704**), or the normal real-time run mode (**1703**). The root node or system gateway in a distributed communication and computing system defines the mode

based on the existence of external events, such as an external control command, internal events, a system failure, or failed integrity check.

Referring now to FIG. **1**, the external commands may be generated from a development tool (**122**) or a remote device (**132**) that is connected via a remote gateway (**131**). In an alternate embodiment, each ECU (**102**) or virtual ECU (**115**) can trigger the system to enter a different operating mode.

Continuing with FIG. **17**, in the configuration mode (**1702**), the system software and the information-sharing configuration can be updated via a secure communication link with encrypted commands Each processing node (ECU or gateway) may have security mechanisms such as a certificate that allows it to identify and authorize another entity (remote gateway, remote ECU, or development tool) to make changes to its bulletin board parameters.

The remote entity may also download a new firmware to the bulletin board. The ECU or gateway can store this new firmware in its non-volatile memory while it backs up the original image on the bulletin board for the case that the new software is not functional. In the update mode, the distributed system can also reconfigure the communication and computing infrastructure based on a new set of parameters that need to be stored in the individual bulletin boards.

In the normal run mode (**1703**), the system operates in the real-time information sharing mode and network configuration and certain parameters can't be changed. That protection allows defining deterministic temporal behavior on all communication links. But any processing node may enter a debug/emergency mode (**1704**) if a failure or other qualifying event occurs.

In the emergency mode, a processor executes an alternate procedure that maintains the temporal behavior on the communication links but may reduce or increase the amount of information shared with other processors. It also lets other processing nodes check on the integrity of sensors and actuators. In the maintenance and upgrade mode, an external system can upgrade executable code images and the bulletin-board configuration via secure communication links.

A system and method are thus provided for sharing information within a distributed embedded communications and computing system and with components outside the embedded system. The information sharing mechanism relies on a bulletin board that may include a small database operating under hard real-time conditions with minimal delays, communication latency, and jitter. The embedded database or bulletin board isolates a real-time application in a Electronic Control Unit (ECU) from various other real time applications and from input output signals in the same module (local information sharing), from event-triggered communications with applications in other modules, and from time-triggered communications with applications in other modules.

One design criteria of the database is that the temporal behavior of communications does not impact the real-time computing task and provides enough information access performance at peak time demand Typically, distributed embedded systems consist of a static structure that can be analyzed at design time. In addition to the real-time operation, the proposed method for information sharing also provides access to the parameters of the embedded system and allows for software upgrades of certain modules.

The present embodiment addresses the shortcomings of traditional computer networks with following enhancements:

1) The concept of multi-mode storage that links two or more communication networks via a bulletin board. The

US 10,248,477 B2

11

bulletin board is a multi-mode storage that can be thought of an extension to shared memory that can be accessed by local and remote processes at attached networks. There may be multiple hierarchical layers of bulletin boards depending on the topology of the communication system. The bulletin board increases the network efficiency by reducing the number of transactions needed to access remote variables.

2) The concept of a direct-access bulletin board that does not require a network layer translation of messages on each node of the network. Even though this approach restricts the reach of each node to only adjacent nodes and the next gateway, this still allows cross-network variable sharing though vertical real-time replication of data.

3) The concept of hierarchical bulletin board management that allows restriction of information access to certain levels in a network, but still allows the replication of information to other nodes in the network. This paradigm follows the path of reducing the information amount from the leaves of the network to central control and diagnosis hubs.

4) The concept that a gateway can host an assembly of bulletin boards or embedded database that allows operations on bulletin boards to generate events for associated processes. This extension allows definition of a set of data processing operations that would be done once in a network and would be instantly available for connected nodes. Examples for operations are sensor data state observers, diagnostics, integrity checks, fail-safe mechanisms, etc.

5) The concept that an embedded communication and computing network can run in multiple modes in order to provide for a guaranteed deterministic behavior of the system. This property can be achieved by only allowing change to the configuration and/or the functions (SW code) in a secured configuration and upgrade mode. If the network is booted in the normal operating mode, all processors execute the existing code and only allow data sharing through the bulletin boards. The emergency or debug mode lets the network run in a fail-safe reduced operation mode or in a diagnostic mode that allows inspection of the system, while it is running. For each operating mode, the gateway can store a processing image on the bulletin board. The advantage of this procedure is that only the communication hubs need to deal with secure data transfer and encryption while the peripheral nodes in the network can be relative simple in design.

6) The concept of designing the topology of a distributed computing and communication system independent of the definition of the individual functions that the network performs. Each processing task is only associated with a bulletin board, but isolated from I/O processing.

Of course, these are all optional embodiments/enhancements.

While various embodiments have been described above, it should be understood that they have been presented by the way of example only, and not limitation. Thus, the breadth and scope of a preferred embodiment should be not limited by any of the above described exemplary embodiments, but should be defined only in accordance with the following claims and their equivalents.

What is claimed is:

**1.** A layered system for sharing information in an automobile vehicle, said system comprising:

an automotive electronic control unit comprising a microprocessor and an operating system;

a hardware abstraction layer within the electronic control unit allowing the operating system to be adapted to a specific hardware implementation as used in the electronic control unit;

12

non-volatile memory comprising a database with a data structure;

a memory manager associated with the non-volatile memory, said memory manager comprising an upgrade and configuration manager to configure the data structure of the non-volatile memory, an event manager to capture input-output events as variables and generate new events, flags or signals, a data access manager to control code update and configuration of the memory and access rights for individual applications at execution, and a data integrity component to analyze stored state variables for integrity and generate events or flags if any problem occurs;

the non-volatile memory further comprising instructions to:

receive information in the form of a packet data unit representing datum information carried by an overall message from a first physical network selected from the group consisting of FlexRay, Controller Area Network, and Local Interconnect Network;

in response to the receipt of the information, issue a storage resource request in connection with a storage resource;

determine whether the storage resource is available for storing the information;

determine whether a threshold has been reached in association with the storage resource request;

in the event the storage resource is not available and the threshold associated with the storage resource request has not been reached, issue another storage resource request in connection with the storage resource;

in the event the storage resource is available, store the information in the storage resource; and

share the stored information with at least one of a plurality of heterogeneous processes including at least one process associated with a second physical network selected from the group consisting of FlexRay, Controller Area Network, and Local Interconnect Network, utilizing a network protocol different from a protocol of the first physical network;

interfaces for communication with each of FlexRay, Controller Area Network, and Local Interconnect Network networks, with each physical network in communication with a component including at least one of a sensor, an actuator, or a gateway, and with each of the FlexRay, Controller Area Network, and Local Interconnect Network interfaces comprising a corresponding network communication bus controller including a corresponding network communication bus driver;

the interfaces including a first communication interface for interfacing with the first physical network, the first communication interface including a first communication interface-related data link layer component, said first communication interface configured to extract variables from the overall message communicated by the first physical network employing a first protocol and storing the packet data unit representing the datum information carried by the overall message from a first physical network in the database; and

a second communication interface for interfacing with the second physical network utilizing a protocol different than the protocol of the first physical network, the second communication interface including a second communication interface-related data link layer component;

US 10,248,477 B2

13

wherein the automotive electronic control unit is config-
ured such that the stored information may be shared
with the second physical network by replicating the
packet unit data obtained from the first physical net-
work by composing another message configured to be
communicated using the different protocol of the sec-
ond physical network.

2. The system of claim 1, wherein the memory comprises
at least one bulletin board that stores information that may
be addressed by any process of any network having access
to the storage resource of the electronic control unit.

3. The system of claim 2, wherein a complexity of the
bulletin board grows linearly with a number of networks.

4. The system of claim 1, wherein the electronic control
unit comprises code for the electronic control unit to run in
a diagnostic mode that allows inspection of the system,
while the electronic control unit is running.

5. The system of claim 4, wherein the electronic control
unit comprises code for the electronic control unit to addi-
tionally run in a debugging mode.

6. The system of claim 1, wherein at least one of the first
and the second physical networks is a multiplexing bus.

7. The system of claim 1, wherein each of the first and the
second physical networks is a multiplexing bus.

8. The system of claim 1, wherein neither the first nor the
second physical network is a multiplexing bus.

9. The system of claim 1, wherein the automotive elec-
tronic control unit comprises digital input/output, an analog
to digital converter, and a digital to analog converter.

10. The system of claim 1, wherein the automotive
electronic control unit comprises a real time clock and a
watchdog.

11. The system of claim 2, wherein the electronic control
unit comprises:

code for the electronic control unit to run in a diagnostic
mode that allows inspection of the system, while the
electronic control unit is running;

code to run in a debugging mode;

code to interface with each of a FlexRay multiplexing bus,
a Controller Area Network multiplexing bus, and a
Local Interconnect Network multiplexing bus;

digital input/output, an analog to digital converter, and a
digital to analog converter;

a real time clock;

a watchdog; and

wherein in the event the storage resource is not available
and the threshold associated with the storage resource
request has been reached, the electronic control unit is
configured to send a notification to a process associated
with the information.

12. A layered system for sharing information in an auto-
mobile vehicle, said system comprising:

an automotive electronic control unit comprising a micro-
processor and an operating system;

a hardware abstraction layer within the electronic control
unit allowing the operating system to be adapted to a
specific hardware implementation as used in the elec-
tronic control unit;

non-volatile memory comprising a database with a data
structure;

a memory manager associated with the non-volatile
memory, said memory manager comprising an upgrade
and configuration manager to configure the data struc-
ture of the non-volatile memory, an event manager to
capture input-output events as variables and generate
new events, flags or signals, a data access manager to
control code update and configuration of the memory

14

and access rights for individual applications at execu-
tion, and a data integrity component to analyze stored
state variables for integrity and generate events or flags
if any problem occurs;

the non-volatile memory further comprising instructions
to:

receive information in the form of a packet data unit
representing datum information carried by an overall
message from a first physical network selected from
the group consisting of FlexRay, Controller Area
Network, Local Interconnect Network and Media
Oriented Systems Transport;

in response to the receipt of the information, issue a
storage resource request in connection with a storage
resource;

determine whether the storage resource is available for
storing the information;

determine whether a threshold has been reached in
association with the storage resource request;

in the event the storage resource is not available and the
threshold associated with the storage resource
request has not been reached, issue another storage
resource request in connection with the storage
resource;

in the event the storage resource is available, store the
information in the storage resource; and

share the stored information with at least one of a
plurality of heterogeneous processes including at
least one process associated with a second physical
network selected from the group consisting of
FlexRay, Controller Area Network, Local Intercon-
nect Network and Media Oriented Systems Trans-
port, utilizing a network protocol different from a
protocol of the first physical network;

interfaces for communication with each of FlexRay, Con-
troller Area Network, and Local Interconnect Network
networks, with each physical network in communica-
tion with a component including at least one of a
sensor, an actuator or a gateway, and with each of the
FlexRay, Controller Area Network, Local Interconnect
Network and Media Oriented Systems Transport inter-
faces comprising a corresponding network communi-
cation bus controller including a corresponding net-
work communication bus driver;

the interfaces including a first communication interface
for interfacing with the first physical network, the first
communication interface including a first communica-
tion interface-related data link layer component, said
first communication interface configured to extract
variables from the overall message communicated by
the first physical network employing a first protocol
and storing the packet data unit representing the datum
information carried by the overall message from a first
physical network in the database; and

a second communication interface for interfacing with the
second physical network utilizing a protocol different
than the protocol of the first physical network, the
second communication interface including a second
communication interface-related data link layer com-
ponent;

wherein the automotive electronic control unit is config-
ured such that the stored information may be shared
with the second physical network by replicating the
packet unit data obtained from the first physical net-
work by composing another message configured to be
communicated using the different protocol of the sec-
ond physical network.

US 10,248,477 B2

15

**13**. The system of claim **12**, wherein the memory comprises at least one bulletin board that stores information that may be addressed by any process of any network having access to the storage resource of the electronic control unit.

**14**. The system of claim **13**, wherein a complexity of the bulletin board grows linearly with a number of networks.

**15**. The system of claim **12**, wherein the electronic control unit comprises code for the electronic control unit to run in a diagnostic mode that allows inspection of the system, while the electronic control unit is running.

**16**. The system of claim **15**, wherein the electronic control unit comprises code for the electronic control unit to additionally run in a debugging mode.

**17**. The system of claim **12**, wherein at least one of the first and the second physical networks is a multiplexing bus.

**18**. The system of claim **12**, wherein each of the first and the second physical networks is a multiplexing bus.

**19**. The system of claim **12**, wherein neither the first nor the second physical network is a multiplexing bus.

**20**. The system of claim **12**, wherein the automotive electronic control unit comprises digital input/output, an analog to digital converter, and a digital to analog converter.

**21**. The system of claim **12**, wherein the automotive electronic control unit comprises a real time clock and a watchdog.

**22**. The system of claim **12**, wherein the electronic control unit comprises:

code for the electronic control unit to run in a diagnostic mode that allows inspection of the system, while the electronic control unit is running;

code to run in a debugging mode;

code to interface with each of a FlexRay multiplexing bus, a Controller Area Network multiplexing bus, a Local Interconnect Network multiplexing bus, and a Media Oriented Systems Transport multiplexing bus;

digital input/output, an analog to digital converter, and a digital to analog converter;

a real time clock;

a watchdog; and

wherein in the event the storage resource is not available and the threshold associated with the storage resource request has been reached, the electronic control unit is configured to send a notification to a process associated with the information.

**23**. A system, comprising:

a first physical network including at least one of a FlexRay network, a Controller Area Network, and a Local Interconnect Network;

a second physical network including at least one of the FlexRay network, the Controller Area Network, and the Local Interconnect Network; and

an automotive electronic control unit communicatively coupled to the first physical network and the second physical network, the automotive electronic control unit comprising:

a first physical network interface including a first network communication bus controller with a first network communication bus driver,

a second physical network interface including a second network communication bus controller with a second network communication bus driver,

a micro-processor communicatively coupled to the first physical network interface and the second physical network interface,

a hardware abstraction layer,

16

an operating system configured to be adapted to a specific hardware implementation, utilizing the hardware abstraction layer, and

a non-volatile memory comprising a data structure and instructions, wherein the micro-processor is configured to cause execution of the instructions to cause the automotive electronic control unit to:

configure the data structure of the non-volatile memory;

generate at least one of a new event, a new flag, or a new signal, based on at least one of an input event or an output event;

control at least one of a code update or a configuration in connection with the non-volatile memory;

control one or more access rights for one or more applications;

generate at least one of a problem-related event or a problem-related flag in response to an identification of a problem identified via an analysis of at least one stored state variable;

receive information in the form of a packet data unit including a datum carried by a received message from the first physical network, utilizing a first network protocol;

in response to the receipt of the information, issue a storage resource request in connection with a storage resource;

determine whether the storage resource is available for storing the information;

determine whether a threshold has been reached in association with the storage resource request;

in the event the storage resource is not available and the threshold associated with the storage resource request has not been reached, issue another storage resource request in connection with the storage resource;

in the event the storage resource is available, store the information in the storage resource;

replicate the stored information;

compose an outgoing message including the replicated stored information; and

share the outgoing message with the second physical network, utilizing a second network protocol that is different from the first network protocol.

**24**. The system of claim **23**, wherein the non-volatile memory comprises at least one bulletin board that includes the stored information that is capable of being accessed by any process of any network having access to the electronic control unit.

**25**. The system of claim **24**, wherein a complexity of the bulletin board grows linearly with a number of networks.

**26**. The system of claim **23**, wherein the electronic control unit comprises code to run in a diagnostic mode that allows inspection of the system, while the electronic control unit is running.

**27**. The system of claim **26**, wherein the electronic control unit comprises code to additionally run in a debugging mode.

**28**. The system of claim **24**, wherein the electronic control unit comprises:

code to run in a diagnostic mode that allows inspection of the system, while the electronic control unit is running;

code to run in a debugging mode;

code to interface with each of a FlexRay multiplexing bus, a Controller Area Network multiplexing bus, and a Local Interconnect Network multiplexing bus;

17

a real time clock;

a watchdog; and

wherein the system is configured such that, in the event the storage resource is not available and the threshold associated with the storage resource request has been reached, the electronic control unit is configured to send a notification to a process associated with the information.

**29.** The system of claim **24**, wherein the system is configured such that at least one of:

the first physical network includes the FlexRay network;

the first physical network includes the Controller Area Network;

the first physical network includes the Local Interconnect Network;

the second physical network includes the FlexRay network;

the second physical network includes the Controller Area Network;

the second physical network includes the Local Interconnect Network;

the new event, the new flag, or the new signal are all generated based on the input event;

only one of the new event, the new flag, or the new signal is generated based on the input event;

the new signal is generated based on the input event;

the new event, the new flag, or the new signal are all generated based on the output event;

only one of the new event, the new flag, or the new signal is generated based on the output event;

the new signal is generated based on the output event;

a single access right is controlled for a single application;

multiple access rights are controlled for multiple applications;

a single access right is controlled for a single application at execution;

multiple access rights are controlled for multiple applications at execution;

both the problem-related event and the problem-related flag are generated in response to the identification of the problem identified via the analysis of at least one stored state variable;

only one of the problem-related event or the problem-related flag is generated in response to the identification of the problem identified via the analysis of at least one stored state variable;

the problem-related event is generated in response to the identification of the problem identified via the analysis of at least one stored state variable;

at least one stored state variable is a single stored state variable; or the at least one stored state variable includes multiple stored state variables.

**30.** A system, comprising:

an automobile including:

a first physical network including at least one of a FlexRay network, a Controller Area Network, and a Local Interconnect Network;

a second physical network including at least one of the FlexRay network, the Controller Area Network, and the Local Interconnect Network; and

18

an automotive electronic control unit communicatively coupled to the first physical network and the second physical network, the automotive electronic control unit comprising:

a first physical network interface including a first network communication bus controller with a first network communication bus driver,

a second physical network interface including a second network communication bus controller with a second network communication bus driver,

a micro-processor communicatively coupled to the first physical network interface and the second physical network interface, a hardware abstraction layer,

an operating system configured to be adapted to a specific hardware implementation, utilizing the hardware abstraction layer, and

a non-volatile memory comprising a data structure and instructions, wherein the micro-processor is configured to cause execution of the instructions to cause the automotive electronic control unit to:

configure the data structure of the non-volatile memory,

generate at least one of a new event, a new flag, or a new signal, based on at least one of an input event or an output event,

control at least one of a code update or a configuration in connection with the non-volatile memory,

control one or more access rights for one or more applications,

generate at least one of a problem-related event or a problem-related flag in response to an identification of a problem identified via an analysis of at least one stored state variable,

receive information in the form of a packet data unit including a datum carried by a received message from the first physical network, utilizing a first network protocol,

in response to the receipt of the information, issue a storage resource request in connection with a storage resource,

determine whether the storage resource is available for storing the information,

determine whether a threshold has been reached in association with the storage resource request,

in the event the storage resource is not available and the threshold associated with the storage resource request has not been reached, issue another storage resource request in connection with the storage resource,

in the event the storage resource is available, store the information in the storage resource,

replicate the stored information,

compose an outgoing message including the replicated stored information, and

share the outgoing message with the second physical network, utilizing a second network protocol that is different from the first network protocol.

* * * * *

# EXHIBIT E

Trials@uspto.gov                                                      Paper No. 33
571-272-7822                                                   Entered: June 14, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

BMW OF NORTH AMERICA, LLC,
Petitioner,

v.

STRAGENT, LLC,
Patent Owner.
_____

Case IPR2017-00676
Patent 8,209,705 B2

_____

Before LYNNE E. PETTIGREW, PATRICK M. BOUCHER, and
CARL L. SILVERMAN, *Administrative Patent Judges*.

BOUCHER, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2017-00676
Patent 8,209,705 B2

In response to a Petition (Paper 2, "Pet.") filed by BMW of North America, LLC ("Petitioner"), we instituted an *inter partes* review of claims 1–6 and 20 of U.S. Patent No. 8,209,705 B2 ("the '705 patent"). Paper 8 ("Dec."). During the trial, Stragent, LLC ("Patent Owner") filed a Response (Paper 11, "PO Resp.") to which Petitioner filed a Reply (Paper 18, "Reply"). During the trial, Petitioner filed a Motion to Exclude portions of the testimony of Patent Owner's expert, which Patent Owner opposed, and to which Petitioner replied. Papers 20, 24, 26. An oral hearing was held on March 14, 2018, and a copy of the transcript was entered into the record. Paper 29 ("Tr.").[1]

We have jurisdiction under 35 U.S.C. § 6. This Decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of the claims on which we instituted trial. Based on the record before us, Petitioner has shown, by a preponderance of the evidence, that claims 1–6 and 20 are unpatentable.

## I. BACKGROUND

### A. The '705 Patent

The '705 patent describes systems and methods "for sharing information in a distributed system." Ex. 1001, col. 1, ll. 29–30. Such systems and methods are illustrated for system architectures such as "may be

---

[1] The hearing was a consolidated hearing for IPR2017-00676 and IPR2017-00677.

2

IPR2017-00676
Patent 8,209,705 B2

situated in automotive electronics or industrial control and monitoring systems." *Id.* at col. 3, ll. 11–13.  An example is provided in Figure 1 of the '705 patent, which is reproduced below.



Figure 1 generally depicts elements of a distributed embedded communication and computing system.  *Id.* at col. 3, ll. 9–11.

In an automotive environment, various electronic control units ("ECUs") control such applications as engine control, brake control, or diagnostics through connections to various sensors and actuators organized into separate subnetworks.  *Id.* at col. 3, ll. 13–18.  Such applications are themselves grouped into backbone system functions, such as "body control, power train and chassis."  *Id.* at col. 3, ll. 19–21.  With a hierarchical

3

IPR2017-00676
Patent 8,209,705 B2

organization that includes gateways 101, 103, 104, 105, messages are relayed up and down through the system layers.  *Id.* at col. 3, ll. 24–26. Each layer may contain multiple ECUs connected through wired serial multiplexing bus systems, with the '705 patent noting several examples that include Controller Area Network ("CAN"), Local Interconnect Network ("LIN"), and Flexray.  *Id.* at col. 3, ll. 26–33.

At the highest level in the hierarchy, "the system level," system gateway 101 is connected via various busses to other system-level ECUs, to subsequent gateways 103, and to external components 120.  *Id.* at col. 3, ll. 60–67.  In addition, system gateway 101 may be connected to external gateway 131 to link the system to remote device 132.  *Id.* at col. 4, ll. 1–6. "Subsequent to the system level may be several layers of groups and subgroups that are link[ed] to the higher levels via gateways (101, 103, 104, 105)."  *Id.* at col. 4, ll. 7–9.

In operation, ECU 102 receives "real-time" input variables from local sensors 108 or from networked sensors 106, respectively via signal lines 113 or multiplexing bus system 112.  *Id.* at col. 3, ll. 39–42.  "[R]eal-time may include any response time that may be measured in milli- or microseconds, and/or is less than 1 second."  *Id.* at col. 3, ll. 36–38.  ECU 102 processes the input variables and generates output variables that may be shared with other ECUs 102.  *Id.* at col. 3, ll. 46–51.  Two relevant modes of sharing are described.

IPR2017-00676
Patent 8,209,705 B2

First, ECUs 102 "typically share information with devices that are connected on the same physical multiplexing system. This method of information sharing is called horizontal information sharing in a hierarchical system." *Id.* at col. 3, ll. 51–55.

Second, a bulletin board may be used so that "the information is shared, in real-time, among a plurality of heterogeneous processes." *Id.* at col. 1, ll. 31–33. According to the '705 patent, "heterogeneous networks may refer to any different communication networks with at least one aspect that is different." *Id.* at col. 7, ll. 27–29. Figure 7 of the '705 patent, reproduced below, illustrates a logical architecture between three heterogeneous network controllers using such a bulletin board.



IPR2017-00676
Patent 8,209,705 B2

Figure 7 illustrates a system architecture in which a bulletin board acts as a shared memory interacting with multiple communication busses, with data received from one communication bus stored on the bulletin board and shared as a new message with other network types.  *Id.* at col. 7, ll. 4–37.

The illustrated architecture includes four principal components:  (1) network controllers 702, 703, and 704 (first column) for each of multiple heterogeneous networks; (2) associated operating system interfaces 705 for each of the heterogeneous networks (second column); (3) remote message communication processes 706 for stripping out network-specific information (third column); and (4) the bulletin board, which may contain events 607, real-time variables 608, configuration parameters, and firmware.  *Id.* at col. 5, ll. 63–67, col. 6, ll. 33–37.  In operation, external event 701, such as a flag indicating that data from a sensor are available, is transmitted on a network to a communication bus controller, such as network controller 703 in the drawing.  *Id.* at col. 7, ll. 4–9.  This causes an operating system interface (such as communication interface 709) to notify a remote message communication process (such as remote message conversion method 710) that data are available, with notification provided in turn to application process 606.  *Id.* at col. 7, ll. 4–17.

### B.  Prosecution History

The application that matured into '705 patent is a continuation of the application that matured into U.S. Patent No. 7,802,263 ("the '263 patent"),

6

IPR2017-00676
Patent 8,209,705 B2

filed December 15, 2003, and claims the benefit of the filing date of U.S.

Provisional Application No. 60/434,018 ("the '018 provisional application"),

filed December 17, 2002.  Ex. 1001 at [60], [63].

At the time of filing the application that matured into the '263 patent,

independent claim 1 recited the following:

> 1.  A method for sharing information in a distributed system, comprising:
> receiving information;
> storing the information on a bulletin board; and
> sharing, in real-time, the information among a plurality of heterogeneous processes.

Ex. 1011, 649.  Although certain amendments were made to the claim during

prosecution, allowance was secured only after an interview with the

Examiner in which the applicants authorized the addition of several

limitations that Petitioner characterizes as "memory-related":

(1) "requesting a bulletin board resource of one or more bulletin boards"; (2)

"determining whether the bulletin board resource is available"; (3) "in the

event the bulletin board resource is not available, re-requesting the bulletin

board resource until a threshold has been reached"; and (4) storing the

information on the bulletin board resource "in the event the bulletin board

resource is available."  *Id.* at 250–252; *see* Pet. 5–6.

Independent claim 1 was filed in the same original form at the time of

filing the application that matured into the '705 patent.  Ex. 1002, 255.

During prosecution, the applicants amended the claims to add what

7

IPR2017-00676
Patent 8,209,705 B2

Petitioner characterizes as "memory-related limitations similar to those in the claims of the '263 patent":

> in the event the storage resource is not available, determining whether a timeout has been reached and causing a re-request in connection with the storage resource if the timeout has not been reached; [and]
> in the event the timeout has been reached, causing an error notification to be sent.

*Id.* at 84–85 (underscoring in original to identify material added by amendment). These added limitations were among those identified by the Examiner in allowing the application as not "disclose[d] or suggest[ed]" "when taken in the context of [the] claims as a whole." *Id.* at 98–99.

### C.  Illustrative Claim

Challenged claim 1, which is illustrative of the challenged claims, is reproduced below with numbers added to identify specific elements of the claim in accordance with the scheme used by Petitioner. *See* Pet. 10–11.

1.  [0] A method for sharing information, the method comprising:
   [1] allowing receipt of information associated with a message, utilizing a first network protocol associated with a first network;
   [2] causing a determination as to whether a storage resource is available;
   [3] in the event the storage resource is not available, determining whether a timeout has been reached and causing a re-request in connection with the storage resource if the timeout has not been reached;

[4] in the event the timeout has been reached, causing an error notification to be sent;

[5] in the event the storage resource is available, causing storage of the information utilizing the storage resource; and

[6] causing the information to be shared by:

[7] in real-time, sharing the information utilizing at least one message format corresponding to a second network protocol associated with a second network which is different from the first network protocol;

[8] wherein the method is associated with an electronic control unit with at least one gateway function, and a plurality of interface portions including:

[9] a first interface portion for interfacing with the first network, the first interface portion including a first interface-related first layer part for receiving first interface-related first layer messages and a first interface-related second layer part, the first interface-related first layer messages being processed after which first interface-related second layer messages are provided, where the first network is at least one of a Controller Area Network, a Flexray network, or a Local Interconnect Network; and

[10] a second interface portion for interfacing with the second network, the second interface portion including a second interface-related first layer part for receiving second interface-related first layer messages and a second interface-related second layer part, the second interface-related first layer messages being processed after which second interface-related second layer messages are provided, where the second network is different from the first network and is at least one of the Controller Area Network, the Flexray network, or the Local Interconnect Network.

Ex. 1001, col. 12, ll. 16–59.

IPR2017-00676
Patent 8,209,705 B2

*D.  Evidence*

Petitioner relies on the following references.  Pet. 15–25.

| Staiger | US 2002/0073243 A1 | June 13, 2002 | Ex. 1004 |
| Millsap | US 6,484,082 B1 | Nov. 19, 2002 | Ex. 1015 |

OSEK/VDX Binding Specification, Version 1.3 (Sept. 17, 2001) ("OSEK Binding") (Ex. 1007)

OSEK/VDX Communication Specification, Version 2.2.2 (Dec. 18, 2000) ("OSEK COM") (Ex. 1008)

OSEK/VDX Network Management Concept and Application Programming Interface, Version 2.51 (May 31, 2000) ("OSEK NM") (Ex. 1009)

OSEK/VDX Fault-Tolerant Communication, Version 1.0 (July 24, 2001) ("OSEK FTCom") (Ex. 1010)[2]

William Wong, *Software And Hardware Standards Help, But In-Vehicle Network Growth Will Be Conservative:  CAN networks and OSEK/VDX-compatible operating systems will drive tomorrow's vehicles*, 49 Elec. Design 62 (Jan. 8, 2001) ("Wong") (Ex. 1012).

In addition, Petitioner provides Declarations by Vijay K. Madisetti, Ph.D., Christopher Butler, and R. Benjamin Cassady, which we have also considered.  Exs. 1003, 1013, 1014, 1026.  No cross-examination testimony of these witnesses was filed in the proceeding, and Patent Owner explicitly confirmed that it did not cross-examine Dr. Madisetti.  Tr. 41:14–16.

---

[2] Petitioner refers to OSEK Binding, OSEK COM, OSEK NM, and OSEK FTCom collectively as "OSEK/VDX."  We sometimes use the same terminology herein.

10

IPR2017-00676
Patent 8,209,705 B2

Patent Owner provides a Declaration by Jeffrey A. Miller, Ph.D.  Ex. 2001.  Dr. Miller was cross-examined by Petitioner, and a transcript of his deposition was entered into the record.  Ex. 1025.  Dr. Miller's Declaration is also the subject of a Motion to Exclude filed by Petitioner, to which Patent Owner responded and Petitioner replied.  Papers 20, 24, 26.

*E.  Grounds of Unpatentability*

Petitioner challenges claims 1–6 and 20 over the following combinations of references.  Pet. 14–15.

| Reference(s) | Basis |
|---|---|
| Staiger | § 102(a) |
| Staiger, Millsap, and Wong | § 103(a) |
| OSEK/VDX | § 102(b) |
| OSEK/VDX | § 103(a) |
| OSEK/VDX, Millsap, and Wong | § 103(a) |

We instituted this proceeding on all of the above-identified challenges, except the anticipation ground over OSEK/VDX.  Dec. 33.  Subsequent to instituting the proceeding, on April 24, 2018, the Supreme Court held that a final written decision under 35 U.S.C. § 318(a) must decide the patentability of all claims challenged in a petition for *inter partes* review.  *SAS Institute, Inc. v. Iancu*, 138 S.Ct. 1348 (2018).  Accordingly, we notified the parties that "[w]e modify our institution decision to institute on all of the challenged claims and all of the grounds presented in the Petition."  Paper 31, 2.  Specifically, we informed the parties that, notwithstanding the original

11

IPR2017-00676
Patent 8,209,705 B2

institution on a subset of the grounds, "the Board intends to address the anticipation grounds over OSEK/VDX in its . . . final written decision[]." *Id.* Neither party has requested further briefing in light of that notification.

### F.  Real Parties in Interest

Petitioner identifies BMW of North America, LLC, BMW Manufacturing Co., LLC, and Bayerische Motoren Werke, AG as real parties in interest in this proceeding.  Pet. 90.

Patent Owner identifies only itself as a real party in interest.  Paper 5, 1.

### G.  Related Proceedings

The parties identify the following district-court proceedings as involving the '705 patent:  (1) *Stragent, LLC v. BMW of North America, LLC*, No. 6:15-cv-00446 (E.D. Tex.); (2) *Stragent, LLC v. Mercedes-Benz USA, LLC*, No. 6:15-cv-00447 (E.D. Tex.); and (3) *Stragent, LLC v. Volvo Cars of North America, LLC*, No. 6:15-cv-00448 (E.D. Tex.).  Pet. 90; Paper 5, 1–2.

The parties also identify several *inter partes* review proceedings involving the '705 patent:  IPR2017-00458, IPR2017-01502, IPR2017-01521, and IPR2017-01522.  Paper 10, 1–2; Paper 13, 2.  Patent Owner further identifies several *inter partes* review proceedings involving U.S. Patent No. 8,566,843 B2, which is a continuation of the '705 patent:

IPR2017-00676
Patent 8,209,705 B2

IPR2017-00457, IPR2017-00677, IPR2017-01503, IPR2017-01504, IPR2017-01519, and IPR2017-01520.  Paper 13, 2.

## II.  ANALYSIS

### A.  *Motion to Exclude*

Petitioner moves to exclude "at least paragraphs 16-18 and 37-103" of Dr. Miller's Declaration (Ex. 2001).  Paper 20, 1.  Petitioner contends that the identified paragraphs "are not the product of reliable principles and methods," contrary to Fed. R. Evid. 702, "because both Dr. Miller's declaration (Ex. 2001) and his deposition (Ex. 1025) show that Dr. Miller applied a wrong claim construction standard, and misunderstood a key legal concept that impacts his opinions on obviousness."  *Id.* at 2.  Specifically, Petitioner observes that Dr. Miller's Declaration "is completely silent regarding the claim construction standard applied," and argues that Dr. Miller's deposition testimony "exposed that he did not apply the proper standard, or at least did not apply it correctly."  *Id.* at 3.  Petitioner speculates that "Dr. Miller was likely not informed of and did not follow the process outlined for construing claims in an IPR."  *Id.* at 4.

We have reviewed the relevant deposition testimony, in which Dr. Miller was asked to identify the standard he used when construing claim terms in his Declaration.  Ex. 1025, 27:1–34:14.  We agree with Petitioner that Dr. Miller did not provide responses sufficient to conclude that he was aware of and/or applied the correct claim-construction standard.  *See id.* at

13

IPR2017-00676
Patent 8,209,705 B2

27:5–6 ("I used what is generally accepted in the field."), 27:9–11 ("So to –
for construing the claim terms is providing a definition of what the term is.
So I provided a general definition for the terms."), 30:3–6 ("Well, that's the
standard that I used for construing the claim terms in this Declaration.  I
don't know if that's the legal qualification for construing claim terms."),
32:18–23 ("broadest reasonable interpretation" would mean "when you're
defining a term that you would define it in a way that is, first of all,
reasonable, that it makes sense and that it's broad, meaning general and that
it's interpreting the phrase or the term").

     Nevertheless, we are not persuaded that the appropriate remedy is
exclusion of Dr. Miller's testimony.  As Patent Owner asserts, "[t]he role of
the expert witness under the Federal Rules of Evidence is to 'help the trier of
fact to understand the *evidence* or to determine a *fact* in issue.'"  Paper 24,
2–3 (quoting Fed. R. Evid. 702) (emphasis by Patent Owner).  As Patent
Owner further asserts, Petitioner does not "impugn[]" Dr. Miller's credibility
as an expert in the subject matter at issue.  *Id.* at 3–4.  We agree with Patent
Owner that "Petitioner's attack on the sufficiency of the evidence is
improper in a motion to exclude."  *Id.* at 4 (citing *Microsoft Corp. v.
Surfcast, Inc.*, Case IPR2013-00292 at 52–53 (Paper 93) (PTAB Oct. 14,
2014)).  We accordingly deny Petitioner's Motion to Exclude.

     Petitioner alternatively argues in its Reply that "Because Dr. Miller
did not apply the correct claim construction standard, his opinions on claim
construction (Ex. 2001 ¶¶16-28) should be afforded no weight."  Reply 2–3.

14

Although we agree that the weight to be accorded to Dr. Miller's testimony on claim construction is impacted by the uncertainty of the analytical procedure he followed, we are not persuaded that his testimony should be discounted wholesale. Dr. Miller provides relevant opinions on a number of issues, particularly including how a person of ordinary skill in the art would understand certain terms in light of the Specification, that are helpful to us as the trier of fact. "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Ladd, Expert Testimony, 5 Vand. L. Rev. 414, 418 (1952).

## B. Claim Construction

The Board interprets claims of an unexpired patent using the broadest reasonable construction in light of the specification of the patent in which they appear. *See* 37 C.F.R. § 42.100(b); *Cuozzo Speed Techs., LLC v. Lee*, 136 S.Ct. 2131, 2144–46 (2016) (upholding the use of the broadest reasonable interpretation standard). An inventor may provide a meaning for a term that is different from its ordinary meaning by defining the term in the specification with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

15

IPR2017-00676
Patent 8,209,705 B2

### 1. *"real-time"*

Independent claims 1 and 20 recite that information is caused to be shared "in real-time, sharing the information utilizing . . . ."  Petitioner argues that the Specification of the '705 patent expressly defines "real-time":  "In the context of the present description, real-time may include any response time that may be measured in milli- or microseconds, and/or is less than 1 second."  Ex. 1001, col. 3, ll. 35–38; Pet. 13.  Accordingly, Petitioner proposes that "'real-time' should be construed as responses that occur in less than one second."  Pet. 13.  Patent Owner contends that the definition from the Specification should be adopted.  PO Resp. 16.

We construe "real-time" as Petitioner proposes, i.e., as including responses that occur in less than one second.  The first part of thequote cited above provided in the Specification ("may be measured in milli- or microseconds") is not limiting because *any* response time, no matter how large or small, may be *measured* in milli- or microseconds.  We nevertheless agree with Petitioner that distinctions between the parties' proposed constructions "are not material to any grounds."  Reply 7.

### 2. *"sharing the information"*

Each of independent claims 1 and 20 recites "in real-time, sharing the information utilizing at least one message format corresponding to a second network protocol associated with a second network which is different from the first network protocol."  Ex. 1001, col. 12, ll. 32–35, col. 14, ll. 56–59.

16

IPR2017-00676
Patent 8,209,705 B2

In its Response, Patent Owner proposes a construction of the entire limitation:

> The limitation . . . can only mean that the method has received a first message in a "first network protocol associated with a first network" (element 1.1), has then delivered that "first network message" to storage, where the "first network message" is partaken of, used, experienced or occupied (that is "shared") with a second network by way of a second network protocol which is different from the first network protocol, and that the entire process is conducted "in milli- or microseconds, and/or is less than 1 second.

PO Resp. 17.  Patent Owner bases its proposal on a general-dictionary definition of "share" and its proposed construction of "real-time."  *Id.* at 16–17 (citing Exs. 2003, 2004).  At the oral hearing, Patent Owner also appeared to rely on the interaction of the full limitation with other limitations of the independent claims, particularly, "in the event the storage resource is available, causing storage of the information utilizing the storage resource."  Tr. 22:11–25:7.  In addition, Patent Owner cites to several quotations drawn from the Specification of the '705 patent that relate to sharing information by its storage on a bulletin board.  PO Resp. 18–20 (citing Ex. 1001, col. 1, ll. 30–33, col. 3, ll. 51–59, col. 6, ll. 27–31, col. 10, l. 67–col. 11, l. 9, col. 11, ll. 20–58).

Petitioner disputes Patent Owner's proposed construction, noting that the limitation does not recite "receiving" a first network message, and does not recite any "storage" or "delivering" a first network message to storage.  Reply 7–8.  In addition, Petitioner contends that Patent Owner's proposed

17

IPR2017-00676
Patent 8,209,705 B2

construction "contradicts the '705 patent's specification," in part because of the disclosure of "horizontal information sharing," which does not require bulletin-board storage. *Id.* at 8–9.

We find it unnecessary to construe the entire (unparsed) limitation set forth above, which includes elements such as "real-time," for which Patent Owner has proposed an independent construction. Rather, it is sufficient to construe "sharing the information," with the full limitation further limiting the message format used. In construing "sharing the information," we find Patent Owner's citation of a technical dictionary to be more probative than the general-purpose dictionary it highlights.

The language of the general-purpose dictionary that refers to "to partake of, use, experience, occupy, or enjoy with others; to have in common," does not appear to contemplate the sharing of "information," which the '705 patent Specification describes as "includ[ing] data, a signal, and/or anything else capable of being stored and shared." *See* Ex. 2003 (general definition of "share"); Ex. 1001, col. 3, ll. 56–59. Instead, the technical definition of "[t]o make files, directories, or folders accessible to other users over a network" is more relevant because it expressly contemplates the same context as the '705 patent, i.e. sharing over a network. Ex. 2004 (technical definition of "share").

We also agree with Petitioner that construction of "sharing the information" does not require that the information be stored. Storage of the information is addressed in other limitations of the independent claims, and

18

IPR2017-00676
Patent 8,209,705 B2

need not be read into the limitation at issue.  *See* Tr. 9:18–21 (Petitioner agreeing that, if the condition of limitation 1.5 is met, "then the information has to be stored").  Furthermore, the description of "information" as "capable of being stored *and* shared" in the '705 patent Specification is consistent with storage and sharing being distinct concepts.  *See* Ex. 1001, col. 3, ll. 56–59 (emphasis added).  In addition, the inclusion of an embodiment in that Specification that does not appear to require storage of the shared information reinforces our conclusion.  Ex. 1001, col. 3, ll. 51–55; *see* Tr. 8:7–12, 12:1–14.

In light of these considerations, we construe "sharing the information" in parallel with the technical-dictionary definition provided by Patent Owner, i.e., as making the information accessible, but not requiring storage of the information.

### 3.  "storage resource manager"

Claims 3 and 4, both of which depend directly from claim 1, recite a "storage resource manager."  Ex. 1001, col. 12, ll. 62–67.  In the Institution Decision, we found it unnecessary to construe this term.  Dec. 10.

Nevertheless, Petitioner proposes that the phrase be construed as "hardware or software that controls interaction with the storage resource." Pet. 13; Reply 11.  Patent Owner instead proposes that the phrase should be construed as "hardware or software that controls storage of information in accordance with the algorithm of Figure 10."  PO Resp. 20.  At the oral

19

IPR2017-00676
Patent 8,209,705 B2

hearing, Petitioner said that it "did not see a meaningful dispute" between the parties proposed constructions.  Tr. 6:19–7:3.

We adopt Petitioner's proposed construction.  The phrase does not appear in the Specification outside of its claims, but, consistent with Petitioner's construction, the Specification describes software and hardware that controls interaction with the storage resource for "resource management."  Ex. 1001, col. 6, ll. 11–21.  Patent Owner's proposed construction improperly narrows the term to a particular embodiment appearing in the written description.  *See SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) ("Though understanding the claim language may be aided by the explanations contained in the written description, it is important not to import into a claim limitations that are not a part of the claim.  For example, a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment.").

### 4.  *"schedule"*

Claim 6, which depends from claim 1, recites that "the information is shared according to a schedule."  Ex. 1001, col. 13, ll. 3–4.  The parties agree that "schedule" should be construed as "a procedural plan that indicates the time and sequence of each operation."  PO Resp. 22; Reply 11.  We adopt the parties' construction.

20

IPR2017-00676
Patent 8,209,705 B2

*C. Effective Filing Date*

Petitioner contends that the challenged claims are "entitled only" to the December 15, 2003, filing date of the '263 patent as their effective filing date, and that they are not entitled to the December 17, 2002, filing date of the '018 provisional application.  Pet. 8–9.  Petitioner argues that "the '263 patent is the first instance where Patent Owner even arguably disclosed the memory-related limitations," and that the '018 provisional application does not disclose

> at least the following limitations of claim 1:  "in the event the storage resource is not available, determining whether a timeout has been reached and causing a re-request in connection with the storage resource if the timeout has not been reached"; "in the event the timeout has been reached, causing an error notification to be sent"; and "in the event the storage resource is available, causing storage of the information utilizing the storage resource. Ex. 1001, claims 1, 20; *see generally* Ex. 1005.

*Id.* at 9.  Petitioner further contends that "the ['018] provisional application simply and generally states that 'the bulletin board manager provides mechanisms for access control,'" and that "[t]his broad statement in no way discloses the claim limitations as described above."  *Id.* (citing Ex. 1005, 9).

In the Institution Decision, we determined that Petitioner had, through these contentions, satisfied its initial burden of production with respect to the issue of the challenged claims' effective filing date.  Dec. 10–11.  As we noted, "Petitioner adequately identifies specific claim limitations that it contends are unsupported by the '018 provisional application and identifies

21

IPR2017-00676
Patent 8,209,705 B2

specific disclosure in the '018 provisional application that it contends is insufficient." *Id.* at 11 (citing *Dynamic Drinkware, LLC v. National Graphics, Inc.*, 800 F.3d 1375, 1380 (Fed. Cir. 2015)).  Patent Owner does not contest in its Response that the challenged claims are entitled only to an effective filing date of December 15, 2003.  Based on the record, we accord that effective filing date to the challenged claims.

### D.  Legal Principles

To establish anticipation, each and every element in a claim, arranged as recited in the claim, must be found in a single prior art reference.  *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008); *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001).  While the elements must be arranged in the same way as is recited in the claim, "the reference need not satisfy an *ipsissimis verbis* test."  *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009); *In re Bond*, 910 F.2d 831, 832–33 (Fed. Cir. 1990).  Identity of terminology between the anticipatory prior art reference and the claim is not required.  Prior art references must be "'considered together with the knowledge of one of ordinary skill in the pertinent art.'"  *In re Paulsen*, 30 F.3d at 1480.

Also, "it is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom."  *In re Preda*, 401 F.2d 825, 826 (CCPA 1968).  As the Court of Appeals for the Federal Circuit recently

IPR2017-00676
Patent 8,209,705 B2

explained, the dispositive question for anticipation is whether one skilled in the art would reasonably understand or infer from a prior art reference that every claim element is disclosed in that reference. *Eli Lilly v. Los Angeles Biomedical Research Inst.*, 849 F.3d 1073, 1074–1075 (Fed. Cir. 2017).

A claim is unpatentable for obviousness under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when in evidence, objective indicia of non-obviousness, i.e., secondary considerations.[3] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

Additionally, the obviousness inquiry typically requires an analysis of "whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) (requiring "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness")); *see In re Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1333

---

[3] The parties do not address secondary considerations, which accordingly do not form part of our analysis.

IPR2017-00676
Patent 8,209,705 B2

(Fed. Cir. 2016) (citing *DyStar Textilfarben GmbH & Co. Deutschland KG v. C. H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006)).

To prevail on its challenges, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable.  35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).  "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable."  *Harmonic Inc. v. Avid Tech., Inc.* 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")).  This burden never shifts to Patent Owner.  *See Dynamic Drinkware*, 800 F.3d at 1378 (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review).  Furthermore, Petitioner does not satisfy its burden of proving obviousness by employing "mere conclusory statements."  *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

### E.  Level of Skill in the Art

The parties advocate for the adoption of similar levels of ordinary skill in the art.  Petitioner contends that a person of ordinary skill "would have a bachelor's degree in electrical engineering, computer engineering, or a related engineering discipline and at least two years of industry experience in the field of distributed computing or automotive engineering, or

24

IPR2017-00676
Patent 8,209,705 B2

equivalent experience, education, or both." Pet. 10. In addition, Petitioner contends that such a person "would also have knowledge or familiarity with in-vehicle computing." *Id.* (citing Ex. 1003 ¶¶ 62–63). Dr. Madisetti's testimony supports Petitioner's proposal. Ex. 1003 ¶¶ 62–63.

> Patent Owner similarly contends that a person of ordinary skill
>
> would have had at least the qualifications of or equivalent to either a master's degree in electrical engineering, computer science, or computer engineering with course work or research in embedded networking technologies or an undergraduate degree in electrical engineering, computer science, or computer engineering with at least two years of relevant work experience in industry.

PO Resp. 22–23. Dr. Miller's testimony supports Patent Owner's proposal. Ex. 2001 ¶ 12. The principal difference between the levels proposed by the parties is Petitioner's requirement that the person have knowledge or familiarity with "in-vehicle computing." Although the Specification illustrates its systems and methods for sharing information in a distributed system in the context of vehicle applications, the claims are not so limited. We are not persuaded that familiarity with in-vehicle computing would be a characteristic of a person of ordinary skill. We therefore adopt Patent Owner's expression of the level of skill in the art, noting that it instead requires some level of familiarity with embedded networking technologies.

IPR2017-00676
Patent 8,209,705 B2

### F. Anticipation by Staiger

#### 1. Independent Claim 1

Staiger, which "relates to a method and a circuit arrangement for communication within and across networks," was filed on December 4, 2001, and published on June 13, 2002.  Ex. 1004 ¶ 1, [22], [43].  Consistent with the effective filing date we accord the challenged claims, Staiger is thus prior art to the '705 patent.

Like the '705 patent, Staiger presents its description of communicating across networks in the context of an automotive environment, describing an ECU as follows:

> An Electronic Control Unit (ECU) in a modern automobile is an example of such a[ circuit] arrangement.  The ECU may be connected to a plurality of real-time networks, e.g., several individual CAN (Controller Area Network) busses or other multiple purpose networks, like multimedia-networks, such as MOST (Media Oriented Systems Transport), i.e., an optical bus system used in automobiles, or IEEE1394 (Firewire).

*Id.* ¶ 3.  Staiger explains that, during operation, the ECU executes an application for controlling remote systems while also monitoring various busses and networks to select and retrieve parameters required for the application programs in progress.  *Id.* ¶ 4.  Staiger describes methods and systems for processing messages to communicate with remote units over at least one data network and with at least one dedicated CPU.  *Id.* ¶ 15.

Figure 2 of Staiger is reproduced below.

26

IPR2017-00676
Patent 8,209,705 B2



FIG. 2

Figure 2 depicts a high-level block diagram of interconnection preprocessor 200, which may be used in the message-processing methods. *Id.* ¶ 36. Preprocessor 200 is connected to switchboard 201, "which is designed to connect four individual CAN-busses 202 to 205 and in addition a first and a second independent CPU 207 and 208." *Id.* First and second CPUs 207 and 208 provide connections to first and second additional bus systems 210 and 211, respectively. *Id.* Each of CAN busses 202–205 is connected to a respective bus adapter 214–217, which may be formed by standardized CAN controllers providing connections to the respective CAN busses 202–205. *Id.* ¶ 38.

27

IPR2017-00676
Patent 8,209,705 B2

In addition to relying on Figure 2 as illustrating an implementation of a method for sharing information as recited in the preamble of independent claim 1, Petitioner relies on the related description of an initializing process as disclosing receipt of information associated with a message and utilizing a first network protocol associated with a first network, as recited in limitation 1.1. Pet. 27–28. In addition, Petitioner relies on such disclosure for limitations 1.6–1.10, observing that Staiger "shares messages with a plurality of different destinations (e.g., CAN busses, FireWire busses, MOST busses, CPUs), and teaches that each message may be transmitted to more than one destination." *Id.* at 34.

*a. Limitation 1.7*

For limitation 1.7, Petitioner points to Staiger's disclosure of "receiving messages from 'one of the CPUs 207 and 208' and broadcasting the message 'to several CAN busses 202 to 205 identically.'" *Id.* at 35 (quoting Ex. 1004 ¶ 51). Petitioner reasons that CPUs 207 and 208 are connected to bus systems such as FireWire or MOST (which correspond to a "first network protocol"), which are different than CAN busses 202–205 (which correspond to a "second network protocol"). *Id.* In addition, Petitioner points to disclosure in Staiger that CAN busses 202–205 "may be either CAN-C or CAN-B," i.e., different versions of the Controller Area Network, and provides evidence those different versions are incompatible with each other. *Id.*; Ex. 1012, 6; Ex. 1003 ¶ 108. "Thus," Petitioner

28

IPR2017-00676
Patent 8,209,705 B2

reasons, "the CAN-B and CAN-C protocols are different from each other."
Pet. 35.  We agree with this reasoning.  Petitioner also sufficiently addresses
the "real-time" sharing requirement of limitation 1.7 by referring to Staiger's
disclosure of a response time that is "typically milliseconds or
microseconds," consistent with the construction adopted herein.  *Id.* at 35–36
(citing Ex. 1004 ¶¶ 7, 51).

Patent Owner responds that "Staiger does not 'share' information
between different ECUs operating on different protocols," as required by
limitation 1.7.  PO Resp. 7, 27.  Rather, according to Patent Owner, "Staiger
discloses a central message processing device that *only receives, processes
and distributes* messages."  *Id.* at 7 (emphasis added).  There are two
important aspects to Patent Owner's argument, which we address in turn.

First, Patent Owner's argument relies on its advocated construction of
"sharing the information" as requiring that the information be stored.  For
the reasons expressed above, we disagree with that proposed construction.
Patent Owner acknowledges that Staiger's central device acts "to receive,
process and distribute messages."  *Id.* at 27.  Such distribution of messages
is consistent with the adopted construction of "sharing the information" as
requiring that the information be made accessible.

Second, while acknowledging that Staiger distributes information,
Patent Owner argues that it "does not convert the message to a format that
can be recognized and used by different ECUs using different protocols."
PO Resp. 27.  Without such format conversion, "Staiger does not disclose

29

IPR2017-00676
Patent 8,209,705 B2

the heart of the claimed invention, which is to receive data or other information from one network, and then process that message so that it can be shared with a second network utilizing a second network protocol associated with the second network." *Id.* According to Patent Owner, Staiger's disclosure is limited to "the concept that the central device can receive CAN messages via CAN-C or CAN-B busses and physical layers, process and distribute them to a final destination." *Id.* But Staiger is deficient, according to Patent Owner, because "information received via a CAN-B bus, using a CAN-B protocol in Staiger cannot be made available to a destination via a CAN-C protocol." *Id.* at 27–28.

The factual disagreement over Staiger's disclosure hinges on the following:

> The switchboard 201 is a multiplexing scheme controlled either by one of the CPUs 207 and 208 or the intercommunication preprocessor 200. This allows the CPUs 207 and 208 to use the functionality of the intercommunication preprocessor 200. *For example, a message generated by one of the CPUs 207 and 208 has to be broadcasted to several CAN busses 202 to 205 identically.* In this case, the message is multiplexed by the switchboard 201 to the intercommunication preprocessor 200, then, the intercommunication preprocessor 200 processes the message and initiates immediate distribution. This procedure significantly saves time, since the intercommunication preprocessor 200, specialized to operate this tasks [*sic*], will require only a fraction of processing time in comparison to a master CPU formed by one of the CPUs 207 and 208. Furthermore, the master CPU only has to execute one single message operation, in case the message needs to be computed before forwarding, which saves processing time as well.

30

IPR2017-00676
Patent 8,209,705 B2

Ex. 1004 ¶ 51 (emphasis added).  As Patent Owner emphasized at the oral hearing, "[t]he key phrase is identically."  Tr. 28:17.  According to Patent Owner, "[i]dentically clearly means that all buses get the same information, the same message.  There [are] no different protocols.  There are no different formats. . . .  Staiger doesn't even hint or suggest that there is any conversion of any message or any data . . . from one protocol or one format to another."  *Id.* at 28:18–23.

Ultimately, the word "identically" cannot bear the weight Patent Owner places upon it to conclude that Staiger does not teach or suggest "utilizing at least one message format corresponding to a second network protocol associated with a second network which is different from the first network protocol," as the claim requires.  On cross-examination, Patent Owner's expert, Dr. Miller, conceded several relevant points that support Petitioner's inference regarding the teachings of Staiger.  And, "in considering the disclosure of a reference, it is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom."  *In re Preda*, 401 F.2d at 826.

On cross-examination, Dr. Miller agreed that Staiger discloses that CAN busses 202–205 connect using different network protocols from those protocols used in networks to which busses 210 and 211 connect, and that the network protocols use different message formats.  Ex. 1025, 66:21–68:13.  Dr. Miller also agreed that the Staiger busses 202–205, 210, and 211

31

IPR2017-00676
Patent 8,209,705 B2

can receive and send messages. *Id.* at 69:19–21. And Dr. Miller agreed that Staiger discloses that messages received from busses 210–211 can be shared with CAN busses 202–205 through bus adaptors 214–217. *Id.* at 74:3–10. In light of these concessions by Patent Owner's expert, the most natural understanding of the single word "identically" in Staiger is that the identical *content* of the message is broadcast over the different CAN busses, not that Staiger fails to accommodate its own recognition that the *formats* used are different.

### b. Limitations 1.8–1.10

For the specific gateway function and interface portions recited in limitations 1.8–1.10, Petitioner ties Staiger's disclosure of an electronic control unit that performs "routing, gateway, bus bridge and filtering functions" to a plurality of real-time networks (Ex. 1004 ¶¶ 3–5) with specific components shown in Figure 2. *See* Pet. 36–39. In particular, Petitioner provides annotated versions of Figure 2 that make specific correspondences between the "first network" and CAN bus 202, and between the "second network" and CAN bus 204, as well as correspondences between the "first interface portion" and bus adapter 214, and between the "second interface portion" and bus adapter 216. *Id.* at 39. With these correspondences, Petitioner further identifies the first and second "layer parts" with the drawing's indications of information transfer between the CAN busses and their respective bus adapters, and between the bus

IPR2017-00676
Patent 8,209,705 B2

adapters and the switchboard.  Petitioner's analysis is sufficient with respect to these elements.

Patent Owner argues that Petitioner makes an insufficient showing with respect to limitations 1.9 and 1.10, which require certain interface portions for interfacing with the first and second networks.  PO Resp. 31–36. For limitation 1.9, Petitioner provides the following annotated version of Figure 2 from Staiger.



Annotated Figure 2 identifies those portions of Staiger that Petitioner maps to the "first interface portion," including the "first interface-related first layer part" and the "first interface-related second layer part."  Pet. 38.  That is, Petitioner contends that bus adapter 214 is a "first interface portion for

33

IPR2017-00676
Patent 8,209,705 B2

interfacing with the first network," that the corresponding physical CAN layer is a "first interface-related first layer part for receiving first interface-related first layer messages," and that multiplexer 222, which forms part of switchboard 201, corresponds to the "first interface-related second layer part." *Id.* at 36–37. Patent Owner disputes this mapping with respect to the "first interface-related second layer part" because "Petitioner still has not pointed to anything that shows a 'second layer part,' where the first layer messages are 'processed' to provide 'second layer messages.'" PO Resp. 33.

Patent Owner's argument is not commensurate with the scope of the claim, which only requires that the first interface-related first layer message be processed and that the first interface-related second layer message be provided afterwards. *See* Reply 15. As Petitioner replies, "[t]he claim does not specify where the first layer messages are processed, or which components provide the second layer messages." *Id.* (citing Ex. 1026 ¶ 29; Ex. 1025, 87:6–9 (Dr. Miller cross-examination testimony: "Q. My question to you is: Does that language dictate where the messages are processed? A. I'm not sure if it says 'where.' It says 'when.'")). Patent Owner's argument is accordingly unpersuasive; Petitioner sufficiently identifies all elements of the limitation as disclosed by Staiger. Patent Owner's argument regarding limitation 1.10 is substantially similar, and unpersuasive for similar reasons.

IPR2017-00676
Patent 8,209,705 B2

### c.  Limitations 1.2–1.5

Petitioner addresses the "memory-related" limitations 1.2–1.5 by reference to Figure 5 of Staiger, which is reproduced below, and related disclosures.



FIG. 5

Figure 5 depicts a flowchart illustration of message processing in an initializing process.  Ex. 1004 ¶ 26.  In explaining the relevance of this process to the claim limitations, Petitioner highlights Staiger's disclosure of

35

IPR2017-00676
Patent 8,209,705 B2

determining whether a tag registry, which it correlates to the "storage resource" recited in claim 1, is available before a "time-out event" occurs. Pet. 29 (citing Ex. 1004 ¶ 62 ("Block 518 receives the time-out event from the delay timer of block 510 and a negative event of a determination of block 520 of whether or not an execution tag registry . . . is available.")).  As Petitioner observes, Figure 5 of Staiger addresses circumstances both when the tag registry is available and when it is not available.  *Id.* at 30–34.

If the tag registry is not available, as determined at block 520, block 516 determines whether the delay time has timed out. Ex. 1004 ¶ 62.  If no time-out has occurred, another determination is made whether the tag registry is available, i.e., "causing a re-request in connection with the storage resource if the timeout has not been reached," as recited in limitation 1.3. *Id.*  If a time-out has instead occurred, "the process passes to block 522," which issues an interrupt request that Petitioner reasonably identifies as the "error notification" recited in limitation 1.4.  *Id.*; Pet. 32–33.  If the tag registry is available, as determined at block 520, the registry is initiated, and the message is retrieved and stored. Ex. 1004 ¶¶ 64, 66.

These steps, as identified by Petitioner from the disclosure of Staiger, track the steps recited in limitations 1.2–1.5 of claim 1 under the various circumstances when the storage resource is available or not available, and

IPR2017-00676
Patent 8,209,705 B2

when the timeout has been reached or not been reached.  The Petition thus identifies all limitations of independent claim 1 as disclosed by Staiger.[4]

### d.  Summary

Based on the foregoing, we conclude that Petitioner shows, by a preponderance of the evidence, that all limitations of independent claim 1 are disclosed by Staiger, and that the claim is therefore anticipated.

---

[4] In the Institution Decision, we observed that limitations 1.3–1.5 appear to be conditional limitations.  Dec. 16 n.3.  Because we find that the limitations are disclosed by Staiger, we need not address whether those limitations are entitled to patentable weight.  *See Ex parte Schulhauser*, No. 2013-007847, 2016 WL 6277792, at *9 (PTAB Apr. 28, 2016) (precedential) (holding "[t]he Examiner did not need to present evidence of the obviousness of the remaining method steps of claim 1 that are not required to be performed under a broadest reasonable interpretation of the claim (e.g., instances in which the electrocardiac signal data is not within the threshold electrocardiac criteria such that the condition precedent for the determining step and the remaining steps of claim 1 has not been met)").  *See also Ex parte Katz*, No. 2010-006083, 2011 WL 514314 (BPAI Jan. 27, 2011); *Cybersettle, Inc. v. Nat'l Arbitration Forum, Inc.*, 243 Fed. Appx. 603, 607 (Fed. Cir. 2007) (unpublished) ("It is of course true that method steps may be contingent.  If the condition for performing a contingent step is not satisfied, the performance recited by the step need not be carried out in order for the claimed method to be performed.").  The parties' arguments on this issue are moot.  *See* PO Resp. 57–59; Reply 24–26.

IPR2017-00676
Patent 8,209,705 B2

## 2. *Dependent claims 2–6*

Claims 2–6 each depend directly from independent claim 1.  Ex. 1001, col. 12, l. 60–col. 13, l. 4.  Patent Owner does not respond separately to Petitioner's arguments regarding these claims, asserting only that "Petitioner has not demonstrated that Staiger meets the limitations of claim 1, and, thus, claims 2-6 are not rendered unpatentable."  PO Resp. 36.

In addressing claim 2's limitation that "the information is replicated among a plurality of the storage resources," Petitioner observes that Figure 5 of Staiger (reproduced above) shows message information stored intermediately at block 506 until a register pool space is allocated, and that Figure 6 of Staiger shows retrieval of message data and storage again at block 608.  Pet. 40 (citing Ex. 1004 ¶¶ 60, 66, 67).  By identifying the register pool space as a "storage resource," and supporting its conclusion that the message information is thus stored in multiple places with testimony by Dr. Madisetti, Petitioner makes a sufficient showing.  *Id.* at 40–41 (citing Ex. 1003 ¶ 120, 121; Ex. 1004 ¶ 41).

With respect to the limitations of claims 3 and 4, respectively reciting extraction of the information from a message and conversion of the information from a signal by a "storage resource manager," Petitioner identifies control engine 224 shown in Figure 2 (reproduced above).  *Id.* at 41–43.  Because Staiger "explains that control engine 224 . . . can extract messages from the bus adapters through multiplexer 222" and because "[t]he bus adapters include physical layers to receive signals from networks 202-

IPR2017-00676
Patent 8,209,705 B2

205," as asserted by Petitioner, the Petition makes a sufficient showing. *Id.* at 42, 43.

For claim 5, which recites that "the information is shared in a single task," Petitioner identifies disclosure in Staiger that "the master CPU only has to execute ***one single message operation***" when broadcasting the message to multiple CAN busses. *Id.* at 43; Ex. 1004 ¶ 51. We agree that this teaches the limitation.

For claim 6, which recites that "the information is shared according to a schedule," Petitioner observes that Staiger teaches transmission of messages periodically or at set times, such as in a first-in–first-out manner, or based on priority. Pet. 44 (citing Ex. 1004 ¶ 44; Ex. 1003 ¶ 129). This is consistent with the parties agreed construction of "schedule" (which we have adopted) as "a procedural plan that indicates the time and sequence of each operation."

We conclude that Petitioner shows, by a preponderance of the evidence, that claims 2–6 are anticipated by Staiger.

### 3. Independent claim 20

Independent claim 20 recites a "system" for sharing information, including a processor and memory, with the memory storing various logic elements that parallel the steps of method claim 1. Ex. 1001, col. 14, l. 38–col. 16, l. 7. Patent Owner does not respond separately to Petitioner's argument regarding this claim, asserting only that "[t]he same distinctions

39

IPR2017-00676
Patent 8,209,705 B2

drawn between Staiger and the limitations of claim 1 apply here."  PO Resp. 36.

In addressing the claim, Petitioner observes that Staiger describes a system that "can be realized in hardware, software, or a combination of hardware and software," as well as a logical intercommunication preprocessor system architecture with "a conventional memory device."  Pet. 44; Ex. 1004 ¶¶ 34, 75, 83.  These identifications in combination with Petitioner's analysis of claim 1 and comparison of the limitations of claims 1 and 20 are sufficient.  *See* Pet. 45.

We conclude that Petitioner shows, by a preponderance of the evidence, that independent claim 20 is anticipated by Staiger.


### 4.  Summary

For the foregoing reasons, we conclude that Petitioner shows, by a preponderance of the evidence, that claims 1–6 and 20 are anticipated by Staiger.


### G.  Obviousness over Staiger, Millsap, and Wong

In addition to its challenge of claims 1–6 and 20 as anticipated by Staiger, Petitioner alternatively challenges those claims as unpatentable under 35 U.S.C. § 103(a) over the combination of Staiger, Millsap, and Wong.  Pet. 45–55.  In doing so, Petitioner relies on its analysis involving Staiger alone for limitations 1.0–1.7 of independent claim 1 (and

40

IPR2017-00676
Patent 8,209,705 B2

corresponding limitations of claim 20), but contends that the combination of Staiger, Millsap, and Wong discloses limitations 1.8–1.10 (and their counterparts in claim 20). *Id.* at 46.

Millsap "relates to networks used in vehicles to provide distributed control of various vehicle functions and, more particularly, to such networks which utilize different groupings of electronic control units (ECUs) to carry out different control tasks." Ex. 1015, col. 1, ll. 6–10. Figure 8 of Millsap is reproduced below.



Figure 8 depicts a conceptual layout of communication kernel 120 that can be used by each of multiple ECUs in communicating with its respective bus, providing a standardized interface between the bus and application process 122 being executed by the ECU. *Id.* at col. 12, ll. 42–46.

Petitioner contends that Millsap thus discloses "an electronic control unit with at least one gateway function, and a plurality of interface portions" as recited in limitation 1.8, in light of Millsap's disclosure of gateway

41

IPR2017-00676
Patent 8,209,705 B2

functions that include transferring wake-up requests, virtual network
information, signals, and data block information to other networks.  Pet. 47
(citing Ex. 1015, col. 12, ll. 20–36).  This is further illustrated in Figure 9 of
Millsap, reproduced below.



*Fig. 9*

Figure 9 shows that "each gateway node is connected to at least 2 [busses]
and will interact with each network according to its message strategy and
transmission models."  Ex. 1015, col. 13, ll. 22–25.  That is, Petitioner
identifies gateway G1 as performing the recited gateway function and
communication kernels 140, 142 as the recited interface portions.  Pet. 47
(annotated drawing).

Petitioner reasons that a person of ordinary skill in the art would have
known to combine these teachings with those of Staiger because both
references (1) are from the same field of endeavor, i.e., are related to real-
time distributed communication and control of automotive ECUs; (2) aim to
solve similar problems of improving data processing between automotive
ECUs; and (3) use similar techniques to solve the problems, such as using
gateway ECUs to bridge different networks to allow for communication
between the networks.  *Id.* at 48–49.  Petitioner supports this reasoning with

IPR2017-00676
Patent 8,209,705 B2

testimony by Dr. Madisetti.  Ex. 1003 ¶¶ 138–141.  Petitioner articulates sufficient reasoning with rational underpinning to support the combination it proposes.

Patent Owner contends that "Millsap is entirely unrelated to the invention claimed in the Patent" because "Millsap does not disclose any CAN, Flexray or LIN network, and, does not disclose any concept of networks operating under different protocols."  PO Resp. 39 (citing Ex. 2001 ¶ 63).  This contention does not provide a sufficient basis to discount Petitioner's articulated reasoning for combining the teachings of the references.  Although limitations 1.9 and 1.10 are expressed in a lengthy manner, the concepts they recite are relatively straightforward, requiring interfaces that process first messages to produce second messages.  Petitioner provides sufficient reasoning and evidence to support its position that one of ordinary skill in the art would have combined the teachings of Staiger and Millsap in the manner it proposes because they are from the same field of endeavor, or at least reasonably pertinent to the particular problem with which the inventor of the '705 patent was concerned.  *See In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004).

In addressing the specific limitations for the "first interface portion" and "second interface portion" recited in limitations 1.9 and 1.10, Petitioner identifies layer 124 of Millsap's Figure 8 as corresponding to the "first layer part" and layer 126 as corresponding to the "second layer part," for each of communication kernels 140, 142, i.e., as "first interface-related" and

43

"second interface-related," respectively. Pet. 52 (annotated drawing). Petitioner additionally relies on Wong, which "expressly describes the concurrent use of LIN and CAN," and which "also discloses FlexRay as an alternative network with higher data rates than either CAN or LIN." Pet. 52–53 (citing Ex. 1012, 6, 7), 55. Petitioner further reasons that the additional combination of Wong with Staiger and Millsap "would have been predictable and yielded no unexpected results" because Staiger and Millsap describe systems that allow messages to be passed between different networks and "[t]he integration of LIN and/or FlexRay with CAN in the same real-time distributed system described in *Wong* was well known to a [person of ordinary skill in the art]." *Id.* at 54–55 (citing Ex. 1003 ¶¶ 147–150).

Patent Owner challenges the use of Wong, even for this limited purpose, because "Wong is not an enabling disclosure." PO Resp. 41. But even if Patent Owner is correct, "a non-enabling reference may qualify as prior art for the purpose of determining obviousness under § 103." *Symbol Techs. Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1578 (Fed. Cir. 1991); *see also Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1357 (Fed. Cir. 2003). Petitioner articulates reasoning with rational underpinning to support its limited use of Wong in combination with Staiger and Millsap.

To support its argument that Millsap teaches the requirement of limitation 1.9 (and the corresponding limitation 20.10 of claim 20) that "first interface-related layer messages [are] processed after which first interface-

44

IPR2017-00676
Patent 8,209,705 B2

related second layer messages are provided," Petitioner cites a portion of the following disclosure regarding Figure 8:

> FIG. 8 depicts a conceptual layout of a communication kernel 120 that can be used by each of the ECUs in communicating with its respective bus. This communication kernel provides a standardized interface between the bus and the application process 122 being executed by the ECU. It includes both software and physical layers. More specifically, the communication kernel 120 includes a physical layer 124 that *provides a conversion of the digital data symbols (1's and 0's) generated by the data link layer 126 into electrical signals* transmitted on the bus.

Ex. 1015, col. 12, ll. 42–51 (emphasis added); *see* Pet. 51. That is, Petitioner relies on the disclosure of digital-to-analog conversion as satisfying the claim's requirement that second layer messages be provided after processing first layer messages. Petitioner reiterates the argument with respect to limitation 1.10 (and corresponding limitation 20.11 of independent claim 20). Pet. 55.

Patent Owner disputes Petitioner's argument, contending that "[m]erely converting data to voltage levels, which represent 0s and 1s, cannot possibly be considered a different type of message." PO Resp. 40 n.4. But limitations 1.9 and 1.10 do not require "a different type of message"; they merely require that "second layer message[s]" be provided after processing "first layer message[s]." Ex. 1001, col. 12, ll. 39–59. Patent Owner improperly interweaves its argument by contending that "even if one accepted that a digital-to-analog converter provides a first interface-

45

IPR2017-00676
Patent 8,209,705 B2

related second layer message, Petitioner still has not shown the message
comports with limitation 1.7." PO Resp. 40. But Petitioner relies on
Staiger, not Millsap, for limitation 1.7. For the reasons discussed above,
Petitioner provides sufficient reasoning to effect the limited combination of
Millsap with the teachings of Staiger, and need not also demonstrate that
Millsap alone discloses limitation 1.7. Determining whether a single one of
the references is deficient with respect to a particular claim element
misapplies the test for obviousness, which is what the combined teachings of
the prior art would have suggested to the hypothetical person of ordinary
skill in the art. *In re Keller*, 642 F.2d 413, 425 (CCPA 1981).

For dependent claims 2–6, Petitioner relies on Staiger as summarized
above. We conclude that Petitioner shows, by a preponderance of the
evidence, that claims 1–6 and 20 are unpatentable under 35 U.S.C. § 103(a)
over Staiger, Millsap, and Wong.

## H.  Anticipation by OSEK/VDX

Petitioner describes OSEK/VDX as "a joint project by sixty-two
automotive companies creating an open-ended architecture standard for
distributed ECUs in vehicles." Pet. 17 (citing Ex. 1007, 2). Petitioner's
expert, Dr. Madisetti, further explains that "OSEK/VDX is a standard for
interfacing distributed ECUs with real-time operating systems found in
automotive networks," including "seven specifications that together describe
'interfaces and protocols for the transfer of data . . . between and within

IPR2017-00676
Patent 8,209,705 B2

network stations (ECUs).'"  Ex. 1003 ¶ 80 (quoting Ex. 1007, 6) (alteration by Dr. Madisetti).

Petitioner's anticipation challenge based on OSEK/VDX relies on a combination of four references (OSEK Binding, OSEK COM, OSEK FTCom, and OSEK NM) that describe different aspects of various versions of the OSEK/VDX standard.  *See* Pet. 14.  Petitioner focuses its attention on version "SB3," which OSEK Binding discloses as encompassing the specific documents relied on, i.e., including version 1.3 of the Binding specification, version 2.2.2 of the communication ("COM") specification, version 2.5.1 of the network-management ("NM") specification, and version 1.0 of the OSEKtime COM ("FTCom") specification.  Ex. 1007, 9.

Petitioner contends that these individual specifications "were originally available at http://osek-vdx.org" and were archived by The Wayback Machine on September 26, 2001, more than a year before both the effective filing date we accord the claims and more than a year before the filing date of the '018 provisional application.  Pet. 20.  To support its contention that the individual documents were publicly accessible on September 26, 2001, Petitioner provides a Declaration of Christopher Butler, Office Manager at the Internet Archive, which manages The Wayback Machine, attesting to its practices regarding archival of files on the Internet.  Ex. 1013.  Petitioner additionally provides a Declaration of R. Benjamin Cassady, attesting to his retrieval of certain documents, including Exhibit 1006, which Petitioner contends "confirms that OSEK FTCom was known

47

IPR2017-00676
Patent 8,209,705 B2

to a [person of ordinary skill in the art] at least by December 10, 2002." Ex. 1014; Pet. 21. Petitioner provides sufficient evidence that each of OSEK Binding, OSEK COM, OSEK FTCom, and OSEK NM is a printed publication.

Nevertheless, we are not persuaded that the four documents are properly considered to constitute a single prior-art reference. "A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, *in a single prior art reference*." *Verdegaal Bros., Inc. v. Union Oil Co. of California*, 814 F.2d 628, 631 (Fed. Cir. 1987) (emphasis added).

Petitioner contends that "OSEK/VDX is a 'single prior art reference' and thus qualifies as prior art under § 102(a) and/or (b) because the standard comprises only seven specifications, all authored by the same group, and would be considered together, evidenced by their linking and cross-referencing." Pet. 22 (citing *Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 424 F.3d 1276, 1285 (Fed. Cir. 2005)). Although Petitioner correctly observes that "[t]he specifications that make up OSEK/VDX version SB3 are indexed within OSEK Binding," Petitioner's overall focus on what it contends is common authorship insufficiently accounts for the different dates of creation of the individual documents. Pet. 22; *see Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1351–1352 (Fed. Cir. 2008) ("the GSM standard is actually several prior art references with separate dates of creation, rather than a single prior art reference") ("the GSM standard is

48

IPR2017-00676
Patent 8,209,705 B2

simply not a coherent whole document that can be assigned a single prior art date of creation").

First, each of the individual documents bears a different date on its face, belying any conclusion that they are properly considered as a single reference.  Ex. 1007, 1 (Binding Specification dated September 17, 2001); Ex. 1008, 1 (Communication specification dated December 18, 2000); Ex. 1009, 1 (Network Management specification dated May 31, 2000); Ex. 1010, 1 (Fault-Tolerant Communication specification dated July 24, 2001). The SB3 version of the OSEK/VDX standard evidently arises from selective reference to different versions of the individual specifications as they have evolved over time.  *See* Ex. 1007, 3 ("As the standardisation of requirements that are applicable to different OSEK/VDX specifications should not be replicated within the different specifications, this document is therefore set-up to collate all requirements that are owned by the different specifications.") (italicization omitted).

Second, Petitioner's argument that the individual documents are commonly authored is tenuous at best.  Petitioner too sweepingly treats two groups responsible for creation of the documents (the "OSEK group" and the "OSEK/VDX steering committee") as defining a single authorship, without addressing the composition of those groups and potential changes in that composition over the time period in which the individual specifications were created.  *See* Pet. 23.  This deficiency is particularly notable in light of the

49

IPR2017-00676
Patent 8,209,705 B2

large number of entities (sixty-two automotive companies) that "attended and contributed to the OSEK/VDX Technical Committee." *See* Ex. 1007, 2. Accordingly, we find that OSEK Binding, OSEK COM, OSEK FTCom, and OSEK NM are not collectively a "single prior art reference," and therefore conclude that Petitioner has not demonstrated a reasonable likelihood of prevailing on its anticipation challenge of claims 1–6 and 20 over OSEK/VDX.

## I. Obviousness over OSEK Binding, OSEK COM, OSEK FTCom, and OSEK NM

As an alternative to its anticipation challenge, Petitioner contends that claims 1–6 and 20 would have been obvious over OSEK/VDX "to the extent that the combined specifications comprising OSEK/VDX are not found to be a single prior art publication."  Pet. 84.  Petitioner reasons that a person of ordinary skill in the art "would naturally consider the OSEK/VDX specifications together in order to gain a complete understanding of the standard and the capabilities of ECU nodes," supporting that reasoning with testimony by Dr. Madisetti.  *Id.* (citing Ex. 1003 ¶ 197; *DyStar Textilfarben*, 464 F.3d at 1367 (Fed. Cir. 2006)).  Particularly in light of OSEK Binding's specific reference to each of the specifications in defining version SB3 (Ex. 1007, 9), we agree with that contention and conclude that Petitioner articulates sufficient reasoning to combine the teachings of the four

IPR2017-00676
Patent 8,209,705 B2

documents.  Patent Owner does not contest Petitioner's rationale for combining the teachings of the four documents.

### 1. Independent Claim 1

Figure 1-2 of OSEK Binding is reproduced below.



Figure 1-2   Layer model of OSEK/VDX with OSEKtime OS

Figure 1-2 illustrates a layer model of OSEK/VDX that shows interfaces to multiple networks for sending messages in "distributed fault-tolerant highly dependable real-time applications."  Ex. 1007, 7.  As shown in the drawing,

IPR2017-00676
Patent 8,209,705 B2

each interface has multiple layers for receiving and processing messages, i.e., "sharing information," as recited in the preamble of claim 1.

In analyzing the specific limitations of independent claim 1, the Petition focuses primarily on OSEK NM, supplementing its analysis with specific reference to portions of OSEK COM, in addressing limitations dealing with the treatment of the availability of a storage resource and real-time sharing of information, as well as in addressing the gateway functions and interface portions of an associated ECU recited in limitations 1.8–1.10. Pet. 56–77. Petitioner observes that the protocol includes transmission and receipt of information in the form of a message between ECUs with a particular type of network, such as CAN, VAN, J1850, K-BUS, and D2B, which it correlates with the "first network protocol associated with a first network," recited in limitation 1.1 and as further illustrated in Figure 2 of OSEK NM, reproduced below. Pet. 57–58 (citing Ex. 1009, 7, 9).



Figure 2.   Infrastructure of the NM (logical ring), example with two busses

52

IPR2017-00676
Patent 8,209,705 B2

Figure 2 shows an infrastructure of a logical ring that includes an electronic communication unit and in which, for example, node A receives messages from node C.  Ex. 1009, 9.

### a.  Limitations 1.2–1.5

In addressing claim 1's treatment of a storage resource, Petitioner contends that OSEK NM discloses determining whether nodes in a network are present and able to transfer information because each node in the network has a "data buffer" and because each node is actively monitored by every other node in the network to determine whether another node is available.  Pet. 58–59 (citing Ex. 1009, 8–10, 11, Fig. 4).  Petitioner thus draws a correlation between such a "data buffer" and the "storage resource" recited in the claim.  *Id.* at 58–59.  In addition, Petitioner points to OSEK NM's disclosure of a set of timers, i.e., $T_{Typ}$, $T_{Max}$, and $T_{Error}$, that determine when to send requests and error notifications to other network nodes.  *Id.* at 60 (citing Ex. 1009, 24–25).  A node is determined to be unavailable when a message is not received from that node within a specified timeframe based on such timers.  Ex. 1009, 9–10.

Thus, for limitation 1.3, which is performed "in the event the storage resource is not available," Petitioner observes that OSEK NM describes a recovery state for an unavailable node that starts the $T_{Error}$ timer, which acts to determine whether a timeout has been reached or not.  Pet. 61–62. Petitioner draws a correspondence between OSEK NM's teachings related to

53

IPR2017-00676
Patent 8,209,705 B2

receiving another message from the unavailable node and a "re-request in connection with the storage resource if the timeout has not been reached," with the normal mode being re-established when the message is received. *Id.* (citing Ex. 1009, 25, 26, 45, 47, 52).  Conversely, if the $T_{Error}$ times out, a "LimpHome" message is transmitted, which Petitioner identifies with the "error notification" recited in limitation 1.4.  *Id.* at 62–63 (citing Ex. 1009, 25).  Petitioner supports its analysis with testimony by Dr. Madisetti.  Ex. 1003 ¶¶ 159–160.  In the event that the node is available, the data are stored in the buffer, which Petitioner contends corresponds to limitation 1.5 requiring "causing storage of the information utilizing the storage resource." Pet. 63–64 (citing Ex. 1009, 11, 20).

Patent Owner disputes two aspects of this portion of Petitioner's analysis.  First, Patent Owner contends that OSEK/VDX does not disclose "causing a determination as to whether a storage resource is available."  PO Resp. 45–46.  This contention appears to be based on a reading of the word "causing" as imputing a requirement for direct interrogation as to the availability status of the recited storage resource:

> In OSEK, transmission of a status message is a signal that the *transmitted node* – not the node receiving the status message–is "alive" on the network.  Nodes in the logical ring therefore determine the status of other network nodes based on messages ***received from*** them, not ***transmitted to*** them.  Unless there are only two nodes on a given network, in normal operation a "monitoring" node will never receive a response to a network message directly back from a node to which it transmits, because

54

IPR2017-00676
Patent 8,209,705 B2

> there will be at least one more node present in the ring sequence,
> interposed in the return path.

*Id.* (citing Ex. 2001 ¶ 77).  This argument, which refers to a response "directly back" from a node to which a monitoring node transmits, is not persuasive because it is not commensurate with the scope of the claim limitation.  Rather, we agree with Petitioner that the limitation does not include requirements regarding "where and how the determination is made," and that "making a determination of the availability of another node based on messages received from that node falls within the scope" of the limitation.  Reply 18.  That is, a node "causes" itself to make a "determination as to whether a storage resource is available" based on information it receives from other nodes.

Second, Patent Owner contends that OSEK/VDX does not disclose "in the event the storage resource is not available, determining whether a timeout has been reached and causing a re-request in connection with the storage resource if the timeout has not been reached."  PO Resp. 47–50.  Patent Owner's argument is similar to the argument it makes in connection with limitation 1.2, i.e., that "Petitioner points directly to ***receiving*** a message as evidence for disclosure of '***causing a re-request***'" and that "[r]eceiving a message is the opposite of sending one, which is what is required in order to 'cause' a re-request."  *Id.* at 49.  This argument is unpersuasive for similar reasons, namely the claim's silence regarding how

IPR2017-00676
Patent 8,209,705 B2

the "re-request" is made.  As Petitioner asserts, "[t]he 're-request' caused in element [1.3] is just another determination of element [1.2]."  Reply 20.

Accordingly, with Petitioner's identifications and reasoning, it makes a sufficient showing for limitations 1.2–1.5.

### b.  Limitations 1.6–1.7

For the real-time sharing limitations 1.6–1.7, Petitioner relies on OSEK NM's disclosure of sharing message data that a node receives from a logical predecessor with a logical successor.  Pet. 64–65 (citing Ex. 1009, 11, Fig. 4).  Petitioner addresses the requirement of a second network using a second, different network protocol by observing that OSEK NM "describes that the several busses may be low-speed CAN and/or high-speed CAN," which Dr. Madisetti testifies "utilize different protocols and have different network architectures."  *Id.* at 67; Ex. 1003 ¶ 167.  Further, the Petition identifies an example in OSEK NM in which $T_{Typ}$, the time within which the sharing occurs, is described as "70*ms*," consistent with the construction of "real-time" we adopt herein.  Pet. 65.

Patent Owner disputes Petitioner's argument with respect to limitation 1.7, i.e., "in real-time, sharing the information utilizing at least one message format corresponding to a second network protocol associated with a second network which is different from the first network protocol."  PO Resp. 50–54.  Patent Owner contends that "the process which Petitioner deems to be 'sharing' is actually nothing more than transmission of data between nodes

56

IPR2017-00676
Patent 8,209,705 B2

on a logical ring confined to a single network, and, thus, amounts to no more than simple network transmission." *Id.* at 51 (citing Ex. 2001 ¶ 88).

But Figure 2 of OSEK NM, reproduced above, provides an illustration of a logical ring with two communication media ("communication media 1" and "communication media 2") that correspond to the "first network" and the "second network" recited in the claim. *See* Reply 21–22; Ex. 1009, 8; Ex. 1026 ¶ 47. And Patent Owner's argument implicitly applies a construction of "sharing the same information" that we do not adopt. *See* PO Resp. 52 ("sharing in the context of the invention of the '705 Patent requires sharing information in real time between two networks, via a shared memory resource").

We are also not persuaded by Patent Owner's argument that "OSEK does not meet the real-time requirement." PO Resp. 53. Petitioner argues persuasively that "OSEK/VDX discloses sharing message data that a node receives from a logical predecessor with a logical successor within predetermined time $T_{Typ}$," which is disclosed as being 70 ms. Reply 23 (citing Ex. 1009, 20–22, 60).

With its identifications and reasoning, Petitioner thus makes a sufficient showing with respect to limitations 1.6 and 1.7.

*c. Limitations 1.8–1.10*

Petitioner's analysis of the remaining limitations includes identification of the electronic communication unit shown in Figure 2 of

57

IPR2017-00676
Patent 8,209,705 B2

OSEK NM, reproduced above, as having the "gateway function" recited in limitation 1.8.  *Id.* at 68–69.  Petitioner contends that such an ECU has a "plurality of interface portions" that are illustrated in Figure 1 of OSEK NM, reproduced below.  *Id.* at 69–70.



Figure 1    interface and algorithms responsibility

Figure 1 illustrates "interface and algorithms responsibility" of an ECU microcontroller with multiple interfaces shown in the "Data Link Layer" in the lower left of the drawing  Ex. 1009, 7–8.  To address the specific structure for the interface portions recited in limitations 1.9 and 1.10, Petitioner provides an annotated drawing that makes correspondences between the "first interface portion" and communication to "Network 1," and similarly between the "second interface portion" and communication to "Network k."  Pet. 74–76.  The respective "first layer part" and "second

IPR2017-00676
Patent 8,209,705 B2

layer part" for each interface portion are further identified by Petitioner as corresponding to the "Interface Circuit" and "Protocol Circuit" for each network. *Id.* In making these correspondences, Petitioner again relies on low-speed CAN and high-speed CAN being different networks, a point on which we credit the testimony of Dr. Madisetti. *See* Ex. 1003 ¶ 177. With these identifications, Petitioner makes a sufficient showing with respect to limitations 1.8–1.10.

### d. Summary

We conclude that Petitioner shows, by a preponderance of the evidence, that independent claim 1 is unpatentable under 35 U.S.C. § 103(a) over OSEK Binding, OSEK COM, OSEK FTCom, and OSEK NM.

### 2. Dependent Claims 2–6

Petitioner also makes a sufficient showing with respect to dependent claims 2–6, to which Patent Owner does not respond separately. *See* PO Resp. 54 ("Petitioner has not demonstrated that OSEK meets the limitations of claim 1, and, thus, claims 2-6 are not rendered unpatentable.").

In addressing claim 2's requirement of information replication among a plurality of storage resources, Petitioner identifies disclosure in OSEK COM that "a message may only have a single sender in a system, but it may have any number of receivers." Pet. 77 (citing Ex. 1008, 17). With respect to the "storage resource manager" limitations of claims 3 and 4, Petitioner

59

IPR2017-00676
Patent 8,209,705 B2

identifies the OSEKtime FTCom Layer shown in Figure 1-2 of OSEK
Binding, reproduced above, as meeting these limitations by extracting
information from a message received by that layer and by converting
information from a signal received by that layer. *Id.* at 78–81. For the
limitations of claims 5 and 6, requiring sharing in a "single task" and
"according to a schedule," Petitioner provides sufficient identification of
different transmission modes as corresponding to these requirements. *Id.* at
81–82.

We conclude that Petitioner shows, by a preponderance of the
evidence, that claims 2–6 are unpatentable under 35 U.S.C. § 103(a) over
OSEK Binding, OSEK COM, OSEK FTCom, and OSEK NM.

### 3. Independent claim 20

As noted above, independent claim 20 differs from claim 1 principally
in that it is directed to a system, rather than a method, with the system
including a processor and a memory that stores various logic elements in
parallel with the steps of claim 1. Ex. 1001, col. 14, l. 38–col. 16, l. 7.
Petitioner provides sufficient identification that the OSEK/VDX system
includes a processor and memory with logic for implementing the disclosed
methods, and draws adequate comparison of the limitations in claims 1 and
20. Pet. 83. In particular, we find OSEK Binding's disclosure of "an open-
ended architecture for distributed control units in vehicles" and OSEK NM's
disclosure of microcontrollers to implement the standard sufficient to

IPR2017-00676
Patent 8,209,705 B2

support Petitioner's position.  Pet. 83; Ex. 1007, 2; Ex. 1009, 7–8; Ex. 1003
¶ 193 (Dr. Madisetti testifying that "[i]t was well known at the time of the
invention that μControllers and microprocessors either included memory or
were interfaced with a memory in order to execute code to implement
methods").

　　　Patent Owner does not respond separately to Petitioner's arguments.
*See* PO Resp. 54 ("The distinctions drawn between OSEK and the
limitations of claim[]1 apply here, and, thus, claim 20 is not unpatentable.").

　　　We conclude that Petitioner shows, by a preponderance of the
evidence, that independent claim 20 is unpatentable under 35 U.S.C.
§ 103(a) over OSEK Binding, OSEK COM, OSEK FTCom, and OSEK NM.

### 4.  Summary

　　　For the foregoing reasons, we conclude that Petitioner shows, by a
preponderance of the evidence, that claims 1–6 and 20 are unpatentable
under 35 U.S.C. § 103(a) over OSEK Binding, OSEK COM, OSEK FTCom,
and OSEK NM.

### J.  Obviousness over OSEK Binding, OSEK COM, OSEK FTCom, OSEK NM, Millsap, and Wong

　　　Petitioner alternatively challenges claims 1–6 and 20 as unpatentable
under 35 U.S.C. § 103(a) over OSEK Binding, OSEK COM, OSEK FTCom,
OSEK NM, Millsap, and Wong.  Pet. 84–90.  Similar to its analysis

IPR2017-00676
Patent 8,209,705 B2

challenging those claims over Staiger, Millsap, and Wong, Petitioner applies further disclosures of Millsap and Wong "[t]o the extent that OSEK/VDX alone does not disclose limitations 1.8-1.10," but otherwise relies on its previous analysis. *Id.* at 85. Similar to the reasons we express above, Petitioner identifies sufficient disclosures in Millsap and Wong to support its position at this stage. Petitioner also provides sufficient reasons to combine the teachings of Millsap and Wong with those of OSEK Binding, OSEK COM, OSEK FTCom, and OSEK NM that generally parallel its reasoning for combining Millsap and Wong with Staiger. *Id.* at 86, 88–89.

For reasons similar to those expressed above in our analysis of the challenged claims over Staiger, Millsap, and Wong, Petitioner makes a sufficient showing. Although Patent Owner contends that Petitioner's reasoning for combining the references is "very generic," it concedes that "[t]he issue . . . is less whether a skilled artisan would combine the references [than] that the references, as combined, still do not show all the '705 Patent limitations." PO Resp. 55 (citing Ex. 2001 ¶ 100). Indeed, Patent Owner "incorporate[s]" its "prior analysis of Millsap and Wong," while reiterating arguments that attack the references individually rather than considering the combination. *Id.* at 55–57.

We conclude that Petitioner shows, by a preponderance of the evidence, that claims 1–6 and 20 are unpatentable over OSEK Binding, OSEK COM, OSEK FTCom, OSEK NM, Millsap, and Wong.

### K. Constitutionality of Inter Partes Review Proceedings

Patent Owner contends that "this IPR should be terminated and the petition dismissed because the IPR system is unconstitutional." PO Resp. 59–60. This argument is foreclosed by the Supreme Court's determination otherwise. *Oil States Energy Services, LLC v. Greene's Energy Group, LLC*, 138 S.Ct. 1365 (2018) ("In this case, we address whether inter partes review violates Article III or the Seventh Amendment of the Constitution. We hold that it violates neither.").

### III. ORDER

It is

ORDERED that Petitioner's Motion to Exclude (Paper 20) is *denied*;

FURTHER ORDERED that, based on a preponderance of the evidence, claims 1–6 and 20 of U.S. Patent No. 8,209,705 B2 are held to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2017-00676
Patent 8,209,705 B2


PETITIONER

Lionel Lavenue
J. Christopher Moulder
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
lionel.lavenue@finnegan.com
christopher.moulder@finnegan.com


PATENT OWNER

Thomas H. Kramer
O'KELLY ERNST & JOYCE, LLC
tkramer@oelegal.com


Thomas F. Meagher
Alan C. Pattillo
MEAGHER EMANUEL LAKS GOLDBERG & LIAO, LLP
tmeagher@meagheremanuel.com
cpattillo@meagheremanuel.com

EXHIBIT F

Trials@uspto.gov                                         Paper 32
571-272-7822                                 Entered: June 13, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE
————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————

BMW OF NORTH AMERICA, LLC,
Petitioner,

v.

STRAGENT, LLC,
Patent Owner.
————————

Case IPR2017-00677
Patent 8,566,843 B2

————————

Before LYNNE E. PETTIGREW, PATRICK M. BOUCHER, and
CARL L. SILVERMAN, *Administrative Patent Judges*.

BOUCHER, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2017-00677
Patent 8,566,843 B2

In response to a Petition (Paper 2, "Pet.") filed by BMW of North America, LLC ("Petitioner"), we instituted an *inter partes* review of claims 51–59 of U.S. Patent No. 8,566,843 B2 ("the '843 patent"). Paper 8 ("Dec."). During the trial, Stragent, LLC ("Patent Owner") filed a Response (Paper 11, "PO Resp.") to which Petitioner filed a Reply (Paper 18, "Reply"). During the trial, Petitioner filed a Motion to Exclude portions of the testimony of Patent Owner's expert, which Patent Owner opposed, and to which Petitioner replied. Papers 20, 24, 26. An oral hearing was held on March 14, 2018, and a copy of the transcript was entered into the record. Paper 29 ("Tr.").[1]

We have jurisdiction under 35 U.S.C. § 6. This Decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of the claims on which we instituted trial. Based on the record before us, Petitioner has shown, by a preponderance of the evidence, that claims 51–59 are unpatentable.

## I. BACKGROUND

### A. The '843 Patent

The '843 patent describes systems and methods "for sharing information in a distributed system." Ex. 1001, col. 1, ll. 29–30. Such systems and methods are illustrated for system architectures such as "may be

---

[1] The hearing was a consolidated hearing for IPR2017-00676 and IPR2017-00677.

2

IPR2017-00677
Patent 8,566,843 B2

situated in automotive electronics or industrial control and monitoring systems." *Id.* at col. 3, ll. 11–13. An example is provided in Figure 1 of the '843 patent, which is reproduced below.



Figure 1 generally depicts elements of a distributed embedded communication and computing system. *Id.* at col. 3, ll. 9–11.

In an automotive environment, various electronic control units ("ECUs") control such applications as engine control, brake control, or diagnostics through connections to various sensors and actuators organized into separate subnetworks. *Id.* at col. 3, ll. 13–18. Such applications are themselves grouped into backbone system functions, such as "body control, power train, and chassis." *Id.* at col. 3, ll. 19–21. With a hierarchical

3

IPR2017-00677
Patent 8,566,843 B2

organization that includes gateways 101, 103, 104, 105, messages are relayed up and down through the system layers. *Id.* at col. 3, ll. 24–26. Each layer may contain multiple ECUs connected through wired serial multiplexing bus systems, with the '843 patent noting several examples that include Controller Area Network ("CAN"), Local Interconnect Network ("LIN"), and Flexray. *Id.* at col. 3, ll. 26–33.

At the highest level in the hierarchy, "the system level," system gateway 101 is connected via various busses to other system-level ECUs, to subsequent gateways 103, and to external components 120. *Id.* at col. 3, ll. 60–67. In addition, system gateway 101 may be connected to external gateway 131 to link the system to remote device 132. *Id.* at col. 4, ll. 1–6. "Subsequent to the system level may be several layers of groups and subgroups that are link[ed] to the higher levels via gateways (101, 103, 104, 105)." *Id.* at col. 4, ll. 7–9.

In operation, ECU 102 receives "real-time" input variables from local sensors 108 or from networked sensors 106, respectively via signal lines 113 or multiplexing bus system 112. *Id.* at col. 3, ll. 39–42. "[R]eal-time may include any response time that may be measured in milli- or microseconds, and/or is less than 1 second." *Id.* at col. 3, ll. 36–38. ECU 102 processes the input variables and generates output variables that may be shared with other ECUs 102. *Id.* at col. 3, ll. 46–51. Two relevant modes of sharing are described.

IPR2017-00677
Patent 8,566,843 B2

First, ECUs 102 "typically share information with devices that are connected on the same physical multiplexing system. This method of information sharing is called horizontal information sharing in a hierarchical system." *Id.* at col. 3, ll. 51–55.

Second, a bulletin board may be used so that "the information is shared, in real-time, among a plurality of heterogeneous processes." *Id.* at col. 1, ll. 31–33. According to the '843 patent, "heterogeneous networks may refer to any different communication networks with at least one aspect that is different." *Id.* at col. 7, ll. 27–29. Figure 7 of the '843 patent, reproduced below, illustrates a logical architecture between three heterogeneous network controllers using such a bulletin board.



IPR2017-00677
Patent 8,566,843 B2

Figure 7 illustrates a system architecture in which a bulletin board acts as a shared memory interacting with multiple communication busses, with data received from one communication bus stored on the bulletin board and shared as a new message with other network types. *Id.* at col. 7, ll. 4–37.

The illustrated architecture includes four principal components: (1) network controllers 702, 703, and 704 (first column) for each of multiple heterogeneous networks; (2) associated operating system interfaces 705 for each of the heterogeneous networks (second column); (3) remote message communication processes 706 for stripping out network-specific information (third column); and (4) the bulletin board, which may contain events 607, real-time variables 608, configuration parameters, and firmware. *Id.* at col. 5, ll. 63–67, col. 6, ll. 33–37.  In operation, external event 701, such as a flag indicating that data from a sensor are available, is transmitted on a network to a communication bus controller, such as network controller 703 in the drawing. *Id.* at col. 7, ll. 4–9.  This causes an operating system interface (such as communication interface 709) to notify a remote message communication process (such as remote message conversion method 710) that data are available, with notification provided in turn to application process 606. *Id.* at col. 7, ll. 4–17.

## B. *Prosecution History*

The application that matured into '843 patent is a continuation of the application that matured into U.S. Patent No. 8,209,705 ("the '705 patent"),

IPR2017-00677
Patent 8,566,843 B2

filed July 30, 2008.  Ex. 1001 at [63].  The '705 patent is a continuation of
U.S. Patent No. 7,802,263 ("the '263 patent"), filed December 15, 2003.  *Id.*
The '843 patent also claims the benefit of the filing date of U.S. Provisional
Application No. 60/434,018 ("the '018 provisional application"), filed
December 17, 2002.  *Id.* at [60].

At the time of filing the application that matured into the '263 patent,
independent claim 1 recited the following:

> 1.   A method for sharing information in a distributed system,
> comprising:
>> receiving information;
>> storing the information on a bulletin board; and
>> sharing, in real-time, the information among a plurality
> of heterogeneous processes.

Ex. 1011, 649.  Although certain amendments were made to the claim during
prosecution, allowance was secured only after an interview with the
Examiner in which the applicants authorized the addition of several
limitations that Petitioner characterizes as "memory-related":
(1) "requesting a bulletin board resource of one or more bulletin boards"; (2)
"determining whether the bulletin board resource is available"; (3) "in the
event the bulletin board resource is not available, re-requesting the bulletin
board resource until a threshold has been reached"; and (4) storing the
information on the bulletin board resource "in the event the bulletin board
resource is available."  *Id.* at 250–252; *see* Pet. 4–5.

Independent claim 1 was filed in the same original form at the time of
filing the application that matured into the '705 patent.  Ex. 1002, 255.

IPR2017-00677
Patent 8,566,843 B2

During prosecution, the applicants amended the claims to add what Petitioner characterizes as "memory-related limitations similar to those in the claims of the '263 patent":

> in the event the storage resource is not available, determining whether a timeout has been reached and causing a re-request in connection with the storage resource if the timeout has not been reached; [and]
> in the event the timeout has been reached, causing an error notification to be sent.

*Id.* at 84–85 (underscoring in original to identify material added by amendment). These added limitations were among those identified by the Examiner in allowing the application as not "disclose[d] or suggest[ed]" "when taken in the context of [the] claims as a whole." *Id.* at 98–99.

Similarly, independent claim 1 was again filed in the same original form at the time of filing the application that matured into the '843 patent. Ex. 1018, 220. The originally filed claims were subsequently canceled during prosecution and applicants "submitted fifty-nine new claims with the memory related limitations similar to the allowed '705 patent claims." Pet. 7; Ex. 1018, 116–32. The amended claims were subsequently allowed without express Reasons for Allowance by the Examiner. Ex. 1018, 63–94.

## C.  Illustrative Claim

Challenged claim 51, which is illustrative of the challenged claims, is reproduced below with numbers added to identify specific elements of the claim in accordance with the scheme used by Petitioner. *See* Pet. 10–11.

8

IPR2017-00677
Patent 8,566,843 B2

51.  [0] An apparatus, comprising:

[1] a control unit configured for:

[2] identifying information associated with a message received utilizing a first network protocol associated with a first network;

[3] issuing a storage resource request in connection with a storage resource and determining whether the storage resource is available;

[4] determining whether a threshold has been reached in association with the storage resource request;

[5] in the event the storage resource is not available and the threshold associated with the storage resource request has not been reached, issuing another storage resource request in connection with the storage resource;

[6] in the event the storage resource is not available and the threshold associated with the storage resource request has been reached, sending a notification; and

[7] in the event the storage resource is available, storing the information utilizing the storage resource;

[8] wherein the apparatus is operable such that the information is capable of being shared in real-time utilizing a second network protocol associated with a second network, and the control unit includes:

[9] a first interface for interfacing with the first network, the first interface including a first interface-related first component for receiving first data units and a first interface-related second component, the control unit being operable such that the first data units are processed after which processed first data units are provided, where the first network is at least one of a Controller Area Network type, a Flexray type, or a Local Interconnect Network type; and

[10] a second interface for interfacing with the second network, the second interface including a second interface-related first component for receiving second data units and a second interface-related second component, the control

9

IPR2017-00677
Patent 8,566,843 B2

> unit being operable such that the second data units are processed
> after which processed second data units are provided, where the
> second network is at least one of the Controller Area Network
> type, the Flexray network type, or the Local Interconnect
> Network type.

Ex. 1001, col. 18, l. 29–col. 19, l. 5.

### D. Evidence

Petitioner relies on the following references. Pet. 15–25.

| Staiger | US 2002/0073243 A1 | June 13, 2002 | Ex. 1004 |
| Millsap | US 6,484,082 B1 | Nov. 19, 2002 | Ex. 1015 |

OSEK/VDX Binding Specification, Version 1.3 (Sept. 17, 2001) ("OSEK
Binding) (Ex. 1007)

OSEK/VDX Communication Specification, Version 2.2.2 (Dec. 18, 2000)
("OSEK COM") (Ex. 1008)

OSEK/VDX Network Management Concept and Application Programming
Interface, Version 2.51 (May 31, 2000) ("OSEK NM") (Ex. 1009)

OSEK/VDX Fault-Tolerant Communication, Version 1.0 (July 24, 2001)
("OSEK FTCom") (Ex. 1010)[2]

In addition, Petitioner provides Declarations by Vijay K. Madisetti,

Ph.D., Christopher Butler, and R. Benjamin Cassady, which we have also

---

[2] Petitioner refers to OSEK Binding, OSEK COM, OSEK NM, and OSEK
FTCom collectively as "OSEK/VDX." We sometimes use the same
terminology herein.

10

IPR2017-00677
Patent 8,566,843 B2

considered.  Exs. 1003, 1013, 1014, 1026.  No cross-examination testimony of these witnesses was filed in the proceeding, and Patent Owner explicitly confirmed that it did not cross-examine Dr. Madisetti.  Tr. 41:14–16.

Patent Owner provides a Declaration by Jeffrey A. Miller, Ph.D.  Ex. 2001.  Dr. Miller was cross-examined by Petitioner, and a transcript of his deposition was entered into the record.  Ex. 1025.  Dr. Miller's Declaration is also the subject of a Motion to Exclude filed by Petitioner, to which Patent Owner responded and Petitioner replied.  Papers 20, 24, 26.

*E.  Asserted Grounds of Unpatentability*

Petitioner challenges claims 51–59 over the following combinations of references.  Pet. 15.

| References | Basis |
|---|---|
| Staiger and Millsap | § 103(a) |
| OSEK/VDX | § 102(b) |
| OSEK/VDX | § 103(a) |
| OSEK/VDX and Millsap | § 103(a) |

We instituted this proceeding on all of the above-identified challenges, except the anticipation ground over OSEK/VDX.  Dec. 33.  Subsequent to instituting the proceeding, on April 24, 2018, the Supreme Court held that a final written decision under 35 U.S.C. § 318(a) must decide the patentability of all claims challenged in a petition for *inter partes* review.  *SAS Institute, Inc. v. Iancu*, 138 S.Ct. 1348 (2018).  Accordingly, we notified the parties that "[w]e modify our institution decision to institute on all of the challenged

11

IPR2017-00677
Patent 8,566,843 B2

claims and all of the grounds presented in the Petition."  Paper 31, 2.
Specifically, we informed the parties that, notwithstanding the original
institution on a subset of the grounds, "the Board intends to address the
anticipation grounds over OSEK/VDX in its . . . final written decision[]."
*Id.*  Neither party has requested further briefing in light of that notification.

## F.  Real Parties in Interest

Petitioner identifies BMW of North America, LLC, BMW
Manufacturing Co., LLC, and Bayerische Motoren Werke, AG as real
parties in interest in this proceeding.  Pet. 83.

Patent Owner identifies only itself as a real party in interest.  Paper 5,
1.

## G.  Related Proceedings

The parties identify the following district-court proceedings as
involving the '843 patent:  (1) *Stragent, LLC v. BMW of North America,
LLC*, No. 6:15-cv-00446 (E.D. Tex.); (2) *Stragent, LLC v. Mercedes-Benz
USA, LLC*, No. 6:15-cv-00447 (E.D. Tex.); and (3) *Stragent, LLC v. Volvo
Cars of North America, LLC*, No. 6:15-cv-00448 (E.D. Tex.).  Pet. 83;
Paper 5, 1–2.

The parties also identify several *inter partes* review proceedings
involving the '843 patent:  IPR2017-00457, IPR2017-01503, IPR2017-
01504, IPR2017-01519, and IPR2017-01520.  Paper 10, 1–2; Paper 13, 2.

12

IPR2017-00677
Patent 8,566,843 B2

Patent Owner further identifies several *inter partes* review proceedings involving the '705 patent:  IPR2017-00458, IPR2017-00676, IPR2017-01502, IPR2017-01521, and IPR2017-01522.  Paper 13, 2.

## II.  ANALYSIS

### A.  *Motion to Exclude*

Petitioner moves to exclude "at least paragraphs 16-21 and 30-104" of Dr. Miller's Declaration (Ex. 2001).  Paper 20, 1.  Petitioner contends that the identified paragraphs "are not the product of reliable principles and methods," contrary to Fed. R. Evid. 702, "because both Dr. Miller's declaration (Ex. 2001) and his deposition (Ex. 1025) show that Dr. Miller applied a wrong claim construction standard, and misunderstood a key legal concept that impacts his opinions on obviousness."  *Id.* at 2.  Specifically, Petitioner observes that Dr. Miller's Declaration "is completely silent regarding the claim construction standard applied," and argues that Dr. Miller's deposition testimony "exposed that he did not apply the proper standard, or at least did not apply it correctly."  *Id.* at 3.  Petitioner speculates that "Dr. Miller was likely not informed of and did not follow the process outlined for construing claims in an IPR."  *Id.* at 4.

We have reviewed the relevant deposition testimony, in which Dr. Miller was asked to identify the standard he used when construing claim terms in his Declaration.  Ex. 1025, 27:1–34:14.  We agree with Petitioner that Dr. Miller did not provide responses sufficient to conclude that he was

13

IPR2017-00677
Patent 8,566,843 B2

aware of and/or applied the correct claim-construction standard. *See id.* at 27:5–6 ("I used what is generally accepted in the field."), 27:9–11 ("So to – for construing the claim terms is providing a definition of what the term is. So I provided a general definition for the terms."), 30:3–6 ("Well, that's the standard that I used for construing the claim terms in this Declaration. I don't know if that's the legal qualification for construing claim terms."), 32:18–23 ("broadest reasonable interpretation" would mean "when you're defining a term that you would define it in a way that is, first of all, reasonable, that it makes sense and that it's broad, meaning general and that it's interpreting the phrase or the term").

Nevertheless, we are not persuaded that the appropriate remedy is exclusion of Dr. Miller's testimony. As Patent Owner asserts, "[t]he role of the expert witness under the Federal Rules of Evidence is to 'help the trier of fact to understand the *evidence* or to determine a *fact* in issue.'" Paper 24, 2–3 (quoting Fed. R. Evid. 702) (emphasis by Patent Owner). As Patent Owner further asserts, Petitioner does not "impugn[]" Dr. Miller's credibility as an expert in the subject matter at issue. *Id.* at 3–4. We agree with Patent Owner that "Petitioner's attack on the sufficiency of the evidence is improper in a motion to exclude." *Id.* at 4 (citing *Microsoft Corp. v. Surfcast, Inc.*, Case IPR2013-00292 at 52–53 (Paper 93) (PTAB Oct. 14, 2014)). We accordingly deny Petitioner's Motion to Exclude.

Petitioner alternatively argues in its Reply that "Because Dr. Miller did not apply the correct claim construction standard, his opinions on claim

14

IPR2017-00677
Patent 8,566,843 B2

construction (Ex. 2001, §§16-21) should be afforded no weight."  Reply 2.
Although we agree that the weight to be accorded to Dr. Miller's testimony
on claim construction is impacted by the uncertainty of the analytical
procedure he followed, we are not persuaded that his testimony should be
discounted wholesale.  Dr. Miller provides relevant opinions on a number of
issues, particularly including how a person of ordinary skill in the art would
understand certain terms in light of the Specification, that are helpful to us as
the trier of fact.  "There is no more certain test for determining when experts
may be used than the common sense inquiry whether the untrained layman
would be qualified to determine intelligently and to the best possible degree
the particular issue without enlightenment from those having a specialized
understanding of the subject involved in the dispute."  Ladd, Expert
Testimony, 5 Vand. L. Rev. 414, 418 (1952).

### B.  Claim Construction

The Board interprets claims of an unexpired patent using the broadest
reasonable construction in light of the specification of the patent in which
they appear.  *See* 37 C.F.R. § 42.100(b); *Cuozzo Speed Techs., LLC v. Lee*,
136 S.Ct. 2131, 2144–46 (2016) (upholding the use of the broadest
reasonable interpretation standard).  An inventor may provide a meaning for
a term that is different from its ordinary meaning by defining the term in the
specification with reasonable clarity, deliberateness, and precision.  *In re
Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

15

IPR2017-00677
Patent 8,566,843 B2

### 1. "real-time"

Independent claim 51 recites that information is capable of being shared "in real time utilizing a second network protocol . . . ," and dependent claim 59 recites that information is processed "to create, in real-time, messages in at least two other message formats . . . ." Petitioner argues that the Specification of the '843 patent expressly defines "real-time": "In the context of the present description, real-time may include any response time that may be measured in milli- or microseconds, and/or is less than 1 second." Ex. 1001, col. 3, ll. 35–38. Accordingly, Petitioner proposes that "'real-time' should be construed as responses that occur in less than one second." Pet. 13. Patent Owner contends that the definition from the Specification should be adopted. PO Resp. 15.

We construe "real-time" as Petitioner proposes, i.e., as including responses that occur in less than one second. The first part of the quote cited above provided in the Specification ("may be measured in milli- or microseconds") is not limiting because *any* response time, no matter how large or small, may be *measured* in milli- or microseconds.

### 2. "threshold"

Independent claim 51 recites "determining whether a threshold has been reached in association with the storage request." Petitioner proposes that "threshold" be construed consistent with a dictionary definition it

16

IPR2017-00677
Patent 8,566,843 B2

provides, as a "value above which something is true or will take place and below which it is not or will not." Pet. 13–14 (citing Ex. 1016, 5). Observing that the Specification of the '843 patent uses "threshold" in the context of an elapsed time, Petitioner further proposes that this construction "include the maximum value (i.e., time-out) of a timer." *Id*. (citing Ex. 1001, col. 8, ll. 21–25, col. 8, ll. 47–51). We agree, and accordingly construe "threshold" as Petitioner proposes.[3]

### 3.  *"heterogeneous networks"*

Dependent claim 55 recites that the "apparatus is operable such that the first network and the second network are heterogeneous networks." The Specification of the '843 patent defines "heterogeneous networks": "In the context of the present description, heterogeneous networks may refer to any different communication networks with at least one aspect that is different." Ex. 1001, col. 7, ll. 26–29. In light of this explicit definition, for purposes of this Decision, we construe "heterogeneous networks" as Petitioner proposes, i.e., as "networks having at least one aspect that is different." Pet. 14 (citing

---

[3] Patent Owner advocates for the same construction advanced by Petitioner, but omits inclusion of the maximum value of a timer. PO Resp. 15. Although Patent Owner asserts that the construction is otherwise "the definition provided by the '843 Patent," it does not cite to the '843 patent to support its assertion, and we are unable to identify such a definition in the patent. Nevertheless, we agree with Petitioner that any distinction between the constructions is not material to any grounds. *See* Reply 6.

IPR2017-00677
Patent 8,566,843 B2

Ex. 1003 ¶ 60).  Patent Owner proposes the same construction.  PO Resp.
16.

### 4.   *"the information is capable of being shared"*

Independent claim 51 recites that "the apparatus is operable such that the information is capable of being shared in real-time utilizing a second network protocol associated with a second network."  Ex. 1001, col. 18, ll. 49–52.  In its Response, Patent Owner proposes the following construction:

> [T]he term "shared in real-time utilizing a second network protocol associated with a second network" can only mean that the first data units have been delivered to storage, where they are partaken of, used, experienced or occupied (that is "shared") by the second network, and that the entire process is conducted "in milli- or microseconds, and/or is less than 1 second."

PO Resp. 16–17.  Patent Owner bases its proposal on a general-dictionary definition of "share" and its proposed construction of "real-time."  *Id.* at 16 (citing Ex. 2003).  At the oral hearing, Patent Owner also appeared to rely on the interaction of the limitation with other limitations recited in claim 51, particularly, "in the event the storage resource is available, storing the information utilizing the storage resource."  Tr. 22:11–25:7.  In addition, Patent Owner cites to several quotations drawn from the Specification of the '843 patent that relate to sharing information by its storage on a bulletin board.  PO Resp. 17–19 (citing Ex. 1001, col. 1, ll. 30–33, col. 3, ll. 51–59, col. 6, ll. 27–31, col. 10, l. 67–col. 11, l. 9, col. 11, ll. 20–58).

18

IPR2017-00677
Patent 8,566,843 B2

Petitioner disputes Patent Owner's proposed construction, noting that the limitation does not recite any "storage" or "deliver[ing]" first data units to storage.  Reply 6–7.  In addition, Petitioner contends that Patent Owner's proposed construction "contradicts the '843 specification," in part because of the disclosure of "horizontal information sharing," which does not require bulletin-board storage.  *Id.* at 8.

We find it unnecessary to construe the entire (unparsed) limitation set forth above, which includes elements such as "real-time," for which Patent Owner has proposed an independent construction.  Rather, it is sufficient to construe "the information is capable of being shared," with the full limitation further limiting the format used.  In construing "the information is capable of being shared," we note that Patent Owner has submitted a definition of "share" drawn from a technical dictionary into the record of this proceeding, although Patent Owner does not cite the technical dictionary in addressing construction of the phrase.  Ex. 2004.[4]  We find the technical dictionary provided by Patent Owner to be more probative than the general-purpose dictionary Patent Owner cites.

_____

[4] We note that, even if Patent Owner had not entered Exhibit 2004 into this proceeding, judges are free to rely on extrinsic dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 n.6 (Fed. Cir. 1996) *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1322–23 (Fed. Cir. 2005) (en banc).

19

The language of the general-purpose dictionary that refers to "to partake of, use, experience, occupy, or enjoy with others; to have in common," does not appear to contemplate the sharing of "information," which the '843 patent Specification describes as "includ[ing] data, a signal, and/or anything else capable of being stored and shared." *See* Ex. 2003 (general definition of "share"); Ex. 1001, col. 3, ll. 56–59. Instead, the technical definition of "[t]o make files, directories, or folders accessible to other users over a network" is more relevant because it expressly contemplates the same context as the '843 patent, i.e., sharing over a network. Ex. 2004 (technical definition of "share").

We also agree with Petitioner that construction of "the information is capable of being shared" does not encompass delivery of the information to storage, which is addressed in other limitations of claim 51, and need not be read into the limitation at issue. *See* Tr. 9:18–21. Furthermore, the description of "information" as "capable of being stored *or* shared" in the '843 patent Specification is consistent with storage and sharing being distinct concepts. *See* Ex. 1001, col. 3, ll. 56–59 (emphasis added). In addition, the inclusion of an embodiment in that Specification that does not appear to require storage of the shared information reinforces our conclusion. Ex. 1001, col. 3, ll. 51–55; *see* Tr. 8:7–12, 12:1–14.

In light of these considerations, we construe "the information is capable of being shared" in parallel with the technical-dictionary definition

IPR2017-00677
Patent 8,566,843 B2

provided by Patent Owner, i.e., as capable of being made accessible, but not requiring storage of the information.

### C. Effective Filing Date

Petitioner contends that the challenged claims are "entitled only" to the December 15, 2003, filing date of the '263 patent as their effective filing date, and that they are not entitled to the December 17, 2002, filing date of the '018 provisional application.  Pet. 8–10.  Petitioner argues that "the '263 patent is the first instance where Patent Owner even arguably disclosed the memory-related claim limitations," and that the '018 provisional application does not disclose

> at least the following limitations of claim 51: "determining whether a threshold has been reached in association with the storage request"; "in the event the storage resource is not available and the threshold associated with the storage resource request has not been reached, issuing another storage resource request in connection with the storage resource"; and "in the event the storage resource is not available and the threshold associated with the storage resource request has been reached, sending a notification."  Ex. 1001, claim 51; *see generally* Ex. 1005.

*Id.* at 9–10.  Petitioner further contends that "the ['018] provisional application simply and generally states that 'the bulletin board manager provides mechanisms for access control,'" and that "[t]his broad statement in no way discloses the claim limitations as described above."  *Id.* (citing Ex. 1005, 9).

21

IPR2017-00677
Patent 8,566,843 B2

In the Institution Decision, we determined that Petitioner had, through these contentions, satisfied its initial burden of production with respect to the issue of the challenged claims' effective filing date. Dec. 10–11. As we noted, "Petitioner adequately identifies specific claim limitations that it contends are unsupported by the '018 provisional application and identifies specific disclosure in the '018 provisional application that it contends is insufficient." *Id.* at 12 (citing *Dynamic Drinkware, LLC v. National Graphics, Inc.*, 800 F.3d 1375, 1380 (Fed. Cir. 2015)). Patent Owner does not contest in its Response that the challenged claims are entitled only to an effective filing date of December 15, 2003. Based on the record, we accord that effective filing date to the challenged claims.

### D. Legal Principles

To establish anticipation, each and every element in a claim, arranged as recited in the claim, must be found in a single prior art reference. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008); *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001). While the elements must be arranged in the same way as is recited in the claim, "the reference need not satisfy an *ipsissimis verbis* test." *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009); *In re Bond*, 910 F.2d 831, 832–33 (Fed. Cir. 1990). Identity of terminology between the anticipatory prior art reference and the claim is not required. Prior art references must be "'considered together with the knowledge of one of ordinary skill in the

22

IPR2017-00677
Patent 8,566,843 B2

pertinent art.'" *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

Also, "it is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom." *In re Preda*, 401 F.2d 825, 826 (CCPA 1968). As the Court of Appeals for the Federal Circuit recently explained, the dispositive question for anticipation is whether one skilled in the art would reasonably understand or infer from a prior art reference that every claim element is disclosed in that reference. *Eli Lilly v. Los Angeles Biomedical Research Inst.*, 849 F.3d 1073, 1074–1075 (Fed. Cir. 2017).

A claim is unpatentable for obviousness under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when in evidence, objective indicia of non-obviousness, i.e., secondary considerations.[5] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

---

[5] The parties do not address secondary considerations, which accordingly do not form part of our analysis.

23

IPR2017-00677
Patent 8,566,843 B2

Additionally, the obviousness inquiry typically requires an analysis of "whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) (requiring "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness")); *see In re Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1333 (Fed. Cir. 2016) (citing *DyStar Textilfarben GmbH & Co. Deutschland KG v. C. H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006)).

To prevail on its challenges, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.* 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden never shifts to Patent Owner. *See Dynamic Drinkware, LLC. v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review). Furthermore, Petitioner does not satisfy its burden of proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

IPR2017-00677
Patent 8,566,843 B2

### *E. Level of Skill in the Art*

The parties advocate for the adoption of similar levels of ordinary skill in the art.  Petitioner contends that a person of ordinary skill "would have a bachelor's degree in electrical engineering, computer engineering, or a related engineering discipline and at least two years of industry experience in the field of distributed computing or automotive engineering, or equivalent experience, education, or both."  Pet. 10.  In addition, Petitioner contends that such a person "would also have knowledge or familiarity with in-vehicle computing."  *Id.* (citing Ex. 1003 ¶¶ 63–64).  Dr. Madisetti's testimony supports Petitioner's proposal.  Ex. 1003 ¶¶ 63–64.

> Patent Owner similarly contends that a person of ordinary skill
>
> would have had at least the qualifications of or equivalent to either a master's degree in electrical engineering, computer science, or computer engineering with course work or research in embedded networking technologies or an undergraduate degree in electrical engineering, computer science, or computer engineering with at least two years of relevant work experience in industry.

PO Resp. 19.  Dr. Miller's testimony supports Patent Owner's proposal.  Ex. 2001 ¶ 12.  The principal difference between the levels proposed by the parties is Petitioner's requirement that the person have knowledge or familiarity with "in-vehicle computing."  Although the Specification illustrates its systems and methods for sharing information in a distributed system in the context of vehicle applications, the claims are not so limited.  We are not persuaded that familiarity with in-vehicle computing would be a

IPR2017-00677
Patent 8,566,843 B2

characteristic of a person of ordinary skill.   We therefore adopt Patent
Owner's expression of the level of skill in the art, noting that it instead
requires some level of familiarity with embedded networking technologies.

### F.  Obviousness over Staiger and Millsap
#### 1.  Independent Claim 51

Staiger, which "relates to a method and a circuit arrangement for
communication within and across networks," was filed on December 4,
2001, and published on June 13, 2002.  Ex. 1004 ¶ 1, [22], [43].  Consistent
with the effective filing date we accord the challenged claims, Staiger is thus
prior art to the '843 patent.

Like the '843 patent, Staiger presents its description of
communicating across networks in the context of an automotive
environment, describing an ECU as follows:

> An Electronic Control Unit (ECU) in a modern automobile is an
> example of such a[ circuit] arrangement.   The ECU may be
> connected to a plurality of real-time networks, e.g., several
> individual CAN (Controller Area Network) busses or other
> multiple purpose networks, like multimedia-networks, such as
> MOST (Media Oriented Systems Transport), i.e., an optical bus
> system used in automobiles, or IEEE1394 (Firewire).

Id. ¶ 3.  Staiger explains that, during operation, the ECU executes an
application for controlling remote systems while also monitoring various
busses and networks to select and retrieve parameters required for the
application programs in progress.  Id. ¶ 4.  Staiger describes methods and

26

IPR2017-00677
Patent 8,566,843 B2

systems for processing messages to communicate with remote units over at least one data network and with at least one dedicated CPU. *Id.* ¶ 15.

Figure 2 of Staiger is reproduced below.



FIG. 2

Figure 2 depicts a high-level block diagram of interconnection preprocessor 200, which may be used in the message-processing methods. *Id.* ¶ 36. Preprocessor 200 is connected to switchboard 201, "which is designed to connect four individual CAN-busses 202 to 205 in addition to a first and second independent CPU 207 and 208." *Id.* First and second CPUs 207 and 208 provide connections to first and second additional bus systems 210 and 211, respectively. *Id.* Each of CAN busses 202–205 is connected to a respective bus adapter 214–217, which may be formed by standardized CAN

IPR2017-00677
Patent 8,566,843 B2

controllers providing connections to the respective CAN busses 202–205. *Id.* ¶ 38.

In addition to relying on Figure 2 as illustrating an apparatus with a control unit, as recited in the preamble and limitation 51.1 of claim 51, Petitioner relies on the related description of an initializing process as disclosing identifying information associated with a message and utilizing a first network protocol associated with a first network, as recited in limitation 51.2. Pet. 26–28. We agree with this identification.

### a. Limitations 51.8–51.10

Petitioner also relies on such disclosure for limitations 51.8–51.10, observing that Staiger "shares messages with a plurality of different destinations (e.g., CAN busses, FireWire busses, MOST busses, CPUs), and teaches that each message may be transmitted to more than one destination." *Id.* at 34. In addressing the "real-time" sharing requirement of limitation 51.8, Petitioner refers to Staiger's disclosure of a response time that is "typically milliseconds or microseconds," consistent with the construction adopted herein. *Id.* at 35 (citing Ex. 1004 ¶¶ 7, 51).

In addressing the types of networks recited in limitations 51.9 and 51.10, Petitioner relies on Staiger's disclosure of the bus adapters interfacing with CAN, and notes that "[e]ach CAN adapter may utilize either CAN-B or CAN-C physical layers, which are different protocols and physical

28

IPR2017-00677
Patent 8,566,843 B2

implementations from each other." *Id.* at 42–43 (citing Ex. 1004 ¶ 38; Ex. 1003 ¶ 127). This identification is sufficient.[6]

For the specific interfaces recited in limitations 51.9 and 51.10, Petitioner (1) ties Staiger's disclosure of an electronic control unit that performs "routing, gateway, bus bridge and filtering functions" to a plurality of real-time networks (Ex. 1004 ¶¶ 3–5) with specific components shown in Figure 2; and (2) alternatively contends that "[t]o the extent that *Staiger* does not teach the [limitations], *Millsap* does." Pet. 37; *see id.* at 35–44. We agree with both of Petitioner's positions.

### i. Staiger

With respect to Petitioner's first position, Petitioner provides annotated versions of Figure 2 of Staiger that make specific correspondences between the "first network" and CAN bus 202, and between the "second network" and CAN bus 204, as well as correspondences between the "first interface" and bus adapter 214, and between the "second interface" and bus adapter 216. *Id.* at 43. With these correspondences, Petitioner further identifies the first and second "interface-related components" with the

---

[6] Although Petitioner takes the position that CAN-B and CAN-C "have 'at least one aspect that is different,' and are therefore different networks," we note that challenged independent claim 51 does not explicitly recite that the first and second networks are different types of networks. *See* Pet. 43. Challenged dependent claims 56–59 include explicit recitations requiring different network protocols. We address Petitioner's challenge to those claims below.

29

IPR2017-00677
Patent 8,566,843 B2

drawing's indications of information transfer between the CAN busses and their respective bus adapters, and between the bus adapters and the switchboard.  Petitioner's annotated Figure 2 is reproduced below.



Annotated Figure 2 identifies those portions of Staiger that Petitioner maps to the "first interface," including the "first interface-related first component" and the "first interface-related second component."  Pet. 37. That is, Petitioner contends that bus adapter 214 is a "first interface for interfacing with the first network," that the corresponding physical CAN layer is a "first interface-related first component for receiving first data units," and that multiplexer 222, which forms part of switchboard 201, corresponds to the "first interface-related second component."  *Id.* at 35–36.

Similarly, the annotated drawing also identifies those portions of Staiger that Petitioner maps to the "second interface," including the "second

IPR2017-00677
Patent 8,566,843 B2

interface-related first component" and the "second interface-related second component." *Id*. at 42–43. That is, Petitioner contends that bus adapter 216 is a "second interface for interfacing with the second network," that the corresponding physical CAN layer is a "second interface-related second component for receiving second data units," and that multiplexer 222, which forms part of switchboard 201, corresponds to the "second interface-related second component." *Id.* Patent Owner does not contest this aspect of Petitioner's analysis.

Rather, Patent Owner contends that Staiger does not disclose limitation 51.8, which requires that the apparatus be "operable such that the information is capable of being shared in real-time utilizing a second network protocol associated with a second network." PO Resp. 25–29. While acknowledging that Staiger distributes information, Patent Owner argues that it "does not convert the message to a format that can be recognized and used by different ECUs using different protocols." *Id.* at 23. Without such format conversion, "Staiger does not disclose the heart of the claimed invention, which is to receive data or other information from one network, and then process that message so that it can be shared with a second network utilizing a second network protocol associated with the second network." *Id.* According to Patent Owner, Staiger's disclosure is limited to "the concept that the central device can receive CAN messages via CAN-C or CAN-B busses and physical layers, process and distribute them to a final destination." *Id.* But Staiger is deficient, according to Patent Owner,

31

IPR2017-00677
Patent 8,566,843 B2

because "information received via a CAN-B bus, using a CAN-B protocol in Staiger cannot be made available to a destination via a CAN-C protocol." *Id.*

The factual disagreement over Staiger's disclosure hinges on the following:

> The switchboard 201 is a multiplexing scheme controlled either by one of the CPUs 207 and 208 or the intercommunication preprocessor 200. This allows the CPUs 207 and 208 to use the functionality of the intercommunication preprocessor 200. *For example, a message generated by one of the CPUs 207 and 208 has to be broadcasted to several CAN busses 202 to 205 identically.* In this case, the message is multiplexed by the switchboard 201 to the intercommunication preprocessor 200, then, the intercommunication preprocessor 200 processes the message and initiates immediate distribution. This procedure significantly saves time, since the intercommunication preprocessor 200, specialized to operate this tasks [*sic*], will require only a fraction of processing time in comparison to a master CPU formed by one of the CPUs 207 and 208. Furthermore, the master CPU only has to execute one single message operation, in case the message needs to be computed before forwarding, which saves processing time as well.

Ex. 1004 ¶ 51 (emphasis added). As Patent Owner emphasized at the oral hearing, "[t]he key phrase is identically." Tr. 28:17. According to Patent Owner, "[i]dentically means that all buses get the same information, the same message. There [are] no different protocols. There are no different formats. . . . Staiger doesn't even hint or suggest that there is any conversion

IPR2017-00677
Patent 8,566,843 B2

of any message or any data . . . from one protocol or one format to another." *Id.* at 28:18–23.

Ultimately, the word "identically" cannot bear the weight Patent Owner places upon it to conclude that Staiger does not teach or suggest that "the apparatus is operable such that the information is capable of being shared . . . utilizing a second network protocol associated with a second network," as the claim requires. On cross-examination, Patent Owner's expert, Dr. Miller, conceded several relevant points that support Petitioner's inference regarding the teachings of Staiger. And, "in considering the disclosure of a reference, it is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom." *In re Preda*, 401 F.2d at 826.

On cross-examination, Dr. Miller agreed that Staiger discloses that CAN busses 202–205 connect to different network protocols from those protocols busses 210 and 211 connect to, and that these network protocols use different message formats. Ex. 1025, 66:21–68:13. Dr. Miller also agreed that the Staiger busses 202–205, 210, and 211 can receive and send messages. *Id.* at 69:19–21. And Dr. Miller agreed that Staiger discloses that messages received from busses 210–211 can be shared with CAN busses 202–205 through bus adaptors 214–217. *Id.* at 74:3–10. In light of these concessions by Patent Owner's expert, the most natural understanding of the single word "identically" in Staiger is that the identical *content* of the

33

IPR2017-00677
Patent 8,566,843 B2

message is broadcast over the different CAN busses, not that Staiger fails to accommodate its own recognition that the *formats* used are different.

### ii. Millsap

Petitioner's alternative position for limitations 51.9 and 51.10 relies on teachings from Millsap, which "relates to networks used in vehicles to provide distributed control of various vehicle functions and, more particularly, to such networks which utilize different groupings of electronic control units (ECUs) to carry out different control tasks." Ex. 1015, col. 1, ll. 6–10. Petitioner supports this reasoning with testimony by Dr. Madisetti. Ex. 1003 ¶¶ 121–123.

Figure 9 of Millsap is reproduced below.



*Fig. 9*

Figure 9 shows that "each gateway node is connected to at least 2 [busses] and will interact with each network according to its message strategy and transmission models." Ex. 1015, col. 13, ll. 22–25. That is, Petitioner identifies communication kernels 140, 142 as the recited interfaces. Pet. 38 (annotated drawing). Petitioner further identifies the first and second

IPR2017-00677
Patent 8,566,843 B2

components of each interface as disclosed in Figure 8 of Millsap, which is
reproduced below.



*Fig. 8*

Figure 8 depicts a conceptual layout of communication kernel 120 that can
be used by each of multiple ECUs in communicating with its respective bus,
providing a standardized interface between the bus and application process
122 being executed by the ECU. *Id.* at col. 12, ll. 42–46.

Petitioner reasons that a person of skill in the art would have known to
combine these teachings with those of Staiger because both references
(1) are from the same field of endeavor, i.e., are related to real-time
distributed communication and control of automotive ECUs; (2) aim to solve
similar problems of improving data processing between automotive ECUs;
and (3) use similar techniques to solve the problems, such as using gateway
ECUs to bridge different networks to allow for communication between the
networks. Pet. 41. Petitioner supports this reasoning with testimony by Dr.

35

IPR2017-00677
Patent 8,566,843 B2

Madisetti.  Ex. 1003 ¶¶ 121–123.  Petitioner articulates sufficient reasoning with rational underpinning to support the combination it proposes.

Patent Owner contends that "Millsap is entirely unrelated to the invention claimed in the '843 Patent" because "Millsap does not disclose any CAN, Flexray or LIN network, and, does not disclose any concept of networks operating under different protocols."  PO Resp. 33 (citing Ex. 2001 ¶ 49).  This contention does not provide a sufficient basis to discount Petitioner's articulated reasoning for combining the teachings of the references.  Although limitations 51.9 and 51.10 are expressed in a lengthy manner, the concepts they recite are relatively straightforward, requiring interfaces that process first messages to produce second messages. Petitioner provides sufficient reasoning and evidence to support its position that one of skill in the art would combine the teachings of Staiger and Millsap in the manner it proposes in part because they are from the same field of endeavor and because they are reasonably pertinent to the particular problem with which the inventor of the '843 patent was concerned.  *See In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004).

In addressing the specific limitations for the "first interface" and "second interface" recited in limitations 51.9 and 51.10, Petitioner identifies layer 124 of Millsap's Figure 8 as corresponding to the "first component" and layer 126 as corresponding to the "second component," for each of communication kernels 140, 142, i.e., as "first interface-related" and "second interface-related," respectively.  Pet. 40 (annotated drawing).

36

IPR2017-00677
Patent 8,566,843 B2

To support its argument that Millsap teaches the requirement of limitation 51.9 that "the control unit be[] operable such that the first data units are processed after which processed first data units are provided," Petitioner cites a portion of the following disclosure regarding Figure 8:

> FIG. 8 depicts a conceptual layout of a communication kernel 120 that can be used by each of the ECUs in communicating with its respective bus. This communication kernel provides a standardized interface between the bus and the application process 122 being executed by the ECU. It includes both software and physical layers. More specifically, the communication kernel 120 includes a physical layer 124 that *provides a conversion of the digital data symbols (1's and 0's) generated by the data link layer 126 into electrical signals* transmitted on the bus.

Ex. 1015, col. 12, ll. 42–51 (emphasis added); *see* Pet. 39. That is, Petitioner relies on the disclosure of digital-to-analog conversion as satisfying the claim's requirement that second layer messages be provided after processing first layer messages. Petitioner reiterates the argument with respect to limitation 51.10. Pet. 42–44. Given the breadth of the claim language, which recites that "processed [first/second] data units" be provided after processing "[first/second] data units," such digital-to-analog conversion meets the claim recitations.

37

IPR2017-00677
Patent 8,566,843 B2

### b. Limitations 51.3–51.7

Petitioner addresses the "memory-related" limitations 51.3–51.7 by reference to Figure 5 of Staiger, which is reproduced below, and related disclosures.



FIG. 5

Figure 5 depicts a flowchart illustration of message processing in an initializing process. Ex. 1004 ¶ 26. In explaining the relevance of this process to the claim limitations, Petitioner highlights Staiger's disclosure of

38

IPR2017-00677
Patent 8,566,843 B2

determining whether a tag registry, which it correlates to the "storage resource" recited in claim 51, is available before a "time-out" event occurs. Pet. 28–29 (citing Ex. 1004 ¶ 62 ("Block 518 receives the time-out event from the delay timer of block 510 and a negative event of a determination of block 520 of whether or not an execution tag registry . . . is available.")). Petitioner thus draws a correspondence between this disclosure and limitations 51.3 and 51.4 by separately focusing on Staiger's determination of the availability of the tag registry ("issuing a storage resource request in connection with a storage resource and determining whether the storage resource is available," recited as limitation 51.3) and on Staiger's determination of whether the time-out event has occurred ("determining whether a threshold has been reached in association with the storage resource request," recited as limitation 51.4). *Id.* at 28–31. In doing so, Petitioner draws a correlation between the delay until a time-out event and the "threshold," consistent with our construction of "threshold" as including the maximum value of a timer. *Id.* at 31.

As Petitioner observes, Figure 5 of Staiger addresses circumstances both when the tag registry is available and when it is not available. *Id.* at 31–34. If the tag registry is not available, as determined at block 520, block 516 determines whether the delay time has timed out. Ex. 1004 ¶ 62. If no time-out has occurred, another determination is made whether the tag registry is available, i.e., "issuing another storage resource request in connection with the storage resource," recited as part of limitation 51.5. *Id.*;

39

IPR2017-00677
Patent 8,566,843 B2

Pet. 31.  If a time-out has instead occurred, "the process passes to block 522," which issues an interrupt request that Petitioner reasonably identifies as the "notification" recited in limitation 51.6. Ex. 1004 ¶ 62; Pet. 32–33.  If the tag registry is available, as determined at block 520, the registry is initiated, and the message is retrieved and stored, corresponding to limitation 51.7.  Ex. 1004 ¶¶ 64, 66; Pet. 33–34.

These steps, as identified by Petitioner from the disclosures of Staiger, track the steps recited in limitations 51.3–51.7 of claim 51 under the various circumstances when the storage resource is available or not available, and when the threshold has been reached or not reached.  Patent Owner does not respond separately to Petitioner's contentions regarding limitations 51.3–51.7.

### c.  Summary

Based on the foregoing, we conclude that Petitioner shows, by a preponderance of the evidence, that independent claim 51 is unpatentable under 35 U.S.C. § 103(a) over Staiger and Millsap.

### 2.  Dependent Claims 52 and 53

Claim 52 and 53 depend from claim 51, respectively reciting that the processed first data units and the second data units "have a same format" or "are the same data units."  Ex. 1001, col. 19, ll. 6–11.  Petitioner addresses these claims by identifying special circumstances of Staiger's more general

40

IPR2017-00677
Patent 8,566,843 B2

structure.  For claim 52, Petitioner contends that when "[b]oth busses [are]
CAN-B or CAN-C busses . . . , each message would have the same format."
Pet. 44 (citing Ex. 1004 ¶¶ 38, 51; Ex. 1003 ¶ 131).  For claim 53, Petitioner
contends that "when the same message is present on the first and second
networks and the first and second networks are the same type (i.e., the
message has the same format and content) . . . each message (i.e., 'data
units') would have the same format and content on each bus."  *Id.* at 44–45
(citing Ex. 1004 ¶¶ 38, 51; Ex. 1003 ¶ 133).  Patent Owner relies on its
arguments for claim 51 and does not respond separately to these contentions,
which we find persuasive.  *See* PO Resp. 29.

We conclude that Petitioner shows, by a preponderance of the
evidence, that claims 52 and 53 are unpatentable under 35 U.S.C. § 103(a)
over Staiger and Millsap.

### 3.  *Dependent Claim 54*

Claim 54 depends from claim 51 and recites that "the apparatus is
operable such that the processing involves headers."  Ex. 1001, col. 19, ll.
13–15.  Petitioner adequately identifies disclosure in Millsap of messages
transmitted as a frame with a header.  Pet. 45 (citing Ex. 1015, col. 8, ll. 52–
62, col. 17, ll. 59–64; Ex. 1003 ¶ 135).  Patent Owner does not respond
separately to this contention, outside its arguments for claim 51.  *See* PO
Resp. 29.

IPR2017-00677
Patent 8,566,843 B2

We conclude that Petitioner shows, by a preponderance of the evidence, that claim 54 is unpatentable under 35 U.S.C. § 103(a) over Staiger and Millsap.

### 4. *Dependent Claim 55*

Claim 55 depends from claim 51 and recites that "the apparatus is operable such that the first network and the second network are heterogeneous networks." Ex. 1001, col. 19, ll. 16–18.  Because Staiger discloses that busses 202–205 may be either CAN-C or CAN-B, and busses 210–211 may be FireWire or MOST, Petitioner contends that the "networks utilize different protocols, and are thus 'heterogeneous.'" Pet. 45–46 (citing Ex. 1004 ¶¶ 38–48; Ex. 1003 ¶ 137).  This position is consistent with our adopted construction of "heterogeneous networks" as "networks having at least one aspect that is different," and Patent Owner does not respond separately to the contention outside its arguments directed at claim 51.  *See* PO Resp. 29.

We conclude that Petitioner shows, by a preponderance of the evidence, that claim 55 is unpatentable under 35 U.S.C. § 103(a) over Staiger and Millsap.

### 5. *Dependent Claims 56–59*

Claims 56–59 each depend from claim 51 and recite that "the apparatus is operable such that the second network protocol is different than

IPR2017-00677
Patent 8,566,843 B2

the first network protocol." Ex. 1001, col. 19, l. 19–col. 20, l. 20. Petitioner relies on the same reasoning as presented for claim 55 for this limitation. Pet. 46.

In addition, claims 57–59 recite further variations, including different rates, different message formats, and a third network protocol different from both the first and second network protocols. *Id.* at col. 20, ll. 1–20. Petitioner addresses these additional limitations by observing that "CAN-C and CAN-B had different transmission bit rates," that CAN-C and CAN-B used different message formats, and that Staiger may use CAN-C, CAN-B, FireWire, and MOST networks. Pet. 46–47.

Although Patent Owner does not dispute Petitioner's reasoning as applied to claim 55, it contends that Petitioner "fail[s] to demonstrate how or where Staiger teaches the concept of information utilizing a first network protocol being shared utilizing a second network protocol, where the second network protocol is different than the first network protocol." PO Resp. 30–31 (citing Ex. 2001 ¶ 44). In advancing this contention, Patent Owner interweaves, in its response addressing each of claims 56–59, a discussion of limitation 51.8, which requires real-time sharing of information "utilizing a second network protocol associated with a second network." *Id.* at 30–41.

We address Patent Owner's argument with respect to limitation 51.8 *supra*, finding it unpersuasive, and we similarly find the argument as applied to claims 56–59 equally unpersuasive. Rather, we agree with Petitioner that Staiger discloses the concept of information sharing between different

43

IPR2017-00677
Patent 8,566,843 B2

network protocols, as evidenced by Staiger's use of CAN-B or CAN-C busses. *See* Reply 13. We also agree with Petitioner that Dr. Miller's cross-examination testimony supports the assertion that "Staiger discloses messages received from busses 210-211 can be shared with CAN busses 202-205 through bus adaptors 214-217, where CAN busses 202-205 are connected to different network protocols and use different message formats from those protocols busses 210 and 211 are connected to." *Id.* (citing Ex. 1025, 66:21–68:13, 69:19–21, 73:3–10; Ex. 1026 ¶ 25).

Patent Owner also argues that the limitation requiring different network protocols is not disclosed by Millsap, but Petitioner does not rely on Millsap for the limitation. *See* PO Resp. 32–35.

We conclude that Petitioner shows, by a preponderance of the evidence, that claims 56–59 are unpatentable under 35 U.S.C. § 103(a) over Staiger and Millsap.

### 6. Summary

For the foregoing reasons, we conclude that Petitioner shows, by a preponderance of the evidence, that claims 51–59 are unpatentable under 35 U.S.C. § 103(a) over Staiger and Millsap.

### G. Anticipation by OSEK/VDX

Petitioner describes OSEK/VDX as "a joint project by sixty-two automotive companies creating an open-ended architecture standard for

44

IPR2017-00677
Patent 8,566,843 B2

distributed ECUs in vehicles." Pet. 18 (citing Ex. 1007, 2). Petitioner's expert, Dr. Madisetti, further explains that "OSEK/VDX is a standard for interfacing distributed ECUs with real-time operating systems found in automotive networks," including "seven specifications that together describe 'interfaces and protocols for the transfer of data . . . between and within network stations (ECUs).'" Ex. 1003 ¶ 81 (quoting Ex. 1007, 6) (alteration by Dr. Madisetti).

Petitioner's anticipation challenge based on OSEK/VDX relies on a combination of four references (OSEK Binding, OSEK COM, OSEK FTCom, and OSEK NM) that describe different aspects of various versions of the OSEK/VDX standard. *See* Pet. 15. Petitioner focuses its attention on version "SB3," which OSEK Binding discloses as encompassing the specific documents relied on, i.e., including version 1.3 of the Binding specification, version 2.2.2 of the communication ("COM") specification, version 2.5.1 of the network-management ("NM") specification, and version 1.0 of the OSEKtime COM ("FTCom") specification. Ex. 1007, 9.

Petitioner contends that these individual specifications "were originally available at http://osek-vdx.org" and were archived by The Wayback Machine on September 26, 2001, more than a year before both the effective filing date we accord the claims and more than a year before the filing date of the '018 provisional application. Pet. 20. To support its contention that the individual documents were publicly accessible on September 26, 2001, Petitioner provides a Declaration of Christopher Butler,

IPR2017-00677
Patent 8,566,843 B2

Office Manager at the Internet Archive, which manages The Wayback
Machine, attesting to its practices regarding archival of files on the Internet.
Ex. 1013.  Petitioner additionally provides a Declaration of R. Benjamin
Cassady, attesting to his retrieval of certain documents, including Ex. 1006,
which Petitioner contends "confirms that OSEK FTCom was known to a
[person of ordinary skill in the art] by at least December 10, 2002."  Ex.
1014; Pet. 22.  Petitioner provides sufficient evidence that each of OSEK
Binding, OSEK COM, OSEK FTCom, and OSEK NM is a printed
publication.

Nevertheless, we are not persuaded that the four documents are
properly considered to constitute a single prior-art reference.  "A claim is
anticipated only if each and every element as set forth in the claim is found,
either expressly or inherently described, *in a single prior art reference*."
*Verdegaal Bros., Inc. v. Union Oil Co. of California*, 814 F.2d 628, 631
(Fed. Cir. 1987) (emphasis added).

Petitioner contends that "OSEK/VDX is a 'single prior art reference'
and thus qualifies as prior art under § 102(a) and/or (b) because the standard
comprises only seven specifications, all authored by the same group, and
would be considered together, evidenced by their linking and cross-
referencing."  Pet. 22–23 (citing *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 424
F.3d 1276, 1285 (Fed. Cir. 2005)).  Although Petitioner correctly observes
that "[t]he specifications that make up OSEK/VDX version SB3 are indexed
within OSEK Binding," Petitioner's overall focus on what it contends is

46

IPR2017-00677
Patent 8,566,843 B2

common authorship insufficiently accounts for the different dates of creation of the individual documents.  Pet. 23; *see Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1351–1352 (Fed. Cir. 2008) ("the GSM standard is actually several prior art references with separate dates of creation, rather than a single prior art reference") ("the GSM standard is simply not a coherent whole document that can be assigned a single prior art date of creation").

First, each of the individual documents bears a different date on its face, belying any conclusion that they are properly considered as a single reference.  Ex. 1007, 1 (Binding Specification dated September 17, 2001); Ex. 1008, 1 (Communication specification dated December 18, 2000); Ex. 1009, 1 (Network Management specification dated May 31, 2000); Ex. 1010, 1 (Fault-Tolerant Communication specification dated July 24, 2001). The SB3 version of the OSEK/VDX standard evidently arises from selective reference to different versions of the individual specifications as they have evolved over time.  *See* Ex. 1007, 3 ("As the standardisation of requirements that are applicable to different OSEK/VDX specifications should not be replicated within the different specifications, this document is therefore set-up to collate all requirements that are owned by the different specifications.") (italicization omitted).

Second, Petitioner's argument that the individual documents are commonly authored is tenuous at best.  Petitioner too sweepingly treats two groups responsible for creation of the documents (the "OSEK group" and the

47

IPR2017-00677
Patent 8,566,843 B2

"OSEK/VDX steering committee") as defining a single authorship, without addressing the composition of those groups and potential changes in that composition over the time period in which the individual specifications were created. *See* Pet. 24. This deficiency is particularly notable in light of the large number of entities (sixty-two automotive companies) that "attended and contributed to the OSEK/VDX Technical Committee." *See* Ex. 1007, 2. Accordingly, we find that OSEK Binding, OSEK COM, OSEK FTCom, and OSEK NM are not collectively a "single prior art reference," and therefore conclude that Petitioner has not demonstrated a reasonable likelihood of prevailing on its anticipation challenge of claims 51–59 over OSEK/VDX.

## H.  Obviousness over OSEK Binding, OSEK COM, OSEK FTCom, and OSEK NM

As an alternative to its anticipation challenge, Petitioner contends that claims 51–59 would have been obvious over OSEK/VDX "to the extent that the combined specifications comprising OSEK/VDX are not found to be a single prior art publication." Pet. 77. Petitioner reasons that a person of ordinary skill in the art "would naturally consider the OSEK/VDX specifications together in order to gain a complete understanding of the standard and the capabilities of ECU nodes," supporting that reasoning with testimony by Dr. Madisetti. *Id.* at 78 (citing Ex. 1003 ¶ 189; *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrice Co.*, 464 F.3d 1356, 1367 (Fed. Cir. 2006)). Particularly in light of OSEK Binding's

48

IPR2017-00677
Patent 8,566,843 B2

specific reference to each of the specifications in defining version SB3 (Ex. 1007, 9), we agree with that contention and conclude that Petitioner articulates sufficient reasoning to combine the teachings of the four documents.  Patent Owner does not contest Petitioner's rationale for combining the teachings of the four documents.

### 1. Independent Claim 51

Figure 1-2 of OSEK Binding is reproduced below.



Figure 1-2    Layer model of OSEK/VDX with OSEKtime OS

49

IPR2017-00677
Patent 8,566,843 B2

Figure 1-2 illustrates a layer model of OSEK/VDX that shows interfaces to multiple networks for sending messages in "distributed fault-tolerant highly dependable real-time applications." Ex. 1007, 7. As shown in the drawing, each interface has multiple layers for receiving and processing messages.

In analyzing the specific limitations of claim 51, the Petition focuses primarily on OSEK NM, supplementing its analysis with specific reference to portions of OSEK COM, in addressing limitations dealing with the treatment of the availability of a storage resource and real-time sharing of information, as well as in addressing the interfaces recited in limitations 51.9 and 51.10. Pet. 48–70. Petitioner observes that "OSEK NM describes a '[g]ateway support' capable of 'monitoring . . . nodes across several networks' and 'negotiat[ing] operating modes across several networks.'" *Id.* at 49 (quoting Ex. 1009, 134) (alterations by Petitioner). Because the standard allows for "[i]nterleaving of network layer messages," which "enables gateway operation that needs to handle different network layer message transmissions concurrently across distinct sub-networks," Ex. 1008, 111–12, Petitioner reasons that OSEK NM thus teaches an ECU configured to implement the described software, and correlates this ECU with the "control unit" recited in limitation 51.1. Pet. 49–50.

Figure 2 of OSEK NM is reproduced below.

IPR2017-00677
Patent 8,566,843 B2



Figure 2   Infrastructure of the NM (logical ring), example with two busses

Figure 2 shows an infrastructure of a logical ring that includes an electronic communication unit and in which, for example, node A receives messages from node C.  Ex. 1009, 9.  In addition to identifying the "Electronic Communication Unit" in the top center of the drawing as the recited control unit, Petitioner observes that the protocol includes transmission and receipt of information in the form of a message between ECUs with a particular type of network, such as CAN, VAN, J1850, K-BUS, and D2B, which it correlates with the "first network protocol associated with a first network," recited in limitation 51.2.  Pet. 51–52 (citing Ex. 1009, 7, 9).

### a.  Limitations 51.3–51.7

In addressing claim 51's treatment of a storage resource, Petitioner contends that OSEK NM discloses determining whether nodes in a network are present and able to transfer information because each node in the network has a "data buffer" and because each node is actively monitored by every other node in the network to determine whether another node is

51

IPR2017-00677
Patent 8,566,843 B2

available.  *Id.* at 52–53 (citing Ex. 1009, 8–10, 11, Fig. 4).  Petitioner thus
draws a correlation between such a "data buffer" and the "storage resource"
recited in the claim.  *Id.* at 52–53.  In addition, Petitioner points to OSEK
NM's disclosure of a set of timers, i.e., $T_{Typ}$, $T_{Max}$, and $T_{Error}$, that determine
when to send requests and error notifications to other network nodes.  *Id.* at
54–55 (citing Ex. 1009, 24–25).  A node is determined to be unavailable
when a message is not received from that node within a specified timeframe
based on such timers.  Ex. 1009, 9–10.  Consistent with our construction of
"threshold" as including the time-out of a timer, Petitioner thus contends that
this procedure corresponds to limitations 51.3 and 51.4 by determining
whether a "storage resource" is available and by determining whether a
threshold has been reached in association with a storage resource request.
Pet. 52–54.  We agree with these identifications.

Patent Owner disputes Petitioner's analysis with respect to limitation
51.3, "issuing a storage request in connection with a storage resource and
determining whether the storage resource is available."  PO Resp. 43–45.
Patent Owner's contention appears to be based on a reading of the claim
language as imputing a requirement for direct interrogation as to the
availability status of the recited storage resource:

> The OSEK NM logical ring permits each node on a network to
> monitor the status of other nodes on the same network by
> receiving status messages, as Petitioner states.  Petition at p. 53.
> However, transmission of a status message is a signal that the
> transmitting node – not the node receiving the status message –
> is "alive" on the network.  Nodes in the logical ring therefore

52

IPR2017-00677
Patent 8,566,843 B2

> determine the status of other network nodes based on messages
> received from them, not transmitted to them.  Unless there are
> only two nodes on a given network, in normal operation a
> "monitoring" node will never receive a response to a network
> message *directly back* from a node to which it transmits, because
> there will be at least one more node present in the ring sequence,
> interposed in the return path.

*Id.* at 44 (citing Ex. 2001 ¶ 70; Pet. 52) (emphasis added).  This argument,
which refers to a response "directly back" from a node to which a
monitoring node transmits, is not persuasive because it is not commensurate
with the scope of the claim limitation.  Rather, we agree with Petitioner that
the limitation "does not state where the request and determination are made,
or how the request and determination are made," and that "requesting a node
to make a determination of the availability of another node based on
messages received from that node falls within the scope" of the limitation.
Reply 17.

For limitation 51.5, which is performed "in the event the storage
resource is not available and the threshold . . . has not been reached,"
Petitioner observes that OSEK NM describes a recovery state for an
unavailable node that starts the $T_{Error}$ timer, which acts to determine whether
a timeout has been reached.  *Id.* at 55–57.  Petitioner draws a
correspondence between OSEK NM's teachings related to receiving another
message from the unavailable node and "issuing another storage request in
connection with the storage resource," with the normal mode being re-
established when the message is received.  *Id.* (citing Ex. 1009, 25, 26, 45,

IPR2017-00677
Patent 8,566,843 B2

47, 52).   Conversely, if the $T_{Error}$ times out, a "LimpHome" message is
transmitted, which Petitioner reasonably identifies with the "notification"
recited in limitation 51.6.  *Id.* at 57–58 (citing Ex. 1009, 25).  Petitioner
supports its analysis with testimony by Dr. Madisetti.  Ex. 1003 ¶¶ 154–155.
In the event that the node is available, the data are stored in the buffer, which
Petitioner contends corresponds to limitation 51.7 requiring "storing the
information utilizing the storage resource."  Pet. 58–59 (citing Ex. 1009, 11,
20).

Patent Owner disputes that OSEK/VDX discloses limitation 51.5, i.e.,
"issuing another storage resource request in connection with the storage
resource" under circumstances when the storage resource is not available
and the threshold has not been reached.  PO Resp. 45–46.  Patent Owner's
argument is similar to the argument it makes in connection with limitation
51.3, i.e., that "Petitioner points directly to *receipt* of a message as evidence
for disclosure of '*issuing* another storage request,'" and that "[r]eceiving is
the opposite of sending."  *Id.* at 46.  This argument is unpersuasive for
similar reasons, namely the claim's silence regarding how the "[]other
storage resource request" is issued.  As Petitioner asserts, "[t]he 'another
storage resource request' issued in element [51.5] is just another storage
resource request of element [51.3]."  Reply 18 (citing Ex. 1026 ¶ 46).

With Petitioner's identifications and reasoning, it makes a sufficient
showing for limitations 51.3–51.7.

IPR2017-00677
Patent 8,566,843 B2

### b. Limitation 51.8

For the real-time sharing limitation 51.8, Petitioner relies on OSEK NM's disclosure of sharing message data that a node receives from a logical predecessor with a logical successor. *Id.* at 59–60 (citing Ex. 1009, 11, Fig. 4). Petitioner addresses the requirement of utilizing a second network protocol associated with a second network by observing that OSEK NM "describes that the several busses may be low-speed CAN and/or high-speed CAN," supporting its argument with testimony by Dr. Madisetti. Pet. 62 (citing Ex. 1003 ¶ 162). Further, the Petition identifies an example in OSEK NM in which $T_{Typ}$, the time within which the sharing occurs, is described as "70*ms*," consistent with the construction of "real-time" we adopt herein. *Id.* at 60.

Patent Owner disputes Petitioner's argument with respect to this limitation. PO Resp. 46–48. Patent Owner contends that Petitioner's argument is deficient because "the structures Petitioner has identified share information wholly within the confines of one network." *Id.* at 48. But Figure 2, reproduced above, provides an illustration of a *logical* ring with two communication media that correspond to different physical networks. *See* Reply 19–20; Ex. 1009, 8; Ex. 1026 ¶ 5.

Patent Owner also contends that Petitioner's argument is deficient because "the data allegedly 'shared' is being automatically 'pushed' from [a] node, rather than 'pulled.'" PO Resp. 48. This argument implicitly applies a construction of "the information is capable of being shared" that we do not

55

IPR2017-00677
Patent 8,566,843 B2

adopt.  That is, Patent Owner appears to be requiring that information be shared from a shared storage, and thus "pulled" on the basis of a request. But no such requirement is recited in the claim limitation, and does not form part of our applied construction.

With Petitioner's identifications and reasoning, it makes a sufficient showing with respect to limitation 51.8.

### c.  Limitations 51.9 and 51.10

In its analysis of the remaining limitations, Petitioner points to Figure 1 of OSEK NM, reproduced below, and related disclosure that describes a data link layer for interfacing with the underlying network.



Figure 1    interface and algorithms responsibility

IPR2017-00677
Patent 8,566,843 B2

Figure 1 illustrates "interface and algorithms responsibility" of an ECU microcontroller with multiple interfaces shown in the "Data Link Layer" in the lower left of the drawing. Ex. 1009, 7. To address the specific structure for the interfaces recited in limitations 51.9 and 51.10, Petitioner provides an annotated drawing that makes correspondences between the "first interface" and communication to "Network 1," and similarly between the "second interface" and communication to "Network k." Pet. 68. The respective "first component" and "second component" for each interface are further identified by Petitioner as corresponding to the "Interface Circuit" and "Protocol Circuit" for each network. *Id.* In making these correspondences, Petitioner again relies on low-speed CAN and high-speed CAN, supporting its argument with testimony by Dr. Madisetti. *Id.* (citing Ex. 1003 ¶ 170). Patent Owner does not dispute these identifications, which we find persuasive.

Petitioner makes a sufficient showing with respect to limitations 51.9 and 51.10.

### d. Summary

We conclude that Petitioner shows, by a preponderance of the evidence, that independent claim 51 is unpatentable under 35 U.S.C. § 103(a) over OSEK Binding, OSEK COM, OSEK FTCom, and OSEK NM.

IPR2017-00677
Patent 8,566,843 B2

## 2. *Dependent Claims 52 and 53*

In addressing claim 52's requirement that "the processed first data units and the second data units have a same format," the Petition provides only cursory analysis. Pet. 70–71. This consists of reproducing Figure 10 of OSEK NM, and asserting that the drawing shows "a received message and a transmitted message having the same format." We agree with Patent Owner that that assertion insufficiently addresses the claim distinction between the *processed* first data units and the *unprocessed* second data units, which are required to have the same format. PO Resp. 49–51. The mere identification of Figure 10 of OSEK NM showing received and transmitted messages that use a common format is insufficient to address the full limitation recited.

Petitioner provides more analysis in its Reply. Reply 21–24. We have reviewed that argument and conclude that it is new argument that is not entitled to consideration because Patent Owner has not had an adequate opportunity to respond. "A reply may only respond to arguments raised in the corresponding opposition or patent owner response." 37 C.F.R. § 42.23(b). Petitioner's more detailed reply argument, as well as the supporting testimony of Dr. Madisetti, Ex. 1026 ¶ 55, are not merely responsive to Patent Owner's argument, but articulate a theory regarding the claim limitation that is not discernible from the Petition. Accordingly, we do not consider Petitioner's reply arguments.

IPR2017-00677
Patent 8,566,843 B2

Petitioner's analysis of Claim 53 is deficient for the same reasons. *See* Pet. 71–72; PO Resp. 51–52 (alleging that "Petitioner's arguments have again misread the language of the claim"); Reply 23–24.

We conclude that Petitioner does not show, by a preponderance of the evidence, that claims 52 and 53 are unpatentable under 35 U.S.C. § 103(a) over OSEK Binding, OSEK COM, OSEK FTCom, and OSEK NM.

### 3. Dependent Claims 54–57

To support its contention that "the processing involves headers," as recited in claim 54, Petitioner points to description in OSEK NM of encoding communication messages such that they have a header and data. Pet. 72 (citing Ex. 1009, 18, Fig. 7). To support its contention that the first and second network are "heterogeneous networks," as recited in claim 56, and to support its contention that the networks use different protocols, as recited in claim 57, Petitioner refers to its earlier analysis in the context of limitation 51.10 that communications may be high-speed CAN or low-speed CAN, which use different network protocols. *Id.* at 72–73. To support its further contention that the network protocols are "such that rates thereof are different," as recited in claim 57, Petitioner refers to its evidence that high-speed CAN and low-speed CAN have different transmission bit rates. *Id.* at 73 (citing Ex. 1012, 5; Ex. 1003 ¶ 184). Patent Owner does not dispute any of these contentions, arguing only that claims 54–57 are not unpatentable by virtue of their dependence from claim 51. *See* PO Resp. 52.

59

IPR2017-00677
Patent 8,566,843 B2

Petitioner's contentions are persuasive and supported by evidence. We conclude that Petitioner shows, by a preponderance of the evidence, that claims 54–57 are unpatentable under 35 U.S.C. § 103(a) over OSEK Binding, OSEK COM, OSEK FTCom, and OSEK NM.

### 4. Dependent Claims 58 and 59

For dependent claims 58 and 59, which also require different first and second network protocols, as well as (for claim 58) conversion of different message formats, and (for claim 59) a third different network protocol with a different message format, Petitioner relies on its previous identification of OSEK/VDX using high-speed or low-speed CAN. Pet. 74, 75. In addressing message "formats" recited in the claims, the Petition assumes, without explanation, that high-speed and low-speed CAN use different "formats." *Id.* at 74–77. We agree with Patent Owner that the Petition insufficiently supports this assumption. *See* PO Resp. 55 ("Petitioner incorrectly assumes that the message formats for CAN-B and CAN-C are different.").

The Petition provides no proposed construction for "format," and does not explain what features characterize a "format" that would allow us to assess the persuasiveness of Petitioner's position. The expert testimony on this point is also contrary, with Dr. Miller unequivocally testifying that "CAN-B and CAN-C use the same message format, because all CAN implementations transmit messages in the form of CAN frames, which have

IPR2017-00677
Patent 8,566,843 B2

the same format." Ex. 2001 ¶ 92.  Dr. Madisetti's initial testimony is unhelpful because it merely repeats Petitioner's argument under the assumption that the formats differ, without providing reasons for such an implicit conclusion.  Ex. 1003 ¶ 186.

With its Reply, Petitioner includes a further Declaration by Dr. Madisetti that provides greater explanation for his position, and this is mirrored by the Reply's argument.  Ex. 1026 ¶ 62; Reply 24–27.  To further support its position, Petitioner provides new documentary evidence with its Reply in the form of U.S. Patent No. 5,379,405.  Ex. 1024.  The additional evidence and argument go beyond the proper scope of a Reply.  37 C.F.R. § 42.23(b).  Patent Owner has had insufficient opportunity to respond to this additional evidence and argument for us to consider it.  There is insufficient basis for us to discount the testimony of Dr. Miller and to give decisive weight to the late-offered testimony of Dr. Madisetti.

We conclude that Petitioner does not show, by a preponderance of the evidence, that claims 58 and 59 are unpatentable under 35 U.S.C. § 103(a) over OSEK Binding, OSEK COM, OSEK FTCom, and OSEK NM.

### 4. Summary

For the foregoing reasons, we conclude that Petitioner shows, by a preponderance of the evidence, that claims 51 and 54–57 are unpatentable under 35 U.S.C. § 103(a) over OSEK Binding, OSEK COM, OSEK FTCom, and OSEK NM.  Petitioner does not show, by a preponderance of the

IPR2017-00677
Patent 8,566,843 B2

evidence, that claims 52, 53, 58, and 59 are unpatentable under 35 U.S.C.

§ 103(a) over OSEK Binding, OSEK COM, OSEK FTCom, and OSEK NM.

### I. Obviousness over OSEK Binding, OSEK COM, OSEK FTCom, OSEK NM, and Millsap

Petitioner alternatively challenges claims 51–59 as unpatentable under

35 U.S.C. § 103(a) over OSEK Binding, OSEK COM, OSEK FTCom,

OSEK NM, and Millsap. Pet. 78–83. Similar to its analysis challenging

those claims over Staiger and Millsap, Petitioner applies further disclosure

of Millsap "to the extent that OSEK/VDX alone does not disclose limitations

51.9-51.10," but otherwise relies on its previous analysis. *Id.* at 78. Similar

to the reasons we express above, Petitioner identifies sufficient disclosure in

Millsap to support its position with respect to claims 51 and 54–57;

Petitioner's analysis with respect to claims 52, 53, 58, and 59 remains

deficient because it does not rely on Millsap to correct the deficiencies with

respect to those claims. Petitioner also provides sufficient reasons to

combine the teachings of Millsap with those of OSEK Binding, OSEK

COM, OSEK FTCom, and OSEK NM that generally parallel its reasoning

for combining Millsap with Staiger. *Id.* at 81–83.

For reasons similar to those expressed above in our analysis of the

challenged claims over Staiger and Millsap, Petitioner thus makes a

sufficient showing with respect to claims 51 and 54–57. Although Patent

Owner contends that Petitioner "approaches the matter [in] a very generic

way, and does not apply Millsap to any specific limitations," it is clear that Petitioner relies on Millsap as an alternative to its theory that OSEK/VDX discloses limitations 51.9 and 51.10. PO Resp. 58; *see* Pet. 78–79. Indeed, Patent Owner "incorporate[s]" its "prior analyis" with respect to Millsap. *Id.* at 59. For the reasons expressed above, we find Petitioner's analysis persuasive, even after consideration of Patent Owner's responsive analysis.

We conclude that Petitioner shows, by a preponderance of the evidence, that claims 51 and 54–57 are unpatentable under 35 U.S.C. § 103(a) over OSEK Binding, OSEK COM, OSEK FTCom, OSEK NM, and Millsap. Petitioner does not show, by a preponderance of the evidence, that claims 52, 53, 58, and 59 are unpatentable under 35 U.S.C. § 103(a) over OSEK Binding, OSEK COM, OSEK FTCom, OSEK NM, and Millsap.

## J. Constitutionality of Inter Partes Review Proceedings

Patent Owner contends that "this IPR should be terminated and the petition dismissed because the IPR system is unconstitutional." PO Resp. 60–61. This argument is foreclosed by the Supreme Court's determination otherwise. *Oil States Energy Services, LLC v. Greene's Energy Group, LLC*, 138 S.Ct. 1365 (2018) ("In this case, we address whether inter partes review violates Article III or the Seventh Amendment of the Constitution. We hold that it violates neither.").

IPR2017-00677
Patent 8,566,843 B2

### III.  ORDER

It is

ORDERED that Petitioner's Motion to Exclude (Paper 20) is *denied*;

FURTHER ORDERED that, based on a preponderance of the evidence, claims 51–59 of U.S. Patent No. 8,566,843 B2 are held to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2017-00677
Patent 8,566,843 B2


PETITIONER:

Lionel M. Lavenue
John Moulder
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
lionel.lavenue@finnegan.com
christopher.moulder@finnegan.com


PATENT OWNER:

Thomas H. Kramer
O'KELLY ERNST & JOYCE, LLC
tkramer@oelegal.com

Thomas F. Meagher
MEAGHER EMANUEL LAKS GOLDBERG & LIAO, LLP
tmeagher@meagheremanuel.com

EXHIBIT G

Trials@uspto.gov                                               Paper 24
571-272-7822                                        Entered: December 6, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

DAIMLER AG, DAIMLER NORTH AMERICA CORPORATION,
MERCEDES-BENZ USA, LLC, AND MERCEDES-BENZ U.S.
INTERNATIONAL, INC.,
Petitioner,

v.

STRAGENT, LLC,
Patent Owner.
_____

Case IPR2017–01502
Patent 8,209,705 B2
_____

Before LYNNE E. PETTIGREW, PATRICK M. BOUCHER, and
CARL L. SILVERMAN, *Administrative Patent Judges*.

SILVERMAN, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2017-01502
Patent 8,209,705 B2

# I.  INTRODUCTION

In response to a Petition (Paper 2, "Pet.") filed by Daimler North America Corporation, Mercedes-Benz USA, LLC, and Mercedes-Benz U.S. International, Inc. (collectively, "Petitioner"), we instituted an *inter partes* review of claims 8–19 of U.S. Patent No. 8,209,705 B2 ("the '705 patent"). Paper 7 ("Dec.").

During the trial, Stragent, LLC ("Patent Owner") timely filed a Response (Paper 10, "PO Resp."), to which Petitioner timely filed a Reply (Paper 18, "Reply").  An oral hearing was held on September 11, 2018, and a copy of the transcript was entered into the record.  Paper 23 ("Tr.").[1]

We have jurisdiction under 35 U.S.C. § 6.  This Decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of the claims on which we instituted trial.  Based on the record before us, Petitioner has shown, by a preponderance of the evidence, that claims 8–19 are unpatentable.

# II.  BACKGROUND

## A.  *Real Parties in Interest and Related Matters*

The real party-in-interest for Patent Owner is Stragent, LLC, the assignee of U.S. Patent No. 8,209,705.  Paper 4.

---

[1] The hearing was a consolidated hearing for IPR2017-01502, IPR2017-01503, and IPR2017-01504.

IPR2017-01502
Patent 8,209,705 B2

The real parties-in-interest for Petitioner are Daimler AG, Daimler
North America Corporation, Mercedes-Benz USA, LLC, and Mercedes-
Benz U.S. International, Inc.  Pet. 87.

IPR2017-00458, also filed by Petitioner, challenges claims of U.S.
Patent No. 8,209,705 ("the '705 patent").  IPR2017-00457, also filed by
Petitioner, challenges claims of related U.S. Patent No. 8,566,843 ("the '843
patent"), the application that issued as the '843 patent being a continuation
of the application that issued as the '705 patent.

The following *inter partes* reviews challenge claims of the '843 patent
or the '705 patent:  IPR2017-00676, IPR2017-00677, IPR2017-01502,
IPR2017-01503, IPR2017-01504, IPR2017-01519, IPR2017-01520,
IPR2017-01521, and IPR2017-01522.

Patent Owner has asserted the '705 Patent in three separate suits:
*Stragent, LLC, v. Mercedes-Benz USA, LLC*, No. 6:16-cv-00447 (E.D. Tex.
May, 20, 2016); *Stragent, LLC v. BMW of North America, LLC*, Civ. No.
6:16-CV-00446 (E.D. Tex. May 20, 2016); and *Stragent, LLC v. Volvo Cars
of North America, LLC*, Civ. No. 6:16-CV-00448 (E.D. Tex. May 20, 2016).
Pet. 87; Paper. 4.

### B.  The '705 Patent

The '705 patent relates to sharing information in a distributed system.
Ex. 1001, Abstract.  Data between networks is shared using a common
"bulletin board" memory.  *Id.*  The system includes at least two different
networks, each of which is either a **C**ontroller **A**rea **N**etwork ("CAN"),
FlexRay, or **L**ocal **I**nterconnect **N**etwork ("LIN").  *Id.* at 3:24–33.  The

3

IPR2017-01502
Patent 8,209,705 B2

system described in the '705 patent may be used in "vehicle communication and control systems, real-time monitoring systems, industrial automation and control systems, as well as any other desired system." *Id.* at 1:22–25. An example is provided in Figure 1 of the '705 patent, which is reproduced below.



Figure 1 generally depicts elements of a distributed embedded communication and computing system. *Id.* at 3:9–11.

In an automotive environment, various electronic control units ("ECUs") control such applications as engine control, brake control, or diagnostics through connections to various sensors and actuators organized into separate subnetworks. *Id.* at 3:13–18. Such applications are themselves grouped into backbone system functions, such as "body control, power train,

4

IPR2017-01502
Patent 8,209,705 B2

and chassis." *Id.* at 3:19–21.  With a hierarchical organization that includes gateways 101, 104, 105, messages are relayed up and down through the system layers.  *Id.* at 3:24–26.  Each layer may contain multiple ECUs connected through wired serial multiplexing bus systems, with the '705 patent noting several examples that include Controller Area Network ("CAN"), Local Interconnect Network ("LIN"), and Flexray.  *Id.* at 3:26–33.

At the highest level in the hierarchy, "the system level," system gateway 101 is connected via various busses to other system-level ECUs, to subsequent gateways 103, and to external components 120.  *Id.* at 3:60–67.  In addition, system gateway 101 may be connected to external gateway 131 to link the system to remote device 132.  *Id.* at 4:1–6.  "Subsequent to the system level may be several layers of groups and subgroups that are link[ed] to the higher levels via gateways (101, 103, 104, 105)."  *Id.* at 4:7–9.

In operation, ECU 102 receives "real-time" input variables from local sensors 108 or from networked sensors 106, respectively via signal lines 113 or multiplexing bus system 112.  *Id.* at 3:39–42.  "[R]eal-time may include any response time that may be measured in milli- or microseconds, and/or is less than 1 second."  *Id.* at 3:36–38.  ECU 102 processes the input variables and generates output variables that may be shared with other ECUs 102.  *Id.* at 3:46–51.  Two relevant modes of sharing are described.

First, ECUs 102 "typically share information with devices that are connected on the same physical multiplexing system.  This method of information sharing is called horizontal information sharing in a hierarchical system."  *Id.* at 3:51–55.

5

IPR2017-01502
Patent 8,209,705 B2

Second, a bulletin board may be used so that "the information is shared, in real-time, among a plurality of heterogeneous processes." *Id.* at 1:31–33.  According to the '705 patent, "heterogeneous networks may refer to any different communication networks with at least one aspect that is different." *Id.* 7:27–29.

The logical architecture of the system described in the '705 patent is described below in annotated Figure 7[2] (Pet. 31):



---

[2] Figures from the '705 patent and cited references are shown with Petitioner's annotations as set forth in the Petition.  Petitioner contends identified features are shown in the annotations.  We rely on the Figures as presented in the '705 patent and the references.

IPR2017-01502
Patent 8,209,705 B2

Figure 7 depicts a bulletin board that interacts with multiple communication buses.

The system architecture includes four main components: (1) network interfaces for each of the heterogeneous networks (red); (2) operating interfaces for each of the heterogeneous networks (yellow); (3) remote message processes for stripping out network-specific information (green); and (4) a real-time, bulletin board-type shared memory (blue). Ex. 1001, 6:33–7:3.

In operation, an external event (for example, a flag indicating that data from a sensor is available) is transmitted on a network to a communication bus controller (*e.g.*, 703). *Id.* at 7:5–8. This causes an operating system interface (*e.g.*, 709) to notify the message communication process (*e.g.*, 710) that data is available. *Id.* The data is sent over the network as a network specific message. *Id.* at 7:4–49.

## C.  Illustrative Claim

All the challenged claims 8–19, depend from independent claim 7, which was a challenged claim in IPR2017-00458 ("'458 IPR"). In the Final Decision in that case ("'458 FD"), we concluded that claim 7 had been shown to be unpatentable over the same combinations of prior art references asserted in this proceeding. *Daimler AG v. Stragent, LLC*, Case IPR2017-00458, (PTAB June 13, 2018) (Paper 31). Claim 7 is thus illustrative of the claims challenged in this proceeding and reads:

7

IPR2017-01502
Patent 8,209,705 B2

7.      [(a)[3]] A non-transitory computer-readable medium storing a computer program product for sharing information, the computer program product comprising:

[(b)] computer code for allowing receipt of information associated with a message, utilizing a first network protocol associated with a first network;

[(c)] computer code for causing a determination as to whether a storage resource is available;

[(d)] computer code for, in the event the storage resource is not available, determining whether a timeout has been reached  and causing a re-request in connection with the storage resource;

[(e)] computer code for, in the event the storage resource is available and the timeout has not been reached, causing storage of the information utilizing the storage resource;

[(f)] computer code for, in the event the timeout has been reached, causing an error notification to be sent; and

[(g)] computer code for causing the information to be shared by: in real-time, sharing the information utilizing at least one message format corresponding to a second network protocol associated with a second network which is different from the first network protocol;

[(h)] wherein the computer program product is associated with an electronic control unit with at least one gateway function, and a plurality of interface portions including:

[(i)] a first interface portion for interfacing with the first network, [(j)] the first interface portion including a first interface-related first layer part for receiving first interface-related first layer messages and a first inter- face-related second layer part, the first interface-related first layer messages being processed after which first interface-related second layer

---

[3] Petitioner and Patent Owner use letters (a)-(n) to designate claim 7 limitations.  Where useful, we refer to these letter designations.

IPR2017-01502
Patent 8,209,705 B2

messages are provided, (k)where the first network is at least one of a Controller Area Network, a Flexray network, or a Local Interconnect Network; and

[(l)] a second interface portion for interfacing with the second network, [(m)] the second interface portion including a second interface-related first layer part for receiving second interface-related first layer messages and a second interface-related second layer part, the second interface-related first layer messages being processed after which second interface-related second layer messages are provided, [(n)] where the second network is different from the first network and is at least one of the Controller Area Network, the Flexray network, or the Local Interconnect Network.

### D. Instituted Grounds of Unpatentability

We instituted trial on the following grounds (Dec. 32).

IPR2017-01502
Patent 8,209,705 B2

| References | Basis | Challenged Claims |
|---|---|---|
| Posadas[4], Stewart[5], and Wense[6] | 35 U.S.C. § 103(a) | 8–19 |
| Miesterfeld[7], Stewart, and Wense | 35 U.S.C. § 103(a) | 8–19 |

## III.  ANALYSIS

### A.  Claim Construction

For petitions filed before November 13, 2018, the Board interprets claims of an unexpired patent using the broadest reasonable construction in light of the specification of the patent in which they appear.  *See* 37 C.F.R. § 42.100(b) (2016); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016) (upholding the use of the broadest reasonable interpretation standard).

---

[4]Posadas et al., "Communications Structure for Sensor Fusion in Distributed Real Time Systems," *Algorithms and Architectures for Real-Time Control 2000: A Proceedings volume from the 6th IFAC Workshop,* Palma de Mallorca, Spain (May 2000)1999 (Ex. 1006, "Posadas").
[5] Stewart et al., "Integration of Real-Time Software Modules for Reconfigurable Sensor-Based Control Systems," *IEEE/RSJ International Conference on Intelligent Robots and Systems*, Raleigh, North Carolina (July 1992) (Ex. 1007, "Stewart").
[6] H-C. von der Wense et al., "Building Automotive LIN Applications," *Advanced Microsystems for Automotive Applications*, 280–292 (2001) (Ex. 1008, "Wense").
[7] U.S. Patent No. 6,141,710, issued Oct. 31, 2000 (Ex. 1009, "Miesterfeld").

10

IPR2017-01502
Patent 8,209,705 B2

Petitioner contends only the term "real-time" requires construction and proposes the broadest reasonable construction of "real-time" includes "[a]ny response time that may be measured in milli- or microseconds, and/or is less than one second."  Pet. 6.  Petitioner contends the '705 patent specification expressly defines this term.  *Id.* (citing Ex. 1001, 3:35–38).  Patent Owner contends the '705 specification defines "real-time" as "any response time that may be measured in milli or microseconds, and/or is less than [one] second."  PO Resp. 17.  In light of the cited portion of the specification, we construe "real-time" as including responses that occur in less than one second.  The first part of the quotation provided in the specification ("may be measured in milli- or microseconds") is not limiting because any response time, no matter how large or small, may be measured in milli- or microseconds.

As discussed more fully, *infra*, Patent Owner proposes construction for several additional terms and Petitioner proposes counter construction for these terms.  PO Resp. 16–19.  Petitioner contends, "[r]egardless of which construction is adopted, the prior art renders the claims unpatentable for the same reasons discussed below."  Reply 3 n.4 (citing Ex. 1038 ¶ 24).  These terms include the following:

"the information" of 7(g):  Patent Owner contends "the information" refers to the same "information" of 7(b) and 7(e).  PO Resp. 16.  We agree.

"shared" and "sharing":  Patent Owner proposes the term should be given its ordinary meaning and "sharing" is to "partake of, use, experience, occupy, or enjoy with others; to have in common."  *Id.* (citing Ex. 2003, Merriam-Webster Dictionary, 10th Edition (2002)).  Petitioner contends

11

IPR2017-01502
Patent 8,209,705 B2

Patent Owner's position is in conflict with the construction for "sharing" adopted by the Board in the '458 FD and that the construction for "sharing" previously adopted in that Final Decision should be applied here—"making the information available to another process."  Reply 3–4 (citing '458 FD, 10–11; Ex. 1038 ¶¶ 25–27).

We are not persuaded by Patent Owner's contention.  The plain language of claim 7 does not require that "the information" be stored using the "storage resource" under all conditions. The plain language of the claim *does*, though, always require the recited code for "causing the information to be shared in real-time utilizing a second network protocol associated with a second network."  Ex. 1001 at 18:23–27.  Nothing in this limitation requires "the information" to have been stored using the storage resource.  Moreover, the '705 patent describes an embodiment in which information is shared without using a shared storage resource.  *Id.* at 8:52–63, 7:40–49.

At the oral hearing, Patent Owner argued that "the information that is shared is the information that is stored because that is the last antecedent." Tr. 40:21–22.  Patent Owner, however, is unable to identify sufficient legal basis for this "last antecedent" theory.  *Id.* at 40:17–18 ("I am not aware of any Federal Circuit or any other governing law on this . . . .").

In addition, we note that Patent Owner has submitted a definition of "share" drawn from a technical dictionary into the record of this proceeding.

12

IPR2017-01502
Patent 8,209,705 B2

Ex. 2004.[8]  We find the technical dictionary provided by Patent Owner to be more probative than the general-purpose dictionary relied on by Patent Owner.

The language of the general-purpose dictionary quoted by Patent Owner—"to partake of, use, experience, occupy, or enjoy with others; to have in common"—does not appear to contemplate the sharing of "information," which the '705 patent describes as "includ[ing] data, a signal, and/or anything else capable of being stored and shared."  *See* Ex. 2003 (general definition of "share"); Ex. 1001, 3:56–59.  Instead, the technical definition of "[t]o make files, directories, or folders accessible to other users over a network" is more relevant because it expressly contemplates the same context as the '705 patent, i.e., sharing over a network.  Ex. 2004 (technical definition of "share").

Thus, the plain language of the claim, intrinsic evidence in the form of the written description, and extrinsic evidence in the form of a technical-dictionary definition all support a construction of information sharing that requires making the information accessible, without requiring storage of the information.  We accordingly construe the various recitations of information sharing in the claims in accordance with such requirements.

---

[8] We note that, even if Patent Owner had not entered Exhibit 2004 into this proceeding, judges are free to rely on extrinsic dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 n.6 (Fed. Cir. 1996); *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1322–23 (Fed. Cir. 2005) (en banc).

IPR2017-01502
Patent 8,209,705 B2

"protocol":  Patent Owner proposes the term means a set of rules or procedures utilizing preexisting agreement as to how information will be structured and how each side will send and receive it for transmitting information between electronic devices.  PO Resp.17.  Petitioner proposes "protocol" is a well-understood term in computer science: "a standard that specifies the format of data as well as the rules to be followed in transmitting it."  Reply 4 (citing Ex. 1041, Webster's New World Computer Dictionary (10th ed., 2003); Ex. 1038 ¶ 28).  We determine the proposed constructions are similar and we select Petitioner's proposed construction as it is more clear.  Our decision does not turn on nuanced distinctions between the parties' proposed constructions.

limitations 7(l), (m), and (n):  Patent Owner contends the "second network" is the second network described in the antecedent limitations, which is the network referenced in limitation 7(g) as the second network utilizing a second different protocol which is the recipient of the "shared" information connected to the storage resource.  PO Resp. 18.  Petitioner contends there is nothing in the claim that requires the second network "receive" anything and nowhere in the claim is a "storage resource" mentioned with regard to the second network.  Reply 5.  According to Petitioner, the term "second network" is readily understood on its face, and does not require the additional unsupported language proposed by Patent Owner.  *Id.* (citing Ex. 1038 ¶ 30).

As discussed, *infra*, we construe the second network as the network recited in the antecedent limitations, and claim 7 does not require the second

IPR2017-01502
Patent 8,209,705 B2

network to be the "recipient" of information or to be connected to a storage resource.

"diagnostic mode":  Patent Owner contends the proper construction of this term is "an alternate mode of operation, distinct from normal operations, that still allows inspection of the system while it is running."  PO Resp. 18–19.  Petitioner contends the specification does not state that a diagnostic mode must be in any way "distinct from normal operations" and instead refers to "multiple modes," which include "secured configuration," "upgrade," "emergency," "debug," "fail-safe reduced operation" and "diagnostic" modes, and does not state these modes are "alternative or "distinct."  Reply 5–6 (citing Ex. 1001, 11:51-67; Ex. 1038 ¶ 34).  Petitioner contends the term "diagnostic mode" is a well-understood phrase with an understood, ordinary meaning: "a mode that is designed to determine whether a computer system is functioning properly or to detect programming errors" and Patent Owner's expert admitted that this was one, reasonable definition.  *Id.* at 6–7 (citing Ex. 1039, 66:21–67:4; Ex. 1038 ¶¶ 32, 33).  Petitioner observes that the specification does not define the terms as proposed by Patent Owner.  *Id.*

As discussed *infra*, we have considered the claim construction of the term "diagnostic mode" proposed by Patent Owner and Petitioner and we construe "diagnostic mode" as a mode, distinct from normal operation, that allows inspection of the system while it is running.

"bulletin board":  Petitioner contends the '705 patent describes a bulletin board as "any data base that enables users to send and/or read electronic messages, file, and/or other data that are of general interest and/or

IPR2017-01502
Patent 8,209,705 B2

addressed to no particular person/process."  Pet. 42, 77–78 (citing Ex. 1001, 5:10–14).  We adopt this construction as it is reasonable and Patent Owner does not specifically contest this construction.

### B. Legal Principles

A claim is unpatentable for obviousness under 35 U.S.C. § 103 if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations, including:  (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of non-obviousness, i.e., secondary considerations.[9]  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

Additionally, the obviousness inquiry typically requires an analysis of "whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue."  *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) (requiring "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness")); *see In re Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1333

---

[9] The parties do not address secondary considerations, which, accordingly, do not form part of our analysis.

16

IPR2017-01502
Patent 8,209,705 B2

(Fed. Cir. 2016) (citing *DyStar Textilfarben GmbH & Co. Deutschland KG v. C. H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006)).

To prevail on its challenges, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable.  35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).  "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable."  *Harmonic Inc. v. Avid Tech., Inc.* 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")).  This burden never shifts to Patent Owner.  *See Dynamic Drinkware, LLC. v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review).  Furthermore, Petitioner does not satisfy its burden of proving obviousness by employing "mere conclusory statements."  *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

### C.  Level of Skill in the Art

Petitioner's declarant, Philip Koopman, Ph.D., asserts that a person of ordinary skill in the art "would have at least an undergraduate degree in Computer Engineering, Computer Science, or equivalent degree, and at least two years relevant experience in industry."  Ex. 1004 ¶¶ 47–48.

Patent Owner's Declarant, Jeffrey A. Miller, Ph.D, asserts that a person of ordinary skill in the art would have at least the qualifications of or

17

IPR2017-01502
Patent 8,209,705 B2

equivalent to either a master's degree in electrical engineering, computer science, or computer engineering with course work or research in embedded networking technologies or an undergraduate degree in electrical engineering, computer science, or computer engineering with at least two years of relevant work experience in industry.  Ex. 2006 ¶ 20.

The principal difference between the parties' proposals is that, as an alternative to an undergraduate degree and two years of relevant work experience, Patent Owner's proposal allows for a master's degree with course work or research in embedded networking technologies.  Based on our review of the '705 patent and the prior art of record, we find that a master's degree with relevant course work or research is equivalent to a bachelor's degree with two years of relevant work experience.  We therefore adopt Patent Owner's expression of the level of skill in the art, which encompasses both alternative sets of qualifications.

### D.  Obviousness over Posadas, Stewart, and Wense
### Claims 8–19

Petitioner contends that claims 8–19 are unpatentable under 35 U.S.C. § 103(a) as obvious over Posadas, Stewart, and Wense.  Pet. 12–51.  Relying on the testimony of Dr. Koopman, Petitioner explains how the combination of Posadas, Stewart, and Wense allegedly teaches all the claim limitations and contends a person having ordinary skill in the art would have combined the teachings of the references.  *Id.* (citing Ex. 1004).

18

IPR2017-01502
Patent 8,209,705 B2

### 1. Posadas

Posadas describes a real-time communications system implemented in an autonomous industrial robot referred to as YAIR (Yet Another Intelligent Robot). Ex. 1006, 8. YAIR includes a number of sensors that are interconnected using two different, real-time networks. *Id.* at 8–11; Fig. 1. The first network, referred to as the "reactive level," is described as "Hard Real-Time," and uses distributed CAN objects on a CAN bus. *Id.* The second network, referred to as the "deliberative level," is described as "Soft Real-Time," and uses the IP protocol on an Ethernet Bus. *Id.* The two networks share information using a "blackboard" shared memory. *Id.* at 10–11.

### 2. Stewart

Stewart discloses a framework for integrating real-time software control modules that comprise a reconfigurable multi-sensor based system. Ex. 1007, 6. Stewart discloses the use of a real time embedded system in a distributed environment that uses a shared, global memory. *Id.* at 10, 12.

### 3. Wense

Wense describes the use of different networks in automobiles, including CAN, LIN, FlexRay, and J1850, and describes the use of CAN and LIN in a single automotive network. Ex. 1008, Abstract, 10–13, Fig. 3.

### 4. Analysis

Petitioner asserts that the combination of Posadas, Stewart, and Wense teaches all of the limitations of independent claim 7.

19

IPR2017-01502
Patent 8,209,705 B2

Claims 8–19 depend from independent claim 7, which is a challenged claim in the '458 IPR, and not directly challenged in the current Petition. The references for each ground in the current Petition are the same as set forth in the petition filed in the '458 IPR. The same Declarant (Prof. Koopman) is utilized to support Petitioner's contentions. Exhibit 1004.

In a Final Decision in the '458 IPR ('458 FD), we determined claim 7 is unpatentable over the cited references.  Nevertheless, because claim 7 must be analyzed to determine the patentability of the dependent claims, we begin by considering the parties' arguments regarding claim 7.

Generally, Petitioner contends Stewart teaches the memory-related limitations[10] of claim 7 and relies on a combination of Posadas and Wense for the remaining limitations.  Pet. 12–41.  Specifically, Petitioner contends Posadas discloses two different networks wherein the first network is a CAN network and the second network is Ethernet.  Petitioner contends the use of LIN or FlexRay as the second network would have been obvious to one of ordinary skill in the art, as demonstrated by the combination of Posadas with Wense.  *Id.*

---

[10] By memory-related limitations, we refer generally to the limitations of claim 1 relating to memory (i.e., a storage resource): causing a determination as to whether a storage resource is available; in the event the storage resource is not available, determining whether a timeout has been reached and causing a re-request in connection with the storage resource if the timeout has not been reached; in the event the timeout has been reached, causing an error notification to be sent; and in the event the storage resource is available, causing storage of the information utilizing the storage resource. Ex. 1001, 12:21–30.  Petitioner refers to these limitations as 7c–7f.  Pet. App'x A.

20

IPR2017-01502
Patent 8,209,705 B2

Independent claim 7 is directed to (a) "computer-readable medium storing a computer program product for sharing information." Petitioner contends that Posadas expressly discloses the "non-transitory computer-readable medium," its method is carried out by computer code, and Posadas describes a communications architecture used in the YAIR robot, and thus expressly discloses a computer program product "for sharing information." Pet. 13 (citing Ex. 1006, 8, Abstract; Ex. 1004 ¶¶ 120–121). We agree with the contention, which Patent Owner does not address in its Response.

Regarding 7(b), "computer code for allowing receipt of information associated with a message, utilizing a first network protocol associated with a first network," Petitioner contends Posadas discloses a CAN system (the "first network protocol") that is distributed over a CAN bus (the "first network"). Pet. 13 (citing Ex. 1006, 9–10, Figs. 3, 4). We agree with the contention, which Patent Owner does not address in its Response.

Regarding 7(c), Petitioner contends Posadas describes the use of a shared memory ("storage resource"), and "causing a determination as to whether a storage resource is available" prior to writing is a well-known step in storing information, and is disclosed by Stewart. Pet. 14–15 (citing Ex. 1006, 10; Ex. 1007, 6, 7, 9); *see* Ex. 1004 ¶¶ 126–127. Specifically, Petitioner contends Stewart discloses the use of a real-time embedded system that is used in a distributed environment, that uses a shared, global memory and describes a "spin-lock" that uses a "test-and-set (TAS)" operation to determine memory availability. *Id.* at 15 (citing Ex. 1007, 6–7, 9, 11). Petitioner further contends this TAS algorithm first determines

21

IPR2017-01502
Patent 8,209,705 B2

whether memory is available before writing to it, then writes a "1" to a lock table to lock the memory for concurrent writes from other processes.  *Id.*

Patent Owner contends that, although determining memory availability may have been known in the prior art, Posadas does not expressly disclose the step and Petitioner has not presented any evidence that the step was necessarily inherent with every computer storage mechanism of the time of the invention.  PO Resp. 27 (citing Ex. 2006 ¶ 55).  Patent Owner contends Posadas discloses a particular distributed blackboard storage system that includes an undisclosed storage medium utilizing an unknown process and does not use a "shared memory" as each computer has a partial copy of the blackboard.  *Id.* at 27–28 (citing Ex. 1006, 10).  According to Patent Owner, in Posadas's storage resource, rather than there being a shared memory, all the data are stored in particular silos, with each silo having its own processor performing undisclosed operations.  *Id.* at 28 (citing Ex. 1006, Fig. 4).

In reply, Petitioner contends the '458 FD agreed with Petitioner that Posadas and Stewart disclose 7(c), determining whether a memory is available before writing to it is a trivial and obvious limitation, and a POSITA would have understood it to be disclosed by Posadas.  Reply 7–9 (citing '458 FD, 16; Ex. 1038 ¶ 38).

We are persuaded that the evidence of record supports Petitioner's position that Posadas and Stewart disclose 7(c).  In particular, Posadas employs "shared memory" (i.e., a "storage resource"), and Stewart employs a "global shared memory" (i.e., also a "storage resource)."  *See* Ex. 1006, 10; Ex. 1007, 7.  And, each of Posadas and Stewart describes determining

IPR2017-01502
Patent 8,209,705 B2

whether the memory is available before writing to it.  Additionally, we note 7(c) does not recite a "shared memory"; it recites only a "storage resource."

Regarding (d), "in the event the storage resource is not available, determining whether a timeout has been reached and causing a re-request in connection with the storage resource if the timeout has not been reached," Petitioner contends Stewart discloses that a task trying to access the global variable table stored in shared memory must continually retry accessing the table, waiting a particular amount of time before each retry, referred to as a "polling time."  Pet. 18–19 (citing Ex. 1007, 11).  Petitioner contends Stewart further discloses that if a maximum amount of time has been reached, then the storage in memory is not performed.  *Id.* (citing Ex. 1004 ¶ 138).  Patent Owner contends that Posadas discloses a particular distributed blackboard storage system that does not appear to have any relationship to Stewart's shared memory and, therefore, a skilled artisan would not combine Posadas and Stewart.  PO Resp. 29 (citing Pet. 18–19; Ex. 2006 ¶ 59).  We agree that the combination of Posadas and Stewart discloses the recited limitations, and we discuss later Patent Owner's contentions regarding why a skilled artisan would not make the combination.

Petitioner contends Stewart discloses (e), "in the event the storage resource is available and the timeout has not been reached, causing storage of the information utilizing the storage resource" wherein Stewart discloses a global variable table which is stored in shared memory for the exchange of data.  Pet. 19 (citing Ex. 1007, 11; Ex. 1004 ¶ 141).  Patent Owner contends Posadas's particular distributed blackboard system does not appear to have

23

IPR2017-01502
Patent 8,209,705 B2

any relationship to Stewart's shared memory.  PO Resp. 29 (citing Ex. 2006 ¶ 59).  We discuss the relationship below.

We agree that the combination of Posadas and Stewart discloses the recited limitations, and we discuss later Patent Owner's contentions regarding why a skilled artisan would not make the combination.

Petitioner contends Stewart discloses (f), "in the event the timeout has been reached, causing an error notification to be sent" because Stewart discloses that a time-out error will occur if a time-out has been reached for a task that has been continually trying to access the table but has been unsuccessful and error handlers should be installed.  Pet. 20 (citing Ex. 1007, 11).  Petitioner refers to Stewart: "a time-out mechanism is used, so that if the lock is not gained within a pre-specified time or number of retries, then the transfer is not performed. . . .  When using the time-out mechanism, error handlers should be installed to detect tasks that suffer successive time-out errors."  *Id.* (citing Ex.1007, 11; Ex. 1004 ¶ 144).

In response, Patent Owner contends Stewart does not describe "sending a notification" because Stewart's reference to error handlers is insufficient:  "[w]hen using the time-out mechanism, error handlers should be installed to detect tasks that suffer successive time-out errors.  Discussion on handling these errors is beyond the scope of this paper."  PO Resp. 30 (emphasis omitted) (citing Ex. 1007, 11).  According to Patent Owner:

> The typical meaning of an "error handler" is a mechanism that forestalls errors if possible, and then recovers from errors when they occur without terminating the application. Ex. 2006 ¶ 66. "Error handler" does not necessarily or inherently include sending a notification, as required by Claim 7 of the Patent.

24

IPR2017-01502
Patent 8,209,705 B2

> In fact, Stewart states that the "discussion on handling these errors is beyond the scope of this paper," which expressly disclaims the disclosure of any particular error-handling method, and, thus, expressly excludes disclosing the sending of any notification. Petitioner does not point to any function or structure in Stewart which sends "a notification." Stewart does not disclose claim element 7f.

*Id.* at 30–31.

In reply, Petitioner contends Stewart discloses sending notification of an error to an error handler and error handlers have a well understood meaning in the art: they include code that is notified and executed when an error occurs. Reply 9 (citing Ex. 1038 ¶ 41). Petitioner contends Patent Owner's expert agreed that error handlers "are generally called when an error occurs." *Id.* (citing Ex. 1040, 114:7–116:10) (emphasis omitted). Petitioner observes the Board has previously rejected Patent Owner's argument in '458 FD:

> Stewart's reference to error handlers …would be understood by one of ordinary skill in the art as teaching 'sending a notification.' In particular, in order for an error handler to act regarding an error after it has occurred, we agree a notification would be sent. IPR458, 17-19; Ex. 1038 ¶ 42. In support of its holding, the Board credited the same admission from [Patent Owner's] expert – that "error handlers" are called (i.e., they receive a notification) after an error has been detected. *Id.*, 19 (citing Ex. 1039, 122:25–123:5). For these reasons, and those presented in the Petition, PO's argument should be rejected here just like it was in relation to the '457 and '458 petitions. Ex. 1038 ¶ 43.

*Id.* at 9–10.

25

IPR2017-01502
Patent 8,209,705 B2

We have reviewed the arguments of Petitioner and Patent Owner and we note as particularly relevant the cross-examination testimony of Patent Owner's declarant, Dr. Miller, in which Dr. Miller agreed with Petitioner that "an error handler is generally called when an error occurs."  Ex. 1040, 114:7–10.

We are persuaded that the evidence of record supports Petitioner's position that Stewart's reference to error handlers, in the context of the teaching of memory management, would be understood by one of ordinary skill in the art as teaching "sending a notification."  In particular, in order for an error handler to act when it is called regarding an error that has occurred, we agree a notification would be sent.  *See* Ex. 1038 ¶¶ 41–43.

In view of the above, we agree that Stewart discloses the limitation 7(f) "in the event the timeout has been reached, causing an error notification to be sent."

Regarding (g), "causing the information stored to be shared by: in real-time, sharing the information utilizing at least one message format corresponding to a second network protocol associated with a second network which is different from the first network protocol," Petitioner contends Posadas describes two networks: a first network (CAN), and a second network that is one of CAN, Ethernet, DDE, RS232, "and so on." Pet. 20–24 (citing Ex. 1006, 8, Fig. 4).  Petitioner contends the two networks and protocols are shown below in annotated Figure 4 of Posadas (Pet. 21):

IPR2017-01502
Patent 8,209,705 B2



*Fig. 4: Distributed blackboard structure.*

Figure 4 depicts a distributed blackboard system.

Petitioner contends the ISCCAN gateway shares the information between the two networks and is shown in annotated Figure 1 of Posadas. (Pet. 27):

27

IPR2017-01502
Patent 8,209,705 B2



Figure 1 depicts the ISCCAN gateway that shares information between the two networks.

Regarding the sharing of information "in real-time," Petitioner contends both networks are labeled "Real Time" networks and further contends the deliberative, "soft" real-time system is able to withstand "communication overloads of 20ms introduced by the SC+ISCCAN system." *Id.* at 22–23 (citing Ex. 1006, 8–11, 13, Fig. 1; Ex 1004 ¶ 149). Petitioner contends Posadas presents test data with results well below one second and concludes that "timing analysis has been conducted showing real-time capabilities at both, low [CAN] and high level [Ethernet] domains." *Id.* at 22–23 (citing Ex. 1006, 13) (emphasis omitted). Petitioner contends Posadas's Table 1 describes response times that can be measured in milli- or microseconds and/or is less than one second. *Id.* at 24 (citing Ex. 1006, Table 1).

Patent Owner contends "sharing the information" of 7(g) refers to information that was received utilizing a first network protocol associated

IPR2017-01502
Patent 8,209,705 B2

with a first network (7(b)), and which was stored in the storage resource (7(c)).  PO Resp. 31–32.  According to Patent Owner, that information ("the information") then has to be shared "utilizing at least one message format corresponding to a second network protocol associated with a second network which is different from the first network protocol."  *Id.* at 32–33.

Patent Owner contends Posadas discloses CAN information that ends with the blackboards shown in silos and there is no second network that shares the information provided by the first network because there is only one network by which information is stored and accessed in Posadas's blackboard. *Id.* at 33 (citing Pet. 18–19 (annotated Posadas Fig. 4); Ex. 2006 ¶¶71–72).  Patent Owner similarly contends there is no difference in protocol between the first and second networks.  *Id.*

In reply, Petitioner contends that Patent Owner incorrectly interprets Posadas, and that Patent Owner's expert disagrees with this interpretation. Reply 10–12.  Petitioner contends Posadas discloses two networks, CAN and Ethernet, and Patent Owner ignores the Ethernet network shown in Posadas's Figure 4.  *Id.* (citing Ex. 1006, Fig. 4; Ex. 1038 ¶¶ 44–46). According to Petitioner, referring to Figure 4 of Posadas, information flows between the CAN network and the Ethernet network and all information must flow through the SC storage shown in (1) as this is the only SC that is physically connected to the CAN network.  *Id.* at 11–12 (citing annotated Fig. 4).  Petitioner contends this information is then distributed over the wireless Ethernet network to processes connected to the Ethernet labeled (2). *Id.*  Petitioner then contends the information from the first (CAN) network is shared in real time through SC (1) to the other SC storage (2) utilizing a

29

IPR2017-01502
Patent 8,209,705 B2

second network protocol (Ethernet). *Id.* Petitioner observes this is how Patent Owner's expert interprets Posadas, and this is the Board's determination in the '458 FD. *Id.* at 12 (citing Ex. 1039, 99:11–100:6, 95:3–8, 96:7–24; '458 FD 23, 27–28).

We agree with Petitioner that Posadas's CAN bus and Ethernet bus meet the definition of "real-time" as we have construed the term. Regarding "sharing the information," we agree with Petitioner that information from the first network (CAN) is shared with the second network (Ethernet) through storage SC (1) and SC (2), as such information "is made available to" both networks. Additionally, we note the information is delivered to each of the networks in the operation of Posadas.

We also agree with Petitioner that Patent Owner's assertion that Posadas is not an enabling disclosure is conclusory and without evidentiary support. *See id.* at 16. Further, as Petitioner observes, even a non-enabling disclosure is prior art for all it teaches for purposes of determining obviousness. *Id.* (citing *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1357 (Fed. Cir. 2003) ("[A] reference need not be enabled; it qualifies as a prior art, regardless, for whatever is disclosed therein")). We agree with Petitioner's reasoning, summarized above, that Posadas describes, inter alia, sharing information between two networks, and Posadas's Table 1 describes response times that can be measured in milli- or microseconds and/or is less than one second, and Posadas sufficiently describes real-time sharing between two networks to support an obviousness determination. *Id.* at 17. Additionally, we note Posadas's YAIR robot was built, operated, and tested. Ex. 1006, 8–13.

30

IPR2017-01502
Patent 8,209,705 B2

In view of the above, we agree the combination of Posadas and Wense discloses 7(g), and we discuss later Patent Owner's contentions regarding why a skilled artisan would not make the combination.

Regarding 7(h), "the computer program product is associated with an electronic control unit with at least one gateway function, and a plurality of interface portions," Petitioner contends Posadas defines the ISCCAN as "gateway software" and it includes interfaces that perform specific translations between CAN protocol and SC data.  Pet. 24–25 (citing Ex. 1006, 11, Fig. 1; Ex. 1004 ¶ 156). We agree with the contention, which Patent Owner does not address in its Response.

Regarding 7(i) "a first interface portion for interfacing with a first network," Petitioner contends, as discussed regarding 7(b), that Posadas discloses a "first network" (CAN) and a "first interface portion" (ISCCAN software).  Pet. 25–26 (citing Ex. 1006, 10, Fig. 3; Ex. 1004 ¶¶ 158–159).

Regarding 7(j) "the first interface portion including," Petitioner contends this limitation describes how network-specific messages (e.g., a CAN frame) are processed so that the data within that message can be stored in memory.  Pet. 26–28 (citing Ex. 1001, Fig.7, 6:33–7:4).  Petitioner contends this limitation requires that the interface include a "first portion" that receives a "first layer message" (e.g., a CAN frame) that is "related" to the first interface.  *Id.* at 26.  Petitioner contends the "first layer message" is processed, and a "second-layer" message (e.g., data to be stored) is provided.  *Id.*

Petitioner contends Posadas discloses this limitation wherein the CAN protocol message frames (first layer message) are used to transport data from

31

IPR2017-01502
Patent 8,209,705 B2

a Communications Object (COB). *Id.* (citing Ex. 1006, 10; Ex 1004 ¶¶ 161–162). Petitioner contends this CAN frame is transmitted by the bus controller and received by the CAN network interface logic in the ISCCAN interface—the claimed "first interface-related first component[11]" (first interface-related first layer part). *Id.* at 26–27. Petitioner contends the gateway software ISCCAN performs specific translations between CAN protocol and SC data wherein the transformed format used to store the data in the blackboard are the "processed first data units" (second layer message). *Id.* Petitioner contends the portion of the ISCCAN that translates raw CAN data to the SC format is the claimed "first interface-related second component" (first interface-related second layer). *Id.* Petitioner contends the first interface limitations are shown in annotated Figure 1. *Id.* at 28.

Regarding 7(i) and 7(j), Patent Owner contends "it is unlikely that Posadas discloses the entirety of limitations 7(i), (j)," and refers to Dr. Miller's Declaration. PO Resp. 34 (citing Ex. 2006 ¶ 76). In turn, Dr. Miller asserts that he "will pass on these," providing insufficient reasoning for us to evaluate. Ex. 2006 ¶ 76. Based on Petitioner's analysis, we are persuaded that Petitioner provides sufficient reasoning to support its contention that Posadas discloses 7(i) and 7(j).

Regarding 7(k), "where the first network is at least one of a Controller Area Network, a Flexray network, or a Local Interconnect Network," Petitioner contends that, as discussed above regarding 7(b), Posadas

---

[11] Petitioner uses the term "component" whereas the claim recites "layer part."

discloses a first network that is a Controller Area Network ("the first network is at least one of a Controller Area Network, a FlexRay network, or a Local Interconnect Network"). Pet. 28–29 (citing Ex. 1006, 10, Fig. 4; Ex. 1004 ¶¶ 166–167). We agree.

Regarding 7(l), Petitioner contends Posadas discloses a second network protocol ("[E]thernet, DDE, RS232, and so on") and an interface ("second interface") described as the radio Ethernet that interfaces with the Ethernet network ("second interface portion for interfacing with the second network"*)*. Pet. 29–31 (citing Ex. 1006, 8, 9, Figs. 2, 4; Ex. 1004 ¶¶ 166–167).

Regarding 7(m) "the second interface portion including," Petitioner contends this limitation is an analog to 7(j) "the first interface portion including," written from the perspective of the second interface (Posadas's Ethernet interface). Pet. 31–33. Petitioner contends Posadas discloses an IP frame that is communicated via an Ethernet link. *Id.* at 32 (emphasis omitted); *see* Ex. 1006, 9 (the main control node includes "a full CAN interface, and radio ethernet link that *provides external IP communication*"). Petitioner contends the distributed blackboard system ("SC") includes both "the second interface-related first part and the second interface-related second part." *Id.* at 32 (citing Ex. 1006, 10). Petitioner contends the SC receives IP frames ("first layer messages"), processes these messages to extract the data from the IP frame, and stores that data, referred to as "SC objects," in the SC, and this constitutes the "second interface-related second messages." *Id.* (citing Ex. 1004 ¶¶ 169–170); *see also* annotated Figure 4 (Pet. 33).

33

IPR2017-01502
Patent 8,209,705 B2

Patent Owner contends Petitioner is incorrect because Posadas discloses only a CAN network communicating with a storage device that includes an internal communication structure, and all communications travel via the same structures.  PO Resp. 34–37 (citing Pet. 33 (annotated Posadas Fig. 4)).

In reply, as discussed *supra* regarding element 7(g), Petitioner contends Patent Owner ignores the Posadas Ethernet network shown in Figure 4.  Reply 10–12 (citing Ex. 1006, Fig. 4; Ex. 1038 ¶ 45–47; Ex. 1039, 11–100.6, 95:3–8; 96:7–24).  Petitioner contends the information flows between the CAN network and the Ethernet network through SC storage (1) and SC storage (2).  *Id.* at 11–12.  According to Patent Owner, Petitioner incorrectly points to the same interface ("Radio Ethernet") as it argued is the first interface of 7(j).  *Id.* at 35.

We agree Posadas discloses 7(l) and 7(m).  Similar to our discussion of 7(j), Posadas's two networks, CAN and Ethernet, communicate with the shared memory through interfaces that enable messages to be stored in memory. The first interface is the physical interface between the CAN network and memory and the second interface is the radio interface between the Ethernet network and memory.

Regarding 7(n), Petitioner contends Posadas discloses a first network ("CAN") and a "second network" that is one of Ethernet, DDE, RS232, "and so on" (i.e., Posadas discloses this limitation "where the second network is different from the first network and is at least one of the Controller Area Network, the Flexray network, or the Local Interconnect Network").  Pet. 33 (citing Ex. 1006, 8, Fig. 4).  Petitioner further contends one of ordinary skill

34

at the time of the alleged invention would have understood that networks other than CAN, DDE, Ethernet, or RS232 could be used as the "second" network and two such networks were LIN and FlexRay. *Id.* at 34.

Petitioner contends LIN and FlexRay were well-known prior to the priority date of the '705 patent and were well-known to work in conjunction with the CAN network. *Id.* at 34–35 (citing Ex. 1004 ¶¶ 173–176). In particular, Petitioner contends Wense describes the use of LIN in the same network as CAN. *Id.* (citing Ex. 1008, 13, Fig. 3) ("LIN has been developed to serve as local subnet to networks with higher performance such as CAN and thus replace hard wiring."). *Id.* Petitioner contends Wense also discloses FlexRay as an alternative network that can be used. *Id.* at 35.

Patent Owner contends Posadas discloses only a CAN network communicating with a storage device that includes an internal communication structure wherein all communications travel via the same structures. Resp. 34–37.

We agree the combination of Posadas and Wense discloses 7(n). As discussed *supra* regarding 7(j), 7(g), 7(m), and 7(l), contrary to Patent Owner's contentions, Posadas discloses two networks (CAN and Ethernet). Patent Owner does not dispute that Wense describes the benefits of the use of LIN in combination with CAN.

Petitioner presents a rationale for one of ordinary skill in the art to have combined Posadas, Stewart, and Wense. Pet. 15–18, 35–41. For example, regarding the combination of Posadas and Wense, Petitioner contends, *inter alia*, both relate to distributed systems in a multiplex networking environment and the combination of their teachings would have

IPR2017-01502
Patent 8,209,705 B2

been predictable.  *Id.* at 35–41 (citing Ex. 1008, 10, 11).  Regarding the combination of Posadas and Stewart, Petitioner contends, *inter alia*, both are in the same field of endeavor (real-time distributed control systems) and use similar techniques to solve the same problem (i.e., a shared memory architecture to exchange information between the hybrid control modules that make up a real-time distributed system).  *Id.* at 15–18 (citing Ex. 1006, 8; Ex. 1007, 6, 7, 8, 11, 12; Ex. 1004 ¶¶ 93–95, 97–104, 129–133).

Patent Owner contends there is no basis for combining Posadas and Stewart to arrive at the invention of claim 7.  PO Resp. 27–29 (citing Ex. 2004 ¶¶ 30, 33).  According to Patent Owner, Posadas discloses a particular distributed blackboard storage system that includes an undisclosed storage medium utilizing an unknown process, and Posadas refers to a structure, identified as "Penny, 1989," on which the blackboard is fashioned, and this cannot be found.  *Id.* at 27–28 (citing Ex. 2006 ¶ 52).  Patent Owner contends Posadas does not use a "shared memory" because "each computer has a partial copy of the blackboard" and, rather than being a shared memory, all the data are stored in particular silos, with each silo having its own processor performing undisclosed operations.  *Id.* at 28 (citing Ex. 1006, 10, Fig. 4).  According to Patent Owner, there is too much possibility that the silos shown in Posadas combining both a blackboard and a processor present unique issues to assume anything about whether some unrelated technology could be combined with such a unique Posadas environment.  *Id.* at 28–29.

In reply, Petitioner contends Posadas describes use of a shared memory ("storage resource"), and that "causing a determination as to

IPR2017-01502
Patent 8,209,705 B2

whether a storage resource is available" prior to writing is a well-known step in storing information, and is disclosed by Stewart.  Reply 7–9 (citing Ex. 1038 ¶¶ 37–39).  Regarding the combination of Posadas and Stewart, Petitioner contends Stewart's memory management techniques are fundamental techniques applicable to shared memory environments and Petitioner's reasoning is thus supported by sufficient rational underpinning. *Id.* at 8–9.  (citing Ex. 1038 ¶ 39).

Patent Owner contends a person of ordinary skill in the art would not have been motivated to combine Wense with Posadas because Petitioner relies on Posadas's "second network," which, according to Patent Owner is the same network as the first network, i.e., "Posadas discloses only a CAN network communicating with a storage device that includes an internal communication structure.  However, all communications travel via the same structures."  PO Resp. 37 (citing Ex. 1006 Figs. 3, 4; Ex. 2006 ¶ 84).  Patent Owner contends, because there is no "second network" in Posadas, there is no motivation to combine Wense with Posadas as contended by Petitioner. *Id.* (citing Ex. 2006 ¶ 84).

In reply, Petitioner contends, as discussed regarding 7(g), Patent Owner's argument is based on an incorrect interpretation of Posadas, an interpretation with which its own expert disagrees.  Reply 10 (citing Ex. 1038 ¶ 44).  According to Petitioner, Patent Owner expressly ignores the Ethernet network shown in Posadas at Figure 4. *Id.* at 10–11 (citing Ex. 1038 ¶¶ 46–48).  Specifically, Petitioner contends:

> As provided in Fig. 4, information flows between the CAN network and the Ethernet network. Ex. 1038, ¶47. Critically, all

37

IPR2017-01502
Patent 8,209,705 B2

> information must first flow through the SC storage shown in (1) – the
> only SC that is physically connected to the CAN network. *Id.* This
> information is then distributed over the wireless Ethernet network to
> processes connected to the Ethernet labeled (2). *Id.* Thus, "the"
> information from the first (CAN) network is shared, in real-time,
> through SC (1), to the other SC storage (2), utilizing a second network
> protocol (Ethernet). *Id.* Indeed, this is precisely how [Patent Owner's]
> expert interpreted Posadas, and how the Board likewise found in the
> '458 proceeding. Ex. 1039, 99: 11–100:6; 95:3-8; 96:7-24; IPR458, 23;
> 27-28.
>
> PO further argues that a POSITA would not have combined
> Posadas with Wense. R.37. But this argument is likewise premised on
> the same flawed interpretation that Posadas discloses only a single
> network, and should be rejected for the same reasons.13 Ex. 1038 ¶ 48.

*Id.* at 11–12.

As discussed, *supra*, we agree with Petitioner's contentions that
Posadas discloses two networks (CAN and Ethernet) and describes the use
of CAN network with an Ethernet network, or other networks.  Patent
Owner does not dispute that Wense describes the benefits of the use of LIN
in combination with a CAN network.

For these reasons, we agree that Petitioner has shown that one of
ordinary skill in the art would have combined the first and second networks
(CAN and Ethernet) and interfaces of Posadas with known memory
management techniques (as further described by Stewart).  Further,
Petitioner has shown sufficiently that one of ordinary skill in the art would
combine the Posadas CAN network with a known second network (LIN) as
described by Wense.  Petitioner's reasoning is thus supported by sufficient
rational underpinning.  *See KSR*, 550 U.S. at 418.

38

IPR2017-01502
Patent 8,209,705 B2

In view of the above, we find Petitioner has shown, by a preponderance of the evidence, that the combination of Posadas, Stewart, and Wense teaches or suggests the limitations of claim 7 and provides sufficient reasoning for combining the references in the manner asserted.

*Challenged Claims 8–19*

Regarding challenged claims 8–19, which depend directly or indirectly from claim 7, Petitioner presents contentions supporting unpatentability. Pet. 47–50. Patent Owner presents opposing contentions in its Response for claims 7, 8, 10, 11, 18, and 19. PO Resp. 38–43. Petitioner addresses only claims 7, 8, 10, and 18 in its Reply.

Regarding claim 8, which recites "the storage resource includes a bulletin board," Petitioner contends the '705 patent describes a bulletin board as "any data base that enables users to send and/or read electronic messages, file, and/or other data that are of general interest and/or addressed to no particular person/process." Pet. 42 (citing Ex. 1001, 5:10–14). According to Petitioner, Posadas discloses a "distributed blackboard system (SC)" and "shared memory," both of which are bulletin board storage resources. *Id.* (citing Ex. 1006, 8, 10). More specifically, the Posadas system "makes an internal representation of the data using a distributed blackboard architecture. (Penny, 1989)." *Id.* (citing Ex. 1006, 10). According to Petitioner, this blackboard architecture is a "shared" memory. *Id.* (citing Ex. 1006, 10 ("communications between processes running in CAN nodes use shared memory")). Thus, according to Petitioner "when a process needs to know data from a sensor, it only needs to obtain the memory pointer where the information is." *Id.* (citing Ex. 1006, 10 (the blackboard system "hides

39

IPR2017-01502
Patent 8,209,705 B2

communication details behind a uniform bind-notification interface"); Ex. 1004 ¶¶ 193–194).

Patent Owner contends the claim term "bulletin board" is not the same as Posadas's distributed blackboard in which every silo has its own SC interface, processor, and only part of the entire blackboard, and, for reasons set forth regarding claim 7, a person of ordinary skill would not have been motivated to combine Posadas, Stewart, and Wense.  PO Resp. 38 (citing Ex. 1001, 7:30–37, Fig. 6; Ex. 2006 ¶ 89).  Patent Owner refers to the '705 patent:

> The approach uses a common, or shared storage system that is connected to all of the system networks through network interfaces. A critically important feature of the bulletin board approach is that the complexity of the bulletin board grows linearly with the number of networks (as opposed to as N(N-1) for the gateway approach), and in one-to-many situations the number of message transformations is half that of the standard networking approach.

*Id.* (quoting Ex. 1001, 7:30–37); *see also* Ex. 1001, Fig. 6.

Petitioner asserts the claims do not require a "common, or shared storage system that is connected to all of the system networks through network interfaces."  Reply 12–13 (citing Ex. 1038 ¶ 50).  Petitioner refers to the statement in the '705 patent that, like Posadas, the shared information may "be ***replicated among a plurality*** of the bulletin board[s]."  *Id.* at 13 (citing Ex. 1001, 1:33-40, 6:22-32).  Petitioner argues Patent Owner is improperly reading limitations into the claims, and even if such limitations were read into the claims, Patent Owner's expert admits Posadas discloses a central shared memory that distributes information from the CAN network

40

IPR2017-01502
Patent 8,209,705 B2

to other processes over the wireless Ethernet network.  *Id.* (citing Ex. 1039, 99:11–100:6).  Petitioner additionally asserts "this is entirely consistent with the Board's ruling in the '458 petition.  'IPR458 FD, 16 ("Petitioner contends Posadas describes the use of a shared memory ('storage resource') . . . . [w]e agree with Petitioner's analysis . . . .").  *Id.* (citing Ex. 1038 ¶ 51).

Applying the construction that a bulletin board constitutes "any data base that enables users to send and/or read electronic messages, file, and/or other data that are of general interest and/or addressed to no particular person/process," we agree that Posadas discloses the claimed bulletin board. Although Posadas's distributed blackboard system and memory may be different from a single bulletin board in which there is only one blackboard system, claim 8 recites only "the storage resource includes a bulletin board." As discussed above, the '705 patent expressly states "the information may "be replicated among a plurality of the bulletin boards."  Ex. 1001, 1:33–40. Notably, the '705 patent's description of a "bulletin board" recites "and/or" in multiple places, indicating that not all of the identified characteristics are necessary to meet that description.  We thus agree with Petitioner that the claim does not require a "common, or shared storage system that is connected to all of the system networks through network interfaces."

We agree with Petitioner's contentions and find that Petitioner has shown, by a preponderance of the evidence, that Posadas discloses claim 8 and, as discussed *supra* regarding claim 7, that one of ordinary skill in the art would have been motivated to combine Posadas, Stewart, and Wense.

Regarding claim 10, which recites "wherein the computer program product is operable such that at least one of the different processes process

41

IPR2017-01502
Patent 8,209,705 B2

the information in a manner that is isolated from temporal characteristics associated with at least one of a plurality of heterogeneous networks," Petitioner contends Posadas discloses this limitation.  Pet. 43–44 (citing Ex. 1001, 8:64–9:2, Fig. 12).  Petitioner refers to the '705 patent:

> Referring to FIG. 12, the application process (1200) utilizes the bulletin board retrieve mechanism (1101) to access all parameters, events, and real –time variables from the bulletin board.  Thus the application process is decoupled from the temporal behavior of the input/output variables and can be triggered by a plurality of events (1201).

*Id*. at 43 (quoting Ex. 1001, 8:64–9:2).

 Petitioner argues Posadas discloses the very same "isolated" (as in the claims) or "decoupled" (as in the specification) system.  *Id.* at 43. According to Petitioner, Posadas describes a real-time communications system that shares information between two, heterogeneous networks.  *Id.* (citing Ex. 1006, 8).  The first network, referred to as the "reactive level," is described as "Hard Real-Time," and uses distributed CAN objects on a CAN bus.  The second network, referred to as the "deliberative level," is described as "Soft Real-Time," and uses the IP protocol on an Ethernet Bus.  *Id.* (citing Ex. 1006, 11, 13, Table 1).  The two networks share information using a "blackboard" shared memory.  *Id.* at 43–44.  Posadas teaches that the ISCCAN and SC distribute ASCII-Hex representations of CAN binary streams for "selective processing."  *Id.*  Processes then "translate this information using a supplied object toolbox." *Id.* at 44 (citing Ex. 1006, 11). In the mapped mode, the ISCCAN and SC "allows the use of defined filtering by applying the SC general bind-notification scheme." *Id.* According to Petitioner, Posadas's system is "isolated from temporal

42

IPR2017-01502
Patent 8,209,705 B2

characteristics" of at least one of the networks, just as the bulletin board retrieve mechanism in the '705 patent is "decoupled from the temporal behavior" of one of the networks. *Id.* (citing Ex. 1004 ¶¶ 200–201). Petitioner contends temporal isolation is one of the primary benefits of using a blackboard system and contends Posadas describes both hard and soft real time interfaced through the ISCCAN. *Id.* According to Petitioner, without temporal isolation, the system simply would not operate. *Id.* (citing Ex. 1004 ¶¶ 202–203).

Patent Owner contends Petitioner ignores the antecedent basis of the "different processes" of claim 10, which lie in claim elements 7(j) and 7(m). PO Resp. 38–39. According to Patent Owner, the "processing" in the context of claim 10 is the processing of the "first interface-related first layer messages" and the "second interface-related first layer messages." *Id.* at 39. Patent Owner contends Petitioner refers to "processes" broadly, without a tether to the language of the claim, and has not shown that the "processing," "translat[ion]," or "defined filtering" of Posadas are in relation to any interface-related first-layer message, or for that matter "isolated from temporal characteristics associated with at least one" network. *Id.* (citing Ex. 2006 ¶ 90). Patent Owner contends for this reason and the reasons set forth regarding claim 7, the combination of Posadas, Stewart, and Wense does not disclose every element of claim 10, nor would a person of ordinary skill have been motivated to combine them to arrive at the invention of the '705 Patent. *Id.* (citing Ex. 2006 ¶ 91).

Petitioner replies that Posadas discloses a real-time communications system that shares information between two heterogeneous networks—CAN

43

IPR2017-01502
Patent 8,209,705 B2

and Ethernet—by way of shared memory.  Reply 13.  Regarding the process of claim 7 limitations 7(j) and 7(m), Petitioner contends these limitations are discussed, *supra*, and the Board has already found claim 7 unpatentable so the "different processes" of claim 10 are disclosed by the prior art.  *Id.* (citing Ex. 1038 ¶ 53).  Petitioner argues in the context of claim 10, "isolated" simply means that the processes are not based on the temporal characteristics of a network.  *Id.* at 14 (citing Ex. 1038 ¶ 53).  Petitioner further argues Claim 10 does not recite any antecedent basis for "a plurality of heterogeneous networks" and although Posadas's processing is clearly temporally isolated from both the CAN and Ethernet networks, according to the claim, isolation from any heterogeneous network is sufficient.  *Id.* at 14– 15 n.15 (citing Ex.1038 ¶ 53).

Petitioner contends Posadas's two networks—a CAN and Ethernet network—operate at different bitrates and the networks interface through an ISCCAN.  *Id.* at 15 (citing Pet. 42–43; Ex. 1038 ¶ 54).  Petitioner contends, because the networks operate at different rates, the system simply would not operate if they were not temporally isolated by the ISCCAN. *Id.* (citing Pet. 42–43; Ex. 1038 ¶ 54).  According to Petitioner, this comports with Posadas's explanation that "'***any Windows application*** (local or remote) can access the communication system with all the necessary communications hidden (including CAN),' as they would be unable to access CAN data with necessary communications hidden if those Windows processes were not temporally isolated."  *Id.* (citing Ex. 1006, 9 (emphasis in original)). Petitioner contends Posadas's bulletin board retrieval operation moves data from the blackboard through the SC to the Ethernet bus.  *Id.* (citing Ex. 1038

44

IPR2017-01502
Patent 8,209,705 B2

¶ 54).  The data transferred includes odometric, ultrasound, and infrared information from the blackboard that was previously sent by CAN and this data is sent at 100 or 300 millisecond periods.  *Id.* (citing Ex. 1006, 11). Petitioner contends, on the CAN bus, this data is written every 8, 10, or 50 millisecond period and, because the data is sent at different periods on the two buses, they are temporally isolated.  *Id.* at 15–16 (citing Ex. 1038 ¶ 54; Ex. 1006, 1).

We agree Posadas discloses the two networks, CAN and Ethernet, that operate at different bit rates in processing information shared at the bulletin board.  In operation, the processes process the information employing decoupling or isolation.  The "different processes" of claim 10 correspond to claim 7 limitations 7(j) and 7(m), discussed *supra*.  As discussed, *supra*, the processes are expressly not based on the temporal characteristics of the two networks (CAN and Ethernet).  Moreover, the claim recites "isolated from temporal characteristics associated with at least one of a plurality of heterogeneous networks" so only one network need be "isolated."

We agree with Petitioner's contentions and find that Petitioner has shown, by a preponderance of the evidence, that Posadas discloses the limitation of claim 10 and, as discussed *supra* regarding claim 7, that one of ordinary skill in the art would have been motivated to combine Posadas, Stewart, and Wense.

Regarding claim 11, which recites "the information is shared with an operating system," Petitioner contends "Stewart discloses that its system, including its state variable table mechanism is 'integrated into the Chimera II Real-time Operating system'" ("Chimera II RTOS") and, therefore,

45

IPR2017-01502
Patent 8,209,705 B2

information in Stewart is shared "with an operating system."  Pet. 44–45 (citing Ex. 1007, Abstract, 7).

Petitioner contends real-time operating systems such as Chimera II were well-known in the art at the time of the '705 invention, and one of ordinary skill in the art would have realized the advantages to adapting Stewart's operating system to Posadas, such as its predictability.  *Id.* at 45 (citing Ex. 1004 ¶¶ 206–208).  According to Petitioner, Posadas discloses sharing information with the Windows NT operating system.  *Id.* (citing Ex. 1006, 8, 9 ("The SC software enables the main robot controller (Windows NT based) to communicate transparently through different channels: CAN, Ethernet, DDE, RS232, and so on.") (emphasis omitted)).  Petitioner contends it would have been a simple and obvious design choice to use the Chimera real-time operating system in place of Windows NT and the Chimera RTOS was designed specifically for use with reconfigurable sensor-based control systems for robotics, a system with which Dr. Koopman has personal experience.  *Id.* (citing Ex. 1004 ¶ 208).  Petitioner contends it would have been an obvious design choice to use a real-time operating system such as the Chimera II RTOS that was designed specifically for robotics in a robot such as Posadas's.  *Id.*  Petitioner further contends one of ordinary skill in the art would have had a reasonable expectation of success of such a modification; the functioning, implementation, and advantages of real time operating systems were all well known at the time of the '705 patent; and one of ordinary skill would have found that modifying Posadas would have been a simple matter.  *Id.* (citing Ex. 1004 ¶ 209).

46

Patent Owner argues "Petitioner's argument–that one of ordinary skill would have seen the substitution of the Chimera II real-time operating system for Windows NT as a 'simple and obvious design choice'–overlooks the fact that Stewart's Chimera II operating system was confined to a single bus." PO Resp. 40 (citing Ex. 1007, 10). Patent Owner contends adaptation of a real-time operating system to a multiple-bus apparatus would have required undue experimentation and would not, contrary to Petitioner's assertion, have been an obvious design choice. *Id.* (citing Ex. 2006 ¶ 92).

Patent Owner contends "Petitioner appears to conflate *requiring an operating system* to operate with *sharing information with an operating system.*" *Id.* at 40–41 (citing Pet. 45). According to Patent Owner, "[n]othing about the 'main robot controller' communicating through 'different channels' discloses sharing of information with the Windows NT operating system itself. *Id.* at 41 (emphasis omitted). Patent Owner contends Petitioner "appears to assume that the mere presence of an operating system is sufficient to demonstrate sharing of information with it, but this cannot be true–information can certainly pass from Posadas' CAN network through the storage's Ethernet network without the information being 'shared' with the operating system." *Id.* at 41. Patent Owner contends Petitioner has not pointed to anything in Posadas that discloses sharing of information with the Windows NT operating system, and Petitioner's argument for disclosure of such sharing by Stewart's operating system fails. *Id.* (citing Ex. 2006 ¶ 93).

Patent Owner contends for these reasons and the reasons set forth regarding claim 7, the combination of Posadas, Stewart, and Wense does not

IPR2017-01502
Patent 8,209,705 B2

disclose every element of claim 11, nor would a person of ordinary skill have been motivated to combine them to arrive at the invention of the '705 patent. *Id.* (citing Ex. 2006 ¶ 94).

Petitioner replies, regarding the combination, that its previous contentions and Board decision apply here. Reply. 16–17 (citing Ex. 1038 ¶ 55; '458 FD, 29–30). In the current proceeding, Petitioner contends Patent Owner's expert provides no opinion beyond conclusory remarks. *Id.* (citing PO Resp. 40–41; Ex. 2006 ¶¶ 92–93; Ex. 1038 ¶ 57). Petitioner contends, in contrast, "[a]s explained in detail in the Petition and in Dr. Koopman's declarations, such a substitution would have been trivial, and would have required no more than ordinary skill." *Id.* at 17 (citing Ex. 1004 ¶¶ 208–209; Ex. 1038 ¶ 58). According to Petitioner, "the notion that Stewart is somehow incompatible with Posadas because it uses a single bus is incorrect--a POSITA would expect any real-time operating system to be capable of handling multiple buses." *Id.*

Petitioner argues Patent Owner's contention that Posadas does not "share" information with the Windows NT operating system itself is also incorrect. *Id.* (citing PO Resp. 41; Ex. 1038 ¶ 59). According to Petitioner, Patent Owner's expert testified "[b]y the development of the SC system, the Windows NT processes have access to the high-level distributed data." *Id.* at 17 (citing Ex. 1039, 104:19–105:6; Pet. 45 (citing Ex. 1006, 9); Ex. 1038 ¶ 59).

We agree the information in Stewart is "integrated into the Chimera II Real-time Operating system" and the information is shared with the operating system. Regarding the combination, as discussed, *supra*, we

48

determine Petitioner provides sufficient evidence why one of ordinary skill in the art would combine Stewart and Posadas. Moreover, regarding claim 11, we credit the testimony of Dr. Koopman over that of Dr. Miller on this point because Dr. Koopman provides more detailed, compelling reasoning that articulates and supports the underlying basis for his statements.

We agree with Petitioner's contentions and find that Petitioner has shown, by a preponderance of the evidence, that Posadas discloses the limitation of claim 11 and, as discussed *supra* regarding claim 7, that one of ordinary skill in the art would have been motivated to combine Posadas, Stewart, and Wense.

Regarding claim 18, which recites "wherein the computer program product is operable such that multiple modes of operation are enabled, wherein at least one of the modes includes a diagnostic mode," Petitioner contends Posadas discloses this limitation. Pet. 49–50. According to Petitioner, "[t]he '705 patent provides little guidance on what the claimed 'mode' is or how it is implemented, stating only that '[t]he emergency or debug mode lets the network run in a fail-safe reduced operation mode or in a diagnostic mode **that allows inspection of the system**.'" *Id.* at 49 (citing Ex. 1001, 11:59–62 (emphasis in original)). Petitioner contends Figure 2 of Posadas expressly discloses a "diagnostic socket" and a diagnostic mode that allows inspection of the system. *Id.* at 49 (citing Ex. 1006, 9, Fig. 2). *See* annotated Figure 2 below:

49

IPR2017-01502
Patent 8,209,705 B2



Fig. 2: YAIR architecture

The above Figure 2 of Posadas highlights the "Diagnostic Socket."

Petitioner further contends Posadas expressly discloses the use of a diagnostic mode while the system is running. *Id.* at 50. According to Petitioner, as discussed in the section labeled "Testing Prototype," Posadas's system includes a module, REC, "[t]o validate the communication system." *Id.* Petitioner contends the REC module "was specifically designed to evaluate[] system performance, and was used to diagnose the source of a robot performance limitation observed during testing: "The REC test bed has been designed to stress the communication system in order to evaluate its performance…. We obtained good communications performance running REC tasks with the following periodicity…. These control periods are slow

50

IPR2017-01502
Patent 8,209,705 B2

and force the robot to move slowly during the test." *Id.* (citing Ex. 1006, 11; Ex. 1004 ¶¶ 229–230).

Patent Owner contends "diagnostic mode" should be understood as "an alternate mode of operation, distinct from normal operations, that still allows inspection of the system while it is running." PO Resp. 42. Patent Owner contends because the Diagnostic Socket is evidently a hardwired connection on the CAN bus, the described REC module, which communicates with the system via wireless network, does not use it. *Id.* According to Patent Owner, by itself, the presence of a Diagnostic Socket does not dictate the presence of a "Diagnostic Mode" and no additional diagnostic or "debugging" mode of operation is expressly disclosed by Posadas. *Id.* (citing Ex. 2006 ¶ 96).

According to Patent Owner, Petitioner overlooks the extensive description of alternative operating modes in the specification and the purpose of these modes is to "provide for a guaranteed deterministic behavior of the system." *Id.* at 42–43 (citing Ex. 1001, 11:52–53). Patent Owner contends "[a]t most, Posadas' REC module was a temporary implementation directed to testing a portion of the communication system in prototype form, not 'an alternate mode of operation.'" *Id.* at 43 (citing Ex. 1006, 11 ("Testing Prototype")). Patent Owner contends the "REC module does not disclose a regular component of the system which provides an alternative mode of operation for diagnostic purposes; for that matter, the REC module does not clearly disclose a second mode of operation at all, as required by Claim 18." *Id.* (citing Ex. 2006 ¶ 97).

51

IPR2017-01502
Patent 8,209,705 B2

Patent Owner contends for these reasons and the reasons set forth above regarding claim 7, the combination of Posadas, Stewart, and Wense does not disclose every element of claim 18, nor would a person of ordinary skill have been motivated to combine them to arrive at the invention of the '705 patent.  *Id.* at 43 (citing Ex. 2006 ¶ 98).

In reply, Petitioner contends Patent Owner's claim construction is incorrect, but even applying this claim construction, Posadas still teaches the "diagnostic mode."  Reply 17–19.  According to Petitioner, assuming Patent Owner's construction, Posadas's REC module's purpose is "to stress the system to evaluate its performance," in other words, "an alternate mode of operation, distinct from normal operations, that still allows inspection of the system while it is running."  *Id.* at 18.  Petitioner contends a performance cannot be evaluated without inspecting the system while it is running, and, inclusion of a "diagnostic socket," which is a hardware attachment to Posadas's circuit, would indicate permanency to a POSITA.  *Id.* at 18–19 (citing Ex. 1038 ¶ 64).

As noted *supra*, we have considered the claim construction of the term "diagnostic mode" proposed by Patent Owner and Petitioner and we construe "diagnostic mode" as a mode, distinct from normal operation, that allows inspection of the system while it is running.

In our analysis, we note the Specification of the '705 patent states the following as an enhancement that addresses shortcomings of traditional computer networks:

> The concept that an embedded communication and computing network can run in multiple modes in order to provide for a

52

IPR2017-01502
Patent 8,209,705 B2

> guaranteed deterministic behavior of the system. This property can be achieved by only allowing change to the configuration and/or the functions (SW code) in a secured configuration and upgrade mode. *If the network is booted in the normal operating mode*, all processors execute the existing code and only allow data sharing through the bulletin boards. *The emergency or debug mode lets the network run* in a fail-safe reduced operation mode or *in a diagnostic mode that allows inspection of the system, while it is running*. For each operating mode, the gateway can store a processing image on the bulletin board. The advantage of this procedure is that only the communication hubs need to deal with secure data transfer and encryption while the peripheral nodes in the network can be relative[ly] simple in design.

*Id.* at 11:51–67 (emphases added).

Within the context of claim 18, which recites that "multiple modes of operation are enabled," and the Specification's description of different modes as distinct from "the normal operating mode," it would be unreasonable to adopt a construction in which a "normal operating mode" that has diagnostic capability falls within the scope of the recited "diagnostic mode."

Applying this claim construction, we agree Posadas's Diagnostic Socket is used with the REC module as a distinct diagnostic mode, while the system is running.

In view of the above, we find that Petitioner has shown, by a preponderance of the evidence, that the combination of Posadas, Stewart, and Wense discloses the limitations of claim 18 and, as discussed *supra* regarding claim 7, that one of ordinary skill in the art would have been motivated to combine these references as contended by Petitioner.

53

*Remaining claims 9, 12–17, and 19*

Remaining claims 9, 12–17, and 19 depend directly or indirectly from claim 7.  Petitioner sets forth contentions and evidence to support the unpatentability of these claims.  Pet. 42-43, 46–48, 51.  Except for claim 19, Patent Owner does not directly address these claims and/or relies on the contentions presented for independent claim 7, discussed *supra*.

Claim 9 recites "wherein the computer program product is operable such that the first interface-related second layer part carries out the processing of the first interface-related first layer messages."  Petitioner contends, for the same reasons discussed regarding limitations 7(i) and 7(j), Posadas discloses that the "first interface-related second layer part" processes the "first interface-related first layer message."  Pet. 42–44 (citing Ex. 1004 ¶ 197).

Claim 12 recites "wherein the computer program product is operable such that objects are generated based on a change of state of the information stored on the storage resource" and claim 13, which depends from claim 12, recites "wherein the objects include at least one of flags, events, signals, and interrupts."  Petitioner contends Posadas's system is "event driven" and the system may be used so that objects are generated based on a change in the "blackboard" (e.g., Posadas's "storage resource").  Pet. 46.  According to Petitioner, using Posadas's system, "it is possible to associate the execution of code with specific events (for instance an event could be a change on the blackboard)" and "[t]hus, the processes, which are bound with SC objects, automatically receive the values [they] need from blackboard objects." *Id.* (citing Ex. 2006, 11; Ex. 1004 ¶ 212) (emphasis omitted).  Petitioner

IPR2017-01502
Patent 8,209,705 B2

contends Posadas's system associates the execution of code with specific events (for instance an event could be a change on the blackboard. *Id.* (citing Ex.1006, 11; Ex. 1004 ¶ 215).

Claim 14 recites "wherein the computer program product is operable such that the real-time involves a response time that is measured in milliseconds," claim 15 recites "such that the real-time involves a response time that is measured in microseconds," and claim 16 recites "such that the real-time involves a response time that is less than 1 second."

Petitioner contends, as discussed *supra* regarding limitation 7(g), Posadas discloses a response time that is below 1 second. Pet. 46–47. According to Petitioner, Posadas also discloses response times between 1.096 and 7.096 milliseconds, which corresponds to 1096 and 7096 microseconds. *Id.* at 47 (citing Ex. 1006, Table 1). Petitioner contends one of ordinary skill in the art would readily understand that Posadas discloses a response time of between 1096 and 7096 microseconds, with actual message transmission lengths being as short as 135 microseconds, and it is well-known that CAN supports microsecond-level response time. *Id.* at 47 (citing Ex. 1004 ¶ 221).

Claim 17 recites "wherein the computer program product is part of an apparatus including a plurality of layers including at least two of an application layer, a middleware layer, a real-time operating system layer, a device driver layer, and a hardware abstraction layer."

Petitioner contends this limitation is disclosed by the combination of Stewart and Posadas. Pet. 48. According to Petitioner, as discussed regarding claim 11 *supra*, Stewart discloses the use of the RTOS (real-time

55

IPR2017-01502
Patent 8,209,705 B2

operating system) and Posadas discloses a middleware layer—the Blackboard System (SC) itself is such a middleware system. *Id.* (citing Ex. 1006, 10–11; Ex. 1004 ¶ 224).  Petitioner contends Posadas discloses an application layer.  *Id.* (citing Ex. 1006, 8 ("The coupling between these two models is possible using an ***application interface***.") (emphasis in original)); *see also* Ex. 1006, 13 ("A local version of the reactive control application described above is running in the main processor.").  According to Petitioner, Posadas also discloses the use of a hardware abstraction layer as it is well-known that Windows NT uses such a layer, and the express disclosure of Windows NT thus also discloses the use of a hardware abstraction layer.  *Id.*  Petitioner contends the combination of Posadas and Stewart more than meets this claim's requirement of "at least two of" the recited layers.  *Id.*

Claim 19 recites "wherein the computer program product is operable such that at least a portion of the message is processed at each of a plurality of layers."

Petitioner contends Posadas discloses this limitation, referring to the discussion *supra* regarding claim 7 limitations 7(j) and 7(m).  Pet. 51. According to Petitioner, the first interface portion includes a first interface-related second layer part that processes the first interface-related first layer message and the second interface portion includes a second interface-related second layer part, which processes the second interface-related first layer message.  Pet. 51 (citing Ex. 1004 ¶ 233).  Petitioner then contends, for the same reasons discussed in connection with limitations 7(j) and 7(m),

56

IPR2017-01502
Patent 8,209,705 B2

Posadas discloses that at least a "portion of the message" is "processed" at a "plurality of layers."  *Id.*

In view of the above, we are persuaded by Petitioner's contentions regarding remaining claims 9, 12–17, and 19 and we find that Petitioner has shown, by a preponderance of the evidence, that the combination of Posadas, Stewart, and Wense discloses the limitations of these claims.  Additionally, other than claim 19, we note Patent Owner has not expressly addressed these contentions in its Patent Owner Response and, regarding claim 19, Patent Owner's contentions are based on claim elements and contentions considered *supra* in claim 7.  PO Resp. 43–44 (citing Ex. 2006 ¶ 99).

Having considered the *Graham* factors, we conclude that Petitioner demonstrates, by a preponderance of the evidence that claims 8–19 are unpatentable under 35 U.S.C § 103(a) over Posadas, Stewart, and Wense.


### E.  Obviousness over Miesterfeld, Stewart, and Wense
### Claims 8–19

Petitioner contends that claims 8–19 are unpatentable under 35 U.S.C. § 103(a) as obvious over Miesterfeld, Stewart, and Wense.  Pet. 9–10, 51–86.  Relying on the testimony of Dr. Koopman, Petitioner explains how Miesterfeld (instead of Posadas) and the combination with Stewart and Wense allegedly teaches all the claim limitations and contends a person having ordinary skill in the art would have combined the teachings of the references.  *Id.* (citing Ex. 1004).

IPR2017-01502
Patent 8,209,705 B2

### 1. *Miesterfeld*

Miesterfeld discloses a system that shares information between a vehicle data bus ("VDB bus") and an intelligent transportation data bus ("ITS bus") using a shared memory to which both the VDB bus and ITS bus have access, and can be used to exchange data.  Ex. 1009, Abstract, Fig. 1. ITS may include a number of different data buses, one of which is disclosed as "IDB."  *Id.* at 9:55–58, Fig. 1.

### 2. Analysis

Petitioner asserts that the combination of Miesterfeld, Stewart, and Wense teaches all of the limitations of independent claim 7.

Claims 8–19 depend from independent claim 7, which is a challenged claim in the '458 IPR, and not directly challenged in the current Petition. The references for each ground in the current Petition are the same as set forth in the petition filed in the '458 IPR. The same Declarant (Prof. Koopman) is utilized to support Petitioner's contentions. Ex. 1004.

In a Final Decision in the '458 IPR ('458 FD), we determined claim 7 is unpatentable over the cited references.  Nevertheless, because claim 7 must be analyzed to determine the patentability of the dependent claims, we begin by considering the parties' arguments regarding claim 7.

Generally, Petitioner contends Stewart teaches the memory-related limitations of claim 7 and relies on a combination of Miesterfeld and Wense for the remaining limitations.  *Id.*  Specifically, Petitioner contends Miesterfeld discloses two different networks wherein the first network is a CAN network and the second network is a J1850 or other network.

IPR2017-01502
Patent 8,209,705 B2

Petitioner further contends the use of LIN or FlexRay as the second network would have been obvious to one of ordinary skill in the art, as demonstrated by the combination of Miesterfeld with Wense. *Id.* Patent Owner contends a person of ordinary skill in the art would not have been motivated to combine Miesterfeld and Stewart and, even if such combination were made, it would not include the required CAN network as Miesterfeld does not disclose a CAN network. PO Resp. 44–62.

Petitioner's assertions regarding the individual limitations of claim 7, and Patent Owner's contentions, can be summarized[12] as follows.

Independent claim 7 is directed to 7(a), "computer-readable medium storing a computer program for sharing information." Petitioner contends, to the extent the preamble is a limitation, it is disclosed by Miesterfeld, which describes the computer readable medium and that its method is carried out by computer code. Pet. 52 (citing Ex. 1009, 2:56–57, 2:61-62, Figs. 4, 6; Ex. 1004 ¶ 238). We agree with the contention, which Patent Owner does not address in its Response.

Regarding 7(b), "computer code for allowing receipt of information associated with a message, utilizing a first network protocol associated with a first network," Petitioner contends Miesterfeld discloses an "ITS data bus interface" that "enables data exchange between memory 30 and ITS data bus 24" and interconnected "ancillary devices" that "exchange data via the ITS data bus." Pet. 52–53 (citing Ex. 1009, 3:23–25, 3:41–42, 3:56–57).

---

[12] We discuss the contentions regarding the motivation to combine after we discuss the individual claim limitations.

59

IPR2017-01502
Patent 8,209,705 B2

Petitioner contends the ITS data bus and the devices interconnected to it are the "first network." *Id.* Petitioner also contends Miesterfeld discloses a "first network protocol" associated with the first network: either "D$^2$B, USB, IDB, Firewall [sic: Firewire], and the like." *Id.* (citing Ex. 1009, 9:55–57, Fig. 1; Ex. 1004 ¶¶ 84–87, 240). We agree Miesterfeld discloses 7(b), which Patent Owner does not address in its Response.

Regarding 7(c), "causing a determination as to whether a storage resource is available," Petitioner contends Miesterfeld discloses this limitation. Pet. 53–54. Petitioner contends Miesterfeld discloses that, before it reads or writes to the shared memory (SPI RAM), the ITS data bus first determines whether the shared memory is available. *Id.* at 53. Petitioner contends this is done by checking whether the SPI RAM Access Denied (SRAD) signal line is high—and that means the SPI RAM is unavailable. *Id.* (citing Ex. 1009, 6:33–40; Ex. 1004 ¶¶ 242–243). We agree Miesterfeld discloses 7(c), which Patent Owner does not address in its Response.

Regarding 7(d), "in the event the storage resource is not available, determining whether a timeout has been reached and causing a re-request in connection with the storage resource if the timeout has not been reached," and 7(f), "in the event the timeout has been reached, causing an error notification to be sent," Petitioner contends Miesterfeld discloses determining a timeout and, as discussed, *supra*, regarding the previous ground, Stewart teaches these memory-related limitations. Pet. 54–56 (citing Ex. 1007, 11; Ex. 1009, 6:46–50) ("a time-out mechanism is used, so that if the lock is not gained within a pre-specified time or number of retries,

60

IPR2017-01502
Patent 8,209,705 B2

then the transfer is not performed. . . .When using the time-out mechanism, error handlers should be installed to detect tasks that suffer successive time-out errors.")); *see also* Pet. 18–20.  Patent Owner repeats its argument that Stewart does not send a notification as discussed in the challenge over Posadas, Stewart, and Wense, discussed *supra*.  PO Resp. 48–50.

We agree with Petitioner that Miesterfeld discloses determining a timeout.  *See* Pet. 54 (citing Ex. 1009, 6:46–50).  Further, for the reasons discussed *supra* with respect to the previous ground, we agree with Petitioner that Stewart teaches the remainder of the memory-related limitations.  *See* Pet. 15–20 (citing Ex. 1007, 6, 7, 9); *see also* n.10, *supra*. We agree the combination of Miesterfeld and Stewart discloses 7(d).

Regarding 7(e), "in the event the storage resource is available, and the timeout has not been reached, causing storage of the information utilizing the storage resource," Petitioner contends Miesterfeld discloses storing the information using the shared memory if the memory is available wherein once the SPI RAM (the storage resource) becomes available, the ITS data bus sets the SPI RAM Access Required ("SRAA") signal.  Pet. 59 (citing Ex. 1009, 6:33–54, Fig. 4; Ex. 1004 ¶¶ 242–243).  We agree Miesterfeld discloses 7(e).

Regarding 7(g) "causing the information to be shared by: in real-time, sharing the information utilizing at least one message format corresponding to a second network protocol associated with a second network which is different from the first network protocol," Petitioner contends Miesterfeld discloses sharing data written by the ITS data bus to shared memory using a VDB message format and the VDB message format is the "message format

61

IPR2017-01502
Patent 8,209,705 B2

corresponding to a second network protocol." Pet. 59–61. Petitioner contends the VDB data bus and its interconnected devices are the claimed "second network which is different from the first network" (ITS). *Id.* Petitioner contends the two networks, and network protocols, are shown in annotated Fig. 1. *Id.* at 60 (citing Ex. 1009, Fig. 1).

Petitioner contends Miesterfeld discloses that the information is shared in real-time because the sharing operations take place within microseconds. *Id.* at 61 (citing Ex. 1009, 6:43–62, 8:51–56).

Patent Owner contends nothing in Miesterfeld states that VDB and ITS are different protocols and, even if they are different protocols, there is no description of conversion between two protocols. PO Resp. 51 (citing Ex. 2006 ¶¶ 111, 114).

In reply, Petitioner contends Miesterfeld discloses two different networks and two protocols and refers to the Board's determination that "Miesterfeld discloses two different networks wherein the first network is a CAN network [ITS /IDB] and the second network is a J1850 or other network [VDB]." Reply 21 (citing '458 FD, 39–40). According to Petitioner, the Board agreed that Miesterfeld discloses two protocols and the "VDB message format is the 'message format corresponding to a second network protocol.'" *Id.* (citing '458 FD, 40, 42, 48–49; Ex. 1038 ¶ 72). Regarding conversion, Petitioner refers to Dr. Koopman's declaration which describes "the ITS bus converts data from ITS, stores it in shared memory, and then the VDB interface checks for stored data and shares it by preparing a VDB message on the VDB bus—i.e., it retrieves ITS data and formats it into a VDB message. *Id.* (citing Ex. 1009, 4:34-37, 7:29-31).

62

IPR2017-01502
Patent 8,209,705 B2

We agree Miesterfeld discloses 7(g).

Regarding 7(h), "the computer program product is associated with an electronic control unit with at least one gateway function, and a plurality of interface portions," Petitioner contends the '705 patent specification explains that an ECU (electronic control unit) is connected to each network of the system through multiplex bus-systems corresponding to each network, and a gateway links the multiplexing buses from each network together.  Pet. 61–63.  Petitioner contends the '705 patent specification also teaches that the ECU can act as the gateway.  *Id.* at 61.

Petitioner contends Miesterfeld discloses a gateway which includes a VDB interface interfacing with a VDB bus, an ITS data bus interface interfacing with an ITS data bus, and a gateway function that uses shared memory to exchange data between the two data buses.  *Id.* at 61–62 (citing Ex. 1009, 2:1–3:25, 3:50–57, Figs. 1, 2; Ex. 1004 ¶¶ 268–269).  Petitioner contends the electronic control unit /gateway, with its constituent elements, is shown below in Figure 2 of Miesterfeld, as annotated by Petitioner.  Pet. 62.

IPR2017-01502
Patent 8,209,705 B2



Figure 2 depicts a block diagram of a gateway system.

Petitioner contends the "gateway" (the claimed "electronic control unit") includes "at least one gateway function," as required by claim 7, because the "[d]ata exchange between VDB 48 and ancillary or ITS data bus 56 occurs through gateway 40." *Id.* at 62–63 (citing Ex. 1009, 3:41–49, 3:59–60).

We agree Miesterfeld discloses 7(h), which Patent Owner does not address.

Regarding 7(i), "a first interface portion for interfacing with the first network," Petitioner contends Miesterfeld discloses an ITS data bus interface (first interface portion) that interfaces with an ITS data bus and its interconnected devices (first network). Pet. 63–65 (citing Ex. 1009, 3:23–25, 3:59–4:6, Fig. 1). Petitioner contends the ITS data bus interface and ITS network are shown in annotated Figure 1. Pet. 64.

IPR2017-01502
Patent 8,209,705 B2

Regarding 7(j), "the first interface including . . . ," Petitioner contends Miesterfeld discloses that information to be stored in memory is first formatted into ITS data that is received by the ITS data bus interface.  Pet. 64–65 (citing Ex. 1009, 3:23–25, 3:54–58).  Petitioner contends this ITS data is the "first interface-related first layer message" and once received, the ITS data bus interface (the claimed "first interface-related first layer part") processes the information for storage into memory and this is the "first interface-related second layer message" ("the first interface portion including a first interface-related first layer part for receiving first interface-related first layer messages and a first interface-related second layer part, the first interface-related first layer messages being processed after which first interface-related second layer messages are provided").  *Id.* at 65 (citing Ex. 1009, 7:29–31).  Petitioner contends the first interface limitations are shown in annotated Figure 1 of Miesterfeld.  Pet. 65.

In response, Patent Owner states "[i]t is unlikely that Miesterfeld discloses the entirety of limitations 7i, j," but provides no reasoning, and cites no evidence, to support this assertion.  PO Resp. 52.

Because Petitioner adequately identifies the recited features, and Patent Owner provides no meaningful counterargument, we agree that Petitioner makes a sufficient showing that Miesterfeld discloses 7(i) and 7(j).

Regarding 7(k), "where the first network is at least one of a Controller Area Network, a Flexray Network, or a Local Interconnect network," Petitioner contends Miesterfeld discloses an "IDB" bus as an example of a specific ITS data bus and, by definition, IDB runs on CAN.  Pet. 66 (citing Ex. 1009, 9:55–58; Ex. 1004 ¶¶ 84–88, 254–255, 278–279).  Petitioner

IPR2017-01502
Patent 8,209,705 B2

contends the IDB bus disclosed as an ITS data bus in Miesterfeld is a CAN network (i.e., Miesterfeld discloses the limitation "the first network is at least one of a Controller Area Network, a Flexray network, or a Local Interconnect Network"). *Id.*

Patent Owner contends the IDB bus disclosed in Miesterfeld is not a CAN bus because IDB meant and continues to mean Standard J2355_199710, published October 1, 1997, and was the only IDB standard when Miesterfeld was published. PO Resp. 53. Patent Owner contends this standard is not even compatible with CAN and therefore there is no possibility that the IDB disclosure can be changed to include CAN. *Id.* According to Patent Owner, a skilled artisan would not understand that Miesterfeld was referring to IDB-C, which is very different from IDB, and wasn't published until November 27, 2001, long after Miesterfeld was published. *Id.* at 53–54 (citing Ex. 2006 ¶ 120). Patent Owner contends, given that Miesterfeld does not disclose a CAN network, it is unnecessary to consider Petitioner's citation to Wense. *Id.* at 54 (citing Ex. 2006 ¶ 121).

In reply, Petitioner refers to '458 FD and contends the Board agreed that "Miesterfeld discloses two different networks wherein the first network is a CAN network [ITS /IDB] and the second network is a J1850 or other network [VDB], . . . Miesterfeld discloses two protocols, . . . [a]nd, . . . the 'VDB message format is the 'message format corresponding to a second network protocol.'" Reply 21 (citing '458 FD, 39, 40, 42, 48–49; Ex. 1038 ¶ 72).

Regarding Miesterfeld's teaching of CAN network, Petitioner contends "[t]hese exact arguments have already been decided against Patent

Owner" and refers to '458 FD.  Reply 22–23.  Specifically, referring to Dr. Koopman's declaration, Petitioner contends:

> J2355 expressly teaches the use of CAN as it describes implementing the ITS data bus using "[e]xisting specifications such as the emerging SAE CAN Task Force specification . . . may fit ITS requirements and will be considered during the standards development process."  Moreover, J2355 refers to the forthcoming IDB-C specification (J2366) stating that "[e]volutionary changes to these [J2355] requirements, the technical details of implementation, and performance specifications will be dealt with in SAE J2366 and related documents (emphasis added)."

*Id*. (citing Ex. 1038 ¶ 75).

We are persuaded that one of ordinary skill in the art would understand Miesterfeld's IDB bus is a CAN bus.  We credit Dr. Koopman's declaration as being more persuasive than Dr. Miller's for this issue.  Ex. 1038 ¶¶ 70–75; Ex. 2006 ¶¶ 118–120). Moreover, Patent Owner incorrectly focuses on the date Miesterfeld was published, rather than all the information that was available to one of ordinary skill in the art on the date of the invention.

We have considered the contentions of Petitioner and Patent Owner, and we find that Petitioner presents persuasive evidence that, at the time of the invention, one of ordinary skill in the art would have understood that the Miesterfeld IDB bus is a CAN bus.  We agree Miesterfeld discloses 7(k).

Regarding 7(l) "a second interface portion for interfacing with the second network," Petitioner contends Miesterfeld discloses a VDB interface (second interface portion) that interfaces with a VDB data bus and its interconnected devices (second network) ("a second interface portion for

IPR2017-01502
Patent 8,209,705 B2

interfacing with the second network"). Pet. 66–68 (citing Ex. 1009, 3:20–22, Fig. 1; Ex. 1004 ¶¶ 281–282). Petitioner contends Miesterfeld illustrates the VDB interface and VDB network in Figure 1 of Miesterfeld below, as annotated by Petitioner. Pet. 66.



*Fig-1*

Figure 1 depicts a block diagram of a gateway system.

Regarding 7(m) "the second interface portion including," Petitioner contends this limitation is an analog to the first interface portion (7(j)), discussed *supra*, and contends Miesterfeld discloses that information to be stored in memory is first formatted into VDB data that is received by the VDB interface. Pet. 67 (citing Ex. 1009, 3:20–23). Petitioner contends this VDB data is the "first interface-related first layer message" and once received, the VDB interface (the claimed "second interface-related first part") processes the information for storage into memory. *Id.* (citing Ex. 1009, 4:11–18; Ex. 1004 ¶¶ 285–286).

Petitioner contends the second interface limitations are shown in

IPR2017-01502
Patent 8,209,705 B2

annotated Figure 1.  Pet. 68.

We agree with Petitioner that the cited portions of Miesterfeld disclose 7(m).

Regarding 7(n), "the second network is different from the first network and at least one of the Controller Area Network, the Flexray network, or the Local Interconnect Network," Petitioner contends Miesterfeld discloses a first network (CAN) and a second network for a VDB data bus and its interconnected devices, which Miesterfeld specifies is a J1850 network ("second network").  Pet. 68–69 (citing Ex. 1009, 4:6–10).  Petitioner contends these two networks are shown in Figure 1 of Miesterfeld.  Pet. 69.

Petitioner contends Miesterfeld discloses, as discussed *supra* regarding 7(g), that the second network is a J1850 network "or any other industry standard as may be required."  *Id.* at 69 (citing Ex. 1009, 4:6–10).  Moreover, Petitioner contends Miesterfeld expressly directs one of ordinary skill in the art that other networks beyond J1850 may be used and one obvious replacement for a J1850 network was the Local Interconnect Network, or "LIN."  *Id.* (citing Ex. 1009, 9:60–63; Ex. 1004 ¶¶ 289–290).  Petitioner further contends Wense describes the use of LIN with CAN.  *Id.* at 69–72 (citing Ex. 1008, 13, Fig 3).

Petitioner presents rationale why one of ordinary skill in the art would have combined Miesterfeld, Stewart, and Wense.  Pet. 55–58, 72–77.  For example, regarding the combination of Miesterfeld and Stewart, Petitioner contends, *inter alia*, both relate to real-time distributed computer control systems with a shared memory and use similar techniques to solve the same

69

IPR2017-01502
Patent 8,209,705 B2

problem (i.e., a shared memory architecture to exchange information between the hybrid control modules that make up a real-time distributed system). *Id.* at 59 (citing Ex. 1009, 3:15–49, 6:31–7:16; Ex. 1007, 6, 8, 11, 12). Regarding the combination of Miesterfeld and Wense, Petitioner contends, *inter alia*, both are in the same field of endeavor (distributed control systems in a multiplex networking environment) and the combination of their teachings would have been predictable. *Id.* at 77–82 (citing Ex. 1008, 11, 12; Ex. 1004 ¶¶ 72–75, 80–84, 271, 274, 275).

Patent Owner contends one of ordinary skill in the art would not have combined Miesterfeld and Stewart because Miesterfeld discloses a system where communication access to the shared memory is hardware based and Miesterfeld's handshake lines are inconsistent with Stewart. PO Resp. 45–47 (citing Ex. 1009, 3:59–4:31, 5:32–43, Figs. 2, 3A, 3B; Ex. 2004 ¶¶ 65–68). Patent Owner also contends Stewart is different from Miesterfeld because Stewart comprises only one network. *Id.* at 48 (citing Ex. 2006 ¶ 105).

In reply, Petitioner contends, regarding the combination of Miesterfeld and Stewart, the Board has already considered and rejected Patent Owner's contentions. Reply 19–20 (citing '458 FD, 50; Ex. 1038 ¶ 69). According to Petitioner, Stewart expressly discloses an expansive use of its invention, noting it could be used "in a real-time multiprocessor environment" and the design can be used "with both statically and dynamically reconfigurable systems." *Id.* at 20 (citing Ex. 1007, 7). Petitioner contends an open architecture multi-processor environment does not limit Stewart as Patent Owner contends. *Id.* (citing Ex. 1038 ¶ 69).

70

IPR2017-01502
Patent 8,209,705 B2

Regarding the contention that Miesterfeld's handshake lines are inconsistent with Stewart, Patent Owner's contentions are conclusory without identifying any technical incompatibility. Instead, we are persuaded by Dr. Koopman's declaration. Ex. 67–69. Additionally, we are persuaded that handshaking and spin locks are ordinary design choices used to access a shared resource.

In view of the foregoing, Petitioner has shown sufficiently that one of ordinary skill in the art would have combined the first and second networks (CAN and J1850) and interfaces of Miesterfeld with known memory management techniques (as further described by Stewart). Further, Petitioner has shown sufficiently that one of ordinary skill in the art would have combined the Miesterfeld CAN network with a known second network ("LIN") as described by Wense. *See KSR*, 550 U.S. at 418.

We agree the combination of Miesterfeld, Stewart, and Wense discloses 7(n).

In view of the above, we find Petitioner has shown, by a preponderance of the evidence, that the combination of Miesterfeld, Stewart, and Wense teaches or suggests the limitations of claim 7.

*Challenged claims 8–19*

Regarding challenged claims 8–19, which depend directly or indirectly from claim 7, Petitioner presents contentions supporting unpatentability. Pet. 51–86. Patent Owner presents opposing contentions in its Response for claims 7, 8, 10, 11, 18, and 19. PO Resp. 44–59. Petitioner addresses only claims 7, 8, 10, and 18 in its Reply.

Regarding claim 8, which recites "the storage resource includes a

71

IPR2017-01502
Patent 8,209,705 B2

bulletin board," Petitioner contends, as in the previous ground, the '705 patent describes a bulletin board as "any data base that enables users to send and/or read electronic messages, file, and/or other data that are of general interest and/or addressed to no particular person/process," and we have adopted this meaning. Pet. 77–78 (citing Ex. 1001, 5:10-14).  According to Petitioner, Miesterfeld discloses a "shared memory" that uses "mailboxes" wherein each parameter is assigned to a mailbox, and each mailbox "is accessibl[e] to both VDB interface 26 and ITS data bus interface 28 so that each interface will be able to read from and/or write to memory 30."  *Id.* at 78 (citing Ex. 1009, Abstract, 3:25-49).  In operation, the VDB bus writes information to these mailboxes, which are then read by the ITS bus interface.  *Id.* (citing Ex. 1009, 4:11–32; Ex. 1004 ¶¶ 305–306).

Patent Owner contends Miesterfeld's shared memory "mailboxes" are distinguishable from the bulletin board required by claim 8 because the "mailboxes" are incapable of accommodating "electronic messages, file, and/or other data that are of general interest and/or addressed to no particular person/process."  PO Resp. 55.  According to Patent Owner, Miesterfeld's "mailboxes" store exclusively predetermined content and lack the generality and flexibility of a bulletin board.  *Id.* (citing Ex. 1009, 3:25–36, Fig. 1). Patent Owner refers to Miesterfeld:

> Preferably, **memory 30 is allocated in a predetermined fashion so that predetermined vehicle peramaters** [sic] **occupy predetermined memory locations, referred to as mailboxes.** Each peramiter *[sic]* can be assigned a mailbox, shown as PAR1 and PAR2, . . . , PARN. Similarly, predetermined sections of the memory can be allocated as a mailbox for storing predetermined commands in predetermined

memory locations, shown as COM1, COM2, through COMN. In this manner, **each parameter and command may be assigned to a certain mailbox, and only the specified data or command may be placed in that mailbox.** Ex. 1009, 3:25-36 (emphasis added).

Ex. 1009, 3:25–26.

According to Patent Owner, Miesterfeld's mailbox does not disclose a "bulletin board" as defined by the specification of the '705 patent. *Id.* (citing Ex. 2006 ¶ 123). Patent Owner contends Miesterfeld's "mailboxes" store exclusively predetermined content and lack the generality and flexibility of a bulletin board. *Id.* at 55. Patent Owner repeats its contention that a person of ordinary skill in the art would not have combined Miesterfeld, Stewart, and Wense. *Id.* at 55–56 (citing Ex. 2006 ¶ 124).

In reply, Petitioner contends Miesterfeld expressly discloses storing the very same information recited by the '705 patent in the same way. Reply 23 (citing PO Resp. 5:10–14; *see also* n.18). According to Petitioner, Miesterfeld expressly discloses that data is stored in a manner that is addressed to "no particular person/process." *Id.* (citing Ex. 1038 ¶ 77). Petitioner contends the shared memory (SPI RAM) simply stores data that may be obtained by any process on either bus and contains no fields indicating where the data should be delivered. *Id.* (citing Ex. 1009, 7:29–40, Fig. 5). Figure 5 of Miesterfeld is set forth below.

IPR2017-01502
Patent 8,209,705 B2



Figure 5 depicts SPI RAM shared memory.

Figure 5 of Miesterfeld is referred to by Petitioner as including no destination for stored data, and Petitioner contends Patent Owner concedes this through the deposition of Dr. Miller. *Id.* at 24 (citing Ex. 1039, 87:20–25; Ex. 1038 ¶ 78).

Petitioner contends Patent Owner is incorrect that Miesterfeld stores only "predetermined content" and is incapable of accommodating

74

IPR2017-01502
Patent 8,209,705 B2

"electronic messages, file, and/or other data that are of general interest and/or are addressed to no particular person/processes" because "[t]he data Miesterfeld stores includes files 'and/or other data' – including, for example, manufacturer data, engine data, or transmission data, 'and the like.'" *Id.* at 25 (citing Ex. 1009, 3:35-39). According to Petitioner, "[t]his is precisely the kind of data described as being stored in the '705 patent." *Id.* (Ex. 1001, 1:33–40, 6:22–25; Ex. 1038 ¶ 79).

Petitioner contends, regarding Patent Owner's use of "predetermined" to describe Miesterfeld memory, "Miesterfeld is simply describing how its data is organized, and is not in any way limiting on the type of data that is stored, or how it is (or is not) addressed" and "there is nothing in the claim language (or specification definition) that precludes placing data in certain locations in memory." *Id.* Petitioner observes, "[e]ven if 'predetermined' is correct, such content is merely a 'preferred' embodiment–as stated in the first word of PO's cited quote ('Preferably')." *Id.* at 25 n.20). According to Petitioner, the '705 patent expressly describes using similar predetermined locations as Miesterfeld. *Id.* (citing Ex. 1001, 6:4–10).

We agree with Petitioner that Miesterfeld's mailboxes constitute the "bulletin board" of claim 8. In particular, the Miesterfeld shared memory (SPI RAM) simply stores data that may be obtained by any process on either bus and contains no fields indicating where the data should be delivered. *Id.* (citing Ex. 1038 ¶ 77). In our determination, we find Dr. Koopman's declaration more persuasive than Dr. Miler's declaration.

In view of the above, we find that Petitioner has shown, by a preponderance of the evidence, that the combination of Miesterfeld, Stewart,

IPR2017-01502
Patent 8,209,705 B2

and Wense discloses the limitations of claim 8 and, as discussed *supra* regarding claim 7, that one of ordinary skill in the art would have been motivated to combine Miesterfeld, Stewart, and Wense as contended by Petitioner.

Regarding claim 10, which recites "wherein the computer program product is operable such that at least one of the different processes process the information in a manner that is isolated from temporal characteristics associated with at least one of a plurality of heterogeneous networks," Petitioner contends Miesterfeld discloses this limitation. Pet. 79–80. Petitioner contends Miesterfeld discloses the same system described by the '705 patent in connection with Figure 12 in which the application process utilizes the bulletin board mechanism to access all parameters, events, and real-time variables from the bulletin board and "[t]hus *the application process is decoupled from the temporal behavior of the input/output variables and can be triggered by a plurality of events* []." *Id.* at 79 (citing Ex. 1001, 8:64–9:2) (emphasis added).

Petitioner contends Miesterfeld discloses a "shared memory" that uses "mailboxes" wherein each parameter is assigned to a mailbox, and each mailbox "is accessibl[e] to both VDB interface 26 and ITS data bus interface 28 so that each interface will be able to read from and/or write to memory 30." *Id.* (citing Ex. 1009, Abstract, 3:25–49). According to Petitioner, in operation, the VDB bus writes information to these mailboxes, which are then read by the ITS bus interface and each message in the shared mailboxes is queued one-at-a-time for transmission. *Id.* at 79–80 (citing Ex. 1009, 4:11–32, 8:38-42 ("VDB message has been queued for transmission, control

76

IPR2017-01502
Patent 8,209,705 B2

passes to block 166 and VDB interface 62 clears all non-Zero message register bits that have been checked during this memory access cycle.")). Petitioner then contends Miesterfeld's system is "isolated from temporal characteristics" of at least one of the networks, just as the bulletin board retrieve mechanism in the '705 patent is "isolated" from the temporal behavior of one of the networks. *Id.* at 80 (citing Ex. 1004 ¶¶ 312–314). As in the previous ground, we adopt Petitioner's proposed meaning of "isolated" as the processes are not based on the temporal characteristics of a network.

Patent Owner contends Petitioner ignores the antecedent basis of the "different processes" of claim 10, which lie in claim elements 7(j) and 7(m). PO Resp. 56. Patent Owner contends the "processing" in the context of the claim is the processing of the "first interface-related first layer messages" and the "second interface-related first layer messages." *Id.* According to Patent Owner, Petitioner's discussion of the VDB bus writing information to mailboxes and queueing messages for transmission reveals absolutely nothing about temporal isolation of message processing. *Id.* at 56–57 (citing Pet. 79–80).

Patent Owner contends for this reason and the reasons set forth above with respect to claim 7, the combination of Miesterfeld, Stewart, and Wense does not disclose every element of claim 10, nor would a person of ordinary skill have been motivated to combine them to arrive at the invention of the '705 patent. *Id.* at 57 (citing Ex. 2006 ¶ 127).

In reply, Petitioner contends Miesterfeld uses shared memory that is accessible to both the VDB and ITS data bus interfaces and, thus, each bus

77

IPR2017-01502
Patent 8,209,705 B2

can read/write to the shared memory, which is the same as in the '705 patent and meets the claim language.   Reply 26 (citing Ex. 1001, 3:25–49; Ex. 1038 ¶ 82; '458 FD, 38).

Petitioner contends Miesterfeld expressly states two criteria are used to determine an attempt to transmit a message onto VDB—and importantly, neither is dependent on ITS.  *Id.* at 26–27.  According to Petitioner, first, Miesterfeld states that the VDB interface will "only attempt to initiate a transmission onto VDB after 40 milliseconds have [passed] since VDB interface last successfully initiated a VDB transmission." *Id.* (citing Ex. 1009, 8:50–60) (emphasis omitted).  Petitioner contends Patent Owner's expert conceded this to be the case.  *Id.* (citing Ex. 1039, 80:8-81:24 ("Q: the writing to the VDB bus does not take into account the speed of the network, whatever that may be? A: Yeah Q: and it also likewise doesn't take into account the rate of the ITS bus, whatever that may be, right? A: Yeah, I would agree with that.").  *Id.*

Petitioner further contends Miesterfeld discloses temporal isolation because each message in the mailbox is queued one at a time for transmission as the VDB bus is available and that "VDB interface 62 may need to arbitrate for control of VDB 48 when attempting a transmission." *Id.* at 27 (citing Ex. 1010, 8:38–60).  According to Petitioner, this means that the timing of transmissions on VDB is dependent upon VDB traffic, and independent of the ITS network, resulting in temporal isolation between the VDB and the ITS networks and the corresponding processes that handle messages on those different network interfaces.  *Id.* (citing Ex. 1038 ¶ 83).

The "different processes" of claim 10 correspond to claim 7

78

limitations 7(j) and 7(m), discussed *supra*. We agree with Petitioner that Miesterfeld discloses a VDB bus and an ITS bus in which both access a shared memory. Miesterfeld discloses at least two situations in which timing of messages on VDB is independent of the other network (ITS). We particularly note Dr. Miller's cross-examination testimony in which he agreed that there is independence between Miesterfeld's two networks. Ex. 1039, 80:8-81:24. This "independence" constitutes the recited "isolation."

In view of the above, we find that Petitioner has shown, by a preponderance of the evidence, that the combination of Miesterfeld, Stewart, and Wense discloses the limitations of claim 10 and, as discussed *supra* regarding claim 7, that one of ordinary skill in the art would have been motivated to combine these references as contended by Petitioner.

Regarding claim 11, which recites "wherein the computer program product is operable such that the information is shared with an operating system," Petitioner relies on similar contentions directed to Stewart as presented for claim 11 in the previous ground, *supra*. Pet. 80–81. Patent Owner responds with substantially the same arguments as in the previous ground.

We find Petitioner's contentions regarding claim 11 to be persuasive for the reasons discussed with respect to the previous ground, and, as discussed, *supra*, regarding claim 7, we are unpersuaded by Patent Owner's contentions regarding the combination of Miesterfeld, Stewart, and Wense.

Regarding claim 18, which recites "wherein the computer program product is operable such that multiple modes of operation are enabled, wherein at least one of the modes includes a diagnostic mode," Petitioner

IPR2017-01502
Patent 8,209,705 B2

contends Miesterfeld discloses this limitation.  Pet. 85.  Petitioner refers to Miesterfeld regarding the use of diagnostic systems:

> In addition to the above-discussed vehicle systems, third party manufacturers design devices which require vehicle data as input in order to operate the device or implement some additional feature on the vehicle. *For example, third party manufacturers may provide navigation systems, diagnostic systems, internet interface systems, personal computer interface systems, and the like for receiving data.* In some applications, these systems may also seek to control vehicle functions where appropriate and safe.

Ex. 1009, 1:31–40 (emphasis added).

Petitioner contends "Miesterfeld goes on to state that one of the goals of the 'present invention' is to 'provide a gateway for enabling data exchange between vehicle systems and third party systems which may require such data'" and one of ordinary skill in the art would understand that Miesterfeld's invention discloses the claimed "diagnostic mode."  *Id.* at 85 (citing Ex. 1009, 1:63–65; Ex. 1004 ¶¶ 336–337) (emphasis omitted).

According to Patent Owner, Petitioner overlooks the extensive description of alternative operating modes in the specification and the purpose of these modes is to "provide for a guaranteed deterministic behavior of the system."  PO Resp. 58–59 (citing Ex. 1001, 11:52–53).  Patent Owner contends, if providing a diagnostic gateway was a goal of the Miesterfeld invention, no figure, diagram or text in the specification reveals it and Miesterfeld does not disclose a "diagnostic mode," or for that matter any alternative mode of operation as required by the language of Claim 18.  *Id.* at 58–59.  According to Patent Owner, Petitioner's statement that a

IPR2017-01502
Patent 8,209,705 B2

person of ordinary skill would understand that Miesterfeld discloses such a mode is simply speculation. *Id.* at 59 (citing Ex. 2006 ¶ 132).

Patent Owner contends for these reasons and the reasons set forth above regarding claim 7, the combination of Miesterfeld, Stewart, and Wense does not disclose every element of claim 18, nor would a person of ordinary skill have been motivated to combine them to arrive at the invention of the '705 patent. *Id.* at 59 (citing Ex. 2006 ¶ 133).

In reply, Petitioner contends Miesterfeld discloses that third parties provide the diagnostic systems and this means that OEM equipment will not have the diagnostic system being referred to. Reply 27 (citing Ex. 1038 ¶ 85). According to Petitioner, one mode is OEM, and a second mode is with the diagnostic system added. *Id.* at 27–28. Petitioner contends a POSITA would also understand that any diagnostic equipment necessarily operates while the system is running to allow inspection of the system. *Id.* at 28.

As discussed in the previous ground, we construe "diagnostic mode" as a mode, distinct from normal operation, that allows inspection of the system while it is running. We are not persuaded by Petitioner's contentions regarding claim 18 as they are inadequate and based on speculation. *See* Ex. 2006 ¶¶ 130–132. In particular, although Miesterfeld refers at high level to "diagnostic systems" provided by third party manufacturers, Petitioner does not sufficiently identify the diagnostic mode "as a mode, distinct from normal operation, that allows inspection of the system while it is running."

*Remaining Dependent claims 9, 12–17, 19*

Remaining claims 9, 12–17, and 19 depend directly or indirectly from claim 7. Petitioner sets forth contentions and evidence to support the

81

IPR2017-01502
Patent 8,209,705 B2

unpatentability of these claims.  Pet. 78, 81–86.  Patent Owner does not directly address these claims and/or relies on the contentions presented for independent claim 7.

Petitioner contends Miesterfeld discloses claim 9, which recites "wherein the computer program product is operable such that the first interface-related second layer part carries out the processing of the first interface-related first layer message."  Pet. 78.  According to Petitioner, as discussed *supra* regarding limitation 7(j), Miesterfeld discloses that information to be stored in memory is first formatted into ITS data (the claimed "first interface-related first layer message") that is received by the first interface-related first layer part of the "intelligent transportation system (ITS) data bus 56."  *Id.* (citing Ex. 1009, 3:54–58).  Petitioner contends once received, a second layer part of the ITS data bus interface (the claimed "first interface-related second layer part") processes the information for storage into memory.  *Id.* (citing Ex. 1009, 7:29–31).  Petitioner contends claim 9 is thus expressly disclosed for the same reasons discussed in connection with limitation 7(j).  *Id.* (citing Ex. 1004 ¶¶ 308–309).

Petitioner contends claim 12, which recites "is operable such that objects are generated based on a change of state of the information stored on the storage resource," is disclosed by Miesterfeld.  Pet. 81–82.  According to Petitioner, when a message is stored for example to be transmitted to the VDB from ITS, the message register is set to non-zero.  *Id.* at 81 (citing Ex. 1009, 7:61–8:60, Fig. 6).  According to Petitioner, the "object" is a value to be transmitted in a message, which corresponds to a particular command in addition to that command's message register bit and that object is

82

IPR2017-01502
Patent 8,209,705 B2

"generated" when the command value changes from invalid to valid. *Id.* at 82. Petitioner contends the change in validity occurs responsive to the message register bit corresponding to that command changing state from zero to one. *Id.* at 82–83 (citing Ex. 1004 ¶¶ 320–321).

Regarding claim 13, which depends from claim 12, and recites "wherein the objects include at least one of flags, events, signals, and interrupts," Petitioner contends Miesterfeld sets the message register to a non-zero, which is a "flag." Pet. 83 (citing Ex. 1009, 7:61–8:60, Fig. 6; Ex. 1004 ¶ 324). Petitioner contends Miesterfeld also discloses the use of "signals." *Id.* (citing Ex. 1009, 7:52–56 (" ITS data bus interface 58 must also write the command code and the action code into the appropriate, predetermined addresses of SPI RAM 64 in addition to setting the appropriate bit of message register 140.")).

Regarding claims 14, 15, and 16, which recite "the real-time involves a response time" that is measured, respectively in milliseconds, microseconds, and less than 1 second, Petitioner contends Miesterfeld discloses these limitations. Pet. 83–84. According to Petitioner, Miesterfeld discloses that the information is shared in real-time because it specifies that the sharing operations take place within microseconds and Miesterfeld specifies that once the shared memory is available, the ITS data bus must notify the system that it will be accessing the shared memory (the SPI RAM) in less than 5 microseconds, and then finish reading or writing to the shared memory in less than 5 microseconds. *Id.* (citing Ex. 1009, 6:43–62). Petitioner contends the VDB interface is expected to begin to transmit any data received from the ITS data bus within 40 milliseconds and thus,

IPR2017-01502
Patent 8,209,705 B2

Miesterfeld expressly discloses a response time of "milliseconds" (claim 14) and "microseconds" (claim 15), both of which are less than one second and thus also disclose claim 16. *Id.* (citing Ex. 1009, 8:51–56; Ex. 1004 ¶ 330).

Regarding claim 17, which recites "wherein the computer program product is part of an apparatus including a plurality of layers including at least two of an application layer, a middleware layer, a real-time operating system layer, a device driver layer, and a hardware abstraction layer," Petitioner contends as discussed *supra* regarding claim 11 in the previous ground, Stewart discloses the claim 11 limitations. Pet. 84–85. According to Petitioner, a POSITA would have appreciated that these software layers could be running in Miesterfeld's VDB Interface microcontroller. *Id.* at 85 (citing Ex. 1004 ¶ 333).

Regarding claim 19, which recites "wherein the computer program product is operable such that at least a portion of the message is processed at each of a plurality of layers," Petitioner contends Miesterfeld discloses this limitation. Pet. 85–86. According to Petitioner, as discussed *supra* regarding limitations 7(j) and 7(n), and similar to the discussion of claim 19 in the previous ground, the first interface portion includes a first interface--related second layer part that processes the first interface-related first layer message and the second interface portion includes a second interface-related second layer part that processes the second interface-related first layer message. *Id.* at 86 (citing Ex. 1004 ¶ 341). Petitioner contends Miesterfeld processes each incoming J1850 protocol message from the VDB interface in a first layer to receive the message as part of the functionality of the VDB Interface 62 microcontroller and that same microcontroller then

IPR2017-01502
Patent 8,209,705 B2

processes the command object information a second time to convert it into a format suitable for use as a command object in SPI RAM. *Id.* (citing Ex. 1004 ¶¶ 340, 341; Ex. 1009, 6:26–7:9).

In view of the above, we are persuaded by Petitioner's contentions regarding remaining claims 9, 12–17, and 19 and we find that Petitioner has shown, by a preponderance of the evidence, that the combination of Miesterfeld, Stewart, and Wense discloses the limitations of these claims. Additionally, we note Patent Owner has not expressly addressed these contentions in its Patent Owner Response.

Having considered the *Graham* factors, we conclude that Petitioner demonstrates, by a preponderance of the evidence, that claims 8–17 and 19 are unpatentable under 35 U.S.C § 103(a) over Miesterfeld, Stewart, and Wense, but does not demonstrate by a preponderance of the evidence that claim 18 is unpatentable over Miesterfeld, Stewart, and Wense.

### Constitutionality of Inter Partes Review Proceedings

Patent Owner contends that "this IPR should be terminated and the petition dismissed because the IPR system is unconstitutional." PO Resp. 62–63. This argument is foreclosed by the Supreme Court's determination otherwise. *Oil States Energy Services, LLC v. Greene's Energy Group, LLC*, 138 S.Ct. 1365, 1370 (2018) ("In this case, we address whether inter partes review violates Article III or the Seventh Amendment of the Constitution. We hold that it violates neither.").

85

IPR2017-01502
Patent 8,209,705 B2

## IV.  CONCLUSION

We conclude that Petitioner demonstrates, by a preponderance of the evidence, that claims 8–19 are unpatentable under 35 U.S.C. § 103(a) over Posadas, Stewart, and Wense, and claims 8–17 and 19 are unpatentable under 35 U.S.C. § 103(a) over Miesterfeld, Stewart, and Wense.

## V.  ORDER

It is

ORDERED that, based on a preponderance of the evidence, claims 8–19 of U.S. Patent No. 8,209,705 B2 are held to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2017-01502
Patent 8,209,705 B2


PETITIONER:

James M. Glass
Brett N. Watkins
Richard A. Lowry
QUINN EMANUEL URQUHART & SULLIVAN, LLP
jimglass@quinnemanuel.com
brettwatkins@quinnemanuel.com
richardlowry@quinnemanuel.com


PATENT OWNER:

Thomas H. Kramer
O'KELLY ERNST & JOYCE, LLC
tkramer@oeblegal.com

Thomas Meagher
Alan C. Pattillo
MEAGHER EMANUEL LAKS GOLDBERG & LIAO, LLP
tmeagher@meagheremanuel.com
cpattillo@meagheremanuel.com

# EXHIBIT H

Trials@uspto.gov                                                   Paper 32
Tel: 571-272-7822                              Entered: December 6, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

BMW OF NORTH AMERICA, LLC,
Petitioner,

v.

STRAGENT, LLC,
Patent Owner.
_____

Case IPR2017-01519
Patent 8,566,843 B2
_____


Before LYNNE E. PETTIGREW, PATRICK M. BOUCHER, and
CHRISTA P. ZADO, *Administrative Patent Judges*.

Opinion for the Board filed by BOUCHER, *Administrative Patent Judge*.

Opinion Dissenting filed by ZADO, *Administrative Patent Judge*.

BOUCHER, *Administrative Patent Judge*.


FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

Case IPR2017-01519
Patent 8,566,843 B2

In response to a Petition (Paper 2, "Pet.") filed by BMW of North America, LLC ("Petitioner"), we instituted an *inter partes* review of claims 1–50 of U.S. Patent No. 8,566,843 B2 ("the '843 patent"). Paper 7 ("Dec."); Paper 19. During the trial, Stragent, LLC ("Patent Owner") filed a Response (Paper 10, "PO Resp.") to which Petitioner filed a Reply (Paper 25, "Reply"). An oral hearing was held with the parties, and a copy of the transcript was entered into the record. Paper 31 ("Tr.").[1]

We have jurisdiction under 35 U.S.C. § 6. This Decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of the claims on which we instituted trial. Based on the record before us, Petitioner has shown, by a preponderance of the evidence, that claims 1–50 are unpatentable.

## I. BACKGROUND

### A. *The '843 Patent*

The '843 patent describes systems and methods "for sharing information in a distributed system." Ex. 1001, 1:29–30. Such systems and methods are illustrated for system architectures such as "may be situated in automotive electronics or industrial control and monitoring systems." *Id.* at 3:11–13. An example is provided in Figure 1 of the '843 patent, which is reproduced below.

---

[1] The hearing was a consolidated hearing for IPR2017-01519, IPR2017-01520, IPR2017-01521, and IPR2017-01522.

Case IPR2017-01519
Patent 8,566,843 B2



Figure 1 generally depicts elements of a distributed embedded communication and computing system. *Id.* at 3:9–11.

In an automotive environment, various electronic control units ("ECUs") control such applications as engine control, brake control, or diagnostics through connections to various sensors and actuators organized into separate subnetworks. *Id.* at 3:13–18. Such applications are themselves grouped into backbone system functions, such as "body control, power train, and chassis." *Id.* at 3:19–21. With a hierarchical organization that includes gateways 101, 103, 104, 105, messages are relayed up and down through the system layers. *Id.* at 3:24–26. Each layer may contain multiple ECUs connected through wired serial multiplexing bus systems, with the '843 patent noting several examples that include Controller Area Network ("CAN"), Local Interconnect Network ("LIN"), and Flexray. *Id.* at 3:26–33.

3

Case IPR2017-01519
Patent 8,566,843 B2

At the highest level in the hierarchy, "the system level," system gateway 101 is connected via various busses to other system-level ECUs, to subsequent gateways 103, and to external components 120. *Id.* at 3:60–67. In addition, system gateway 101 may be connected to external gateway 131 to link the system to remote device 132. *Id.* at 4:1–6. "Subsequent to the system level may be several layers of groups and subgroups that are link[ed] to the higher levels via gateways (101, 103, 104, 105)." *Id.* at 4:7–9.

In operation, ECU 102 receives "real-time" input variables from local sensors 108 or from networked sensors 106, respectively via signal lines 113 or multiplexing bus system 112. *Id.* at 3:39–42. "[R]eal-time may include any response time that may be measured in milli- or microseconds, and/or is less than 1 second." *Id.* at 3:36–38. ECU 102 processes the input variables and generates output variables that may be shared with other ECUs 102. *Id.* at 3:46–51. Two relevant modes of sharing are described.

First, ECUs 102 "typically share information with devices that are connected on the same physical multiplexing system. This method of information sharing is called horizontal information sharing in a hierarchical system." *Id.* at 3:51–55.

Second, a bulletin board may be used so that "the information is shared, in real-time, among a plurality of heterogeneous processes." *Id.* at 1:31–33. According to the '843 patent, "heterogeneous networks may refer to any different communication networks with at least one aspect that is different." *Id.* at 7:27–29. Figure 7 of the '843 patent, reproduced below, illustrates a logical architecture between three heterogeneous network controllers using such a bulletin board.

4

Case IPR2017-01519
Patent 8,566,843 B2



Figure 7 illustrates a system architecture in which a bulletin board acts as a shared memory interacting with multiple communication busses, with data received from one communication bus stored on the bulletin board and shared as a new message with other network types.  *Id.* at 7:4–37.

The illustrated architecture includes four principal components: (1) network controllers 702, 703, and 704 (first column) for each of multiple heterogeneous networks; (2) associated operating system interfaces 705 for each of the heterogeneous networks (second column); (3) remote message communication processes 706 for stripping out network-specific information (third column); and (4) the bulletin board, which may contain events 607, real-time variables 608, configuration parameters, and firmware.  *Id.* at 5:63–67, 6:33–37.  In operation, external event 701, such as a flag indicating that data from a sensor are available, is transmitted on a network to a communication bus controller, such as network controller 703 in the

Case IPR2017-01519
Patent 8,566,843 B2

drawing.  *Id.* at 7:4–9.  This causes an operating system interface (such as communication interface 709) to notify a remote message communication process (such as remote message conversion method 710) that data are available, with notification provided in turn to application process 606.  *Id.* at 7:4–17.

## B.  Prosecution History

The application that matured into the '843 patent is a continuation of the application that matured into U.S. Patent No. 8,209,705 ("the '705 patent"), filed July 30, 2008.  Ex. 1001 at [63].  The '705 patent is a continuation of U.S. Patent No. 7,802,263 ("the '263 patent"), filed December 15, 2003.  *Id.*  The '843 patent also claims the benefit of the filing date of U.S. Provisional Application No. 60/434,018 ("the '018 provisional application"), filed December 17, 2002.  *Id.* at [60].

At the time of filing the application that matured into the '263 patent, independent claim 1 recited the following:

> 1.  A method for sharing information in a distributed system, comprising:
>> receiving information;
>> storing the information on a bulletin board; and
>> sharing, in real-time, the information among a plurality
> of heterogeneous processes.

Ex. 1011, 649.  Although certain amendments were made to the claim during prosecution, allowance was secured only after an interview with the Examiner in which the applicants authorized the addition of several limitations:  (1) "requesting a bulletin board resource of one or more bulletin boards"; (2) "determining whether the bulletin board resource is available";

Case IPR2017-01519
Patent 8,566,843 B2

(3) "in the event the bulletin board resource is not available, re-requesting the bulletin board resource until a threshold has been reached"; and

(4) storing the information on the bulletin board resource "in the event the bulletin board resource is available."  *Id.* at 250–252.

Independent claim 1 was filed in the same original form at the time of filing the application that matured into the '705 patent.  Ex. 1002, 255. During prosecution, the applicants amended the claims to add limitations similar to those that secured allowance of the claims of the '263 patent:

> in the event the storage resource is not available, <u>determining whether a timeout has been reached and</u> causing a re-request in connection with the storage resource <u>if the timeout has not been reached</u>; [and]
> > <u>in the event the timeout has been reached, causing an error notification to be sent</u>.

*Id.* at 84–85 (underscoring in original to identify material added by amendment).  These added limitations were among those identified by the Examiner in allowing the application as not "disclose[d] or suggest[ed]" "when taken in the context of [the] claims as a whole."  *Id.* at 98–99.

Independent claim 1 was again filed in the same original form at the time of filing the application that matured into the '843 patent.  Ex. 1018, 220.  The originally filed claims were subsequently canceled during prosecution and applicants submitted new claims that included limitations similar to those that secured allowance in the prior applications.  Ex. 1018, 116–32.  The amended claims were subsequently allowed without express Reasons for Allowance by the Examiner.  Ex. 1018, 63–94.

Case IPR2017-01519
Patent 8,566,843 B2

*C. Illustrative Claim*

Challenged claim 1, which is illustrative of the challenged claims, is reproduced below with numbers added to identify specific elements of the claim in accordance with the scheme used by Petitioner. *See* Pet. 16–31.

1.   [0] A non-transitory computer-readable medium storing a computer program product for sharing information, the computer program product, comprising:

[1] code for allowing receipt of information associated with a message received utilizing a first network protocol associated with a first network;

[2] code for causing a determination as to whether a storage resource is available;

[3] code for determining whether a threshold has been reached and causing a request in connection with the storage resource if the threshold has not been reached;

[4] code for, in the event the threshold has been reached, causing an error notification to be sent;

[5] code for, in the event the storage resource is available, causing storage of the information utilizing the storage resource; and

[6] code for causing the information to be shared by:

[7] in real-time, sharing the information utilizing at least one message format corresponding to a second network protocol associated with a second network;

[8] wherein the computer program product is associated with an electronic control unit with a plurality of interface portions including:

[9] a first interface portion for interfacing with the first network, the first interface portion including a first interface-related first layer part for receiving first interface-related first layer messages and a first interface-related second layer part, the computer program product being operable such that the first interface-related first layer messages are processed after which first interface-related second layer messages are provided, where the first network is at least one of a Controller Area Network

8

Case IPR2017-01519
Patent 8,566,843 B2

> type, a Flexray network type, or a Local Interconnect Network type; and
>
> [10] a second interface portion for interfacing with the second network, the second interface portion including a second interface-related first layer part for receiving second interface-related first layer messages and a second interface-related second layer part, the computer program product being operable such that the second interface-related first layer messages are processed after which second interface-related second layer messages are provided, where the second network is at least one of the Controller Area Network type, the Flexray network type, or the Local Interconnect Network type.

Ex. 1001, 12:15–62.

### D.  Evidence

Petitioner relies on the following references.  Pet. 12–16.

| Staiger | US 2002/0073243 A1 | June 13, 2002 | Ex. 1004 |
| Millsap | US 6,484,082 B1 | Nov. 19, 2002 | Ex. 1015 |

William Wong, *Software And Hardware Standards Help, But In-Vehicle Network Growth Will Be Conservative:  CAN networks and OSEK/VDX-compatible operating systems will drive tomorrow's vehicles*, 49 Elec. Design 62 (Jan. 8, 2001) ("Wong") (Ex. 1012).

In addition, Petitioner provides Declarations by Vijay K. Madisetti and R. Benjamin Cassady, which we have also considered.  Exs. 1003, 1014.  No cross-examination testimony of these witnesses was filed in the proceeding.

Patent Owner provides a Declaration by Jeffrey A. Miller, Ph.D.  Ex. 2001.  Dr. Miller was cross-examined by Petitioner, and a transcript of his deposition was entered into the record.  Ex. 1031.

Case IPR2017-01519
Patent 8,566,843 B2

*E.  Asserted Grounds of Unpatentability*

Petitioner challenges claims 1–50 over the following combinations of references.  Pet. 12.

| Reference(s) | Ground(s) | Claims |
|---|---|---|
| Staiger | § 102(a), (b), (e) | 1–21, 24–27, 49, 50 |
| Staiger | § 103(a) | 1–21, 24–27, 49, 50 |
| Staiger, Millsap, and Wong | § 103(a) | 1–50 |

We instituted this proceeding on the obviousness challenge over Staiger, Millsap, and Wong.  Dec. 27.  Subsequent to instituting the proceeding, the Supreme Court held that a final written decision under 35 U.S.C. § 318(a) must decide the patentability of all claims challenged in a petition for *inter partes* review.  *SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348 (2018). Accordingly, we notified the parties that "[w]e modify our institution decision to institute on all of the challenged claims and all of the grounds presented in the Petition."  Paper 19, 2.  Neither party requested further briefing in light of that notification.

*F.  Real Parties in Interest*

Petitioner identifies BMW of North America, LLC, BMW Manufacturing Co., LLC, and Bayerische Motoren Werke, AG as real parties in interest in this proceeding.  Pet. 93.

Patent Owner identifies only itself as a real party in interest.  Paper 4, 1.

Case IPR2017-01519
Patent 8,566,843 B2

### G.  Related Proceedings

The parties identify the following district-court proceedings as involving the '843 patent:  (1) *Stragent, LLC v. BMW of North America, LLC*, No. 6:16-cv-00446 (E.D. Tex.); (2) *Stragent, LLC v. Mercedes-Benz USA, LLC*, No. 6:16-cv-00447 (E.D. Tex.); and (3) *Stragent, LLC v. Volvo Cars of North America, LLC*, No. 6:16-cv-00448 (E.D. Tex.).  Pet. 93; Paper 4, 1–2.

The following *inter partes* review proceedings also involve the '843 patent:  IPR2017-00457, IPR2017-00677, IPR2017-01503, IPR2017-01504, and IPR2017-01520.  The following *inter partes* review proceedings involve the related '705 patent: IPR2017-00458, IPR2017-00676, IPR2017-01502, IPR2017-01521, and IPR2017-01522.

## II.  ANALYSIS

### A.  Claim Construction

In an *inter partes* review proceeding based on a petition filed prior to November 13, 2018, the Board interprets claims of an unexpired patent using the broadest reasonable construction in light of the specification of the patent in which they appear.  *See* 37 C.F.R. § 42.100(b) (2016); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016) (upholding the

Case IPR2017-01519
Patent 8,566,843 B2

use of the broadest reasonable interpretation standard).[2]  An inventor may

provide a meaning for a term that is different from its ordinary meaning by

defining the term in the specification with reasonable clarity, deliberateness,

and precision.  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

### 1.  *"real-time"*

Independent claim 1 recites "in real-time, sharing the information."

Ex. 1001, 12:33.  Independent claims 47–50 include similar recitations

directed to sharing information in "real-time."  *Id.* at 16:31, 17:8, 17:40–41,

18:11–12.  Petitioner argues that the Specification of the '843 patent

expressly defines "real-time":  "In the context of the present description,

real-time may include any response time that may be measured in milli- or

microseconds, and/or is less than 1 second."  Pet. 9; Ex. 1001, 3:35–38.

Accordingly, Petitioner proposes that "'real-time' should be construed as

responses that occur in less than one second."  Pet. 9 (citing Ex. 1003 ¶ 58).

Patent Owner contends that the definition from the Specification should be

adopted.  PO Resp. 14.

---

[2] The Office recently promulgated changes to the claim-construction
standard applied in *inter partes* review proceedings.  *Changes to the Claim
Construction Standard for Interpreting Claims in Trial Proceedings Before
the Patent Trial and Appeal Board*, 83 Fed. Reg. 51,340 (Oct. 11, 2018).
Because the Petition was filed before November 13, 2018, effective date of
the rule change, however, those changes do not apply to this proceeding.  *Id.*
at 51,345 ("The Office will continue to apply the BRI standard for
construing unexpired patent claims . . . in AIA proceedings where a petition
was filed before the effective date of the rule.").

Case IPR2017-01519
Patent 8,566,843 B2

We construe "real-time" as Petitioner proposes, i.e., as including responses that occur in less than one second.  The first part of the quote cited above provided in the Specification ("may be measured in milli- or microseconds") is not limiting because *any* response time, no matter how large or small, may be *measured* in milli- or microseconds.

## 2.  *"threshold"*

Independent claims 1 and 47 recite "determining whether a threshold has been reached and causing a request in connection with the storage resource if the threshold has not been reached."  Ex. 1001, 12:24–26, 16:23–25.  Independent claims 48–50 include similar recitations.  *Id.* at 16:60–67, 17:32–34, 17:66–18:4.  Petitioner proposes that "threshold" be construed consistent with a dictionary definition it provides, as a "level, point, or value above which something is true or will take place and below which it is not or will not."  Pet. 9 (citing Ex. 1016, 5).  Observing that the Specification of the '843 patent uses "threshold" in the context of an elapsed time, Petitioner further proposes that this construction "include the maximum value (i.e., time-out) of a timer."  *Id.* (citing Ex. 1001, 8:21–25, 8:47–51).  Patent Owner does not address construction of the term in its Response.  We agree with Petitioner's reasoning in light of the Specification, and accordingly construe "threshold" as Petitioner proposes.

## 3.  *"heterogeneous networks"*

Dependent claims 26 and 32 recite that "the first network and the second network are heterogeneous networks."  Ex. 1001, 14:40–41, 15:10–11.  The Specification of the '843 patent defines "heterogeneous networks":

Case IPR2017-01519
Patent 8,566,843 B2

"In the context of the present description, heterogeneous networks may refer to any different communication networks with at least one aspect that is different." Ex. 1001, 7:26–29. In light of this explicit definition, we construe "heterogeneous networks" as Petitioner proposes, i.e., as "networks having at least one aspect that is different." Pet. 10 (citing Ex. 1003 ¶ 60). Patent Owner does not address construction of the term.

### 4. "isolated from temporal characteristics"

Dependent claim 32 recites that "each of a plurality of different processes process the information in a manner that is isolated from temporal characteristics associated with the heterogeneous networks." Ex. 1001, 15:11–14. Petitioner proposes that "isolated from temporal characteristics" be construed as "unaffected by the temporal behavior," and supports its proposed construction with examples provided in the Specification and with testimony by Dr. Madisetti. Pet. 10–11 (citing Ex. 1001, 8:47–51, 8:64–9:2, 11:10–13; Ex. 1003 ¶ 61). Patent Owner does not address construction of the term. Petitioner's proposed construction is reasonable, and we adopt it.

### 5. "network layer translation"

Dependent claim 35 recites that "the storage resource is operable so as not to require a network layer translation of messages." Ex. 1001, 15:27–28. According to Petitioner, "[t]he only place where 'translation' is mentioned in the specification, other [than] in claim 35 itself," occurs in identifying "enhancements" that address "shortcomings of traditional computer networks," namely, "[t]he concept of a direct-access bulletin board that does not require a network layer translation of messages on each node of the

14

Case IPR2017-01519
Patent 8,566,843 B2

network." Pet. 11; Ex. 1001, 11:19–20, 11:30–35. Petitioner asserts, supported by the testimony of Dr. Madisetti, that a person of ordinary skill in the art "would have understood the term to mean removing network information, such as network addresses and communication network problems," and therefore proposes construing "network layer translation" as "removing network information." Pet. 11 (citing Ex. 1003 ¶ 62). Patent Owner does not address construction of the phrase. Petitioner's proposed construction is reasonable, and we adopt it.

### 6. Information Sharing

Patent Owner identifies recitations in each of the independent claims that relate to real-time sharing of information. PO Resp. 12. Patent Owner's argument regarding the construction of such recitations can be illustrated with independent claim 1, which recites "code for causing the information to be shared by: in real-time, sharing the information utilizing at least one message format corresponding to a second network protocol associated with a second network." Ex. 1001, 12:32–35. According to Patent Owner, "the words '*the* information' clearly refer to information previously identified in the claims." PO Resp. 12. In claim 1, Patent Owner contends that "it is the 'information associated with a message received utilizing a first network protocol associated with a first network' (limitation 1.1) which was caused to be stored utilizing the storage resource (limitation 1.6[3]) – i.e., it is information whose storage was completed to the bulletin board or the storage resource." *Id.* at 13.

---

[3] Patent Owner appears to intend to refer to limitation 1.5.

Case IPR2017-01519
Patent 8,566,843 B2

Patent Owner thus contends that information sharing, as recited in the independent claims, requires completion of storage to the recited bulletin board or storage resource.  Patent Owner also cites a general-dictionary definition of "share" as "to partake of, use, experience, occupy, or enjoy with others; to have in common."  *Id.* at 14 (citing Ex. 2003).

We are not persuaded by Patent Owner's contention.  Outside of the preamble, claim 1 first recites "information" as part of the requirement of "code for allowing receipt of information associated with a message received utilizing a first network protocol associated with a first network." Ex. 1001, 12:19–21.  The claim includes recitations for various code that contemplate potentially different actions depending on the satisfaction of different conditions.  For example, code causes a "determination as to whether a storage resource is available," and, "in the event the storage resource is available," code "caus[es] storage of the information utilizing the storage resource."  *Id.* at 12:22–23, 12:29–31.  But additional code causes "a request in connection with the storage resource if [a] threshold has not been reached" and causes an error notification to be sent if "the threshold has been reached."  *Id.* at 12:22–28.  The plain language of the claim does not require that "the information" be stored using the "storage resource" under all conditions.

The plain language of the claim *does*, though, always require the presence of "code for causing the information to be shared," specifically by "in real-time, sharing the information utilizing at least one message format corresponding to a second network protocol associated with a second network."  *Id.* at 12: 32–35.  Nothing in the plain language of this element requires that "the information" have been stored with the storage resource.

Case IPR2017-01519
Patent 8,566,843 B2

Indeed, Petitioner identifies "embodiments of the specification that share information not using a shared storage."  Reply 8.  In particular, the Specification of the '843 patent describes "horizontal information sharing in a hierarchical system" where output variables generated by an ECU are output to local actuators, which are connected via discrete signal lines or networked actuators connected via a multiplexing bus.  *See* Ex. 1001, 8:51–59, 7:38–49 ("In an alternate embodiment of the remote message communication process . . . [t]o communicate between two heterogeneous networks, this process may then be repeated in reverse by adding back the header information for the various layers of the second network, and eventually putting the message onto the second network's physical link."); *see* Tr. 10:19–12:7 (Petitioner, at oral hearing, discussing embodiment that shares information without using a shared storage).  Furthermore, the description of "information" as "capable of being stored *or* shared" in the '843 patent Specification is consistent with storage and sharing being distinct concepts.  *See* Ex. 1001, 3:56–59 (emphasis added).

At the oral hearing, Patent Owner argued that "the information" recited in element 1.7 ("in real time, sharing *the information* utilizing at least one message format corresponding to a second network protocol associated with a second network") (emphasis added) necessarily refers to "the information" recited in element 1.5 (code for, in the event the storage resource is available, causing storage of *the information* utilizing the storage resource") (emphasis added):

> Our position is that the information then appears in Element 1.5, which says the information is stored utilizing a storage resource. Therefore, the next time the word the information is used, it's

17

Case IPR2017-01519
Patent 8,566,843 B2

> now referring to the last antecedent basis, which is no longer
> Element 1.1.  The last antecedent is Element 1.5.

Tr. 48:10–14. But Patent Owner is unable to identify sufficient legal basis
for its "last antecedent" theory.  *See id.* at 40:8–15 ("I have not found the
concept in patent claim construction.").

In addition to these considerations, we note that Patent Owner has
submitted a definition of "share" drawn from a technical dictionary into the
record of this proceeding.  Ex. 2004.[4]  We find the technical dictionary
provided by Patent Owner to be more probative than the general-purpose
dictionary Patent Owner quotes.

The language of the general-purpose dictionary definition of "share"
that states "to partake of, use, experience, occupy, or enjoy with others; to
have in common," does not appear to contemplate the sharing of
"information," which the '843 patent Specification describes as "includ[ing]
data, a signal, and/or anything else capable of being stored and shared."  *See*
Ex. 2003 (general definition of "share"); Ex. 1001, 3:56–59.  Instead, the
technical definition of "[t]o make files, directories, or folders accessible to
other users over a network" is more relevant because it expressly
contemplates the same context as the '843 patent, i.e., sharing over a
network.  Ex. 2004 (technical definition of "share").

---

[4] We note that, even if Patent Owner had not entered Exhibit 2004 into this
proceeding, judges are free to rely on extrinsic dictionary definitions when
construing claim terms, so long as the dictionary definition does not
contradict any definition found in or ascertained by a reading of the patent
documents.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 n.6
(Fed. Cir. 1996) *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1322–23 (Fed.
Cir. 2005) (en banc).

Case IPR2017-01519
Patent 8,566,843 B2

Thus, the plain language of the claim, intrinsic evidence in the form of the Specification, and extrinsic evidence in the form of a technical-dictionary definition all support a construction of information sharing that requires making the information accessible, without requiring storage of the information.  We accordingly construe the various recitations of information sharing in the claims in accordance with such requirements.

### 7.  Other Terms

We do not find it necessary, for purposes of this Decision, to construe any other terms explicitly.  *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc*., 200 F.3d 795, 803 (Fed. Cir. 1999)) (only terms in controversy need to be construed, and only to the extent necessary to resolve the controversy).

### B.  Effective Filing Date

Petitioner contends that the challenged claims are entitled to claim the benefit of only the December 15, 2003, filing date of the '263 patent, and, in particular, that they are not entitled to the December 17, 2002, filing date of the '018 provisional application.  Pet. 6–8.  Petitioner argues that "the '263 patent is the first instance that even arguably discloses the memory-related limitations," and that the '018 provisional application does not disclose

> at least the following memory-related limitations of claim 1: "code for determining whether a threshold has been reached and causing a request in connection with the storage resource if the threshold has not been reached"; "code for, in the event the storage resource is available, causing storage of the information

Case IPR2017-01519
Patent 8,566,843 B2

> utilizing the storage resource[,]" . . . [and] at least the following
> limitation of claims 48 and 50: "when the storage resource is
> not available and the threshold associated with the
> [determination whether the storage resource is available] has not
> been reached, issuing another storage resource request in
> connection with the storage resource."

*Id.* at 7–8. Petitioner further contends that "the ['018] provisional
application simply states that 'the bulletin board manager provides
mechanisms for access control,'" and that "[t]his broad statement . . . in now
way discloses the limitations above." *Id.* at 8 (citing Ex. 1005, 8). Patent
Owner does not present any evidence or argument that the '843 patent is
entitled to claim the benefit of the '018 provisional application filing date.

For a claim of a patent to claim priority from the filing date of its
provisional application, the provisional application must contain a written
description of the claim in the manner set forth under 35. U.S.C. § 112. 35
U.S.C. § 119(e)(1). Although a petitioner bears the ultimate burden of
persuasion to show a claim is unpatentable, a second and distinct burden—
the burden of production—is a shifting burden. *Dynamic Drinkware, LLC v.
National Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). In cases
such as here, where Petitioner has presented sufficient evidence and
argument of unpatentability based on references that pre-date the filing date
of the '263 patent, Petitioner has met its initial burden of production. *Id.* at
1379. The burden then shifted to Patent Owner to show that the '018
provisional application provides written description support for the
challenged claims of the '843 patent. *Id.* at 1380. As we discussed above,
Patent Owner does not provide any evidence or argument in this regard, and
therefore has not met its burden of production to show the challenged claims

20

Case IPR2017-01519
Patent 8,566,843 B2

are entitled to the benefit of the '018 provisional application filing date. Therefore, based on the record, we accord the challenged claims the December 15, 2003 filing date of the '263 patent.

We note that, although the burden of production has not shifted back to Petitioner with regard to entitlement to the '018 provisional filing date, the Petition identifies specific claim limitations Petitioner contends are unsupported by the '018 provisional application and identifies specific disclosure in the '018 provisional application that it contends is insufficient. Pet. 6–8.

## C. Legal Principles

To establish anticipation, each and every element in a claim, arranged as recited in the claim, must be found in a single prior art reference. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008); *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001). While the elements must be arranged in the same way as is recited in the claim, "the reference need not satisfy an *ipsissimis verbis* test." *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009); *In re Bond*, 910 F.2d 831, 832–33 (Fed. Cir. 1990). Identity of terminology between the anticipatory prior art reference and the claim is not required. Prior art references must be "'considered together with the knowledge of one of ordinary skill in the pertinent art.'" *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

Also, "it is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom." *In re Preda*, 401 F.2d 825, 826 (CCPA 1968). As the Court of Appeals for the Federal Circuit recently

Case IPR2017-01519
Patent 8,566,843 B2

explained, the dispositive question for anticipation is whether one skilled in the art would reasonably understand or infer from a prior art reference that every claim element is disclosed in that reference. *Eli Lilly v. Los Angeles Biomedical Research Inst.*, 849 F.3d 1073, 1074–1075 (Fed. Cir. 2017).

A claim is unpatentable for obviousness under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when in evidence, objective indicia of non-obviousness, i.e., secondary considerations.[5] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

Additionally, the obviousness inquiry typically requires an analysis of "whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) (requiring "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness")); *see In re Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1333 (Fed. Cir. 2016) (citing *DyStar Textilfarben GmbH & Co. Deutschland KG v. C. H. Patrick Co.*, 464 F.3d 1356, 1360 (Fed. Cir. 2006)).

---

[5] The parties do not address secondary considerations, which accordingly do not form part of our analysis.

Case IPR2017-01519
Patent 8,566,843 B2

To prevail on its challenges, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable.  35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).  "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable."  *Harmonic Inc. v. Avid Tech., Inc.* 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")).  This burden never shifts to Patent Owner.  *See Dynamic Drinkware*, 800 F.3d at 1378 (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review).  Furthermore, Petitioner does not satisfy its burden of proving obviousness by employing "mere conclusory statements."  *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

### D.  Level of Skill in the Art

The parties advocate for the adoption of similar levels of ordinary skill in the art.  Petitioner contends that a person of ordinary skill "would have a bachelor's degree in science in electrical engineering, computer engineering, or a related engineering discipline and at least two years of industry experience in the field of distributed computing or automotive engineering, or equivalent experience, education, or both."  Pet. 8.  In addition, Petitioner contends that such a person "would also have knowledge or familiarity with in-vehicle computing."  *Id.* (citing Ex. 1003 ¶¶ 65–66).  Dr. Madisetti's testimony supports Petitioner's proposal.  Ex. 1003 ¶¶ 65–66.

23

Case IPR2017-01519
Patent 8,566,843 B2

> Patent Owner similarly contends that a person of ordinary skill
>
> would have had at least the qualifications of or equivalent to
> either a master's degree in electrical engineering, computer
> science, or computer engineering with course work or research
> in embedded networking technologies or an undergraduate
> degree in electrical engineering, computer science, or computer
> engineering with at least two years of relevant work experience
> in industry.

PO Resp. 15. Dr. Miller's testimony supports Patent Owner's proposal.

Ex. 2001 ¶ 17. The principal difference between the levels proposed by the

parties is Petitioner's requirement that the person have knowledge or

familiarity with "in-vehicle computing." Although the Specification

illustrates its systems and methods for sharing information in a distributed

system in the context of vehicle applications, the claims are not so limited.

We are not persuaded that familiarity with in-vehicle computing would be a

characteristic of a person of ordinary skill in the relevant art. We therefore

adopt Patent Owner's expression of the level of skill in the art, noting that it

instead requires some level of familiarity with embedded networking

technologies.

### E. Testimony of Dr. Miller

Petitioner argues that the testimony of Patent Owner's expert,

Dr. Miller "deserves little weight because he misapplies the law and

provides contradictory testimony." Reply 2. Specifically, Petitioner

contends that Dr. Miller (1) does not understand or apply the principles of

broadest reasonable interpretation in his claim constructions; (2) imports

limitations from the Specification into the claims; (3) does not understand

Case IPR2017-01519
Patent 8,566,843 B2

what defines an invention; and (4) cannot identify an antecedent basis. *Id.* at 2–3.

As Petitioner recognizes, in a related *inter partes* review proceeding, we "agree[d] with Petitioner that Dr. Miller did not provide responses sufficient to conclude that he was aware of and/or applied the correct claim-construction standard." *BMW of N. Am., LLC v. Stragent, LLC*, Case IPR2017-00677, slip op. at 13–14 (PTAB June 16, 2018) (Paper 32). But deficiencies in Dr. Miller's testimony in that earlier proceeding have largely been cured in the instant proceeding. *See, e.g.*, Ex. 2001 ¶ 27 ("I have been advised, and it is my understanding, that patent claims in IPR proceedings such as this are given their broadest reasonable construction in view of the patent claims, specification, file history, and the understanding of one having ordinary skill in the relevant art at the time of the invention.").

We have reviewed the deposition testimony to which Petitioner draws our attention, and disagree that Dr. Miller's imprecisions regarding patent law are sufficient to discount or limit the weight accorded to his opinions. *See* Reply 3–7. Technical experts are not expected to be legal authorities, and Dr. Miller's opinions are helpful to us as the trier of fact. *See* Fed. R. Evid. 702 (stating conditions under which an expert witness may testify in the form of an opinion). We are also not persuaded by Petitioner's argument that Dr. Miller's opinions should be given reduced weight because "he is a pay for opinion expert, whose opinions reflect counsel instructions rather than his views." Reply 5. Despite Petitioner's allusions, we see nothing irregular or improper with Dr. Miller's acknowledgment that Patent Owner's "attorneys did provide some clarifications and help in preparing the declaration." *See id.*; Ex. 1031, 30:21–24. Dr. Miller swears to the

Case IPR2017-01519
Patent 8,566,843 B2

statements in his Declaration under penalty of perjury, and we see no compelling reason not to accord those states due weight.  Ex. 2001, 62.

### F. Obviousness over Staiger, Millsap, and Wong

#### 1. Staiger

Staiger, which "relates to a method and a circuit arrangement for communication within and across networks," was filed on December 4, 2001, and published on June 13, 2002.  Ex. 1004 ¶ 1, [22], [43].  Consistent with the effective filing date we accord the challenged claims herein, Staiger is prior art under 35 U.S.C. §§ 102(a), 102(b), and 102(e).

Staiger, like the specification of the '843 patent, describes network communications in automobiles.  *Id.* ¶ 2.  Staiger discloses that "[t]hrough the networks the computer systems are able to collect information from different mostly remote systems" and that "[t]he information might contain parameters describing the state of operation of the remote systems which are meant to be controlled or monitored by the computer system receiving the information."  *Id.*  In particular, Staiger discloses an Electronic Control Unit ("ECU") "connected to a plurality of real-time networks, e.g., several individual CAN (Controller Area Network) busses or other multiple purpose networks, like multimedia-networks, such as MOST (Media Oriented Systems Transport), i.e., an optical bus system used in automobiles, or IEEE1394 (Firewire)."  *Id.* ¶ 3.  The ECU executes an application program for controlling remote systems while concurrently performing gateway functions between the different networks.  *Id.* ¶¶ 4–5.

Figure 2 of Staiger is reproduced below.

Case IPR2017-01519
Patent 8,566,843 B2



FIG. 2

Figure 2 depicts a high-level block diagram of intercommunication processor 200, connected to switchboard 201, "which is designed to connect four individual CAN-busses 202 to 205 and in addition a first and a second independent CPU 207 and 208." *Id.* ¶ 36 (emphasis omitted). Each of CAN busses 202–205 is connected to a respective bus adapter 214–217, which may be formed by standardized CAN controllers providing connections to the respective CAN busses 202–205. *Id.* ¶ 38. First and second CPUs 207 and 208 provide connections to first and second additional bus systems 210 and 211, respectively. *Id.* ¶ 36. Can-busses 202 to 205 may be compatible with one of the CAN-B network protocol or the CAN-C network protocol. *See id.* ¶ 38. "Connecting up to four CAN busses and one or two CPUs together represents a typical network requirement used in modern automobiles. However, . . . the present invention is neither limited to this

27

Case IPR2017-01519
Patent 8,566,843 B2

particular bus system[], the specific number of busses nor to the number of CPUs connected to it." *Id.* ¶ 37.  Figure 2 also depicts execution tag registry 238, which Staiger describes as being "connected to a first, a second and a third execution unit 240 to 244 which can access a register pool 246 for storing data and for exchanging data among the execution units 240 to 244." *Id.* ¶ 41.

### 2. *Millsap*

Millsap, which relates to "[a] network management approach for use in a vehicle to control activation of electronic control units (ECUs) networked together throughout the vehicle," was filed on May 24, 2000, and issued on November 19, 2002.  Ex. 1015 at [22], [45], [57].  Consistent with the effective filing date we accord the challenged claims herein, Millsap is prior art under 35 U.S.C. §§ 102(a) and 102(e).

Millsap, like Staiger and the specification of the '843 patent, describes network communications in automobiles.  *Id.* at [57].  Millsap describes "an on-board vehicle network which utilizes a network management strategy that permits distributed ECUs on the network."  *Id.* at 2:27–33.

Figure 9 of Millsap is reproduced below.



*Fig. 9*

28

Case IPR2017-01519
Patent 8,566,843 B2

Figure 9 depicts Gateway G1 comprising two interfaces, Comm. Kernel 140 ("communication kernel") and Comm. Kernel 142, connected to two different networks, SubNet A and SubNet B. *Id.* SubNet A is connected via high-speed bus 110, and SubNet B is connected via low-speed bus 112. *Id.* at 12:27–30. Each communication kernel includes a data link layer ("DLL") and a physical layer that provides conversion of digital data symbols (i.e., 1's and 0's) generated by the data link layer into electrical signals transmitted on the bus. *Id.* at 12:42–51.

### 3. *Wong*

Wong, which relates to automotive networks, was purportedly published on January 8, 2001. Ex. 1012; Ex. 1014 ¶ 4. Consistent with the effective filing date we accord the challenged claims herein, Wong is prior art under 35 U.S.C. § 102(b).

Wong, like Staiger and the specification of the '843 patent, describes network communications in automobiles. Ex. 1012, 62. Wong discloses that "[v]ehicles will be home for some of the most diverse network and multiprocessing technology over the next five years," and that "[s]tandards will help improve acceptance and reduce costs." *Id.* "Leading the standardization charge for networks in automotive environments is the Controller Area Network (CAN) . . . providing a standard for real-time operating systems for the many embedded processors found in automotive networks." *Id.* Wong discloses further that CAN is not the only kind of network used in automobiles. "At the low end, the Local Interconnect Network (LIN) is being employed," and "[a] variety of multimedia networks

29

Case IPR2017-01519
Patent 8,566,843 B2

are undergoing evaluation too, including a modified version of IEEE-1394 standard to allow operation in a more hostile environment." *Id.* (emphasis omitted). Wong provides a table listing various automobile networking standards, including, for example, CAN, CAN-A, CAN-B, CAN-C, LIN, and FlexRay. *Id.* at 66. According to Wong, "[t]he vehicle of the future will contain a variety of networks tied together primarily for management and diagnostic support. . . . One or more gateways will link various network segments." *Id.* at 64 (Fig. 1).

### 4. *Independent Claim 1*
#### a. *Preamble*

With respect to the preamble of claim 1, which recites "[a] non-transitory computer-readable medium storing a computer program product for sharing information," Petitioner relies on Staiger's disclosure of "a method and a circuit arrangement for communication within and across networks." Ex. 1001, 12:16–18; Pet. 16–17, 62. Petitioner argues that Staiger discloses a computer program product as recited because Staiger discloses that the method and circuit may be implemented using software. Pet. 17–18 (citing Ex. 1004 ¶ 83). Petitioner further argues that Staiger discloses code for performing the features recited in limitations 1.1 to 1.6 by virtue of disclosing a software implementation. *Id.* Patent Owner does not dispute Petitioner's contention.

We find, on the basis of the evidence and explanation provided by Petitioner, that Petitioner has shown sufficiently that Staiger discloses the preamble of claim 1.

Case IPR2017-01519
Patent 8,566,843 B2

### b. Element 1.1

Petitioner contends that Staiger discloses "code for allowing receipt of information associated with a message received utilizing a first network protocol associated with a first network," as recited in claim 1.  Ex. 1001, 12:19–21; Pet. 18, 62.  According to Petitioner, Staiger discloses receiving information associated with a message by virtue of its disclosure of an initializing process that analyzes information encoded in an incoming message received through any one of the CAN busses.  Pet. 18 (citing Ex. 1004 ¶¶ 32, 36).  Petitioner argues that Staiger discloses using a "first network protocol associated with a first network" by virtue of its disclosure of receiving information from remote units using a particular type of bus, such as CAN, FireWire, or MOST.  *Id.*  According to Petitioner, each bus type is associated with a specific network protocol.  *Id.*  Patent Owner does not dispute Petitioner's contention.

We find, on the basis of the evidence and explanation provided by Petitioner, that Petitioner has shown sufficiently that Staiger discloses this limitation.

### c. Element 1.2

Petitioner contends that Staiger discloses "code for causing a determination as to whether a storage resource is available," as recited in claim 1.  Ex. 1001, 12:22–23; Pet. 18–19, 62.  Petitioner relies on Staiger's determination of whether an execution tag registry is available.  Pet. 18–19.  Petitioner argues that Staiger's tag registry is a "storage resource" because it stores data.  *Id.* (citing Ex. 1004 ¶ 41).  Petitioner argues a determination of availability is made because Staiger discloses "a determination of block 520

Case IPR2017-01519
Patent 8,566,843 B2

of whether or not an execution tag registry . . . is available." *Id.* at 18–19 (quoting Ex. 1004 ¶ 62) (ellipses in original).  Patent Owner does not dispute Petitioner's contention.

We find, on the basis of the evidence and explanation provided by Petitioner, that Petitioner has shown sufficiently that Staiger discloses this limitation.

### d.  Element 1.3

Petitioner contends that Staiger discloses "code for determining whether a threshold has been reached and causing a request in connection with the storage resource if the threshold has not been reached," as recited in claim 1.  Ex. 1001, 12:24–26; Pet. 19–21, 62.  Petitioner relies on Staiger's disclosure of a time-out event.  Pet. 19–21 (citing Ex. 1004, Fig. 5).  Staiger discloses that if a tag registry is unavailable, the system re-requests allocation of the registry so long as no time-out has occurred.  *Id.* at 19–20 (citing Ex. 1004 ¶ 62).  Petitioner equates determination of a time-out event with determining whether a threshold has been reached.  *Id.*  Petitioner's argument is based on the construction of "threshold" that we adopted above, namely, "a level, point, or value above which something is true or will take place and below which it is not or will not."  *Id.* at 20.  Petitioner argues that the threshold in Staiger is the amount of time it takes for a time-out event to occur.  *Id.*  If a time-out event has not occurred, i.e., the threshold has not been reached, Petitioner argues Staiger discloses causing the claimed request in connection with a storage resource because Staiger discloses re-requesting allocation of a tag registry if the tag registry was previously unavailable.  *Id.*  Patent Owner does not dispute Petitioner's contention.

Case IPR2017-01519
Patent 8,566,843 B2

We find, on the basis of the evidence and explanation provided by Petitioner, that Petitioner has shown sufficiently that Staiger discloses this limitation.

### e. Element 1.4

Petitioner contends that Staiger discloses "code for, in the event the threshold has been reached, causing an error notification to be sent," as recited in claim 1.  Ex. 1001, 12:27–28; Pet. 21–22, 62.  Petitioner relies on Staiger's disclosure that when a time-out event has occurred (i.e., the threshold has been reached) and the tag registry is unavailable, Staiger causes an "interrupt request" to be sent.  Pet. 21–22 (citing Ex. 1004 ¶ 62, Fig. 5).  Petitioner argues that the "interrupt request" is the claimed error notification because it provides notification of an error with the tag registry. *Id.* (citing Ex. 1003 ¶ 104).  In particular, the "interrupt request" indicates situations in which the intercommunication pre-processor ("IPP") is unavailable or busy.  *Id.* (citing Ex. 1004, Fig. 5).  Patent Owner does not dispute Petitioner's contention.

We find, on the basis of the evidence and explanation provided by Petitioner, that Petitioner has shown sufficiently that Staiger discloses this limitation.

### f. Element 1.5

Petitioner contends that Staiger discloses "code for, in the event the storage resource is available, causing storage of the information utilizing the storage resource," as recited in claim 1.  Ex. 1001, 12:29–31; Pet. 22–25, 62.  Petitioner argues that Staiger teaches that if the tag registry is available and

Case IPR2017-01519
Patent 8,566,843 B2

no time-out has occurred, the tag registry is initiated and the message is retrieved and stored.  Pet. 22–25 (citing Ex. 1004 ¶¶ 64, 66, Figs. 5, 6; Ex. 1003 ¶ 6).  Patent Owner does not dispute Petitioner's contention.

We find, on the basis of the evidence and explanation provided by Petitioner, that Petitioner has shown sufficiently that Staiger discloses this limitation.

g.  *Elements 1.6 and 1.7*

Claim 1 recites "code for causing the information to be shared by:  in real-time, sharing the information utilizing at least one message format corresponding to a second network protocol associated with a second network."  Ex. 1001, 12:32–35.  Petitioner contends that Staiger discloses these limitations.  Pet. 25–27, 62.

In addressing these limitations, Petitioner argues that Staiger discloses sharing messages with a plurality of different destinations.  *Id.* at 25–26 (citing Ex. 1004 ¶¶ 35–36, 48, Fig. 1).  Of particular relevance is the following disclosure, explaining aspects of Figure 2 of Staiger, reproduced above:

> The switchboard 201 is a multiplexing scheme controlled either by one of the CPUs 207 and 208 or the intercommunication preprocessor 200.  This allows the CPUs 207 and 208 to use the functionality of the intercommunication preprocessor 200.  *For example, a message generated by one of the CPUs 207 and 208 has to be broadcasted to several CAN busses 202 to 205 identically.*  In this case, the message is multiplexed by the switchboard 201 to the intercommunication preprocessor 200, then, the intercommunication preprocessor 200 processes the message and initiates immediate distribution.  This procedure significantly saves time, since the intercommunication

34

Case IPR2017-01519
Patent 8,566,843 B2

> preprocessor 200, specialized to operate this tasks [*sic*], will require only a fraction of processing time in comparison to a master CPU formed by one of the CPUs 207 and 208. Furthermore, the master CPU only has to execute one single message operation, in case the message needs to be computed before forwarding, which saves processing time as well.

Ex. 1004 ¶ 51 (emphasis added).

In making its argument, Petitioner observes that CPUs 207 and 208 are connected to bus systems such as FireWire or MOST, corresponding to a "first network protocol," as recited in element 1.1, and that CPUs 202–205 are connected to CAN busses, which are different and correspond to a "second network protocol." Pet. 26. In addition, Petitioner observes that the resulting information sharing occurs in "real-time" because Staiger discloses that CAN, FireWire, and MOST busses are real-time busses with a response time in "milliseconds or microseconds," consistent with our construction. *Id.* at 27 (citing Ex. 1004 ¶¶ 7, 51; Ex. 1003 ¶ 111). We find this identification sufficient.

We recognize that Petitioner elides in its initial presentation of its argument by asserting that "*Staiger* discloses *receiving messages* from 'one of the CPUs 207 and 208'" when Staiger instead refers to "a message *generated* by one of the CPUs 207 and 208." Pet. 26 (emphasis added); Ex. 1004 ¶ 51 (emphasis added). This is a point also made by the dissent. *See post*, at 7–10 (Zado, APJ, dissenting). But "it is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom." *In re Preda*, 401 F.2d 825, 826 (CCPA 1968). In doing so, we note that Patent Owner concedes that Staiger "discloses that messages from the various

35

Case IPR2017-01519
Patent 8,566,843 B2

busses are received and distributed" (although Patent Owner draws other distinctions addressed below). PO Resp. 24 (citing Ex. 1004 ¶ 36). And Patent Owner's expert, Dr. Miller, testified on cross-examination that "the message coming through CPU 207 and 208 has to be broadcasted to the CAN busses 202 to 205 identically." Ex. 1031, 112:2–4. We thus understand Staiger to teach the broadcast of messages received from CPUs 207 and 208 to CAN busses 202–205, as Petitioner asserts.

Furthermore, Staiger's disclosure is necessarily evaluated in the context of the reference as a whole, which describes a method that "focuses on message processing in a system for communicating with remote units over at least one data network and with at least one dedicated CPU." Ex. 1004 ¶ 15. After "a message to be processed is received and it is determined the kind of treatment to be performed with the received message," Staiger performs such processing and, "[f]inally, the result of the message processing is presented to be forwarded to a destination unit." *Id.* Intercommunication among the various busses shown in Figure 2, reproduced above, may occur with switchboard 201, which "is a multiplexing scheme controlled either by one of the CPUs 207 and 208 or the intercommunication preprocessor 200." *Id.* ¶ 51.

Petitioner addresses this multiplexing aspect in its Reply, an argument we find properly responsive to Patent Owner's contentions that "Staiger only describes a type of multiplexing" and that "the Patent does not suggest that multiplexing is a form of sharing." PO Resp. 26. In particular, Petitioner directs our attention to Figure 8 of the '843 patent and related description that suggests multiplexing is a form of "sharing." Reply 17 (citing Ex. 1001, 3:46–59, Fig. 8, 7:53–58). In addition, Petitioner highlights cross-

36

Case IPR2017-01519
Patent 8,566,843 B2

examination testimony of Patent Owner's expert, Dr. Miller, that "I would
say if you transmit data from one device to another device, that the data has
been shared with the second device. . . . Yes, you can use multiplexing for
doing that." *Id.* (quoting Ex. 1031, 24:2–13).

Patent Owner also disputes Petitioner's analysis for these limitations
on the basis that the plain language of elements 1.6 and 1.7[6] requires that
"the information" that is shared must be the same information that is
received in element 1.1, "utilizing a first network protocol associated with a
first network," and which is stored in the storage resource in element 1.5.
PO Resp. 23–24.  According to Patent Owner, elements 1.6 and 1.7 require
"that the information associated with a first network protocol associated with
a first network, which was stored in the storage resource, be shared 'utilizing
a second network protocol associated with a second network.'" *Id.* at 24.
Patent Owner argues that Staiger neither discloses nor enables a skilled
artisan to execute these limitations because "whatever their function, busses
210 and 211 are never connected to any information stored in the storage
resource, because CPUs 207 and 208 interrupt any communication between
them and any storage." *Id.* at 26–27.

Part of this is essentially the same argument that we address in detail
above as a matter of claim construction.  As we explain there, the plain
language of the claim, intrinsic evidence in the form of the Specification,
and extrinsic evidence in the form of a technical-dictionary definition
supports a construction of information sharing that does not require storage

---

[6] Patent Owner erroneously refers to limitations 1.7 and 1.8.  *See, e.g.*, PO
Resp. 23.

Case IPR2017-01519
Patent 8,566,843 B2

of the information.  In advancing this argument with respect to elements 1.6 and 1.7, Patent Owner improperly seeks to import certain specific embodiments described in the Specification into the claims.  But "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1323 (citing *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  The claims are "the sole measure of the grant." *Innova/Pure Water, Inc.*, 381 F.3d at 1115 (citing *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 339 (1961)).

In addition, Patent Owner highlights the word "identically" in Staiger's disclosure of broadcasting messages from CPUs 207 and 208 to CAN busses 202–205:  "The 'identically' means that all busses 202 – 205 must be the same protocol – either CAN-B or CAN-C, but not both at the same time."  PO Resp. 26 (citing Ex. 2001 ¶¶ 65–66).  According to Patent Owner, "Staiger does not contemplate converting of data so as to be available for two protocols, because Staiger does not disclose any form of conversion of data from one protocol to another." *Id.* at 27.  This argument is unpersuasive because Petitioner is relying on the undisputed fact that CPUs 207 and 208 use FireWire or MOST, a different protocol than the CAN protocol used by busses 202–205.

The dissent emphasizes the other aspect of Patent Owner's argument, namely that "the information" recited in element 1.7 "must be the same *information* recited in limitation 1.1 that is associated with a received message." *See post*, at 15–16 (Zado, APJ, dissenting).  As the dissent observes, "Staiger discloses its system receiving a message, and *processing*

38

Case IPR2017-01519
Patent 8,566,843 B2

the message." *Id.* at 15 (citing Ex. 1004 ¶¶ 32–33, 35).  We do not disagree
that "the message would be processed, and a *new, different* message
resulting from the processing would be sent to CAN buses 202 to 205." *Id.*
at 17.  But in concluding that "*the information* that is shared would not
necessarily be the same *information* that is received, as required by
limitations 1.1 and 1.7," the dissent conflates "the information" and "the
message." *See id.*

Such conflation is contrary both to the claim language and the
disclosure of Staiger.  That is, the claim explicitly distinguishes the
*information* and the *message* by reciting, in element 1.1, "allowing receipt of
information associated with a message." Ex. 1001, 12:18.  Staiger similarly
explains, in describing its Figure 1, that "an incoming message" is received,
and that "information [is] encoded in the incoming data." Ex. 1004 ¶ 32.
Although various processing is performed on the *message* in Staiger,
including an "initializing process," a "dynamic process," and a "presentation
process," none of these processes is described as changing the "information
encoded in the incoming data."  In particular, the "initializing process"
"analyses an incoming message . . . and determines further processing based
on configuration data . . . and information encoded in the incoming data."
*Id.* ¶ 32.  The "dynamic process" allows "differentiation to known state of
the art processor topologies."  *Id.* ¶ 33.  And the "presentation process"
allows "output[ting] a message as a result of the computation of the
incoming message." *Id.* ¶ 35.

Although such overhead processing may prepare the received
information for distribution with Staiger's multiplexing techniques, there is
no indication that the informational content of the message is changed.

39

Case IPR2017-01519
Patent 8,566,843 B2

Indeed, Staiger's summary description of this processing appears to take steps to preserve the informational content through storage in a set of registers:

> First, a message to be processed is received and it is determined the kind of treatment to be performed with the received message. Then message specific information specifying contents of the received message and the determined treatment of a received message are stored into a first set of registers. . . . Then the determined treatment gets performed. Meanwhile, the first set of registers are monitored in order to start presenting the result of the message processing once the processing of the message is complete. Finally, the result of the message processing is presented to be forwarded to a destination unit.

Ex. 1004 ¶ 15.

Accordingly, we find, on the basis of the evidence and explanation provided by Petitioner, and having considered Patent Owner's arguments, that Petitioner has shown sufficiently that Staiger discloses elements 1.6 and 1.7.

### h.  *Element 1.8*

Petitioner contends that the combination of Staiger and Millsap teaches or suggests that "the computer program product is associated with an electronic control unit with a plurality of interface portions," as recited in claim 1. Ex. 1001, 12:36–38; Pet. 63–66. Petitioner relies on Millsap's disclosure of electronic control units, or ECUs, in vehicle control system networks. Pet. 63–64 (citing Ex. 1015, abst.). According to Petitioner, the ECUs disclosed in Millsap include a plurality of interface portions because the ECUs are connected to one or more networks. *Id.* (citing Ex. 1015, 1:6–

40

Case IPR2017-01519
Patent 8,566,843 B2

10, 2:41–46, 12:20–36, 12:42–44, Fig. 8; Ex. 1003 ¶ 193).  In particular,
Millsap discloses a gateway ECU comprising two communication kernels,
Comm. Kernel 140 and Comm. Kernel 142, wherein each communication
kernel connects to a different network, Sub-Net A and Sub-Net B,
respectively.  *Id.* at 64 (citing Ex. 1015, Fig. 9).  Petitioner takes the position
that the communication kernels disclose interface portions because they
connect to networks via busses 110 and 112, respectively, and include
physical layers.  *Id.*  Petitioner makes a sufficient showing with these
identifications.

Petitioner also articulates sufficient reasoning for combining these
teachings with Staiger because both references (1) are from the same field of
endeavor, i.e., are related to real-time distributed communication and control
of automotive ECUs; (2) aim to solve similar problems of improving data
processing between automotive ECUs; and (3) use similar techniques to
solve the problems, such as using gateway ECUs to bridge different
networks to allow for communication between the networks.  *Id.* at 65.
Petitioner supports this reasoning with testimony by Dr. Madisetti.  Ex. 1003
¶ 195.  In addition, Petitioner persuasively argues that the combination
would have been predictable and yielded no unexpected results:  "The
communication kernel described in *Millsap* was one of many well-known
and well-understood interface designs for providing data from a bus to a
computing resource that a POSITA would have known could be used with
the adapters of *Staiger*."  Pet. 66 (citing Ex. 1015, 12:42–13:14; Ex. 1003
¶ 197).

Patent Owner disputes whether a person of skill in the art would
combine the teachings of Staiger and Millsap, but this is done more broadly

41

Case IPR2017-01519
Patent 8,566,843 B2

in also discussing the further combination with Wong.  Because that is most relevant to elements 1.9 and 1.10, we address that argument below.

We find, on the basis of the evidence and explanation provided by Petitioner, that Petitioner has shown sufficiently that the combination of Staiger and Millsap discloses element 1.8.

### i.  Elements 1.9 and 1.10

With respect to elements 1.9 and 1.10, which recite first and second interface portions for interfacing with first and second networks, respectively, Petitioner identifies Millsap's communication kernel 140 as a "first interface portion" and communication kernel 142 as a "second interface portion," noting that kernel 140 and kernel 142 connect to different networks, i.e., a first network and a second network.  Pet. 66–68.  For the recitation that each interface portion has a first layer part and a second layer part, Petitioner argues that the physical layer in Millsap's communication kernel reads on the claimed "first layer part," and the communication kernel's DLL reads on the "second layer part."  *Id.* at 68–69.  Petitioner argues that the networks in the combined system of Staiger and Millsap can be CAN, FireWire, or MOST, because Staiger expressly discloses these networks.  *Id.* at 69.  Petitioner further argues that a skilled artisan would have understood other networks, such as LIN and FlexRay, were in use in automotive systems at the time, and could have been used in the combined system of Staiger and Millsap.  *Id.* (citing Ex. 1003 ¶ 202).  Petitioner relies on Wong to support its argument regarding the understanding of a skilled artisan.  *Id.* (citing Ex. 1012, 68, Figs. 1–2).

Case IPR2017-01519
Patent 8,566,843 B2

Petitioner provides a rationale for combining Wong with Staiger and Millsap.  *Id.* at 70.  In pertinent part, Staiger and Millsap relate to bridging different networks in automobiles, and Wong provides a description of various well known networks used in automobiles at the time.  *Id.*  Petitioner argues the combination would have yielded predictable results, namely, a gateway ECU that bridges between not only various types of CAN networks described in Staiger, but also bridges with other well-known networks used in automobiles, as disclosed in Wong.  *Id.* at 71–72.

We are persuaded by Petitioner's arguments regarding the combination of Staiger, Millsap, and Wong.  Patent Owner responds that "Petitioner has also not shown that Millsap is at all related to the invention claimed in the ['843] Patent."  PO Resp. 47.  In particular, Patent Owner asserts that "Millsap does not disclose, for example, any CAN, Flexray or LIN network."  *Id.* (citing Ex. 2001 ¶ 127).  In addition, although Patent Owner agrees that Wong discusses the potential use of CAN, LIN, and Flexray with automotive ECUs, "that is only one small part of the limitations."  *Id.* at 48 (citing Ex. 2001 ¶¶ 129–130).

Although limitations 1.9 and 1.10 are expressed in a lengthy manner, the concepts they recite are relatively straightforward, requiring interfaces that process first messages to produce second messages.  Petitioner provides sufficient reasoning and evidence to support its position that one of skill in the art would combine the teachings of Staiger and Millsap in the manner it proposes in part because they are from the same field of endeavor and because they are reasonably pertinent to the particular problem with which the inventor of the '843 patent was concerned.  *See In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004).

Case IPR2017-01519
Patent 8,566,843 B2

We find, on the basis of the evidence and explanation provided by Petitioner, that Petitioner has shown sufficiently that the combination of Staiger, Millsap, and Wong discloses elements 1.9 and 1.10.

### j. Summary

Based on the foregoing, we conclude that Petitioner shows, by a preponderance of the evidence, that independent claim 1 is unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### 5. Claim 2

Claim 2 depends from claim 1 and recites that "the computer program product is operable such that the determination as to whether the storage resource is available is made utilizing an initial request in connection with the storage resource." Ex. 1001, 12:64–67. For this limitation, drawing an equivalence between the recited "storage resource" and Staiger's tag registry, Petitioner observes that Figure 5 of Staiger illustrates performing a "determination . . . of whether or not an execution tag registry . . . is available." Pet. 31–32 (quoting Ex. 1004 ¶ 62). With this identification, Petitioner makes a sufficient showing, which is not contested by Patent Owner outside of its arguments directed at underlying claim 1.

We conclude that Petitioner shows, by a preponderance of the evidence, that claim 2 is unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

Case IPR2017-01519
Patent 8,566,843 B2

### 6. *Claims 3–8*

Claim 3 depends from claim 1 and recites that "the computer program product is operable such that the storage resource includes a bulletin board resource." Ex. 1001, 13:2–4. According to the Specification of the '843 patent, "the bulletin board may refer to any database that enables users to send and/or read electronic messages, files, and/or other data that are of general interest and/or addressed to no particular person/process." *Id.* at 5:9–13.

For the limitation of claim 3, Petitioner identifies execution tag registry 238, shown in Figure 2 of Staiger, reproduced above, with the recited "bulletin board resource." As Petitioner observes, "[d]ata stored by execution tag registry 238 are shared by execution units 240-244 for processing different processes, and thus are not addressed to any particular process." Pet. 33 (citing Ex. 1003 ¶ 124). In light of the Specification's explanation of a "bulletin board," we agree with Petitioner that Staiger's "ETRs [execution tag registries] are the claimed 'bulletin boards.'" *Id.* (citing Ex. 1003 ¶ 124).

Claims 4–6 each depend from claim 1 and respectively recite similar features, namely that the computer program product is operable such that the storage resource "includes a shared memory," "stores messages that are addressed to no particular process," and "stores messages available by any number of processes." Ex. 1001, 13:5–17. That is, we agree with Petitioner that these features are aspects of execution tag registry 238, as well as of register pool 246, also illustrated in Figure 2 of Staiger.

Claims 7 and 8 each depend from claim 1 and respectively recite that the computer program product is operable such that the storage resource "is

Case IPR2017-01519
Patent 8,566,843 B2

a section of a storage" and "involves a database." Ex. 1001, 13:14–24.
Petitioner contends that these limitations are met by Staiger because
execution tag registry is "included in a DP (dynamic process) execution unit
239 and store[s] data needed for the computation of the received messages."
Pet. 36; Ex. 1004 ¶ 41. We agree, as well as with Petitioner's related
contention involving register pool 246, which is "for storing data and
exchanging data among the execution units 240-241." Pet. 36; Ex. 1004
¶ 41.

Patent Owner does not contest these aspects of Petitioner's analysis
with respect to any of claims 3–8. We conclude that Petitioner shows, by a
preponderance of the evidence, that claims 3–8 are unpatentable under 35
U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### 7. Claims 9, 10, 12, and 13

Claims 9, 10, 12, and 13 each depend from claim 1 and respectively
recite that the computer program product is operable such that the request is
"a re-request," "a storage resource request," "another storage resource
request," and "for access to the storage resource." Ex. 1001, 13:25–30,
13:36–44. For these limitations, Petitioner relies on Staiger's disclosure of
allocating an execution tag registry during the initial process of message
processing. Pet. 36–37 (citing Ex. 1004 ¶ 63, Fig. 5). Figure 5 of Staiger is
reproduced below.

Case IPR2017-01519
Patent 8,566,843 B2



FIG. 5

Figure 5 is a flowchart illustration of message processing in an initializing process.  Ex. 1004 ¶26.

At block 520 of Figure 5, a determination is made whether an execution tag registry is available; if it is, "the process continues to block 526 [for] initiating and preparing the execution tag registry" for access.  Ex. 1004 ¶ 64.  Petitioner accordingly reasons from this disclosure, and we agree, that "the request is a storage resource request," as recited in claim 10, and that "the request is for access to the storage resource," as recited in claim 13.  Pet. 36–37 (citing Ex. 1003 ¶ 130).

47

Case IPR2017-01519
Patent 8,566,843 B2

In addition, Staiger discloses monitoring delay timer 510, which issues a "time-out event." Ex. 1004 ¶ 63. If the requested execution tag registry is not available and "[i]f the time-out event has not yet happened," the process makes a negative determination in time-out block 516, and returns to block 524 to again request access to the execution tag registry at block 520. *Id.* Petitioner accordingly reasons, and we agree, that "the request is a re-request," as recited in claim 9, and that such a re-request is "another storage resource request," as recited in claim 12. Pet. 37 (citing Ex. 1003 ¶ 131).

Patent Owner does not contest these aspects of Petitioner's analysis. We conclude that Petitioner shows, by a preponderance of the evidence, that claims 9, 10, 12, and 13 are unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### 8. *Claim 11*

Claim 11 depends from claim 1 and recites that "the computer program product is operable such that the request is repeated until the storage resource is available unless a certain time beyond the threshold has elapsed." Ex. 1001, 13:32–35. For this limitation, Petitioner relies on Staiger's disclosure of increasing an internal counter that counts the number of interrupt requests. Pet. 38 (citing Ex. 1004 ¶ 61). Because Staiger discloses repeatedly re-requesting access to the execution tag registry if the registry is not available until a time-out event occurs (as in block 516 of Figure 5 of Staiger), Petitioner reasons that the limitation is met. *Id.* at 38–39 (citing Ex. 1004 ¶ 62–63; Ex. 1003 ¶ 133). We agree with this reasoning, which is not separately disputed by Patent Owner.

Case IPR2017-01519
Patent 8,566,843 B2

We conclude that Petitioner shows, by a preponderance of the evidence, that claim 11 is unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### 9. *Claims 14 and 15*

Claims 14 and 15 each depend from independent claim 1 and recite that the computer program product is operable such that the determining, causing, and threshold are each associated with "a same layer of processing" and "a middleware layer that sits under an application layer." Ex. 1001, 13:45–53. For these limitations, Petitioner observes that the determination of whether a time-out event has occurred and the causing of the request in connection with the execution tag registry (blocks 510, 514, 516, and 520 of Figure 5) are all part of an "initializing process." Pet. 40 (citing Ex. 1004 ¶¶ 60–64). As Petitioner asserts, "the initializing process is performed by IP execution unit 226, which is part of the middleware layer," and "IP execution unit 226 sits under a DP execution unit 239 (i.e., the 'application layer')." *Id.* (citing Ex. 1004 ¶ 39, Fig. 2). We agree with these identifications.

Petitioner does not contest this aspect of Petitioner's analysis, and we conclude that Petitioner shows, by a preponderance of the evidence, that claims 14 and 15 are unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### 10. *Claim 16*

Claim 16 depends from claim 1 and recites that the computer program product is operable such that "the sharing includes providing the information

Case IPR2017-01519
Patent 8,566,843 B2

to a plurality of software or hardware operations that share the storage resource." Ex. 1001, 13:55–59.  For this limitation, Petitioner refers again to Staiger's example of broadcasting messages from CPUs 207 and 208 to several CAN busses 202–205.  Pet. 40 (citing Ex. 1004 ¶ 51).  Petitioner reasons that the limitation is met because the messages are received and stored in register pool 238, shown in Figure 2 above, and can thereby be accessed by execution units 240–244 and different processes shown in Figure 3.  *Id.* at 40–41 (citing Ex. 1004 ¶ 41, Figs. 2, 3; Ex. 1003 ¶ 137).  We agree with this reasoning, which Patent Owner does not dispute separately from its arguments directed at claim 1.

We conclude that Petitioner shows, by a preponderance of the evidence, that claim 16 is unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### *11.  Claim 17*

Claim 17 depends from claim 1 and recites that the computer program product is operable such that "the electronic control unit is equipped with at least one gateway function." Ex. 1001, 13:61–63.  For this limitation, Petitioner refers to Staiger's express disclosure of connecting an ECU that performs "routing, gateway, bus bridge and filtering functions" to real-time networks.  Pet. 41 (citing Ex. 1004 ¶¶ 3–5).  Patent Owner does not separately dispute this showing, which we find sufficient.

We conclude that Petitioner shows, by a preponderance of the evidence, that claim 17 is unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

Case IPR2017-01519
Patent 8,566,843 B2

### 12. Claims 18–20

Claims 18–20 each depend from claim 1 and respectively recite that the computer program product is operable such that the real-time involves a response time that "is measured in milliseconds," "is measured in microseconds," and "is less than 1 second." Ex. 1001, 13:65–67, 14:2–4, 14:6–8. Petitioner addresses these limitations with Staiger's express disclosure of "real-time capability of the bus system, i.e., the capability of a system to respond to stimuli within some small upper limit of response time, typically milliseconds or microseconds." Pet. 41–42; Ex. 1004 ¶ 7. Because this disclosure meets the claim limitations, which Patent Owner does not separately dispute, Petitioner makes a sufficient showing.

We conclude that Petitioner shows, by a preponderance of the evidence, that claims 18–20 are unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### 13. Claims 21–23

Claims 21–23 depends from claim 1 and respectively recite that the computer program product is operable such that the first network or the second network is "of the Controller Area Network type," is "of the Flexray network type," and is "of the Local Interconnect Network type." Ex. 1001, 14:11–21. Petitioner addresses the CAN limitation of claim 21 with Staiger's express disclosure that bus adapters 214–217 interface to CAN busses 202–205. Pet. 42 (citing Ex. 1004 ¶ 38; Ex. 1003 ¶ 143). For the Flexray and LIN limitations of claims 22 and 23, Petitioner relies on the express disclosure of such networks in Wong. Pet. 72–73 (citing Ex. 2012, 68). Because the identified disclosures meet the respective claim

51

Case IPR2017-01519
Patent 8,566,843 B2

limitations, which Patent Owner does not separately dispute, Petitioner makes a sufficient showing.

We conclude that Petitioner shows, by a preponderance of the evidence, that claims 21–23 are unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### 14.   Claim 24

Claim 24 depends from claim 1 and recites specific structure for each of the interface-related layer parts.  Specifically, the claim requires that "the first interface-related first layer part or the second interface-related first layer part include[] at least one of a controller, a communication interface, or an operating system interface"; and the claim requires that "the first interface-related second layer part or the second interface-related second layer part include[] at least one of a remote conversion layer, a communication interface, or an operating system interface."  Ex. 1001, 14:22–31.  Petitioner focuses on the "communication interface" recited within each of the two limitations, and the correspondences discussed above in connection with limitations 1.9 and 1.10 of independent claim 1.  Because those identified parts receive or transmit messages, Petitioner contends that each of them is at least a "communication interface."  Pet. 42–44.  We agree, and Patent Owner does not dispute this aspect of Petitioner's analysis.

We conclude that Petitioner shows, by a preponderance of the evidence, that claim 24 is unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

Case IPR2017-01519
Patent 8,566,843 B2

### 15. *Claim 25*

Claim 25 depends from claim 1 and recites that the computer program product is operable such that "the first interface portion and the second interface portion are each separate portions of a same apparatus." Ex. 1001, 14:34–37. We agree with Petitioner that Figure 2 of Staiger, reproduced above, shows the two interface portions, i.e., bus adapter 214 and bus adapter 216 are separate portions of the same apparatus, i.e., intercommunication preprocessor 200. Pet. 44 (citing Ex. 1004, Fig. 2; Ex. 1003 ¶ 149).

### 16. *Claims 26–30*

Claims 26–30 each depend from claim 1 and recite that the computer program product is operable such that "the first network and the second network are heterogeneous networks," and certain variations requiring that the second network protocol (and a third network protocol in the case of claim 30) be different than the first network protocol. Ex. 1001, 14:38–15:3. Petitioner addresses these limitations by observing that bus adapters 214–217 interfacing with a CAN have different protocols than CPUs 207 and 208 interfacing with FireWire or MOST. Pet. 45. By drawing a correspondence between the former and the "first network protocol," and between the latter and the "second network protocol," Petitioner reasons that they are heterogeneous networks because they have at least one aspect that is different, in accordance with the claim construction we adopt. *Id.* In particular, Petitioner asserts that "[t]hese different buses transmit and receive data at different rates and use message formats not compatible with each

Case IPR2017-01519
Patent 8,566,843 B2

other," supporting that assertion with testimony of Dr. Madisetti.  *Id.* (citing
Ex. 1012, 64; Ex. 1003 ¶ 152).

Alternatively, Petitioner observes that the bus adapters may interface
with CAN-B or CAN-C, "which are different network protocols and
physical implementations from each other."  *Id.* at 46 (citing Ex. 1004 ¶ 38).
Also supported by testimony of Dr. Madisetti, Petitioner asserts that "[t]hese
different implementations of CAN transmit and receive data at different
rates and are therefore not compatible with each other."  *Id.* (citing Ex. 1012,
64; Ex. 1003 ¶ 153).  The use of both CAN-B and CAN-C also forms the
basis for Petitioner's argument regarding claim 30, which requires a third
network protocol.  *Id.* at 47.  Specifically, Petitioner reasons that CAN-B
corresponds to the "first network protocol," CAN-C corresponds to the
"second network protocol," and FireWire or MOST corresponds to the "third
network protocol."  *Id.*  In such a circumstance, "[t]he first network protocol
is different than either of the second and third network protocols," as claim
30 requires.  *Id.* (citing Ex. 1003 ¶ 155).

Patent Owner disputes this analysis with an argument that generally
parallels its argument for independent claim 1.  That is, Patent Owner
contends, similar to its argument directed at element 1.7 of claim 1, that
Petitioner's assertions "do not alter the underlying issue that Staiger does not
disclose the sharing of information received via a message utilizing a first
network protocol with a second network using a different protocol,
regardless of whether the rates are different."  PO Resp. 32.  For reasons
discussed in depth above in connection with claim 1, Patent Owner's
arguments are not persuasive.

54

Case IPR2017-01519
Patent 8,566,843 B2

In addressing claim 30, Patent Owner makes the further argument that "[w]hile it is correct that Staiger shows that Staiger's central unit receives information from as many as three different networks, Staiger does not even contemplate operating two different CAN protocols side-by-side." *Id.* at 34. Specifically, Patent Owner contends that "it is clear that Staiger intended the system to have identical CAN busses," whether they be CAN-B or CAN-C. *Id.* (citing Ex. 2001 ¶ 91). Patent Owner appears to ground this contention in Staiger's assertion that "[t]he additional first and second bus systems 210 and 211 might be different from each other." *See id.* But neither Patent Owner nor its expert explains why having bus systems 210 and 211 be different from each other limits whether CAN busses 202–205 need to use the same protocol. Patent Owner stresses that, in Staiger's statement that CAN busses 202–205 may use CAN-C or CAN-B, "[t]he 'or' is of key importance – it is not 'and/or'." *Id.* (citing Ex. 2001 ¶¶ 89–91). But as Petitioner argues in reply, "'or' is true when CAN-C, CAN-B, or CAN-C and CAN-B are present." Reply 22 (citing Ex. 1031, 13:24–14:17). Accordingly, Patent Owner's argument is unpersuasive.

We conclude that Petitioner shows, by a preponderance of the evidence, that claims 26–30 are unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### 17. *Claims 31–34*

Claim 31 depends from claim 1 and recites that the computer program product is operable such that the storage resource "is protected utilizing semaphores." Ex. 1001, 15:6–7. Claims 32–34 depend from claim 31 and

Case IPR2017-01519
Patent 8,566,843 B2

respectively recite heterogeneous networks, information storage in response to interrupts, and updating of information at different rates. *Id.* at 15:8–24.

For the limitation of claim 31, Petitioner contends that a person of ordinary skill in the art would recognize that, to protect the execution tag registry, Staiger "necessarily would have to implement techniques that lock access." Pet. 48. Petitioner further contends that "[u]sing semaphores to lock access was a standard technique . . . , well known to people skilled in the art at the time before '843's priority date," and cites two documentary references, as well as testimony of Dr. Madisetti in support of that contention. *Id.* (citing Exs. 1019, 1020; Ex. 1003 ¶ 158). Patent Owner does not dispute this aspect of Petitioner's analysis, which we find sufficient for this limitation.

For the limitation of claim 32, Petitioner relies on the disclosure of heterogeneous networks discussed above for claims 26–30. Pet. 48–49. According to Petitioner, Staiger "discloses various examples of the execution tag registry task, none of which depends on the underlying network." *Id.* at 49. That is, "[p]rocessing of the execution tag registry task described by *Staiger* is not any different for different networks, be[] it CAN-B, CAN-C, Flexray, LIN, or other." *Id.* Patent Owner does not dispute this characterization of Staiger, with which we agree. Petitioner's reasoning that Staiger thereby discloses that "each of a plurality of different processes process the information in a manner that is isolated from temporal characteristics associated with the heterogeneous networks" is also consistent with our adopted construction of "isolated from temporal characteristics." *See id.*

Case IPR2017-01519
Patent 8,566,843 B2

For the limitation of claim 33, Petitioner refers to Figure 4 of Staiger, which illustrates that some interrupts are associated with the initializing process, and other interrupts (such as explicitly shown interrupt request lines, i.e., "IRQs") are associated with presentation processes. Pet. 50–51. With this identification, Petitioner makes a sufficient showing, which is not disputed by Patent Owner.

For the limitation of claim 34, Petitioner relies on the fact that different CAN busses may be low-speed or high-speed, thereby transmitting and receiving data at different rates. *Id.* at 51–52. Petitioner reasons that "the different processes are therefore updated with the information at a first rate that differs from a second rate with which the different processes send the information to the storage resource," as required by the claim. *Id.* This reasoning is not separately disputed by Patent Owner, and is a sufficient showing.

We conclude that Petitioner shows, by a preponderance of the evidence, that claims 31–34 are unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### 18. *Claim 35*

Claim 35 depends from claim 1 and recites that the computer program product is operable such that "the storage resource is operable so as not to require a network layer translation of messages." Ex. 1001, 15:27–28. For this limitation, Petitioner observes that Staiger discloses "receiving messages from the network layer (e.g., the various buses), processing the message in an initializing process before storing the messages in ETR 238." Pet. 52 (citing Ex. 1004 ¶¶ 60–62). According to Petitioner, because "[d]uring the

57

Case IPR2017-01519
Patent 8,566,843 B2

initializing process, no network information needs to be removed from the messages," there is no need for network layer translation. *Id.* We agree with this reasoning, which is not separately disputed by Patent Owner.

We conclude that Petitioner shows, by a preponderance of the evidence, that claim 35 is unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### 19. Claims 36 and 37

Claims 36 and 37 each depend from claim 1 and respectively recite that the computer program product is operable such that "the threshold includes a timeout" and "the threshold includes a time-related threshold." Ex. 1001, 15:29–35. For these limitations, similar to element 1.4 of independent claim 1, discussed above, Petitioner relies on Staiger's disclosure of re-requesting access to an execution tag registry if the registry is not available and "a time-out event has not yet happened." Pet. 52–53 (citing Ex. 1004 ¶¶ 62–63, Fig. 5). We are persuaded by Petitioner's argument that these aspects of the prior art meet the claim limitations, and Patent Owner does not separately dispute Petitioner's reasoning.

We conclude that claims 36 and 37 are unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### 20. Claims 38 and 41

Claims 38 and 41 each depend from claim 1 and recite that messages include protocol data units. Ex. 1001, 15:36–42, 15:56–59. Petitioner reasons that the recited "first layer messages" and "second layer messages" in Staiger are received or associated with messages received from multiple

Case IPR2017-01519
Patent 8,566,843 B2

networks, "so they all include data packets communicated across network protocols, which were also known as 'protocol data units (PDUs).'"  Pet. 54. Petitioner cites uncontroverted testimony of Dr. Madisetti that supports the assertion, and Patent Owner does not separately dispute this aspect of Petitioner's analysis.  *See* Ex. 1003 ¶ 170.

We conclude that Petitioner shows, by a preponderance of the evidence, that claims 38 and 41 are unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.


### 21.  Claims 39 and 42

Claims 39 and 42 each depend from claim 1 and recite that messages include headers.  Ex. 1001, 15:43–47, 15:60–62.  Petitioner observes that Staiger's messages include protocol data units, "which by definition, have headers." Pet. 55 (citing Ex. 1003 ¶ 172).  In addition, Petitioner addresses the requirement of claim 39 that "the first interface-related first layer messages and the first interface-related second layer messages are different in terms of at least one aspect of headers thereof" by observing that, with the correspondence drawn in its analysis of claim 1, the "first interface-related first layer messages have network application headers, and the "first interface-related second layer messages" have filter headers.  *Id.* (citing Ex. 1004, Fig. 9; Ex. 1003 ¶ 172).  These identifications are sufficient, and Patent Owner does not separately dispute this aspect of Petitioner's analysis.

We conclude that Petitioner shows, by a preponderance of the evidence, that claims 39 and 42 are unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

Case IPR2017-01519
Patent 8,566,843 B2

### 22.  Claim 40

Claim 40 depends from claim 1 and recites that "the processing includes conversion" and that "the first interface-related second layer part carries out the processing of the first interface-related first layer messages." Ex. 1001, 15:48–55.  Petitioner contends that such processing is disclosed by Staiger because "the bus messages from the physical layer network are received and sent through multiplexer 222 to control engine 224 of the [intercommunication preprocessor] for processing."  Pet. 56 (citing Ex. 1004 ¶¶ 38–39; Ex. 1003 ¶ 174).  This contention is consistent with the claim limitation, and is not separately disputed by Patent Owner.

We conclude that Petitioner shows, by a preponderance of the evidence, that claim 40 is unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### 23.  Claim 43

Claim 43 depends from claim 1 and recites that the computer program product is operable such that "the first interface-related first layer part is associated with a layer that is below another layer associated [with] the first interface-related second layer part."  Ex. 1001, 15:65–67.  Petitioner addresses this limitation by referring to the interfacing of Staiger's bus adapters 214–217 with multiplexer 222, which forms part of switchboard 201.  Pet. 57–58 (citing Ex. 1004 ¶¶ 38, 50).  Petitioner reasons that "the CAN physical layers are associated with the 'first interface-related first layer part' and located below switchboard 201 that is associated with the 'first interface-related second layer part.'"  *Id.* at 58 (citing Ex. 1003 ¶ 176).  This aspect of Petitioner's analysis is not separately disputed by Patent Owner.

Case IPR2017-01519
Patent 8,566,843 B2

We conclude that Petitioner shows, by a preponderance of the evidence, that claim 43 is unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### 23. *Claims 44 and 45*

Claims 44 and 45 depend from claim 1 and respectively recite that the computer program product is operable such that the first interface-related second layer messages and the second interface-related first layer messages "have a same format" and "are a same messages." Ex. 1001, 16:1–10. As previously noted, Staiger discloses that busses 202–205 may use CAN-B or CAN-C. Ex. 1004 ¶ 38. In light of this, Petitioner reasons that

> messages received by bus adapter 214 (i.e., "first interface-related first layer messages") from the CAN-C must be converted to messages (i.e., "first interface-related second layer messages") in the format associated with the CAN-B so that they match with messages received by bus adapter 216 from CAN-B (i.e., "second interface-related first layer messages").

Pet. 58. Petitioner provides the example of messages received by bus adapters 214–217 from the CAN being converted to messages in the format associated with the other network protocol so that they match with messages received by CPUs 207 and 208. *Id.* at 58–59. Accordingly, "*Staiger* therefore discloses that the messages have a same format, as in claim 44, and are the same messages, as in claim 45." *Id.* at 59. Patent Owner does not separately dispute this aspect of Petitioner's analysis, which we find sufficient.

Case IPR2017-01519
Patent 8,566,843 B2

We conclude that Petitioner shows, by a preponderance of the evidence, that claims 44 and 45 are unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### 24.  *Claim 46*

Claim 46 depends from claim 1 and recites that the computer program product is operable such that "a waiting period is implemented between re-requests for the storage resource."  Ex. 1001, 16:11–14.  Relying again on the delay timer discussed above in connection with claims 9, 10, 12, and 13, Petitioner contends that the timer "inherently has a waiting period or interval between consecutive time increments, [and] there is a waiting period between the re-requests."  Pet. 59–60.  Petitioner supports this inherency argument with testimony of Dr. Madisetti, and the argument is not separately disputed by Patent Owner.  *See* Ex. 1003 ¶ 180.

We find this argument sufficient on this record, and conclude that Petitioner shows, by a preponderance of the evidence, that claim 46 is unpatentable over Staiger, Millsap, and Wong.

### 25.  *Claim 47*

Independent claim 47 is a method claim that substantially parallels computer-readable medium claim 1.  Ex. 1001, 16:15–50.  Petitioner contends that claim 47 is therefore unpatentable "[f]or the same reasons" as claim 1, and Patent Owner similarly relies only on arguments directed at claim 1 and addressed above.  Pet. 60; PO Resp. 35.  Because we find that Petitioner makes a sufficient showing with respect to claim 1, we also find that Petitioner makes a sufficient showing with respect to claim 47.

Case IPR2017-01519
Patent 8,566,843 B2

We conclude that Petitioner shows, by a preponderance of the evidence, that claim 47 is unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

### 26.  Claim 48

Independent claim 48 includes many limitations that have evident counterparts in independent claim 1.  We have reviewed Petitioner's analysis of claim 48, and find it sufficient.  *See* Pet. 74–92.  We note that that analysis applies Millsap for elements 48.7–47.9 in a manner similar to elements 1.8–1.10, discussed in detail above.  Patent Owner's arguments are also similar to those it makes in connection with claim 1, and we therefore address them briefly.  *See* PO Resp. 35–46.

First, Patent Owner disputes Petitioner's showing with respect to element 48.7, which recites that the computer program product be operable "such that the information is capable of being shared in real-time utilizing a control unit that includes a plurality of interfaces."  *Id.* at 37–43.  In addressing Petitioner's analysis of this element, Patent Owner reiterates its argument that sharing information requires storage:  "Petitioner . . . never explain[s] how Staiger allegedly discloses a sharing of a message that was received in limitation 48.1 and was then stored as per limitation 48.6."  *Id.* at 39 (citing Ex. 2001 ¶ 101).  Because we disagree that this is a requirement of the claim, for the reasons discussed above, Patent Owner's argument is not persuasive.

In addition, the dissent agrees with Patent Owner that "Petitioner has not shown that the information associated with the received message is the same as the information associated with the outgoing message that Petitioner

Case IPR2017-01519
Patent 8,566,843 B2

asserts is capable of being shared in real-time." *See post* at 19 (Zado, APJ, dissenting).  For the reasons we set forth in our discussion of limitations 1.7 (*see supra*, Section II.F.4.g), we disagree with the dissent's reading of Staiger on this point.

Second, Patent Owner disputes Petitioner's showing with respect to element 48.9, which recites "a second interface, the second interface including a second interface-related component for receiving second data units, the computer program product being operable such that the second data units are processed after which processed second data units are provided." *Id.* at 43–46.  In particular, Patent Owner contends that Staiger's "discussion of Figure 2 shows clearly that information is broadcast through the CAN buses, but there is nothing [in] Staiger that reflects messages being received from the CAN buses." *Id.* at 45 (citing Ex. 2001 ¶ 119).  This argument is similar in respects to Patent Owner's argument regarding element 1.7 of claim 1, addressed above, in that the argument does not account for the reasonable inferences that may be drawn from Staiger as a whole.  As Petitioner points out, Staiger discloses that the intercommunication preprocessor provides storage for "messages received from either one of the bus adapters 214 to 217 or one of the CPUs 207 and 208." Ex. 1004 ¶ 40; *see* Reply 24.  One of skill in the art would reasonably understand that Staiger implicitly contemplates the receipt of messages from the CAN busses.

Accordingly, we conclude that Petitioner shows, by a preponderance of the evidence, that independent claim 48 is unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

Case IPR2017-01519
Patent 8,566,843 B2

*27.  Claims 49 and 50*

Independent claims 49 and 50 respectively recite "[a] non-transitory computer-readable medium storing a computer program product for sharing information" and "[a]n apparatus," with limitations that Petitioner characterizes as "substantially identical to or even broader than elements" of independent claim 1.  Pet. 93.  We agree with this characterization, and Patent Owner advances no arguments different from those made in connection with claim 1.  *See* PO Resp. 46.

We accordingly conclude that Petitioner shows, by a preponderance of the evidence, that claims 49 and 50 are unpatentable under 35 U.S.C. § 103(a) over Staiger, Millsap, and Wong.

*G.  Anticipation by and Obviousness over Staiger*

As noted above, grounds involving anticipation of claims 1–21, 24–27, 49, and 50 by Staiger, and obviousness of those claims over Staiger, were added to this proceeding in response to the Supreme Court's decision in *SAS Institute*.  In Patent Owner's Response and in Petitioner's Reply, these additional grounds are not separately addressed outside the arguments presented for the obviousness combination over Staiger, Millsap, and Wong.  Accordingly, and because the grounds involving Staiger alone are moot in light of our conclusions regarding Staiger, Millsap, and Wong, we do not further address the grounds involving Staiger alone.

*H.  Constitutionality of Inter Partes Review Proceedings*

Patent Owner contends that "this IPR should be terminated and the petition dismissed because the IPR system is unconstitutional."  PO Resp.

Case IPR2017-01519
Patent 8,566,843 B2

55–56.  This argument is foreclosed by the Supreme Court's determination
otherwise.  *Oil States Energy Services, LLC v. Greene's Energy Group,
LLC*, 138 S. Ct. 1365, 1370 (2018) ("In this case, we address whether inter
partes review violates Article III or the Seventh Amendment of the
Constitution.  We hold that it violates neither.").

### I. Estoppel

Petitioner argues that under 37 C.F.R. § 42.73(d)(3)(i) Patent Owner
is estopped from arguing any claim not patentably distinct from those held
unpatentable.  Reply 2.  Rule 42.73(d)(3) states "[a] patent applicant or
owner is precluded from taking action inconsistent with the adverse
judgment, including obtaining in any patent: (i) [a] claim that is not
patentably distinct from a finally refused or canceled claim."  Because we
conclude that Petitioner has made a sufficient showing with respect to all
challenged claims, even considering Patent Owner's arguments, we do not
reach this issue.

### III. ORDER

It is

ORDERED that, based on a preponderance of the evidence, claims 1–
50 of U.S. Patent No. 8,566,843 B2 are held to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision,
parties to this proceeding seeking judicial review of our decision must
comply with the notice and service requirements of 37 C.F.R. § 90.2.

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BMW OF NORTH AMERICA, LLC,
Petitioner,

v.

STRAGENT, LLC,
Patent Owner.

_____

Case IPR2017-01519
Patent 8,566,843 B2

_____

Before LYNNE E. PETTIGREW, PATRICK M. BOUCHER, and
CHRISTA P. ZADO, *Administrative Patent Judges*.

ZADO, *Administrative Patent Judge*, dissenting.

I respectfully dissent from my colleagues' determination that
Petitioner has shown the challenged claims of the '843 patent are
unpatentable.  In my view, the majority decision finds incorrectly that
Petitioner has established, by a preponderance of the evidence, that the
challenged claims are unpatentable.

## I.     INTRODUCTION

Of the claims challenged by Petitioner, claims 1, 47, 48, 49, and 50
are independent, and claims 2–46 depend from claim 1.  Petitioner asserts,
under all three grounds, that Staiger discloses limitation 1.7 of claim 1.
Pet. 26–27 (arguing with regard to its first two grounds, i.e., anticipation by

Case IPR2017-01519
Patent 8,566,843 B2

Staiger and obviousness over Staiger, that Staiger discloses limitation 1.7);
*id.* at 62–73 (arguing with regard to its third ground, i.e., obviousness over
the combination of Staiger, Millsap, and Wong, limitations 1.8–1.10, but not
including any additional arguments for limitation 1.7).  For reasons stated
below, it is my view that Petitioner has not shown sufficiently that Staiger
discloses limitation 1.7, and therefore, has not established unpatentability of
claim 1 by a preponderance of the evidence.

Claims 2–21 and 24–46 depend either directly or indirectly from
claim 1, and therefore include all the limitations of claim 1.  Petitioner does
not set forth additional evidence or arguments for these dependent claims
that addresses the shortcomings of the arguments for limitation 1.7.  *Id.* at
31–60, 72.  Therefore, it is my view that Petitioner also had not established
unpatentability of claims 2–21 and 24–46 by a preponderance of the
evidence.

As to independent claims 47, 49, and 50, Petitioner asserts these
claims "are substantially identical to or even broader than elements 1.0–
1.10." *Id.* at 60, 93.  Petitioner does not provide any additional evidence or
arguments for these independent claims that addresses the shortcomings of
the arguments for limitation 1.7.  *Id.*  Because Petitioner does not make a
sufficient showing for claim 1, and Petitioner asserts claims 47 and 49 and
50 are substantially identical to or even broader than limitations 1.0 to 1.10
of claim 1, and does not provide any additional arguments or evidence for
these claims, it is my view that Petitioner has not established unpatentability
of claims 2–47, 49, and 50 by a preponderance of the evidence.

To the extent there are any differences between claim 1 and claims 47,
49 and 50 that would require additional or different evidence and argument,

Case IPR2017-01519
Patent 8,566,843 B2

Petitioner does not identify any or provide additional evidence and argument to address them.  37 C.F.R. § 42.104(b)(4); *id.* § 42.22(a)(2); *id.* § 42.104(b)(5).  As the Federal Circuit has explained, "[i]n an IPR, the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable."  *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016).

Petitioner challenges claim 48 under only its third ground, i.e., obviousness over the combination of Staiger, Millsap, and Wong.  Pet. 12. For reasons stated below, it is my view that Petitioner has not shown sufficiently that Staiger discloses limitation 48.1 of claim 48, and therefore, has not established unpatentability of claim 48 by a preponderance of the evidence.

## II.    ANALYSIS

### A.    *Principles of Law*

To prevail on its challenges, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable.  35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).  "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable."  *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d at 1363.  It is incumbent upon Petitioner to identify, in the Petition, "in writing and with particularity each claim challenged, the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge to each claim."  35 U.S.C. § 312(a)(3); *see also Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (2016) ("It is of the utmost importance that petitioners in the IPR proceedings

Case IPR2017-01519
Patent 8,566,843 B2

adhere to the requirement that the initial petition identify 'with particularity' the 'evidence that supports the grounds for the challenge to each claim.' 35 U.S.C. § 312(a)(3).").  Although the burden of production may shift, the burden of persuasion on the issue of patentability remains with Petitioner always and never shifts to Patent Owner.  *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

Petitioner asserts unpatentability under both §§ 102 and 103.  Pet. 12. To establish anticipation, each and every element in a claim, arranged as recited in the claim, must be found in a single prior art reference.  *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008); *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001).  Prior art references must be "'considered together with the knowledge of one of ordinary skill in the pertinent art.'"  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).  Also, "it is proper to take into account not only specific teachings of the reference but also the inferences which one skilled in the art would reasonably be expected to draw therefrom."  *In re Preda*, 401 F.2d 825, 826 (CCPA 1968).  As the Court of Appeals for the Federal Circuit recently explained, the dispositive question for anticipation is whether one skilled in the art would reasonably understand or infer from a prior art reference that every claim element is disclosed in that reference. *Eli Lilly v. Los Angeles Biomedical Research Inst.*, 849 F.3d 1073, 1074–1075 (Fed. Cir. 2017).

A claim is unpatentable for obviousness under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which

Case IPR2017-01519
Patent 8,566,843 B2

said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations, including:  (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when in evidence, objective indicia of non-obviousness, i.e., secondary considerations.  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).  Furthermore, Petitioner does not satisfy its burden of proving obviousness by employing "mere conclusory statements."  *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

B.    *Claim 1*

(1) "[1.6] *code for causing the information to be shared by:*"

(2) "[1.7] *in real-time, sharing the information utilizing at least one message format corresponding to a second network protocol associated with a second network*"

Limitations 1.6 and 1.7 recite "code for causing *the information* to be shared by: in real-time, sharing the information utilizing at least one message format corresponding to a second network protocol associated with a second network."  Ex. 1001, 12:32–35 (emphasis added).  The parties do not dispute, and the majority does not state otherwise, that "*the* information" as recited in limitations 1.6 and 1.7 refers to the same information recited in limitation 1.1.[7]  Limitation 1.1 recites "code for allowing receipt of

---

[7] As discussed in the majority decision, the parties dispute whether "the information" must also be stored, as recited in limitation 1.5.  Majority Dec.

Case IPR2017-01519
Patent 8,566,843 B2

*information* associated with a message received utilizing a first network protocol associated with a first network." *Id.* at 12:19–21 (emphasis added). In light of this antecedent, limitations 1.6 and 1.7 require code that causes sharing of *the same information* that is received in a message formatted using a first format, and sharing that *information* in a different, second format.

### 1.    *Petitioner's Argument*

(3) *"sharing the information utilizing at least one message format corresponding to a second network protocol associated with a second network"*

For reasons discussed below, contrary to Petitioner's assertion, I would find that Staiger does not disclose limitation 1.7.

Petitioner relies on Staiger alone for disclosure of "sharing the information utilizing at least one message format corresponding to a second network protocol associated with a second network," as recited in limitation 1.7.  Pet. 26.  Petitioner's argument is that Staiger satisfies this limitation vis-à-vis disclosure that one of CPUs 207 and 208 receives a message from one of buses 210 or 211 and broadcasts the message to several of CAN buses 202 to 205 identically.  *Id.*  Petitioner's theory is that a message using a first network protocol (e.g., FireWire or MOST), as required by limitation 1.1, is received by one of CPUs 207 and 208 from one of buses 210 and 211.  *Id.*  Furthermore, the received message is converted by one of CPUs 207 and 208 into a message that uses a second network protocol (e.g., CAN), and then is shared via broadcasting to several of CAN

---

15–19, 37–38.  I agree with my colleagues that the claim does not require the information to be stored.

Case IPR2017-01519
Patent 8,566,843 B2

buses 202 to 205. *Id.* Petitioner does not present any alternative theory as to how Staiger discloses limitation 1.7. *Id.*

Contrary to the argument and theory upon which Petitioner relies, Staiger does not expressly disclose CPUs 207 and 208 broadcasting a message *received from* buses 210 and 211 to CAN buses 202 to 205. Petitioner's argument in the Petition on this issue, in its entirety, is reproduced below:

> *Staiger* discloses receiving messages from "one of the CPUs 207 and 208" and broadcasting the message "to several CAN busses 202–205 identically." Ex. 1004, ¶ 51. CPUs 207–208 are connected to bus systems such as FireWire or MOST (i.e., a "first network protocol"), which are different than CAN busses 202–205 (i.e., a "second network protocol"). *Id.*, ¶ 36.

Pet. 26. Here, Petitioner identifies disclosure in Staiger of a scenario in which one of CPUs 207 and 208 broadcasts a message to CAN buses 202 to 205 identically. Ex. 1004 ¶ 51. However, Staiger does not say that this message is received from buses 210 or 211. *Id.* On the contrary, Staiger says that this message is *generated by one of CPUs 207 and 208. Id.* Nowhere does Staiger disclose that this message comes from any source other than one of CPUs 207 and 208.

The only disclosure regarding buses 210 and 211 includes the statement that they are connected to CPUs 207 and 208, and identification of the network protocols the buses may use. Ex. 1004, ¶ 36. Aside from the depiction in Figure 2 showing a connection between buses 210 and 211 and CPUs 207 and 208, the entire disclosure regarding these buses is reproduced below:

7

Case IPR2017-01519
Patent 8,566,843 B2

> The first and the second CPU 207 and 208 are
> providing connections to first and second additional
> bus systems 210 and 211, respectively. The
> additional first and second bus systems 210 and 211
> might be different from each other and formed by,
> e.g., a FireWire system, i.e., a high performance
> serial bus specified according to IEEE 1394, or any
> other kind of multimedia bus, such as, e.g., MOST
> (Media Oriented Systems Transport).

*Id.* As is readily seen from this disclosure, Staiger never explains the

purpose of buses 210 and 211, nor describes what they are connected to

(aside from CPUs 207 and 208). Nor does Staiger disclose the types of

messages CPUs 207 and 208 receive from buses 210 and 211, and in

particular, whether these messages contain information to be shared with

CAN buses 202 to 205.

Based on the foregoing, there is no question that Staiger does not

expressly disclose that the message broadcast from one of CPUs 207 and

208 to CAN buses 202 to 205 is received from one of buses 210 to 211.

In the absence of any express disclosure, it is proper to take into

account the inferences which one of skill in the art would be reasonably

expected to draw from Staiger. *In re Preda*, 401 F.2d at 826; *Eli Lilly v. Los

Angeles Biomedical Research Inst.*, 849 F.3d at 1074–1075. With regard to

the inferences a skilled artisan would reasonably have drawn, Petitioner

bears the burden of demonstrating that a person of ordinary skill in the art

would have inferred that Staiger discloses that the message broadcast from

one of CPUs 207 and 208 comes in through one of buses 210 and 211.

However, on this point, the Petition is utterly silent. Pet. 26. As discussed

above, the Petition provides only two sentences of argument, neither of

8

Case IPR2017-01519
Patent 8,566,843 B2

which addresses the inferences a skilled artisan would have drawn.  *Id.*
Indeed, the Petition does not even assert that a skilled artisan would have
inferred that messages broadcasted by CPUs 207 to 208 to CAN buses 202
to 205 are received from buses 210 and 211 and converted from one protocol
to another by the CPUs, as required by limitation 1.7.  *Id.*  Rather, the
Petition merely points out that buses 210 and 211 are connected to
CPUs 207 and 208, without stating what inferences would have been drawn,
and why.  *Id.* (stating that "CPUs 207–208 are connected to bus systems
such as FireWire or MOST (i.e., a 'first network protocol'), which are
different than CAN busses 202–205 (i.e., a second network protocol').").
However, given that Staiger says the message to be broadcasted is *generated*
*by one of CPUs 207 and 208*, Petitioner needs to explain why a skilled
artisan would have drawn the inference that the message, rather than being
generated by one of the CPUs as stated in Staiger, instead comes from
another source.  Furthermore, in view of Staiger's lack of description
regarding buses 210 and 211, Petitioner needs to explain why a skilled
artisan would have inferred that the other source for the message is one of
buses 210 and 211.  Regardless of whether Petitioner could have presented
sufficient argument and evidence regarding the inferences a skilled artisan
would have drawn, Petitioner clearly has not done so here.

In addition to the argument in the Petition, Petitioner argues in the
Reply that Dr. Miller provides testimony that supports its position.
Reply 18–19.  However, his testimony does not support Petitioner's
position.  In particular, Petitioner relies on Dr. Miller's testimony to support
the statements in the Petition that Staiger discloses: 1) CPUs 207 and 208
are connected to buses 210 and 211; 2) buses 210 and 211 use the protocols

9

Case IPR2017-01519
Patent 8,566,843 B2

FireWire or MOST, whereas CAN buses 202 to 205 use the CAN protocol; and 3) CPUs 207 and 208 broadcast messages to CAN buses 202 to 205 identically. *Id.* However, like the Petition, Petitioner does not explain why a skilled artisan would have drawn the inference that the broadcasted messages, rather than being generated by the CPUs as disclosed in Staiger, instead come from one of buses 210 and 211. Petitioner's explanation amounts to little more than observing that there is a connection between buses 210 and 211. However, as discussed above, absent any description in Staiger of the purpose of these buses, the devices connected to them, and they types of messages received by them, mere observation that there is a connection, in my view, is insufficient to satisfy Petitioner's burden. The majority decision discusses Petitioner's argument in the Reply, namely Petitioner's reliance on Dr. Miller's testimony, which is discussed more fully below, *infra* Section II.B.3.

In my view, absent sufficient explanation from Petitioner, as well as underlying evidence, Petitioner has not satisfied its burden. For the foregoing reasons, it is my view that Petitioner has failed to show that Staiger discloses one of CPUs 207 and 208 broadcasting to CAN buses 202 to 205 a message *received from one of buses 210 and 211*. Because this is the only theory upon which Petitioner relies to show disclosure of limitation 1.7, Petitioner has failed to show that Staiger discloses this limitation.

2.  *Evidence Discussed in the Majority Decision*

Although the majority finds Petitioner has shown with sufficiency that Staiger discloses this limitation, the majority relies not on express disclosure—which, for reasons expressed above, Staiger lacks—but, rather

10

Case IPR2017-01519
Patent 8,566,843 B2

on what a person of ordinary skill in the art would have inferred Staiger discloses. Majority Dec. 35–36. However, as discussed above and below, it is my view that the record lacks sufficient argument and evidence to draw the inferences necessary for Petitioner to prevail.

### 3. Dr. Miller's Testimony

To support its decision, the majority relies on an admission by Patent Owner's expert, Dr. Miller, that "the message *coming through* CPU 207 and 208 has to be broadcasted to the CAN busses 202 to 205 identically." Majority Dec. 35–36 (citing Ex. 1031, 112:2–4). Based on this testimony, the majority "understand[s] Staiger to teach the broadcast of messages *received by* CPUs 207 and 208 to CAN busses 202–205, as Petitioner asserts." *Id.* at 36 (emphasis added). I respectfully disagree that Staiger discloses the broadcast of messages *received by* CPUs 207 and 208 to CAN buses 202–205. As discussed above, the disclosure upon which the majority relies states that the broadcasted messages are *generated by* one of CPUs 207 and 208. Ex. 1004, ¶ 51. Moreover, even if it were true that Staiger discloses that the messages broadcasted by CPUs 207 and 208 are *received by*, rather than *generated by*, the CPUs, there is no explanation as to how Dr. Miller's testimony, and the majority's understanding, leads to any inference that the received message is from one of *buses 210 and 211*, as required under Petitioner's theory. The majority does not, in citing Dr. Miller's testimony, concede that Staiger expressly discloses that the broadcasted message comes from buses 210 and 211. Majority Dec. 35–36 (the majority stating that it "understand[s] Staiger to teach the broadcast of messages received from CPUs 207 and 208 to CAN busses 202–205," but omitting discussion of the message coming from buses 210 and 211).

11

Case IPR2017-01519
Patent 8,566,843 B2

Petitioner attempts, in its Reply, to rely on this testimony by Dr.
Miller to support the argument that "Staiger's system does share information
. . . for example, from busses 210 and 211 to busses 202 to 205," and
"Staiger discloses that 'the messages' on busses 210 and 211 is 'coming
through CPU 207 and 208 to be broadcasted to the CAN busses 202 to 205
identically.'"  Reply 18 (citing Ex. 1031, 111:19–112:4).  However, as
discussed below, Dr. Miller's testimony does not support these assertions.

Petitioner takes out of context Dr. Miller's testimony that "the
message coming through CPU 207 and 208 has to be broadcasted to the
CAN busses 202 and 205 identically," arguing that this testimony supports
Petitioner's interpretation of Staiger as disclosing that messages on
buses 210 and 211 come through CPU 207 and 208 and have to be
broadcasted to CAN buses 202 to 205 identically.  *Id.*  First, Dr. Miller never
testifies that messages coming through CPUs 207 and 208 are received from
buses 210 and 211.  Rather, Dr. Miller reads verbatim a sentence in Staiger
that neither party disputes, namely that Staiger discloses an exemplary
scenario in which a message *generated by one of CPUs 207 and 208* has to
be broadcasted to several CAN buses 202 to 205 identically, and confirms
what he had read.

> Q    My question was: Does Staiger disclose that CPU 207
>      and 208 communicate through bus adapters 214, 215,
>      216, and 217?
>
>      THE WITNESS: I don't see that it specifically says that.
>      The sentence that I see here, which I read earlier in
>      paragraph 51 says, "A message generated by one of the
>      CPUs 207 and 208 has to be broadcasted to several CAN
>      busses 202 to 205 identically."

Case IPR2017-01519
Patent 8,566,843 B2

Q       BY MR. DAMON [Petitioner's counsel]: And from
        Figure 2, how would CPUs 207 and 208 communicate
        with busses 202 through 205?  For simplicity, you can
        pick any one from 202 to 205.  You don't have to explain
        all four of them.

        THE WITNESS: Well, somehow it has to make it on
        to—what is that?—bus 222.  I'm looking at the
        specification, the multiplexer 222.

Q       BY MR. DAMON: And in Figure 2, do you see any other
        lines between 207 and 208 that CAN busses 202
        through 205 also communicate through that is not the
        multiplexer 222?

A       No, I don't.

BY MR.DAMON [Petitioner's counsel]: But you agree that
        CPUs 207 and 208 can communicate with CAN
        busses 202 to 205?

        THE WITNESS: Again, the sentence says in
        paragraph 51, "CPUs 207 and 208 has to be broadcasted
        to several CAN busses 202 to 205 identically."

Q       BY MR. DAMON: Is that a yes or no?

A       So the message coming through CPU 207 and 208 has to
        be broadcasted to the CAN busses 202 to 205 identically.

Ex. 1031, 110:15–112:9 (counsel objections omitted).  Although this

testimony confirms that Staiger discloses one of CPUs 207 and 208

broadcasting a message to CAN buses 202 to 205 identically, there is

nothing in this testimony about the message being received *from buses 210*

*or 211*.  Moreover, whatever may have been meant by the particular

phrasing used by Dr. Miller, namely "[s]o the message *coming through*

CPU 207 and 208," it does not override the disclosure of Staiger, which says

Case IPR2017-01519
Patent 8,566,843 B2

nothing about the messages being broadcasted as *coming through* CPUs 207 and 208, but rather states that CPU 207 or 208 *generates* the message. Ex. 1004, ¶ 51.

Rather than concede that the message to be broadcasted comes through buses 210 and 211, in the very next line, omitted by Petitioner and not discussed in the majority decision, Dr. Miller states that the message is *generated* by CPUs 207 and 208.  *Id.* at 112:7–8.  Later in this line of questioning, Dr. Miller clarifies several times that he does not admit that Staiger discloses any conversion between protocols, e.g., that a message coming in from bus 210 or 211 in FireWire or MOST format is converted by CPU 207 or 208 for broadcast to CAN buses 202 to 205.  *Id.* at 119:7–8 ("I'm not admitting anything about conversions coming in with Staiger and Figure 2); *id.* at 119:16–18 ("I'm not admitting that there's any conversion going on between the protocols going out on any of the wires"); *id.* at 109:23–110:3 ("But I want to clarify something here because I don't want my answers to be taken out of context and misrepresented.  Nowhere does Staiger disclose that a message of a certain format is coming in, being converted, and going back out on a different line as a different protocol."). For the foregoing reasons, contrary to Petitioner's assertion, Dr. Miller's testimony does not support an inference that in Staiger's system CPUs 207 and 208 broadcast a message *from buses 210 and 211* to buses 202 to 205. Therefore, it is my view that Dr. Miller's testimony, when taken in context, does not support Petitioner's overall assertion that Staiger discloses limitation 1.7.

Case IPR2017-01519
Patent 8,566,843 B2

4.     *Staiger's Disclosure of Processing Messages and Forwarding the Result to a Destination Unit Using Multiplexing*

It is not clear that the majority relies on any additional evidence, other than Dr. Miller's single statement about messages coming through CPUs 207 and 208—which Petitioner takes out of context—to arrive at its finding as to the inferences a skilled artisan would have made, namely that Staiger discloses broadcasting messages received from buses 210 and 211. The majority states Staiger's disclosure necessarily is evaluated in the context of the reference as a whole, and references disclosure about processing messages that are multiplexed, but this appears to go toward an issue raised by Patent Owner as to whether multiplexing can be considered a form of "sharing information," rather than to whether Staiger discloses broadcasting messages received from buses 210 and 211. Majority Dec. 36 ("Petitioner addresses this multiplexing aspect in its Reply, an argument we find properly responsive to Patent Owner's contentions that 'Staiger only describes a type of multiplexing,' and that 'the Patent does not suggest that multiplexing is a form of sharing.'"). In any event, this discussion does not mention buses 210 and 211. It states that Staiger describes message processing, noting that after a message to be processed is received, it is determined the kind of treatment to be performed with the received message, and that the result of the message processing is forwarded to a destination unit. *Id.* However, even though Staiger discloses processing received messages and sending out the results, Staiger still lacks disclosure that the received messages to be processed come in from buses 210 and 211. In view of this lack of disclosure, it is my view that to satisfy its burden *Petitioner* needs to provide at least some explanation as to why a skilled

Case IPR2017-01519
Patent 8,566,843 B2

artisan would have inferred that the messages processed by Staiger's system come in through buses 210 and 211.

Moreover, Staiger's disclosure of message processing highlights an additional, significant failure of Petitioner's arguments. As discussed above, limitation 1.7 refers to code for causing sharing of *the information*, which must be the same *information* recited in limitation 1.1 that is associated with a received message. However, the message output by Staiger's system, e.g., the message it shares, is not the same message it receives. Staiger discloses its system receiving a message, and *processing* the message. Ex. 1004, ¶¶ 32–33, 35. The processing includes performing computations on data in the message, and "assembl[ing] a *new* message" from the data that results from processing the message that was received, and outputting the new message. *Id.* ¶ 44; *id.* ¶ 33 (after analyzing an incoming message, "the message is subject of the second process that is called 'dynamic process'"); *id.* ¶ 35 ("output[ing] a message 112 as a result of the computation of the incoming message 102"). Processing of messages, and outputting a *new* message is not merely an embodiment of Staiger. It is described as the invention. *Id.* ¶ 15 (in the Summary of Invention, "[t]he method focuses on message processing . . . [f]irst, a message to be processed is received and it is determined the kind of treatment to be performed with the received message" and "once a process execution unit is available for processing", then "the determined treatment gets performed . . . [f]inally the result of the message processing is presented to be forwarded to the destination unit."); *id.* at [57] ("The message processing device according to the present invention includes a first execution unit for receiving a message to be processed and determining the kind of treatment to be performed with the

16

Case IPR2017-01519
Patent 8,566,843 B2

received message, a second execution unit for performing the determined treatment, and a third execution unit for presenting the result of the message processing to be forwarded to a destination unit.").

Therefore, even if a message received by one of CPUs 207 and 208 "came through" from one of buses 210 and 211, as argued by Petitioner, Staiger's teachings taken as a whole indicate that the message would not be broadcasted to CAN buses 202 to 205. Rather, the message would be processed, and a *new*, *different* message resulting from the processing would be sent to CAN buses 202 to 205. Accordingly, *the information* that is shared would not necessarily be the same *information* that is associated with the received message, as required by limitations 1.1 and 1.7. It is Petitioner's burden to show the information is the same. Petitioner does not identify what it contends to be *the information* associated with the received message, nor explain how Staiger discloses that this information is in the output message. Pet. 26. Petitioner does not discuss Staiger's disclosure that the ouput message is new, and not the same as the received message, nor explain why a skilled artisan would have inferred, nonetheless, that the information in the new output message is the same as the information in the received message. *Id.* For this additional reason, I would find that Petitioner has not satisfied its burden to show unpatentability.

5.    *Multiplexing as Sharing; Shared Information; Identically*

The remainder of the discussion by the majority regarding limitation 1.7 does not relate to whether the message broadcast by one of CPUs 207 and 208 is received from one of buses 210 and 211. The majority addresses arguments raised by Patent Owner as to whether multiplexing is a form of sharing, whether *the information* in limitation 1.7 must be stored as

Case IPR2017-01519
Patent 8,566,843 B2

recited in limitation 1.5, and whether broadcasting a message "identically"
to CAN buses 202 to 205 means that Staiger's system is incapable of
converting data so as to be available in two protocols.  Majority Dec. 36–38.
This discussion by the majority does not appear to include any additional
evidence or considerations leading to the majority's finding that Staiger
discloses that the message broadcast by one of CPUs 207 and 207 is
received from one of buses 210 and 211.

<p align="center">6.     Summary</p>

For the foregoing reasons, I would find that Petitioner has not set forth
sufficient evidence and argument that Staiger discloses limitation 1.7 of
claim 1.  In particular, Staiger does not expressly disclose this limitation, and
Petitioner has not set forth argument and evidence sufficient to show that a
skilled artisan would have inferred that Staiger discloses it.  Therefore, it is
my view that Petitioner has not established, by a preponderance of the
evidence, that claim 1 is unpatentable.  Also, for similar reasons, as
discussed *supra* Section II.B., it is my view that Petitioner has not
established, by a preponderance of the evidence, that claims 2–47, 49, and
50 are unpatentable.

<p align="center">C.     Claim 48</p>

For reasons that follow, I would find that Petitioner has not shown
that "Staiger and/or Millsap" discloses limitation 48.7 of claim 48, as
Petitioner asserts.  Pet. 84–86.  As a result, it is my view that Petitioner has
not established, by a preponderance of the evidence, that claim 48 is
unpatentable as obvious over the combination of Staiger, Millsap, and
Wong.

Case IPR2017-01519
Patent 8,566,843 B2

### 1.   Discussion

"[48.1] code for receiving information associated with a message received utilizing a first network protocol associated with a first network"

[48.7] wherein the computer program product is operable such that the information is capable of being shared in real-time utilizing a control unit that includes a plurality of interfaces including:"

Petitioner contends Staiger and/or Millsap discloses limitation 48.7. Pet. 84–86.  The recitation "the information" in this limitation refers to the "information" recited in limitation 48.1.  In its argument for limitation 48.1 Petitioner relies only on Staiger, arguing that "Staiger discloses receiving messages."  Pet. 76 (citing Ex. 1004[8] ¶¶ 15, 32, 35).  I agree that Staiger discloses receiving messages.  The Summary of Invention states "[f]irst, a message to be processed is received and it is determined the kind of treatment to be performed with the received message."  Ex. 1003 ¶ 15.  Also, in connection with Figure 1, which illustrates three-steps for processing received messages, Staiger describes a first process called an "initializing process" in which an incoming message is analyzed.  *Id.* ¶ 32.  Staiger discloses that in the third process, the "presentation process," presentation process ("PP") execution unit 110 outputs a message that results from computations performed on the incoming message.  *Id.* ¶ 35.  However, although Petitioner argues that Staiger discloses receiving a message, Petitioner does not specify what it contends is *the information* associated with the message, as recited in limitation 48.1.  Pet. 76.

---

[8] Petitioner erroneously cites to Exhibit 1003, the declaration of Dr. Madisetti, rather than to Ex. 1004, Staiger.

19

Case IPR2017-01519
Patent 8,566,843 B2

Patent Owner argues, and I agree, that Petitioner has not shown that information associated with Staiger's received message is the same as the information in Staiger's outgoing message.  PO Resp. 39.  As I discussed above, the message Petitioner identifies as the received message to satisfy limitation 48.1 is Staiger's incoming message.   Pet. 76 (citing Ex. 1004 ¶¶ 15, 32, 35).  This message, after it is received, for example by block 102 in Figure 1, is processed by Dynamic Process ("DP"), which includes three execution units that can run sequentially or in parallel.  Ex. 1004, ¶¶ 15, 33, 56.  Staiger explains that the DP execution units perform tasks and computations on the information in the incoming message, and a *new* message is generated that includes the *results* of the computations.  *Id.* ¶¶ 35, 47, 56.  Therefore, the new, output message in Staiger that Petitioner relies on for disclosure of sharing "the information" is not the same message, *and has not been shown to include the same information*, as the input message that Petitioner relies on for disclosure of limitation 48.1's recitation of "information."  Petitioner does not explain why or how information in Staiger's new, output message, which results from computations performed on information in the received input message, is the same information associated with the input message.

In particular, Petitioner does not identify what it contends to be *the information* associated with the received message, nor explain how Staiger discloses that this information is in the output message.  The majority decision presents a theory regarding how Staiger discloses sharing *the information*, Majority Dec. 38–40, but this theory is not presented in the Petition.  In particular, the majority finds that the processing performed in Staiger "may prepare the received information for distribution with Staiger's

20

Case IPR2017-01519
Patent 8,566,843 B2

multiplexing technique," and finds that "there is no indication that the informational content of the message is changed." *Id.* at 39–40. However, it is my view that the majority has not applied the burdens correctly.

As discussed above, the majority finds that there is no indication that the informational content of the received message is changed in the new message. Majority Dec., 39. However, in assessing whether Petitioner has satisfied its burden, the relevant inquiry is not whether Staiger indicates or specifies with particularity which information in the new message is changed. Rather, in light of Staiger's disclosure that a "*new*" message is assembled based on the results of processing a received message, Ex. 1004, ¶¶ 15, 33, 35, 47, Petitioner bears the burden of identifying information in the received message that it contends is not changed, which Petitioner does not do, and of showing that this information is in the new message, which Petitioner does not even argue.

Also, I do not find the evidence upon which the majority relies to be persuasive. To support its finding that Staiger does not indicate that the informational content of a received message is changed in the new message, the majority relies on Staiger's disclosure of a set of registers for storing "message specific information specifying the contents of the received message." Majority Dec., 40 (quoting Ex. 1004, ¶ 15). The majority finds that this description indicates that Staiger "appears to take steps to preserve the informational content through storage in a set of registers." *Id.* at 39–40. However, another interpretation is that the set of registers is not for preserving informational content, but rather is for providing storage that is convenient for the DP execution units to access so that they may execute computations on the information. First, Staiger does not expressly say that

21

Case IPR2017-01519
Patent 8,566,843 B2

the registers store informational content from received messages in order to preserve it for later insertion into the *new* message.  Second, rather than store information for later insertion into a *new* message, Staiger describes using the registers to store data needed by the dynamic process "for the computation of received messages."  Ex. 1004, ¶ 41.  Staiger discloses

> control engine 224 is connected to the interrupt bus 220 and further possesses a connection to execution tag registry 238 which is included in a DP (dynamic process) execution unit 239 and store data needed for the computation of the received messages.  The execution tag registry 238 itself is connected to a first, a second, and a third execution unit 240 and 244 which can access a register pool for storing data and exchanging data among the execution units 240 to 244.

*Id.*  Accordingly, I interpret Staiger's disclosure to indicate that the registers are for storing information that is to be changed, i.e., to be computed on, by dynamic processes.  Regardless of whose interpretation is correct, Petitioner bears the ultimate burden of persuasion.  Petitioner does not present any evidence or argument on the issue of how the registers in Staiger are used.

For the foregoing reasons, I would find that Petitioner has not shown sufficiently that Staiger discloses limitation 48.7.

Petitioner also contends that to the extent Staiger does not teach this limitation, Millsap does.  Pet. 86.  However, Petitioner does not specify with particularity how Millsap teaches or suggests this limitation.  Petitioner asserts that this limitation is taught by Millsap "for similar reasons discussed above for element 1.8," without providing any additional explanation.  *Id.* at 86 (citing Pet., Section VI.B.1.a).  But limitation 1.8 is substantially

Case IPR2017-01519
Patent 8,566,843 B2

different from limitation 48.7.  Limitation 1.8 recites "wherein the computer program product is associated with an electronic control unit with a plurality of interface portions including."  In particular, this limitation does not describe sharing the information.  Petitioner, therefore, places the burden on the Board to sift through the Petition's discussion of limitation 1.8 in order to ascertain Petitioner's assertions as to limitation 48.7—a task which is not the Board's burden to undertake.  Our rules require that a petition specify with particularity where each element of a claim is found in the prior art, and include a detailed explanation of the relevance of the prior art to the claim. 37 C.F.R. § 42.104(b)(4); *id.* § 42.22(a)(2); *id.* § 42.104(b)(5).  As the Federal Circuit has explained, "[i]n an IPR, the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d at 1363. Petitioner's reference to its discussion of a dissimilar claim limitation fails to specify with particularity how Millsap discloses limitation 48.7.

### 2.   *Summary*

For the foregoing reasons, I would find that Petitioner has not set forth sufficient evidence and argument that either Staiger or Millsap discloses limitation 48.7 of claim 48, as asserted by Petitioner.  Therefore, it is my view that Petitioner has not established, by a preponderance of the evidence, that claim 48 is unpatentable.

### III.   CONCLUSION

The majority decision reaches the incorrect conclusion that Petitioner has established, by a preponderance of the evidence, that claims 1–50 are unpatentable.  From the majority's contrary decision, I respectfully dissent.

Case IPR2017-01519
Patent 8,566,843 B2


PETITIONER:

James M. Glass
Brett N. Watkins
Richard A. Lowry
QUINN EMANUEL URQUHART & SULLIVAN, LLP
jimglass@quinnemanuel.com
brettwatkins@quinnemanuel.com
richardlowry@quinnemanuel.com


PATENT OWNER:

Thomas H. Kramer
O'KELLY ERNST & JOYCE, LLC
tkramer@oeblegal.com

Thomas Meagher
Alan C. Pattillo
MEAGHER EMANUEL LAKS GOLDBERG & LIAO, LLP
tmeagher@meagheremanuel.com
cpattillo@meagheremanuel.com