## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **STRAGENT, LLC,** | |
| *Plaintiff,* | **Case No. 1:20-cv-00510-JDW** |
| v. | |
| **BMW OF NORTH AMERICA, LLC, et al.,** | |
| *Defendants.* | |
| **STRAGENT, LLC,** | |
| *Plaintiff,* | **Case No. 1:20-cv-00511-JDW** |
| v. | |
| **MERCEDES-BENZ USA, LLC, et al.,** | |
| *Defendants.* | |
| **STRAGENT, LLC,** | |
| *Plaintiff,* | **Case No. 1:22-cv-00293-JDW** |
| v. | |
| **VOLVO CAR USA, LLC,** | |
| *Defendant.* | |

## <u>MEMORANDUM</u>

In this series of related lawsuits, Stragent, LLC alleges that various car manufacturers, including Defendants BMW of North America, LLC, BMW Manufacturing Co., LLC, Mercedes-Benz USA, LLC, and Volvo Car USA, LLC, infringe four of Stragent's

patents. Those patents relate to automotive electronic control units' sharing of information between different networks that might use different protocols. Stragent contends that the Defendants' manufacture, use, sale, and/or offer for sale of vehicles that contain Automotive Open System Architecture technology infringes those patents. The Parties have submitted to the Court for construction six terms from the four patents in suit, Patent Nos. 9,705,765 (the "'765 Patent"), 10,002,036 (the "'036 Patent"), 10,031,790 (the "'790 Patent"), and 10,248,477 (the "'477 Patent"). The Court held a hearing on June 29, 2022, and now resolves the disputed constructions.

I.     **LEGAL STANDARD**

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWS Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quotation omitted). Claim construction is a matter of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837 (2015). "[T]here is no 'magic formula or catechism'" for construing a patent claim, nor is a court "barred from considering any particular sources or required to analyze sources in any specific sequence[.]" *Phillips*, 415 F.3d at 1324. Instead, a court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.* (citation omitted).

A court generally gives the words of a claim "their ordinary and customary meaning", which is the "meaning that the term would have to a person of ordinary skill in

the art at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (quotations omitted). Usually, a court first considers the claim language; then the remaining intrinsic evidence; and finally, the extrinsic evidence in limited circumstances. *See Interactive Gift Exp., Inc. v. Compuserve, Inc.,* 256 F.3d 1323, 1331-32 (Fed. Cir. 2001). While "the claims themselves provide substantial guidance as to the meaning of particular claim terms[,]" a court also must consider the context of the surrounding words. *Phillips,* 415 F.3d at 1314. In addition, the patent specification "'is always highly relevant to the claim construction analysis' and indeed is often 'the single best guide to the meaning of a disputed term.'" *AstraZeneca AB v. Mylan Pharms. Inc.,* 19 F.4th 1325, 1330 (Fed. Cir. 2021) (quotation omitted). But, while a court must construe claims to be consistent with the specification, the court must "avoid the danger of reading limitations from the specification into the claim ...." *Phillips,* 415 F.3d at 1323. This is a "fine" distinction. *Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 1186–87 (Fed.Cir.1998). In addition, "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Hill-Rom Svcs., Inc. v. Stryker Corp.,* 755 F.3d 1367, 1372 (Fed. Cir. 2014) (quotation omitted) (alterations in original).

A court may refer to extrinsic evidence only if the disputed term's ordinary and accustomed meaning cannot be discerned from the intrinsic evidence. *See Vitronics Corp.*

*v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996). Although a court may not use extrinsic evidence to vary or contradict the claim language, extrinsic materials "may be helpful to explain scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history." *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 980 (Fed. Cir. 1995). Extrinsic evidence is used "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art[.]" *Phillips,* 415 F.3d at 1318. The Federal Circuit has cautioned against relying upon expert reports and testimony that is generated for the purpose of litigation because of the likelihood of bias. *Id.*; *see also Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 595 (1993) ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.") (quotation omitted).

Ultimately, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be . . . the correct construction." *Renishaw PLC v. Marposs Societa' per Anzioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation[.]" *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1550 (Fed. Cir. 1996), *abrogated on other grounds by*, *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558 (Fed. Cir. 2000), *vacated*, 535 U.S. 722 (2002).

## II.    CONSTRUCTION OF DISPUTED TERMS

### A.    "debugging mode"[1]

| Stragent's Construction | Defendants' Construction | Court's Construction |
| --- | --- | --- |
| "a program or module to detect, locate and fix errors in the system while it is running" | "a mode, distinct from normal operation, that allows the network to run in a fail-safe reduced operation mode or in a diagnostic mode that allows inspection of the system, while it is running" | "a mode, distinct from normal operation, that allows the network to run in a fail-safe reduced operation mode or in a diagnostic mode that allows inspection of the system, while it is running" |

During the claim construction hearing, the Parties agreed that "debugging mode" is "a mode, distinct from normal operation." Given that agreement, the Court adopts that part of Defendants' proposed construction, which is consistent with the claim language and the specification. The patent specifications further explain that "[t]he emergency or debug mode lets the network run in a fail-safe reduced operation mode or in a diagnostic mode that allows inspection of the system, while it is running." ('477 Patent, 11:36-39.[2]) In addition, the Parties have agreed on a construction for "diagnostic mode" that explains

---

[1]    This term appears in Claims 27-28 of the '477 Patent.

[2]    Because each of the four patents in issue have the same common specification, the Parties referred to the '477 Patent's specifications during claim construction. (D.I. 63.) For the ease of reference and sake of consistency, the Court does the same.  Also, when the Court cites to docket entries, it does so in *Stragent v. BMW of North Am. LLC et al.*, No. 20-cv-510.

that that mode "allows inspection of the system while it is running rather than what it does." (D.I. 63, 100.)

The construction of "debugging mode" should parallel the agreed construction of "diagnostic mode" by defining what the mode "allows." The Court can assume that when the inventors described two modes, juxtaposed together in the claim language, they had similar intent. In addition, having consistent constructions of different modes will aid the jury in understanding the claims. So the Court's construction defines what the distinct mode allows based on the language of the specification.

The Court rejects Stragent's alternative proposed approach for several reasons. *First*, it focuses on the definition of "debugging," rather than "debugging mode." Although Stragent complains that the Defendants'' proposed construction does not define what "debugging" is, Stragent did not ask the Court to construe the word "debugging;" it joined in a request to construe "debugging mode." Notably, Stragent agreed to a construction of "diagnostic mode" without seeking to define "diagnostic" or "diagnose." That agreement demonstrates that the construction of a "mode" does not necessarily require the construction of the descriptive word in the name of the mode. Stragent's focus on the word "debugging," rather than "debugging mode," means that its arguments miss the mark. *Second*, Stragent's proposed construction relies almost entirely on extrinsic evidence—a technical definition of "debugging." But Stragent has not shown a need to resort to extrinsic evidence, particularly when the specification speaks to the construction.

6

Contrary to Stragent's arguments, reading the claim term in view of the specification is not the same as limiting the claim to the described embodiment.

Finally, in light of the Parties' agreed-upon construction of "diagnostic mode," Defendants' proposed construction of "debugging mode" makes clear that the two modes are not the same. In fact, the mirroring constructions will make it easier for the jury to understand that while diagnostic mode permits inspection of the system while it is running, debugging mode permits the same inspection but is different because it can also allow the network to run in a fail-safe reduced operation mode. That is, it can do something that diagnostic mode does not do. As a result, this construction does not run afoul of the presumption that "the use of these 'two terms in a claim requires that they connote different meanings.'" *Neville v. Found. Constructors, Inc.*, 972 F.3d 1350, 1357 (Fed. Cir. 2020) (quotation omitted). The Court agrees that both a POSITA and the jury will understand what is meant by a fail-safe reduced operation mode and, therefore, adopts Defendants' proposed construction.

**B.**   **"issue a storage resource request in connection with a storage resource of the automotive electronic control unit"[3]**

| Stragent's Construction | Defendants' Construction | Court's Construction |
|---|---|---|
| No construction is required.<br><br>If construction is required, "make a request in connection with the storage resource of the automotive electronic control unit" | "issue a request for storing information associated with a message in conjunction with the message being received at the automotive electronic control unit/hardware processor"[4] | Plain and ordinary meaning; no construction necessary |

The '036, '790, and '477 Patents describe apparatus and/or system claims that set forth a series of events related to a storage resource request, including the initial request to a storage resource, a determination whether a storage resource is available, and, if so, storage of the information. The claim at issue is directed toward the first step—issuance of the storage resource request—and the plain and ordinary meaning of the disputed term is apparent to the Court, a POSITA, and a jury. Thus, it is not necessary to construe this claim.

The Court rejects Defendants' proposed construction because it imports limitations from elsewhere in the claim. Indeed, the concepts that the storage resource is meant for "storing information associated with a message" after the automotive electronic control

---

[3]   This term appears in Claims 1 and 102 of the '036 Patent, Claims 1 and 15 of the '790 Patent, and Claim 23 of the '477 Patent.

[4]   Defendants revised their proposed construction in their opposition brief. (*See* D.I. 76 at 5.)

unit and/or hardware processor receives the message is addressed in other claim limits. Because the rest of the claim describes those aspects of the apparatus and/or system, there is no need to include those limitations when construing this particular term, which focuses on the first part of the storage resource request process.

For the same reason, the Court does not adopt PTAB's recent construction that this term "at least encompasses checking to see if the storage resource is available." (D.I. 140-1, Ex. A at 10.) That limit appears elsewhere in the '765 Patent. Because the Parties agree that one should construe the disputed claim terms consistently across all of the patents in suit, the Court will not adopt PTAB's construction, which includes a limit that appears elsewhere in the claim.

C.      "determining whether a storage resource is available"[5]

| Stragent's Construction | Defendants' Construction | Court's Construction |
|---|---|---|
| No construction is required.

If construction is required, "ascertain or decide the availability of a storage resource" | "determine the availability of a storage resource for information associated with a message in the automotive electronic control unit in conjunction with the message being received by the automotive electronic control unit"[6] | Plain and ordinary meaning; no construction necessary |

---

[5]      This term appears in Claims 12 and 24 of the '765 Patent.
[6]      Defendants revised their proposed construction in their opposition brief. (*See* D.I. 76 at 7.)

Like the preceding term, the Court need not construe this claim because its plain and ordinary meaning is readily apparent to the Court, a POSITA, and a jury. Thus, it is not necessary to construe this claim. Again, Defendants' proposed construction fails because it seeks to import limitations that appear elsewhere in the claim, making it unnecessary to repeat them as part of this disputed term, which is directed to single step in the overall process.

D.   "re-trying an access in connection with the storage resource"[7]

| Stragent's Construction | Defendants' Construction | Court's Construction |
|---|---|---|
| No construction is required.<br><br>If construction is required, "making another attempt to ascertain or decide the availability of a storage resource" | "again determining whether a storage resource is available after a first determination that a storage resource is not available, for example by issuing another storage resource request in connection with the storage resource" | "making another attempt to ascertain or decide the availability of a storage resource" |

The Court concludes that this term requires construction because the concept of "an access" does not have a clear, obvious meaning. The Parties' proposed constructions align in their understanding that "an access" means a determination of a storage resource's availability, and the Court agrees. In addition, the Parties agree that the concept

---

[7]   This term appears in Claims 12 and 24 of the '765 Patent.

of "retrying" means a second or successive attempt to determine that availability. Although they propose slightly different language, it is really a difference without distinction, as Defendants acknowledged during the claim construction hearing.

The Court rejects the second half of Defendants' proposed construction because it includes an example that could confuse a jury. While Defendants contend that the example would clarify how access may be re-tried, the Court will not call-out one particular embodiment and run the risk that the jury will view that particular embodiment as a requirement. As a result, the Court rejects Defendants' proposed construction.

E. "sharing the information"[8]

| Stragent's Construction | Defendants' Construction | Court's Construction |
|---|---|---|
| "permitting the information stored in a storage resource to be used by another process" | "making the information accessible, without requiring storage of the information"[9] | "making the information accessible" |

The Parties appear to agree that "storing" and "sharing" are different things. Nevertheless, they each introduce the concept of storage in their proposed constructions. The Court sees no reason to do so. Simply put, there is no requirement that the information be stored before it can be shared. *First*, the claim language itself does not

---

[8]    This term appears in Claims 12 and 24 of the '765 Patent, Claims 1 and 102-03 of the '036 Patent, and Claims 1-2, 5, 8-9, 15-16, 20, and 22-24 of the '790 Patent.
[9]    Defendants revised their proposed construction in their opening brief. (*See* D.I. 67 at 12.)

require storing the information before sharing it. *Second*, neither the specifications nor the accompanying figures require that information be stored before it can be shared. *Third*, though not binding on this Court, the PTAB concluded that the same term in parent patent(s) did not require that the information be stored.

Because neither the claim language nor the intrinsic evidence explains what it means to "share" the information, the Court may rely on extrinsic evidence for guidance. *See Vitronics*, 90 F.3d at 1584 n.6. Stragent points to the technical definition of "share," which means "[t]o make files, directories, or folders accessible to other users over a network." *Microsoft Computer Dictionary*, 477 (5th Ed. 2002); *see also Newton's Telecom Dictionary*, 1133 (30th Ed. 2016) (defining "share" as "[t]o make resources ... available to network users"). This definition is consistent with the Parties' respective proposals that sharing refers to "permitting the information ... to be used by another process" and "making the information accessible." However, the Court adopts Defendants' proposed construction because it is the simpler of the two and is more consistent with the technical definition of "sharing."

The Court will not adopt the remaining portion of Defendants' proposed construction: "without requiring storage of the information." The "explicit claim language" does not support this negative limitation. *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1322 (Fed. Cir. 2003). Nor have Defendants "identified any express disclaimer or independent lexicography in the written description that would justify adding that

negative limitation." *Id.* at 1323. Because none of the accepted bases for importing a negative limitation is present here, the Court will not adopt this portion of Defendants' proposal.

Likewise, the Court will not adopt Stragent's proposed construction because it rests on a misunderstanding of the term "the information." Although the claims are not identical, claim 1 in the '790 Patent provides a representative sample of the claim language at issue. The first reference to "information" in that claim is "information associated with a message received …." ('790 Patent, 12:44-45.) Subsequent references to "the information" in the claim refer back to that first reference. Stragent contends that the information must have been "stored" (D.I. 66 at 15), but the claim language does not impose that requirement. To the contrary, the claim discusses the possibility that the apparatus will not store the information "in the event the storage resource is not available." (*E.g.*, '790 Patent 12:65.) Most importantly, the sharing of information occurs pursuant to claim limits separate from the limits that discuss accessing storage resources, so in theory one could satisfy limits concerning sharing without first requiring storage. Thus, Stragent's proposed construction that the information being shared must first have been stored, is at odds with the plain language of the patent.

F.     "configure the data structure of the nonvolatile memory"[10]

| Stragent's Construction | Defendants' Construction | Court's Construction |
|---|---|---|
| "Allocate memory, and/or implement the relationships between the data elements and/or the allowable functions" | "make a change to the data structure of the non-volatile memory" | "choose options for organizing data in the nonvolatile memory" |

The claim language does not explain the disputed terms: "configure" and "data structure." Likewise, while both Parties point to the '477 Patent's specifications for support, this intrinsic evidence does not provide any guidance as to how to construe these terms. Because the intrinsic evidence does not help the Court discern the terms' ordinary and accustomed meaning, the Court turns to applicable definitions. In the technical sense, "[t]o 'configure' is to choose options in order to create a custom system." *The Computer Glossary*, 73 (9th Ed. 2001). "To choose options" is broad enough to encompass both updating and making changes. In turn, "data structure" refers to how data is organized. *See McGraw-Hill Dictionary of Scientific and Technical Terms*, 550 (6th Ed. 2003) ("A collection of data components that are constructed in a regular and characteristic way."); *Microsoft Computer Dictionary*, 477 (5th Ed. 2002) ("An organization scheme, such as a record or array, that can be applied to data to facilitate interpreting the data or performing operations on it."); *The Computer Glossary* at 92 ("The physical layout of data."). Given

---

[10]     This term appears in Claim 23 of the '477 Patent.

these definitions, the Court will construe the disputed term as: "choose options for organizing data in the nonvolatile memory."

Defendants' proposal rests on an assumption that the configuration described in the disputed claim term occurs in "configuration mode," but they do not point to anything in the intrinsic evidence to support that assumption. Even if Defendants are correct that any configuration of the data structure occurs in configuration mode, they do not offer any explanation why the Court should construe the term to refer to making a change, as opposed to making an update. The specification discloses updating as an action that can happen in configuration mode. (*See* '477 Patent, 10:9-12, 11:28-33.) Despite this, Defendants argue that "configure" must mean "change." Finally, Defendants do not propose any construction for "data structure."

Stragent's reliance on intrinsic evidence also falls short. The specification on which Stragent relies describes a bulletin board embodiment and discloses that "[t]he bulletin board manager (501) contains an upgrade and configuration manager (507)" that "is necessary to configure the data structure of the bulletin board …." ('477 Patent, 4:39-44.) This specification sheds no light on what "configure" or "data structure" means. Instead, it tracks the language of the claim itself, which is not helpful. Beyond that, Stragent bases its argument on extrinsic evidence, but its proposed construction has no connection to the extrinsic evidence that it cites. In short, Stragent gives the Court no reason to adopt its construction.

III.    **CONCLUSION**

The Court will construe the disputed claims as described above, and it will adopt

the Parties' agreed-upon constructions. An appropriate Order follows.

**BY THE COURT:**


*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

**Date**:  August 9, 2022